No. 23-60284

In the
# United States Court of Appeals
## for the Fifth Circuit

**MORRIS & DICKSON CO., LLC,**

*Petitioner,*

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**

*Respondent.*

On Petition for Review of an Order of the
Drug Enforcement Agency

# OPPOSED MOTION FOR STAY PENDING
# PETITION FOR REVIEW

Jim Walden
John Curran
Veronica M. Wayner
James Meehan
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, NY 10281
(212) 335-2030
jwalden@wmhlaw.com

Jeffrey R. Johnson
    *Counsel of Record*
Harry S. Graver
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
jeffreyjohnson@jonesday.com

*Counsel for Petitioner Morris & Dickson Co., LLC*

## CERTIFICATE OF INTERESTED PERSONS

### No. 23-60284, *Morris & Dickson Co., LLC v. U.S. Drug Enforcement Administration*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Petitioner Morris & Dickson Co., LLC is a Louisiana limited liability company. Its parent company is Morris & Dickson Holding Co. L.L.C., a Louisiana limited liability company.

2.    The owners of Morris & Dickson Holding Co. L.L.C. are individual members of the Dickson family and their trusts. *See* 5th Cir. R. 28.2.1 ("If a large group of persons or firms can be specified by a generic description, individual listing is not necessary.").

3.    Respondent United States Drug Enforcement Administration is a federal agency.

| Petitioner | Counsel |
|---|---|
| Morris & Dickson Co., LLC | Jeffrey R. Johnson<br>Megan Lacy Owen<br>Harry S. Graver<br>JONES DAY<br>51 Louisiana Ave., N.W.<br>Washington, D.C. 20001<br>(202) 879-3939<br>jeffreyjohnson@jonesday.com<br><br>Jim Walden<br>John Curran<br>Veronica M. Wayner<br>James Meehan<br>WALDEN MACHT & HARAN LLP<br>250 Vesey Street, 27th Floor<br>New York, NY 10281<br>(212) 335-2030<br>jwalden@wmhlaw.com |
| **Respondent** | **Counsel** |
| United States Drug Enforcement Administration | Hallie Hoffman<br>Paul Dean<br>David M. Locher<br>Dayle Elieson<br>Timothy J. Shea<br>Office of Chief Counsel<br>U.S. DRUG ENFORCEMENT ADMINISTRATION<br>8701 Morrissette Drive<br>Springfield, VA 22152<br>(571) 776-2840 |

Joshua M. Salzman
Anna M. Stapleton
Civil Division, Appellate Staff
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
(202) 514-3511
joshua.m.salzman@usdoj.gov

Dated: June 2, 2023                    */s/* Jeffrey R. Johnson
                                       *Counsel of Record for Petitioner*
                                       *Morris & Dickson Co., LLC*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

TABLE OF AUTHORITIES ................................................................. v

MOTION FOR STAY PENDING PETITION FOR REVIEW ................. 1

BACKGROUND ................................................................................ 2

LEGAL STANDARD FOR MOTION TO STAY ................................... 7

ARGUMENT ................................................................................... 8

I.    MORRIS & DICKSON IS LIKELY TO SUCCEED
      ON THE MERITS ..................................................................... 8

      A.   Morris & Dickson Is Entitled To A New Hearing
           Before A Constitutional Tribunal ...................................... 8

           1.   DEA ALJs Are Unconstitutionally Insulated .................... 9

           2.   ALJ Dorman's Unlawful Insulation Requires
                a New Hearing ............................................................ 11

           3.   ALJ Dorman's Unconstitutional Appointment
                Similarly Demands a New Hearing ............................... 13

      B.   The Order Is Arbitrary and Capricious ............................ 17

           1.   The Order Is Unreasoned on Its Own Terms ................. 18

           2.   The Order Is Likely Pretextual .................................... 22

II.   MORRIS & DICKSON WILL SUFFER IRREPARABLE
      HARM ABSENT A STAY .......................................................... 24

III.  THE PUBLIC INTEREST FAVORS A STAY AND DEA
      WILL SUFFER NO PREJUDICE FROM ONE .............................. 26

CONCLUSION ................................................................................ 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Armendariz-Mata v. U.S. DOJ, DEA,*
82 F.3d 679 (5th Cir. 1996) .................................................. 25

*Axon Enter., Inc. v. FTC,*
143 S. Ct. 890 (2023) ................................................... 5, 15

*Bowsher v. Synar,*
478 U.S. 714 (1986) .................................................... 12

*Burgess v. FDIC,*
871 F.3d 297 (5th Cir. 2017) ............................................ 9

*Campaign for S. Equality v. Bryant,*
773 F.3d 55 (5th Cir. 2014) ............................................. 8

*Cardinal Health, Inc. v. Holder,*
846 F. Supp. 2d 203 (D.D.C. 2012) ................................... 18

*Carr v. Saul,*
141 S. Ct. 1352 (2021) .............................................. 16, 17

*Chapman v. California,*
386 U.S. 18 (1967) .................................................... 13

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
51 F.4th 616 (5th Cir. 2022) ........................................... 12

*Cochran v. SEC,*
No. 19-10396 (5th Cir. Sept. 24, 2019) (per curiam) ................. 9

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ................................................ 12

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ................................................ 22

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) ................................................ 22

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) ................................................ 9, 12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) .......................................................... 27

*Hassman v. Off. of the Deputy Adm'r*,
   515 F. App'x 667 (9th Cir. 2013) ..................................................... 18

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022) ......................................................... 9, 10

*Jones Total Health Care Pharmacy, LLC v. DEA*,
   881 F.3d 823 (11th Cir. 2018) ......................................................... 21

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ............................................................. 3, 13, 14

*Masters Pharm., Inc. v. DEA*,
   No. 15-1335 (D.C. Cir. Oct. 14, 2015) (per curiam) ............................. 7

*Morris & Dickson Co. v. Whitaker*,
   360 F. Supp. 3d 434 (W.D. La. 2018) ............................................ 4, 15

*Morris & Dickson Co., LLC v. Sessions*,
   No. 18-cv-605, 2018 WL 2393013 (W.D. La. May 8, 2018) .................. 3

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) ................................................................. 12

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................. 8, 26

*R.J. Reynolds Vapor Co. v. FDA*,
   65 F.4th 182 (5th Cir. 2023) ........................................................... 7

*Ryder v. United States*,
   515 U.S. 177 (1995) ...................................................................... 11

*Stern v. Marshall*,
   564 U.S. 462 (2011) ...................................................................... 12

*Thompson v. U.S. Dep't of Lab.*,
   885 F.2d 551 (9th Cir. 1989) ........................................................ 18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Weaver v. Massachusetts*,
 137 S. Ct. 1899 (2017) ...................................................................... 11

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. art. II, § 1 ....................................................................... 9

U.S. Const. art. II, § 3 ....................................................................... 9

5 U.S.C. § 1202 ................................................................................ 10

5 U.S.C. § 7521 ................................................................................ 10

21 U.S.C. § 823 ................................................................................ 18

**OTHER AUTHORITIES**

88 Fed. Reg. 34,523 (May 30, 2023) ............................................... *passim*

Joshua Goodman & Jim Mustian, *DEA chief faces probe into
 'swampy' hires, no-bid contracts*, AP News (Apr. 19, 2023) ............... 23

*Howard N. Robinson, M.D.; Decision & Order*,
 79 Fed. Reg. 19,356 (Apr. 8, 2014) ................................................ 21

*Leo R. Miller, M.D.; Revocation of Registration*,
 53 Fed. Reg. 21,931 (June 10, 1988) .............................................. 21

## **MOTION FOR STAY PENDING PETITION FOR REVIEW**

On May 30, 2023, the United States Drug Enforcement Administration entered a Final Order revoking Morris & Dickson Co., LLC's registrations to distribute controlled substances. 88 Fed. Reg. 34,523 (May 30, 2023) (the "Order," or Ex. A). Unless stayed, the Order will force Morris & Dickson to close after more than 180 years in business. Ex. A, 34,542-43. Not only is the Order's harm impending, concrete, and catastrophic—but it is also the product of a clearly unconstitutional proceeding.

The Order is set to take effect August 28, 2023. But it is necessary for Morris & Dickson to seek a stay now. Absent one soon, as DEA itself acknowledges, Morris & Dickson's "customers and their patients" will take the next 90 days to "find new suppliers" ahead of the Order going into effect. Ex. B, 34,522. Moreover, in filing now, Morris & Dickson ensures that this Court may have adequate time to consider this motion in an orderly and prompt manner—and avoid the emergency briefing that would necessarily follow should current settlement talks falter, and the Order ultimately go into effect. (Counsel for Morris & Dickson have consulted with counsel for DEA, and it opposes this request.)

## BACKGROUND

Morris & Dickson is a wholesale drug distribution company headquartered in Shreveport, Louisiana. Founded in 1841, it remains family owned. It is operated by highly experienced industry professionals. It employs more than six hundred people, and provides pharmaceuticals to thousands of healthcare providers across 29 states.

Before this episode (which occurred more than five years ago), Morris & Dickson had never faced any DEA enforcement action, fine, or penalty in the history of its DEA registrations. And during the relevant period, Morris & Dickson had a productive working relationship with DEA. Between 2014 and 2017, DEA completed a number of audits and reviews of Morris & Dickson, all without issue. In fact, DEA's former Head of its Diversion Control Division later testified that Morris & Dickson's compliance efforts during this time were "passionate, direct, [and] sincere." *See* Ex. C, 861:13-17, 862:12-14.

Nonetheless, on May 2, 2018, DEA suspended Morris & Dickson's registrations through an Order to Show Cause ("OTSC") and Immediate Suspension of Registration ("ISO"), alleging primarily that Morris & Dickson had failed to maintain effective controls against diversion. But

the Western District of Louisiana soon enjoined the ISO on the ground it was likely arbitrary and capricious. *Morris & Dickson Co., LLC v. Sessions*, No. 18-cv-605, 2018 WL 2393013 (W.D. La. May 8, 2018).

Because DEA's OTSC remained in effect, however, Morris & Dickson requested an administrative hearing so that it could contest DEA's charges. DEA assigned Administrative Law Judge Charles Dorman.

Before ALJ Dorman, Morris & Dickson repeatedly raised constitutional challenges to DEA's ALJ appointment and removal processes. *See, e.g.*, Ex. D, 37; Ex. E, 1; Ex. F, 21:1-15. The Supreme Court soon endorsed the former (and withheld judgment on the latter), holding in *Lucia v. SEC* that the SEC's ALJs were "inferior officers" under Article II and thus must be appointed by the President or a Head of Department. 138 S. Ct. 2044, 2055 (2018).

On the heels of *Lucia,* Morris & Dickson noted again in August 2018 that ALJ Dorman had been unlawfully appointed by the DEA Administrator, and suggested that it would file a motion on those grounds if the matter proceeded. Ex. D, 37; Ex. H, 36:7-37:2. Despite Morris & Dickson's concerns, ALJ Dorman continued to preside—holding

hearings, considering submissions, and making significant decisions about the proposed evidence and proposed stipulations of fact. *See, e.g.*, Ex. H, 6:23-7:23 (evidentiary rulings); Ex. I, 4-6 (making relevancy determinations); Ex. J, 2 (excluding stipulations and directing the parties to prepare submissions); *see also, e.g.*, Ex. K (Morris & Dickson supplementing summary of witness' anticipated testimony based on ALJ's prehearing ruling); Ex. L (submitting evidence pursuant to ALJ's order). Much of this occurred before ALJ Dorman's appointment was purportedly ratified by then-Attorney General Sessions on October 25, 2018.

On October 26, 2018, Morris & Dickson filed suit in the Western District of Louisiana to enjoin DEA's administrative proceedings. Ex. E, 1. ALJ Dorman then stayed proceedings pending resolution. Ex. M, 3. Before the Western District, Morris & Dickson alleged that DEA ALJs were not properly appointed, and enjoyed unconstitutional protections against removal. Ex. E, 1.

In December 2018, the District Court dismissed the complaint for lack of jurisdiction, ruling that Morris & Dickson had to proceed through the administrative process first. *Morris & Dickson Co. v. Whitaker*, 360

F. Supp. 3d 434, 452 (W.D. La. 2018). That jurisdictional holding was indisputable error under *Axon Enterprise, Inc. v. Federal Trade Commission*, 143 S. Ct. 890 (2023).

At the restarted administrative proceedings in May 2019, Morris & Dickson renewed its constitutional objections. Ex. F, 21:1-15. In August 2019, ALJ Dorman issued his recommendation, where he proposed revoking Morris & Dickson's DEA registrations. Ex. G, 158.

All the while, Morris & Dickson completely redesigned its compliance regime—spending millions of dollars enhancing its system to a "best in class" standard—and continued to effectively serve the region (including throughout the COVID-19 pandemic). Hatcher Decl. ¶ 22. Morris & Dickson also tried to resolve this matter through settlement. From August 2018 through November 2019, it offered several proposals to DEA. Walden Decl. ¶ 3. Between January 2022 and July 2022 Morris & Dickson and DEA engaged in more productive negotiations, and on three occasions traveled to Virginia for in-person meetings. *Id.* ¶¶ 4-6. By November 18, 2022, the parties had made meaningful headway, and DEA conveyed it could likely agree to one of Morris & Dickson's key requirements. *Id.* ¶ 7. On May 19, 2023, following an unusual six-month

lull in settlement talks, DEA informed Morris & Dickson that it was prepared to resume discussions. *Id.* ¶¶ 10-11.

Inexplicably, however, just one hour later on May 19, the Administrator served Morris & Dickson with a copy of the Order, which adopted the ALJ's recommendation and revoked Morris & Dickson's registrations. *Id.* ¶ 12. The Order came nearly four years after the ALJ issued his recommendation—as well as after Morris & Dickson had overhauled its compliance system; helped Louisiana navigate the COVID-19 pandemic; and appointed a new, experienced Chief Executive Officer, General Counsel, and Chief Compliance Officer. Hatcher Decl. ¶ 22.

On May 20, 2023, Morris & Dickson asked DEA to stay its Order pending this Court's review. On May 23, 2023, the Administrator declined to do so, but delayed its effective date to 90 days after publication. Ex. B, 34,522. The Administrator based this decision on the "potential need for [Morris & Dickson's] customers … to find new suppliers given the revocation of [its] registrations" and the "possibility for renewed settlement negotiations." *Id.*

Given the Order's publication, however, Morris & Dickson cannot wait further without risking near-certain ruin. Absent some assurance Morris & Dickson will be able to challenge the Order in court, its customers will undoubtedly move to find new suppliers in the coming months—as DEA itself acknowledges. *Id.*; Hatcher Decl. ¶¶ 12-15; Casida Decl. ¶¶ 6-11; Hunter Decl. ¶¶ 8-10. To ensure the Order does not destroy the Company before it is declared unlawful, Morris & Dickson seeks a stay. *See, e.g.*, Order, *Masters Pharm., Inc. v. DEA*, No. 15-1335 (D.C. Cir. Oct. 14, 2015) (per curiam) (granting similar stay).

## LEGAL STANDARD FOR MOTION TO STAY

This Court considers four factors to determine whether to stay an agency order pending review: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 188 (5th Cir. 2023). The first two factors "are the most critical," and the last two merge when the government is the

party opposing the stay request.  *Nken v. Holder*, <u>556 U.S. 418, 434-35</u>
(2009).

## ARGUMENT

Morris & Dickson now faces commercial annihilation if this Court
does not stay the agency's unlawful Order pending review.  DEA stands
to lose only the immediate implementation of a sanction that it waited
nearly four years to impose and had no authority to issue.

## I.   MORRIS & DICKSON IS LIKELY TO SUCCEED ON THE MERITS

Morris & Dickson is likely to succeed on the merits by showing both
(A) that DEA conducted an unlawful proceeding before an
unconstitutional ALJ, and (B) that the Administrator acted arbitrarily
and capriciously.  A movant need only present "a substantial case …
when a serious legal question is involved."  *Campaign for S. Equality v.
Bryant*, <u>773 F.3d 55, 57</u> (5th Ci<u>r. 2014</u>).  Morris & Dickson's case is
overwhelming.

### A.   Morris & Dickson Is Entitled To A New Hearing Before A Constitutional Tribunal

DEA conducted its hearing before an ALJ who is unconstitutionally
insulated from removal through a double layer of "for cause" protection,

8

and who DEA retained in violation of the Appointments Clause.  Those defects warrant a stay of the Order that emerged from them.  *See, e.g.*, *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (staying penalty due to Appointments Clause challenge); Order, *Cochran v. SEC*, No. 19-10396 (5th Cir. Sept. 24, 2019) (per curiam) (same for administrative proceeding).

### 1.    DEA ALJs Are Unconstitutionally Insulated

Article II vests "[t]he executive Power" in the President, including ultimate authority to remove officers to ensure that the law is "faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* § 3.  The Supreme Court has held that the Executive's removal power may not be frustrated by more than one layer of "for cause" protection.  *Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010).  And this Court has held that two layers of "for cause" protection insulating ALJs are unconstitutional.  *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).

DEA ALJs' tenure protections are plainly unlawful under *Jarkesy*.  There, this Court held that the multiple layers of "for cause" protection insulating SEC ALJs from executive supervision violated Article II.  *Id.* at 463.  It did so because SEC ALJs "perform substantial executive

functions," yet multiple layers of "for cause" protection impede the President from having "sufficient control over the performance of [those] functions." *Id.*

There is no material difference between SEC ALJs and DEA ALJs. Here, as there, DEA ALJs "exercise considerable power over administrative case records." *Id.* at 464. Here, as there, DEA ALJs "control[] the presentation and admission of evidence." *Id.* And here, as there, DEA ALJs "perform substantial executive functions." *Id.* at 463. The Government has conceded as much, accepting such ALJs as inferior officers. Ex. N, 3.

DEA ALJs enjoy too the same double-layer insulation that this Court held unconstitutional in *Jarkesy*. First, under the Administrative Procedure Act, DEA ALJs (like SEC ALJs) may be removed only "for good cause established and determined by the Merit Systems Protection Board." 5 U.S.C. § 7521(a); *see also Jarkesy*, 34 F.4th at 464 (identifying this as one layer of "for cause" protection). Second, Merit System Protection Board members, in turn, may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d); *see also Jarkesy*, 34 F.4th at 465 (identifying this as second

layer).  Put together, DEA ALJs are insulated by two layers of "for cause"
protection.    That  is  unconstitutional—a  point  the  Order  does  not
acknowledge, let alone try to address.

### 2.    ALJ Dorman's Unlawful Insulation Requires a New Hearing

The proper remedy for this sort of removal problem is a new hearing
before a new, proper adjudicator.  Under the Supreme Court's precedents,
a new hearing is the traditional remedy for separation-of-powers defects
in adjudications.  *See, e.g.*, *Ryder v. United States*, 515 U.S. 177, 182-83
(1995).  That is so because such a defect—whether sounding in removal
or appointment—is akin to structural error; "it 'affect[s] the framework
within which the trial proceeds,' rather than being 'simply an error in the
trial process itself.'"    *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907
(2017).  Here, much as Article III's tenure protections are supposed to
guarantee judges exercise independent judgment, Article II's unitary
structure is supposed to guarantee ALJs exercise their power under the
auspices of the President.  When ALJs are insulated from that hierarchy,
their judgment is inherently compromised—corrupting the adjudication

and necessitating a new hearing.  *Cf. Stern v. Marshall*, 564 U.S. 462, 502-03 (2011); *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986).

Because this matter arises under the APA and in the distinct context of direct review of an specific agency adjudication, this case is thus different in kind from *Collins v. Yellen* (a non-APA case where the Court was asked to unwind the implementation of a hundred-billion-dollar contract years after it had gone into effect), 141 S. Ct. 1761, 1787-89 (2021), or *Community Financial Services Ass'n of America, Ltd. v. CFPB* (where this Court was asked to vacate a generally applicable notice-and-comment regulation), 51 F.4th 616, 633 (5th Cir. 2022).  And more fundamental, here, unlike those cases, the removal restriction is not severable from the officer's authority to act.  *See Collins*, 141 S. Ct. at 1787-88 & n.23.  Congress vested DEA ALJs with power *because* of their independence; their adjudicative authority rises (and falls) with their tenure protections.  A court may not "blue-pencil" the statutory scheme Congress designed, all to fashion a fundamentally *different* scheme in the name of saving part of the *existing* one.  *Free Enter. Fund*, 561 U.S. at 509-10; *see also Murphy v. NCAA*, 138 S. Ct. 1461, 1482-84 (2018).

At minimum, in this context, the burden is on the Government—not Morris & Dickson—to demonstrate that any removal defect was harmless. *See Chapman v. California*, <u>386 U.S. 18, 24</u> (1967). Recall, Morris & Dickson was (erroneously) barred from pursuing a pre-enforcement challenge to the ALJ's constitutional status. If Morris & Dickson is *also* forced to now show prejudice after-the-fact to obtain relief—a nebulous and difficult counterfactual inquiry—the unconstitutional removal restrictions at issue may well escape judicial scrutiny entirely, contrary to precedent. *Lucia*, <u>138 S. Ct. at 2055</u> n.5.

### 3.  ALJ Dorman's Unconstitutional Appointment Similarly Demands a New Hearing

The Appointments Clause independently requires a new hearing. All agree ALJ Dorman is an inferior officer, and thus his initial appointment by the DEA Administrator violated the Constitution. Ex. N, 3. And all agree the remedy for such an Appointments Clause problem is ordinarily a new hearing before a properly appointed ALJ. *Lucia*, <u>138 S. Ct. at 2055</u> & n.5.

It is no answer to this defect to say that ALJ Dorman was ratified midway through proceedings, or that his actions before ratification were

too trivial to trigger *Lucia*'s remedy. This because ALJ Dorman took significant steps *before* he was purportedly ratified. *Supra* at 3 (collecting examples). This is thus a straightforward case under *Lucia*. There, the Supreme Court made plain that parties must receive one hearing before an ALJ who has been previously untainted by the merits. But here, ALJ Dorman had already grappled with the merits before he was purportedly ratified. *See, e.g.*, Ex. H, 19:12-25:24. Given this exposure, it is impossible to say he had the open mind required by *Lucia*. *See* 138 S. Ct. at 2055 n.5. A new hearing is necessary.

DEA engages with none of this. Ex. A, 34,542-43. Instead, the Order's primary (really only) argument is that Morris & Dickson waived its Appointments Clause challenge—the very challenge it voiced repeatedly to ALJ Dorman, and even sued over in federal court. *Id.* at 34,542. That is wrong.[1]

---

[1] It bears note that the Attorney General's purported ratification of ALJ Dorman's appointment is deeply suspect. There is no evidence to support a finding that ratification occurred, let alone evidence that ALJ Dorman took his constitutionally required oath upon receipt of the ratification paperwork; that he received a commission from the President; or that he engaged in any ceremony signifying his appointment.

14

For starters, DEA should not even be heard to press this argument. In convincing the Western District of Louisiana to dismiss Morris & Dickson's request to enjoin the administrative process, DEA asserted over and again that "if [Morris & Dickson] does not prevail before the Administrator, its appointment and removal claims will be subject to review in a court of appeals." Dkt. 24 at 12, *Morris & Dickson Co., LLC v. Sessions*, No. 18-cv-1406 (W.D. La. Nov. 1, 2018).  The district court agreed, rejecting Morris & Dickson's jurisdictional arguments largely because "Morris & Dickson's separation-of-powers challenges w[ould] have their day in court." *Morris & Dickson Co.*, 360 F. Supp. 3d at 448. Having wrongly convinced the district court to take that path, *see Axon*, 143 S. Ct. at 897, DEA cannot renege on its promise that Morris & Dickson's challenge could be heard now.

In any event, DEA is incorrect—Morris & Dickson repeatedly raised this objection.  As detailed above, it noted its constitutional concerns and suggested it would file a motion on the point before ALJ Dorman on August 3, 2018, Ex. D, 37; *filed suit* against DEA raising these constitutional claims on October 26, 2018, Ex. E, 1; obtained a stay of

ALJ proceedings on such grounds, Ex. M, 3; and renewed its objections before ALJ Dorman on May 13, 2019, Ex. F, 21:1-15.

DEA says Morris & Dickson somehow waived its constitutional claims by not "formally request[ing] reassignment" after the administrative proceedings resumed, and suggests all Morris & Dickson needed to do to get a new ALJ was ask. Ex. A, 34,542. That blinks reality. During the litigation where Morris & Dickson sued to raise this very issue, DEA *took the position* ALJ Dorman could continue to preside once proceedings resumed—a position it apparently maintains today. *See* Dkt. 24 at 14 n.5, *Morris & Dickson Co.*, No. 18-cv-1406, *supra* (arguing that ratification "cure[d] any constitutional defect"); Ex. A, 34,542 (same). In other words, the Agency had already told Morris & Dickson that formally seeking reassignment would be rejected. Morris & Dickson was thus under no obligation to pursue that "futil[e]" course. *Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021).

All told, the Agency cites nothing for its counterintuitive view of waiver. Nor could it. A party that repeatedly raises an objection—to say nothing of suing in federal court over it—does not waive that objection. And in all events, the Supreme Court has emphasized that it is

"appropriate for courts to entertain constitutional challenges to statutes … even when those challenges were not raised in administrative proceedings." *Id.* at 1360. Either way, waiver poses no bar to Morris & Dickson's constitutional claims.

## B.    The Order Is Arbitrary and Capricious

The Order is also arbitrary and capricious twice over. To start, the Order is flawed on its own terms. Namely, it uses the wrong frame of reference—it is entirely *backward-looking*—and fails to meaningfully analyze whether Morris & Dickson's current, reformed operations are inconsistent with the public interest *going forward*, as is statutorily required. That omission is telling but not surprising: In waiting four years to issue the Order so as to allow for a settlement (and in delaying the Order's effective date for the same reasons), DEA has effectively conceded Morris & Dickson's revised operations pose no *prospective* threat to the public interest. Indeed, Morris & Dickson has affirmatively benefited the public in recent years (especially during COVID-19), through its enhanced compliance procedures. Nowhere does the Order adequately explain why *those* procedures should be stopped—and that is facially deficient.

Although these defects are sufficient to stay the Order, they are compounded by the specter that the Order's stated rationale is pretextual. The Order justifies its timing and scope on the ground settlement talks had broken down between DEA and Morris & Dickson. Ex. A, 34,540-41 n.92. But that is just not true; and every indication is the real impetus behind the Order was an attempt to get ahead of an upcoming story from the Associated Press. Morris & Dickson plans to seek discovery on these points, should DEA not include all relevant materials in the record. *See, e.g.*, *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989) (administrative record includes "all documents and materials directly or indirectly considered by agency decision-makers").

### 1.  The Order Is Unreasoned on Its Own Terms

The Administrator may revoke a company's registrations if doing so "is" inconsistent with the public interest. 21 U.S.C. § 823(b). As such, the public interest analysis is necessarily forward-looking. *See Hassman v. Off. of the Deputy Adm'r*, 515 F. App'x 667, 668 (9th Cir. 2013) (touchstone of analysis is "misconduct in the future"); *see also, e.g.*, *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 221 (D.D.C. 2012)

("past misconduct" cannot constitute "sole basis" for decision). But here, the Order is wholly backward-looking, and fails to give a reasoned explanation for why revoking Morris & Dickson's registrations *is* in the public interest *going forward*.

That defect is particularly glaring given DEA's conduct here: What the Order *says* is irreconcilable with what the Administrator *has done*. Once more, in light of ongoing settlement negotiations, the Administrator waited *four years* to issue the Order—during which Morris & Dickson operated safely and effectively. Hatcher Decl. ¶ 20. Moreover, the Administrator extended the effective date of the Order to 90 days so that "renewed settlement negotiations" could potentially succeed. Ex. B, 34,522.

If Morris & Dickson's current operations truly threatened the public interest, the Administrator would not have waited a presidential term to reach a decision, nor delay that decision in hopes of a settlement. Rather, DEA's actions reveal that a *reformed* Morris & Dickson—not a *closed* one—is what is in the public interest. At minimum, the Order needed to offer some reasoned explanation to square its edict with its actions. It does not.

Worse, the Order—with its backward-looking lens—fails to meaningfully engage with the fact Morris & Dickson *has* reformed over the last number of years. As detailed above, and as even ALJ Dorman acknowledged, Morris & Dickson has implemented an "impressive" array of remedial measures that have reformed its operations. Ex. A, 34,539. And as noted too, the efficacy of those remedial measures is not theoretical—they *have worked* for the last few years, including under the unprecedented demands of the recent pandemic.

The Administrator instead gave short-shrift to these remedial measures on the ground Morris & Dickson showed inadequate remorse. *Id.* at 34,537-38. But that is both wrong, and nonsensical. The best evidence of Morris & Dickson's commitment to reform is the fact it *has* reformed. The record includes ample, undisputed evidence of Morris & Dickson revamping its compliance regime—including, for instance, testimony by Louis Milione, a former Head of DEA's Diversion Control Division, emphasizing the efficacy of these new efforts. *Id.* at 34,524, 34,539-40. And it would have included more, had the ALJ not wrongly excluded or discounted significant exculpatory evidence as to Morris &

Dickson's anti-diversion measures. *See, e.g.*, Ex. O, 25-27; Ex. P, 15-18, 24-28.

It was arbitrary and capricious to write off (or ignore) this evidence. *See, e.g.*, *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 833 (11th Cir. 2018) ("Of course, corrective measures undertaken by a pharmacy are certainly relevant to whether it can be trusted with a registration"). DEA proceedings are intended to be "non-punitive." *Howard N. Robinson, M.D.; Decision & Order*, 79 Fed. Reg. 19,356, 19,369 (Apr. 8, 2014). And again, the inquiry is what is in the public interest *going forward*. Accordingly, if a company has changed its practices, a reasoned decision must analyze how those changes bear on the public interest *in the future*. *See Leo R. Miller, M.D.; Revocation of Registration*, 53 Fed. Reg. 21,931, 21,932 (June 10, 1988).

Last, the above errors all came to a head in the Administrator's decision to opt for the most severe sanction possible—revocation—rather than an alternative enforcement sanction—such as leadership changes or third-party monitors. *See* Ex. O, 33-34 (chronicling lesser penalties for similar registrants). The Order states in a single line that DEA has "considered" alternative sanctions (Ex. A, 34,540-41 n.92), but offers no

explanation for why those sanctions are inadequate. That would be arbitrary and capricious in its own right; all the more so given DEA's conduct. Again, the Administrator's *stated preference* is for this matter to settle. *Id.*; Ex. B, 34,522. That is, the Administrator *wants* Morris & Dickson to *continue operating*, just under certain conditions. A reasoned decision must explain why DEA cannot accomplish through order what it wishes to gain through settlement, and why revocation is appropriate even though—on DEA's own account—something less is ultimately what benefits the public most. The Administrator makes no effort to address, let alone answer, this tension.

The APA "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The Order fails that command at each turn.

## 2.     The Order Is Likely Pretextual

Independent from these facial defects is the fact the Order's rationale is likely pretextual, rendering it again arbitrary and capricious. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573-76 (2019). After four years of waiting, the Administrator justified releasing the Order—and revoking Morris & Dickson's registrations—on the ground settlement

talks had broken down. *See* Ex. A, 34,540-41 n.92. But that is just not true. Walden Decl. ¶¶ 4-7, 10. Indeed, just an hour before the Order was released, Morris & Dickson's counterparty at DEA stated DEA was ready to reopen settlement negotiations. *Id.* ¶¶ 10-11.

So what changed? Days before the Order was released, a reporter at the Associated Press—armed with a leaked copy of the ALJ's recommendation—had contacted the agency (and soon Morris & Dickson) to inquire about why the Administrator had not yet acted. *Id.* ¶¶ 8, 10. By all signs, and without notifying other internal stakeholders, the Administrator—who was already facing increased press scrutiny for other reasons[2]—immediately finalized and published the Order. *See id.* ¶¶ 11-12.

There is serious reason to think the Administrator's offered reason—that settlement talks had broken down—is not the real reason. For one, its premise is not true. And more telling, it defies credulity to say that the above timeline is coincidental. Rather, the Order is likely

---

[2] Joshua Goodman & Jim Mustian, *DEA chief faces probe into 'swampy' hires, no-bid contracts*, AP News (Apr. 19, 2023), https://apnews.com/article/dea-corruption-fentanyl-cocaine-drugs-contracts-milgram-7fd24fe46c4b664f285773798357d418.

pretextual; an effort to avoid press criticism rather than render a reasoned administrative decision.

## II.  MORRIS & DICKSON WILL SUFFER IRREPARABLE HARM ABSENT A STAY

Absent a stay, revoking Morris & Dickson's registrations will cause immediate and irreversible harm that a later judicial decision cannot remedy.

To start, allowing the Order to go into effect will likely have catastrophic consequences on Morris & Dickson's business operations. This because stripping Morris & Dickson of its DEA registrations will effectively prevent it from selling *any* pharmaceuticals.  In the healthcare industry—due to market conditions and contracting practices—pharmacies and other providers buy controlled and non-controlled substances *together* from their primary distributor, with whom they have a nearly exclusive relationship.   Hatcher Decl. ¶ 12.   Accordingly, depriving Morris & Dickson of the ability to sell controlled substances will cause its customers to purchase *all* of their pharmaceuticals elsewhere.  *Id.* ¶¶ 12-15.  Importantly, that the Order's effective date is 90 days from publication is no help on this score—absent a stay, Morris

& Dickson's customers will begin finding new suppliers immediately, rather than scramble three months from now. *Id.* ¶ 13; Casida Decl. ¶¶ 6-11; Hunter Decl. ¶¶ 8-10; *see also* Ex. B, 34,522.

Forcing Morris & Dickson to close its doors after over 180 years is obvious irreparable harm. More, it would be near impossible to reconstitute Morris & Dickson after its forced dissolution, because of reputational harm and the loss of goodwill. And *even if* Morris & Dickson managed to stay in business, it would be unable to recover any monetary damages—for reputational harm, lost sales, disrupted business relationships—given DEA's sovereign immunity. *See Armendariz-Mata v. U.S. DOJ, DEA*, 82 F.3d 679, 682 (5th Cir. 1996).

Given all this, even DEA has effectively conceded Morris & Dickson is entitled to a stay at this juncture. In opposing Morris & Dickson's requested injunction to stop DEA's administrative process, DEA alleged Morris & Dickson did not face immediate "reputational injury" or "loss of employment opportunities" at *that* time. Dkt. 24 at 20-21 & n.9, *Morris & Dickson Co.*, No. 18-cv-1406, *supra.* But in the next breadth, DEA conceded that, if Morris & Dickson *later* faced revocation, it could "secure

judicial review before ever losing its registration." *Id.* at 21.  DEA was right then.

## III.  THE PUBLIC INTEREST FAVORS A STAY AND DEA WILL SUFFER NO PREJUDICE FROM ONE

Morris & Dickson has demonstrated a likelihood of success on the merits and irreparable harm, the two "most critical" stay factors.  *Nken*, 556 U.S. at 434.  The public interest also plainly favors a stay, and DEA will not suffer any prejudice from a modest delay of the sanction it waited four years to impose.

Granting a stay serves the public interest.  Foremost, a stay would help avoid tremendous disruption to medical care throughout the nation. Again, Morris & Dickson provides pharmaceuticals to thousands of hospitals, pharmacies, and other providers in 29 states, some of which are the most medically underserved in the country.  Hatcher Decl. ¶ 9.  It also employs hundreds of people, all of whom would be potentially out of a job without this Court's intervention.  *Id.*

What's more, a stay would ensure that Morris & Dickson receives at least one opportunity to vindicate its constitutional rights in federal court.  Morris & Dickson tried to protect those rights in federal court prior

to the administrative hearing, but the District Court erroneously forced Morris & Dickson to proceed first through DEA. Absent a stay, and if forced to close, Morris & Dickson will be unable to press its constitutional claims in court. But it is not in the public interest to allow administrative agencies to escape review by shuttering their targets. *See, e.g., Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

On the other side of the ledger, DEA cannot maintain there is now an immediate need to shut Morris & Dickson down. One more time, DEA waited nearly four years to act on ALJ Dorman's recommendation. And the Administrator delayed the Order's effective date even more, to 90 days. Ex. B, 34,522. Indeed, DEA has never seriously suggested that there is a genuine risk of Morris & Dickson—operating now under its redone compliance regime—doing anything besides continuing to serve the public.

# CONCLUSION

This Court should stay DEA's Order pending the Court's review of Morris & Dickson's petition.


Dated: June 2, 2023                    Respectfully submitted,

                                       */s/ Jeffrey R. Johnson*

Jim Walden                             Jeffrey R. Johnson
John Curran                                *Counsel of Record*
Veronica M. Wayner                     Harry S. Graver
James Meehan                           JONES DAY
WALDEN MACHT & HARAN LLP               51 Louisiana Ave., N.W.
250 Vesey Street, 27th Floor           Washington, D.C. 20001
New York, NY 10281                     (202) 879-3939
(212) 335-2030                         jeffreyjohnson@jonesday.com
jwalden@wmhlaw.com

*Counsel for Petitioner Morris & Dickson Co., LLC*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,162 words, as counted by Microsoft Word, excluding the parts of the motion excluded by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word in Century Schoolbook Std 14-point font.

Dated: June 2, 2023                    */s/* Jeffrey R. Johnson
                                                   *Counsel of Record for Petitioner*
                                                   *Morris & Dickson Co., LLC*

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: June 2, 2023                    /s/ Jeffrey R. Johnson
                                       *Counsel of Record for Petitioner*
                                       *Morris & Dickson Co., LLC*

## CERTIFICATE OF SERVICE

I certify that on June 2, 2023, the foregoing motion was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated: June 2, 2023                    */s/* Jeffrey R. Johnson
                                       *Counsel of Record for Petitioner*
                                       *Morris & Dickson Co., LLC*

31

# DECLARATIONS

**INDEX**

| Declarations |
|---|
| Declaration of Braden Hunter |
| Declaration of Mike Casida |
| Declaration of Jody Hatcher |
| Declaration of Jim Walden |

**MORRIS & DICKSON CO., LLC,**
*Petitioner*,

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**
*Respondent*.

## DECLARATION OF BRADEN HUNTER

Braden Hunter, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury, as follows:

1.     I am the Chief Financial Officer ("CFO") of Morris & Dickson Co., LLC ("Morris & Dickson" or the "Company") and have served in that role since November 2022.

2.     I hold a Bachelor of Business Administration from Texas A&M University, where I studied Accounting, and a Master of Science from Texas A&M University, where I studied Management Information Systems.

3.     I have more than 20 years of corporate finance experience and six years in the healthcare industry.

4.     From 2017 to 2019, I ran Pricing and Business Development for McKesson, the nation's largest pharmaceutical distributor, where I

oversaw the request for proposal ("RFP") process for pharmaceutical distribution businesses for thousands of pharmacies and over $50 billion in yearly pharmaceutical spending—that is, the purchase of McKesson products by pharmacies.

5.      From 2019 to 2021, I was the Vice President of Retail Pharmacy for McKesson, where I was responsible for all financial aspects of the company's approximately $120 billion Retail Pharmacy distribution business.

6.      I respectfully submit this Declaration in support of Morris & Dickson's motion for a stay pending this Court's determination of its Petition for Review of the order of the United States Drug Enforcement Administration ("DEA"), published in the Federal Register on May 30, 2023 (the "Final Order"), revoking Morris & Dickson's controlled substances registrations.  The Final Order states that it is effective 90 days after its publication.

7.      As Morris & Dickson's CFO, and based on my experience in finance and the healthcare industry, failing to obtain a stay of the DEA's order would cause immediate and irreparable harm to Morris & Dickson's business and threaten the Company's existence.

8.    The pharmaceutical wholesale industry is based on a primary distribution model.  Due to the complexity of sourcing pharmaceuticals from thousands of manufacturers, health care providers (such as hospital systems) select one distributor to provide most, if not all, of their pharmaceutical products.  A prerequisite to serving in this space as a wholesaler is to have access to all product categories that a health care provider may need.  The inability to provide certain product categories— especially one as critical to patient care as controlled substances— precludes a distributor from participating in the market.  If Morris & Dickson were to lose its registrations for controlled substances for even a short time, its customer base would be forced to look for other suppliers for all of their pharmaceutical needs.

9.    As explained in the Declaration of Mike Casida, Morris & Dickson's Senior Director of Health Systems, 70% of Morris & Dickson's revenue is from health systems and institutional businesses.  These are complex supply chains supporting the most underprivileged patient bases.  Each month, Morris & Dickson provides over 22,000 deliveries, containing more than 245,000 boxes and 20,000 cold chain products, to these health care providers.  Many of our institutional businesses must

follow legal requirements to perform full RFPs prior to switching wholesalers to ensure patient safety and to safeguard overall health care costs. These processes can take up to nine months—and possibly longer—to complete.

10.    Unless a stay is granted, major health systems and government institutions will be cut off from the supplies they need to function. They will also be left without sufficient time to find suitable replacements. As a result, their patients' access to critical health care services will be placed in jeopardy. Large portions of the healthcare supply chain in the Southeastern United States will suffer.

11.    Further, as Morris & Dickson's CFO, I can say with reasonable certainty that the Company will sustain a devastating hit to its finances unless a stay is granted. Even a modest loss of its primary customer base—health systems and institution businesses —would render the Company unable to pay the high cost of doing business in the pharmaceutical industry.

12.    Only the grant of a stay pending this Court's determination of its Petition for Review will prevent irreparable financial harm to the Company and protect patients and businesses in the Southeastern

United States from becoming collateral damage.

Respectfully submitted this 2nd day of June, 2023.

*/s/ Braden Hunter*
Braden Hunter

**MORRIS & DICKSON CO., LLC,**
*Petitioner*,

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**
*Respondent*.

## DECLARATION OF MIKE CASIDA

Mike Casida, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury, as follows:

1.    I am the Senior Director, Health Systems at Morris & Dickson Co., LLC ("Morris & Dickson" or the "Company"). I lead all institutional sales efforts for the Company, including Morris & Dickson's supply of pharmaceutical products to hospitals and health systems in the Southeastern United States. I am the relationship manager and primary point of contact with hospitals and health systems.

2.    I respectfully submit this Declaration in support of Morris & Dickson's motion for a stay pending this Court's determination of its Petition for Review of the order of the United States Drug Enforcement Administration ("DEA"), published in the Federal Register on May 30, 2023 (the "Final Order"), revoking M&D's controlled substances

registrations.  The Final Order states that it is effective 90 days after its publication.

3.    I hold a Bachelor of Arts from the University of Oklahoma, where I studied Administrative Leadership.

4.    I joined Morris & Dickson in November 2001.  Prior to joining the Company, I held a management position at another major pharmaceutical distributor.  I am fully familiar with and experienced in the wholesale distribution of pharmaceutical products to health and hospital systems, including both controlled and non-controlled substances.

5.    Hospitals often operate as part of a greater health system, composed of hospitals, clinics, and outpatient pharmacies—which are often located within a hospital.  In this Declaration, I will refer to this network as a "Health System."  My duties at Morris & Dickson include being the leader of the Company's relationship with Health Systems.

6.    Almost all of the Health Systems serviced by Morris & Dickson are public non-profit entities, publicly funded and managed. Generally, an agreement between Morris & Dickson and a Health System must be approved by a public agency.

7.    Most Health Systems obtain their supply of pharmaceutical products through a formal bidding process.  That process usually consists of: (1) a request for proposal is provided to capable suppliers; (2) a 30-to-60 day period for distributors to submit proposals; (3) a period lasting approximately three to six months period to review the proposals; and (4) the award of the supply contract.  Thus, completing the process to procure a vendor for pharmaceutical products usually takes at least six to nine months.  It is my understanding that this period could be abbreviated in an emergency, but in my experience, even on an emergency basis, changing the wholesale distributor would require two to three months in order to ensure the adequate operation of the Health System and patient safety.

8.    Most of Morris & Dickson's relationships with Health Systems were procured through the competitive bidding process.  These successful competitive bids comprise a large percentage of Morris & Dickson's revenue earned from Health Systems.  Overall, Health Systems make up approximately 70% of the Company's revenue.

9.    The Company usually serves as the primary distributor for the Health Systems with which it conducts business.  These contracts

generally indicate that the Company will provide the customer with both controlled and non-controlled substances.  As Morris & Dickson provides between 90-95% of the entity's controlled and non-controlled substances, it plays a vital role in the Health System's patient care.

10.    Based upon my expertise, experience and knowledge of the wholesale supply of pharmaceutical products to Health Systems, Health Systems will not award—and generally will not continue a contract with—a wholesaler that is not able to fill its orders both for controlled and non-controlled substances.

11.    Therefore, the current 90-day period between publication of the Final Order and the date it takes effect will not adequately protect Morris & Dickson from the resulting severe consequences.  Health Systems have a basic duty to provide pharmaceutical products to their patients.  Absent a stay, Health Systems will be required to find an alternative source of supply, rendering the decision by this Court moot before it can be issued.

12.    Finally, I have read the Final Order.  It concerns conduct prior to 2018, and none of the 2018 conduct addressed in the Final Order pertained to Morris & Dickson's business with Health Systems.  Thus,

Morris & Dickson is in peril of losing 70% of its revenue, even though the Company's relationship with that source of revenue—Health Systems—was not the subject of the Final Order.

Respectfully submitted this 2nd day of June, 2023.


_/s/ Mike Casida_
Mike Casida

**MORRIS & DICKSON CO., LLC,**
*Petitioner*,

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**
*Respondent*.

## DECLARATION OF JODY HATCHER

Jody Hatcher, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury, as follows:

1.     I am the Chief Executive Officer ("CEO") of Morris & Dickson Co., LLC ("Morris & Dickson" or the "Company"), and have served in that role since April 14, 2021.

2.     I hold an M.B.A. from the University of Dallas, where I studied business management.

3.     I have more than 30 years of experience in the healthcare industry.

4.     From December 2008 through April 2015, I was the President and CEO of Novation, a healthcare services company.

5.     From April 2015 through January 2016, I was the President of Offering Delivery and Operations at healthcare services company VHA

UHC Alliance, a precursor to Vizient, Inc.

6.    From February 2016 through December 2019, I was the President of supply chain services for Vizient, Inc., the country's largest healthcare performance improvement company.

7.    I have also served on the Board of Directors of numerous companies in the healthcare industry, including GHX, Health Care Supply Chain Association, Provista, PartsSource Inc., Cohealo, Inc., and PDI.

8.    Through these positions, I have gained extensive experience with the operations of the healthcare industry, and in particular healthcare supply chains.

9.    Morris & Dickson is a pharmaceutical distribution company and a licensed wholesaler in 29 states.  The Company has more than 600 employees.  It distributes approximately 30,000 products to more than 2,000 customers, including independent retail pharmacies, health systems, and alternate care customers, some of which are located in the most medically underserved locales in the Nation.  Approximately 70% of Morris & Dickson's revenue stream comes from hospital systems.

10.    I have reviewed the order of the United States Drug

Enforcement Administration ("DEA"), published in the Federal Register on May 30, 2023 (the "Final Order"), revoking M&D's controlled substances registrations..  I have also reviewed DEA's May 23, 2023 Order extending the effective date of the Final Order to 90 days after its publication.

11.   If the Final Order takes effect prior to the resolution of the Company's Petition for Review of the Final Order, I can say without reservation that the consequences will likely be catastrophic for Morris & Dickson's business operations.

12.   Anything less than a full stay pending resolution of the Petition for Review will cause customers to take their business elsewhere, as they will not want to endanger their supply.  The vast majority of our customers have a near-exclusive relationship with Morris & Dickson and rely heavily on the Company.  Morris & Dickson is their primary distributor, from whom they buy both controlled and non-controlled substances.  This type of exclusivity is standard in the healthcare industry, for reasons ranging from contracting practices, to fluctuating market conditions, to streamlined supply chains designed to best serve patient populations.

3

13.    Due to this system, customers will not stay in a relationship that poses risk to their supply.  Customers cannot easily change distributors on a moment's notice.  For example, a health system— essentially a conglomerate of hospitals—may need six to nine months to adequately vet alternative distributors.  County and State agencies, many of which Morris & Dickson serve, also have legal obligations to fully bid their business prior to switching distributors.  This process can take up to a year given the complexity of these markets.

14.    Given this lag in time, DEA's decision to stay the Final Order for 90 days following its publication in the Federal Register (rather than the usual 30) will not meaningfully affect a customer's decision about whether to begin the process of changing distributors.  Where health systems have legal obligations to bid their business prior to a wholesaler switch, a 90-day timeline poses an immediate and significant risk to their ability to serve their patient populations and puts lives at risk.

15.    Moreover, customers require that a distributor supply them with both non-controlled and controlled substances.  Depriving Morris & Dickson the ability to sell the latter poses immediate and significant risk. Any disruption to the continuity of supply—even as brief as a week—is a

threat to a customer's inventory supply. The deterioration of the Company's customer base, prior to the Court's decision on Morris & Dickson's Petition for Review, renders an ultimate decision in Morris & Dickson's favor meaningless, because the irreparable harm will already be done.

16.   I understand, based on my review of Morris & Dickson records and my communications with customers, that in the days following DEA's issuance of its May 2, 2018 Order to Show Cause and Immediate Suspension of Registration ("ISO"), several logistics providers and customers stopped doing business with the Company. After becoming CEO, I quickly recognized that the ISO's effect was long-lasting. Some customers permanently terminated their relationships, while many others resumed purchasing from Morris & Dickson only recently.

17.   Based on my industry experience, I can state without reservation that if the Final Order is not stayed during the resolution of the Petition for Review, Morris & Dickson will face an existential risk that manufacturers, logistics vendors, and customers will terminate their relationship with Morris & Dickson. These trading partners and customers—by necessity—will have to find a substitute supplier for their

inventory before the litigation is resolved. These customers are unlikely ever to return to Morris & Dickson, causing irreparable damage to the Company even if it prevails on its Petition for Review.

18. The harm that will occur in the absence of a stay extends beyond the Company's customers. It involves others in the pharmaceutical supply chain, such as the manufacturers and logistics vendors. In fact, in the short period of time that has elapsed since news of the Final Order became public, manufacturers have already told Morris & Dickson that they are holding orders to the Company.

19. Morris & Dickson will also likely suffer adverse consequences from state regulators if the Final Order takes effect. In addition to its registrations with DEA, Morris & Dickson must maintain valid licenses in the 29 states in which it is a registered wholesaler.

20. In my experience with regulators over the years, any disciplinary action imposed by DEA is highly likely to be adopted in sum and substance by state regulators, even though Morris & Dickson has operated safely and effectively over the last four years.

21. As a result, if the Final Order takes effect, and Morris & Dickson's DEA registrations are revoked, I can confidently state that the

Company's state licenses permitting its activities as a pharmaceutical wholesaler will likely be revoked as well.

22.    The Final Order comes after Morris & Dickson helped Louisiana navigate the COVID-19 pandemic; appointed a new, independent Chief Executive Officer; spent millions of dollars enhancing its compliance system to a "best in class" standard; and appointed both a General Counsel and Chief Compliance Officer (with substantial anti-diversion experience), among other executive positions that are now filled by individuals with extensive industry experience.

23.    Should the Final Order take effect without a stay pending this Court's review of the Petition for Review, the damage will be felt far and wide.  Hundreds of Company employees will lose their jobs.  There will be disruption to the pharmaceutical supply chain in the Southeastern United States and beyond.  Decades-long customer relationships will abruptly end.   A stay of the Final Order will avert irreversible injury to the Company, as well as maintain the status quo for customers and the many other stakeholders in the supply chain.

Respectfully submitted this 2nd day of June, 2023.


*/s/ Jody Hatcher*
Jody Hatcher

**MORRIS & DICKSON CO., LLC,**

*Petitioner*,

v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**
*Respondent*.

## DECLARATION OF JIM WALDEN

Jim Walden, pursuant to 28 U.S.C. §1746, hereby declares under penalty of perjury as follows:

1.     I, along with my firm, Walden Macht & Haran LLP ("Walden Macht & Haran"), represent Morris & Dickson Co., LLC ("Morris & Dickson").

2.     I offer this declaration to provide background on Morris & Dickson's settlement negotiations with the Drug Enforcement Administration ("DEA") in connection with its administrative matter, Docket No. 18-31.

3.     Morris & Dickson was initially represented in the administrative matter by Cadwalader, Wickersham & Taft, LLP. Walden Macht & Haran was substituted as counsel in December 2021. From my review of memoranda in our voluminous client file, I understand that Morris & Dickson has been trying to resolve this matter

through settlement since August 2018.  Between August 2018 through November 2019, Morris & Dickson offered DEA several proposals, although no settlement was reached.

4.     Shortly after Walden Macht & Haran became counsel for Morris & Dickson, in January 2022, M&D met with DEA at their offices in Arlington, Virginia.  At that time, nearly three years had elapsed without meaningful direct communications between the parties.

5.     At that meeting, Morris & Dickson presented DEA with a new settlement proposal, which it subsequently formalized into a term sheet sent to DEA on January 17, 2022.

6.     Over the next several months, Morris & Dickson and DEA continued to engage in productive settlement discussions.  On two occasions during this period, M&D traveled to Arlington for in-person meetings.

7.     On November 18, 2022, Paul Dean, counsel for DEA, informed me that DEA could likely agree to one of Morris & Dickson's key requirements for a settlement:  that M&D could keep its registration as part of a settlement.  I conveyed that information to Morris & Dickson.

8. On May 18, 2023, a reporter from the Associated Press contacted Morris & Dickson, requesting to speak about why DEA had not acted on ALJ Charles Dorman's recommendation to revoke Morris & Dickson's DEA registrations (the "ALJ Recommendation"). Morris & Dickson promptly notified me of the Associated Press's request.

9. That same day, I spoke to DEA's counsel, who advised that he was not aware of anyone at DEA providing these documents to the reporter and that DEA generally viewed the administrative file as FOIA exempt until after issuance of a final order, which had not yet been issued.

10. On May 19, 2023, I spoke to the reporter, who informed me that he had been in contact with DEA. He also told me he was in possession of a leaked copy of the ALJ Recommendation and other unspecified documents from the confidential administrative file. The reporter said the ALJ Recommendation came from an unknown source.

11. Later that day, I spoke again to DEA's counsel, who advised that his "front office" approved the resumption of settlement communications and would have no response to the reporter's inquiry.

12.    One hour later, Morris & Dickson received via email an Order from the DEA Administrator adopting the ALJ Recommendation and revoking Morris & Dickson's registrations (the "Final Order"), which would become effective 30 days after the publication of that Order in the Federal Register.

13.    On May 22, 2023, I communicated with the Associated Press reporter.   He confirmed that he received some unspecified "new documents" and, as a result, the Associated Press was advancing publication of its story to the next day.

14.    On May 23, 2023, the Associated Press published its story, confirming that it obtained a copy of the ALJ's Recommendation to the DEA Administrator and that the Administrator had issued the Final Order revoking Morris & Dickson's DEA registrations.

15.    Notice of the Administrator's order was not published until May 26, 2023.

Respectfully submitted this 2nd day of June, 2023.


*/s/ Jim Walden*
Jim Walden

4