# EXHIBITS

## INDEX

| Exhibit No. | Exhibit |
|---|---|
| A | *Morris & Dickson Co., LLC; Decision and Order*, 88 Fed. Reg. 34,523 (May 30, 2023) |
| B | *Morris & Dickson Co., LLC; Order*, 88 Fed. Reg. 34,522 (May 30, 2023) |
| C | Excerpt from *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (May 15, 2019) (Testimony of Louis Milione) |
| D | Respondent's Prehearing Statement, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Aug. 3, 2018) |
| E | Letter from Morris & Dickson Co., LLC to ALJ Charles Wm. Dorman (Oct. 26, 2018) |
| F | Excerpt from *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (May 13, 2019) |
| G | Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Aug. 29, 2019) |
| H | Excerpt from *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Aug. 10, 2018) (Prehearing Transcript) |
| I | Prehearing Ruling, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Aug. 13, 2018) |
| J | Second Prehearing Ruling, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Jan. 10, 2019) |
| K | Respondent's Supplemental Prehearing Statement, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Sept. 12, 2018) |

| Exhibit No. | Exhibit |
|---|---|
| L | Letter from Morris & Dickson Co., LLC to D. deBruyn (Oct. 11, 2018) |
| M | Order Staying Proceedings and Denying Government's Request for Interlocutory Appeal, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Nov. 1, 2018) |
| N | Letter from the Solicitor General to Agency General Counsels, Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.) (July 2018) |
| O | Respondent's Exceptions to Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Oct. 8, 2019) |
| P | Respondent's Motion to Reopen the Administrative Record, *In the Matter of Morris & Dickson Co., LLC*, No. 18-31 (Jan. 5, 2022) |

# EXHIBIT A



# FEDERAL REGISTER

Vol. 88            Tuesday,

No. 103          May 30, 2023

Pages 34411–34744

OFFICE OF THE FEDERAL REGISTER

document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Scott Brinks,**
*Federal Register Liaison Officer, Drug Enforcement Administration.*
[FR Doc. 2023–11370 Filed 5–26–23; 8:45 am]
**BILLING CODE 4410–09–P**

# DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

[Docket No. 18–31]

## Morris & Dickson Co., LLC; Decision and Order

On May 2, 2018, the Drug Enforcement Administration (DEA or Government), issued an Order to Show Cause (OSC) and Immediate Suspension of Registration (ISO) to Morris & Dickson Co., LLC (Respondent), of Louisiana. Administrative Law Judge (ALJ) Exhibit (ALJX) 1, at 1. The OSC informed Respondent of the immediate suspension of its Certificates of Registration Nos. RM0314790 and RM0335732 (registrations)[1] and proposed their revocation pursuant to 21 U.S.C. 824(a)(4) and 823(b) because it alleged that Respondent's continued registrations were inconsistent with the public interest. *Id.*

Respondent requested a hearing before a DEA ALJ, which was conducted from May 13 to May 16, 2019. On August 29, 2019, the ALJ issued a Recommended Decision (RD), which was transmitted to the Agency along with the administrative record on November 26, 2019.[2] The Agency has incorporated portions of the ALJ's RD herein.

The Government presented a *prima facie* case. Respondent ultimately admitted to and accepted some responsibility for its failures in effectively applying its customer due diligence in assessing orders of controlled substances, its failures to implement a suspicious order monitoring system "consistent with best practices for compliance," and its failures to adequately resolve red flags on orders that it shipped. *See infra* section V. Respondent also admitted that its three suspicious order reports to DEA during the relevant time period were insufficient. *Id.* Nonetheless, Respondent presented testimony and evidence aimed at rebutting the Government's case with regard to the scope of its regulatory noncompliance during the relevant time period.

After thoroughly reviewing the entire record, the Agency finds substantial record evidence that Respondent's continued registration is inconsistent with the public interest in light of the long-term, egregious failures of Respondent in its responsibility as a distributor to maintain effective controls against diversion of controlled substances. Furthermore, the Agency finds that Respondent has failed to demonstrate that the Agency should continue to entrust it with its controlled substance registrations.

### I. Summary of the Allegations

1. The OSC primarily alleged that Respondent failed to maintain effective controls against diversion when it failed to report to DEA thousands of unusually large orders for hydrocodone and oxycodone, which constituted potential suspicious orders, and when it shipped orders to customers without resolving red flags of diversion or reporting the orders to DEA in violation of 21 U.S.C. 823(b)(1) and (e)(1) as well as 21 CFR 1301.71(a) and 1301.74(b). OSC, at 2. Further, the OSC alleged that Respondent failed to adequately design and operate a system to alert Respondent to suspicious orders of controlled substances and failed to report the suspicious orders to DEA in violation of 21 CFR 1301.74(b). *Id.*

2. The allegations included that, from January 2014 until April 2018, Respondent shipped approximately 7,000 unusually large orders of oxycodone and almost 5,000 unusually large orders of hydrocodone. OSC, at 5; Govt Prehearing, at 8. During this time, Respondent filed a total of only three suspicious order reports with DEA.

3. Furthermore, the OSC alleged that, from approximately January 2014 to April 2018,[3] Respondent failed to carry out its due diligence and suspicious order monitoring policies and failed to document the resolution of meaningful due diligence into orders placed by the following pharmacies: Wallace Drug Company, Inc.; Bordelon's Super-Save Pharmacy; Folse Pharmacy; Pharmacy Specialties Group, Inc.; Dave's Pharmacy; the Wellness Pharmacy, Inc.; Wilkinson Family Pharmacy; and Hephzibah Pharmacy, L.L.C. (hereinafter, the exemplar pharmacies).

### II. The Witnesses

#### A. The Government's Witnesses

The Government presented its case through the testimony of six witnesses and the introduction of 70 exhibits. The Government's first witness was the Acting Section Chief of the Pharmaceutical Investigation Section of the DEA (the Section Chief), who testified generally regarding the regulatory requirements for distributors. Tr. 47–87. The Government also presented testimony from two Diversion Investigators (DI 1 and DI 2) regarding the history of the investigation and the identification of Government exhibits.[4] *See* RD, at 11–12 (citing Tr. 94–101; 144–177). Next, the Government presented testimony from the Chief of the Statistical Services Section of DEA, G.R., who was qualified without objection as an expert in "developing and implementing statistical models and methods of analyzing large and complex data sets." RD, at 13 (citing Tr. 192). G.R. testified to the methodology he employed in analyzing the statistical data that was used by DEA in its determination that Respondent had failed to report suspicious orders.[5] RD, at 12–15 (citing Tr. 187–245). The Government also presented testimony from the Group Supervisor of the New Orleans Field Division (the GS), who was accepted as an expert in "the identification of common red flags suggestive of an illicit pharmaceutical operation and as well [as] with respect to the requirements imposed on DEA registrants to identify and investigate

---

[1] Respondent sought and obtained a temporary restraining order against enforcement of the ISO. *See* ALJX 89, at 7. On May 18, 2018, the DEA Acting Administrator rescinded the ISO issued on May 2, 2018. Tr. 12; *see* Stip. 26.

[2] On October 8, 2019, Respondent filed Exceptions to the Recommended Decision (Resp Exceptions) and on November 7, 2019, the Government filed a response to Respondent's Exceptions. On January 5, 2022, Respondent filed a Motion to Reopen the Administrative Record. On January 14, 2022, the Government filed an opposition to this motion and on January 21, 2022, Respondent filed a Reply Memorandum in Support of its Motion to Reopen the Administrative Record. The Agency addresses the Exceptions throughout and the Motion to Reopen at the end of this Decision.

[3] The allegations for three of the exemplar pharmacies only spanned a subset of this timeframe: Wellness Pharmacy, January 2014–December 2017; Wilkinson Family Pharmacy, January 2014–April 2017; Hephzibah Pharmacy, April 2017–May 2017. Govt Prehearing, at 3.

[4] The Government presented testimony from a third Diversion Investigator (DI 3) to rebut the testimony of Respondent's witnesses, however, the Agency agrees with the RD that the testimony of DI 3 was not essential to the case and is therefore not including it herein. RD, at 20.

[5] G.R. testified that he had corrected DEA's admitted error in the calculations in the OSC, which applied a Three Interquartile Range (IQR) to the median of the data set, or the 50th percentile, instead of the 75th percentile, and as a result, produced a larger group of outliers. Tr. 204, 208–09. G.R. further acknowledged that the error was identified by Respondent's expert. Tr. 218.

such red flags when they become aware of them.'' RD, at 16 (citing Tr. 282).[6]

*B. Respondent's Witnesses*

Respondent presented its case through the testimony of three witnesses and the introduction of ten exhibits. Respondent's first witness was Kenneth A. Weinstein, Tr. 501–689, who was the Vice President of the consulting firm Analysis Group, Inc. (AGI), and was accepted without objection as an expert in statistical analysis related to controlled substance distribution and in pharmacy ordering and inventory management. RD, at 22 (citing Tr. 513–14; 520–21). Weinstein authenticated Respondent Exhibit (RX) 14, pages 15–19, and RX 28 and 29. Tr. 506, 562–68. Weinstein testified generally regarding the use of the Tukey analytical model in developing Suspicious Order Monitoring systems and testified specifically regarding what he found to be deficiencies in G.R.'s statistical analysis in this case. Weinstein also testified regarding AGI's compliance work for Respondent after DEA had issued the OSC.

Respondent's second witness was Scott Irelan, Tr. 693–840, who had worked for Respondent for 31 years before becoming the Director of Corporate Compliance and Security in May 2018 after the OSC was issued. Irelan testified regarding his current role at Respondent, the remedial measures that Respondent had put in place since the issuance of the OSC, Respondent's preexisting compliance measures during the relevant time period, and Respondent's acceptance of responsibility.

Respondent's final witness was Louis Milione,[7] Tr. 841–1057, who was, at the time, the Senior Managing Director of Guidepost Solutions. Respondent hired Guidepost Solutions to enhance Respondent's compliance system. Tr. 878–79. Milione was previously the Assistant Administrator of the Diversion Control Division at DEA and was offered and accepted without objection as an expert ''in diversion.'' Tr. 851. He testified regarding his factual interactions with Respondent during his tenure at DEA [8] and regarding the work Guidepost performed for Respondent to improve its compliance with DEA requirements.[9]

**III. Findings of Fact**

The Parties agree to 47 stipulations (Stips.), which are accepted as facts in these proceedings. The Agency incorporates all of these into the record—the most relevant of which are summarized here. *See* RD, at 33–38. Between January 2014 and May 2018, Respondent submitted a total of three suspicious order reports to DEA. Stip. 7. In this same approximate timeframe, Respondent supplied controlled substances, including oxycodone and hydrocodone, to Wallace, Bordelon's, Folse, Pharmacy Specialties, and Dave's pharmacies. Respondent also supplied Hephzibah with controlled substances, including oxycodone and hydrocodone, between April and May 2017, Wellness Pharmacy between January 2014 and December 2017, and Wilkinson [10] between January and April 2017. *See* Stips. 11–20. The timeframe of the allegations in the OSC are hereinafter referred to as ''the relevant timeframe.''

*A. DEA's Investigation*

In 2017, while investigating pharmacies in Louisiana selling high volumes of oxycodone and hydrocodone, the DEA New Orleans Division discovered that some of those pharmacies were supplied by Respondent. Tr. 92. During a subsequent audit, Respondent told DEA that it used Pro Compliance Reports and its employees to identify suspicious orders. Tr. 93.

occurred in August 2016 when Milione was in the role of Assistant Administrator of the Diversion Control Division at DEA. Tr. 856–861; RX 21; RX 11 (PowerPoint slide deck). Milione testified that, at that meeting, he believed that Paul Dickson, Sr., was committed to his regulatory obligations and sincere. Tr. 873. The powerpoint slides from that meeting, which Respondent submitted into evidence, generally support Respondent's statements regarding the workings of its previous SOM at a high level and its termination of customers pursuant to its due diligence efforts. RX 11; *see infra* n.61 regarding termination of Respondent's customers, and *infra* n.89 regarding evidence of the sincerity of Paul Dickson, Sr.

[9] The testimonies of Weinstein, Milione, and Irelan are afforded full credibility in this Decision on all points that are within their expertise and relevant to the final decision as further found herein. This Decision has found all major points of conflict between the Government's and Respondent's witnesses to be largely irrelevant to the Agency's adjudication of the allegations. The Agency analyzes the evidentiary weight of portions of the testimony of these witnesses in balance with other evidence on the record where relevant. It is noted that, although Irelan's testimony regarding acceptance of responsibility is analyzed in the Sanction Section *infra*, it is afforded full credibility.

[10] Wilkinson Family Pharmacy voluntarily surrendered its DEA Certificate of Registration for Cause. Stip. 20.

DEA served Respondent with three separate subpoenas and several requests for clarification between February 1, 2018, and April 2018.[11] RD, at 44–50. The subpoenas related to Respondent's identification of suspicious orders, due diligence, internal investigations, and internal policies and practices, and also identified specific pharmacies. Government Exhibits (GX) 7, 8, 10, 12, 15. Respondent responded via letters and produced some documentation. For example, GX 9 contains an undated letter from Jacob Dickson, stating that Respondent submitted only two suspicious order reports to DEA because it ''utilizes a pro-active approach to avoid diversion of controlled drugs, including: screening new pharmacy customers; aggressively monitoring orders for controlled drugs; and eliminating pharmacy customers who fill orders for controlled drugs in excess of acceptable ratios, accept cash payments, fill prescriptions for the 'Holy Trinity' and/or other unacceptable practices.'' GX 9, at 1; Tr. 319. The undated letter also states that ''DEA and applicable regulations do not require that a wholesale distributor maintain records of each and every internal investigation conducted on *possible* suspicious orders.'' GX 9, at 1–2 (emphasis in original); Tr. 319–20. The letter further explained that once Respondent has cleared a possible suspicious order, ''no record is maintained.'' GX 9, at 2. The undated letter explained that Respondent used a ''four-fold approach to monitor all prescription drug orders and detect unusual ordering patterns, amounts, and cash payments to identify potentially suspicious orders.'' GX 9, at 2; Tr. 321. The four-fold approach included: use of Pro Compliance Reports; preparing a Market Basket Report of each customer on a monthly basis; since April 2017, use of software that identifies orders that are more than 10 times the ''average dosage units ordered on a given drug on a certain day with the last 90 days of ordering patterns of the same drug''; the experience of the employees who fill the orders for controlled substances; and the input of delivery drivers and salesmen. GX 9, at 3–4.

Government Exhibit 11 is Respondent's (signed by Paul Dickson) supplemental undated response to DEA following up on subpoenas issued to Respondent. Tr. 144–45, 324; GX 11, at 2. This response states that ''[b]ecause formal records are not kept in the regular course of business on the

[6] The Agency adopts the ALJ's credibility findings regarding the Section Chief, the DIs, G.R., and the GS. RD, at 11–12, 15, 19.

[7] Milione is currently the Principal Deputy Administrator of DEA. Despite his return to the Agency, it is noted that Milione has not had any contacts with the Administrator nor anyone participating in the decisionmaking in this matter about and due to his prior involvement with this case.

[8] Respondent presented evidence, including testimony from Milione, about a meeting with Respondent at Respondent's invitation that

[11] The Agency adopts the findings of fact in the RD related to these subpoenas and Respondent's response and summarizes herein. RD, at 44–50.

investigation of orders which do not result in the finding of a 'suspicious order' per 21 CFR 1301.74, the email communications produced herewith represent the most responsive records maintained.'' GX 11, at 2; Tr. 324.

At the same time, Respondent produced an external hard drive containing documents in response to the February subpoenas. Tr. 146. Again, DEA emailed Respondent to ensure a complete response, which Respondent generally affirmed and also then provided a phone log[12] with the earliest entry dated January 5, 2016. GX 12–14. In response to the subpoena for policies and trainings, Respondent informed DEA that its training of employees on suspicious order monitoring ''does not necessitate or result in the production of documents.'' GX 16, at 1. Respondent's reply included two policy and procedure documents, which Respondent described as containing ''some limited direction as to suspicious order monitoring.'' *Id.;* Tr. 174–76; GX 17, 18.

*B. General Regulatory Obligations*

21 CFR 1301.74(b) requires distributors to

. . . design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

*Id.*

Respondent received a copy of a letter sent on September 27, 2006, by DEA to distributors of controlled substances. Tr. 62–63; GX 3, at 1. The letter emphasized that ''[d]istributors are, of course, one of the key components of the distribution chain. If the closed system is to function properly as Congress envisioned,

distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.'' GX 3, at 1. The letter therefore, reminded distributors of their ''responsibilities . . . in view of the prescription drug abuse problem our nation currently faces.'' *Id.* Further, the letter reminded distributors of their duty under the regulation to ''design and operate a system to disclose to the registrant suspicious orders of controlled substances,'' and their duty to report suspicious orders to DEA upon discovering the suspicious order. *Id.* at 2. In addition, the letter reminded distributors of their duty to exercise due diligence to avoid filling suspicious orders. *Id.* Finally, the letter provided distributors with 14 examples derived from DEA investigations of a customer's behavior that might be indicative of diversion. *Id.* at 3. The letter states that these examples are not all-inclusive and that ''[d]istributors should consider the totality of the circumstances when evaluating an order for controlled substances, just as DEA will do when determining whether the filling of an order is consistent with the public interest within the meaning of 21 U.S.C. 823(e).'' *Id.* DEA sent the same letter a second time on February 7, 2007. Tr. 64–65; GX 69.

Government Exhibit 4 is a December 20, 2007 letter that the DEA sent to every distributor of controlled substances. Tr. 63–64; GX 4, at 1. The stated purpose of this letter was to again remind distributors of the requirement to inform DEA of suspicious orders. GX 4, at 1. The letter reminded distributors that in addition to ''maintain[ing] effective controls against diversion,'' they are also required to ''report suspicious orders of controlled substances.'' *Id.* The letter reminded registrants that the regulation requires that these orders be reported *when discovered* by the registrant.'' *Id.* (emphasis in original). The letter also reminded distributors ''that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels'' in accordance with their requirements to maintain effective controls against diversion in 21 U.S.C. 823(e). *Id.* The letter also informed registrants that DEA interpreted the list of types of suspicious orders to be ''disjunctive and [ ] not all inclusive.'' 21 CFR 1301.74(b).

DEA maintains an Automation of Reports and Consolidated Orders System (ARCOS). Tr. 69–70. Distributors are required to report to ARCOS all shipments of controlled substances in schedules I and II and all narcotic controlled substances in schedule III. Stip. 9; Tr. 70. In April 2008, DEA met with Respondent's President Paul Dickson, Sr., and discussed Respondent's legal obligations and requirements as a distributor, including suspicious order requirements, the need to know its customers, and the need to conduct due diligence. Tr. 67–68. At the time, DEA reviewed its ARCOS data with Respondent to show customers who had anomalies and to demonstrate ''things that [Respondent] should be looking at and questioning [its] customers [about].'' Tr. 68–69. In 2013 and 2015, DEA conducted distributor conferences and Jacob Dickson, Respondent's compliance officer,[13] attended both conferences. Tr. 66–67. Both sides also presented evidence about a meeting with Jacob Dickson, Paul Dickson Sr., C.G. (a former compliance officer at Respondent) and officials from DEA, including Milione, in which Respondent presented its Suspicious Order Monitoring (SOM) system to DEA. *See* RX 11 (powerpoint); *see supra* n.8.

Respondent filed three suspicious order reports during the relevant time period. Stip. 7. The first, dated April 7, 2014, states that ''[a]t this time, and pending further review by you or M&D, M&D has stopped selling schedule II through schedule V drugs to the captioned pharmacy.'' GX 6, at 1. The next report is dated April 26, 2017, and states that the pharmacy in question ''purchased a quantity of 60 cartons of prefilled 10 mg morphine sulphate syringes . . . This was a substantial increase over a total sales of one carton in the prior four months.'' GX 6, at 35. The letter states that the order was investigated but does not discuss the resolution of this investigation, nor whether the order was filled. The final report was filed on the same day, April 26, 2017, and gives no facts related to what order was deemed suspicious nor any information about an investigation or whether the order was shipped. GX 6, at 36.

Distributors are required to design and operate a suspicious order monitoring system that identifies suspicious orders. 21 CFR 1301.74(b). Suspicious orders include, but are not

---

[12] Regarding the exemplar pharmacies, the phone log contains two entries concerning the Pharmacy Specialties Group, with a DEA registration number ending in ''589.'' GX 14, at 4, 31; GX 23, at 1. Those entries are dated March 7, 2016, and December 13, 2017. GX 14, at 4, 31. There is one entry concerning Dave's Pharmacy, with a DEA registration number ending in ''386.'' GX 14, at 23; GX 24, at 1. That entry is dated February 16, 2017. GX 14, at 23. There are three entries concerning Hephzibah Pharmacy, with a DEA registration number ending in ''695.'' GX 14, at 23, 26; GX 25, at 1. Those entries are dated March 17 and 21, 2017, and June 20, 2017. GX 14, at 23, 26. There are five entries concerning Wilkinson Family Pharmacy, with a DEA registration number ending in ''198.'' GX 14, at 24; GX 27, at 1. Those entries are dated April 19, 20, 21, and 24, 2017. GX 14, at 24. There are three entries concerning Wallace Drugs, with a DEA registration number ending in ''363.'' GX 14, at 31; GX 20, at 1. Those entries are all dated January 9, 2018. GX 14, at 31; RD, at n.12. *See supra* section III.D.

[13] The GS testified that ''one time [Jacob Dickson] was marked as president and then in the other time it was compliance officer.'' Tr. 67. In a letter to DEA in response to subpoenas, Jacob Dickson's title was listed as Vice President, SOM Manager. GX 9, at 4.

limited to, three stated criteria: orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id.*

Additionally, a distributor's general duty to prevent diversion includes the duty to perform due diligence on its customers. *Southwood Pharmaceuticals, Inc.,* 72 FR 36487, 36500 (2007); *see also Masters Pharmaceuticals, Inc.,* 80 FR 55418, 55476 (2015), *pet. for review denied, Masters Pharmaceuticals, Inc.* v. *Drug Enf't Admin.,* 861 F.3d 206 (D.C. Cir. 2017). The GS testified that if the required due diligence at the customer level identifies red flags indicative of diversion, Tr. 328, those red flags render an individual order suspicious and trigger the investigation or reporting requirement, even if the regulatory criteria in 21 CFR 1301.74(b) are not present, *e.g.,* the order size is not unusual. Tr. 477–478; *see also Masters Pharm., Inc.,* 80 FR at 55477 (stating that ''an order is not only suspicious by virtue of its internal properties—*i.e.,* being of unusual size, pattern, or frequency—but by virtue of the suspicious nature of the pharmacy which placed [the order]'').

The Agency's decision in *Masters* sets forth that a distributor must either investigate suspicious circumstances on an order and resolve all indicia of diversion or decline to fill the order and report it to DEA. *Masters Pharm., Inc.,* 80 FR at 55478.

*C. Red Flags—Customer Due Diligence*

The record evidence establishes that customer red flags indicative of potential customer diversion include a pharmacy customer that: dispenses a high volume of narcotics; dispenses the trinity drug cocktail; [14] dispenses disproportionately more controlled substances than non-controlled substances; [15] fills prescriptions for customers who live far away from the pharmacy; fills prescriptions for a high volume of patients who pay for prescriptions in cash; [16] fills prescriptions for practitioners whose DEA registrations cannot be verified; [17] fills a disproportionate volume of controlled substance prescriptions written by only a few prescribers; and/or orders excessive quantities of a limited variety of controlled substances. Tr. 297, 299–301, 335, 411, 427, 489–90, 648–49, 681, 1037; *see also* Pro Compliance Reports GX 20–56. Weinstein noted that red flags are visible in a pharmacy's dispensing data and not its ordering data. [18] Tr. 679. Irelan admitted that, during the relevant time period, due diligence was not being applied at the ordering level. [19] Tr. 722–23.

The GS testified that when Respondent received the Pro Compliance Reports in GX 20–56 that demonstrated red flags of diversion, it was obligated to resolve the red flags and document their resolution. Tr. 474–76. Based on the record testimony of the experts, and the *Masters* decision, the Agency finds that when a distributor is aware of red flags indicating diversion of controlled substances from a customer, at a minimum, it is obligated to investigate further and resolve the red flags, or, if it chooses not to investigate and resolve, it must report the order as suspicious to DEA and not ship the controlled substances. *See infra,* section IV.A.4.

---

[14] The trinity drug cocktail consists of an opioid, such as hydrocodone, a benzodiazepine, such as alprazolam, and a muscle relaxer, such as Soma, and the combination of substances is still a red flag even if each element is prescribed by different prescribers. Tr. 55, 300, 344.

[15] The record contains varying evidence as to the threshold percentage of a pharmacy customer's controlled substance fills relative to its non-controlled substance fills that would trigger a red flag for the distributor. *See* Tr. 351, 461 (The GS testifying that if the percentage of controlled substance prescriptions filled exceeds 15 percent of total prescriptions, it is a red flag); Tr. 1030 (Milione testifying that if a pharmacy is filling controlled substance prescriptions at a percentage exceeding the national average, then the distributor can resolve the red flag without reporting a suspicious order); Tr. 867 (Irelan testifying that the previous SOM system involved monitoring ''for customers that were getting a little closer to 20 percent of that ratio''); RD, at n.5 (noting that the *Masters* decision found the threshold to be around 20 percent for controlled versus 80 to 90 percent for non-controlled, *Masters Pharm., Inc.,* 80 FR at

55480, but finding that the GS presented the most credible evidence at 15 percent).

The Agency finds the exact percentage threshold to be largely irrelevant to determine in this case, because in every instance of the Government's allegations, this particular red flag was flagged by the Pro Compliance Reports that were created for Respondent. Furthermore, all of the pharmacy customers in the allegations were dispensing controlled substances at 20 percent or more of their total dispensing—with one customer at one point dispensing as high as 69 percent controlled substances, *see* GX 26, at 11 (Wellness). The only exception was Bordelon's dispensing at 17 percent controlled substances, but which Pro Compliance reported as being ''slightly higher than national average.'' GX 21, at 6. Furthermore, seven of the eight exemplar pharmacies demonstrated multiple red flags in addition to this one. It is indisputable that Respondent was aware of this red flag for each of these customers at a customer level due to the Pro Compliance Reports in its possession.

[16] The record contains varying evidence as to the threshold percentage of cash payments for controlled substance prescription fills at a pharmacy customer that would trigger a red flag for the distributor. *See* Tr. 328 (The GS testifying that any pharmacy customer exceeding 9 percent cash payments from customers should raise red flags); *see also* 1036–37 (Milione testifying that a high percentage of cash in controlled versus non controlled prescriptions is a red flag, but can be resolved with due diligence, the records of which must be maintained); Tr. 681 (Weinstein testifying that if a pharmacy has ''a substantially higher percentage of cash payments for controlled substances than it did for a non-controlled substances, that would be a [potential] red flag of diversion,'' but that he does not have ''a particular definition of substantial or significant,'' because it was more of a ''relative comparison''; *but see* Tr. 649 (Weinstein answered that it was ''fair'' to say that when a distributor becomes aware of factors, such as cash payments, ''they're significant red flags of diversion.'').

Again, the Agency finds the exact percentage threshold for cash payments to be largely irrelevant to determine in this case, because in every instance of the Government's allegations, this particular red flag was flagged by the Pro Compliance Reports that were created for Respondent. As detailed herein, the percentages of cash paid by Respondent's customers at issue were also particularly high, *see, e.g.,* 41 percent, GX 22, at 12 (Folse). It is indisputable that Respondent was aware of this red flag for each of these customers at a customer-level based on the Pro Compliance Reports in its possession.

[17] The Pro Compliance Reports additionally contain reports of prescribers whose DEA controlled substance registrations ''could not be verified through DEA-Verify.com'' and whose controlled substance prescriptions were filled by Respondent's customers. *See, e.g.,* GX 22, at 17; Tr. 336 (June 2017 Report showing that False filled controlled substances prescribed by 23 practitioners whose registrations could not be verified). Both Irelan and Milione testified that the portion of the Pro Compliance Reports concerning the verification of prescriber DEA numbers is unreliable. Tr. 765–66, 797, 901. Milione also testified that a distributor needs to hold and report a suspicious order if it is aware that a customer is filling prescriptions for a practitioner with no DEA registration. Tr. 1025. Although the Agency agrees with the RD, at n.14,

that during the relevant timeframe, there is no evidence in the record that Respondent resolved the red flags presented by these reports demonstrating unverified registrations, even if they were unreliable, the Agency also finds that there is more than enough evidence on the record that Respondent did not resolve the other clearly established red flags of diversion and therefore finds it unnecessary to address these additional red flags in this Decision.

[18] The fact that the red flags applied to the customer generally and not to each individual order, *see* ALJX 89, at 99, is irrelevant to this adjudication, because under the relevant legal requirements, Respondent cannot ignore red flags that demonstrate that its customers are potentially diverting controlled substances and continue to fill those individual orders without resolving each of those red flags. *See* Tr. 477–478. At a minimum, Respondent must either have stopped the shipments and reported orders to DEA or resolved and documented each of the red flags. *See Masters Pharm., Inc.,* 861 F.3d at 222–23.

[19] It is noted that Respondent attempted to introduce and the ALJ rejected, Exhibit 32C, based on lack of identification. Tr. 447. Respondent's stated purpose was to impeach the Government's witness in demonstrating that Respondent's due diligence files did include photographs as described in its policy, Tr. 447, contrary to the GS's testimony that he did not ''recall any'' photographs, Tr. 322; RX 32C. The GS testified credibly that he did not recall seeing the file with the photograph ''at all.'' Tr. 447. The Agency has reviewed the document and notes that it did include a photograph; however, the Agency is not finding that Respondent's compliance with its policy on this issue is relevant to this decision and, therefore, the exhibit marked for identification as RX 32C plays no role in the adjudication of this matter. Further, if this exhibit had been included in the record, standing alone, it bodes poorly for Respondent concerning its failure to report suspicious orders for terminated customers. *See infra* n.61.

*D. Pro Compliance and Market Basket Reports*

In conducting customer due diligence, Respondent used, at least up to and including during the hearing, Pro Compliance Reports,[20] which provide analysis of a pharmacy's dispensing data to include key indicators of red flags of diversion, such as the percentage of a customer's business that represents controlled substance dispensing, the volume of cash payments, and the amount of trinity drug cocktails filled. Tr. 464–65, 716–17. In this case, the reports in Respondent's possession for the exemplar pharmacies demonstrated numerous red flags of diversion, and the Agency finds substantial record evidence that Respondent did not adequately document the resolution of those red flags or report the orders to DEA as suspicious.[21] Additionally, the reports in evidence for the exemplar pharmacies appear to demonstrate violations of Respondent's purported policy of "eliminating pharmacy customers who fill orders for controlled drugs in excess of acceptable ratios, accept cash payments, prescribe the 'Holy Trinity' and/or other unacceptable practices." GX 9, at 1. According to Respondent, Market Basket Reports[22] were prepared for each customer on a monthly basis as part of its due diligence. GX 9, at 3–4. The reports identified percentages of controlled substances in total dispensing. *Id.; see, e.g.,* GX 59. Respondent no longer uses Market Basket reports but continues to use Pro Compliance Reports. Tr. 716.

The GS testified that he did not find evidence that Respondent ever rejected a controlled substance order from any of the exemplar pharmacies, nor did he find documentation that Respondent dispelled all of the red flags in these reports. Tr. 385–86, 316,[23] 413.

1. Folse Pharmacy

The record evidence demonstrates that the Pro Compliance Initial Risk Evaluation Report provided to Respondent for Folse Pharmacy designated the pharmacy as "high risk." GX 22, at 5; Tr. 328. Further, Pro Compliance Reports for Folse Pharmacy in Respondent's possession demonstrated that during the time period of the allegations, Folse Pharmacy's dispensing practices raised numerous red flags, including: high percentages[24] of controlled substance prescriptions, high percentages of controlled substance prescriptions paid for in cash,[25] an increase[26] in the number of oxycodone dosage units dispensed, and dispensing of trinity cocktail prescriptions.[27] *See* RD, at 51–53. Furthermore, in June 2017, a Pro Compliance Report recommended that Respondent engage with Folse's owner to "gain a better understanding of [its] dispensing practices . . . ." GX 22, at 17. The record does not include evidence of an investigation into or resolution of the red flags identified. Further, the record is clear that Respondent did not report any orders from this customer to DEA as suspicious and there is no record evidence that Respondent stopped shipping to this customer as a result of these reports. Tr. 340; Stip. 13.

2. Bordelon's

Pro Compliance Reports for Bordelon's Super Save Pharmacy in Respondent's possession demonstrated that during the time period of the allegations, Bordelon's dispensing practices raised numerous red flags, including: high percentages[28] of controlled substance prescriptions, higher than average oxycodone and hydrocodone units, and dispensing of trinity cocktail prescriptions.[29] *See* RD, at 53–54. In March 2017, a Pro Compliance Report recommended that Respondent engage with Bordelon's owner to "gain a better understanding of [its] dispensing practices . . . ." GX 21, at 6. The record is clear that Respondent did not report any orders from this customer to DEA as suspicious and there is no record evidence that Respondent stopped shipping to this customer as a result of these reports. Tr. 347–48; Stip. 12.

3. Wallace Drug Company

Pro Compliance Reports for Wallace in Respondent's possession demonstrated that during the time period of the allegations, Wallace's dispensing practices raised numerous red flags, including, but not limited to: high percentages of controlled substance prescriptions paid for in cash,[30] higher than average dosages of oxycodone and hydrocodone, and dispensing of trinity cocktail prescriptions.[31] *See* RD, at 54–55. In August 2017, a Pro Compliance Report recommended that Respondent engage with Wallace's owner to "gain a better understanding of [its] dispensing practices." GX 20, at 6. Respondent produced phone log entries on January 9, 2018, for Wallace. *See* GX 14, at 31 (note stating that the pharmacy salesman had been contacted and Respondent recommended that he return the order, noting "might need to check on this guy" and "looks like he is hitting this stuff hard!"). Another note on the same date states that the customer was contacted and the customer explained the large order. According to the note, Respondent's employee recommended the return of the hydrocodone and the customer returned it. This note did not occur

---

[20] Each Pro Compliance Report contains a statement regarding the Controlled Substances Act (CSA) requirement on manufacturers and distributors to design and operate a system that will disclose suspicious orders of controlled substances. *See, e.g.,* GX 23, at 11; Tr. 355.

[21] Respondent argues that "the Government offered no evidence to demonstrate that Respondent failed to dispel suspicion." ALJX 89, at 100. The Agency finds this argument to be circular. Respondent did not maintain adequate documentation of its resolution of red flags or suspicious orders, so there is no evidence to demonstrate whether it did or did not conduct the due diligence necessary to resolve the red flags. *See infra* n.80. As described herein, the Agency requires documentation of Respondent's due diligence for many reasons.

[22] Respondent points out that the GS's testimony regarding the Market Basket reports was possibly based on a misinterpretation of the numbers. ALJX 89, at 30 (citing Tr. 409, 423–425). In adjudicating the allegations, this Decision focuses on the Pro Compliance Reports in which there is more than enough information to support the Agency's finding that the alleged customers presented red flags of diversion, the resolution of which was not adequately documented, yet Respondent continued to ship. The Market Basket Reports are only considered to demonstrate that Respondent was conducting some due diligence.

[23] Respondent points to Irelan's testimony to contest the notion that Respondent was not stopping shipments based on reports; however, the citations to his testimony support that Respondent was generally conducting some due diligence as it had described in its letters to DEA in response to the subpoena, not that the red flags at issue for the exemplar pharmacies were resolved. ALJX 89, at 16; *see also, e.g.,* RX 31.001 (notes on pharmacies other than exemplar).

[24] According to the Pro Compliance Reports in evidence, percentages of controlled substances during the relevant time period ranged from approximately 30 to 36 percent of Folse's total dispensing. GX 22, at 12–17.

[25] According to the Pro Compliance Reports in evidence, percentages of controlled substance dispensing paid for in cash ranged from approximately 18 to 41 percent. GX 22, at 12–14, 17.

[26] Between September 2013 and November 2014, the number of oxycodone dosage units dispensed increased from 40,812 to 52,571. GX 22, at 12; Tr. 330–31 (The GS describing this increase as "a very big red flag"); *see also* Tr. 471–74.

[27] In June 2017, Folse dispensed nine trinity drug cocktails and in September 2016, Folse dispensed twenty-two trinity drug cocktails. GX 22, at 17, 14; Tr. 300, 335–36.

[28] In March 2017, the percentage of controlled substances dispensed represented 17 percent of Bordelon's total dispensing, which Pro Compliance reported to be "slightly higher than national averages." GX 21, at 5–6.

[29] In March 2017, Bordelon's dispensed four trinity drug cocktails. GX 20, at 5–6.

[30] In August 2017, 31 percent of controlled substance prescriptions filled by Wallace were paid for in cash. GX 20, at 5.

[31] In August 2017, Wallace dispensed three trinity drug cocktails. GX 20, at 5–6; Tr. 349–50.

until five months after the Pro Compliance Report for Wallace, which demonstrated multiple additional red flags of diversion for which there is no documented resolution. Therefore, it is unclear whether the employee flagging this particular order knew that there might be further reason to suspect that this pharmacy was engaging in diversion in order to be able to adequately resolve the suspicious circumstances surrounding the order. Even if this note arguably provided a documented resolution of an unusually large order, the other red flags for this customer are unresolved and unaccounted for. There is also no record evidence that Respondent reported the unusually large order or any orders from this customer to DEA and there is no record evidence that Respondent stopped shipping to this customer as a result of these reports or notes. Tr. 353; Stip. 11.

### 4. Pharmacy Specialties Group

Pro Compliance Reports for Pharmacy Specialties in Respondent's possession demonstrated that during the time period of the allegations, Pharmacy Specialties' dispensing practices raised numerous red flags, including: high percentages [32] of controlled substance prescriptions, high percentages of controlled substance prescriptions paid for in cash,[33] an increase [34] in the number of hydrocodone, oxycodone, and benzodiazepine dosage units dispensed, and dispensing of trinity cocktail prescriptions.[35] *See* RD, at 55–57. In February 2016, a Pro Compliance Report recommended that Respondent engage with Pharmacy Specialties' owner to "gain a better understanding of [its] dispensing practices." GX 23, at 6. Respondent's phone logs demonstrate that an employee raised a concern on March 7, 2016, regarding Pharmacy Specialties Group; however, there is no record documentation of how the concern was resolved and Respondent

---

[32] According to the Pro Compliance Reports in evidence, the percentages of controlled substances ranged from approximately 24 to 30 percent of Pharmacy Specialties' total dispensing. GX 23, at 5, 18; Tr. 353–54.

[33] According to the Pro Compliance Reports in evidence, the percentages of controlled substances dispensing paid for in cash ranged from approximately 28 percent to 31 percent. GX 23, at 5–6, 16, 18, 18.

[34] From February 2016 to October 2016, the number of hydrocodone dosage units dispensed increased by 25 percent, while from October 2016 to September 2017, the number of dosage units of oxycodone, hydrocodone, and benzodiazepines dispensed increased by 148, 89, and 106 percent respectively. GX 23, at 16, 18; Tr. 358–59.

[35] In February 2016, October 2016, and September 2017, Pharmacy Specialties dispensed trinity drug cocktails. GX 23, at 6, 16; Tr. 355, 358–59.

---

continued to distribute. *See* GX 14, at 4 ("[C]heck out this guys usage for item [ ] compared to his overall warehouse purchasing, this seems quite elevated to me. . . . .????"). This note identifies a suspicious order; however, according to the record evidence, Respondent did not report the order to DEA. Further, there is no documented investigation or resolution of the concern raised by the employee in the record. On December 13, 2017, another note reads, "Henry will give the customer a warning about his Oxy purchases. Too much cash, too much growth. Will re-run and if no improvement will either restrict or cut off completely." *Id.* at 31. Although this note seems to set forth a plan for compliance, it does not include any indication of an investigation into or resolution of the red flags identified. Further, the record evidence is clear that Respondent did not report this order or any orders from this customer to DEA and there is no record evidence that Respondent stopped shipping to this customer as a result of these reports. Tr. 362; Stip. 14.

### 5. Dave's Pharmacy

Pro Compliance Reports for Dave's Pharmacy in Respondent's possession demonstrated that during the time period of the allegations, Dave's dispensing practices raised numerous red flags, including: high percentages [36] of controlled substance prescriptions, high percentages of controlled substance prescriptions paid for in cash,[37] increases [38] in the number of oxycodone dosage units dispensed, and dispensing of trinity cocktail prescriptions.[39] *See* RD, at 57–59. In March 2014, a Pro Compliance Report recommended that Respondent engage with Dave's owner to "gain a better understanding of [its]

---

[36] According to the Pro Compliance Reports in evidence, percentages of controlled substances during the relevant time period ranged from approximately 20 to 22 percent of Dave's total dispensing. GX 24, at 5, 18–21, 24, 30; Tr. 362–67.

[37] According to the Pro Compliance Reports in evidence, percentages of controlled substance dispensing paid for in cash ranged from approximately 17 to 35 percent. GX 24, at 18–21, 23, 24, 30; Tr. 364–67.

[38] For example, from March 2014 to January 2015, the number of oxycodone dosage units dispensed increased from 17,889 to 29,994, and from May 2014 compared to December 2015, the number of dosage units of oxycodone increased by 205 percent. GX 24, at 18, 19, 21; Tr. 364; *see also* RD, at 57–59.

[39] Between March 2014 and January 2015, Dave's dispensed 57 trinity drug cocktails. GX 24, at 18; Tr. 364. Between May 2014 and December 2015, Dave's dispensed 27 trinity drug cocktails, and between December 2015 and June 2016, Dave's dispensed 33 trinity drug cocktails. GX 24, at 19–20. Tr. 365–66. Further, between June and November 2016, Dave's dispensed 37 trinity drug cocktails and in June 2017, Dave's dispensed 14. GX 24, at 21, 24.

---

dispensing practices. . . ." [40] GX 24, at 6. It also states that this pharmacy "represents a relatively *high risk* to [Respondent]." *Id.* (emphasis in original). A year later, on February 16, 2017, Respondent's phone logs contain the following note about Dave's: "Talked to [D.J.] about the issues at his store. He will let the doctors know that he will no longer be filling these scripts." GX 14, at 23. According to the record evidence, Respondent did not elicit or document an explanation for the red flags and the record is clear that Respondent never reported this order or any orders from this customer to DEA. Further, there is no record evidence that Respondent stopped shipping to this customer as a result of these reports. Tr. 384–85; Stip. 15.

### 6. Hephzibah Pharmacy

A Pro Compliance Report for Hephzibah Pharmacy in Respondent's possession demonstrated that during the time period of the allegations, Hephzibah's dispensing practices raised numerous red flags, including: high percentages [41] of controlled substance prescriptions, high percentages of controlled substance prescriptions paid for in cash,[42] and dispensing of trinity cocktail prescriptions.[43] *See* RD, at 59–60. In February 2017, a Pro Compliance Report recommended that Respondent engage with Hephzibah's owner to "gain a better understanding of [its] dispensing practices. . . ." GX 25, at 6.

Jacob Dickson sent an email to a DI stating that Respondent had ceased business with Hephzibah because Respondent did not support the customers who "wished to change their business model;" however, Respondent "did not find these accounts to exhibit suspicious activity or excessive orders." GX 72, at 1. Respondent's phone logs state on March 17, 2017, that "they must work on clearing up issues that Pro Compliance found, high cash, trinity & high quantities on Hydrocodone and Oxycodone. Will re-run in 90 days." GX 14, at 23. On March 21, 2017, there is a follow up entry that states, "After a couple of months, they decided they would rather change wholesalers than cooperate with our compliance program." *Id.* at 26. Although the notes demonstrate that Respondent was

---

[40] This Pro Compliance Report identifies Dave's second highest prescriber as having eighty-five incidents of prescribing trinity drug cocktails.

[41] In February 2017, controlled substance prescriptions constituted 27 percent of Hephzibah's total dispensing. GX 25, at 6; Tr. 370–71.

[42] In February 2017, the percentage of controlled substance dispensing paid for in cash was 36 percent. GX 25, at 6, 12; Tr. 371.

[43] In February 2017, Hephzibah dispensed nine trinity drug cocktails. GX 25, at 5–6; Tr. 371.

conducting some due diligence, this statement contradicts Jacob Dickson's email asserting that Respondent terminated the business relationship and also that Respondent did not find the accounts to exhibit suspicious activity when it clearly had identified red flags through Pro Compliance Reports. *See* GX 72, at 1 (listing Hephzibah Pharmacy as an account that Respondent "chose to close").[44]

### 7. The Wellness Pharmacy

Pro Compliance Reports for the Wellness Pharmacy in Respondent's possession demonstrated that during the time period of the allegations, Wellness's dispensing practices raised red flags of very high percentages of controlled substance prescriptions and high numbers of dosage units of hydrocodone and oxycodone. *See* RD, at 60–61. Although Pro Compliance's initial risk assessment evaluated Wellness as "low risk," it also revealed that between April and June 2013, 67 percent of all prescriptions dispensed by Wellness were for controlled substances. Further Pro Compliance Reports during the relevant time period demonstrated that Wellness's percentage of controlled substance prescriptions continued to range from approximately 64 to 69 percent. GX 26, at 10–12, 14, 21; Tr. 374. There is no record evidence that Respondent reported these orders to DEA or any orders from this pharmacy, documented the resolution of the red flags, or stopped shipping to this customer as a result of the red flags that these reports identified. Tr. 384–85; Stip. 17.

### 8. Wilkinson Family Pharmacy

Pro Compliance Reports for Wilkinson Family Pharmacy in Respondent's possession demonstrated that during the time period of the allegations, Wilkinson's dispensing practices raised numerous red flags, including: high percentages[45] of controlled substance prescriptions, increases in oxycodone, high percentages of controlled substance prescriptions paid for in cash,[46] higher

than average dosages of oxycodone and hydrocodone, and dispensing of trinity cocktail prescriptions.[47] *See* RD, at 61–63. In January 2017, a Pro Compliance Report recommended that Respondent engage with Wilkinson's owner to "gain a better understanding of [its] dispensing practices." GX 27, at 26.[48] There is no record evidence that Respondent reported these orders or any orders from this customer to DEA, or stopped shipping to this customer as a result of these reports. Tr. 384–85; Stip. 19.

The Government has presented substantial record evidence that Respondent distributed controlled substances to the exemplar pharmacies during the relevant time period in the face of red flags of diversion, including high percentages of controlled substance prescriptions, high percentages of controlled substance prescriptions paid for in cash, dispensing of trinity cocktail prescriptions, and increases and higher than average dosages of particular schedule II controlled substances. All of these red flags were specifically identified by Pro Compliance Reports in Respondent's possession. Although some of the notations provided by Respondent demonstrated that employees had suspicions about certain orders and had made some contacts,

---

[44] The Agency agrees with the ALJ's finding that the phone log note deserves more weight as to what occurred with this pharmacy than Jacob Dickson's email. RD, at 136 n.60.

[45] According to the Pro Compliance Reports in evidence, percentages of controlled substances during the relevant time period ranged from approximately 9 to 42 percent of Wilkinson's total dispensing. GX 27, at 20–23. 25–26; Tr. 367, 378–380.

[46] According to the Pro Compliance Reports in evidence, percentages of controlled substance dispensing paid for in cash ranged from approximately 17 to 38 percent and cash paid for non-controlled substance prescriptions was significantly lower. GX 27, at 20–23; Tr. 378–380.

---

[47] Between March 2014 and January 2015, Wilkinson dispensed twenty-six trinity drug cocktails. GX 27, at 21; Tr. 378. Between January 2015 and January 2016, Wilkinson dispensed twenty-one trinity drug cocktails, and between December January 2016, and August 2016, Wilkinson dispensed twenty trinity drug cocktails. GX 27, at 22–23. Tr. 379. Further, in January 2017, Wilkinson dispensed fourteen trinity drug cocktails, and in June 2017, Wilkinson dispensed 14. GX 27, at 26, 32.

[48] Respondent produced an email from March 4, 2014, from Wilkinson, which appeared to be in response to a Pro Compliance Report that Respondent had sent to Wilkinson. Wilkinson's explanation primarily focuses on cash payments. RX 05.001. The GS testified that this showed "some" due diligence. Tr. 452. There was extensive dispute about the introduction of this exhibit during the hearing. Tr. 453–458. It appeared that Respondent did try to offer the exhibit into evidence, Tr. 453, and then offered it subject to connection. Tr. 455. The ALJ ultimately determined to send it to the Agency as part of the administrative record. RD, at 104 n.41. The Agency has considered this exhibit because the contested nature of the hearing at this point has made it difficult to determine whether this exhibit was offered. The exhibit demonstrates that Respondent conducted "some" due diligence on Wilkinson. However, it is noted that the document does not demonstrate the resolution of each of the red flags of diversion, nor does it reflect any independent analysis of Respondent's statements regarding the cash red flag. Ultimately, the Agency accepts that Respondent conducted "some" due diligence for Wilkinson. Further, even if Respondent had adequately resolved the red flags for this pharmacy, there is more than enough evidence of Respondent's failures to conduct due diligence to support the Agency's finding that Respondent's registrations are inconsistent with the public interest.

---

none of the notations adequately resolved the red flags and none of the orders were reported to DEA as suspicious. In the documents Respondent produced to DEA, the GS did not find any indication that the Compliance officer stopped shipment of any order of controlled substances identified as suspicious. Tr. 315–16, 385. It is noted that most of these customers displayed not just one red flag, but multiple red flags of diversion—most of them well over any arguable threshold that would require investigation, *see supra* notes 15–16— and there is insufficient record evidence that Respondent conducted or documented due diligence to resolve these numerous red flags of diversion presented by its customers.

### E. Suspicious Orders Under 21 CFR 1301.74(b)

The Government alleged that Respondent failed to design and operate an effective system to disclose to Respondent suspicious orders and to report those orders to DEA. OSC, at 8. DEA used statistical analysis of orders placed by Respondent's customers for oxycodone and hydrocodone to "identify extremely large individual pharmacy transactions and extremely large monthly volume totals," in order to demonstrate the failures of Respondent's SOM system and reporting. *Id.* The GS explained that the reporting of suspicious orders is particularly important for DEA to be able to "conduct an investigation" and identify potential diversion. Tr. 284–86.

G.R. testified regarding the statistical analysis that he performed for the investigation, including his use of a statistical methodology called the Tukey method to identify outlier transactions that represented possible suspicious orders. Tr. 225; 236–37. G.R. testified that Tukey uses an interquartile range, which is the difference between the first and third quartiles, and then is multiplied by a factor of one-and-a-half to six (IQR multiplier). Tr. 202. Although there is no single multiplier to use, Tr. 523, the higher the IQR multiplier, the fewer outliers will be identified. Tr. 523–24. G.R. used an IQR multiplier of 3 to calculate a smaller group of outliers to identify "what are called far out or extreme outliers." Tr. 203, 233, 242. G.R. testified that the transactions that he identified using three IQR above the 75th percentile represented unusually large transactions, which would normally occur less than one percent of the time. Tr. 238–39.

G.R. testified that he analyzed Respondent's sales of oxycodone and

hydrocodone from January 1, 2014, to April 30, 2018, and compared every transaction the pharmacy made from January 1, 2014, to April 30, 2018, against every other transaction made during the same time period to the same pharmacy, which he called a "fixed-frame analysis." Tr. 197–98; 226–27. He credibly testified that he used the fixed-frame analysis because he was looking for "a ballpark estimate of scale, size of outlier population," as opposed to the exact number of outliers. Tr. 227, 234.

Government Exhibits 65 and 66 contain all of the transactions concerning oxycodone shipments that Respondent reported to DEA between January 1, 2014, and April 30, 2018, as well as the results of G.R.'s corrected analysis using the above-described methodology. Tr. 71–72. GX 65, 66; Tr. 71–72, 211–12. G.R.'s corrected analysis identified the following amounts of Respondent's oxycodone and hydrocodone sales as outliers, *i.e.*, unusually large, from January 1, 2014, to April 30, 2018.

| Substance | 2014 | 2015 | 2016 | 2017 | [49]2018 | Total |
|---|---|---|---|---|---|---|
| Oxycodone | 2,097 | 1,857 | 1,546 | 1,361 | 391 | 7,252 |
| Hydrocodone | 1,919 | 1,314 | 1,006 | 536 | 173 | 4,948 |

Tr. 212–13; GX 65–66, at Summary tab; Government Demonstrative Exhibit (GDX), at 10.

G.R.'s corrected analysis also identified approximately 450 potential outliers for Respondent's oxycodone and hydrocodone sales for seven[50] of the exemplar pharmacies from January 1, 2014, to April 30, 2018. Tr. 213–14, 216–17, 243; GDX, at 11.[51] *See* RD, at 68 for table. The Agency is considering the review of the exemplar pharmacies' unusually large orders for oxycodone and hydrocodone only to further demonstrate the general failure of Respondent to identify, investigate and report suspicious orders.[52]

In response to criticism from Respondent's expert, G.R. also conducted a "look-back analysis," which, according to G.R., produced results "consistent with what [he] found using the"[53] fixed-frame analysis

method. Tr. 228, 235. In his look-back analysis, G.R. looked at "the entire population" and not only the seven exemplar pharmacies in the OSC showing unusually large transactions. Tr. 230. G.R. testified that statistical analysis is "one piece of the analysis that is necessary to comply with DEA's regulations governing distributors." Tr. 223–24, 1084–90. *See* GX 73 and 74 (analysis using the look-back methodology that Weinstein recommended). The look-back analysis for oxycodone transactions revealed 6,816 outlier transactions, a 6 percent reduction when compared to the fixed-frame analysis of 7,252 that the Government previously found. Tr. 1091; GX 73, at Summary tab. The look-back analysis for hydrocodone transactions revealed 5,222 outlier transactions, a 5.5 percent increase when compared to the fixed-frame analysis of 4,948 that the Government previously found. Tr. 1092; GX 74, at Summary tab.[54]

Respondent presented the testimony of its own expert, Weinstein, who opined that G.R.'s analysis failed to reliably identify unusually large or suspicious orders. Tr. 558. Weinstein based his criticism of G.R.'s analysis on four factors: (1) the use of a four-year fixed-frame as opposed to the look-back method; (2) the failure to consider the schedule change of hydrocodone in late 2014 from schedule III to schedule II; (3) the failure to consider package size and formulation; and (4) the use of the line item approach as opposed to a

cumulative approach. RD, at 70; Tr. 525–28, 541–46, 558.

Weinstein credibly explained his criticisms of G.R.'s analysis in detail, opining that the factors he identified both over-estimated, *see, e.g.,* Tr. 552, and under-estimated, *see, e.g.,* Tr. 552–53, the number of outliers that could have potentially constituted suspicious orders.

Weinstein notably "did not conduct an original analysis to determine, retrospectively, which of Respondent's orders from 2014 through 2018 should have been identified as suspicious." Resp Exceptions, at 40; *see also* RD, at 25, 75. Respondent argues that it is not Respondent's burden to do so. Resp Exceptions, at 40 (citing *Steadman* v. *Securities and Exchange Comm'n,* 450 U.S. 91, 100–03 (1981); *Masters Pharm., Inc.,* 80 FR at 55473; 21 CFR 130.44(e)).

Even if the Agency fully credits Weinstein's criticism of G.R.'s analysis, the Government has clearly demonstrated its *prima facie* case that Respondent failed to design and operate a system to identify suspicious orders and report them to DEA and Respondent admits as much. *See, e.g.,* Tr. 666 (Weinstein testifying that the numbers run in early 2018 would have identified suspicious orders in similar quantities to what Respondent is currently reporting); Tr. 813 (Irelan testifying that he accepts responsibility for the Government's allegations in the OSC, paragraph 10, regarding the failure to design and operate an adequate SOM system). The G.R. analysis, according to G.R.'s credible testimony, offered a ballpark estimate of the scale of suspicious orders that Respondent neglected to identify and report to DEA. RD, at 12, and 136; *accord* Tr. 404 (The GS testifying that he asked G.R. to conduct an analysis "to get a sense of just mathematically quantifying how many suspicious orders could theoretically have been missed by

---

[49] January 1, 2018, to April 30, 2018. Tr. 212, 226.

[50] G.R.'s corrected analysis did not identify any unusually large transactions of oxycodone or hydrocodone that Respondent shipped to Hephzibah Pharmacy. ALJX 14, at 4; Tr. 230. However, the Pro Compliance Report for Hephzibah Pharmacy demonstrated multiple red flags of diversion. *Supra* section III.D.6.

[51] The tables reflect transaction size, not frequency. Tr. 244.

[52] It is noted that Weinstein conducted a "look-back" analysis of G.R.'s data; Tr. 537–38, 550–51, 693, RDX–4; *see also* RD, at 73 (table analyzing these amounts). The Agency acknowledges that Respondent demonstrated Weinstein's analysis produced significantly lower results; "nearly half of the outlier transactions he identified in 2017 and 2018 would not have been identified as outliers." ALJX 89, at 38 (citing Tr. 529–30, 568; RX 28 and 29)).

[53] Respondent argued in its Exceptions that G.R.'s look-back analysis could not be characterized as "substantially similar" to the fixed-frame analysis because although the numerical size of outliers was similar, each analysis found substantially different outliers. Resp Exceptions, at 41–42. Respondent's point is noted; however, both analyses identified numerous outliers and, ultimately, the number of outliers that could have represented suspicious orders under both analyses far exceeded the three that Respondent reported to DEA during the relevant timeframe. Further, Respondent did not demonstrate adequate documentation of its resolution of suspicious orders nor is there

information on the record that Respondent stopped shipping.

[54] Respondent contests the Government's introduction of this rebuttal evidence in its Exceptions. Resp Exceptions, at 40–41. As further explained herein, the Agency credits Weinstein's criticism of G.R.'s analysis. The exact number of unreported suspicious orders is unnecessary for the Government to prove or the Agency to conclude in finding a violation because Respondent was responsible for creating and maintaining an adequate SOM system and identifying and reporting suspicious orders. Here, it is clear from the evidence that Respondent's SOM system during the relevant timeframe was inadequate.

Morris & Dickson'' [55]). Respondent argued that the Government's case was founded [56] on establishing specific outliers that Respondent failed report to DEA as suspicious orders. Resp Exceptions, at 43 (citing *e.g.,* OSC, at 37, 46, 54, 65, 74, 84, 93); *see also* ALJX 52, at 20. However, the Agency does not find it necessary to count and identify the exact number of specific outliers, and the reason why is simple. Respondent is charged with violating a non-prescriptive regulation, which clearly places the burden on the distributor to design and operate a system to disclose to the distributor suspicious orders of controlled substances under Agency guidelines.[57] The DEA regulations notably do not prescribe *exactly* what SOM system to use or what constitutes a suspicious order—what constitutes an order of unusual size, an order deviating substantially from a normal pattern, etc. Respondent, in its defense, did not attempt to demonstrate that the system that it had in place during the relevant time period adequately identified suspicious orders—in fact, Irelan took responsibility for Respondent's SOM system failures and failure to adequately report suspicious orders to DEA. Tr. 731, 733. Based on the evidence in the record and Respondent's admitted failures, the Agency finds that Respondent clearly violated 21 CFR

1301.74(b) in failing to design and operate its system and in failing to investigate or report suspicious orders to DEA. Respondent's attempts to distract the Agency from the notion that it did not adequately meet the regulatory obligation by picking apart DEA's ballpark estimate demonstrating the potential magnitude of Respondent's violations are unavailing. The Agency notes that Respondent contests the quantity of suspicious orders that G.R. identified as unreported to DEA; but G.R.'s analysis, which he notably calibrated to only identify extreme outliers, Tr. 203, shows that the number of unreported suspicious orders for these two controlled substances during the relevant timeframe could have potentially been in the thousands.[58]

*F. Respondent's Policies and Procedures During the Relevant Timeframe*

Respondent produced a Policies and Procedure Manual and a Standard Operating Procedures (SOP) Manual in response to DEA's investigation. GX 17 and 18. The Policies and Procedure Manual states, ''Where a Compliance Officer sees a ratio of controlled drugs ordered out of the normal range, or the overall quantity is too high compared with the volume of the account, the Compliance Officer has a duty to investigate by calling the account. The Compliance Officer may stop shipment on any order if he or she finds the order to be unusually suspicious.'' GX 17, at 12. The Policies and Procedures Manual notably does not indicate an obligation to report suspicious orders to DEA. The GS testified that in his review of Respondent's records, he did not see documentation of stopped suspicious orders. Tr. 315–16. The SOP Manual [59] states that Respondent ''keeps a system in operation which is designed to discover those purchasing patterns of controlled substances which exceed the norm and could possibly be related to diversion activities.'' GX 18, at 19. The GS testified that this statement does not adequately reflect the obligations in 21 CFR 1301.74(b). Tr. 307. Further, although the SOP Manual describes various analytical reports regarding drug sales and drug volumes, the GS testified that he did not see any references to these reports in Respondent's relevant

records. Tr. 308–09, 491. The SOP Manual does clearly state that ''[w]hen a suspicious pattern or purchase is identified by any of the above methods the customer is contacted in some but not all cases and asked for a written explanation for the unusual order. In all cases,[60] a letter is sent to the DEA indicating a possible suspicious order.'' GX 18, at 20.

*G. Respondent's Former SOM System*

Irelan testified that Respondent's SOM system during the time period comprising the allegations (former SOM System) was ''not as robust as what we have today.'' Tr. 738–40 (citing *e.g.,* GX 19, at 3); *see also* RX 31.001 and 31.002 (notes that were part of Respondent's former SOM System). The former SOM system included: know your customer efforts; an electronic customer profile (ECP); a market basket system; reports from Pro Compliance; direct contact with and soliciting of information from customers; and reliance on Respondent's sales force and those who actually filled orders for controlled substances. Tr. 866–70; GX 9, at 2–3; GX 17, at 12; GX 18, at 19–20.

Irelan testified that Respondent's former SOM system would send an email or text message to the compliance officer, C.G., when an order was flagged as suspicious and the order would ship if C.G. did not take action to stop it. Tr. 728, 778.

Irelan testified that Respondent's former SOM system was ''not consistent with best practices . . . . because it didn't hold the order. It didn't give an opportunity to resolve red flags before shipping.'' Tr. 729. Additionally, Irelan testified that ''the calculation that the system was using [to identify potentially suspicious orders] was only using ten times a 90-day average,'' which made it ''inadequate.'' Tr. 729; *see also* Tr. 321–22 (The GS testimony that 8 times the average could still be a suspicious order); Tr. 652 (Weinstein testifying that this calculation was not sufficient based on DEA guidance). Regarding the former SOM system, Milione testified that his ''understanding is they accepted that there were things wrong with it, that the

---

[55] It is noted that Respondent uses a different quote from the GS that stated that the intent of the analysis was ''to quantify, you know, just how many orders are we talking about that fell outside of just a normal pattern or set amount'' and that ''the analysis showed that there were roughly, 14,000 orders that should have been reported as suspicious based on the quantity that was ordered.'' Respondent's Exceptions, at 45 (quoting Tr. 293). Given the several contextual parameters that the GS used in these statements, like ''just a normal pattern or set amount'' and ''based on the quantity that was ordered,'' the Agency does not find this statement to be inconsistent with the GS's statement at Tr. 404, regarding the purpose of G.R.'s analysis.

[56] The Government's Prehearing Statement states that G.R. ''will testify that a standard statistical outlier analysis is a reasonable method to identify unusual transactions in the context of pharmaceutical distribution.'' ALJX 7, at 6. The description of G.R.'s testimony in both the Government's Prehearing Statement and Third Supplemental Prehearing Statement discusses the manner in which G.R. arrived at his calculations and established reasonable thresholds. *Id.* at 6–8; ALJX 52, at 20 (''G.R. will testify that his analysis identified the following unusually large transactions for the exemplar pharmacies.''). The Agency additionally agrees with the rationale of the ALJ that G.R.'s testimony regarding the intent of his statistical analysis did not give rise to a new allegation. *See* RD, at 96 n.33.

[57] The December 20, 2007 letter that DEA sent to manufacturers and distributors stated that ''[t]he regulation clearly indicates that it is the sole responsibility of the registrant to design and operate such a system. Accordingly, DEA does not approve or otherwise endorse any specific system for reporting suspicious orders.'' GX 4, at 1.

[58] Respondent further made arguments related to what it determined as inconsistent analysis in the RD related to G.R.'s outlier numbers. Resp Exceptions, at 44–46. The Agency finds that G.R.'s analysis provides a ballpark of the egregiousness of Respondent's failures to design and operate the required system. *See* Tr. 227, 224.

[59] The SOP Manual states that the details of Respondent's suspicious order monitoring program ''are confidential and therefore are not made a part of this manual.'' Tr. 306; GX 18, at 17.

[60] The GS testified that customers should be contacted in all cases. Tr. 484. *Masters* may provide some room for nuance if Respondent stops shipment of the orders and reports to DEA; however, none of this nuance is represented in the SOP Manual. Additionally, the policy states that ''in all cases,'' DEA is required to be notified, when in fact, DEA was only notified three times during the relevant time period and the record evidence established that Respondent neither reported to DEA nor adequately documented the resolution of red flags for the exemplar pharmacies or generally for suspicious orders during the relevant time period. *See supra* III.D.

reporting to DEA was insufficient.'' Tr. 989. He stated, ''it was clear that there was an issue'' and that after reviewing the system, his company told Respondent that ''there are certain things that should be enhanced knowing what DEA expected.'' Tr. 990–91. For example, ''one of the big things was a way to flag orders [in] real time and in an appropriate way with some kind of an algorithm and then report those flagged orders to DEA.'' Tr. 991.

Respondent also argues that as a result of its former SOM system, it had ceased supplying controlled substances to 42 pharmacies from 2014 to 2016. RX 11, at 14 (powerpoint slide); Tr. 871. Respondent's expert acknowledged that if those customers had been terminated based on Respondent's SOM program, it should have filed suspicious order reports with DEA. Tr. 1015–16; *see also Masters Pharm., Inc.,* 80 FR at 55477 (holding that a distributor discovering a suspicious order must either stop shipping and report to DEA or investigate and resolve the red flags). If Respondent stopped shipping and terminated a customer as a result of discovering a suspicious order, that order should have been reported to DEA. There is no evidence that the 42 customers from 2014 to 2016 were reported to DEA—in fact, the evidence establishes that there was only one suspicious order report filed during this timeframe on April 7, 2014. *See* GX 6, at 1.[61]

## H. Respondent's New SOM System

Respondent requested confidentiality related to its current SOM system and policies; therefore, this Decision incorporates by reference the findings of the RD related to Respondent's system and summarizes herein at as high a level as possible while appropriately adjudicating the facts.[62] *See* RD, at 75–82. Guidepost[63] undertook seven corrective measures on Respondent's behalf. Tr. 882. Those measures included: (1) establishing an anti-diversion compliance regulatory affairs team; (2) enhancing Respondent's SOM system; (3) redeveloping Respondent's ECP; (4) enhancing Respondent's ''know your customer protocols''; (5) enhancing Respondent's due diligence investigative protocols; (6) conducting employee training; and (7) documenting everything and reporting to DEA. Tr. 882–900. The Analysis Group, Inc., (AGI) was also brought in to develop a live real-time order monitoring system that would identify suspicious orders. Tr. 885. Between May 14, 2018, and July 29, 2018, Respondent submitted 58 suspicious order reports to the DEA. RX 20. In those 58 reports, Respondent informed the DEA of approximately 3,915 suspicious orders. *Id.* Applying Respondent's new SOM program to its orders from early 2018, Weinstein identified a similar number of suspicious orders.[64] Tr. 666, 676, 682–

83. Respondent's current SOM system holds customer's orders as ''potentially suspicious'' and prevents the orders from being shipped until the Compliance team has reviewed. Tr. 668–69, 672; 582. Furthermore, Respondent currently documents its due diligence regarding suspicious orders in the Enhanced Customer Profiles in a readily-retrievable format. Tr. 737, 716; RD, at 79.

## IV. Analysis

A distributor's registration may be suspended or revoked upon a finding that the distributor ''has committed such acts as to render [its] registration under section 823 of this title inconsistent with the public interest as determined under such section . . . .'' 21 U.S.C. 824(a)(4). With regard to distributors of schedule II controlled substances, Congress has set forth five factors to consider when determining whether the distributor's registration is in the public interest. The factors to be considered are:

(1) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;

(2) compliance with applicable State and local law;

(3) prior conviction record of applicant under Federal or State laws relating to the manufacture, distribution, or dispensing of such substances;

(4) past experience in the distribution of controlled substances; and

(5) such other factors as may be relevant to and consistent with the public health and safety.

21 U.S.C. 823(b).[65]

---

[61] It is also noted that Jacob Dickson's letter stated that Respondent had ceased supplying 142 retail pharmacies ''due to questions and concerns that the pharmacies were overdispensing controlled substances. After ceasing doing business with these 'bad accounts' [Respondent] has seen very few examples which would justify the reporting of a suspicious order.'' GX 9, at 5. Milione testified that Mr. Dickson ''specifically took pride in being able to say, look, this—every year there has been this—this many customers that they focused on and identified. And I think—I don't know the exact math. It was 125, 135 customers from 2008 to 2016 that were terminated or suspended . . . based upon their compliance suspicious order monitoring program.'' Tr. 870–71. Respondent provided transcribed testimony from Mr. Dickson in a separate hearing stating that Respondent eliminated 142 customers ''because in some form or fashion they might have been suspicious and diverting.'' RX 1, at 61. It is unclear how many of these customers were terminated during the relevant timeframe—other than the 42 customers that were terminated during 2014 to 2016. Without the benefit of evidence or testimony regarding the circumstances of the terminations during the relevant timeframe, it is difficult for the Agency to determine what weight to give these terminations, *see* RD, at n.32; however, the language on the record describing these orders as ''suspicious and diverting'' or ''overdispensing'' or ''bad accounts'' certainly brings into question whether they could constitute additional violations of the suspicious order reporting requirement. *See also* RD, at 136. In sum, without further evidence explaining the circumstances of the terminations or the reasons why they were unreported to DEA, the Agency

cannot give Respondent's terminations during the relevant timeframe the weight that Respondent requests to demonstrate its compliance. These terminations are not being considered as further violations of DEA regulations, but they are also not given weight for Respondent in the public interest inquiry. Finally, the Agency notes that whether Respondent's SOM System was adequate prior to the relevant timeframe is not a matter currently before the Agency.

[62] *See, e.g.,* Tr. 15 (Respondent requesting confidentiality based on ''proprietary trade secrets of the Analysis Group regarding the customized suspicious order monitoring system that they have developed for the Respondent, as well as all of the different functionality of the Respondent's suspicious order monitoring system.''); ALJX 82. The Agency has provided a high-level summary of these improvements to demonstrate consideration of the scope of Respondent's remedial measures. The numbers of suspicious orders have been included because the Agency finds this information to be relevant to the adjudication of this matter.

[63] Respondent paid Guidepost a large sum of money between the time the OSC/ISO was issued and May 2019 to be brought into compliance with DEA regulations. Tr. 973–74, 992 (*see* RD, at 76 for further details). Milione testified that Respondent has ''spared no expense'' in becoming compliant with DEA regulations. Tr. 992.

[64] Although Respondent did not run its new system on the old data during the time period covered by the OSC, Tr. 682, 686, Weinstein did testify that Respondent applied its current SOM system to the orders Respondent received in early 2018 (covering some of the allegations in the OSC) and Weinstein testified that using the current SOM system ''[c]ertainly there were some that would

have been identified in those months. And in a similar number to what's being identified currently.'' Tr. 666; *see also* Tr. 676 (data from April 2018 (in the relevant timeframe) produced a roughly similar volume of flagged orders, which ''tends to be in the hundreds each month that are identified by the thresholds''). It is noted that these numbers reflect the quantity of orders that would have been flagged for suspicion and does not ''take into account any due diligence'' etc. Tr. 677. This testimony is not included in this Decision to prove the number of suspicious orders that DEA should have received in early 2018, but, instead, is included to further support the Agency's finding that Respondent's suspicious order monitoring and reporting during the relevant timeframe was insufficient to meet the regulatory requirements.

[65] 21 U.S.C. 823(e) also applies to distributors of controlled substances. The section sets forth the identical factors to be considered regarding a registration to distribute controlled substances in schedules III, IV, and V, as are contained in 21 U.S.C. 823(b) concerning schedules I and II. The Government's allegations are focused primarily on Respondent's distribution of schedule II controlled substances, but in 2014, during the time period of the allegations, hydrocodone was changed from a schedule III to a schedule II controlled substance. Tr. 539. Additionally, Respondent is a registered distributor of controlled substances in schedules II–

The Agency considers these public interest factors in the disjunctive and may rely on any one or a combination of factors and give each factor the weight the Agency deems appropriate in determining whether to revoke a registration or to deny a pending application for renewal of a registration. *Masters Pharm., Inc.,* 80 FR at 55472 (applying DEA decisions on the public interest factors in 21 U.S.C. 823(f) to the public interest factors for distributors in 21 U.S.C. 823(b) and (e)); *see also Southwood Pharm, Inc.,* 72 FR at 36497–98. Any one factor, or combination of factors, may be decisive. *David H. Gillis, M.D.,* 58 FR 37507, 37508 (1993). There is no need to enter findings on each of the factors.[66] *Hoxie* v. *Drug Enf't Admin.,* 419 F.3d 477, 482 (6th Cir. 2005); *Masters Pharm., Inc.,* 80 FR at 55473.

The Government bears the initial burden of proof and must justify revocation by a preponderance of the evidence. *Steadman,* 450 U.S. at 100–03; *Masters Pharm., Inc.,* 80 FR at 55473; 21 CFR 1301.44(e). If the Government makes a *prima facie* case for revocation, then the burden of proof shifts to the registrant to show why its continued registration would not be inconsistent with the public interest. *Masters Pharm., Inc.,* 80 FR at 55473; *see also Med. Shoppe—Jonesborough,* 73 FR 364, 387 (2008).

In this case, the Government contends that Respondent's continued registrations are inconsistent with the public interest based on Factors One and Four. ALJ–90, at 27–29.

*A. Respondent's Failure To Maintain Effective Controls Against Diversion and its Experience With Controlled Substances (Factors One and Four)*[67]

With respect to Factor One, concerning the maintenance of effective

controls against diversion, DEA has promulgated regulations to guide the regulated community. Specifically,

All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances. In order to determine whether a registrant has provided effective controls against diversion, the Administrator shall use the security requirements set forth in [21 CFR] 1301.72–1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion.

21 CFR 1301.71(a).

DEA's security regulations further provide that:

The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 CFR 1301.74(b).

The OSC alleges that Respondent failed to maintain "effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," in violation of 21 U.S.C. 823(b)(1) and 21 CFR 1301.71(a). ALJX 1, at 3, paras. 7, 10. Second, the OSC alleges that Respondent failed to adequately "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and report them to DEA, in violation of 21 CFR 1301.74(b). ALJX 1, at 3, paras. 8, 10.

Factor Four involves a registrant's past experience in the distribution of controlled substances, which the Government has argued is appropriately considered along with its maintenance of effective controls against diversion. *See, e.g., Masters Pharm., Inc.,* 80 FR at 55473. In this case, Respondent argues that its experience in the distribution of controlled substances "is extensive," as it was "founded in 1841 and distributes more than 33,000 products," and that its history of compliance weighs against a finding that Respondent's registration is inconsistent with the public interest. ALJX 89, at 115–116 (citing RX 1, at 13:16, 15:10). Although Respondent's arguments have been considered, Respondent's misconduct as described further herein precludes a finding that Respondent's experience establishes a

"history of compliance." *See Novelty Distributors, Inc.,* 73 FR 52689, 52702 (2008) (analyzing the identical factor for distributors under 21 U.S.C. 823(h)).

1. A Suspicious Order

To begin, the regulations require distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 CFR 1301.74(b). The regulations provide that, at minimum, a suspicious order includes "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.; see* section IV.A.3. These three criteria are non-exclusive and registrants may encounter other considerations beyond those spelled out in the regulation that could qualify an order as suspicious. *Masters Pharm., Inc.,* 80 FR at 55473–74; *Masters Pharm., Inc.,* 861 F.3d at 221 (noting the regulatory criteria for suspicion are "exemplary rather than exhaustive"). For example, a distributor might find a pharmacy's orders for controlled substances to be suspicious not only based on their exhibiting the characteristics set forth in the regulation, but also based upon the "pharmacy's business model, dispensing patterns, or other characteristics." *Masters Pharm., Inc.,* 80 FR at 55473–74; *see also id.* at 55477 (stating that "an order is not only suspicious by virtue of its internal properties—*i.e.,* being of unusual size, pattern, or frequency—but by virtue of the suspicious nature of the pharmacy which placed [the order]"). The identification of a suspicious order that is based on the nature of the pharmacy's business takes place at the customer-level. *See infra* section IV.A.4.

In order to conclude that an order for controlled substances is suspicious, a "distributor is not required to establish, to a statistical certainty, that a pharmacy was likely diverting controlled substances." *Masters Pharm., Inc.,* 80 FR at 55480. In fact, suspicion is a low standard, defined as merely one's "'apprehension or imagination of the existence of something wrong based only on inconclusive or slight evidence, or possibly no evidence.'" *Masters Pharm., Inc.,* 80 FR at 55478 (quoting Black's Law Dictionary 1585 (9th ed. 2009)). Thus, if a distributor is aware of any indication of "the existence of something wrong" concerning the size, frequency, or pattern of an order, then the distributor is obligated to report it to the DEA. *Masters Pharm., Inc.,* 80 FR at 55478. Because suspicion is a low standard, a distributor's obligation to report suspicious orders is triggered long before the distributor would have

---

V; therefore, the Agency, even when referring only to (b), considers the identical public interest factors under both sections 823(b) and (e) in this section.

[66] Respondent argues that "an independent consideration of each of these [five] factors [at 21 U.S.C. 823(b)(1–5)] weigh[s] against a finding that Respondent's continued registration is inconsistent with the public interest." ALJX 89, para. 291. In other words, although the Government only submitted evidence relevant to Factor One and Factor Four, Respondent urges the Agency to find evidence relevant to all five Factors. The Agency declines to adjudicate, at Respondent's request, arguments that the Government did not make, yet notes that if it were to do as Respondent requests, the ensuing analysis of all five Factors would continue to point to the revocation of Respondent's registration.

[67] While listing the five public interest factors of 21 U.S.C. 823(b), the Government specifically notes that it does not rely on Factors Three or Five and makes no argument concerning Factor Two. ALJ–90, at 27–29 & n.12. Further, the Government combines its analysis of Factors One and Four. *Id.*

at 28–44. The Government notes that where it has not made allegations with respect to Factors Three and Five, the factors do not weigh for or against revocation. *See* ALJX 90, at n.12. As such, although the Agency has considered all five factors, its analysis focuses on Factors One and Four.

probable cause to believe that a customer is engaged in diversion. *Id.* As *Masters* explains, suspicion is not contingent on evidence that the order will be diverted or that the customer is engaged in diversion. *Id.* With regard to the reporting requirement, the Agency's emphasis is on *suspicion* and not conclusive proof of diversion. *Id.* at 55420 (explaining that tying suspicion to evidence of diversion ''imposes a higher standard than that of the plain language of the regulation, which requires only that the order be suspicious'').

### 2. Respondent's Failure To Adequately Design and Operate a Suspicious Order Monitoring System

When a distributor's suspicious order monitoring (SOM) system places a hold on a customer's order for controlled substances because the order is of unusual size, pattern, or frequency, the order meets the specific criteria of being suspicious. *Masters Pharm., Inc.,* 80 FR at 55479; *Masters Pharm., Inc.,* 861 F.3d at 216–17 (affirming the Acting Administrator's ruling that ''orders held by the [distributor's SOM systems] met the regulatory definition of 'suspicious orders' ''). DEA has made clear that it does not endorse any particular system for identifying suspicious orders. GX 4, at 1; Tr. 59–60, 76, 210, 497, 646.

In this case, Respondent's SOM system during the relevant time period did not have the capability to hold an order that was flagged as ''potentially suspicious.'' Tr. 728, 778. Therefore, the system could not comply with the DEA legal requirements. Tr. 729 (Irelan testifying that the SOM system was ''not consistent with best practices'' because ''[i]t didn't give an opportunity to resolve red flags before shipping.'')

Additionally, the witnesses were in agreement that Respondent's SOM system during the relevant time period was inadequate to identify orders of unusual size in that it only flagged orders that were ''ten times a 90-day average,'' Tr. 729–30, 321, 652.[68]

Further, while Respondent had written policies and procedures, those policies and procedures only identified three suspicious orders over a period of four years and four months that were reported to the DEA. Respondent admits that its previous policies were inadequate. Tr. 720–21. Respondent had a policy of producing monthly and daily reports, yet none is apparent in the Administrative Record, and although Respondent maintained a proprietary database, RX 11, at 5, there is no record evidence from this database.

Finally, although Respondent argues that the record supports that it was conducting due diligence into its customers, Respondent admits that it did not adequately document that due diligence, nor did it apply that due diligence at an order level. *See infra* section IV.A.4. Respondent's policy of not documenting its due diligence, GX 9, was also inconsistent with the *Masters* decision. *See id.*

In sum, the Agency finds substantial record evidence that Respondent failed to design and operate an adequate SOM system in violation of 21 CFR 1301.74(b).

### 3. Respondent's Failure To Report Suspicious Orders Under the Listed Criteria in 21 CFR 1301.74(b)

As explained above, DEA regulations obligate distributors of controlled substances to not only design and operate a system to identify suspicious orders, but to also report all suspicious orders to DEA. 21 CFR 1301.74(b). In other words, DEA regulations require distributors like Respondent ''to alert DEA when their retail-pharmacy customers *attempt* to obtain unusual amounts of a controlled substance, because such attempts are powerful evidence that the pharmacies are operating illegally.'' *Masters Pharm., Inc.,* 861 F.3d at 217–18 (emphasis in original).[69] Moreover, the Agency has previously held that filing ARCOS reports does not satisfy a distributor's obligation to notify DEA of suspicious orders, *Southwood Pharm., Inc.,* 72 FR at 36501, nor does filing reports on a routine or periodic schedule. *Masters Pharm., Inc.,* 80 FR at 55478.

The purpose of the DEA's reporting requirement is ''to provide investigators in the field with information regarding potential illegal activity in an expeditious manner.'' *Masters Pharm., Inc.,* 80 FR at 55483 n.169 (quoting *Southwood Pharm., Inc.,* 72 FR at 36501). As such, when a distributor obtains ''information that an order is suspicious but then chooses to ignore that information and fails to report the order,'' the distributor violates its regulatory obligation. *Id.* at 55478.

Here, DEA presented evidence using the Tukey statistical model to determine a ballpark number of suspicious orders that an adequate SOM system might have identified during the time period in the allegations both for the eight exemplar pharmacies and for Respondent's customer base at large for two frequently abused controlled substances: oxycodone and hydrocodone. The ballpark estimate found numerous potential suspicious orders for seven out of the eight exemplar pharmacies, and for the overall customers, it found that 7,252 sales of oxycodone and 4,948 sales of hydrocodone during this time period should have possibly been reported as suspicious to DEA.[70]

The ballpark numbers constitute substantial evidence that there were far more suspicious orders that should have been identified, investigated, or reported than the mere three that Respondent reported during the time period. Even taking into consideration all of the criticism levied on DEA's modeling by Respondent's expert, he himself admitted that the data run during the beginning of 2018 produced similar results to the quantity that Respondent was reporting under the new system, which, in a little over a year, amounted to 3,915 suspicious orders. As such, the Agency agrees with the ALJ that the three suspicious order reports filed during the relevant timeframe ''barely scratched the surface,'' RD, at 140, and finds it clear that the Government has proven by substantial evidence that Respondent failed to investigate or report potentially thousands of suspicious orders of oxycodone and hydrocodone to DEA. *Supra* section III.E.

Furthermore, the *Southwood* decision explained that even *after* a suspicious order is reported to DEA, a distributor must conduct some due diligence and only ship the order ''if it is able to determine that the order is not likely to be diverted into illegal channels.'' *Masters Pharmaceuticals,* 861 F.3d 206 (2017) (citing *Southwood Pharm., Inc.,* 72 FR at 36500). Here, it is undisputed that Respondent submitted three suspicious order reports to DEA during the relevant time period. The GS testified that Respondent shipped these orders without documenting any resolution of the suspicious circumstances that caused Respondent to report them to DEA. Tr. 294. Thus, the Agency finds substantial record evidence that Respondent's lack of documentation of its investigation into and resolution of these red flags,

---

[68] DEA sent a letter in December 20, 2007, warning distributors that a SOM system ''rely[ing] on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders.'' GX 4, at 2.

[69] Suspicious orders meeting the definition in 21 CFR 1301.74(b) must be reported to DEA, and Respondent did not argue otherwise. *See, e.g.,* Tr. 732, 1024; RX 20.001, at 1. There is additionally no record evidence that Respondent investigated these suspicious orders and resolved them at any time.

[70] It is noted that the ballpark numbers that G.R. testified to support a conclusion that Respondent failed to identify, resolve, or report suspicious orders under the criteria in § 1301.74(b) to DEA—not whether Respondent failed to conduct customer due diligence generally.

coupled with its shipping of the suspicious orders, demonstrates additional violations of Respondent's regulatory obligations to provide effective controls and procedures to guard against diversion of controlled substances.

### 4. Customer Due Diligence and Red Flags

It is inherent in the obligation under 21 CFR 1301.71(a) to maintain "effective controls" against diversion that "a registrant has an affirmative duty to protect against diversion by knowing its customers and the nature of [their controlled substances] sales." *Holloway Distributing*, 72 FR 42118, 42124 (2007).[71] Therefore, a distributor is required to act on " 'information which raise[s] serious doubt as to the legality of [the customer's] business practices,' " also referred to as red flags,[72] indicative of diversion. *Masters Pharm., Inc.*, 80 FR at 55477 (alteration in original) (quoting *Southwood Pharm., Inc.*, 72 FR at 36498). A distributor must also "conduct a reasonable investigation to determine the nature of a potential customer's business before it sells to the customer." *Id.* Furthermore, a distributor has a continuing obligation to perform due diligence of a customer throughout the distributor's relationship with that customer. *Id.* at 55477. *Masters* clarified that "although a distributor's investigation of the order (coupled with its previous due diligence efforts) may properly lead it to conclude that the order is not suspicious, the investigation must dispel all red flags indicating that a customer is engaged in diversion to render the order non-suspicious and exempt it from the requirement that the distributor 'inform' the Agency about the order." *Id.* at 55478.

The record evidence and testimony from multiple experts in this case, the Pro Compliance Reports themselves,

and prior DEA decisions have all clearly demonstrated that such suspicious circumstances, or red flags, include a pharmacy that: dispenses a high volume of narcotics;[73] dispenses the trinity drug cocktail;[74] dispenses disproportionately more controlled substances than non-controlled substances;[75] fills prescriptions for a high volume of patients who pay for prescriptions in cash;[76] fills a disproportionate volume of controlled substance prescriptions written by only a few prescribers;[77] and orders excessive quantities of a limited variety of controlled substances.[78] *See supra* section III.C. A distributor fails to maintain effective controls against diversion when the distributor continues to distribute controlled substances to a pharmacy that exhibits red flags of diversion without resolving those red flags. *Masters Pharm., Inc.*, 80 FR at 55457 (faulting the distributor for supplying controlled substances "while ignoring numerous red flags as to the legitimacy of the pharmacy's dispensing of controlled substances"); *cf. Top RX Pharmacy*, 78 FR 26069, 26082 (2013) (applying a similar principle to pharmacies filling prescriptions that contain red flags of abuse or diversion); *see also Novelty Distributors, Inc.*, 73 FR 52689, 52699 (2008) (applying a similar principle to list I chemical distributors under 21 U.S.C. 823(h) ("Fundamental to its obligation to maintain effective controls against diversion, a distributor must review every order and identify suspicious transactions. Further, it must do so prior to shipping the products. Indeed, a distributor has an affirmative duty to forgo a transaction if, upon investigation, it is unable to determine that the proposed transaction is for

legitimate purposes.")).[79] A distributor has an obligation to guard against diversion, and as such, must resolve red flags of diversion presented by its customers or decline to ship the controlled substance. 21 U.S.C. 823(b), (e); 21 CFR 1301.71(a).

When a customer demonstrates red flags of diversion, the distributor must report a suspicious order to DEA unless the distributor conducts a due diligence investigation, which "must dispel all red flags indicative that a customer is engaged in diversion." *Masters Pharm., Inc.*, 80 FR at 55478. "Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the [DEA] must be informed." *Id.; see also id.* at 55479 n.164 (same).

In upholding DEA's interpretation of the due diligence requirement in the *Masters* decision, the D.C. Circuit Court of Appeals stated:

As we have emphasized throughout this opinion, it is not necessary for a distributor of controlled substances to investigate suspicious orders if it reports them to DEA and declines to fill them. But if a distributor chooses to shoulder the burden of dispelling suspicion in the hopes of shipping any it finds to be non-suspicious, and the distributor uses something like the SOMS Protocol to guide its efforts, then the distributor must actually undertake the

---

[71] *See also Holloway Distributing*, 72 FR 42118, 42124 (2007) (finding that a distributor of List I chemicals' "policy—which is fairly characterized as 'see no evil, hear no evil'—is fundamentally inconsistent with the obligations of a DEA registrant").

[72] It is noted that Agency Adjudications have used the term "red flag" as early as 1998 and federal courts have used the term as early as 1986. *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 FR 79188, 79195 n.23 (2016), *pet. for rev. denied*, 881 F.3d 823 (11th Cir. 2018). In general, a red flag is any "circumstance that does or should raise a reasonable suspicion as to the validity of a prescription [or order]." *Pharmacy Doctors Enters. d/b/a Zion Clinic Pharmacy*, 83 FR at 10896 n.31 (quoting *Hills Pharmacy, L.L.C.*, 81 FR at 49839). Red flags are, in essence, "warning signs" or "suspicious circumstances" that alert the registrant that something is not right. *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 FR at 79195 n.23.

[73] *Masters Pharm., Inc.*, 80 FR at 5548–81 n.168 (explaining where a distributor had information that 50 percent of the prescriptions filled by a pharmacy were for controlled substances, while the average pharmacy only fills about 20 percent, the distributor "had substantial information which raised a strong suspicion as to the legitimacy of [the pharmacy's] dispensing practices"); GX 3, at 3.

[74] *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 FR at 79194 ("The combination of a benzodiazepine, a narcotic and carisoprodol is 'well known in the pharmacy profession' as being used 'by patients abusing prescription drugs.' " (quoting *E. Main St. Pharmacy*, 75 FR 66149, 66163 (2010))).

[75] *Masters Pharm., Inc.*, 80 FR at 55456; GX 3, at 3.

[76] *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 FR at 79194 (" '[A]ny reasonable pharmacist knows that a patient that (sic) wants to pay cash for a large quantity of controlled substances is immediately suspect.' " (quoting *E. Main St. Pharmacy*, 75 FR 66149, 66158 (2010))).

[77] GX 3, at 3.

[78] *Masters Pharm., Inc.*, 80 FR at 55421; GX 3, at 3.

[79] Respondent introduced testimony regarding whether Respondent could continue to ship during a due diligence investigation into customer-level red flags of diversion—arguing that there is a certain amount of discretion involved and that stopping shipments would disrupt the supply chain. *See, e.g.,* Tr. 1049, 1050, 1042; 649. The record does not support a finding that Respondent did, in fact, adequately dispel all of the red flags on these customers at any time (before or after distributing), or that Respondent adequately documented purported resolutions of the red flags. The *Masters* decision cannot be read to intend to create a loophole in which a distributor could avoid reporting requirements and continue to ship orders of controlled substances while conducting lengthy investigations into red flags. Such an interpretation would not meet the requirement that a distributor maintain effective controls against diversion. To the extent that, as Respondent argues, there may be some discretion in the decision of when to ship, it is abundantly clear that a distributor cannot ship if it cannot determine that the "proposed transaction is for legitimate purposes," *Novelty Distributors* 73 FR at 52699, or without resolving " 'information which raise[s] serious doubt as to the legality of [a potential or existing customer's] business practices.' " *Masters Pharm., Inc.*, 80 FR at 55477 (alteration in original) (quoting *Southwood Pharm., Inc.*, 72 FR at 36498). Further, Respondent's supply chain argument is weakened by the fact that Respondent had a duty to and was purportedly running reports on prospective customers; therefore, it knew about many of the red flags in the eight exemplar pharmacies before engaging in business with them. *See, e.g.,* GX 25, at 4 (Initial Risk Evaluation Report for Hephzibah Pharmacy LLC); RX 11, at 15 (powerpoint demonstrating turned down prospective accounts based on Pro Compliance Reports).

investigation. For example, when an employee uses the SOMS Protocol to confirm or dispel suspicion based on the amount of controlled medication the pharmacy is selling, the employee must request a 'UR,' *i.e.,* a document showing the pharmacy's 'actual dispensing[s] . . . of each drug.' [*Masters Pharm., Inc.,*] 80 FR [55418,] 55420 [(2015)]. Moreover, the investigating employee must 'document' customers' explanations for suspicious orders, so that he or she can verify those explanations and make sure they are consistent over time. *Id.* at 55428 n.21. Additionally, if a customer's explanation for its order is 'inconsistent with other information the investigator has obtained about or from the customer, . . . the [investigator] must conduct 'additional investigation to determine whether [its customer is] filling legitimate prescriptions.' *Id.* at 55477. Finally, the investigation must dispel all of the 'red flags' that gave rise to the suspicion that the customer was diverting controlled substances. *Id.* at 55478. The Administrator recognized that, if investigating employees fail to take such basic steps, the SOMS (or similar protocol) does not function as an effective tool for dispelling suspicion.

*Masters Pharm., Inc.,* 861 F.3d at 222–23. The D.C. Circuit made clear that all red flags must be resolved or the order must be reported to DEA as suspicious.

In this case, Respondent received numerous Pro Compliance Reports that raised multiple red flags for each of the relevant customers during the relevant time period. *See* GX 20–56; *supra* section III.D. The Pro Compliance Reports themselves clearly identify specific red flags in Respondent's customers' data and frequently recommend further discussions and onsite visits to resolve them. *See, e.g.,* GX 21, at 6; *supra* III.E. Although Respondent produced some minimal evidence consisting of phone logs for some of the exemplar pharmacies in the OSC, *see supra* n.12 and section III.D., which indicated a few instances over the several year timeframe where Respondent had engaged with these customers regarding red flags and/or suspicious orders, there is not adequate documentation as to how Respondent resolved the red flags, even as Respondent continued to fill these orders without reporting them to DEA. Moreover, the GS credibly testified that documentation was an essential component of due diligence. Tr. 298–99 ("[I]f you don't document it how are you going to remember it, how are you going to be able to prove it happened"). The *Masters* decision further pointed out that documentation is essential in maintaining effective controls against diversion to ensure that customers are consistent in their explanations regarding red flags. *Masters Pharm., Inc.,* 80 FR at 55428 n.21. The D.C.

Circuit also affirmed the Agency's position that if a distributor undertakes an investigation into its customer's potential diversion, then it must document and "dispel all of the 'red flags' that gave rise to the suspicion that the customer was diverting controlled substances" to avoid the requirement to report the suspicious order to DEA. *Masters Pharm., Inc.,* 861 F.3d at 222–23.

Here, Respondent acknowledged the paucity of documentation in its records that might show that it had resolved red flags. *See, e.g.,* Tr. 720; GX 9, at 1–2. Contrary to Respondent's argument (ALJ–89, at 101–03, paras. 272–75), the absence of documentation of resolving red flags does indeed constitute evidence that the red flags were never resolved. *See Masters Pharm., Inc.,* 861 F.3d at 218.[80] While Respondent did conduct some due diligence, such as by obtaining Pro Compliance Reports and by preparing its own monthly Market Basket Reports of its customers, ordering the reports without taking appropriate action based on the content of those reports does not come close to satisfying the regulatory obligation to conduct due diligence. These Pro Compliance Reports identify multiple red flags from Respondent's pharmacy customers—demonstrating that Respondent was aware of these red flags—while the records it produced do not resolve them in any substantive way to demonstrate effective controls against

---

[80] To permit Respondent to escape any liability for its lack of adequate controls to protect against diversion merely because Respondent created a policy that did not require documentation of how those controls were exercised would nullify the purpose of the statutory and regulatory requirements. Further, the Agency agrees with the ALJ that Respondent's intentional strategy of not presenting the testimony of any witness who was actually involved in Respondent's purported resolution of red flags further undermines its argument that the red flags were actually resolved. *Id.* Finally, Agency decisions have frequently described the importance of documentation to meet DEA regulatory requirements in other contexts. *See Kaniz F. Khan-Jaffery, M.D.,* 85 FR 45667, 45686 (2020) ("DEA's ability to assess whether controlled substances registrations are consistent with the public interest is predicated upon the ability to consider the evidence and rationale of the practitioner at the time that she prescribed a controlled substance—adequate documentation is critical to that assessment." (citing *Cynthia M. Cadet, M.D.,* 76 FR 19450, 19464 (2011))). In particular, the *Masters* decision affirmatively stated the requirement for distributors to document their resolutions of red flags and gave a rational basis for that requirement—ensuring that the information is memorialized for the resolution of future indicia of diversion. *Masters Pharm., Inc.,* 80 FR at 55,428 n.21. This basis is very apparent here where Respondent's customer base is large and the shipments are numerous. As such, the Agency finds that Respondent's failure to maintain adequate documentation indicates a violation of the requirements to maintain effective controls against diversion.

diversion. *See, e.g.,* GX 20–56 (the Pro Compliance Reports for the exemplar pharmacies). Respondent's employees even noted occasions where information in the Pro Compliance Reports was specifically concerning to them or where they were aware of additional indicia of diversion or suspicious orders, yet these orders were neither reported to DEA nor is there record evidence to support a finding that Respondent resolved all of the red flags that gave rise to the suspicion. *See, e.g.,* Respondent's employee's comments, at GX 14, at 4 ("[T]his seems quite elevated to me. . . . .????") and 31 ("Henry will give the customer a warning about his Oxy purchases. Too much cash, too much growth. Will re-run and if no improvement will either restrict or cut off completely."). The note documenting this interaction not only fails to offer any resolution of the suspicious circumstances or indicate any reporting to DEA, but also indicates that Respondent knew of the existence of a suspicious order and that the customer was given a warning—providing it with a chance to amend its behavior and further avoid detection from DEA. The regulations require resolution or reporting, not implementation of a "second chance" or "three strikes you're out" program.

A distributor fails to conduct meaningful due diligence that satisfies its regulatory duties where it merely "accept[s] at face value whatever superficial explanation" the pharmacy offers and then fails to independently verify it. *Masters Pharm., Inc.,* 80 FR at 55457. Further, conducting due diligence but then failing to act on the findings is also inadequate. *See Southwood Pharm., Inc.,* 72 FR at 36500 (finding the distributor's due diligence efforts to be inadequate where the distributor possessed information that customers were diverting controlled substances yet the distributor continued to provide them with controlled substances). Thus, as the GS credibly testified as an expert witness, the Agency finds that even though Respondent produced some due diligence files to DEA, Respondent seemed to "conduct due diligence and ignore the red flags that are in [its] face and continue to ship" without documenting the resolution of red flags or reporting to DEA, in violation of DEA regulations. Tr. 463; *see also* Tr. 80 (testimony of the Section Chief: "[Y]ou can ask for all these things, but you have to do something with it."). As the evidence shows, Respondent continued to distribute controlled substances despite the red flags raised in its due

diligence files and without either adequately documenting an investigation or resolution of the red flags or refusing to ship and reporting the orders to DEA. As such, Respondent's due diligence was clearly insufficient to meet DEA's legal requirements. *See also* RD, at 120–128 (finding that Respondent did not either dispel all red flags for Folse, Bordelon's, Wallace, Pharmacy Specialties, Dave's Pharmacy, Hephzibah, Wellness, and Wilkinson or report the customers to DEA and refuse to ship).

5. Summary of Public Interest Factors

There is substantial record evidence that Respondent failed to adequately design a suspicious order monitoring system and failed to report suspicious orders to DEA. Further, Respondent failed to report controlled substance orders from customers displaying red flags of diversion and in such cases failed to either cease shipment or, alternatively, to investigate, resolve, and document the resolution of the red flags. Thus, the Agency finds that Respondent failed to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific, and industrial channels in violation of 21 CFR 1301.71(a). The Agency also finds that Respondent failed to adequately design and operate a system to disclose to the registrant suspicious orders of controlled substances and report those orders to DEA in violation of 21 CFR 1301.74(b). *See also* RD, at 138. These violations constitute failures to maintain effective controls against diversion under 21 U.S.C. 823(b)(1) and demonstrate negative experience in distribution under 21 U.S.C. 823(b)(4) and weigh strongly in favor of revoking Respondent's Certificates of Registration.

*B. Respondent's Integrated Enterprise*

DEA has requested revocation of both Respondent's registration at its distribution center in Shreveport, Louisiana, and Respondent's second registration in New Orleans (Jefferson Parish). Respondent argues that DEA has not "alleged any misconduct to have occurred at Respondent's Jefferson location or adduced any evidence or testimony at the hearing regarding Respondent's Jefferson registration." Resp Exceptions, at 49.

The Agency has frequently "treat[ed] two separately organized business entities as one integrated enterprise . . . based on the overlap of ownership, management, and operations of the two entities." *Jones Total Health Care Pharmacy, L.L.C., and SND Health Care,*

*L.L.C.,* 81 FR 79188, 79222 (2016) (citing *MB Wholesale, Inc.,* 72 FR 71956, 71958 (2007)). "[W]here misconduct has previously been proved with respect to the owners, officers, or key employees of a pharmacy, the Agency can deny an application or revoke a registration of a second or subsequent pharmacy where the Government shows that such individuals have influence over the management or control of the second pharmacy." *Superior Pharmacy I and Superior Pharmacy II,* 81 FR 31310, 31341, n.71 (2016). Further, the Agency may revoke a registration without misconduct attributable to that particular registration if the Agency finds that the registrant committed egregious misconduct under a second registration. *Roberto Zayas, M.D.,* 82 FR 21410, 21430 (2017) (revoking physician's DEA registration in Florida due to conduct attributed to a Texas registration that had expired).

When a practitioner registrant acts in a manner inconsistent with the public interest, in determining whether to revoke, DEA looks to whether the practitioner can be entrusted with a registration. *See, e.g. Arvinder Singh, M.D.,* 81 FR 8247, 8248 (2016). If a practitioner holding multiple registrations cannot be entrusted with one, then it would be difficult to justify entrusting the same practitioner with another in a separate location. Similarly, when a corporate entity is owned and operated by individuals who have acted inconsistently with the public interest and have misused one of their registrations, the Agency cannot ignore this fact when considering whether to entrust those same individuals with another registration. Furthermore, even if Respondent has not used the Jefferson registration for distribution, this fact does not prevent it from using its registration for distribution in the future.[81] *See Suntree Pharmacy and Suntree Medical Equipment, LLC,* 85 FR 73753, 73766 (2020).

The lens through which Congress has instructed the Agency to assess each distributor registration is whether or not such registration is consistent with the public interest. 21 U.S.C. 823(b). In this case, if Respondent was allowed to simply shift its operations to an entity with the same ownership, then the effect of the violations found herein against Respondent would be a nullity and there would be nothing to prevent Respondent's Jefferson location from continuing to act inconsistently with the

public interest. It would be inconsistent with the intent of the CSA to permit such an easily implementable loophole, while it is consistent with Agency decisions to close the loophole by treating the two overlapping entities as one integrated enterprise for purposes of sanction.

Therefore, due to the uncontested commonality of ownership, management, and operations, *see* RD, at 154, the Agency finds that it is appropriate to treat Respondent's two registrations as one integrated enterprise.

**V. Sanction**

The Government has established a *prima facie* case to revoke Respondent's registration; therefore, the Agency will review any evidence and argument that Respondent submitted to determine whether or not Respondent has presented "sufficient mitigating evidence to assure the Administrator that [it] can be trusted with the responsibility carried by such a registration." *Samuel S. Jackson, D.D.S.,* 72 FR 23848, 23853 (2007) (quoting *Leo R. Miller, M.D.,* 53 FR 21931, 21932 (1988)). " 'Moreover, because "past performance is the best predictor of future performance," ' *ALRA Labs, Inc.* v. *Drug Enf't Admin.,* 54 F.3d 450, 452 (7th Cir. 1995), [the Agency] has repeatedly held that where a registrant has committed acts inconsistent with the public interest, the registrant must accept responsibility for [the registrant's] actions and demonstrate that [registrant] will not engage in future misconduct.' " *Jayam Krishna-Iyer,* 74 FR 459, 463 (2009) (quoting *Medicine Shoppe,* 73 FR 364, 387 (2008)); *see also Samuel S. Jackson, D.D.S.,* 72 FR at 23853; *John H. Kennnedy,* M.D., 71 FR 35705, 35709 (2006); *Prince George Daniels, D.D.S.,* 60 FR 62884, 62887 (1995). The issue of trust is necessarily a fact-dependent determination based on the circumstances presented by the individual respondent; therefore, the Agency looks at factors, such as the acceptance of responsibility and the credibility of that acceptance as it relates to the probability of repeat violations or behavior and the nature of the misconduct that forms the basis for sanction, while also considering the Agency's interest in deterring similar acts. *See Arvinder Singh, M.D.,* 81 FR 8247, 8248 (2016).

*A. Acceptance of Responsibility*

1. Standing and Authority To Accept Responsibility

Respondent contends that it has unequivocally accepted responsibility

---

[81] The ALJ noted that Respondent's exhibits demonstrate that it uses the Jefferson location to "secure controlled substances" and makes distributions out of its Shreveport facility. RD, at 156 (citing RX 1, at 15, 16).

for the proven misconduct and that Irelan, as its Controlled Substance Compliance Officer, was both authorized by Respondent and an appropriate person to accept responsibility on behalf of Respondent. Resp Exceptions, at 8. The Agency agrees that neither Agency regulations nor prior Agency decisions clearly preclude Irelan from accepting responsibility on behalf of Respondent and will therefore consider his acceptance of responsibility on its merits. Further, the Agency finds that the record supports that Mr. Irelan is responsible for preventing the reoccurrence of Respondent's compliance failures and accepts that Irelan obtained authority from Respondent to accept responsibility at the hearing. *See* Tr. 803 (Irelan is responsible for implemented remedial measures), Tr. 1072–74;[82] *but see* Tr. 804 (decisions also go through the chain of command and to the Board).

Ultimately, as explained above, the Agency has long stated that when the Government has presented a *prima facie* case, the burden shifts to the respondent to demonstrate why it can still be entrusted with a registration in spite of its misconduct and the Agency has emphatically emphasized the requirement that respondent unequivocally accept responsibility to establish that trust. *See, e.g., Jeffrey Stein, M.D.,* 84 FR 46968, 46972 (2019); *see also Leo R. Miller, M.D.,* 53 FR 21931, 21932 (1988) (describing revocation as a remedial measure "based upon the public interest and the necessity to protect the public from those individuals who have misused controlled substances or their DEA Certificate of Registration, and who have not presented sufficient mitigating evidence to assure the Administrator that they can be trusted with the responsibility carried by such a registration"). For several reasons, Irelan's testimony has not adequately convinced the Agency that Respondent unequivocally accepts responsibility for its past misconduct.

**2. Minimization and Characterization of the Misconduct**

Here, Irelan accepted responsibility for Respondent failing to effectively apply its customer due diligence in assessing orders of controlled substances, Tr. 722–23, for Respondent failing to implement and maintain a suspicious order monitoring system

"consistent with best practices for compliance," Tr. 729, 731,[83] and for the fact that "[t]he reporting that was being done, there were three suspicious order reports to the DEA, and that was insufficient," Tr. 731, 733. Irelan also testified that he accepted responsibility for Respondent shipping orders of controlled substances from January 2014 to May 2018 without resolving red flags and testified that he is responsible "for preventing reoccurrence of the company's past failures with respect to application of customer due diligence." Tr. 807, 721.[84]

In discussing his acceptance of responsibility for Respondent's failure to apply its customer due diligence, Irelan specifically testified that, based on his review of Respondent's records before May 2018, Respondent conducted "a tremendous amount of due diligence" on its customers. Tr. 704–05, 710. Irelan caveated that Respondent did not keep the due diligence documentation "in such a way as to make it . . . easily accessible." Tr. 705 (referring to "notes on paper," "notes . . . kept in a database" and "limited notes in our enhanced customer profile"). Nonetheless, the Agency finds that Irelan's statements claiming a "tremendous amount of due diligence" were aimed at minimizing the extent of Respondent's misconduct, which the Agency has previously weighed against a finding of unequivocal acceptance of responsibility. *See Ronald Lynch, M.D.,* 75 FR 78745, 78754 (2010) (finding that

Respondent did not accept responsibility after noting that he "repeatedly attempted to minimize his [egregious] misconduct"; *see also Michael White, M.D.,* 79 FR 62957, 62967 (2014)). Additionally, Irelan's insistence that Respondent was conducting this "tremendous amount" of due diligence "but it was not applied at the order level," *e.g.,* Tr. 828, not only minimizes the violation but fails to acknowledge its scope. At the end of the day, the fact that Respondent was not *applying* the due diligence to the orders (investigating/stopping/reporting) is possibly the most impactful aspect of Respondent's violation. If Respondent was conducting due diligence that was not documented or could not be retrieved such that it could be applied to the actual filling of orders, then Respondent was not exercising effective controls against diversion because employees filling future orders would not know if there were customer-level red flags or whether they were resolved.

Further, Irelan's statements regarding whether Respondent's monitoring systems were "consistent with best practices" also clearly minimized the scope of Respondent's misconduct and did not demonstrate a full grasp of the breadth of the misconduct alleged— which was that Respondent had violated DEA regulations,[85] not failed to implement "best practices." Respondent's attempt to characterize the DEA regulations as being merely best practices as opposed to affirmative legal requirements both minimizes the severity of the violations and also demonstrates a failure to grasp of the significance of the requirements.

**3. Scope of the Misconduct**

The requisite acceptance of responsibility hinges on the respondent demonstrating an understanding both of the past misconduct and its extent. *See Jones,* 881 F.3d at 833. Here, the ALJ found that Irelan did not "acknowledge the *scope* of the Respondent's misconduct," and therefore, his acceptance was equivocal. RD, at 151 (citing *Arvinder Singh, M.D.,* 81 FR at 8250–51).

As Respondent stated in its Exceptions:

Multiple United States Courts of Appeal have upheld DEA's acceptance of responsibility requirement as rational on the grounds that if a respondent "does not understand the extent of the past misconduct or its current responsibilities under the law,

---

[82] The ALJ did not admit RX 54; however, the Agency accepts that Irelan had authority to make compliance decisions and speak for Respondent in the proceeding.

[83] *Compare* Tr. 731 (Respondent's counsel asked whether the SOM system "was consistent with best practices *and* compliance" (emphasis added)). Whether or not this distinction from the previous statement was an error of speech, the Agency finds this statement to not differ significantly from the previous statement—in both, there was clearly a purposeful avoidance of taking responsibility for the full scope of Respondent's actions and an attempt to characterize the DEA regulations as being merely best practices as opposed to affirmative legal requirements.

[84] When Government Counsel asked him whether he accepted responsibility in several specific paragraphs of the OSC, Irelan either refused or testified that he was not in a position to answer. *See* RD, at 86. For a few of the paragraphs, Irelan's reservations seemed to be that Respondent conducted at least some additional due diligence on some of the eight pharmacies, but Irelan admitted that the due diligence was not properly applied. *See, e.g.,* Tr. 832–33, 828–29. Given the contested nature of this part of the hearing, the Agency does not find these failures to accept responsibility to imply that Irelan has not accepted responsibility for the misconduct. *See* Resp Exceptions, at 24 (arguing that these were not proven allegations). However, the Agency does find, as explained herein, that Irelan's continual insistence on referring to all of the due diligence that Respondent was conducting—while not documenting it in a retrievable manner nor applying it to the orders—was clearly intended to minimize Respondent's misconduct.

[85] Even if Respondent chose its language to avoid drawing legal conclusions, the use of the term "best practices" was not sufficient to accurately describe the violations found herein and was clearly aimed at minimizing them. *See supra* n.83.

the DEA rationally could doubt that the [respondent] would faithfully comply in the future with its obligations under the CSA.'' *Jones Total Health Care Pharmacy, LLC* v. [*Drug Enf't Admin.*], 881 F.3d 823, 833 (11th Cir. 2018); *accord MacKay* v. [*Drug Enf't Admin.*], 664 F.3d 808, 820 (10th Cir. 2011) (admittance of fault is relevant to Administrator's consideration of whether a respondent will change its future behavior). As Respondent's current Compliance Director, Mr. Irelan has assessed Respondent's past controlled substance compliance failures and is responsible for preventing their reoccurrence.

Resp Exceptions, at 13.

In contrast to Respondent's final statement above, there were a few times where Irelan's limited involvement and knowledge of the misconduct indisputably impeded his ability to accept full responsibility, such as when, regarding Wellness Pharmacy, he was unable to state what due diligence ''specifically was performed for that account.'' Tr. 831. The Agency finds that Irelan's admission that he had not familiarized himself with the specific due diligence performed by Respondent for the exemplar pharmacies demonstrates that he did not actually have the knowledge required to accept unequivocal responsibility on behalf of Respondent for the full extent of the violations found. Irelan's assertion that Respondent did conduct a ''tremendous amount'' of due diligence is also inconsistent with his stated lack of knowledge regarding the amount of due diligence conducted for the limited number of customers included in the OSC's allegations. It seems logical that in cultivating an understanding of Respondent's violations in order to adequately accept responsibility, Irelan would have focused his review on the customers most relevant to the allegations. Therefore, Irelan does not seem to have been equipped to meet Respondent's burden in accepting responsibility.

**4. Trust in Respondent**

Although the Agency does not challenge Irelan's authority to act on behalf of Respondent in accepting responsibility, the burden is on *Respondent* to credibly and candidly demonstrate that it can be entrusted with a registration. Respondent chose to meet that burden by presenting Irelan's testimony in lieu of a principal or an individual who had knowledge of the full scope of the violations. Although the Agency does not contest that Respondent *could* choose Irelan to accept responsibility on its behalf, that finding does not mean that Irelan was equipped to do so unequivocally.

It is noted that the Agency has long held that the misconduct of an entity's principal is properly considered in determining whether to revoke the entity's registration. *Chip RX, L.L.C., d/b/a City Ctr. Pharmacy,* 82 FR 51433, 51438 (2017) (citing *G & O Pharmacy of Paducah,* 68 FR 43752, 43753 (2003)). An essential element of Respondent's showing of trust is that the registrant and its principals accept responsibility for their misconduct by acknowledging their wrongdoing. *Sun & Lake Pharmacy,* 76 FR 24533 (citing *Medicine Shoppe,* 73 FR at 387; *Jackson,* 72 FR at 23853; *Kennedy,* 71 FR at 35709). In this case, at least one of Respondent's principals, Paul Dickson, Sr., bears at least some responsibility for the misconduct, and Irelan bears none. *See* Tr. 723.

Irelan opined that C.G. and Jacob Dickson, who were in charge of compliance during the relevant time period, were responsible for Respondent's misconduct, but was not sure enough of the ''dynamics'' or ''reporting process'' to opine about whether Paul Dickson, Sr., carried any responsibility. Tr. 808–09. The extent of the misconduct is an important factor in the Agency's ability to determine whether to entrust Respondent with a registration and Irelan's inability to testify to the level of involvement and knowledge of Respondent's principals in the misconduct demonstrates another reason why the Agency cannot deem his acceptance of responsibility to be adequate such that the Agency can entrust Respondent with a registration. In fact, Respondent's submitted evidence includes testimony from the Hearing on the Motion for Temporary Restraining Order[86] in which Paul Dickson, Respondent's president, testified that he was primarily responsible for development of Respondent's SOM program and that he designed the system. RX 1, at 33. Paul Dickson further told the Court that in designing the system, he knew that he

''didn't do a perfect job,'' but that ''it was the best that [he] could do. And [he] think[s] it's dang good. And [he doesn't] think a single person has gotten hurt by [their] drugs. [He] sure do[esn't] know of one . . . . So [he] think[s] it works.'' RX 1, at 57. These statements from the president of a family-owned and -operated company so strongly miss the point of the requirements of a DEA registrant that they further undercut the Agency's ability to entrust Respondent with a registration. To equate a registrant's compliance with an agency's closed regulatory system with the consequence of knowing whether anyone was hurt ''by [their] drugs'' exhibits a stark misunderstanding of the regulatory requirement.

The Agency finds that Irelan's inability to describe Paul Dickson's involvement in the proven misconduct further demonstrates the inadequacy of Respondent's acceptance of responsibility in this proceeding. In all, Irelan's lack of understanding and recognition of the full scope of the misconduct and attempts to minimize the misconduct lead the Agency to conclude that Respondent's acceptance of responsibility was equivocal and insufficient to ensure that Respondent can be entrusted with a registration.

*B. Remedial Measures*

When a registrant fails to make the threshold showing of acceptance of responsibility, the Agency has stated that it need not address the registrant's remedial measures. *Daniel A. Glick, D.D.S.,* 80 FR 74800, 74,810 (2015); *see also Ajay S. Ahuja, M.D.,* 84 FR at 5498 n.33; *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.,* 81 FR at 79202; *The Medicine Shoppe,* 79 FR 59504, 59510 (2014). A registrant does not unequivocally accept responsibility for its actions simply by taking remedial measures. *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 & 5195,* 77 FR 62316, 62346 (2012). Refusal to acknowledge the *full scope of misconduct,* even with remedial measures, is a risk to the public interest. *Arvinder Singh, M.D.,* 81 FR 8247, 8250–51 (2016) (emphasis added).

The ALJ characterized Respondent's remedial measures as ''impressive.'' RD, at 152. The Agency similarly credits the efforts that the record reflects Respondent undertook to improve its compliance with DEA's requirements after being served with the OSC. As the ALJ appropriately stated, the Agency has also made it abundantly clear that remediation alone is not adequate to avoid a sanction and that limited-to-no-weight is given to remedial measures when the effort is not made until after

---

[86] It is noted that the ALJ excluded pages 147 to 216 of this transcript as irrelevant, but allowed pages 1 through 146 because Respondent offered it as remedial, mitigation, or community impact evidence. ALJX 39, at 6 (citing ALJX 29, at 2, 4.) Although it is also noted that the hearing in which these statements were made was related to the public interest in the context of the ISO, the ALJ found, and the Agency agrees, that this evidence bears some relevance to the current inquiry. *Id.* Furthermore, Respondent argues in its Exceptions that ''[t]his testimony is relevant evidence of Respondent's credibility and good faith intent in working with DEA to stop diversion.'' Resp Exceptions, at 31. For the reasons stated above, the Agency finds that, if anything, Paul Dickson's remarks seem indignant that DEA is pursuing enforcement, seem aimed at minimizing the misconduct, and display a lack of understanding and respect for the regulatory requirements.

enforcement begins. *See Mireille Lalanne, M.D.,* 78 FR 47750, 47777 (2013) (quoting *Liddy's Pharmacy, L.L.C.,* 76 FR 48887, 48897 (2011) ("The Agency has recognized that a cessation of illegal behavior only when 'DEA comes knocking at one's door,' can be afforded a diminished weight borne of its own opportunistic timing.'")); *see also Southwood Pharm. Inc.,* 72 FR at 36503 (giving no weight to respondent's "stroke-of-midnight decision" to cease supplying suspect pharmacies with controlled substances and to employ a compliance officer).[87]

Additionally, the ALJ found that, based on prior Agency decisions, he could give no weight to Respondent's remedial measures given the lack of Respondent's unequivocal acceptance of responsibility. RD, at 152.[88] [89] As the

[87] In its Exceptions, Respondent points to the factual distinctions between cited cases in the RD and the circumstances in this case and also points to numerous other settled cases that, in Respondent's opinion, demonstrate that the sanction here is unfair. Resp Exceptions, at 25 and 33. However, "the issue of trust is necessarily a fact-dependent determination based on the circumstances presented by the individual respondent," and it is the respondent's burden to bear. *See, e.g., Stein,* 84 FR at 46,972. And contrary to Respondent's arguments, the proposed sanction is supported by similar sanctions in other recent distributor adjudications where the Agency similarly found that respondents' registrations were inconsistent with the public interest and that those respondents had not demonstrated that they could be entrusted with a registration. *See Southwood Pharm., Inc.,* 72 FR at 36487 (rejecting the ALJ's sanction because it was "insufficient to protect the public interest. While [the Agency is] mindful of the corrective measures engaged in by Respondent, its sales of extraordinary quantities of controlled substances to entities which it had reason to know were diverting the drugs caused extraordinary harm to public health and safety."); *see also Masters Pharm., Inc.,* 80 FR at 55501.

[88] Respondent repeatedly asserts that these adjudications are difficult to defend due to what it claims is an unfair system—that Respondent must accept responsibility prior to knowing what misconduct has been proven. Resp Exceptions, at 7. Respondent chose litigation strategies presumably based on the longstanding structure and content of Agency decisions in these adjudications and the Agency does not fault it for those decisions. In the end, Respondent had the burden to prove that it could be entrusted with a registration and it has failed to meet that burden. *See Masters Pharm., Inc.,* 861 F.3d 206 (D.C. Cir. 2017) (rejecting arguments that DEA's structure of requiring acceptance of responsibility is unfair, because "under longstanding DEA precedent, once DEA presents enough evidence at hearing to show that a registered vendor or distributor of controlled substances has 'committed acts inconsistent with the public interest,' the 'registrant must present[] . . . mitigating evidence' including evidence that it has 'accept[ed] responsibility for its actions and demonstrate[d] that it will not engage in future misconduct'" (quoting *Medicine Shoppe-Jonesborough,* 73 FR 364, 387 (2008)). Furthermore, the Agency's finding on this issue does not hinge on whether Irelan has accepted responsibility for each proven allegation, but instead hinges on Irelan's persistent minimization of the misconduct and further on Respondent's overall failure to demonstrate that *Respondent has unequivocally*

Agency has consistently held, "past performance is the best predictor of future performance." *Lesly Pompy, M.D.,* 84 FR 57749, 57761 (2019); *see also Jones Total Health Care Pharmacy, LLC* v. *Drug Enf't Admin.,* 881 F.3d 823, 833 (11th Cir. 2018) (affirming refusal to consider remedial measures where registrant did not accept responsibility for its misconduct); *Pharmacy Doctors Enterprises, Inc.* v. *Drug Enf't Admin.,* 789 F. App'x 724, 2019 WL 4565481, at *7–8 (11th Cir. Sept. 20, 2019) (same).[90]

In this case, even if the Agency gave weight to Respondent's remedial measures, the measures are outweighed by the fact that it has not adequately established that Respondent as an entity fully understands the scope of the misconduct such that it can be entrusted with regulatory compliance in the future.

## C. The Extent of the Misconduct

The record demonstrates that Respondent's violations of the law were not isolated occurrences, but took place over the course of four years and involved multiple customers. *See Garrett Howard Smith, M.D.,* 83 FR at 18910 (collecting cases) ("The egregiousness and extent of [the] misconduct are significant factors in determining the appropriate sanction."). In spite of its self-described status as a privately-owned company that has been in business for 177 years,[91] Respondent

accepted responsibility and can be trusted with a registration.

[89] Respondent argues that Milione's testimony regarding the August 2016 meeting with Paul Dickson, Sr., *supra* n.8, demonstrates Respondent's "good faith and sincerity, which flatly contradict the ALJ's intent-laden description of Respondent's compliance as 'cavalier'" and argues that this fact is relevant in considering Respondent's likelihood towards recidivism. Resp Exceptions, at 30 (citing RD, at 156). The Agency cannot give this meeting or Paul Dickson's sincerity during this moment in time the weight that Respondent requests it be afforded given that the evidence demonstrates that for approximately two years prior to this meeting and two years afterwards, Respondent was not complying with DEA regulations. Further, Respondent did not present the Agency with Paul Dickson's testimony at this hearing to be able to weigh his credibility and sincerity either in 2016, when this meeting occurred, or at the time of the hearing. The transcribed testimony that Respondent did submit from Paul Dickson demonstrated that he believed his SOM system to be "dang good"—a statement with which the Agency emphatically disagrees. *See* RX 1, at 57.

[90] *See also Hills Pharmacy, LLC,* 81 FR 49815, 49847 (2016) ("[T]here is no need to consider Respondent's remedial efforts as they are rendered irrelevant by its failure to acknowledge its misconduct."); *Daniel A. Glick, D.D.S.,* 80 FR 74800, 74810 (2015) ("[S]ince the Respondent has not tendered an unequivocal acceptance of responsibility, under established Agency precedent, [it] is foreclosed from a favorable result in these proceedings and the issue of remedial actions is irrelevant.").

[91] *See also* RX 1, at 21 (estimating Respondent's number of retail pharmacy customers at

maintained sparse documentation of its SOM procedures generally and maintained very little documentation of its resolution of red flags of diversion displayed by its customers or of individual suspicious orders. The record evidence demonstrates that Respondent attended two conferences, held a personal meeting with DEA, and received multiple letters in which DEA emphasized the critical importance of a distributor's role in preventing diversion given the opioid crisis in the nation and reminded distributors of their obligations under the law. A letter from DEA dated September 27, 2006, stated "[G]iven the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm." GX 3, at 2. In spite of Respondent's established knowledge regarding the criticality of its role in preventing "dangerous and potentially lethal consequences," Respondent did not adequately resolve or document investigation into the numerous red flags indicating diversion that its own Pro Compliance Reports identified on the exemplar pharmacies and failed to report a multitude of suspicious orders to DEA.

## D. Deterrence

Finally, both specific and general deterrence strongly weigh in favor of revoking Respondent's registration. *See Daniel A. Glick, D.D.S.,* 80 FR at 74810. The record demonstrates that Respondent violated DEA regulations over a lengthy time period—failing to report a multitude of suspicious orders to DEA and depriving DEA of valuable information about pharmacies and practitioners who might have been engaging in diversion or violating their obligations as DEA registrants, thus contributing to the country's devastating prescription drug abuse problem. Under these circumstances and on this record, a sanction less than revocation [92] would

"approximately 600 primary . . . and another 200 secondary that fluctuates") and 22–23 ("[O]nly competition are what's called 'the big three,' the global companies").

[92] Respondent argues without support that a sanction short of revocation would serve the same deterrence goals and would prevent harm to the community that would result from closing Respondent. Resp Exceptions, at 28, 31. The Agency does not consider community impact in its decisions. *See infra* n.96. As Respondent notes, it is difficult to know what level of sanction would deter future non-compliance in the registrant community, but in Respondent's case, where the violations were blatant, long-term, and impactful, the Agency finds, given the record before it, that revocation offers an appropriate deterrent effect.

send a message to the current and prospective registrant community that compliance with DEA regulations is not a condition precedent to maintaining a DEA registration and that a distributor can spend years insufficiently reporting suspicious orders and inadequately resolving red flags presented by its customers, so long as it finally invests in the procedures it should have had in place all along after it is caught and faces potential consequences.[93]

Although Respondent has implemented remedial measures, it has not adequately demonstrated that its leadership can be entrusted to continue these measures and prevent reoccurrence of what happened prior to the issuance of the OSC, which amounted to a SOM system that was not designed or operated in a way that would adequately prevent diversion of controlled substances nor provide DEA with information critical to its mission. Respondent argues that the ALJ erred in finding that "the continued registration of a fully remediated registrant with an 'impressive' anti-diversion regime, along with evidence of good faith desire to prevent diversion, does not serve the public interest." [94] Resp Exceptions, at

1. However, Respondent's argument neglects to mention that remediation is irrelevant without continued trust. Respondent wants credit for "commission[ing] former top DEA officials to design their ideal anti-diversion system," *id.*, because it believes that as long as it has invested the money now, it will prevent DEA from enforcing against it. There are several considerations other than remediation that the Agency uses in determining sanction as explained herein. The fact is that, under these circumstances and on this record, Respondent has not adequately convinced the Agency that it can be entrusted with a registration—its acceptance of responsibility did not prove that it or its principals understand the full extent of their wrongdoing, the effect that it had on the Agency and the American public, and the potential harm that it caused.[95] It was Respondent's burden to prove that it could be entrusted to protect the public interest in maintaining a DEA registration—and it has failed to do so.

Having reviewed the record in its entirety, the Agency finds that Respondent cannot be entrusted with a DEA registration and orders that its registration be revoked. The Agency addresses collateral matters and additional issues raised in Respondent's Exceptions before issuing a final Order.

## VI. Motion To Reopen

On January 5, 2022, Respondent filed a Motion to Reopen the Administrative Record. Respondent seeks to introduce evidence of post-hearing conduct that it argues demonstrates acceptance of responsibility and successful

remediation.[96] Although not specifically contemplated in the CSA or regulations, DEA decisions have repeatedly held that the Administrator may, in her discretion, order that the administrative record be reopened. The party moving to reopen, however, bears a heavy burden. *See INS* v. *Abudu,* 485 U.S. 94, 110 (1988); *see also Cities of Campbell* v. *FERC,* 770 F.2d 1180, 1191 (D.C. Cir. 1985) ("Reopening an evidentiary hearing is a matter of agency discretion and is reserved for extraordinary circumstances." (citations omitted)); *Nance* v. *EPA,* 645 F.2d 701, 717 (9th Cir. 1981).

The Agency finds that Respondent has not met its burden to reopen the record. In all DEA administrative proceedings, there is inevitably at least some delay between the hearing and the final decision of the Administrator.[97] Allowing parties to reopen the record to introduce evidence of acceptance of responsibility and remedial measures taken during that delay would create a recursive loop further delaying the conclusion of proceedings to the detriment of the public interest. *See, e.g., Abudu,* 485 U.S. at 107; *Qoku* v. *Gonzales,* 156 F. App'x. 703, 705 (5th Cir. 2005). As the Supreme Court observed in *Vermont Yankee Nuclear Power Corp.* v. *NRDC,* "[a]dministrative consideration of evidence . . . always creates a gap between the time the

Furthermore, again, Respondent has not adequately established trust, *see supra* Section V.A.4, which is crucial to demonstrate the appropriateness of a sanction less than revocation under the Agency's consideration of specific deterrence. Respondent also argues that the ALJ erred in its deterrence analysis by failing to consider the Government's purported unwillingness to engage Respondent in settlement negotiations. Resp Exceptions, at 33–35. While a settlement agreement between the Government and a respondent may be a way to provide enforceable assurances of the respondent's future compliance, the parties have not reached such a settlement here. Accordingly, and although the Agency has considered alternative sanctions as Respondent has requested, it has decided that revocation currently is the most appropriate sanction as explained herein.

[93] DEA decisions have demonstrated concern that giving weight to last minute remedial measures would show the regulated community that a registrant "can unlawfully distribute controlled substances until [it] gets caught, and as long as [it] then acknowledges wrongdoing and puts on evidence that [it] has reformed, [it] will get a slap on the wrist." *David Ruben, M.D.,* 78 FR 38363, 38387 (2013); *see also Southwood Pharm., Inc.,* 72 FR 36487, 36504 (2007) ("A precedent which ignores how irresponsibly a registrant has acted and allows it to maintain its registration based on its claim of having reformed its business practices, could well prompt other registrants to ignore their obligations under the Act and sell massive quantities of controlled substances to diverters.").

[94] Respondent argues that its "current conduct is the best evidence that its continued registration is consistent with the public interest." Resp Exceptions, at 7. However, remediation is notably not an enumerated public interest factor under 21 U.S.C. 823(b). Remediation is a factor that the Administrator considers in reviewing the extent to which sanctions are appropriate and only after the Government has made a *prima facie* case demonstrating that the allegations support a finding that Respondent's continued registration is not in

the public interest. *See, e.g., Samuel S. Jackson, D.D.S.,* 72 FR at 23,853.

[95] Respondent attached to its Exceptions the Department of Justice Office of the Inspector General (OIG) September 2019 Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids—claiming that the report is DEA's motivation for pursuing "the harshest sanction" against Respondent. The report is dated September 2019—a month after the ALJ's issuance of the RD. Furthermore, DEA subpoenaed Respondent as early as February 1, 2018; therefore, temporally, the OIG's findings could not have motivated the Agency's investigation into Respondent. Such allegations are a distraction from the issue at hand—Respondent failed to comply with its regulatory obligations and neither the Agency nor the country could possibly have the ability to know what might have happened had those suspicious orders been reported to DEA and to what extent diversion and abuse might have been prevented. What the Agency does know is that Respondent's failures were monumental, and Respondent clearly misses the point in arguing that "had the Respondent more consistently reported suspicious orders with the DEA, it has been established that the reports would have been ignored." Resp Exceptions, at 5.

[96] Respondent also requests to reopen the record to introduce evidence of the impact revoking its registration would have on the community. Motion to Reopen, at 20–22. The Agency has consistently found that community impact is not a relevant consideration under the public interest factors. *E.g., Stephen E. Owusu, D.P.M.,* 87 FR 3343, 3351 n.21 (2022); *George Pursley, M.D.,* 85 FR 80,162, 80,188 n. 82 (2020); *Frank Joseph Stirlacci, M.D.,* 85 FR 45229, 45239 (2020). Accordingly, Respondent's community impact evidence is not grounds to reopen the record. Further, Respondent made arguments that it should be allowed to introduce evidence that it concedes is not an independent basis to reopen the record but argues is properly admitted if the record is reopened. Reply ISO Motion to Reopen, at 12. Nonetheless, the Agency is not reaching a finding on the admissibility of this evidence because it is not granting Respondent's Motion to Reopen.

[97] The delay between the hearing and the issuance of the final decision in this matter was longer than is typical for the Agency, but the proceedings were delayed partially at Respondent's request. On March 9, 2020, Respondent wrote a letter to the then-Acting Administrator asking that the Agency postpone issuing a Final Order "to allow the COVID–19 crisis to abate or the parties to reach a final settlement . . . ." *See* Letter from Respondent. Respondent then requested yet another delay in its Motion to Reopen asking that the Administrator delay the issuance of a final order "until after [Respondent's] new counsel has had an opportunity to resolve the matter with DEA's Chief Counsel." Motion to Reopen, at 4, n.4. Respondent cannot request to delay the proceedings and then claim that a failure to reopen the record is somehow prejudicial to Respondent because of its requested delay.

record is closed and the time the administrative decision is promulgated . . . . If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.'' 435 U.S. 519, 554–55 (1978) (quoting *ICC* v. *Jersey City,* 322 U.S. 503, 514 (1944) (citing *Northern Lines Merger Cases,* 396 U.S. 491, 521 (1970)).

Respondent had the opportunity to, and did, introduce evidence related to its acceptance of responsibility and remedial measures at the hearing. That evidence was entered into the record and considered in the ALJ's Recommended Decision and this Final Order.

## VII. Lucia

The Agency has carefully considered Respondent's Exceptions to the Recommended Decision, has addressed them throughout the record, and addresses the remaining herein.

In its Exceptions, Respondent notes that ''as [it] has repeatedly and consistently objected, including at the hearing, this entire proceeding was unconstitutional.'' (citing Tr. 20:23– 22:17). Respondent contends that ''[t]he presiding ALJ in this matter was unconstitutionally appointed when these proceedings began and unconstitutionally continued to preside over these proceedings after the Attorney General purportedly ratified his appointment.'' (citing *Lucia* v. *Securities and Exchange Comm'n,* 138 S. Ct. 2044, 2055 (2018) (hereinafter, *Lucia*)). The Agency will note the factual sequence of events surrounding Respondent's *Lucia* claims.

Respondent's Prehearing Statement, filed on August 3, 2018, averred, ''Respondent may file a motion before this Tribunal related to the constitutionality of the DEA's administrative process given the U.S. Supreme Court's recent decision in [*Lucia*].'' ALJX 8, at 37. During the Prehearing Conference, Respondent's attorney stated, ''with regards to the *Lucia* case, this is obviously no disrespect intended to the Court but we do think that it's a significant issue that should we proceed to hearing, we do want to address and I would like to file a motion about it.'' The ALJ replied, ''Well, if you're going to file a motion about it, I obviously would need to take a look at it . . . . Apparently, if you file a motion, there's a good chance you'll wind up with a different Judge . . . .

I'm just putting you on notice that that's what's likely to happen.'' Prehearing, Tr. 36. The ALJ ordered that ''[y]ou obviously can file motions tomorrow if you want to but any motions I'm going to need to rule on I would like to have no later than October 23rd. . . .'' Tr. 42–43.

On October 26, 2018, Respondent submitted a letter on the record alerting the Tribunal that it had commenced an action in the United States District Court for the Western District of Louisiana seeking an ''injunction enjoining DEA and DOJ from requiring Morris & Dickson to appear in any administrative proceeding, including the upcoming hearing scheduled for November 13, 2018, unless and until a constitutionally valid administrative system has been established.'' ALJX 26, at 1. On October 31, 2018, Respondent filed another letter with the Tribunal explaining that it did not file a motion with the ALJ because the Agency ''has no authority to entertain a facial constitutional challenge'' and that ''[t]he Louisiana Court will resolve that question. Morris & Dickson simply provides this Tribunal notice of that filing and requests sufficient time to allow the Louisiana Court (and, if necessary, the Fifth Circuit Court of Appeals) to make its ruling.'' ALJX 34, at 1–2.

On December 31, 2018, Respondent submitted a letter notifying the Tribunal that ''[o]n December 28, 2018, the District Court in the Western District of Louisiana dismissed Respondent's complaint without prejudice, finding that it did not have jurisdiction to hear Morris & Dickson's claims'' and attaching the decision. ALJX 47, at 1. The Decision stated that, although Respondent's argument was ''somewhat close,'' ''in light of the policy problem created by crafting a 'constitutional claim' exception to Congress's ability to channel initial review through agencies, the Court finds that Morris & Dickson's separation-of-powers claims are not 'wholly collateral' to the proceeding before Judge Dorman because they were raised in an attempt to delay or defeat administrative enforcement of the CSA.'' *Id.* at 30.

On January 15, 2019, the ALJ issued an Order Lifting the Stay and Third Prehearing Ruling. ALJX 51. The Order stated that Respondent indicated during a telephonic conference on the previous day that it ''w[ould] not seek to maintain the stay in this case pending its appeal to the United States Court of Appeals for the Fifth Circuit''[98] and that

''it w[ould] not file a motion seeking to recuse [the ALJ] from this case based on the Supreme Court's decision in *Lucia* . . . .'' *Id.* at 1.

The next time Respondent raised the *Lucia* issue was at the beginning of the hearing on May 13, 2019. Respondent's lawyer made a self-described ''statement of the record, simply,'' Tr. 23, that ''we respectfully renew for the record our objection to the hearing and proceeding.'' Tr. 22. However, Respondent's lawyer also agreed that Respondent was ready to go to hearing that day and made no further motions or requests for a new ALJ. Tr. 24.

On October 25, 2018, the Attorney General ratified the prior appointment of the DEA ALJs, including ALJ Dorman, and ''approved their appointments as his own under the Constitution.'' *See* Office of the Attorney General, Order No. 4.315–2018.[99] It is noted that, at the time that the hearing took place in this matter, ALJ Dorman's appointment as an Administrative Law Judge had been ratified. Respondent never formally requested reassignment nor availed itself of the opportunity to request interlocutory review to the Administrator on any ruling of the ALJ or any *Lucia*-related issue pursuant to 21 CFR 1316.62. Had Respondent contested the matter formally with the Agency, the Agency would have assigned another ALJ, *see* Prehearing, Tr. 36, and saved significant Agency resources. The Agency further finds that ALJ Dorman's appointment was ratified before the hearing. Due to Respondent's calculated choice to preserve the matter for the record, Tr. 23, but not raise it in any way that the Agency might have had the capacity to address and remedy itself, the Agency considers the argument waived for purposes of finalizing this adjudication.

Having found that Respondent cannot be entrusted with a DEA registration, the Agency issues the following Order revoking Respondent's DEA registrations.

## Order

Pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 824(a)(4) and 21 U.S.C. 823(b), (e), I hereby revoke DEA Certificates of Registration Nos. RM0314790 and RM0335732 issued to Morris & Dickson, Co., LLC. Further, pursuant to 28 CFR 0.100(b) and the authority vested in me by 21 U.S.C. 824(a)(4) and 21 U.S.C.

[98] Respondent's appeal to the United States Court of Appeals for the Fifth Circuit was dismissed by

its own motion. *See Morris and Dickson* v. *William Barr, et al.,* No. 19–30043, 2019 WL 3230978 (5th Cir. Apr. 1, 2019).

[99] Although not considered material to this Decision, a copy of this Order will be included in the administrative record for future reference.

823(b), (e), I hereby deny any pending application of Morris & Dickson, Co., LLC to renew or modify these registrations, as well as any other pending application of Morris & Dickson, Co., LLC. This Order is effective August 28, 2023.

**Signing Authority**

This document of the Drug Enforcement Administration was signed on May 19, 2023, by Administrator Anne Milgram. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Scott Brinks,**
*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2023–11369 Filed 5–26–23; 8:45 am]

**BILLING CODE 4410–09–P**

---

**DEPARTMENT OF LABOR**

**Bureau of Labor Statistics**

**Information Collection Activities; Comment Request**

**AGENCY:** Bureau of Labor Statistics, Department of Labor.

**ACTION:** Notice of information collection; request for comment.

**SUMMARY:** The Department of Labor, as part of its continuing effort to reduce paperwork and respondent burden, conducts a pre-clearance consultation program to provide the general public and Federal agencies with an opportunity to comment on proposed and/or continuing collections of information in accordance with the Paperwork Reduction Act of 1995. This program helps to ensure that requested data can be provided in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the impact of collection requirements on respondents can be properly assessed. The Bureau of Labor Statistics (BLS) is soliciting comments concerning the proposed revision of the ''Current Population Survey (CPS).'' A copy of the proposed information collection request can be obtained by

contacting the individual listed below in the **ADDRESSES** section of this notice.

**DATES:** Written comments must be submitted to the office listed in the **ADDRESSES** section of this notice on or before July 31, 2023.

**ADDRESSES:** Send comments to Erin Good, BLS Clearance Officer, Division of Management Systems, Bureau of Labor Statistics, Room G225, 2 Massachusetts Avenue NE, Washington, DC 20212. Written comments also may be transmitted by email to *BLS_PRA_Public@bls.gov.*

**FOR FURTHER INFORMATION CONTACT:** Erin Good, BLS Clearance Officer, at 202–691–7628 (this is not a toll free number). (See **ADDRESSES** section.)

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The CPS has been the principal source of the official Government statistics on employment and unemployment for over 75 years. The CPS is a monthly sample survey of 60,000 eligible households. The labor force information gathered through the survey is of paramount importance in keeping track of the economic health of the Nation. The survey is the only source of monthly data on total employment and unemployment. The Employment Situation news release contains data from this survey and is designated as a Principal Federal Economic Indicator (PFEI). Moreover, the survey also yields data on the characteristics of persons not in the labor force. The CPS data are used monthly, in conjunction with data from other sources, to analyze the extent to which, and with what success, the various components of the American population are participating in the economic life of the Nation.

The labor force data gathered through the CPS are provided to users in the greatest detail possible, in conjunction with the demographic information obtained in the survey. In brief, the labor force data can be broken down by sex, age, race, ethnicity, marital status, family composition, educational level, veteran status, certification and licensing status, disability status, and other characteristics. Through such breakdowns, one can focus on the employment situation of specific population groups as well as on general trends in employment and unemployment. Information of this type can be obtained only through demographically oriented surveys such as the CPS.

The basic CPS data also are used as an important platform on which to base the data derived from the various

supplemental questions that are administered in conjunction with the survey. By coupling the basic data from the monthly survey with the special data from the supplements, one can get valuable insights on the behavior of American workers and on the social and economic health of their families.

There is wide interest in the monthly CPS data among Government policymakers, legislators, economists, the media, and the general public. While the data from the CPS are used in conjunction with data from other surveys in assessing the economic health of the Nation, they are unique in various ways. Specifically, they are the basis for much of the monthly Employment Situation report, a PFEI. They provide a monthly, nationally representative measure of total employment, including farm work, self-employment, and unpaid family work; other surveys are generally restricted to the nonagricultural wage and salary sector, or provide less timely information. The CPS provides data on all job seekers, and on all persons outside the labor force, while payroll-based surveys cannot, by definition, cover these sectors of the population. Finally, the CPS data on employment, unemployment, and on persons not in the labor force can be linked to the demographic characteristics of the many groups that make up the Nation's population, while the data from other surveys often have limited demographic information. Many groups, both in the government and in the private sector, are eager to analyze this wealth of demographic and labor force data.

**II. Current Action**

Office of Management and Budget clearance is being sought for a revision of the Current Population Survey. BLS is seeking approval to remove two questions that collected information about the impact of the COVID–19 pandemic on where people worked. These questions, which ask about telework or work at home in February 2020, have been included on the CPS since October 2022 to measure the impact of the COVID–19 pandemic on the labor force. BLS feels that enough time has passed since the onset of the pandemic and its impact on how people work. These questions would not provide meaningful data going forward.

**III. Desired Focus of Comments**

The Bureau of Labor Statistics is particularly interested in comments that:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the

# EXHIBIT B





# FEDERAL REGISTER

Vol. 88          Tuesday,

No. 103          May 30, 2023

Pages 34411–34744

OFFICE OF THE FEDERAL REGISTER

Judgments related to the PSA are not subject to Tunney Act review.[28]

Comments regarding the acquisition of Sanderson are also not subject to Tunney Act review in this matter because the Complaint does not challenge the Sanderson acquisition. Rather, the Complaint alleges that the Settling Defendants' multi-decade collaboration on compensation decisions, sharing of compensation information, and facilitation of such conduct was anticompetitive and that Wayne and Sanderson violated the Packers and Stockyards Act. Under the Tunney Act, the court reviews only whether the proposed remedies address the violations the United States has alleged in its complaint.[29] Potential harms arising from that acquisition that were identified by some public comments are therefore outside the permissible scope of review under the Tunney Act.[30]

The United States understands that some of the commenters are advocating for additional enforcement in the poultry industry. Parts of the CCAR and CFFE Comments urge the United States to continue working to address "the antitrust implications of industry data sharing activities." [31] The Carstensen Comment focuses almost wholly on information-sharing; it asks the United States to continue pursuing other conspirators, to "forbid any exchange of confidential business information of any kind" between the Settling Defendants, and to "revisit [its] outdated guidance on information exchange to emphasize that such conduct among rivals is likely to be unlawful absent specific, limited justifications." [32]

The United States does not contend that the proposed Final Judgments resolve all issues in the poultry industry, but these comments are outside the scope of Tunney Act review. They concern conduct not challenged in the Complaint and thus do not provide a basis for measuring the relief included in the proposed Final Judgments.[33] The proposed Final Judgments do address the claims raised against the Settling Defendants.

Additionally, the United States believes the proposed Final Judgments demonstrate to companies both inside and outside the poultry industry that anticompetitive information-sharing risks significant legal consequences, and the broad scope of the monitor contained in the proposed Final Judgments provides protection against anticompetitive information-sharing in contexts other than poultry processing compensation. The United States takes the conduct alleged in the Complaint seriously; the investigation into such conduct is ongoing and the United States will pursue additional claims where the evidence and the law justifies action. Members of the public are encouraged to submit information about potentially unlawful exchanges of information between competitors to the Department of Justice Antitrust Division's Citizen Complaint Center (*https://www.justice.gov/atr/citizen-complaint-center*).

## V. Conclusion

After careful consideration of the public comments, the United States continues to believe the proposed Final Judgments provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint and are therefore in the public interest. The United States will move this Court to enter the proposed Final Judgments after the public comments and this response are published as required by 15 U.S.C. 16(d).

Dated: May 23, 2023.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA

Kathleen Simpson Kiernan,

*U.S. Department of Justice, Antitrust Division, Civil Conduct Task Force, 450 Fifth Street NW, Suite 8600, Washington, DC 20530, Tel: 202–353–3100, Fax: 202–616–2441, Email: Kathleen.Kiernan@usdoj.gov.*

[FR Doc. 2023–11388 Filed 5–26–23; 8:45 am]

**BILLING CODE 4410–11–P**

---

# DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

[Docket No. 18–31]

## Morris & Dickson Co., LLC; Order

On May 19, 2023, I issued and served on the parties a Decision and Order (the Decision and Order) revoking, effective 30 days from the date of publication in the **Federal Register**, Certificate of Registration Nos. RM0314790 and RM0335732 issued to Morris & Dickson, Co., LLC (Respondent). By motion dated May 20, 2023, Respondent requested a stay of the Decision and Order. On May 21, I issued an order soliciting additional information from Respondent and asking the Government to respond to Respondent's Motion for Stay. On May 22, both parties responded. Respondent clarified that it was requesting a stay of at least 90-to-120 days so that it can renew settlement negotiations with the Government. Respondent's May 22, 2023 Letter re Motion for Stay, at 1. Respondent also stated that a stay was necessary to mitigate the impact on its "customers, employees, and other stakeholders," including pharmacies, hospitals, and patients. *Id.* at 4–5. The Government indicated that it opposed any stay request, but stated that it was "open to settlement offers" and suggested it was willing to engage in settlement negotiations with Respondent. Government's Opposition to Motion to Stay, at 3.

Upon consideration of the entire record before me, the public interest—in particular, the potential need for Respondent's customers and their patients to find new suppliers given the revocation of Respondent's registrations—and the possibility for renewed settlement negotiations, I hereby order that the May 19, 2023 Decision and Order will be effective on August 28, 2023—ninety days from the date of the Decision and Order's publication in the **Federal Register**. This change is reflected in the published Decision and Order.

*It is so ordered.*

## Signing Authority

This document of the Drug Enforcement Administration was signed on May 23, 2023, by Administrator Anne Milgram. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the

---

[28] Competitive Impact Statement at 3; *see also* 15 U.S.C. 12(a). The PSA-related provisions include changes to compensation and disclosure requirements for Sanderson and Wayne growers.

[29] *See Microsoft,* 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459–60.

[30] The United States has statutory authority to review certain proposed transactions under the Hart-Scott-Rodino Act, 15 U.S.C. 18a, but contrary to some of the public comments the United States does not "approve" transactions. *See, e.g., Steves and Sons, Inc.* v. *JELD–WEN, Inc.,* 988 F.3d 690, 713–14 (4th Cir. 2021) ("The Department's decision not to pursue the matter isn't probative as to the merger's legality because many factors may motivate such a decision, including the Department's limited resources."); *see also In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 664 (7th Cir. 2002).

[31] CFFE Comment at 3 (highlighting the impact of such information-sharing on poultry growers); CCAR Comment at 8 (recommending the United States "consider the anti-trust implications of such data sharing arrangements regarding poultry growers and production details as well").

[32] Carstensen Comment at 2.

document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Scott Brinks,**

*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2023–11370 Filed 5–26–23; 8:45 am]

**BILLING CODE 4410–09–P**

# DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

[Docket No. 18–31]

## Morris & Dickson Co., LLC; Decision and Order

On May 2, 2018, the Drug Enforcement Administration (DEA or Government), issued an Order to Show Cause (OSC) and Immediate Suspension of Registration (ISO) to Morris & Dickson Co., LLC (Respondent), of Louisiana. Administrative Law Judge (ALJ) Exhibit (ALJX) 1, at 1. The OSC informed Respondent of the immediate suspension of its Certificates of Registration Nos. RM0314790 and RM0335732 (registrations)[1] and proposed their revocation pursuant to 21 U.S.C. 824(a)(4) and 823(b) because it alleged that Respondent's continued registrations were inconsistent with the public interest. *Id.*

Respondent requested a hearing before a DEA ALJ, which was conducted from May 13 to May 16, 2019. On August 29, 2019, the ALJ issued a Recommended Decision (RD), which was transmitted to the Agency along with the administrative record on November 26, 2019.[2] The Agency has incorporated portions of the ALJ's RD herein.

The Government presented a *prima facie* case. Respondent ultimately admitted to and accepted some responsibility for its failures in effectively applying its customer due

diligence in assessing orders of controlled substances, its failures to implement a suspicious order monitoring system "consistent with best practices for compliance," and its failures to adequately resolve red flags on orders that it shipped. *See infra* section V. Respondent also admitted that its three suspicious order reports to DEA during the relevant time period were insufficient. *Id.* Nonetheless, Respondent presented testimony and evidence aimed at rebutting the Government's case with regard to the scope of its regulatory noncompliance during the relevant time period.

After thoroughly reviewing the entire record, the Agency finds substantial record evidence that Respondent's continued registration is inconsistent with the public interest in light of the long-term, egregious failures of Respondent in its responsibility as a distributor to maintain effective controls against diversion of controlled substances. Furthermore, the Agency finds that Respondent has failed to demonstrate that the Agency should continue to entrust it with its controlled substance registrations.

## I. Summary of the Allegations

1. The OSC primarily alleged that Respondent failed to maintain effective controls against diversion when it failed to report to DEA thousands of unusually large orders for hydrocodone and oxycodone, which constituted potential suspicious orders, and when it shipped orders to customers without resolving red flags of diversion or reporting the orders to DEA in violation of 21 U.S.C. 823(b)(1) and (e)(1) as well as 21 CFR 1301.71(a) and 1301.74(b). OSC, at 2. Further, the OSC alleged that Respondent failed to adequately design and operate a system to alert Respondent to suspicious orders of controlled substances and failed to report the suspicious orders to DEA in violation of 21 CFR 1301.74(b). *Id.*

2. The allegations included that, from January 2014 until April 2018, Respondent shipped approximately 7,000 unusually large orders of oxycodone and almost 5,000 unusually large orders of hydrocodone. OSC, at 5; Govt Prehearing, at 8. During this time, Respondent filed a total of only three suspicious order reports with DEA.

3. Furthermore, the OSC alleged that, from approximately January 2014 to April 2018,[3] Respondent failed to carry

out its due diligence and suspicious order monitoring policies and failed to document the resolution of meaningful due diligence into orders placed by the following pharmacies: Wallace Drug Company, Inc.; Bordelon's Super-Save Pharmacy; Folse Pharmacy; Pharmacy Specialties Group, Inc.; Dave's Pharmacy; the Wellness Pharmacy, Inc.; Wilkinson Family Pharmacy; and Hephzibah Pharmacy, L.L.C. (hereinafter, the exemplar pharmacies).

## II. The Witnesses

### A. The Government's Witnesses

The Government presented its case through the testimony of six witnesses and the introduction of 70 exhibits. The Government's first witness was the Acting Section Chief of the Pharmaceutical Investigation Section of the DEA (the Section Chief), who testified generally regarding the regulatory requirements for distributors. Tr. 47–87. The Government also presented testimony from two Diversion Investigators (DI 1 and DI 2) regarding the history of the investigation and the identification of Government exhibits.[4] *See* RD, at 11–12 (citing Tr. 94–101; 144–177). Next, the Government presented testimony from the Chief of the Statistical Services Section of DEA, G.R., who was qualified without objection as an expert in "developing and implementing statistical models and methods of analyzing large and complex data sets." RD, at 13 (citing Tr. 192). G.R. testified to the methodology he employed in analyzing the statistical data that was used by DEA in its determination that Respondent had failed to report suspicious orders.[5] RD, at 12–15 (citing Tr. 187–245). The Government also presented testimony from the Group Supervisor of the New Orleans Field Division (the GS), who was accepted as an expert in "the identification of common red flags suggestive of an illicit pharmaceutical operation and as well [as] with respect to the requirements imposed on DEA registrants to identify and investigate

---

[1] Respondent sought and obtained a temporary restraining order against enforcement of the ISO. *See* ALJX 89, at 7. On May 18, 2018, the DEA Acting Administrator rescinded the ISO issued on May 2, 2018. Tr. 12; *see* Stip. 26.

[2] On October 8, 2019, Respondent filed Exceptions to the Recommended Decision (Resp Exceptions) and on November 7, 2019, the Government filed a response to Respondent's Exceptions. On January 5, 2022, Respondent filed a Motion to Reopen the Administrative Record. On January 14, 2022, the Government filed an opposition to this motion and on January 21, 2022, Respondent filed a Reply Memorandum in Support of its Motion to Reopen the Administrative Record. The Agency addresses the Exceptions throughout and the Motion to Reopen at the end of this Decision.

[3] The allegations for three of the exemplar pharmacies only spanned a subset of this timeframe: Wellness Pharmacy, January 2014– December 2017; Wilkinson Family Pharmacy, January 2014–April 2017; Hephzibah Pharmacy, April 2017–May 2017. Govt Prehearing, at 3.

[4] The Government presented testimony from a third Diversion Investigator (DI 3) to rebut the testimony of Respondent's witness, however, the Agency agrees with the RD that the testimony of DI 3 was not essential to the case and is therefore not including it herein. RD, at 20.

[5] G.R. testified that he had corrected DEA's admitted error in the calculations in the OSC, which applied a Three Interquartile Range (IQR) to the median of the data set, or the 50th percentile, instead of the 75th percentile, and as a result, produced a larger group of outliers. Tr. 204, 208– 09. G.R. further acknowledged that the error was identified by Respondent's expert. Tr. 218.

# EXHIBIT C

UNITED STATES DEPARTMENT OF JUSTICE

DRUG ENFORCEMENT ADMINISTRATION

HEARING

_____
                                    :
IN THE MATTER OF:                   :
                                    :
MORRIS & DICKSON CO., LLC    : Docket No. 18-31
                                    :
                                    :
_____:

Wednesday,
May 15, 2019

Courtroom A
Drug Enforcement Administration

Office of Administration Law Judges

1550 Crystal Drive

Suite 901

Arlington, Virginia

The above-entitled matter came on for
hearing, pursuant to notice, at 9:00 a.m.

BEFORE:    THE HONORABLE CHARLES WM. DORMAN,

U.S. Administrative Law Judge

1    ordinary?

2        A    Generally, meetings -- meetings with

3    the -- meetings with the regulated community are

4    not completely out of the ordinary, no.  There

5    are interactions.

6        Q    Was this an unusual meeting in your

7    view?

8        A    It was.

9        Q    And why was that?

10       A    Well, I had -- I wasn't aware that we

11   were ever invited down.  I certainly wasn't ever

12   invited down in this manner to go to the -- to

13   meet with the leadership and some of the

14   compliance personnel and talk about these issues.

15       Q    And how long did you and your DEA team

16   meet with Mr. Dickson and the Morris & Dickson

17   employees?

18       A    I'd say a couple hours, an hour and a

19   half, two hours.  I'm not exactly sure.

20       Q    And tell us in general what was

21   discussed.

22       A    Generally, you know, Paul Dickson

23   opened the meeting and echoed some of the things

24   from his email about how it's a business priority

25   and a personal priority and his overdoses of

1    family fiends that they knew.  And that framed

2    the agenda for the meeting, a discussion about

3    their suspicious order monitoring system, the

4    results of their system, and then he wanted to

5    prompt some other discussion afterwards with us

6    about how better to combat -- or I think he

7    characterized it like better -- better ways to

8    combat diversion.

9        Q    Now, did Mr. Dickson talk to you about

10   Morris & Dickson's anti-diversion control

11   efforts?

12       A    Yes.

13       Q    And in what manner did he discuss

14   those with you or anybody there?

15       A    In a very -- I guess passionate is the

16   way, I mean, to describe it.  It was a

17   passionate, direct, sincere way.

18       Q    What specifically -- how did he

19   discuss his anti-diversion control efforts and

20   programs?

21            MR. DEAN:  Objection.  Hearsay, Your

22   Honor.

23            MS. AVERGUN:  No.  How he discussed

24   it, not -- I'm not asking for the content, number

25   one.  I'm not offering it for the truth of the

1    matters asserted, just that there was a meeting.

2                    JUDGE DORMAN:  Do you want to know if

3    he said it emphatically?  What do you mean by

4    how?

5                    MS. AVERGUN:  Well, I'm trying to --

6    in what -- what was the content of the meeting?

7                    JUDGE DORMAN:  Well, let me --

8                    MS. AVERGUN:  How was it presented?

9                    JUDGE DORMAN:  Let me overrule at this

10    point.  Okay.

11                    BY MS. AVERGUN:

12         Q      How was it presented?

13         A      It was presented in a very committed

14    way.

15         Q      What, if anything, did Mr. Dickson

16    show you during this meeting?

17         A      There was a PowerPoint presentation.

18    Sorry about that.

19         Q      Thank you.  And during the PowerPoint

20    presentation what, in general, did Mr. Dickson

21    discuss?

22         A      In the PowerPoint presentation, he

23    discussed the areas of the SOM system.  He and

24    Clara Guin went through the presentation.  And as

25    I recall it, it was broken up into several areas

1      -- know your customer -- the Morris & Dickson

2      suspicious order monitoring system, know your

3      customer, and the electronic customer profile,

4      and then the market they had characterized, which

5      is a customized program, this market basket

6      analysis.

7              MS. AVERGUN:  Okay.  Can we please put

8      up Respondent Exhibit -- it should be 22.

9              BY MS. AVERGUN:

10      Q     Can you just take a quick look through

11      that document, Mr. Milione?

12      A     I'm sorry.  What number do you -- 22

13      is something else.

14      Q     Respondent Exhibit 22?

15      A     Yeah.

16              JUDGE DORMAN:  Is this the one that

17      you -- is that the one you want up there?

18              MS. AVERGUN:  No.

19              JUDGE DORMAN:  I didn't think it was.

20      Are you looking for the PowerPoint?

21              MS. AVERGUN:  Yes.  Oh.  Sorry, 11.

22      11.

23              JUDGE DORMAN:  2011 or just 11?

24              MS. AVERGUN:  Just 11.

25              JUDGE DORMAN:  Okay.  You have a lot

936

## C E R T I F I C A T E

This is to certify that the foregoing transcript

In the matter of: Morris and Dickson Co., LLC

Before: US Drug Enforcement Administration

Date: 05-15-19

Place: Arlington, VA

was duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings.

_____
Court Reporter

# EXHIBIT D

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

| In the Matter of | Docket No. 18-31 |
|---|---|
| **MORRIS & DICKSON CO., LLC** | ADMINISTRATIVE LAW JUDGE |
| | CHARLES WM. DORMAN |

**RESPONDENT'S PREHEARING STATEMENT**

Jodi L. Avergun
Keith M. Gerver
Cadwalader, Wickersham & Taft LLP
700 Sixth Street NW
Washington, DC 20001
(202) 862-2456 (office)
(202) 862-2400 (facsimile)
jodi.avergun@cwt.com
keith.gerver@cwt.com

Dated: August 3, 2018

## PREHEARING STATEMENT OF MORRIS & DICKSON CO., LLC

Pursuant to the Administrative Law Judge's May 21, 2018 Order for Prehearing Statements, as modified by the Administrative Law Judge's May 31, 2018 Order Granting Respondent's Motion for Extension of Time, Respondent Morris & Dickson Co., LLC ("Respondent"), by and through undersigned counsel, hereby submits its Prehearing Statement in the above-captioned matter.

### I.    STATEMENT OF THE ISSUE AND REQUESTED RELIEF

A.    ISSUE

Whether the Drug Enforcement Administration ("DEA") has demonstrated, by a preponderance of the evidence, that Respondent's DEA Certificates of Registration Nos. RM0314790 and RM0335732 should be revoked or applications for renewal denied as inconsistent with the public interest, as that term is defined under 21 U.S.C. §§ 823(b) and (e) and 824(a).

B.    REQUESTED RELIEF

Respondent requests that the Administrative Law Judge ("ALJ") issue findings of fact and a recommended ruling that Respondent's DEA Certificates of Registration Nos. RM0314790 and RM0335732 not be revoked because its continued registration is consistent with the public interest under 21 U.S.C. §§ 824(a)(4) and 823(b) & (e).

Respondent reserves the right to file a supplemental Prehearing Statement based on DEA's subsequent filings, if any, to clarify, explain, or expand on information to be presented concerning DEA's allegations against Respondent.

### II.    PROPOSED STIPULATIONS OF FACT

Respondent has reviewed the Government's Proposed Stipulations of Fact contained in its July 20, 2018 Prehearing Statement. Respondent agrees to the substance and form of each of the Government's proposed stipulations and proposes the additional stipulations of fact:

Stipulation No. 21:    On May 29, 2014, DEA conducted a periodic audit at Respondent's Shreveport facility.

Stipulation No. 22:    On October 27, 2015, DEA conducted a periodic audit at Respondent's Shreveport facility.

Stipulation No. 23:    In the spring of 2016, Respondent voluntarily invited then-Assistant Administrator for Diversion Control Louis Milione to Respondent's headquarters in Shreveport, Louisiana to discuss Respondent's DEA compliance efforts and technical capabilities.

Stipulation No. 24:    On August 17, 2016, Mr. Milione, then-Deputy Assistant Administrator Demetra Ashley, and the Diversion Program Manager of the New Orleans Field Division, Sonya Jackson, met with Paul Dickson, President of Respondent, at Respondent's headquarters in Shreveport.

Stipulation No. 25:    On November 15, 2017, DEA conducted a periodic audit at Respondent's facilities.

Stipulation No. 26:    On February 1, 2018, DEA served an administrative subpoena on Respondent seeking records pertaining to suspicious order reports filed by Respondent as well as records and documents pertaining to due diligence or internal investigations conducted on possible suspicious orders for controlled substances from January 1, 2016 to February 1, 2018.

Stipulation No. 27:    On February 2, 2018, DEA served an administrative subpoena on Respondent seeking records pertaining to the distribution of controlled substances to Wilkinson Family Pharmacy (Registration No. FW3669198) from June 1, 2015 through June 1, 2017.

Stipulation No. 28:    On April 11, 2018, DEA served an administrative subpoena on Respondent seeking records reflecting Respondent's policies, guidance, and/or training for its employees with respect to the identification, investigation, and reporting of suspicious or potentially suspicious orders.

Stipulation No. 29:    At no time prior to the service of the first administrative subpoena on Respondent had DEA ever taken any disciplinary action in any form against Respondent.

Stipulation No. 30:    On May 2, 2018, the DEA Acting Administrator issued an Order to Show Cause and Immediate Suspension of Registration (the "ISO") to Respondent, immediately suspending both Registration Nos. RM0314790 and RM0335732.

Stipulation No. 31:    The ISO did not allege any facts in support of its suspension of Respondent's Registration No. RM0335732 located in Jefferson, Louisiana.

Stipulation No. 32:    The ISO is devoid of allegations concerning sales to any of the Respondent's customers other than retail pharmacy customers.

Stipulation No. 33:    The ISO contained allegations relating solely to hydrocodone and oxycodone sales to eight (8) of Respondent's retail pharmacy customers.

Stipulation No. 34:    On May 8, 2018, Judge Elizabeth Foote of the U.S. District Court for the Western District of Louisiana issued a Temporary Restraining Order enjoining the DEA from enforcing the ISO.

Stipulation No. 35:    Judge Foote found that there was a substantial likelihood that Respondent would be able to prove that the decision to issue an ISO was arbitrary and capricious.

Stipulation No. 36:    Judge Foote found that there was a substantial likelihood that Respondent would be irreparably harmed if the ISO were not permanently enjoined.

Stipulation No. 37:    On May 10, 2018, DEA filed a "Partial Administrative Record" with the U.S. District Court for the Western District of Louisiana.

Stipulation No. 38:    The Partial Administrative Record contained a statistical analysis that DEA claimed demonstrated statistically unusual orders. DEA subsequently conceded that this statistical analysis—on which the ISO was based—was incorrectly calculated and applied.

Stipulation No. 39:    At all times during which Respondent filled orders for the customers identified in the ISO and DEA's Prehearing Statement (*i.e.* Wallace Drug Company, Inc., d/b/a Wallace Discount Drugs (FW6006363), Bordelon's Super-Save Pharmacy (AB6203549), Folse Pharmacy (BF0636451), Pharmacy Specialties Group, Inc. (FP4243589), Dave's Pharmacy (BD5662386), Hephzibah Pharmacy LLC (AV5145695), The Wellness Pharmacy (BT7485166), and Wilkinson Family Pharmacy ( FW3669198)) the customers were validly registered with DEA to purchase and dispense controlled substances.

Stipulation No. 40:    DEA has not promulgated a regulation or rule containing an objective standard by which a wholesale distributor can evaluate orders to determine if they are of unusual size, deviate substantially from a normal pattern, or are of unusual frequency under 21 C.F.R. § 1301.74(b).

Stipulation No. 41:    DEA has not promulgated a regulation or rule defining the due diligence that it requires registrants to conduct to ensure that controlled substances are not diverted into other than legitimate channels.

Stipulation No. 42:    On March 1, 2012, then-DEA Assistant Deputy Administrator Joseph Rannazzisi testified before Congress that ARCOS data may reflect that a pharmacy has high volume purchases of narcotics, "yet it turns out that the pharmacy is a legitimate pharmacy, because it is next to a hospital or oncology practice."

Stipulation No. 43:    On November 16, 2017, Attorney General Jefferson B. Sessions issued a Memorandum regarding "Prohibition on Improper Guidance Documents" ("Sessions Memorandum"). The Sessions Memorandum states that "guidance may not be used as a substitute for rulemaking and may not be used to impose new requirements on entities outside the Executive Branch" nor "should [it] create binding standards by which the [DOJ] will determine compliance with existing regulatory or statutory requirements."

## III.    PROPOSED WITNESSES

1.    Paul M. Dickson, President, Morris & Dickson Co., LLC, P.O. Box 51367, Shreveport, LA 71115.

2.    Clara Guin, Morris & Dickson Co., LLC, P.O. Box 51367, Shreveport, LA 71115.

3.    Scott Irelan, Director of Corporate Compliance & Security, Morris & Dickson Co., LLC, P.O. Box 51367, Shreveport, LA 71115.

4.    Louis J. Milione, Senior Managing Director, Guidepost Solutions LLC, 1130 Connecticut Avenue, N.W., Suite 520, Washington, D.C. 20036.

5.    Kenneth A. Weinstein, Vice President, Analysis Group, Inc. ("AGI"), 111 Huntington Ave., 14th Floor, Boston, MA 02199.

## IV.    SUMMARY OF TESTIMONY

1.    Paul M. Dickson

Mr. Dickson will testify regarding Respondent's history and business model, the operation and components of its pre-May 2018 DEA regulatory compliance program, its acceptance of

responsibility for shortcomings in certain of its documentation practices, and the financial and reputational impact of DEA's May 2, 2018 ISO.

    a.    <u>History of Respondent</u>

Mr. Dickson will testify that Respondent has been in continuous business for 177 years in the Shreveport, Louisiana area. He will testify that Respondent employs 840 employees, including 517 in the Shreveport area. He will testify that Respondent is the only remaining privately-owned, full-line wholesale pharmaceutical distributor in the United States. He will testify that Respondent's share of the pharmaceutical distribution market is approximately 2%. He will testify that Respondent distributes pharmaceutical products, including Schedule II controlled substances, to customers located in fourteen (14) states, from a single distribution facility located in Shreveport. He will testify that Respondent distributes approximately 30,000 products to nearly 3,000 customers, including independent retail pharmacies, hospitals, and alternate care customers. He will testify that approximately 850 of Respondent's customers are independent retail pharmacies. He will testify that the alternate care customer category includes hospices, skilled nursing facilities, public health facilities, mental and long-term care facilities, and prisons.

    b.    <u>Respondent's Pre-May 2018 Suspicious Order Monitoring System</u>

Mr. Dickson will testify that, prior to May 2, 2018, Respondent designed and operated an effective system to disclose to Respondent suspicious orders of controlled substances. He will testify that he was personally responsible for Respondent's DEA compliance program beginning in 1984 through approximately 2012, when day-to-day oversight of compliance was turned over to a dedicated compliance manager who had been assisting him with DEA compliance since 2008. Mr. Dickson will testify that he personally developed Respondent's suspicious order monitoring system ("SOM"), and that the SOM system evolved and continues to evolve as Respondent's

business has grown. Mr. Dickson will testify that Respondent always has intended to act in compliance with DEA regulations, and that he had a good faith belief that Respondent's system was in full compliance with the law.

Mr. Dickson will testify that the version of Respondent's SOM system that was in effect at the time of the ISO dated back to August 2008, when DEA provided a briefing to him and to Respondent's staff on anti-diversion regulations at a meeting in Lafayette, Louisiana. He will testify that when he returned from Lafayette, he assigned certain compliance responsibilities to an employee with nearly twenty (20) years of experience with the company. Mr. Dickson will testify that he and Respondent's compliance officer developed a report that would indicate when a customer's orders of controlled substances exceeded twenty (20) percent of total sales to that customer. He will testify that Respondent's compliance officer could review up to six months' worth of order history when reviewing orders.

Mr. Dickson will testify that Respondent also developed a "market basket analysis" to evaluate customer orders. He will testify that this analysis compared a customer's purchases of controlled substances to a "market basket" of non-controlled items, such as blood pressure medication, diabetes medication, or antibiotics, purchased by the customer. He will testify that he created the "market basket" method to assess the ratio of a customer's purchases of controlled substances to its purchases of common non-controlled medications. He will testify that Respondent conducted this review on a monthly basis for each customer.

Mr. Dickson will testify that between 2010 and 2011, he determined that Respondent should transition to an automated order monitoring system. He will testify that Respondent contracted with a third party vendor, SOMLink, to provide that system. Mr. Dickson will testify

that Respondent beta-tested the SOMLink system, but determined that the system was inadequate from a technical perspective compared to Respondent's internal capabilities.

In 2013, Respondent contracted with a third-party vendor, Pro Compliance, to provide initial and at least annual reports containing dispensing-level information for its retail pharmacy customers. He will testify that Respondent maintained the Pro Compliance reports in each customer's electronic file, which were accessed via an electronic portal containing other know-your-customer information. He also will testify that beginning in 2013, the Respondent's compliance officer obtained a Pro Compliance report for new customers prior to shipping the customer's first order. He will testify that the compliance officer would provide a customer's Pro Compliance report to Respondent's sales representatives and discuss the contents with them prior to the representative's next visit to the customer.

Mr. Dickson will testify that, beginning in 2013, Respondent began to end its relationships with certain customers based on its review of Pro Compliance data. He will testify that following this effort—which resulted in the termination of over 100 customers—he believed that Respondent had thereby sufficiently vetted his remaining customers.

Mr. Dickson also will testify that in 2013, Respondent developed database software referred to as the "Enhanced Customer Profile" ("ECP"). He will testify that the ECP served as a single point of reference or "dashboard" for customer due diligence information. He will testify that the ECP included, for example, customer registration and license information, store photos, and Pro Compliance data.

Mr. Dickson will testify that in April 2017, Respondent introduced an automated filter to the SOM system that imposed real-time limits on customer orders. He will testify that this filter flagged an order for a controlled substance if the order was ten (10) times the amount of the

customer's average daily order quantity over the previous ninety (90) days. Mr. Dickson will testify that the filter flagged the order for review by the compliance officer. Ultimately, the system was enhanced so that the compliance officer received an email or text message alert informing her of the flag and the need to take action to review the order.

Mr. Dickson will testify that at all times prior to the issuance of the ISO, Respondent's compliance process involved observation, review, and analysis by the Respondent's compliance officer, field sales force, vault employees, and delivery drivers. Mr. Dickson will testify that the compliance officer or sales representative would conduct due diligence interviews of pharmacy staff via telephone if there was a flagged order that otherwise could not be explained by a mistaken data entry. He will testify that Respondent relied on its employees' knowledge and awareness of Respondent's customers' order frequency and pattern. He will testify that Respondent's truck drivers were trained to report anything unusual at the store location. He will testify that Respondent's sales representatives would typically conduct monthly visits to Respondent's customers to discuss the pharmacy's controlled substances sales.

Mr. Dickson will testify that Respondent's compliance officer would decide whether to ship or cancel an order flagged by the electronic filter after an investigation that considered the market basket analysis, the Pro Compliance reports, and other customer due diligence information contained in the ECP. With respect to the review of Pro Compliance reports, he will testify that Respondent's compliance officer would review the following data:

- The total amount of controlled substances Respondent sold to the customer compared to the total amount each customer was dispensing; if there was a substantial difference, that could indicate that there was a potential issue;

- The total percentage of controlled substances dispensed compared to total prescriptions dispensed;

- The total amount of controlled substances paid for in cash; and

- The list of top prescribing doctors for potential issues identified by Pro Compliance.

Mr. Dickson will testify that Respondent has stressed the importance of compliance with its customers. He will testify that at the last five retail pharmacy marketing shows Respondent has held, Respondent hired an outside compliance vendor to conduct training on compliance and anti-diversion issues for Respondent's pharmacy customers in attendance.

Mr. Dickson will testify that Respondent's Policies & Procedures Manual for Prescription Drug Handling details aspects of Respondent's SOM system, including: the monthly "market basket" analysis and initial onboarding and discretionary review of Pro Compliance reports, as well as the role of Respondent's order processing and delivery personnel. He will testify that Respondent's Standard Operating Procedures Manual describes Respondent's system for identifying unusual purchasing patterns of controlled substances. He will testify that Respondent's compliance officer would receive both daily and monthly reports of a customer's controlled substances purchases. Mr. Dickson will testify that prior to 2012, he personally received and reviewed copies of these reports.

Mr. Dickson also will testify that, while Respondent had a policy of investigating orders flagged by Respondent's SOM system, Respondent did not maintain formal records documenting the results of those investigations. He will testify that he did not understand that this was expected of Respondent. He will testify that he believed Respondent's efforts at compliance, which were aimed at terminating suspect accounts that, in his view, were more likely to engage in diversion,

satisfied what he believed to be Respondent's regulatory obligations. He will testify that he accepts responsibility for any shortcomings in that regard.

    c.    Respondent Customers Identified in the ISO

Mr. Dickson will testify regarding his personal knowledge of the customers identified in the ISO. He will testify that Respondent conducted due diligence regarding these customers and monitored these customers' orders and compliance with Respondent's expectations regarding anti-diversion and controlled substances compliance. Specifically:

- *Wallace Discount Drugs*. He will testify that he is familiar with the pharmacy and its owner, its order history, and its business practices, including its orders in January 2018 for 24,000 dosage units of hydrocodone. He will testify that Respondent's compliance officer investigated the order when it was placed. He will testify that the investigation found that the owner, Mr. Wallace, purchased a large quantity due to concerns that he might have issues obtaining inventory. He will testify that Respondent requested Mr. Wallace return a portion of the shipment that was to cover anticipated inventory shortages, which he did. He will testify that Respondent did not believe this was a suspicious order because, following investigation, Respondent did not suspect Wallace of wrongdoing, and because Respondent believed Wallace's orders were otherwise normal.

- *Bordelon's Super-Save Pharmacy*. He will testify that he is personally familiar with Bordelon's Super-Save Pharmacy ("Bordelon's") and has visited the store location. He will testify that the pharmacy is located in a low-income neighborhood in inner-city Baton Rouge, Louisiana. He will testify that Bordelon's customers are almost primarily Medicaid-covered patients, who, due to pricing constraints on alternate treatments covered by Medicaid, are often prescribed a higher volume of controlled substances as treatment

for pain than the general population. He also will testify that large orders placed in 2014 identified in the ISO were the result of the rescheduling of hydrocodone, which also resulted in a price increase. He will testify that, to his knowledge, the owner, David Bordelon, was arbitraging based on price and to avoid running out of stock. He will testify that Respondent did not consider these to be suspicious orders because the pharmacy had an adequate explanation.

- **Pharmacy Specialties**. He will testify that Pharmacy Specialties Group, Inc. ("Pharmacy Specialties"), as a specialty pharmacy, serves niche patients, including an epilepsy clinic. He will testify that it was not unusual for Pharmacy Specialties to purchase a large number of controlled substances based on its business model.

- **Dave's Pharmacy**. He will testify that Dave's Pharmacy ("Dave's") purchased controlled substances earlier than its normal order pattern on three occasions based on a fear of potential shortages. He will testify that when the higher volume orders were placed, Respondent investigated and requested that the pharmacy return the purchased items, which the pharmacy did. He will testify that Respondent did not consider these to be suspicious orders because the pharmacy had an adequate explanation.

- **Hephzibah**. He will testify that Hephzibah Pharmacy LLC ("Hephzibah") was a customer of Respondent's for a total of three months. He will testify that prior to onboarding, Respondent communicated its concerns to the pharmacy based on information contained in the initial Pro Compliance report and made clear that its status as a customer was conditioned upon its compliance with Respondent's compliance program. He will testify that Hephzibah did not comply with Respondent's conditions and, as a result, Respondent

closed the pharmacy's account when it began to order drugs from a different wholesaler rather than comply with Respondent's compliance program.

- ***Wilkinson***. He will testify that Wilkinson Family Pharmacy ("Wilkinson") was located in a low-income, working-class suburb of New Orleans, Louisiana and served a large Medicaid population. He will testify that the owner of the pharmacy voluntarily relinquished his DEA registration when pressured to do so by DEA Diversion Investigators executing an administrative inspection warrant in his store. He will testify that prior to this action, Respondent closely investigated and monitored Wilkinson. He will testify that no reports were made to the DEA regarding Wilkinson's orders because Respondent did not suspect Wilkinson of engaging in diversion. He will testify that Wilkinson was responsive to Respondent's recommendations regarding red flags noted in the Pro Compliance reports Respondent commissioned.

d.    Respondent's Relationship with DEA

Mr. Dickson will testify that in November 2006, he received a letter from DEA regarding anti-diversion compliance and that he personally met with the New Orleans Field Division in Metairie to discuss DEA's expectations for Respondent's compliance efforts.

Mr. Dickson will testify that he traveled to Washington, DC in 2008 to receive the industry-standard DEA presentation on the Distributor Initiative. He will testify that Respondent's employees attended the DEA National Distributors Conferences in October 2013, April 2015, and May 2016.

Mr. Dickson will testify that Respondent's employees had frequent interactions with representatives from the New Orleans Field Division, including attending DEA-provided anti-diversion training in Lafayette, Louisiana in 2008. He will testify that DEA Diversion Investigators

visited Respondent's facilities in 2014 and 2015 to conduct periodic audits. He will testify that at no point did the Diversion Investigators state or suggest that they had concerns with Respondent's SOM program. Rather, he will testify that, based on conversations with DEA New Orleans Field Division officers, he understood that they did not want to be inundated with reports of suspicious orders, but rather wanted reports only when Respondent believed diversion may be occurring.

Mr. Dickson will testify that on August 17, 2016, Respondent met with DEA personnel, including then-Assistant Administrator for Diversion Control Louis J. Milione, then-Deputy Assistant Administrator Demetra Ashley, and the Diversion Program Manager of the New Orleans Field Division, Sonya Jackson, accepted Mr. Dickson's invitation to visit Respondent's headquarters in Shreveport, Louisiana to discuss Respondent's DEA compliance efforts and technical capabilities. He will testify that he made a formal presentation to the DEA officials about Respondent's suspicious order monitoring system. He will testify that Respondent requested input from DEA on the operation of Respondent's system. He will testify that DEA did not provide any input or commentary.

Mr. Dickson will testify that there was no further communication between Respondent and DEA until DEA conducted a periodic audit in November 2017.

Mr. Dickson will testify that Respondent enjoyed a productive, positive, and cooperative relationship with DEA, in particular with the officers and agents in the New Orleans Field Division. He will testify that he believed that DEA was satisfied with Respondent's compliance efforts and that if DEA were not satisfied, he had developed a sufficient rapport and relationship such that DEA would have communicated its dissatisfaction. He will testify that he continues to believe that Respondent had a comprehensive compliance program.

e.    Reputational and Financial Impact of the ISO

Mr. Dickson will testify regarding the financial and reputational impact to Respondent since the Government's reckless issuance of an ISO based on a statistical analysis that DEA itself concedes was fatally flawed. He will testify as to the severe collateral damage the ISO caused Respondent's hospital and alternate care business lines—neither of which were discussed or mentioned in the ISO. He will testify that Respondent's single largest alternate care customer, Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") in Oklahoma, informed Respondent on May 7, 2018, that it would terminate its relationship with Respondent because of the ISO. He will testify that this contract represents approximately $64 million in annual revenue to Respondent. He will testify that the Oklahoma MMCAP has state statutory obligations requiring it to purchase its medicine from a single distributor.

Mr. Dickson will testify that Respondent has contracts with eight (8) MMCAP states and that each of those contracts are at risk when their terms expire. He also will testify that LHC Group, Inc., a large hospital customer, informed Respondent via letter dated June 19, 2018, that it would terminate its contract with Respondent. He will testify that losing this contract will result in approximately $8 million in lost business per year.

Mr. Dickson will testify that at least nine (9) suppliers and third-party logistics companies have withheld shipment of products because of the outstanding Order to Show Cause, which is based on the same allegations contained in the ISO that was rescinded on May 18, 2018. He will testify that those companies include: United Parcel Service, RXTPL, Allergan Pharmaceuticals, Eisai, Inc., Impax Laboratories, Par Pharmaceutical, Purdue Pharma, Rhodes Pharmaceuticals, and Ascend Laboratories LLC.

Mr. Dickson will testify that because Respondent has only one (1) distribution center, the ISO would have effectively shuttered the company.

f.    Corroboration of Remedial Efforts

Mr. Dickson will corroborate testimony from Mr. Milione and Mr. Weinstein regarding the substantial efforts Respondent has undertaken in an exceedingly short period of time to improve and enhance its SOM system, including with respect to documentation.

2.    Clara Guin

Ms. Guin will corroborate Mr. Dickson's testimony regarding customer due diligence and review of potentially suspicious orders during the time period she was primarily responsible for Respondent's compliance program.

3.    Scott Irelan

Mr. Irelan will testify regarding Respondent's identification, review, and reporting of flagged orders. He will testify that in May 2018, he became Respondent's Director of Corporate Compliance and Security. He will testify that in May 2018, Respondent created a dedicated Regulatory Affairs team under his leadership to supervise and manage controlled substance compliance. Mr. Irelan will testify that the team has five (5) full-time employees. He will testify that the team is currently supplemented by three (3) consultants from Guidepost Solutions ("Guidepost").

Mr. Irelan will testify that between May 10, 2018, and May 24, 2018, Respondent implemented an "interim hard limiter" on purchases of controlled substances by its retail pharmacy customers. He will testify that this method was developed under the guidance of Guidepost and used the following formula:

- Using the national average number of prescriptions presented by the National Association of Community Pharmacies ("NACP") in 2017 (163 prescriptions a day; or 3,586 prescriptions a month), Respondent calculated the average number of prescriptions for each retail pharmacy to determine the size of the pharmacy relative to the national average.

- Respondent calculated a multiplier based on the size of Respondent's script count compared to the average size from NACP script counts.

- Respondent capped any multipliers (regardless of retail size) at three times the national average.

- Respondent applied the multiplier to DEA's 2016 national monthly average of dispensed hydrocodone and oxycodone units to determine the "interim hard limiter threshold" for the retail pharmacy customer.

Mr. Irelan will testify that on May 14, 2018, Respondent updated the interim hard limiter for item groups other than hydrocodone and oxycodone. He will testify that Guidepost assisted Respondent in calculating the average of Respondent's average monthly non-hospital sales over the previous year and to multiply that number by the customer's script multiplier. He will testify that this method was used for all customers except hospitals.

Mr. Irelan will testify that the interim hard limiter was replaced by AGI's interim thresholds, which became effective at the close of business on May 24, 2018.

Mr. Irelan will testify that the Regulatory Affairs team is responsible for reviewing and analyzing any orders flagged by Respondent's suspicious order monitoring system. He will testify that flagged orders are held for review. He also will testify that the Regulatory Affairs team evaluates these held orders for possible shipment using a variety of sources. Mr. Irelan will testify that these sources include: customer due diligence questionnaires, Pro Compliance reports,

pharmacy dispensing information (where available), site visit reports, customer registration and license information, store photos, direct customer contact via telephone or email, and disciplinary information from State Boards of Pharmacy and Boards of Medicine for principals of the pharmacy, its pharmacists, as well as those physicians that generate the majority of the prescriptions that are dispensed at the pharmacy. He will testify that, based on the results of the Regulatory Affairs team's analysis, the team may conduct additional due diligence, including through site visits or other investigative processes, to determine whether a flagged order may be shipped.

Mr. Irelan will testify that the Regulatory Affairs team documents the findings of its analysis: that is, whether the order should be cancelled or released for shipment. He will testify that the documentation is contained in the customer's Enhanced Customer Profile. He will testify that the documentation supporting a decision to ship will include the factors that the Regulatory Affairs team considered in making its determination. Mr. Irelan will testify that currently the sole authority to release any flagged order for shipment rests with a Guidepost consultant.

Mr. Irelan will testify that Respondent has reported all orders flagged by its suspicious order monitoring system since May 14, 2018. He will testify that a report is generated that contains all flagged orders from the previous day and sent to New Orleans Field Division Group Supervisor Joel L. Dunn. He will testify that 57 flagged order reports were submitted between May 14, 2018, and July 31, 2018. He will testify that those flagged order reports contained 4,765 flagged orders of controlled substances. He will testify that, of those orders, 3,814 were flagged and cancelled. Of those 3,814 orders, he will testify that 2,242 were for Schedule II controlled substances. He will testify that since May 14, 2018, 951 orders of Schedule II through V controlled substances have been flagged and shipped. He will testify that of those 951 orders, 376 have been for Schedule

II controlled substances. Mr. Irelan will testify that Respondent recently automated the process by which it prepares the flagged order report and transmits it to Group Supervisor Dunn. He will testify that three (3) orders have been reported as suspicious following investigation.

4.    Louis J. Milione

Mr. Milione will testify about his roles and responsibilities when he led DEA's Diversion Control Division from October 2015 through June 2017 as the Assistant Administrator, as well as his prior career as a DEA agent.

He will testify that he first met Mr. Dickson at an HDMA Board of Director's meeting in Colorado on June 12, 2016, at which Mr. Milione was an invited speaker. Mr. Milione will testify that, on the next day, he received an email from Mr. Dickson inviting him and others from DEA to Respondent's headquarters for a briefing about Respondent's insight into combatting diversion, which Mr. Dickson described as "both a personal and business priority."

Mr. Milione will further testify that he, his then-Deputy Assistant Administrator Demetra Ashley, and New Orleans Field Division Diversion Program Manager Sonya Jackson travelled to Respondent's facilities in Shreveport, Louisiana on August 17, 2016. He will testify that he and his team met for several hours with Mr. Dickson and other members of Respondent's leadership team, including Respondent's then-compliance manager, Clara Guin, and his son, Jacob Dickson, to whom Ms. Guin reported.

Mr. Milione will testify that at the meeting, Mr. Dickson:

•    Described the positive relationship and interactions that he and Respondent had with DEA's New Orleans Field Division over several decades;

•    Provided a PowerPoint overview of Respondent's DEA compliance program;

•    Expressed Respondent's commitment to compliance;

- Appeared sincere in the belief that the Respondent SOM system was adequate and in compliance with the law and DEA regulations;

- Expressed interest in receiving from the DEA objective standards that the DEA would like a wholesale distributor to use when evaluating orders;

- Expressed interest in following up in greater detail with the New Orleans Field Division Diversion Program manager about Respondent's compliance program; and

- Expressed his willingness to work with the DEA on local anti-diversion efforts and broader national initiatives.

Mr. Milione will testify that he instructed the local DEA team to follow up with Respondent for further discussions. He will testify that no such follow-up occurred. He will testify that he did not inform Respondent that there were any issues with respect to its SOM system. He will testify that there was no communication from DEA to Respondent until DEA conducted a periodic inspection on Respondent in November 2017.

Mr. Milione will testify that in June 2017, he retired from DEA and, in July 2017, began working at Guidepost Solutions as a Senior Managing Director. He will generally describe his duties and responsibilities as a Senior Managing Director at Guidepost.

Mr. Milione will testify that beginning on or about May 7, 2018, Guidepost was engaged by Respondent to help enhance its DEA regulatory compliance program. Mr. Milione will testify that he has been personally involved in this process since that time. Mr. Milione will testify that the following enhancements have been made to the Respondent's controlled substance compliance program:

- Establishment of dedicated DEA anti-diversion regulatory staff;

- Enhancements to respondent's SOM system;

- Enhanced "know your customer" processes;

- Redeveloped enhanced customer profiles;

- Enhanced due diligence investigations of respondent's retail pharmacy customers;

- Compliance and anti-diversion training; and

- Review and update of respondent's theft and loss protocols

    a.      Establishment of Dedicated DEA Anti-Diversion Regulatory Staff

Mr. Milione will testify that Respondent created a dedicated Regulatory Affairs team to supervise and manage controlled substance compliance under the leadership of a senior executive with more than 30 years' experience in company operations. He will testify that the Regulatory Affairs team consists of five (5) full-time employees.

Mr. Milione will testify that a Guidepost team that consists of former DEA Diversion Investigators, former DEA Special Agents, and former state investigators oversee the review of flagged orders and assists with Respondent's controlled substances efforts.

    b.      Enhancements to Respondent's Suspicious Order Monitoring System

Mr. Milione will testify that Respondent retained AGI to develop and implement an interim statistical methodology to identify orders of unusual size, frequency, or pattern in an automated fashion. This methodology automatically flags orders for review by Respondent's Regulatory Affairs and Guidepost team.

Mr. Milione also will testify about Respondent's order diligence, order analysis, and order reporting.

    i.      Order Diligence

Mr. Milione will testify that information used to evaluate flagged orders for possible shipment is gathered from various sources and stored in a customer-specific ECP. These sources include: customer due diligence questionnaires (together with a certification of compliance), Pro Compliance reports, dispensing data (where available), site visit reports, customer registration and license information, store photos, disciplinary information from State Boards of Pharmacy and Boards of Medicine for principals of the pharmacy, its pharmacists, as well as those physicians that generate the majority of the prescriptions that are dispensed at the pharmacy.

   ii.  Order Analysis

Mr. Milione will testify that Regulatory Affairs staff members, under the guidance of Guidepost personnel with anti-diversion experience, analyze flagged orders that were not immediately cancelled using the information gathered during order diligence efforts. Mr. Milione will testify that based on the results of the flagged order analysis, additional customer due diligence, pharmacy site visits, and other investigative processes may be employed to determine whether a flagged order can be shipped. Additionally, all justifications for releasing a flagged order are documented by the reviewer in the customer's ECP. Mr. Milione will testify that the sole authority to release any flagged order rests with a member of the Guidepost Solutions team.

   iii.  Order Reporting

Mr. Milione will testify that since May 14, 2018, Respondent began reporting all orders flagged by its order monitoring system to DEA. The vast majority of flagged orders are immediately cancelled, but some are held for further review for possible shipment. Mr. Milione will testify that once an order is investigated and "cleared," it can be shipped to Respondent's customer.

   c.  Enhanced "Know Your Customer" Process

Mr. Milione will testify that Respondent distributed an enhanced customer due diligence questionnaire to all approximately 850 retail pharmacy customers. The questionnaire contains sections requesting information regarding store and owner background, description of the customer's business model, disciplinary history, dispensing information, and the customer's corresponding responsibility to prevent diversion.

Mr. Milione will testify that Respondent also requires its retail pharmacy customers to certify their compliance with and understanding of their obligations under the Controlled Substances Act and DEA regulations.

d.    Redeveloped Enhanced Customer Profiles

Mr. Milione will testify that Respondent has revamped and remodeled its previous ECPs (which included "market basket" analysis information) to function as know-your-customer dashboards allowing Regulatory Affairs team members immediate at-a-glance access to a broad array of customer information used to analyze flagged orders and evaluate "red flags," including customer questionnaire information, order history by item and drug family, current thresholds and usage data, flagged order history, and statistical information derived from Pro Compliance reports or other dispensing data. He will testify that Regulatory Affairs team members can easily add notes on flagged orders or with respect to the customer generally.

e.    Enhanced Due Diligence Investigations of Retail Pharmacy Customers

Mr. Milione will testify that a Guidepost team of former DEA Diversion Investigators, former DEA Special Agents and former state or local law enforcement conducted site visits at fifty-nine (59) of Respondent's retail pharmacy customers identified through a review of Pro Compliance reports. He will testify that based on those site visits and follow-up investigations, Respondent cut-off four (4) retail pharmacy customers from receiving any controlled substances.

He will testify that all site visit reports have been uploaded into the ECP and are readily available for regulatory affairs personnel to review.

Mr. Milione will testify that an additional forty-nine (49) of Respondent's retail pharmacy customers were identified for enhanced due diligence. These forty-nine (49) customers include the top twenty-five (25) purchasers of hydrocodone and oxycodone, as well as customers identified through an order history review. He will testify that to date, and based upon Guidepost's enhanced due diligence, three (3) retail pharmacy customers have been cut off from receiving any controlled substances. He will testify that enhanced due diligence investigations of all forty-nine (49) customers will continue on rolling basis until completion.

     f.     Compliance and Anti-Diversion Training

Mr. Milione will testify that Guidepost has provided "on the ground" training to the Regulatory Affairs team on such topics as: the identification of physical and statistical "red flags," strategies for analyzing Pro Compliance Reports, flagged order review protocols, information on highly diverted/abused drugs, and enhanced due diligence investigative protocols. Mr. Milione also will testify that outside legal counsel has provided training to key Respondent management personnel on DEA compliance-related issues.

     g.     Theft and Loss Protocols

Mr. Milione will testify that Respondent, with Guidepost's assistance, is reviewing all theft and loss investigations and reporting. Mr. Milione will testify that Guidepost has briefed Respondent leadership and distribution center staff on regulatory requirements, including the need for timely reporting to DEA via DEA Form 106.

5.    <u>Kenneth A. Weinstein</u>

     a.     Background Information

Mr. Weinstein will testify regarding his relevant professional and education background and experience. He will testify that he is a Vice President of AGI, an international economics consulting firm established in 1981 that has a staff of over 800 professionals, where he has been employed since 2010. He will testify that in 2003 he received an A.B. with honors from Harvard University in applied mathematics with a sub-field of economics, and that in 2008, he received an M.B.A. from the MIT Sloan School of Management.

Mr. Weinstein will testify that through his consulting projects at AGI, his other work experience, and his academic studies, he has developed expertise in applying statistical methods to large and complex databases in both health care and other industries. He will testify that he has extensive experience leading consulting engagements focused on the statistical analysis of data related to the distribution of controlled substances, has worked on such projects continuously since 2011, and is currently assisting clients at every level of the supply chain for controlled substances: manufacturers, distributors, and pharmacy chains. He will testify that he has developed real-time Suspicious Order Monitoring algorithms for large pharmaceutical distributors, prepared statistical analyses to identify unusual dispensing at the pharmacy and prescriber level, assisted with loss prevention efforts based on inventory data, and presented statistical analyses to senior government officials, including those at the DEA, the Department of Justice, various Offices of the United States Attorneys, and various State Attorneys General. Mr. Weinstein also will testify that he has published articles in Law360 regarding Suspicious Order Monitoring and changes to opioid regulations, and that to enhance his knowledge on these topics, he has attended conferences and symposia hosted by the Healthcare Distribution Alliance, the American Society for Pharmacy Law, and the American Conference Institute.

      b.      Engagement by Respondent

Mr. Weinstein will testify that he was retained by Respondent to review the statistical analysis relied upon by DEA in the ISO, and in particular the statistical analysis used by DEA to identify "unusually large orders" of oxycodone and hydrocodone that DEA alleges "should have been identified as potentially 'suspicious' within the meaning of 21 C.F.R § 1301.74(b)." He will testify that prior to being retained in this matter on May 10, 2018, he had no prior engagements with Respondent. He will testify that AGI is being compensated for his time spent on this matter at an hourly rate of $540, and that this compensation is not contingent on the nature of his findings or on the outcome of the proceeding.

     c.     Opinion of DEA Methodology

Mr. Weinstein will testify regarding his understanding of the analysis regarding which Gamaliel S. Rose plans to testify on behalf of DEA. DEA's July 20, 2018 Prehearing Statement did not include spreadsheets supporting DEA's analysis; as such, Mr. Weinstein's understanding is based on educated assumptions about which specific data Mr. Rose analyzed to form the conclusions described in DEA's Prehearing Statement. Mr. Weinstein's opinion is therefore subject to modification in a supplemental prehearing statement upon review of the specific underlying data and analysis.

Despite not having the specific data on which DEA relied, Mr. Weinstein can observe and will unequivocally testify that DEA's approach in identifying potentially suspicious orders has significant flaws that make its conclusions about unusual orders unreliable. This remains his opinion even after the updates to methodology that he understands DEA to have made since the ISO.

Mr. Weinstein will testify that he understands that, subsequent to the ISO being issued, Mr. Rose updated DEA's analysis to address one of several errors Mr. Weinstein identified in a May

15, 2018 Declaration (the "Weinstein Declaration") submitted in support of Respondent's motion for a preliminary injunction (the "Partially Corrected Method"). Specifically, the Weinstein Declaration demonstrated that DEA incorrectly implemented the Tukey method of identifying statistical outliers by using the median rather than the 75th percentile, and thus vastly over-identified the number of orders that the ISO characterized as "unusually large." Although DEA's summary of Mr. Rose's testimony discloses that Mr. Rose concedes that error and corrects it, Mr. Weinstein will testify that DEA's summary does not reveal any revised analysis addressing any of the other oversights discussed in the Weinstein Declaration.

Mr. Weinstein understands that Mr. Rose's revised analysis incorporates seven additional months of data from October 2017 through April 2018. However, the summary of Mr. Rose's testimony does not state whether DEA's analysis incorporates customers whose first purchases occurred during the seven additional months or if it is based on the same customers included in the analysis for the Partial Administrative Record. Mr. Weinstein will testify that his analysis of the seven additional months of data is limited to customers that were included in DEA's analysis for the Partial Administrative Record.

Based on this understanding, Mr. Weinstein will testify that he has attempted to replicate DEA's analysis, which he does not concede is accurate. By applying what he still believes to be DEA's flawed analysis, he has obtained results that are generally similar to the figures reported in DEA's Prehearing Statement. He will testify that, after applying the Partially Corrected Method and even incorporating seven additional months of data in its analysis, the number of orders identified by DEA as "unusually large" is nearly 50 percent lower than what was alleged in the ISO. As an example, he will testify that Hephzibah Pharmacy, which was reported in the ISO to

have had 16 unusually large orders of oxycodone in 2017, would have no orders identified as unusually large using the Partially Corrected Method.

Mr. Weinstein also will testify that DEA briefly mentioned in the ISO a separate analysis to identify "extremely large monthly pharmacy totals," but did not reference this analysis for the customers named in the ISO. The analysis is also not mentioned in DEA's Prehearing Statement. Mr. Weinstein will testify that he has reviewed the spreadsheet related to this analysis that was provided in the Partial Administrative Record, and has identified significant flaws in the approach.

Mr. Weinstein will testify regarding significant remaining flaws in the Partially Corrected Method, namely: DEA's approach continues to rely on data not available to Respondent at the time orders were made, and thus cannot be used to show that Respondent should have identified those orders as unusually large; and DEA's individual-order approach still does not take into account ordering and inventory practices in the context of the pharmaceutical distribution business, and thus inappropriately identifies orders as unusual. Mr. Weinstein will testify regarding his updated assessment of such issues.

Specifically, Mr. Weinstein will testify that DEA's approach continues to identify orders as unusually large based on a comparison to orders that occurred much later in time. He will testify that the addition of seven months of data between the time the ISO analysis was applied and the date of the Partially Corrected Method exacerbates the issue. That is, the threshold used by DEA to determine whether an order placed in January 2014 was unusually large now relies on data from orders placed in April 2018; Respondent never could have derived such thresholds to compare against its orders from the earlier date, because the data used to calculate the threshold did not yet exist. He will testify that it is impossible for a distributor to identify an order as unusually large (and potentially suspicious) if it only appears so compared to orders that have yet not been placed

at the time the order was made. He will testify that this approach is a substantial factor in causing DEA significantly to overstate the number of orders it identifies as "unusually large."

Mr. Weinstein will testify that, even without modifying DEA's approach, the average monthly number of "unusually large" orders declines significantly from year to year due to decreases in order volume over time, with the most orders identified in 2014. He will testify that DEA identifies 74 percent fewer hydrocodone orders and 45 percent fewer oxycodone orders per month as unusually large in 2018 as in 2014.

He will further testify that he has analyzed what results DEA would have obtained had it applied its Partially Corrected Method only to orders made in the year prior to a given order date, *i.e.*, to orders that would have been available to Respondent at the time orders were placed.

Mr. Weinstein will testify that he has assessed the specific impact of this modified approach on the customers named in the ISO. He will testify that, had DEA applied its Partially Corrected Method to the actual data available to the Respondent at the time that it was analyzing an order, over 80 percent of the hydrocodone orders and over 60 percent of the oxycodone orders identified by DEA as unusually large for these customers in 2017-2018 would not have exceeded an individual-order threshold based on the prior year's data, leaving only five of the 27 hydrocodone orders and only 42 of the 122 oxycodone orders still identified under the modified approach limited to the prior year's data. As an illustrative example, he will testify that Folse Pharmacy, which using the Partially Corrected Method would have 69 orders in 2017-2018 identified as unusually large, would have had only two of these orders identified as unusually large using the modified approach that is applied only to orders made in the year prior to a given order date.

Mr. Weinstein also will testify that with this modified approach, of the overall number of orders identified by the Partially Corrected Method as unusually large in 2017-2018 not limited to

customers named in the ISO, over 50 percent of hydrocodone orders and over 20 percent of oxycodone orders would not have exceeded an individual-order threshold based on the prior year's data. He will testify that he expects the number of orders identified in years prior to 2017-2018 would also be reduced under the modified approach. He will testify that the limited adjustments made in the modified approach do not address all of the flaws in DEA's approach and should not be construed as a "correct" number of suspicious orders for the customers named in the ISO or overall.

Mr. Weinstein also will testify that DEA's approach continues to focus on an extremely narrow view of the data—individual line-item order amounts placed by a given customer—that fails to take into account the context of the pharmaceutical distribution business and leads to substantial conceptual flaws. He will testify that in September 2006, DEA issued guidance that "distributors should consider the totality of the circumstances when evaluating an order for controlled substances, just as DEA will do when determining whether the filling of an order is consistent with the public interest . . . " and that the choice of what data to consider for analysis— what information forms "the totality of the circumstances"—goes hand-in-hand with the statistical method used for calculation. He will testify that the choice to take this narrow line-item view of the data leads to conceptual flaws that render DEA's characterization of "unusually large" orders unreliable. He will testify that, for example, DEA continues to identify as "unusually large" some orders that were for 500 units of oxycodone or for 1,000 units of hydrocodone, *i.e.*, for the smallest available package size potentially available for pharmacies to order for a given formulation. Furthermore, he will testify that DEA's focus on individual order sizes, as opposed to total order amounts even at the daily level, fails to take into account any reasonable considerations that could cause variation in individual order amounts without any corresponding increase in cumulative

volume. Mr. Weinstein will testify that DEA's method could identify "unusually large" orders for a pharmacy that is shipped the same total amount by Respondent each day, but varies in the number and size of its individual orders throughout the day.

      d.     Opinion With Respect to Specific Orders Identified in the ISO

Mr. Weinstein will testify regarding the impact of DEA's line-item approach on specific orders identified as unusually large for the customers named in the ISO. For example, he will testify regarding the two oxycodone orders that DEA identified as unusually large for Wilkinson Pharmacy. He will testify that the first, in May 2015, was an order for 5,000 units. He will testify that Wilkinson Pharmacy ordered 77,800 total units of oxycodone in May 2015, an amount consistent with past ordering and *less than* its monthly total in any of March, April, June, or July, months in which DEA did not identify any individual oxycodone orders as unusually large. He will testify that the second Wilkinson Pharmacy order identified by DEA as unusually large, in April 2017, was for 6,000 units. He will testify that, due to Wilkinson Pharmacy surrendering its DEA license, it was not an active customer for the full month of April 2017. However, he will testify that its total orders of 45,000 units in the partial month were on pace for approximately 70,000 to 75,000 total units in April, which would have exceeded the volume of only one of the 12 prior months, thus consistent with past ordering. Mr. Weinstein will testify that a reasonable approach to identifying unusually large orders would take into account the context in which orders were placed and the cumulative volume to which they corresponded; neither of the oxycodone orders for Wilkinson Pharmacy appear large in such context.

Mr. Weinstein expects to be able to testify as to similar conclusions for other customers named in the ISO once he is provided with the data upon which DEA relies. Mr. Weinstein also will testify that per the ISO, orders identified by DEA's statistical approach should only have been

identified as "potentially 'suspicious." He will testify that even had Respondent applied DEA's flawed approach and identified certain orders as exceeding a threshold, upon review and investigation Respondent might reasonably have determined that the orders were not suspicious and would not have had to report them.

In light of DEA's failure to address the issues described above, Mr. Weinstein intends to testify that its method is not capable of demonstrating that Respondent failed to report suspicious orders.

e.    Enhancements to Respondent's SOM Thresholds

Mr. Weinstein will further testify regarding the enhancements to Respondent's suspicious order monitoring thresholds that have been put into place since the ISO and are under continued development. Mr. Weinstein will testify that he and a team of AGI consultants calculated and provided interim thresholds for Respondent's immediate use for retail and alternate care customers beginning on May 24, 2018. He will testify that these interim thresholds were updated periodically from May 24, 2018 through July 3, 2018, primarily to reflect updates to customer and item group classifications and to minimum thresholds.

Mr. Weinstein will testify that the interim threshold methods calculate cumulative monthly volume for each item group and compare that volume against a monthly threshold (ordering limit) that is calculated based on the Tukey statistical method. More specifically, he will testify that to calculate the May 2018 threshold value, for customers with eight or more months of ordering between the May 2017-April 2018 period, AGI utilized the Tukey method to analyze the monthly order volumes for each customer. He will testify that the standard 3.0 multiplier was used for the Tukey calculation. Mr. Weinstein will testify that AGI also calculated several other statistical approaches and applied the lowest interim monthly threshold that was calculated for each

customer-item group. He will testify that these additional statistical tests included applying the Tukey method to the eight largest monthly amounts from the prior year (rather than all 12 monthly amounts from the prior year). For customers with large variation in ordering (*e.g.*, those who switched from secondary to primary), Mr. Weinstein will testify that using the eight largest orders can minimize variation and result in a lower, more conservative threshold.

In addition, he will testify that AGI developed thresholds to account for customer/item groups that have fewer than eight customer-months in their historical distributions. He will testify that if the customer had at least one month of historical ordering for the item group, AGI performed a modified statistical calculation that takes the overall range (the difference between the largest and smallest values) of monthly order volumes for a customer and adds the 75th percentile of monthly order volume. Mr. Weinstein will testify that for customers with no range, two times the 75th percentile monthly order volume was used for this modified calculation. He will testify that this allows for a statistically based calculation to be used for customers/items that are infrequently ordered. He will testify that if there was no ordering history, a minimum threshold (based on maximum package size plus the minimum package size for each item group) was used. He will testify that the lowest (*i.e.*, most conservative) of the three Tukey-based calculations was used as the interim monthly threshold for each customer-item group, except when it was below the minimum threshold, in which case the minimum threshold was applied.

Mr. Weinstein will testify that the method also includes conservative adjustments to cap order amounts based on the customers' share of purchases for federally controlled items and to limit growth in certain instances to an amount equivalent to two packages of an item. Specifically, he will testify that for customers with certain levels of volume and a ratio of controlled substance dosage units to total dosage units ("controlled ratio") in excess of 20 percent, the initial threshold

based on the customer's own history was adjusted downward. He will testify that accepting the 20 percent criterion in the interim period is not a concession that if a pharmacy has a ratio of controlled units to total units that exceeds 20 percent it is *per se* suspicious. Indeed, he will testify that in AGI's view, 20 percent is a lower than normal percentage for many typical retail pharmacies. He will testify that these calculations and updates to the interim method are described in detail in the "Summary of Morris & Dickson Interim Thresholds" document provided in response to the May 31, 2018 subpoena.

Mr. Weinstein will testify that since June 16, 2018, when the subpoena response was submitted, AGI has also developed additional enhancements to the interim method to integrate data from Pro Compliance dispensing reports to determine the typical dosage units per prescription. He will testify that these per-prescription calculations were then used as inputs to update minimum thresholds and to help determine the thresholds to be used for new customers.

Mr. Weinstein will further testify that ongoing analyses to develop an enhanced permanent system include determining thresholds based on an evaluation of peer groups within Respondent's customer base, as well as assisting in the development of know-your-customer analytics to support due diligence review.

## V. EXHIBITS

| Respondent Exhibit No. 1 | Hearing on Motion for Temporary Restraining Order, Official Transcript of Proceedings (May 8, 2018) (216 pages) |
| --- | --- |
| Respondent Exhibit No. 2 | Hearing on Motion for Temporary Restraining Order, Exhibit Spreadsheet (May 8, 2018) (2 pages) |
| Respondent Exhibit No. 3 | Temporary Restraining Order issued by Judge Foote (May 8, 2018) (2 pages) |
| Respondent Exhibit No. 4 | Order Rescinding Immediate Suspension Order (May 18, 2018) (1 page) |

Respondent Exhibit No. 5 | Email communications evidencing due diligence conducted by Respondent produced to DEA in response to administrative subpoenas (number of pages dependent on DEA's case-in-chief)

Respondent Exhibit No. 6 | Notes from Morris & Dickson Discussion with Wilkinson Family Pharmacy (July 16, 2013) (1 page)

Respondent Exhibit No. 7 | Email from Keith Wilkinson to Valerie McGill regarding Wilkinson Family Pharmacy Cash Payments (March 4, 2014) (1 page)

Respondent Exhibit No. 8 | Email from Valerie McGill to Clara Guin copying Wilkinson Family Pharmacy regarding Wilkinson Family Pharmacy Cash Payments (April 29, 2014) (1 page)

Respondent Exhibit No. 9 | Email from Clara Guin to Jacob Dickson regarding Wilkinson Family Pharmacy Cash Payments (April 25, 2014) (1 page)

Respondent Exhibit No. 10 | Timeline of Wilkinson Family Pharmacy (April 24, 2013 – April 24, 2017) (1 page)

Respondent Exhibit No. 11 | Morris & Dickson Standard Operating Procedures Manual (revised 08/22/16) (25 pages)

Respondent Exhibit No. 12 | Morris & Dickson Policies & Procedures Manual for Prescription Drug Handling (February 2018) (16 pages)

Respondent Exhibit No. 13 | Morris & Dickson Program Announcement for "Pharmacy Safety, Security & RXPatrol" (August 2, 2014) (1 page)

Respondent Exhibit No. 14 | Corresponding Responsibility Brochure – Purdue Pharma (December 14, 2014) (8 pages)

Respondent Exhibit No. 15 | Morris & Dickson Program Announcement for "Lawful Prescribing and Preventing Diversion" (July 11, 2015) (2 pages)

Respondent Exhibit No. 16 | Morris & Dickson Program Announcement for "Pharmacy Crimes from the Criminal's Perspective" (August 12, 2017) (1 page)

Respondent Exhibit No. 17 | PowerPoint Presentation: Effective Controls Against Diversion of Controlled Substances (August 20, 2008) (5 pages)

Respondent Exhibit No. 18 | DEA Notice of Inspection (May 29, 2014) (2 pages)

Respondent Exhibit No. 19     DEA Notice of Inspection (October 27, 2015) (1 page)

Respondent Exhibit No. 20     Morris & Dickson PowerPoint presentation "A Wholesaler's Perspective" dated August 17, 2017 [sic] (19 pages)

Respondent Exhibit No. 21     DEA Notice of Inspection (November 15, 2017) (1 page)

Respondent Exhibit No. 22     Email regarding Cancellation of MMCAP Oklahoma (June 1, 2018) (2 pages)

Respondent Exhibit No. 23     Letter cancelling MMCAP with Oklahoma (June 1, 2018) (2 pages)

Respondent Exhibit No. 24     Email regarding Cancellation of MMCAP Oklahoma (June 4, 2018) (2 pages)

Respondent Exhibit No. 25     Letter from LHC Group, Inc. to Morris & Dickson regarding cancelling the Pharmacy Distribution Agreement (June 19, 2018) (1 page)

Respondent Exhibit No. 26     List of Suppliers Shipping through 3PLs, dated July 24, 2018 (1 Excel file)

Respondent Exhibit No. 27     Letter from UPS Supply Chain to Morris & Dickson regarding discontinuation of shipping to Morris & Dickson (June 11, 2018) (2 pages)

Respondent Exhibit No. 28     Email from Kristie Dover to Kevin Hawkey and Alycia Solomon copying Neil Chabot and Michael Trant regarding McKesson's discontinuation of sales of controlled substances to Morris & Dickson (June 25, 2018) (5 pages)

Respondent Exhibit No. 29     Emails containing daily flagged order reports (May 14, 2018 through July 31, 2018) (56 pages, 57 Excel files)

Respondent Exhibit No. 30     Email from Paul Dickson to Louis Milione, dated August 12, 2016, regarding Respondent invitation to make presentation on anti-diversion efforts (5 pages)

Respondent Exhibit No. 31     Morris & Dickson Anti-Diversion Compliance Efforts (May 1, 2018 through Present), dated July 26, 2018 (5 pages)

Respondent Exhibit No. 32     ECP Software Improvements, dated July 26, 2018 (35 pages)

| | |
|---|---|
| Respondent Exhibit No. 33 | Documents produced to DEA in response to DEA's subpoena dated May 31, 2018 (June 16, 2018) (number of pages dependent on DEA's case-in-chief) |
| Respondent Exhibit No. 34 | Declaration and Curriculum Vitae of Kenneth A. Weinstein in support of Motion for Preliminary Injunction (May 15, 2018) (23 pages) |
| Respondent Exhibit No. 35 | Summary of modified DEA analysis of oxycodone and hydrocodone shipments, limiting data for comparison to orders one year prior to order under analysis (1 Excel file) |
| Respondent Exhibit No. 36 | Summary of orders identified by DEA by month and year (1 Excel file) |
| Respondent Exhibit No. 37 | Summary of Morris & Dickson Interim Thresholds (6 pages) |

## VI.    OTHER MATTERS

Respondent reserves the opportunity to amend its Prehearing Statement at a time and date specified by this Tribunal.

Respondent anticipates using summaries and demonstrative exhibits during the examination of witnesses. Respondent will identify those exhibits in its supplemental Prehearing Statement and will provide them to the Government prior to the witnesses' testimony.

Respondent may file a motion before this Tribunal related to the constitutionality of the DEA's administrative process given the U.S. Supreme Court's recent decision in *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044, 585 U.S. __ (2018).

Respondent also may file a motion related to Attorney General Sessions' November 16, 2017 Memorandum regarding "Prohibition on Improper Guidance Documents."

Respondent also may file a motion in limine to exclude testimony and evidence not disclosed in DEA's initial prehearing statement because it did not comply with this Tribunal's Order for Prehearing Statements, dated May 21, 2018, directing the parties to clearly indicate

each and every act, omission or occurrence which they intend to introduce through each witness.

## VII.    POSITION REGARDING HEARING STATUS & ESTIMATE OF TIME

Respondent has no objection to the Government's request that the hearing take place at the DEA Hearing Facility, 1550 Crystal Drive, Suite 901, Arlington, VA 22202.

Respondent estimates that it can present its case-in-chief in two days, exclusive of cross-examination.

Dated: August 3, 2018

Respectfully Submitted,

Jodi L. Avergun
Keith M. Gerver
Cadwalader, Wickersham & Taft LLP
700 Sixth Street NW
Washington, DC 20001
(202) 862-2456 (office)
(202) 862-2400 (facsimile)
jodi.avergun@cwt.com
keith.gerver@cwt.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2018, I caused the foregoing to be filed with the DEA

Office of Administrative Law Judges by electronic mail at ECF-DEA@usdoj.gov, and I caused a

copy of the same to be sent by electronic mail to the Government's counsel Paul A. Dean, Esq., at

Paul.A.Dean@usdoj.gov and John Beerbower, Esq., at John.E.Beerbower@usdoj.gov.

# EXHIBIT E

# CADWALADER

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W., Washington, DC 20001
Tel +1 202 862 2200  Fax +1 202 862 2400
www.cadwalader.com

Confidential Treatment Requested by Morris & Dickson Co., LLC
Pursuant to 5 U.S.C. § 552(b)

October 26, 2018

**VIA ECF-DEA**

Hon. Charles Wm. Dorman
Office of Administrative Law Judges
U.S. Drug Enforcement Administration
1550 Crystal Drive, 9th Floor
Arlington, VA 22202

Re:     Morris & Dickson Co., LLC, Dkt. No. 18-31

Dear Judge Dorman:

We are writing on behalf of Respondent Morris & Dickson Co., LLC ("Morris & Dickson") to provide the Tribunal with notice of the enclosed filings made today by Morris & Dickson in the United States District Court for the Western District of Louisiana seeking declaratory and injunctive relief in connection with the unconstitutional appointment and removal processes applied by the United States Department of Justice ("DOJ") and the Drug Enforcement Administration ("DEA") with respect to administrative law judges ("ALJs"). Among other relief, Morris & Dickson seeks an injunction enjoining DEA and DOJ from requiring Morris & Dickson to appear at any administrative proceeding, including the upcoming hearing scheduled for November 13, 2018, unless and until a constitutionally valid administrative system has been established.

In light of the Solicitor General's conclusion that "SEC ALJs, and other ALJS who exercise similar powers, are inferior officers and must be appointed as such," we believe that the Department of Justice is likely to concede the unconstitutional nature of the appointment of the DEA's ALJs. *See* Office of the Solicitor General, Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.) (July 23, 2018) at 2. When we raised this potential *Lucia* issue with the Tribunal at our August 10, 2018 prehearing conference, Your Honor noted that it was the Tribunal's belief that this guidance "basically suggested that if anybody files a motion, the Judge is recused or needs to recuse himself." Prehr'g Conference Tr. 36:18–20. As such, we wanted to alert Your Honor to our filing as soon as possible to provide the Tribunal with the earliest opportunity to consider and take such action it deems appropriate.

# CADWALADER

Hon. Charles Wm. Dorman
October 26, 2018

We respectfully request that, at minimum, the Tribunal stay all upcoming deadlines, including the November 13, 2018 hearing date, until the United States District Court rules on Morris & Dickson's motion to enjoin the administrative proceeding. In case it is helpful, we attach here a Securities and Exchange Commission litigation release (https://www.sec.gov/litigation/opinions/2018/33-10536.pdf) that demonstrates the steps that the Commission took in the days following the *Lucia* decision. These steps included a stay of all then-ongoing proceedings.

Respectfully submitted,

Jodi Avergun /KMG

Jodi L. Avergun

Attachments

cc:    Paul Dean, Esq.
       John Beerbower, Esq.

# ATTACHMENTS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

---

MORRIS & DICKSON CO., LLC,

                              Plaintiff,

              v.

JEFFERSON B. SESSIONS, III,
UNITED STATES DEPARTMENT OF JUSTICE,
UTTAM DHILLON,
UNITED STATES DRUG ENFORCEMENT
ADMINISTRATION, and
THE UNITED STATES OF AMERICA

                              Defendants.

---

18-cv-

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

---

Plaintiff Morris & Dickson Co., LLC ("Morris & Dickson" or the "Company"), as

and for its complaint against Defendants Jefferson B. Sessions, III, in his official capacity

as Attorney General of the United States, the United States Department of Justice, Uttam

Dhillon, in his official capacity as Acting Administrator of the Drug Enforcement

Administration, the United States Drug Enforcement Administration ("DEA," and

collectively, the "Defendants"), and the United States of America, hereby alleges, based

on knowledge as to its own conduct, and on information and belief as to all other matters,

as follows:

## **NATURE OF THE ACTION**

1.       This action arises from DEA's attempt to subject Morris & Dickson to an

unconstitutional administrative proceeding before a DEA Administrative Law Judge

("ALJ").  Defendants issued an Order to Show Cause and Immediate Suspension of Registration compelling Morris & Dickson to participate in an unlawful adjudicative process before a DEA ALJ appointed in violation of Article II of the United States Constitution.  In the event that these unlawful DEA proceedings result in adverse findings against Morris & Dickson, the DEA ALJs' findings would be given substantial deference, entrenching the harm caused by the DEA's unconstitutional proceedings.

2.    The United States Supreme Court has found that an ALJ appointment process nearly identical to that used by DEA is unconstitutional.  DEA, however, has done nothing to conform its ALJ appointment process to constitutional requirements.  Moreover, statutory restrictions on an ALJ's removal violate the President's Article II executive power. DEA nonetheless continues to seek to compel Morris & Dickson to participate in an unconstitutional DEA administrative proceeding.  Morris & Dickson seeks declaratory and injunctive relief to prevent the irreparable harm it would suffer if subjected to such an unconstitutional proceeding.

3.    The pending DEA administrative proceeding against Morris & Dickson  is not authorized by law and violates constitutional separation of powers principles. Specifically, DEA's administrative enforcement scheme is unconstitutional on multiple grounds.  First, DEA ALJs are not appointed in accordance with Article II, Section 2, Clause 2 of the United States Constitution ("the Appointments Clause").  Second, statutory prohibitions regarding the removal of DEA ALJs violate Article II's constitutional requirement by infringing the President's executive power and his obligation to faithfully execute the law.

4.     DEA ALJs are executive "officers" for purposes of Article II's Appointments Clause. They hold continuing positions, established by law, in which they exercise significant authority and discretion presiding over DEA administrative hearings and adjudicating adversarial enforcement proceedings.

5.     Under the Appointments Clause, inferior Article II "officers" such as DEA's ALJs must be appointed either by the President or the Head of their Department, the Attorney General of the United States. DEA ALJs, however, are appointed by neither. Rather, all three DEA ALJs—including the DEA ALJ presiding over Morris & Dickson's administrative hearing—were selected from a pool of candidates provided by the White House Office of Personnel Management and appointed by the DEA Administrator upon recommendation from DEA's Chief ALJ.

6.     In June 2018, the United States Supreme Court confirmed that this ALJ appointment process is unconstitutional. Although the Court's decision specifically addressed the appointment of ALJs for the Securities and Exchange Commission ("SEC"), its reasoning equally applies to the selection and appointment process employed by DEA with respect to all three of its ALJs. The Solicitor General explicitly acknowleged this fact in a memorandum addressed to all agency general counsels made public following the Supreme Court's decision in *Lucia*. In that memorandum, the Solicitor General stated that "SEC ALJs, and other ALJs who exercise similar powers, are inferior officers and must be appointed as such." Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.), Office of the Solicitor General, July 23, 2018, *available at* https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf.

7.    The framework for removal of DEA's ALJs is similarly unconstitutional. Article II, Section 1, Clause 1 of the United States Constitution vests the executive power, including the specific power to faithfully execute the laws of the United States, in the President. The Supreme Court has held that, because the executive power is vested in the President, Article II requires officers such as ALJs to be answerable to the President, and not separated from the President by attenuated chains of accountability.    Statutory prohibitions found in Sections 7521(a) and 1202(d) of Title 5 of the United States Code prevent the President and Attorney General from removing DEA ALJs. Rather, they may be removed only for "good cause" as "determined" by the Merit Systems Protection Board ("MSPB"), whose members themselves can only be removed by the President on certain limited "good cause" grounds. This scheme violates Article II by unconstitutionally imposing two layers of protections between the President (or Attorney General) and his inferior officer ALJs, thereby depriving the President (or Attorney General) from exercising his executive oversight duties.

8.    This Court offers Morris & Dickson its only opportunity for meaningful judicial review that could prevent a deprivation of its constitutional rights. Morris & Dickson cannot wait until a DEA ALJ conducts a hearing and reaches a determination before seeking review in an Article III court, because Morris & Dickson would then have already suffered a constitutional harm. Morris & Dickson thus seeks protection from an illegal and unconstitutional proceeding.

9.    Declaratory and injunctive relief is necessary and appropriate here. The DEA ALJ appointment and removal processes are unconstitutional. Requiring Morris & Dickson to continue to participate in the pending administrative process and defend itself

in an adversarial hearing before a DEA ALJ would deprive Morris & Dickson of its right to proceed before a constitutionally valid hearing officer and cause it to suffer irreparable harm from unconstitutional governmental action. The relief sought is necessary to preserve Morris & Dickson's constitutional rights

## THE PARTIES

10.    Plaintiff Morris & Dickson is a Louisiana corporation with its principal place of business in Shreveport, Louisiana. Morris & Dickson is a family-owned and operated drug distribution company that was founded in 1841. It is registered as a DEA distributor in two locations under DEA registration numbers RM033572 (Jefferson location) and RM0314790 (Shreveport location).

11.    Defendant Jefferson B. Sessions, III, is the Attorney General of the United States, and the head and principal officer of the United States Department of Justice. He is sued in his official capacity.

12.    Defendant United States Department of Justice is an executive department of the United States, headquartered in Washington, D.C.

13.    Defendant DEA is a federal agency, headquartered in Washington, D.C., within the United States Department of Justice.

14.    Defendant Uttam Dhillon is the Acting Administrator of DEA. He is sued in his official capacity.

15.    Defendant United States of America is named in accordance with 5 U.S.C. § 702.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1346 because this action arises under the Constitution and laws of the United States concerning commercial regulation.  The United States has waived its sovereign immunity from this lawsuit in 5 U.S.C. § 702.  It has also weived its sovereign immunity through the federal common law principle of nonstatutory review. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).

17.    Venue is proper in this district under 28 U.S.C. § 1391(e) because (i) one or more Defendants is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or is an agency of the United States, or is the United States and (ii) Plaintiff resides in this District and no real property is involved in the action.

## BACKGROUND

18.    Morris & Dickson is a DEA-registered wholesale drug distribution company headquartered in Shreveport, Louisiana.  Founded in 1841—it remains a family owned and operated business, and is now the sole remaining independently owned and privately held full-line drug wholesale distributor in the nation.  Morris & Dickson holds two DEA licenses: one for its single operational distribution center in Shreveport, Louisiana, which ships 100% of its controlled drug products, and the second for its small transportation hub in Jefferson Parish, Louisiana.  Morris & Dickson employs approximately 800 people, with over sixty percent of these employees working in Shreveport.  Morris & Dickson's Shreveport distribution center provides much-needed

drugs to hundreds of hospitals, pharmacies, and alternate care providers—such as nursing homes, hospices, and public health facilities—across 14 different states.

19.    Both of Morris & Dickson's registrations expire on January 31, 2019. DEA regulations require that Morris & Dickson file its renewal applications between 45 and 60 days prior to January 31, 2019. DEA regulations require that these licenses remain valid during the pendency of the underlying Order to Show Cause proceeding as long as the renewal applications are timely filed. To deny the renewal application, DEA would need to institute a new administrative proceeding before an ALJ.

20.    During the relevant time period, Morris & Dickson had a productive working relationship with DEA and believed it was acting in compliance with its regulatory obligations. In addition, between 2014 and 2017, DEA conducted three routine audits of Morris & Dickson's Shreveport facitility, none of which resulted in adverse findings. It therefore was surprised when DEA sought to suspend its registrations and subject it to an unconstitutional adversarial proceeding before a DEA ALJ.

21.    Indeed, Morris & Dickson held multiple voluntary meetings with DEA officials to address and develop regulatory compliance issues and systems. For example, in spring 2016, Morris & Dickson invited then-DEA Assistant Administrator for Diversion Control Louis Milione to Morris & Dickson's Shreveport headquarters to discuss Morris & Dickson's compliance efforts and technological capabilities. On August 17, 2016, Morris & Dickson's President & CEO, Paul Dickson, met with Mr. Milione, then-Deputy Assistant Administrator Demetra Ashley, and the Diversion Program Manager of the DEA New Orleans Field Division, Sonya Jackson, at the company's Shreveport headquarters. At that meeting, Mr. Dickson provided DEA with an explanation of Morris & Dickson's

programs for monitoring and detecting potentially suspicious customer orders of controlled substances. Mr. Dickson also sought feedback from DEA, however, DEA did not provide any comments to Mr. Dickson and made no criticisms or suggested changes regarding Morris & Dickson's compliance programs.

22.    Without ever having previously notified Morris & Dickson that a single aspect of its diversion control operation was unacceptable, on or around May 2, 2018, DEA suddenly issued an Order To Show Cause and Immediate Suspension of Registration (the "Order to Show Cause," "Immediate Suspension Order" or "ISO"), suspending Morris & Dickson's DEA licenses without advance notice or warning. The ISO immediately cancelled both of Morris & Dickson's DEA licenses, RM0314790 and RM0335732, and required it to immediately halt shipment of all controlled substances from its Shreveport distribution center.

23.    Prior to the May 2, 2018 ISO, Morris & Dickson never faced any DEA enforcement action, fine, or penalty in the entire history of its DEA registrations. DEA had in its possession information about every distribution of Schedule II controlled substances Morris & Dickson made to its pharmacy customers by virtue of mandatory ARCOS reports it filed each month. Nevertheless, DEA did not raise specific concerns to Morris & Dickson about any of its shipments to active customers. Nor did DEA ever request that Morris & Dickson voluntarily stop shipments to any particular customer.

24.    Confronted with the threat of being forced out of business by DEA's unjustified ISO, Morris & Dickson filed suit and successfully obtained emergency injunctive relief against DEA. *Morris & Dickson Co., LLC v. Sessions, et al.*, Docket No. 5:18-cv-00605 (W.D. La. May 03, 2018). On May 8, 2018, Judge Elizabeth Foote of the

United States District Court for the Western District of Louisiana issued a Temporary Restraining Order enjoining DEA from enforcing the ISO.

25.     In issuing the Temporary Restraining Order, Judge Foote heard testimony, and determined that Morris & Dickson demonstrated a "substantial likelihood" of successfully proving that the DEA Acting Administrator's decision to issue the ISO was arbitrary and capricious. The District Court also determined that Morris & Dickson faced a substantial threat of irreparable harm if enforcement of the ISO was not enjoined and that the balance of the equities and public interest further weighed in favor of enjoining the ISO's enforcement.

26.     Faced with Judge Foote's findings and Morris & Dickson's pending motion for a preliminary injunction to terminate the ISO, DEA effectively conceded that its decision to issue the ISO was arbitrary and capricious. On May 18, 2018, then-DEA Acting Administrator Robert W. Patterson issued a Notice of Rescission of the ISO (the "Rescission Order"). The Acting Administrator resigned from DEA a short time thereafter.

27.     Although unprecedented, DEA's Rescission Order did not remove the threat of enforcement hanging over Morris & Dickson's head. Rather, DEA continued to subject Morris & Dickson to an unlawful adjudicative process. The Rescission Order withdrew the immediate order of suspension, but DEA's Order to Show Cause remained in effect. As a result, Morris & Dickson had until June 1, 2018, to request an administrative hearing or else the DEA Acting Administrator would, on his own without hearing any evidence or argument from Morris & Dickson, issue a final order regarding Morris & Dickson's regulatory compliance efforts.

28.    With the clock ticking and with no opportunity to demonstrate to DEA that its proceedings were unconstitutional, unjust, and in violation of the Controlled Substances Act, Morris & Dickson requested a hearing and objected to the DEA administrative process.  The DEA Office of Administrative Law Judges ("OALJ") received the Request for Hearing on May 21, 2018, the same date on which DEA ALJ Charles Wm. Dorman issued an Order scheduling a Prehearing Conference for June 25, 2018, and required the parties to submit prehearing statements.

29.    On May 30, 2018, Morris & Dickson's counsel informed DEA attorneys that DEA's ALJ appointment process suffered from the same constitutional infirmities as those identified in the then-pending Supreme Court case *Lucia v. Securities and Exchange Commission*, No. 17-0130 (Argued Apr. 23, 2018).  Morris & Dickson suguested that the hearing before ALJ Dorman be postponed until after the impending *Lucia* decision.  DEA consented to the adjournment, and ALJ Dorman issued a new prehearing and trial schedule.

30.    Morris & Dickson timely and repeatedly made clear that it objected to the DEA administrative proceeding as a result of the unconstitutional appointment and removal process.  For example, in a July 13, 2018 submission to the DEA ALJ, Morris & Dickson expressly reserved the right to object to the continuation of the proceedings against it in light of the Supreme Court decision in *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018).  Morris & Dickson also stated in its timely submitted August 3, 2018 prehearing statement that it anticipated challenging the constitutionality of DEA's administrative process given the Supreme Court decision in *Lucia*.  At the Prehearing Conference on August 10, 2018, Morris & Dickson again notified DEA and ALJ Dorman

that it might seek to challenge the constitutionality of the DEA administrative process on the basis of *Lucia*.

31.    In several conversations and emails between counsel, DEA led Morris & Dickson to believe that it was seriously considering a settlement proposal Morris & Dickson submitted in writing on August 23, 2018. However, on October 16, 2018, nearly sixty days after it first made a settlement proposal, DEA informed Morris & Dickson that it rejected the offered settlement and that no counter-offer from DEA would be forthcoming. That rejection left Morris & Dickson with no option but to file this lawsuit.

32.    Morris & Dickson's trial before ALJ Dorman is set to commence on or about November 13, 2018, and to continue until November 19, 2018.

### DEA ADMINISTRATIVE LAW JUDGES

33.    DEA ALJs are officers for the purpose of Article II of the U.S. Constitution. DEA ALJs receive their appointments pursuant to the Administrative Procedure Act ("APA"). Under that statute and its concomitant regulations, they preside over administrative proceedings, occupy a continuing office established by law, and exercise significant authority. For example, Sections 1316.52 and 1316.42(f) of Title 21 of the Code of Federal Regulations provide that ALJs shall oversee administrative proceedings. Section 930.204(a) of Title 5 of the Code of the Federal Regulations provides that DEA ALJs receive a career appointment and are exempt from probationary periods that apply to certain other government employees.

34.    Similar to SEC ALJs, which the Supreme Court has held are inferior officers within the meaning of Article II, DEA ALJs enjoy broad discretion to exercise significant

authority with respect to administrative proceedings. Under 5 U.S.C. § 556(c)(1)-(11), DEA ALJs may, among other things:

    (a)    administer oaths and affirmations;

    (b)    issue subpoenas authorized by law;

    (c)    rule on offers of proof and receive relevant evidence;

    (d)    take depositions or have depositions taken when the ends of justice would be served;

    (e)    regulate the course of the hearing;

    (f)    hold conferences for the settlement or simplification of the issues by consent of the parties or by the use of alternative means of dispute resolution;

    (g)    inform the parties as to the availability of one or more alternative means of dispute resolution, and encourage use of such methods;

    (h)    require the attendance at any conference held;

    (i)    dispose of procedural requests or similar matters;

    (j)    make or recommend decisions; and

    (k)    take other action authorized by agency rule consistent with [the APA].

35.    DEA regulations also empower and require DEA ALJs to carry out adjudicative functions in hearings and resolve adversarial proceedings on behalf of DEA. In that regard, Section 1316.52 of Title 21 of the Code of Federal Regulations provides that DEA ALJs are "to conduct a fair hearing, to take all necessary action to

avoid delay, and to maintain order." Under the same regulations, DEA ALJs have the additional authority and power to:

(a)    Arrange and change the date, time, and place of hearings . . . and prehearing conferences and issue notice thereof.

(b)    Hold conferences to settle, simplify, or determine the issues in a hearing, or to consider other matters that may aid in the expeditious disposition of the hearing.

(c)    Require parties to state their position in writing with respect to the various issues in the hearing and to exchange such statements with all other parties.

(d)    Sign and issue subpoenas to compel the attendance of witnesses and the production of documents and materials to the extent necessary to conduct administrative hearings pending before him.

(e)    Examine witnesses and direct witnesses to testify.

(f)    Receive, rule on, exclude, or limit evidence.

(g)    Rule on procedural items pending before him.

(h)    Take any action permitted to the presiding officer as authorized by this part or by the provisions of the [APA].

## THE DEA ALJ APPOINTMENTS PROCESS
## VIOLATES THE APPOINTMENTS CLAUSE

36.    Section 3105 of Title 5 of the United States Code establishes the process for the appointment of all ALJs, including DEA ALJs. This statute provides that each federal

Executive agency "shall" appoint as many ALJs as necessary for the agency's administrative proceedings.

37.     DEA currently has three ALJs.  All three DEA ALJs, including ALJ Dorman assigned to oversee Morris & Dickson's administrative proceeding, were appointed pursuant to a similar, unconstitutional process.

38.     DEA ALJs have at all times been appointed by the DEA Administrator. The DEA Administrator selects DEA ALJs from a pool of candidates that submit their applications to the White House Office of Personnel Management ("OPM").[1]  The DEA Chief ALJ reviews those applications and recommends certain ALJ candidates for consideration and appointment by the DEA Administrator.

39.     The appointment of DEA ALJs by the DEA Administrator violates Article II's Appointments Clause because the DEA Administrator (or Acting Administrator, as applicable) is not the "head" or "principal officer" of an executive Department.  DEA is not an executive Department under Article II of the Constitution.  Rather, DEA is an agency

---

[1]     On July 10, 2018, President Donald J. Trump issued Presidential Executive Order ("E.O.") 13843, "Excepting Administrative Law Judges from the Competitive Service," which sought to provide flexibility in the ALJ appointment process by excepting ALJs from OPM competitive-examination and service-selection procedures.  Significantly, however, E.O. 13843 did not remedy DEA's constitutionally defective ALJ appointment process. For example, prior to July 10, 2018, OPM required ALJ applicants to meet certain minimum qualifications, including qualifications relating to law licensure, litigation experience, and passage of the ALJ written examination developed and administered by OPM.  E.O 13843 designated ALJs under a new excepted service, Schedule E, to permit ALJs to be appointed without imposing on them OPM's "complicated and elaborate examination processes or rating procedures . . . ."  E.O. 13843 did not require ALJs to be appointed by the Heads of the respective Executive Departments, and did not address or affect the status of any ALJs appointed prior to July 10, 2018, including the DEA ALJs who were all appointed prior to July 10, 2018.

within and subordinate to the Department of Justice, an executive Department of the United States.

40.    The Attorney General of the United States is the head and principal officer of the Department of Justice. As the head of the Department to which DEA belongs, the power and authority to appoint DEA ALJs rests solely, in addition to the President, with the Attorney General. The DEA Administrator lacks the constitutional power and authority to appoint an ALJ.

41.    Neither the President of the United States nor the Attorney General of the United States appoints ALJs to their positions at DEA. Thus, the DEA ALJs were appointed pursuant to a process that violates the Appointments Clause, a fundamental defect in the DEA's administrative enforcement process.

### DEA'S SCHEME FOR THE REMOVAL OF ALJS VIOLATES ARTICLE II'S VESTING OF EXECUTIVE POWER IN THE PRESIDENT

42.    The regulatory and administrative framework pursuant to which DEA ALJs may be removed also violates Article II because it robs the President and the Attorney General of their constitutional authority and duty to exercise executive power and to faithfully execute the laws of the United States through the oversight of inferior officers such as ALJs.

43.    The APA provides that ALJs, including DEA ALJs, may be removed only for good cause as established and determined by the Merit Systems Protection Board. That statutory restriction renders the President and Attorney General unable to determine "good cause," and thus unable to remove DEA ALJs without approval of the MSPB. Members of the MSPB themselves, however, may not be removed absent good cause. These dual

for-cause removal limitations violate Article II. *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010).

44.     This needlessly complex removal structure violates Article II's requirement that inferior executive officers not be protected from removal by their superiors at will, when those superiors are themselves protected from being removed by the President at will.

45.     As alleged above, DEA ALJs are executive officers who exercise significant executive power. Nevertheless, (a) DEA ALJs are protected from removal by a statutory "good cause" standard, 5 U.S.C. §7521(a), and (b) MSPB members empowered to determine the "good cause" standard are themselves protected from removal by an "inefficiency, neglect of duty, or malfeasance in office" standard. 5 U.S.C. §1202(d). This arrangement thwarts the President's Article II executive power, and ensures that neither the President nor the Attorney General as Head of Department can take care that the laws are faithfully executed by determining whether good cause exists to remove inferior officers.

## CAUSES OF ACTION

### COUNT ONE
### (Application for Injunctive Relief)

46.     Morris & Dickson repeats and realleges each and every allegation in paragraphs 1-45 above as if fully set forth here.

47.     Without injunctive relief from this court, Morris & Dickson will be required to submit to an unconstitutional proceeding. This in and of itself constitutes irreparable injury to Morris & Dickson unless DEA's current administrative proceeding is enjoined.

48.    Furthermore, if the DEA Administrator, upon recommendation from the presiding DEA ALJ, finds that Morris & Dickson's continued registration is against the public interest, the harm will be be severe and irreversible.  Morris & Dickson will be out of business because it is fully reliant on shipments of controlled substances from its Shreveport facility to maintain revenue for operations.  Moreover, Plaintiff could not obtain meaningful judicial review in time to prevent this outcome.  Nor can this harm be remedied after-the-fact with money damages, as numerous immunity doctrines would prevent Plaintiff from obtaining a financial damages award from DEA.  And, in any event, Morris and Dickson will be out of business.

49.    Morris & Dickson has a substantial likelihood of success on the merits of its claim.  The harm to Plaintiff, absent injunctive relief, far outweighs any harm to DEA if such relief is granted.  Finally, the grant of an injunction will serve the public interest by protecting parties' constitutional rights and ensuring that it can continue to serve its customers who require the medicines provided by Morris & Dickson.

## COUNT TWO
### (Declaratory Judgment)

50.    Morris & Dickson repeats and realleges each and every allegation in paragraphs 1-49 above as if fully set forth here.

51.    Morris & Dickson requests a declaratory judgment that the statutes, regulatory provisions, and policies providing for the appointment of DEA ALJs are unconstitutional as applied by DEA and DOJ.

52.     Morris & Dickson further requests a declaratory judgment that the statutes, regulatory provisions, and policies providing for removal of DEA ALJs are unconstitutional as applied by DEA and DOJ.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for an Order and Judgment:

53.     Declaring unconstitutional the statutes, regulatory provisions, and policies providing for the appointment and removal of DEA ALJs as applied by DEA and DOJ;

54.     An order and judgment enjoining DEA and DOJ from carrying out an administrative proceeding against Morris & Dickson, including on the Order to Show Cause at issue or any other proceedings with regard to Morris & Dickson's DEA registrations unless and until a constitutionally valid system is in place;

55.     Such other and further relief as this court may deem just and proper, including reasonable attorneys' fees and costs of this action.

Dated:      October 26, 2018

Respectfully submitted,

By: /s/   *Frank H. Spruiell*
Frank H. Spruiell, Jr.,  La. Bar No. 1611
Reid A. Jones, La. Bar No. 34611
WIENER, WEISS & MADISON
A Professional Corporation
333 Texas Street, Suite 2350 (71101)
P. O. Box 21990
Shreveport, Louisiana  71120-1990
Telephone: (318) 226-9100
Facsimile: (318) 424-5128
Email:  fspruiell@wwmlaw.com
Email:  rjones@wwmlaw.com

Michael A. Carvin (*pro hac vice*), D.C. Bar No. 366-784
JONES DAY LLP
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Telephone:  (202) 879-7643
Facsimile:  (202) 626-1700

Jodi Avergun (*pro hac vice*), N.Y. Bar No. 2166668
Keith Gerver (*pro hac vice*), N.Y. Bar No. 5049846
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Joshua Arnold (*pro hac vice*), N.Y. Bar No. 4718714
William Simpson (*pro hac vice*), N.Y. Bar No. 5587076
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

*Counsel for Morris & Dickson Co., LLC*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| MORRIS & DICKSON CO., LLC, | 18-cv- |
| Plaintiff, | |
| v. | |
| JEFFERSON B. SESSIONS, III, UNITED STATES DEPARTMENT OF JUSTICE, UTTAM DHILLON, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, and THE UNITED STATES OF AMERICA, | |
| Defendants. | |

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Morris & Dickson Co., LLC ("Morris & Dickson") hereby moves for a preliminary injunction enjoining Defendants from carrying out an administrative proceeding against Morris & Dickson, including the Order to Show Cause issued by the United States Drug Enforcement Administration ("DEA") on or around May 2, 2018, or on any other proceedings with regard to Morris & Dickson's DEA registrations, unless and until there is a constitutionally valid system of statutes, regulatory provisions, and policies, as applied by DEA and the United States Department of Justice ("DOJ"), providing for the appointment and removal of DEA Administrative Law Judges ("ALJs").

As set forth more fully in the memorandum in support of this motion, a preliminary injunction is appropriate for the following non-exclusive reasons:

1. There is a substantial likelihood that Morris & Dickson will succeed on the merits of its claims that statutes, regulations, and policies, as applied by DEA and DOJ, providing for

the appointment and removal of DEA ALJs are not authorized by law and violate constitutional separation of powers principles, thus subjecting Morris & Dickson to an unconstitutional administrative proceeding.

2. Morris & Dickson will suffer irreparable harm if the requested preliminary injunction is not issued and the company is subjected to the deprivation of its constitutional rights and potential long-term economic harms not reparable by money damages.

3. The harm Morris & Dickson would suffer as a result of the denial of the injunction far outweighs the harm, if any, Defendants would suffer if the injunction is granted. Furthermore, since the hearing before the DEA ALJ is currently scheduled to begin on November 13, 2018, and since Morris & Dickson's Motion raises (at the very least) serious questions as to whether that allegedly unconstitutional proceeding should be enjoined to avoid irreparable injury, the balance of hardships favors enjoining Defendants from requiring Morris & Dickson to appear before a DEA ALJ, either at the currently-scheduled November 13, 2018 hearing or any other date, until the Court rules on Morris & Dickson's Motion for preliminary injunction.

4. The public interest will be harmed if the preliminary injunction is not granted.

WHEREFORE, Morris & Dickson prays that this Court issue all process necessary and appropriate to:

(1) enjoin Defendants from carrying out an administrative proceeding against Morris & Dickson, including on the Order to Show Cause issued by DEA on or around May 2, 2018, or on any other proceedings with regard to the renewal of Morris & Dickson's DEA registrations unless and until there is a constitutionally valid system of statutes, regulatory provisions, and policies, as applied by DEA and DOJ, providing for the appointment and

removal of DEA ALJs;

(2) in the interim, enjoin Defendants from requiring Morris & Dickson to appear before a DEA

ALJ, either at the currently-scheduled November 13, 2018 hearing or any other date, until

the Court rules on Morris & Dickson's Motion for preliminary injunction. Such interim

relief would give this Court and the parties sufficient time to resolve Plaintiff's Motion in

an orderly and efficient manner; and

(3) grant such further and other relief as this Court deems just and proper.

Dated:          October 26, 2018

Respectfully submitted,

By: /s/ *Frank H. Spruiell*

Frank H. Spruiell, Jr.,  La. Bar No. 1611
Reid A. Jones, La. Bar No. 34611
WIENER, WEISS & MADISON
A Professional Corporation
333 Texas Street, Suite 2350 (71101)
P. O. Box 21990
Shreveport, Louisiana  71120-1990
Telephone: (318) 226-9100
Facsimile: (318) 424-5128
Email:  fspruiell@wwmlaw.com
Email:  rjones@wwmlaw.com

Jodi Avergun (*pro hac vice*), N.Y. Bar No.
2166668
Keith Gerver (*pro hac vice*), N.Y. Bar No.
5049846
CADWALADER, WICKERSHAM & TAFT
LLP
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Joshua Arnold (*pro hac vice*), N.Y. Bar No.
4718714
William Simpson (*pro hac vice*), N.Y. Bar No.
5587076
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Michael A. Carvin (*pro hac vice*), D.C. Bar No.
366-784
JONES DAY LLP
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Telephone:  (202) 879-7643
Facsimile:   (202) 626-1700

*Counsel for Morris & Dickson Co., LLC*

**CERTIFICATE OF SERVICE**

I certify that on this 26th day of October, 2018, I have served a copy of the above and foregoing on all counsel of record through the Court's CM/ECF system.

_s/  Reid A. Jones_
Reid A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MORRIS & DICKSON CO., LLC,

                              Plaintiff,

            v.

JEFFERSON B. SESSIONS, III, ET AL.,

                              Defendant.

18-cv- _____

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S<br>MOTION FOR PRELIMINARY INJUNCTION</u>

Frank H. Spruiell, Jr., La. Bar No. 1611
Reid A. Jones, La. Bar No. 34611
WIENER, WEISS & MADISON
A Professional Corporation
333 Texas Street, Suite 2350 (71101)
P. O. Box 21990
Shreveport, Louisiana 71120-1990
Telephone: (318) 226-9100
Facsimile: (318) 424-5128
Email: fspruiell@wwmlaw.com
Email: rjones@wwmlaw.com

Joshua Arnold (*pro hac vice*), N.Y. Bar No.
4718714
William Simpson (*pro hac vice*), N.Y. Bar
No. 5587076
CADWALADER, WICKERSHAM &
TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Jodi Avergun (*pro hac vice*), N.Y. Bar No.
2166668
Keith Gerver (*pro hac vice*), N.Y. Bar No.
5049846
CADWALADER, WICKERSHAM &
TAFT LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

Michael A. Carvin (pro hac vice), D.C. Bar
No. 366-784
JONES DAY LLP
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-7643
Facsimile: (202) 626-1700

*Counsel for Morris & Dickson Co., LLC*

# TABLE OF CONTENTS

**PAGE(S)**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 3

ARGUMENT ....................................................................................................... 6

1.     MORRIS & DICKSON IS LIKELY TO SUCCEED ON THE MERITS .............. 6

    A.     DEA ALJs Are Not Constitutionally Appointed Because Neither the President Nor the Attorney General Appointed Them ......................... 6

    B.     The DEA's Statutory Scheme Unconstitutionally Robs the President and Attorney General of Their Power to Determine Whether Good Cause Exists to Remove Inferior Officers ....................... 10

2.     MORRIS & DICKSON WILL SUFFER IRREPARABLE INJURY ABSENT THE REQUESTED RELIEF ................................................ 13

3.     THE BALANCE OF EQUITIES FAVORS MORRIS & DICKSON ................. 15

4.     THE PUBLIC INTEREST FACTOR HEAVILY FAVORS GRANTING THE PRELIMINARY INJUNCTION ................................................ 16

CONCLUSION ................................................................................................... 18

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Armendariz-Mata v. U.S. DOJ, DEA,*
82 F.3d 679 (5th Cir. 1996) ......................................................................... 15

*Boumediene v. Bush,*
553 U.S. 723 (2008) ..................................................................................... 17

*Clinton v. City of New York,*
524 U.S. 417 (1998) ..................................................................................... 17

*Feinerman v. Bernardi,*
558 F. Supp. 2d 36, 51 (D.D.C. 2008)......................................................... 14

*Free Enter. Fund v. Public Co. Accounting Oversight Board,*
561 U.S. 477 (2010) ................................................................ 6, 8, 11, 12, 17

*Freytag v. C.I.R.,*
501 U.S. 868 (1991) .................................................................................. 8, 16

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,*
23 F.3d 1071 (6th Cir. 1994) ....................................................................... 17

*Gordon v. Holder,*
721 F.3d 638 (D.C. Cir. 2013)...................................................................... 16

*Lucia v. S.E.C.,*
138 S. Ct. 2044 (2018) ............................................... 1, 2, 6, 7, 12, 13, 16

*Moore v. City of East Cleveland,*
431 U.S. 494 (1977) ..................................................................................... 14

*Morrison v. Olson,*
487 U.S. 654 (1988) ............................................................... 10, 11, 17-18

*Nat'l Mining Ass'n v. Jackson,*
768 F. Supp. 2d 34 (D.D.C. 2011)................................................................ 14

*Opulent Life Church v. City of Holly Springs, Miss.,*
697 F.3d 279 (5th Cir. 2012) ....................................................................... 17

*Pub. Utils. Comm'n of Cal. v. United States,*

355 U.S. 534 (1958) ......................................................................................... 14

*Ryder v. United States,*
515 U.S. 177 (1995) ........................................................................................ 16

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) .................................................................................... 17

*Sherley v. Sebelius,*
704 F. Supp. 2d 63 (D.D.C. 2010)................................................................... 14

*Tex. Med. Providers Performing Abortion Services v. Lakey,*
667 F.3d 570 (5th Cir. 2012)............................................................................. 6

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n,*
689 F.2d 693 (7th Cir. 1982)........................................................................... 14

*United States v. L.A. Tucker Truck Lines, Inc.,*
344 U.S. 33 (1952) .......................................................................................... 16

*Valley v. Rapides Parish Sch. Bd.,*
118 F.3d 1047 (5th Cir. 1997) ........................................................................ 14

## STATUTES

5 U.S.C. § 556(c) ............................................................................................... 7

5 U.S.C. § 1202(d) ....................................................................................... 2, 12

5 U.S.C. § 7521(a) ....................................................................................... 2, 11

21 U.S.C. § 871(a) ............................................................................................. 9

21 U.S.C. § 878(a) ............................................................................................. 9

## REGULATIONS

5 C.F.R. § 930.204(a) ........................................................................................ 7

21 C.F.R. §1316.52 ........................................................................................... 7

28 C.F.R. § 0.100 .............................................................................................. 9

## EXECUTIVE AUTHORITIES

Exec. Order No. 13843, 583 Fed. Reg. 32755 (July 10, 2018) ................................................... 10

*Guidance on Administrative Law Judges after Lucia v. SEC (S. Ct.)*,
Off. of the Solicitor General, July 23, 2018, *available at*
https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf ................. 10

*In re Pending Administrative Proceedings*,
Comm. Fut. Trading Comm'n, (Apr. 9, 2018), *available at*
https://www.cftc.gov/sites/default/files/2018-04/ogcorder040918.pdf ........................................ 8

*In re Pending Administrative Proceedings*,
Securities Act Release No. 10536 (Aug. 22, 2018), *available at*
https://www.sec.gov/litigation/opinions/2018/33-10536.pdf .............................................. 2, 8, 16

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. II, § 1, cl. 1 ......................................................................................... 10

U.S. Const. Art. II, § 2, cl. 2 ........................................................................................ 1, 7

**MAY IT PLEASE THE COURT:**

Plaintiff Morris & Dickson Co., LLC ("Morris & Dickson"), submits this Memorandum in Support of its Motion for Preliminary Injunction (the "Motion") enjoining Defendants Jefferson B. Sessions, III, in his official capacity as Attorney General of the United States, the United States Department of Justice (the "DOJ"), Uttam Dhillon, in his official capacity as Acting Administrator of the Drug Enforcement Administration, the United States Drug Enforcement Administration (the "DEA"), and the United States of America (collectively, the "Defendants"), from subjecting Morris & Dickson to an administrative proceeding and trial before a DEA ALJ, including prohibiting the Defendants from requiring Morris & Dickson to appear at the upcoming November 13, 2018 hearing, and granting any other relief the court deems just and proper.

## <u>PRELIMINARY STATEMENT</u>

This action arises out of an ongoing administrative proceeding before a DEA Administrative Law Judge ("ALJ"). Defendants subjected Morris & Dickson to an unconstitutional adjudicative process by issuing Morris & Dickson an Order to Show Cause and Immediate Suspension of Registration to initiate a DEA administrative proceeding. This administrative proceeding is ongoing.

Because of the manner in which DEA ALJs are appointed, and the protection they receive from removal, the DEA administrative proceeding that the Defendants imposed on Morris & Dickson is unconstitutional.

ALJs are "Officers of the United States" within the meaning of the Appointments Clause of the U.S. Constitution, *see* Art. II, § 2, cl. 2, because they "hold a continuing office established by law" and exercise "'significant discretion' when carrying out . . . 'important functions'." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2053 (2018). Such "Officers of the United States" must be "properly

appointed," meaning appointed by the Head of Department—not by a staff member or other inferior officer. *See id.* at 2055.

Like the Securities and Exchange Commission ("SEC" or "Commission") ALJs at issue in *Lucia* who were not appointed by the Commission as a head of department, neither are DEA ALJs appointed by the head of the department to which the DEA belongs, *i.e.*, the Attorney General. Instead, DEA ALJs are appointed by the DEA Administrator upon recommendation from the DEA's Chief ALJ.[1] Consequently, the ALJ selection process at the DEA violates the Appointments Clause, depriving Morris & Dickson of a constitutional proceeding before a constitutionally valid hearing officer.

DEA ALJs also receive unconstitutional statutory protection against removal that deprives the President and Attorney General of their constitutional executive oversight duties. *See* 5 U.S.C. § 7521(a). While "good cause" limitations can be valid, the determination of the criterion of "good cause" sufficient for removal must lie solely with the President or heads of departments. *See generally Lucia*, 138 S. Ct. at 2060 (Breyer, J., concurring). DEA ALJs enjoy "good cause" protection against removal, but only the Merit Systems Protection Board ("MSPB") determines what behaviors or actions may result in a valid "good cause" removal. *See* 5 U.S.C. § 7521(a). And members of the MSPB themselves may only be removed by the President "for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

Thus, the MSPB is independent of the President and it, rather than the President and the removable-at-will Attorney General, determines what behaviors or actions provide "good cause"

---

[1] After the Supreme Court's ruling in *Lucia*, the SEC reformed its ALJ appointments process to ensure that the Commission itself exercises appointment power, beginning with the Commission's ratification of all SEC ALJs. *See In re Pending Administrative Proceedings*, Securities Act Release No. 10536 (Aug. 22, 2018), *available at* https://www.sec.gov/litigation/opinions/2018/33-10536.pdf. As of this date, the DEA has not taken the same remedial action to ensure its ALJs meet the constitutional requirements articulated in *Lucia*.

to remove a DEA ALJ. Consequently, that ALJ is above the oversight of the President. Thus, this administrative configuration, with two layers between the President or Attorney General's judgment and their inferior officer, is an unconstitutional structure that undermines the President's Article II executive power.

For these reasons as well as those set forth below, a preliminary injunction is necessary to prevent Morris & Dickson from being compelled to submit to an unconstitutional proceeding and from suffering irreparable harm from unconstitutional governmental action. Therefore, Morris & Dickson respectfully requests that this Court grant its Motion for a preliminary injunction, and in the interim grant its request that the Defendants be enjoined from requiring Morris & Dickson to appear at the upcoming November 13, 2018 hearing.

## **BACKGROUND**

Morris & Dickson is a DEA-registered wholesale drug distribution company headquartered in Shreveport, Louisiana. Compl. ¶ 18. Founded in 1841, it remains a family owned and operated business, and is now the sole remaining independently owned and privately held full-line drug wholesale distributor in the nation. *Id.* Morris & Dickson employs approximately 800 people, with over sixty percent of these employees working in Shreveport. *Id.* Morris & Dickson's Shreveport distribution center provides much-needed drugs to hundreds of hospitals, pharmacies, and alternate care providers—such as nursing homes, hospices, and public health facilities—across 14 different states. *Id.*

During the relevant time period, Morris & Dickson believed it was acting in compliance with its regulatory obligations and had no reason to believe DEA would attempt to suspend its DEA registrations. Compl. ¶ 20. Between 2014 and 2017, DEA conducted three routine audits of Morris & Dickson's Shreveport facitility, none of which resulted in adverse findings. *Id.* However, without ever having previously notified Morris & Dickson that a single aspect of its

diversion control operation was unacceptable, on or around May 2, 2018, the DEA suddenly issued

an Order To Show Cause and Immediate Suspension of Registration (the "Immediate Suspension

Order" or "ISO"), suspending Morris & Dickson's DEA registrations without advance notice or

warning, and halting shipment of all controlled substances from its Shreveport distribution center.

Compl. ¶ 22.  Prior to the May 2, 2018 ISO, Morris & Dickson never faced any DEA enforcement

action, fine, or penalty in its 177-year history.  Compl. ¶ 23.

On May 8, 2018, Judge Elizabeth Foote of the U.S. District Court for the Western District

of Louisiana issued a Temporary Restraining Order enjoining DEA from enforcing the ISO.

Compl. ¶ 24.  In issuing the Temporary Restraining Order, Judge Foote heard testimony and

determined that Morris & Dickson demonstrated a "substantial likelihood" of successfully proving

that the DEA Acting Administrator's decision to issue the ISO was arbitrary and capricious.

Compl. ¶ 25.  The District Court also determined that Morris & Dickson faced a substantial threat

of irreparable harm if enforcement of the ISO was not enjoined and that the balance of equities

and public interest further weighed in favor of enjoining the ISO's enforcement.  *Id.*

Faced with Judge Foote's findings and Morris & Dickson's motion for a preliminary

injunction to terminate the ISO, DEA effectively conceded that its decision to issue the ISO was

arbitrary and capricious.  Compl. ¶ 26.  On May 18, 2018, then-DEA Acting Administrator Robert

W. Patterson issued a Notice of Rescission of the ISO (the "Rescission Order").  *Id.*  The Acting

Administrator then resigned from DEA a short time thereafter.  *Id.*

Although unprecedented, DEA's Rescission Order did not remove the threat of

enforcement hanging over Morris & Dickson's head, because DEA's Order to Show Cause

remained in effect.  Compl. ¶ 27.  In other words, Morris & Dickson had until June 1, 2018, to

request an administrative hearing or else the DEA Acting Administrator would, on his own without

hearing any evidence or argument from Morris & Dickson, issue a final order regarding Morris &

Dickson's regulatory compliance efforts. *Id.* With the clock ticking and no ability to demonstrate to DEA that its proceedings were unjust, Morris & Dickson requested a hearing and objected to the DEA administrative process. Compl. ¶ 28.

On or around May 21, 2018, Morris & Dicson filed a Request for Hearing with the DEA Office of Administrative Law Judges ("OALJ"). ALJ Dorman issued an Order scheduling a Prehearing Conference for June 25, 2018, and required the parties to submit prehearing statements. Compl. ¶ 28. On May 30, 2018, Morris & Dickson's counsel communicated to attorneys for the DEA Office of Chief Counsel that DEA's administrative process suffered from the same constitutional infirmities as the SEC's process then under Supreme Court review. Compl. ¶ 29. Morris & Dickson's counsel proposed extending the administrative hearing schedule past the end of June 2018, when it anticipated that *Lucia* would be decided. DEA counsel agreed to a 45-day extension to the hearing schedule. *Id.*

Morris & Dickson timely and repeatedly made clear that it objected to the DEA appointment and removal process. Compl. ¶ 30. In papers Morris & Dickson submitted to the administrative court on July 13, 2018, it specifically said that it did not "waive its right to object to the continuation of [the administrative] proceeding in light of" the *Lucia* decision. Compl. ¶ 30. Morris & Dickson stated in its timely submitted August 3, 2018 prehearing statement that it anticipated challenging the constitutionality of DEA's administrative process given the Supreme Court decision in *Lucia*. *Id.* Morris & Dickson repeated as much before ALJ Dorman at the Prehearing Conference on August 10, 2018, again providing DEA with notice that Morris & Dickson may seek to challenge the constitutionality of the DEA administrative process on the basis of *Lucia*. *Id.* Morris & Dickson's trial before ALJ Dorman is set to commence on or about November 13, 2018, and to continue until November 19, 2018. Compl. ¶ 32.

## ARGUMENT

Morris & Dickson is entitled to a preliminary injunction if it "show[s] (1) a substantial likelihood that [it] will prevail on the merits, (2) a substantial threat that [it] will suffer irreparable injury if the injunction is not granted, (3) [its] substantial injury outweighs the threatened harm to the party whom [it] seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). Because the appointment and removal procedures for DEA ALJs are plainly unconstitutional following the Supreme Court's *Lucia* decision, and because Morris & Dickson will be irreparably harmed if it is subjected to a burdensome, unlawful administrative process, it easily meets this standard.

1. ## MORRIS & DICKSON IS LIKELY TO SUCCEED ON THE MERITS

Following *Lucia*, ALJs are no doubt inferior officers. *See Lucia*, 138 S. Ct. at 2053. The Appointments Clause in Article II of the Constitution requires the President or a Head of Department to appoint officers, and forbids multiple layers of insulation protecting officers from the President's authority and judgment to remove them. *See Free Enter. Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 492 (2010). But Morris & Dickson is subject to an administrative proceeding before a DEA ALJ who was not constitutionally appointed under the Appointments Clause, and who is not accountable to the President or Attorney General because they do not determine whether good cause exists for the removal of DEA ALJs. Morris & Dickson, therefore, is currently subject to an unconstitutional administrative proceeding that this Court should enjoin.

A. **DEA ALJs Are Not Constitutionally Appointed Because Neither the President Nor the Attorney General Appointed Them**

The process by which DEA ALJs are appointed violates the Appointments Clause because the ALJs are selected by the DEA Administrator from a pool of applicants rather than by

appointment of the President or the Head of Department—that is, the President or the United States Attorney General. The Constitution is unmistakably clear that any officer not appointed by the President must be appointed by a "Head of Department." U.S. Const. Art II, § 2, cl. 2.; *see also Lucia*, 138 S. Ct. at 2049.

The DEA ALJ overseeing Morris & Dickson's administrative proceeding is an inferior officer. DEA ALJs occupy an essentially identical position as the SEC ALJs found to be "officers" in *Lucia*. The *Lucia* Court explained that SEC ALJs hold "a continuing office established by law," *Lucia*, 138 S. Ct. at 2053, because they "receive[] a career appointment," 5 C.F.R. § 930.204(a), "to a position created by statute, down to its 'duties, salary, and means of appointment,'" namely, the Administrative Procedure Act, 5 U.S.C. §§ 556-557, 5372, 3105. *Lucia*, 138 S. Ct. at 2053 (citing *Freytag*, 501 U.S. at 878). *Lucia* also acknowledged that SEC ALJs exercised "significant discretion" when carrying out "important functions," and emphasized the ability of SEC ALJs to take testimony, receive evidence or examine witnesses, conduct trials, regulate the course of a hearing, and enforce compliance with discovery orders. *Id.*

DEA ALJs are creatures of the same statutory scheme as SEC ALJs, so *Lucia* applies with equal force here. DEA ALJs are inferior officers holding a continuing office established by law because they receive career appointments, 5 C.F.R. § 930.204(a), they hold a position granted by statute, 5 U.S.C. § 556(c)(1)-(11), and they exercise significant discretion when carrying out important functions to "conduct a fair hearing" and "maintain order." 21 C.F.R. §1316.52(a)-(h).

The SEC responded to *Lucia* by issuing constitutional appointments of ALJs, originating from the Commission itself, ratifying the status of ALJs as inferior officers appointed by a Head

of Department.[2]  Other agencies have similarly responded to *Lucia* by ratifying appointments.[3]  But at the DEA, ALJs are still appointed by the DEA Administrator upon recommendation from the DEA's Chief ALJ.  Compl. ¶ 38.

Put simply, the DEA Administrator is not a Head of Department.  Leading an organ within the executive branch, such as the DEA, is a necessary but *not* sufficient condition to being a Head of Department.  *Freytag v. C.I.R.*, 501 U.S. 868, 885 (1991) ("We cannot accept . . . that every part of the Executive Branch is a department, the head of which is eligible to receive the appointment power.").

The Supreme Court's opinion in *Free Enterprise Fund v. PCAOB*, focusing on the text and history of the Appointments Clause, made clear that a Department is inherently a *freestanding* component of the Executive Branch.  "Because the Commission is a freestanding component of the Executive Branch, *not subordinate to or contained within any other such component*, it constitutes a 'Department' for the purposes of the Appointments Clause."  561 U.S. 477, 511 (2010) (emphasis added).  *See also id.* (describing the founding-era meaning of "department" with reference to Noah Webster's 1828 dictionary definition as a "separate allotment or part of business; a distinct province").  Accordingly, the "head" of the DEA—the Administrator—is not Head of a "Department."

The DEA is both subordinate to and contained within another component of the executive branch: the Department of Justice.  When the Reorganization Plan of 1973 created the DEA, it left no room for ambiguity about whether the DEA would be contained within another department.

---

[2]  *See In re Pending Administrative Proceedings*, Securities Act Release No. 10536 (Aug. 22, 2018), *available at* https://www.sec.gov/litigation/opinions/2018/33-10536.pdf.

[3]  *See, e.g.*, *In re Pending Administrative Proceedings*, Comm. Fut. Trading Comm'n, (Apr. 9, 2018) (responding to *Lucia* by ratifying appointment of the CFTC Judgment Officer by the Commission itself), *available at* https://www.cftc.gov/sites/default/files/2018-04/ogcorder040918.pdf.

*See* Reorganization Plan No. 2 of 1973, § 4.  On the contrary, the Plan explicitly declared, "[t]here is established in the Department of Justice an agency which shall be known as the Drug Enforcement Administration. . . ."  *Id.*  The Plan thus transferred "all intelligence, investigative, and law enforcement functions" related to drug enforcement from other cabinet positions "to the Attorney General."  *Id.* § 1.  Likewise under the Controlled Substances Act ("CSA"), Congress couched the DEA's authority to enforce the CSA within the power to "perform such other law enforcement duties as the Attorney General may designate."  21 U.S.C. § 878(a)(5); *see also* 28 C.F.R. § 0.100 (assigning to the DEA various functions vested in the Attorney General).  Likewise, the Plan dictates that the Administrator "shall perform such functions as the Attorney General shall from time to time direct."  Reorganization Plan No. 2 of 1973 § 5.

The Supreme Court has recognized the hierarchy between the DOJ, headed by the Attorney General, and its subordinate component the DEA, by finding that DEA officials are simply officers of the Department of Justice.  *Touby v. United States*, 500 U.S. 160, 169 (1991).  In *Touby*, the Court evaluated Section 501(a) of the CSA, which provides that "[t]he Attorney General may delegate any of his functions under [the Controlled Substances Act] to any officer or employee of the Department of Justice."  21 U.S.C. § 871(a).  Applying Section 501, the Court rejected the petitioner's argument "that Congress did not authorize the delegation of temporary scheduling power from the Attorney General to the DEA. . . ."  *Touby*, 500 U.S. at 169.  That outcome is only possible if DEA officers necessarily fit the "officer or employee of the Department of Justice" requirements of Section 501.  *See* 21 U.S.C. § 871(a).

Further, the Solicitor General explained in a now-public Department of Justice memorandum addressed to all Agency General Counsel that "[f]or traditional agencies in the Executive Branch, the relevant [Head of Department] is the head of the Executive Department to

which your agency or office belongs."[4]  Following this reasoning, the Attorney General is the Head of Department of the DEA, and either the Attorney General or the President must appoint DEA ALJs.[5]  Because DEA ALJs are not appointed by the Attorney General, the current administrative proceeding against Morris & Dickson is an unconstitutional proceeding.

## B.    The DEA's Statutory Scheme Unconstitutionally Robs the President and Attorney General of Their Power to Determine Whether Good Cause Exists to Remove Inferior Officers

Article II of the U.S. Constitution vests "the executive Power" in the President, including ultimate authority to remove officers to fulfill that executive power and preserve the separation of powers. U.S. Const. Art. II, § 1, cl. 1.  Nonetheless, the Supreme Court has acknowledged that Congress may impose certain limitations on that power. Specifically, the Court has permitted certain "for good cause" limitations on the President's removal authority. *Morrison v. Olson*, 487 U.S. 654, 663 (1988).

In *Morrison v. Olson*, the Supreme Court upheld the constitutionality of independent counsel who were appointed by a special court, wielded the full powers of a prosecutor, and were removable by the Attorney General only "'for good cause.'"  *Id*. at 663 (quoting 28 U.S.C. §596(a)(1)).  "In *Humphrey's Executor*, [the Court] found it 'plain' that the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." *Id*. at 687 (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935)).  In both *Morrison*

---

[4] *Guidance on Administrative Law Judges after Lucia v. SEC (S. Ct.)*, Off. of the Solicitor General, July 23, 2018, *available at* https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf

[5] The President's recent executive order hardly solves the Appointment Clause violation.  *See* Exec. Order No. 13843, 583 Fed. Reg. 32755 (July 10, 2018).  The order exempted ALJs from certain competitive service selection procedures in an attempt to make them "compatible with the discretion an agency head must possess under the Appointments Clause."  This Executive Order did not purport to, and did not, cure the constitutional issues surrounding ALJ appointments—as shown by other agencies' moves to ratify ALJs.

and *Humphrey's Executor*, however, the <u>*determination of*</u> "good cause" rested in constitutionally authorized hands: either the President or a Head of Department beholden to the President.

Specifically, the Court in *Morrison* noted that the statute "g[a]ve the Attorney General," an officer directly responsible to the President and "through [whom]" the President could act, "several means of supervising or controlling" the independent counsel—"[m]ost importantly . . . the power to remove the counsel for good cause." *Id.*, at 695–696 (internal quotation marks omitted). The determination of the conduct or factors that would result in a removal for "good cause" was not outsourced to yet another agency or individual and remained with the Attorney General. *See Morrison*, <u>487 U.S. at 685-8</u>6. Thus, since the power to remove was vested in the Attorney General—who is the President's "alter ego" because the President may remove him at will—this did not infringe the President's executive power. The President effectively exercises the removal power through his "alter ego." *See Free Enter. Fund*, <u>561 U.S. at 495–9</u>7; *Myers v. United States*, <u>272 U.S. 52, 133</u> (1926) ("Each head of a department is and must be the President's alter ego in the matters of that department where the President is required by law to exercise authority.").

Here, however, the APA allows an action to remove certain ALJs, including DEA ALJs, only "for good cause *established and determined by the Merit Systems Protection Board* on the record after opportunity for hearing before the Board." <u>5 U.S.C. § 7521(a)</u> (emphasis added).[6] Those MSPB members in turn may not be removed except for "inefficiency, neglect of duty, or malfeasance in office." <u>5 U.S.C. § 1202(d)</u>. Unlike the Attorney General, MSPB members are

---

[6]   For example, the President's oversight of his inferior officers at the DEA is so limited that, even with the Attorney General's support, he would be powerless to remove a hypothetical DEA ALJ that, because of the ALJ's own personal views in favor of decriminalization of marijuana, refused to conduct proceedings against registrants charged with violations of federal marijuana laws unless the MSPB determined that this behavior constituted a "good cause" to remove the ALJ.

independent actors and not removable at-will "alter egos" of the President. Thus, vesting them with the authority to determine "good cause" for removal unconstitutionally infringes the President's removal power. *Free Enterprise Fund* makes clear that these "dual for-cause limitations . . . contravene the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 492. By "withdraw[ing] from the President any decision on whether that good cause exists," *id.* at 495, and vesting that power in the MSPB, the DEA ALJs' statutory arrangement usurps the President's Article II authority to oversee the DOJ. The result is a system of DEA ALJs who are accountable neither to the President nor to his alter ego, a Head of Department—a far cry from the President constitutionally charged with "the power of appointing, overseeing, and controlling those who execute the laws." *Id.* at 492 (quoting James Madison, 1 Annals of Cong. 463 (1789)).

Specifically, by empowering decisionmakers who can only be removed for "inefficiency, neglect of duty, or malfeasance in office" to determine when inferior officers may themselves be removed "for cause," the statutory scheme denies the President the power to remove officers executing federal law. While "good cause" restrictions on the President's removal power are acceptable (in some circumstances), the President cannot remove DEA ALJs for what *he* considers "good cause," since that "determination" is made by officers over whom he does not exercise plenary power.

In his *Lucia* concurrence, Justice Breyer directly acknowledged that the MSPB offers troubling protection against ALJ removal: "Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what *Free Enterprise Fund* interpreted the Constitution to forbid in the case of the Board members." 138 S. Ct. at 2060 (Breyer, J., concurring). Justice Breyer noted that the Court in *Free Enterprise Fund* chose not to declare that ALJs violated the Constitution's Article II removal requirements, *id.* at 2061, but the Court reached that decision in a pre-*Lucia* environment. *Lucia* definitively ruled that ALJs are

inferior officers, thus altering the landscape of administrative law and ALJs. *See Lucia,* 138 S. Ct. at 2053-55. Considering the extraordinary power of DEA ALJs, their unchecked lifetime tenure, and the unusual insulation provided by the MSPB, DEA ALJs can no longer escape the constitutional requirement to fall within executive oversight. The President or Attorney General must have the power to determine when good cause exists to remove ALJs, and act on that determination in accordance with the President and his Article II executive power.

In sum, the DEA ALJ's "good cause" removal protections fall to the discretion of the MSPB—itself insulated from presidential oversight by another layer of removal protection. This arrangement thwarts the President's Article II executive power, and ensures that neither the President nor the Attorney General as Head of Department can see that the laws are faithfully executed by determining whether good cause exists to remove inferior officers. In light of *Lucia,* the DEA can claim no protection from *Morrison or Humphrey's Executor* to preserve this unconstitutional structure.

## 2.    MORRIS & DICKSON WILL SUFFER IRREPARABLE INJURY ABSENT THE REQUESTED RELIEF

Without injunctive relief from this court, Morris & Dickson will be required to submit to a proceeding that nakedly violates the separation of powers. Being forced to endure this *void-ab-initio* process before a constitutionally unacceptable adjudicator plainly constitutes irreparable harm. A litigant facing the threat of administrative proceedings before a structurally biased adjudicator, for example, need not suffer through those proceedings before seeking review. Instead, because "irreparable injury [occurs] when [a] plaintiff [i]s forced to submit" to such an adjudication, it may be enjoined at the outset. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997); *see also*, *e.g.*, *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693 (7th Cir. 1982) (irreparable injury in proceeding before adjudicator with a financial stake

in the dispute). Mandatory proceedings before an unconstitutionally appointed and unconstitutionally insulated decisionmaker are an even more systemic flaw and give rise to at least the same irreparable injury. "[W]here the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, . . . judicial relief [may be] sought as the only effective way of protecting the asserted constitutional right." *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 539–40 (1958); *cf., e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 528 n.3 (1977) (litigants may challenge an unconstitutional permitting scheme without seeking a permit because of the "irreparable injury" caused by being forced to submit to such a scheme).

Morris & Dickson's irreparable injury is further illustrated by the other uncompensable harms it will suffer if forced to proceed before the DEA ALJ. A government action that threatens great, certain, and imminent injury is deemed irreparable where, because of sovereign immunity, the victim will not be able to recover compensatory damages. *See Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (if plaintiff "cannot recover damages from the defendant due to the defendant's sovereign immunity . . . any loss of income suffered by the plaintiff is irreparable *per se*"); *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2011); *Sherley v. Sebelius*, 704 F. Supp. 2d 63, 72 (D.D.C. 2010). If the DEA ALJ suspends Morris & Dickson's DEA registrations, the ensuing reputational and economic damage would be severe and irreversible, long before Morris & Dickson could obtain meaningful judicial review. And even after Morris & Dickson prevailed in overturning the DEA's unlawful decision (rendered by an unlawful decisionmaker), sovereign and qualified immunity doctrines would prevent Morris & Dickson from recovering money damages to restore the reputational harm, lost sales, and interrupted operations inflicted by any adverse administrative judgment. *See Armendariz-Mata v. U.S. DOJ, DEA*, 82 F.3d 679, 682 (5th Cir. 1996) (dismissing compensatory and punitive damages claims against DEA, explaining the "APA's § 702 waiver of the government's sovereign immunity

does not apply to monetary damages."). Because Morris & Dickson faces deprivation of constitutional rights and irreparable injury to its business, it will suffer irreparable harm and is therefore entitled to injunctive relief.

### 3.     THE BALANCE OF EQUITIES FAVORS MORRIS & DICKSON

Morris & Dickson is thus poised to suffer irreparable harm at the hands of an unconstitutional administrative proceeding. The DEA, by contrast, faces no harm at all from an injunction requiring it to litigate the constitutional acceptability of its ALJs in this Court before any proceeding in its administrative tribunal. To begin with, the DEA has effectively conceded that there is no imminent need to modify Morris & Dickson's registrations—rather than contest the court's decision to preliminarily enjoin the Immediate Suspension Order, the DEA rescinded it. Moreover, the DEA has no legitimate interest in litigating the constitutionality of its ALJ structure in-house. DEA ALJs are not authorized or competent to determine whether the ALJ appointment and removal process violates the Constitution. Finally, the DEA has no legitimate interest in delaying for years, on a petition for appellate review, the adjudication of the constitutionality of the DEA ALJs' service rather than adjudicating the issue in district court today.

Indeed, the DEA should *want* the issue of whether its ALJs are unconstitutionally insulated from presidential control decided now, not through a petition for review. If Morris & Dickson prevails on a petition for review—as it surely will, given the clarity with which *Lucia* and the Solicitor General's own memorandum speak to this issue—any order against Morris & Dickson will be void. *See Freytag v. C.I.R.*, 501 U.S. 868, 879 (1991) ("alleged defect in the appointment . . . goes to the validity of the . . . proceeding"); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (holding that a defect in the appointment of an officer would be "an irregularity which would invalidate a resulting order"). As a result, Morris & Dickson will be entitled (at the least) to a new hearing, before a constitutionally valid ALJ. *See Lucia*, 138 S.

Ct. at 2055 ("[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief." (internal quotation marks omitted)); *see Ryder v. United States*, 515 U.S. 177, 188 (1995) (holding that a successful Appointments Clause challenger "is entitled to a hearing before a properly appointed panel" of the body in question). The DEA has no valid interest in wasting its time—and Morris & Dickson's money and reputation—in administrative proceedings that will just have to be redone if and when the DEA receives constitutionally acceptable ALJs.

The balance of equities thus strongly supports enjoining the DEA's administrative process against Morris & Dickson until the DEA's ALJ appointment and removal procedures are brought into harmony with the Constitution. In the interim, since the hearing before the DEA ALJ is currently scheduled to begin on November 13, 2018, and since Morris & Dickson's Motion raises (at the very least) serious question as to whether that allegedly unconstitutional proceeding should be enjoined to avoid irreparable injury, this Court should enjoin Defendants from requiring Morris & Dickson to appear before a DEA ALJ, either at the currently-scheduled November 13, 2018 hearing or any other date, until the Court rules on Morris & Dickson's Motion for preliminary injunction. Such interim relief would give this Court and the parties sufficient time to resolve Plaintiff's Motion in an orderly and efficient manner.

## 4.    THE PUBLIC INTEREST FACTOR HEAVILY FAVORS GRANTING THE PRELIMINARY INJUNCTION

The public interest in this case favors the enforcement of individual constitutional rights against an overreach of the administrative state. *See generally Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest.") (citation omitted). In fact, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control*

*Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *accord Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (applying that rule to enforce a preliminary injunction protecting First Amendment rights in the Fifth Circuit). A preliminary injunction against the DEA is the only way to preserve Morris & Dickson's constitutional rights against being subjected to an unconstitutional proceeding.

An injunctive order would also restore constitutional separation of powers by ensuring members of the executive branch are accountable to the President and the people—not left to their own unchecked discretion. *See Free Enter. Fund*, 561 U.S. at 492. In a democracy, the preservation of due process and constitutional rights serves the most important public interest. *See G & V Lounge, Inc.*, 23 F.3d at 1079. The separation of powers is an indispensable bulwark protecting those rights, and therefore serving that interest. *See Boumediene v. Bush*, 553 U.S. 723, 742 (2008) ("This [separation of powers] serves not only to make Government accountable but also to secure individual liberty."); *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring) (acknowledging the "faithful expression of ancient due process and separation of powers principles the framers recognized as vital to ordered liberty under the Constitution."); *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting) ("While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty."). Since injunctive relief is necessary here to preserve constitutional rights, it unquestionably serves the public interest.

## **CONCLUSION**

For the foregoing reasons, Morris & Dickson respectfully requests that this Court grant its application for a preliminary injunction, including its request for interim relief from the upcoming November 13, 2018 hearing.

Dated:     October 26, 2018

Respectfully submitted,

By: /s/   *Frank H. Spruiell*

Frank H. Spruiell, Jr.,  La. Bar No. 1611
Reid A. Jones, La. Bar No. 34611
WIENER, WEISS & MADISON
A Professional Corporation
333 Texas Street, Suite 2350 (71101)
P. O. Box 21990
Shreveport, Louisiana  71120-1990
Telephone: (318) 226-9100
Facsimile: (318) 424-5128
Email:  fspruiell@wwmlaw.com
Email:  rjones@wwmlaw.com

Jodi Avergun (*pro hac vice*), N.Y. Bar No. 2166668
Keith Gerver (*pro hac vice*), N.Y. Bar No. 5049846
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Joshua Arnold (*pro hac vice*), N.Y. Bar No. 4718714
William Simpson (*pro hac vice*), N.Y. Bar No. 5587076
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

Michael A. Carvin (*pro hac vice*), D.C. Bar No. 366-784
JONES DAY LLP
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Telephone:  (202) 879-7643
Facsimile:  (202) 626-1700

*Counsel for Morris & Dickson Co., LLC*

## CERTIFICATE OF SERVICE

I certify that on this 26th day of October, 2018, I have served a copy of the above and foregoing on all counsel of record through the Court's CM/ECF system.

s/   *Frank H. Spruiell*

Frank H. Spruiell

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 10536 / August 22, 2018

SECURITIES EXCHANGE ACT OF 1934
Release No. 83907 / August 22, 2018

INVESTMENT ADVISERS ACT OF 1940
Release No. 4993 / August 22, 2018

INVESTMENT COMPANY ACT OF 1940
Release No. 33211 / August 22, 2018

| In re:<br>Pending Administrative Proceedings | ORDER |
| --- | --- |

On November 30, 2017, we ratified the appointments of Chief Administrative Law Judge Brenda Murray and Administrative Law Judges Carol Fox Foelak, Cameron Elliot, James E. Grimes, and Jason S. Patil to the office of administrative law judge in the Securities and Exchange Commission.[1]  In an abundance of caution and for avoidance of doubt, we today reiterate our approval of their appointments as our own under the Constitution.

In light of the Supreme Court's decision in *Lucia v. SEC*,[2] we previously stayed any pending administrative proceeding initiated by an order instituting proceedings that commenced the proceeding and set it for hearing before an ALJ, including any such proceeding currently pending before the Commission.[3]  We now find it prudent to allow the stay to expire effective today, August 22, 2018.

With respect to any such proceeding currently pending before an ALJ or the Commission, we order that respondents be provided with the opportunity for a new hearing before an ALJ who did not previously participate in the matter.  We remand all proceedings currently pending before the Commission to the Office of Administrative Law Judges for this purpose and vacate any

---

[1]     *Order*, Exchange Act Release No. 82178, 2017 WL 5969234 (Nov. 30, 2017); *see also SEC Ratifies Appointment of Administrative Law Judges*, https://www.sec.gov/news/press-release/2017-215 (Nov. 30, 2017).

[2]     138 S. Ct. 2044 (2018).

[3]     *Order*, Exchange Act Release No. 83675, 2018 WL 3494802 (July 20, 2018); *Order*, Exchange Act Release No. 83495, 2018 WL 3193858 (June 21, 2018).

2

prior opinion we have issued in the matter.  A list of matters is attached as Exhibit A.  In these matters, as well as the matters currently pending before an ALJ, we direct the conduct of further proceedings consistent with this order and the Court's decision in *Lucia v. SEC*.  The ALJs are directed to notify the parties in the cases pending before them of this order.

Any pending deadlines in each administrative proceeding currently pending before an ALJ or remanded to the Office of Administrative Law Judges, as described above, are hereby vacated and superseded by the procedures and deadlines set forth in this order.  In each such proceeding, absent express agreement by the parties regarding alternative procedures, the Chief Administrative Law Judge shall by rotation to the extent practicable designate an ALJ who did not previously participate in the matter to be the presiding hearing officer.[4]  Any agreement by the parties regarding alternative procedures shall be submitted to the Chief Administrative Law Judge by September 7, 2018.  In all cases, assignments shall be made no later than September 21, 2018.

The assigned ALJ shall exercise the full powers conferred by the Commission's Rules of Practice and the Administrative Procedure Act and shall not give weight to or otherwise presume the correctness of any prior opinions, orders, or rulings issued in the matter.[5]  Within 21 days of being assigned to the proceeding, the ALJ shall issue an order directing the parties to submit proposals for the conduct of further proceedings.  After considering the parties' submissions, the ALJ shall hold a new hearing and prepare an initial decision; but if a party fails to submit a proposal, the ALJ may enter a default against that party pursuant to Rule of Practice 155 or impose another appropriate sanction under Rule of Practice 180.[6]

The Rules of Practice as amended on July 13, 2016 shall govern all pending proceedings,[7] unless the presiding ALJ determines, after giving the parties notice and an

---

[4]     17 C.F.R. § 200.30-10(a)(2).

[5]     *E.g.*, Rule of Practice 111, 17 C.F.R. § 201.111; 5 U.S.C. § 556.

[6]     17 C.F.R. §§ 201.155, .180.

[7]     In proceedings instituted before the effective date of the amended Rules of Practice, the Commission directed the ALJ to issue an initial decision within 120, 210, or 300 days of service of the OIP; for purposes of applying the amended Rules of Practice to such proceedings, they shall be deemed proceedings under the 30-, 75-, or 120-day timeframes, respectively, as specified in Rule of Practice 360(a)(2).  In all proceedings, the ALJ shall compute the deadlines for scheduling a hearing and issuing an initial decision as specified in amended Rule of Practice 360(a)(2) from the date the proceeding is assigned to a hearing officer pursuant to this order, rather than the date of service of the relevant order instituting proceedings.  The deadlines stated in this order confer no procedural or substantive rights on any party, and the presiding ALJ may, for good cause shown, modify any of them, including the date by which the initial decision must be issued.  This grant of authority allowing the presiding ALJ to modify the deadlines stated in

(footnote continued . . . )

3

opportunity to be heard, that application of a particular amended rule in a proceeding instituted prior to their effective date would not be just and practicable or otherwise would work a manifest injustice under the circumstances of that case, in which case the former rule applies.

This order does not preclude the Commission from assigning any proceeding to the Commission itself or to any member of the Commission at any time.

By the Commission.


Brent J. Fields
Secretary

---

( . . . continued)

this order supersedes the provisions in Rule of Practice 360(a)(3)(i) and (ii) governing the circumstances under which the deadlines to issue initial decisions may be extended.

Exhibit A

A.C. Simmonds, et al., File No. 3-17999

Accelerated Acquisition XVII, et al., File No. 3-18146

Aervision Holdings, Inc., et al., File No. 3-18199

Affirmative Insurance Holdings, Inc., Armada Oil, Inc., and Chuma Holdings, Inc., File No. 3-18378

AFN, Inc., et al., File No. 3-17743

Alexandre S. Clug, File No. 3-16318

Altovida Inc., et al., File No. 3-18104

American Magna Corp., et al., File No. 3-18105

American-Swiss Capital, Inc., et al., File No. 3-18156

Andrew Stitt, File No. 3-17621

Anthony C. Zufelt, File No. 3-17907

ARX Gold Corporation, File No. 3-18185

Atomic Paintball, Inc., et al., File No. 3-17991

Aurios, Inc., et al., File No. 3-18092

Axesstel, Inc., File No. 3-17941

Axiom Oil & Gas Corp., et al., File No. 3-18096

Balqon Corporation, et al., File No. 3-18095

Baltia Air Lines, Inc., Graphite Corp., and 24Holdings, Inc.,, File No. 3-18472

Barbara Duka, File No. 3-16349

Bioelectronics Corp., Ibex, LLC, St. John's, LLC, Andrew J. Whelan, and Kelly A. Whelan, File No. 3-17104

BioPharma Manufacturing Solutions Inc., et al., File No. 3-18148

Biovest International, Inc., et al., File No. 3-17935

Bluforest, Inc., File No. 3-17558

Bohai Pharmaceuticals Group Inc., File No. 3-18151

BOLDFACE Group, Inc., et al., File No. 3-18103

Brian Michael Berger, File No. 3-18129

Canso Enterprises Ltd., et al., File Nos. 3-17984, 17985, 17986, 17987, 17988, 17989

CellCyte Genetics Corp., File No. 3-18141

Century Acquisition Corp. and Eastern Acquisition Corp., File No. 3-18162

Chile Mining Technologies Inc., File No. 3-18174

China Du Kang Co., Ltd., File No. 3-18106

China Fruits Corp., et al., File No. 3-18017

China Greenstar Corporation, et al., File No. 3-18097

China Hefeng Rescue Equipment, Inc., et al., File No. 3-18179

Christopher M. Gibson, File No. 3-17184

Cibolan Gold Corporation, File No. 3-18077

Circle Star Energy Corp. and Energy Holdings International, Inc., File No. 3-18142

CNK Global, Inc. (a/k/a American Life Holding Co., Inc.), File No. 3-18082

Cono Italiano, Inc., et al., File No. 3-18177

Core Resource Management, Inc., et al., File No. 3-18079

Creator Capital Ltd., File No. 3-18189

David F. Bandimere, File No. 3-15124

Dearborn Bancorp, Inc., File No. 3-18223

dELiA*s Inc. and Global Energy, Inc., File No. 3-18037
Demitrios Hallas, File No. 3-18229
Diane Dalmy, File No. 3-16339
Digital Brand Media & Marketing Group, Inc., File No. 3-17990
e.Digital Corp., and Liberty Coal Energy Corp., File No. 3-18475
Edward M. Daspin, File No. 3-16509
Energy Edge Technologies Corp. and Focus Gold Corp., File No. 3-18038
Engage Eco Solutions, Inc., et al., File No. 3-18191
Evolucia, Inc. and OSL Holdings, Inc., File No. 3-18014
E-Waste Systems, Inc., File No. 3-18107
Frank Chiappone, Andrew G. Guzzetti, William F. Lex, Thomas E. Livingston, Brian T. Mayer,
    and Philip S. Rabinovich, File No. 3-15514
Fu Lu Cai Productions Ltd. and Heavy Earth Resources, Inc., File No. 3-18173
Gamzio Mobile, Inc., File No. 3-18170
Gary C. Snisky, File No. 3-17645
GC China Turbine Corp., File No. 3-16604
Geoglobal Resources, Inc. and USA Synthetic Fuel Corp., File No. 3-18153
Gerardo E. Reyes, File No. 3-18126
GL Capital Partners, LLC and GL Investment Services, LLC, File No. 3-17818 and 17819
GO EZ Corporation, et al., File No. 3-18204
Gregory Reyftmann, File No. 3-17959
GS Enviroservices, Inc., et al., File No. 3-17977
Guardian 8 Holdings, et al., File No. 3-18221
Hall Tees, Inc., et al., File No. 3-18155
Hampshire Group, Limited, File No. 3-18201
Hedgebrook, JayHawk Energy, Inc., and Rubicon Financial, Inc., File No. 3-18484
Hui Feng and Law Offices of Feng & Associates, P.C., File No. 3-18209
Hydrogen Future Corporation, et al., File No. 3-18220
HydroPhi Technologies Group, Inc., et al., File No. 3-18208
Ibex Advanced Mortgage Technology, Inc., File No. 3-18047
Icon Vapor, Inc., et al., File No. 3-18210
IMK GROUP, INC., et al., File No. 3-18203
Immunoclin Corp. et al., File No. 3-18190
Infinity Real Estate Holdings Corporation, et al., File No. 3-18217
Intellicell Biosciences, Inc., File No. 3-17990
J.S. Oliver Capital Management, L.P., File No. 3-15446
James A. Winkelmann and Blue Ocean Portfolios, File No. 3-17253
James E. Cohen and Joseph A. Corazzi, File No. 3-15974
James P. Griffin, File No. 3-17848
Jeffrey D. Smith, Joseph Carswell, and Michael W. Fullard, File No. 3-18271
Jeffrey Gainer, File No. 3-18130
Joe Lawler, File No. 3-17650
John Austin Gibson, Jr., File No. 3-17856
John J. Aesoph, CPA and Darren M. Bennett, CPA, File No. 3-15168
John Thomas Capital Management, L.P., and George R. Jarkesy, Jr., File No. 3-15255
Joseph J. Fox, File No. 3-16795

Joseph Vitale, File No. 3-18252

JuQun, Inc., et al., File No. 3-18193

KollagenX Corp., et al., File No. 3-18207

Kun De International Holdings, Inc., and Sutor Technology Group Limited, File No. 3-18169

Kung Fu Dragon Group Limited, File No. 3-18091

Laurie Bebo, File No. 3-16293

Lawrence E. Penn, III, File No. 3-18288

Louis V. Schooler, File No. 3-17115

Mackenzie Taylor Minerals, Inc., et al., File No. 3-18149

MarilynJean Interactive Inc., File No. 3-18445

Mark Megalli, File No. 3-18250

Medicus Homecare Inc., File No. 3-18081

Michelle L. Helterbran Cochran, CPA, File No. 3-17228

Montalvo Spirits, Inc., et al., File No. 3-18078

Neurologix, Inc., et al., File No. 3-18180

New Media Insight Group, Inc. and Pacific Sands, Inc., et al., File No. 3-18206

New Western Energy Corp. and Primco Management, Inc., File No. 3-18007

New York Sub Co., File No. 3-18038

Next Galaxy Corp. and Novamex Energy, Inc., File No. 3-18219

Patric Ken Baccam a/k/a Khanh Sengpraseuth, File No. 3-18276

Paul Edward ("Ed") Lloyd, Jr., CPA, File No. 3-16182

Penny Auction Solutions, Inc., et al., File No. 3-18202

Raymond J. Lucia Companies, Inc. and Raymond J. Lucia, Sr., File No. 3-15006

Retirement Surety LLC, Crescendo Financial LLC, Thomas Rose, David Leeman, and David
    Featherstone, File No. 3-18061

Rosalind Herman, File No. 3-17828

Roy Dekel, File No. 3-17751

Saving2Retire, LLC and Marian P. Young, File No. 3-17352

Sean P. Finn and M. Dwyer LLC, File No. 3-17693

Shervin Neman and Neman Financial, Inc., File No. 3-17699

Spring Hill Capital Markets, LLC, Spring Hill Capital Partners, LLC, Spring Hill Capital
    Holdings, LLC, and Kevin D. White, File No. 3-16353

StationDigital Corp., File No. 3-18004

Talman Harris and Victor Alfaya, File No. 3-17874

Timothy W. Carnahan and CYIOS Corporation, File No. 3-16386

Tintic Gold Mining Company, File No. 3-18157

Tod A. Ditommaso, File No. 3-17550

Vortronnix Technologies, Inc., File No. 3-18023

Warren D. Nadel, File No. 3-17883

William D. Bucci, File No. 3-17888

# EXHIBIT F

UNITED STATES DEPARTMENT OF JUSTICE

DRUG ENFORCEMENT ADMINISTRATION

HEARING

_____  :
                                 :
IN THE MATTER OF:                :
                                 :
MORRIS & DICKSON CO., LLC        : Docket No. 18-31
                                 :
_____ :

Monday,
May 13, 2019

Courtroom A

Drug Enforcement Administration

Office of Administrative Law Judges

1550 Crystal Drive

Suite 901

Arlington, Virginia 22202

The above-entitled matter came on for

hearing, pursuant to notice, at 9:30 a.m.

BEFORE:    THE HONORABLE CHARLES WM. DORMAN,

           U.S. Administrative Law Judge

1    protective order is best raised to the

2    Administrator, as they were in CVS.

3              Mr. Dean, in my second prehearing

4    ruling, which was dated January 10, 2019, and I

5    asked the Government to clarify why pages 1 and 2

6    in the proposed Government Exhibits 7, 8, and 15

7    appear to be the same.  Perhaps you complied with

8    my ruling and I simply missed it, but in getting

9    ready for the hearing today, I'm still puzzled.

10   Is there some difference in pages 1 and 2 of each

11   one of those exhibits?

12             MR. DEAN:  No, Your Honor, but that's

13   the way the record is, it's a double copy.  So we

14   didn't want to split the record, because it is

15   stored that way, two versions together.

16             JUDGE DORMAN:  Okay, so I can ignore

17   page 2 in each one of those and I won't miss

18   anything at all?

19             MR. DEAN:  Yes, Your Honor.

20             JUDGE DORMAN:  Okay.  Is there

21   anything further that either party would like to

22   address before we move into opening statements?

23             MS. AVERGUN:  Yes, Your Honor.  Your

24   Honor, with due respect, we do have a preliminary

25   matter.

1      We continue to renew our objection and
2  continue to object to the hearing on the grounds
3  that this administrative proceeding is
4  unconstitutional.  Specifically, Your Honor, and
5  again with respect, the statutes, regulations,
6  and administrative policies, as applied by DEA
7  and the United States Department of Justice,
8  providing for the appointment and removal of DEA
9  administrative law judges are unlawful, violate
10  the appointment clause in constitutional
11  separation of powers principles of the
12  Constitution.  Respondent, and indeed the public
13  interest, will suffer irreparable injury is
14  Morris & Dickson is subjected to this
15  unconstitutional administrative proceeding.

16      As Your Honor is aware, we have raised
17  this objection before.  On May 30, less than two
18  weeks after receiving the order to show cause, I
19  provided a notice to DEA Chief Counsel of the
20  constitutional objection.

21      And then we objected to the proceeding
22  on the grounds of the unconstitutional
23  appointment and removal of DEA administrative law
24  judges in a July 13, 2018 submission to this
25  Tribunal.  And in our August 3, 2018 prehearing

1   statement and then in an August 8, 2018

2   prehearing conference.

3           On October 26, 2018, as you alluded to

4   this morning, Your Honor, we filed a complaint in

5   the U.S. District Court for the Western District

6   of Louisiana seeking declaratory and injunctive

7   relief to enjoin this proceeding, which complaint

8   was dismissed by the U.S. District Court for lack

9   of subject-matter jurisdiction after a delay of

10  time.

11          Your Honor, Respondent is aware and

12  mindful of your ruling of November 1, 2018, in

13  which the Tribunal stated that it did not have

14  the authority to rule on the constitutionality of

15  its appointment as an ALJ.  However, we

16  respectfully renew for the record our objection

17  to the hearing and proceeding.

18          JUDGE DORMAN:  That was very nice of

19  you to submit that in writing ahead of time.  Do

20  you have a response?

21          MR. DEAN:  Your Honor, our response is

22  short and simple.  This is the first time they've

23  actually ever objected to this proceeding.  And

24  in January of this year, Respondent had an

25  agreement with this party, with this Court, and

C E R T I F I C A T E

This is to certify that the foregoing transcript

In the matter of: Morris and Dickson Co., LLC

Before: US Drug Enforcement Administration

Date: 05-13-19

Place: Arlington, VA

was duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings.


------------------------
Court Reporter

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

# EXHIBIT G

**UNITED STATES DEPARTMENT OF JUSTICE**

**Drug Enforcement Administration**

| | |
|---|---|
| In the Matter of<br><br>**Morris & Dickson, Co., LLC** | **Docket No. 18-31** |

**RECOMMENDED RULINGS, FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND DECISION**

**Charles Wm. Dorman
U.S. Administrative Law Judge**

August 29, 2019

Appearances:

Paul A. Dean, Esq.
John E. Beerbower, Esq.
    *for the Government*

Jodi L. Avergun, Esq.
Keith M. Gerver, Esq.
Joshua P. Arnold, Esq.
    *for the Respondent*

# Table of Contents

**The Allegations** ................................................................................................. 5

**The Witnesses** ................................................................................................ 11

The Government's Witnesses ........................................................................ 11

The Respondent's Witnesses ........................................................................ 20

**The Facts** ...................................................................................................... 33

Stipulations ................................................................................................... 33

Findings of Fact ........................................................................................... 38

A Distributor's Regulatory Obligations ................................................... 38

DEA's Investigation of Respondent & Respondent's Response to DEA Subpoenas .......... 44

Pro-Compliance Reports & Market Basket Analysis Reports ................... 50

Folse Pharmacy ..................................................................................... 52

Bordelon's Super-Save Pharmacy ........................................................ 54

Wallace Drug Company ......................................................................... 55

Pharmacy Specialties Group ................................................................. 56

Dave's Pharmacy ................................................................................... 58

Hephzibah Pharmacy ............................................................................. 60

The Wellness Pharmacy ........................................................................ 61

Wilkinson Family Pharmacy ................................................................. 62

The Respondent's Policies & Procedures .............................................. 64

The Tukey Method of Statistical Analysis ............................................ 67

Rose's Analysis & Opinions .................................................................. 68

Weinstein's Analysis & Opinions ......................................................... 70

The Respondent's Old SOM System ..................................................... 75

The Respondent's New SOM System .................................................... 77

The Respondent's Current ECP System ................................................ 80

August 2016 Meeting ............................................................................. 83

The Respondent's Acceptance of Responsibility .................................. 84

**Analysis** ....................................................................................................... 88

The Government's Position ........................................................................... 89

Customer-based Due Diligence ................................................................ 91

Monitoring Orders and Reporting Requirements ................................................. 92

Duty to Investigate Before Shipping ................................................................. 93

Respondent Failed to Conduct Adequate Due Diligence ................................... 93

Respondent Failed to Detect and Report Suspicious Orders .............................. 94

Mr. Irelan Cannot Accept Responsibility for Respondent .................................. 95

Egregiousness and Deterrence .......................................................................... 96

The Respondent's Position ..................................................................................... 97

Suspicious Orders ............................................................................................ 98

Red Flags ......................................................................................................... 99

The Government Did Not Prove that Respondent Failed to Conduct Due Diligence ......... 100

No Requirement to Cease Shipments ............................................................... 100

Mr. Irelan's Authority to Accept Responsibility .............................................. 102

21 C.F.R. § 1316.50 ........................................................................................ 103

Unequivocal Acceptance of Responsibility ...................................................... 103

Public Interest Factors .................................................................................... 106

Analysis of Factor One:  Maintenance of Effective Controls Against Diversion ................... 107

Identifying Suspicious Orders ......................................................................... 109

Reporting Suspicious Orders ........................................................................... 110

Conducting Due Diligence ............................................................................... 112

Red Flags ....................................................................................................... 115

Adverse Inference .......................................................................................... 117

The Respondent's Policies ............................................................................... 119

Failure to Maintain Effective Controls Against Diversion ................................ 122

Folse Pharmacy .......................................................................................... 122

Bordelon's Super-Save Pharmacy ............................................................... 123

Wallace Drug Company .............................................................................. 124

Pharmacy Specialties Group ....................................................................... 125

Dave's Pharmacy ....................................................................................... 126

Hephzibah Pharmacy .................................................................................. 127

The Wellness Pharmacy .............................................................................. 128

Wilkinson Family Pharmacy ....................................................................... 129

Analysis of the Evidence Concerning the Exemplar Pharmacies.........................................130

Failure to Report Suspicious Orders.................................................................................135

**Discussion and Conclusions of Law** .............................................................................141

*Prima Facie* Showing and Balancing ..............................................................................143

Acceptance of Responsibility..........................................................................................147

Remediation ...................................................................................................................154

Deterrence .....................................................................................................................155

Relationship between the Shreveport and Jefferson Certificates of Registration...................156

**Recommendation**..........................................................................................................158

On May 3, 2018, the Drug Enforcement Administration ("DEA" or "Government") served Morris & Dickson, Co., LLC ("Respondent") with an Order to Show Cause and Immediate Suspension of Registration ("OSC/ISO"), immediately suspending the DEA Certificates of Registration ("COR"), Numbers RM0314790 and RM0335732, of Morris & Dickson Co., LLC ("Respondent"), pursuant to 21 U.S.C. § 824(d), and proposing to revoke its CORs and deny any pending applications for renewal or modification, pursuant to 21 U.S.C. §§ 824(a)(4) and 823(b).　Administrative Law Judge Exhibit ("ALJ-") 1; ALJ-2.　In response to the OSC/ISO, the Respondent timely requested a hearing before an Administrative Law Judge. ALJ-3.　The hearing that the Respondent requested was held in Arlington, Virginia, on May 13-16, 2019.

I note that the Respondent has requested confidential treatment of all of its exhibits, as well as a portion of the testimony of Mr. Kenneth A. Weinstein.　Tr. 14-16, 559; ALJ-81-82. That portion of Mr. Weinstein's testimony for which the Respondent requests confidential treatment begins on page 560 and ends on page 689 of the transcript.

The issue before the Acting Administrator is whether the record as a whole establishes by a preponderance of the evidence that the DEA Certificates of Registration of Morris & Dickson, Co., LLC, No. RM0314790, and Morris & Dickson, Co., LLC, d/b/a Spark Drug, Inc., No. RM0335732, should be revoked, and any pending applications be denied, because their continued registrations would be inconsistent with the public interest under 21 U.S.C. §§ 824(a)(4), and 823(b) and (e).　ALJ-9, at 1.

This Recommended Decision is based on my consideration of the entire Administrative Record, including all of the testimony, admitted exhibits, and the oral and written arguments of counsel.

## THE ALLEGATIONS

1.　Morris & Dickson failed to maintain effective controls against diversion in that it failed to report to DEA thousands of unusually large orders for hydrocodone and oxycodone and it shipped those orders without resolving red flags of diversion.　ALJ-1, at 2, para. 2.

2.　Morris & Dickson failed to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," in violation of 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.71(a).　ALJ-1, at 3, paras. 7, 10.

3.   Morris & Dickson failed to adequately "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and report them to DEA, in violation of 21 C.F.R. § 1301.74(b). ALJ-1, at 3, paras. 8, 10.

4.   Morris & Dickson ignored and/or failed to implement its due diligence and suspicious order monitoring policies and failed to conduct meaningful due diligence into these orders to ensure that the controlled substances were not diverted into other than legitimate channels. ALJ-1, at 3, para. 10. Morris & Dickson has routinely shipped—and, as recently as February 28, 2018, continues to ship—controlled substances despite evidence suggesting a likelihood of diversion. *Id.*

5.   Between January 2014 and September 2017, Morris & Dickson filed a total of three suspicious order reports with DEA. ALJ-1, at 4-5, paras. 12-13, 17. For two reports filed in April 2017, Morris & Dickson shipped the orders for controlled substances before reporting the orders to DEA. *Id.* at 4, para. 13. For the third report filed in April 2014, the report did not contain sufficient information to determine whether Morris & Dickson shipped the order for controlled substances. *Id.*

6.   In response to an administrative subpoena served by DEA on February 5, 2018, Morris & Dickson indicated it did not believe that it was required to maintain records on investigations of potentially suspicious orders. ALJ-1, at 4-5, paras. 14, 16. Morris & Dickson's response stated that "formal records are not kept in the regular course of business on the investigation of orders which do not result in the finding of a suspicious order. *Id.* at 5, para. 16. Morris & Dickson did not produce any such records in response to DEA's subpoena. *Id.*

7.   Between January 1, 2014 and April 30, 2018, Morris & Dickson shipped 7,252 unusually large orders of oxycodone (12,594,100 dosage units) and 4,948 unusually large orders of hydrocodone (22,042,800 dosage units). ALJ-1, at 5, paras. 18-20; ALJ-52, at 19. Morris & Dickson did not report any of these orders as suspicious to DEA, except for the three reports noted in paragraph 5. ALJ-1, at 5, para. 20. As a result, Morris & Dickson failed to maintain effective controls against the diversion of controlled substances, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1), and 21 C.F.R. § 1301.71(a), and failed to identify and report suspicious orders of controlled substances to DEA, in violation of 21 C.F.R. § 1301.74(b). *Id.* at 5-6, paras. 21-23.

8.    Morris & Dickson failed to implement its due diligence and suspicious order monitoring policies and failed to conduct or failed to document the resolution of meaningful due diligence into orders placed by the following seven pharmacies:

a.   **Wallace Drug Company, Inc. d/b/a Wallace Discount Drugs ("Wallace"):** Between January 1, 2014 and April 30, 2018, Morris & Dickson shipped 6 orders of hydrocodone (78,000 dosage units) and 1 order of oxycodone (6,000 dosage units) to Wallace that were unusually large. ALJ-1, at 7, para. 30; ALJ-52, at 20. Morris & Dickson shipped controlled substances to Wallace despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 7, paras. 30, 32.

b.   **Bordelon's Super-Save Pharmacy ("Bordelon's"):** Between January 1, 2014 and September 2017, Morris & Dickson shipped 359 orders of hydrocodone (430,570 dosage units) and 1,184 orders of oxycodone (458,430 dosage units) to Bordelon's. ALJ-1, at 7, para. 36. Morris & Dickson shipped controlled substances to Bordelon's despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 7, paras. 35, 38-39. Morris & Dickson shipped 50 unusually large orders of oxycodone (83,500 dosage units) to Bordelon's between January 1, 2014 and April 30, 2018, and 2 unusually large orders of hydrocodone (24,000 dosage units) to Bordelon's between January 1, 2014 and April 30, 2018. ALJ-1, at 7, para. 37; ALJ-52, at 20. Among the unusually large orders shipped to Bordelon's were an order for 2,000 dosage units of oxycodone shipped in January 2017 (approximately ten times the median order for Bordelon's); 3,000 dosage units of oxycodone shipped in May 2015 (approximately fifteen times the median order for Bordelon's); and four orders totaling 42,000 dosage units of hydrocodone shipped in September 2014 (approximately forty-two times the median order for Bordelon's). ALJ-1, at 7-8, paras. 37(a)-(c).

c.   **Folse Pharmacy ("Folse"):** Morris & Dickson shipped 973 orders of hydrocodone (1,586,630 dosage units) and 2,314 orders of oxycodone (2,270,700 dosage units) to Folse between January 2014 and September 2017. ALJ-1, at 8, para. 45.

Specifically, between January 1, 2014 and April 30, 2018, Morris & Dickson shipped 58 unusually large orders of oxycodone to Folse (337,200 dosage units) and 68 unusually large orders of hydrocodone (624,000 dosage units) to Folse. *Id.* at 8-9, para. 46; ALJ-52, at 20. Morris & Dickson shipped controlled substances to Folse despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 8-9, paras. 44, 47-48. Among the unusually large orders shipped to Folse were two orders totaling 12,000 dosage units of oxycodone shipped in September 2017 (each order approximately twelve times the median order for Folse); two orders totaling 24,000 dosage units of hydrocodone shipped in August 2017 (each order approximately twelve times the median order for Folse); and two orders totaling 14,000 dosage units of oxycodone shipped in September 2015 (each order approximately fourteen times the median order for Folse). ALJ-1, at 8-9, paras. 46(a)-(c).

d. **Pharmacy Specialties Group, Inc. ("Pharmacy Specialties"):** Morris & Dickson shipped 184 orders of hydrocodone (224,330 dosage units) and 464 orders of oxycodone (238,520 dosage units) to Pharmacy Specialties between January 2014 and September 2017. ALJ-1, at 9, para. 53. Specifically, Morris & Dickson shipped to Pharmacy Specialties 10 unusually large orders of oxycodone (23,200 dosage units) between January 1, 2014 and April 30, 2018 and 15 unusually large orders of hydrocodone (68,000 dosage units) between January 1, 2014 and April 30, 2018. ALJ-1, at 9-10, para. 54; ALJ-52, at 20. Among the unusually large orders shipped to Pharmacy Specialties were 2,400 dosage units of oxycodone shipped in October 2016 (approximately five times the median order for Pharmacy Specialties); 12,000 dosage units of hydrocodone shipped in January 2016 (approximately twelve times the median order for Pharmacy Specialties); and 12,000 dosage units of hydrocodone shipped in September 2015 (approximately twelve times the median order for Pharmacy Specialties). ALJ-1, at 9-10, para. 54(a)-(c). Morris & Dickson shipped controlled substances to Pharmacy Specialties despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to

resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 9-10, paras. 52, 55, 58-59.

e. **Dave's Pharmacy ("Dave's"):**   Morris & Dickson shipped 1,990 orders of hydrocodone (3,273,280 dosage units) and 4,808 orders of oxycodone (2,029,400 dosage units) to Dave's between January 2014 and September 2017. ALJ-1, at 11, para. 64. Specifically, Morris & Dickson shipped to Dave's 103 unusually large orders of oxycodone (264,200 dosage units) between January 1, 2014 and April 30, 2018, and 14 unusually large orders of hydrocodone (141,000 dosage units) between January 1, 2014 and April 30, 2018. ALJ-1, at 11, para. 65; ALJ-52, at 20. Among the unusually large orders shipped to Dave's were 6,000 dosage units of oxycodone shipped in April 2017 (approximately twenty times the median order for Dave's); three orders of 18,000 total dosage units of oxycodone shipped in June 2015 (each order approximately twenty times the median order for Dave's); and two orders totaling 24,000 dosage units of hydrocodone shipped in March 2015 (each order approximately twelve times the median order for Dave's). ALJ-1, at 11, paras. 65(a)-(c). Morris & Dickson shipped controlled substances to Dave's despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 10-11, paras. 62-63, 66-67.

f. **The Wellness Pharmacy, Inc. ("Wellness"):**   Morris & Dickson shipped 4,997 orders of oxycodone (3,083,080 dosage units) and 1,351 orders of hydrocodone (1,569,010 dosage units) to Wellness between January 2014 and September 2017. ALJ-1, at 13, para. 83. Specifically, Morris & Dickson shipped to Wellness 119 unusually large orders of oxycodone (387,800 dosage units) and 3 unusually large orders of hydrocodone (18,000 dosage units) between January 1, 2014 and April 30, 2018. ALJ-1, at 13, para. 84; ALJ-52, at 20. Among the unusually large orders shipped to Wellness were 6,000 dosage units of oxycodone shipped in June 2017 (approximately fifteen times the median order for Wellness); 6,000 dosage units of oxycodone shipped in April 2017 (approximately fifteen times the median order for Wellness); 5,000 dosage units of oxycodone shipped in April 2017 (approximately twelve times the median order for Wellness); and two orders totaling 12,000 dosage

units of hydrocodone shipped in October 2014 (each order approximately six times the median order for Wellness). ALJ-1, at 13, paras. 84(a)-(c). Morris & Dickson shipped controlled substances to Wellness despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 13, paras. 82, 85, 88.

g. **Wilkinson Family Pharmacy ("Wilkinson"):** Morris & Dickson shipped 1,284 orders of hydrocodone (1,431,680 dosage units) and 4,564 orders of oxycodone (3,100,140 dosage units) to Wilkinson between January 2014 and April 2017. ALJ-1, at 14, para. 92. Specifically, Morris & Dickson shipped to Wilkinson 2 unusually large orders of oxycodone (11,000 dosage units) and 49 unusually large orders of hydrocodone (421,000 dosage units) between January 1, 2014 and April 30, 2018. ALJ-1, at 14, para. 93; ALJ-52, at 20. Among the unusually large orders shipped to Wilkinson were 6,000 dosage units of oxycodone shipped in April 2017 (approximately fifteen times the median order for Wilkinson); 12,000 dosage units of hydrocodone shipped in September 2015 (approximately twelve times the median order for Wilkinson); and three orders totaling 36,000 dosage units of hydrocodone shipped in September 2014 (each order approximately twelve times the median order for Wilkinson). ALJ-1, at 14, paras. 93(a)-(c). Morris & Dickson shipped controlled substances to Wilkinson despite being aware of red flags for diversion. Morris & Dickson failed to conduct adequate due diligence sufficient to resolve those red flags and failed to report suspicious orders to DEA. ALJ-1, at 14-15, paras. 91, 96-97.

9. **Hephzibah Pharmacy, L.L.C. ("Hephzibah"):** Morris & Dickson shipped 92 orders of oxycodone (18,620 dosage units) and 57 orders of hydrocodone (21,800 dosage units) to Hephzibah between April 2017 and June 2017. ALJ-1, at 12, para. 71. Morris & Dickson shipped these orders to Hephzibah after having received a report from a third-party vendor that raised red flags concerning Hephzibah's dispensing practices, without conducting adequate due diligence to resolve those concerns. *Id.* at 11-12, paras. 69-70, 72-73, 75. In December 2017, Morris & Dickson reported that it had closed the Hephzibah account due to Morris & Dickson's due diligence efforts, but it had not found

Hephzibah to have exhibited suspicious activity or excessive orders. *Id.* at 12, para. 77. Morris & Dickson shipped all the orders placed by Hephzibah. *Id.* at 12, para. 78.

## THE WITNESSES

### I.    The Government's Witnesses

The Government presented its case through the testimony of six witnesses and the introduction of 70 exhibits. The Government's first witness was **Thomas Prevoznik** ("Prevoznik"), the Acting Section Chief of the Pharmaceutical Investigation Section of the DEA. Tr. 47-87. Prevoznik has been with the DEA for 28 years and began his career as a Diversion Investigator. Tr. 48. Prevoznik provided background information about his training, career progression, and duties within the DEA. Tr. 48-52. Prevoznik discussed the controlled substances that are currently sought for illicit use, such as oxycodone, hydrocodone, benzodiazepines, lorazepam, gabapentin, Neurontin, and Soma, and he described the opioid crisis in the United States. Tr. 52-54. He noted that the regulated community recognizes the term "trinity drug cocktail," which is a combination of an opioid, a benzodiazepine, and a muscle relaxer. Tr. 55. Prevoznik also provided an overview of the Controlled Substances Act ("CSA"), and what distributors are required to do to comply with the CSA. Tr. 57-62, 76-83. Prevoznik provided information concerning outreach programs the DEA conducted for distributors. Tr. 62-69. Prevoznik explained the purpose of the Automation of Records and Consolidated Ordering System ("ARCOS"), and that distributors are required to report their transactions of controlled narcotics in Schedules I-III, and other specified controlled substances. Tr. 69-72. Prevoznik identified Government Exhibits 3, 4, 65, 66, and 69. Tr. 62-65.

Prevoznik presented as a professional, objective regulator who had no stake in the outcome of the case. Further, Prevoznik provided testimony that was sufficiently detailed, plausible, consistent, and cogent to be fully credible, with one exception. That exception concerns his testimony that a distributor is only required to report orders that it suspects might be diverted. Tr. 60, 85-87. Because that testimony is inconsistent with 21 C.F.R. § 1301.74(b), I do not credit it. That section requires reporting of suspicious orders and gives examples, such as orders of unusual size or frequency, or exhibiting an abnormal pattern. The section does not indicate that those examples must also be linked to a suspicion that the orders will be diverted.

Prevoznik's testimony on this matter is also inconsistent with the expert testimony of Joel Dunn. Tr. 497-98.

The Government's second witness was **David Lemoine** ("Lemoine"). Tr. 88-132. Lemoine began his career with the DEA in 2013 as a Diversion Investigator. He now works with the New Orleans Field Division Technical Operations Group. Tr. 89. He provided testimony concerning his training and experience with DEA, prior to his involvement in the current case. Tr. 89-92. Lemoine testified about why the DEA started investigating the Respondent in November 2017, and how that investigation was conducted. Tr. 92-101. During the investigation, the Respondent provided details of its suspicious order monitoring program to DEA. Tr. 93. Lemoine identified Government Exhibits 6, 7, 8, 9, and 10. Tr. 94-101.

Lemoine presented as a professional, objective regulator who had no stake in the outcome of the case. Further, Lemoine provided testimony that was sufficiently detailed, plausible, consistent, and cogent to be fully credible.

**Robin Hogue** ("Hogue") was the third witness called by the Government. Tr. 142-86. Hogue is a Diversion Investigator for the DEA and she began her employment with the DEA in 2015. Tr. 142-43. Hogue briefly discussed her prior experience and training. Tr. 143. Hogue testified that she became the primary case agent of DEA's investigation of the Respondent in March 2018. Tr. 143-44. The remainder of Hogue's testimony consisted of identifying Government documents. Hogue identified Government Exhibits 11-63, 68, and 71. Tr. 144, 147-177.

Hogue presented as a professional, objective regulator who had no stake in the outcome of the case. Further, Hogue provided testimony that was sufficiently detailed, plausible, consistent, and cogent to be fully credible.

The Government next presented the testimony of **Gamaliel Rose** ("Rose"). Tr. 187-245. Rose attended Yale University and he also received a Master's of Business Administration with a concentration in statistical analysis from the Darden School of Business. Tr. 188. After earning his MBA, Rose worked as an analysis consultant and statistician. Tr. 189. He joined DEA in 1999 as a management analyst. Tr. 189, 218. In 2003, Rose became a program analyst in the office of DEA's Deputy Administrator. Tr. 218-21. He then joined DEA's statistical analysis unit in 2006 and was promoted to section chief of that unit in 2008. Tr. 190, 222. The statistical analysis unit develops "statistical analyses for top management to help allocate resources,

identify targets, problems, and to take any other problems that would come along from" other sections of DEA. Tr. 190. Rose has been the Chief of the Statistical Services Section of the DEA since 2008. Tr. 188. As Section Chief, Rose "supervise[s] the analysis process" and makes sure the DEA has "high-quality data that [it] can rely on for proceedings like this" and to make informed decisions in the execution of DEA's work. Tr. 190.

Rose has developed and implemented statistical models related to the pharmaceutical industry. Tr. 191-92. Rose was qualified, without objection, as an expert in "developing and implementing statistical models and methods of analyzing large and complex data sets." Tr. 192.

For his work on DEA's investigation into Respondent, Rose was asked to apply a statistical model that his section had developed and applied in other investigations. Tr. 193. Initially, Rose was provided a set of ARCOS data concerning Respondent's oxycodone and hydrocodone sales from January 1, 2014 to September 30, 2018. Tr. 193-94, 217. Rose obtained the data from the ARCOS unit. Tr. 193. He later obtained data of Respondent's sales of oxycodone and hydrocodone through April 30, 2019. Tr. 194.

In conducting his analysis, Rose looked at transactions, meaning the number of dosage units of oxycodone and hydrocodone that Respondent sold to various pharmacies. Tr. 196. Rose then compared every transaction of one pharmacy made during a fixed time period against every other transaction of that pharmacy made during the same time period. Tr. 197, 226-27. Rose called this a fixed-frame analysis. Tr. 197. Rose's analysis compared a single transaction against all other transactions made by the same pharmacy during "a fixed frame of four years" from January 1, 2014 to April 30, 2018.[1] Tr. 198. This type of analysis is easier to do than "the more onerous and more complex" moving-frame analysis. Tr. 198, 227. Rose explained that there was no material difference in the outcome between a fixed-frame and a moving-frame analysis. Tr. 198-99, 227-28. Both types of analysis "produce the same basic result, which is to identify a body of outliers that . . . would be worthy of further study." Tr. 199. The results of Rose's analysis are based on the easier fixed-frame method because he was looking for "a ballpark estimate of scale, of size of outlier population," not the exact number of outliers. Tr. 227, 234. He also conducted a moving-frame analysis which produced results "consistent with what [he] found using the" fixed-frame method. Tr. 228, 235. In his moving-frame

---

[1] At one point during his testimony, Rose stated that his analysis went through the end of the 2018 calendar year. Tr. 198. He later stated that the analysis included transactions through April 30, 2018. Tr. 226.

analysis, Rose looked at "the entire population" and not only the eight exemplar pharmacies in the OSC. Tr. 230.

Rose applied the Tukey method to perform his analysis of Respondent's oxycodone and hydrocodone transactions. Tr. 199. Rose believed the Tukey method was easier to apply to the data than a standard deviation model. Tr. 236. He used the Tukey method because it is "a more flexible method for dealing with" irregular distribution patterns. Tr. 199. Rose got the idea to use the Tukey method from Respondent's expert, Mr. Kenneth A. Weinstein. Tr. 200, 237. The Tukey method is widely-recognized as a reasonable method to identify statistical outliers. Tr. 200, 209, 236-37.

The Tukey method uses the first and third quartiles of a data set to identify outliers. Tr. 201-02. The first quartile is the 25th percentile and the third quartile is the 75th percentile. Tr. 201. The Tukey method uses the first and third quartiles as markers for identifying outliers below the 25th percentile and above the 75th percentile. Tr. 201. The interquartile range ("IQR") is the difference between the first and third quartiles, which is then multiplied by a factor of 1.5 to 6. Tr. 202. The IQR multiplier is applied to the third quartile, or 75th percentile, to identify "approximate indications of . . . unusuality." Tr. 202. The specific IQR multiplier used depends on the level of "rigor or onus you're trying to put on the data." Tr. 202. Applying a lower IQR multiplier, such as 1.5, would produce more outliers than a higher IQR multiplier. Tr. 202-03. DEA did not want to be "overly onerous" on registrants so Rose applied an IQR multiplier of 3 instead of 1.5. Tr. 202-03. Rose used an IQR multiplier of 3 because he found it to "work[] very well at identifying what are called far out or extreme outliers." Tr. 203, 233, 242. By using 3 IQR, Rose calculated a smaller group of outliers than he would have had he used 1.5 IQR. Tr. 203. There are situations where it is appropriate to use an IQR higher than 3. Tr. 202, 234.

Rose testified that his analysis of Respondent's sales from January 1, 2014 to April 30, 2018, identified 7,252 oxycodone sales and "just under 5,000" hydrocodone sales that were outliers. Tr. 212. He also testified about the number of outlier transactions with respect to seven of the exemplar pharmacies in the OSC. Tr. 213-14, 216-17, 243.

Rose also performed a Tukey analysis for the OSC/ISO. Tr. 204. This analysis was incorrect because one of Rose's analysts applied 3 IQR to the median of the data set, or the 50th percentile, instead of the 75th percentile. Tr. 204, 208-09. This incorrect analysis produced "a

much larger group of outliers." Tr. 209. When Rose realized the mistake, he corrected the analysis and had his analyst "go back and check every other analysis he had done, and he verified that they all had been done correct." Tr. 209.

The Government also called Rose as a rebuttal witness to address one of the criticisms leveled by the testimony of the Respondent's expert witness concerning the methodology Rose had used to identify outliers. Tr. 1083-93. Rose also did an analysis of the Respondent's orders using the look-back analysis, which the Respondent's expert suggested was a better approach. Tr. 1083. Using the look-back analysis Rose examined every transaction against the other transactions of the same pharmacy and compared it against the pharmacy's orders in the previous 365 days. Tr. 1084-85. Rather than the fixed-frame analysis that Rose had originally performed, the new analysis used a moving, dynamic frame. Tr. 1083. The analytical frame moved every day. Tr. 1085. In conducting this second analysis, Rose used an IQR multiplier of 3. Tr. 1085. Government Exhibits 73 and 74 contain the results of Rose's look-back analysis. Tr. 1089. Using the look-back analysis Rose identified 6,816 outliers for oxycodone, rather than 7,252 that he had identified using the fixed-frame analysis. Tr. 1091. This was a reduction of 6 percent. Tr. 1091. Using the look-back analysis Rose identified 5,222 outliers of hydrocodone, rather than 4,948 that he had identified using the fixed-frame analysis. Tr. 1092. This was an increase of 5.5 percent. Tr. 1091. In Rose's opinion, the results of the fixed-frame analysis and the look-back analysis for oxycodone and hydrocodone were substantially similar. Tr. 1091-92.

Rose presented as a professional, objective regulator who had no stake in the outcome of the case. Further, Rose provided testimony that was sufficiently detailed, plausible, consistent, and cogent to be fully credible.

The Government's final witness was **Joel Dunn** ("Dunn"). Tr. 277-498. Dunn has worked for DEA since 2004. Tr. 278. Dunn spent his first ten years with DEA as a diversion investigator in Dallas, Texas, where he was assigned to the tactical diversion squad and became a senior diversion investigator. Tr. 278-79. He attended a 13-week training course in Quantico to become a diversion investigator. Tr. 278. He then spent three years as the staff coordinator of DEA's special operations division ("SOD"). Tr. 279. At SOD, Dunn investigated matters involving international diversion. Tr. 281. He is currently Group Supervisor of DEA's New Orleans Field Division. Tr. 278. Dunn holds a bachelor's degree from the University of Texas at Arlington and a law degree from Wesleyan University. Tr. 279, 485.

When Dunn was a senior DI in Dallas, he taught half-day training sessions on pharmaceutical diversion at the basic narcotic investigator school hosted by DEA. Tr. 280. He also conducted "quite a bit of training" when he worked in the special operations division, including three trips to Canada where he taught the Royal Canadian Mounted Police about controlled substance diversion in the United States. Tr. 280.

As group supervisor of the New Orleans Field Division, Dunn oversees the work of diversion investigators, registration technicians, and a group assistant. Tr. 279. He provides "subject matter expertise" to the diversion investigators on their investigations. Tr. 279-80. Dunn has worked on diversion investigations for the last 14-15 years. Tr. 280. He also teaches a for-credit course about pharmaceutical regulation at Tulane University Medical School. Tr. 281. He has also taught at Xavier University School of Pharmacy concerning regulations pertaining to pharmacists and red flags that a pharmacist should be aware of. Tr. 281, 486. In addition to teaching at schools, Dunn has also provided training to federal prosecutors on diversion, including a recent training for Assistant United States Attorneys. Tr. 281-82. The training Dunn has offered to schools and prosecutors includes how to identify red flags. Tr. 485-86.

Dunn was accepted, without objection, as "an expert in the identification of common red flags suggestive of an illicit pharmaceutical operation and as well as with respect to the requirements imposed on DEA registrants to identify and investigate such red flags when they become aware of them." Tr. 282.

Dunn testified that 21 C.F.R. § 1301.74(b) requires distributors "to devise and maintain a system to detect suspicious orders." Tr. 283. The same regulation provides that "orders of unusual size, [unusual] frequency, or deviating from a standard pattern" are characteristics of a suspicious order. Tr. 283. This list is not exhaustive. Tr. 283. DEA regulations also require distributors to report suspicious orders to DEA upon discovery of the suspicious order. Tr. 283. Dunn testified that DEA's reporting requirement is important for three reasons. Tr. 283-84. First, if the distributor fails to report a suspicious order, DEA has "no way of knowing it occurred" and cannot investigate that order. Tr. 283-84. Second, orders of Schedule II and III drugs are reported to DEA on a quarterly basis, so a distributor will be able to report a suspicious order to DEA much faster than waiting for the ARCOS report. Tr. 284. Third, ARCOS does not include data of orders for all controlled substances. Tr. 284.

Dunn also explained why DEA is concerned about large shipments of controlled substances to retail pharmacies. Tr. 285. First, he explained that an order of unusual size would be an order "outside of the typical market for that particular pharmacy." Tr. 285. Second, he testified that large orders of controlled substances present a greater risk of diversion. Tr. 285-86. Schedule II narcotics, such as oxycodone and hydrocodone, and Schedule II amphetamines are of specific concern to DEA because "they are the most abused controlled substances" and "have the highest street values." Tr. 286. Dunn also testified that it is more concerning to DEA when large shipments of controlled substances go to small, independent pharmacies rather than when they go to chain pharmacies with national reach. Tr. 286-87.

There are different ways for DEA to determine whether an order of controlled substances is unusually large. Tr. 292. For example, DEA can conduct a statistical analysis or compare a pharmacy's orders of controlled substances against past orders to see if its orders have increased significantly. Tr. 292.

Dunn supervised the DIs on their investigation of the Respondent. Tr. 291-92. As part of the investigation, Dunn requested Rose's group to conduct a statistical analysis of the Respondent's orders of controlled substances to see how many orders were of an unusual size. Tr. 293, 403-04. Dunn asked Rose to conduct an analysis "to get a sense of just mathematically quantifying how many suspicious orders could theoretically have been missed by Morris & Dickson." Tr. 404. The results of Rose's analysis of Respondent's orders revealed about 14,000 orders that should have been reported as suspicious. Tr. 294. Dunn's investigation found three suspicious order reports filed by the Respondent. Tr. 294. The Respondent shipped the orders related to the three suspicious order reports that it filed. Tr. 294. A distributor should not ship an order once it identifies that order as suspicious. Tr. 294.

DEA requires a distributor to conduct due diligence when a distributor identifies a red flag. Tr. 295, 298, 301-02. The distributor must exercise due diligence in investigating the red flags it identifies and resolving those red flags before it ships the controlled substances. Tr. 295, 298, 301-02. It would not be proper to ship controlled substances before resolving red flags. Tr. 302. For example, if a distributor identifies that a pharmacy it sells to is dispensing an unusually high volume of oxycodone, the distributor should conduct due diligence to ensure those prescriptions are "going to a legitimate medical purpose." Tr. 298. During DEA's investigation, Dunn requested the Respondent's due diligence files. Tr. 295. A distributor must

document the due diligence it conducts. Tr. 298, 302. It would be difficult for a distributor to prove that it conducted due diligence if it failed to document the steps it took. Tr. 298-99, 302-03.

There are similarities and differences between red flags for distributors and red flags for practitioners. Tr. 297. Red flags for distributors include a pharmacy that: dispenses a high volume of narcotics; dispenses the trinity drug cocktail; fills prescriptions for customers who live far away from the pharmacy; fills prescriptions for a high volume of patients who pay for prescriptions in cash. Tr. 297, 300-01. It is a red flag for a pharmacy to order and dispense disproportionally more controlled substances than non-controlled substances. Tr. 299. It is also a red flag if a pharmacy orders "excessive quantities of a limited variety of controlled substances." Tr. 300. Dunn testified that DEA views one trinity prescription as a high volume. Tr. 300, 353.

The Respondent's Standard Operating Procedures ("SOP") Manual says that the Respondent "keeps a system in operation which is designed to discover those purchasing patterns of controlled substances which exceed the norm and could possibly be related to diversion activities." Tr. 307; GE-18, at 19. Dunn testified that the requirements of 21 C.F.R. § 1301.74(b) are "a little more encompassing than just the statement exceed the norm." Tr. 307. Based on the Respondent's SOP Manual, Dunn testified that the Respondent's suspicious order monitoring program did not look for the things required under 21 C.F.R. § 1301.74(b). Tr. 307-08.

The Respondent's SOP Manual describes three methods for identifying suspicious orders: Controlled Drug Volume Analysis Program; Management Oversight; and Employee Oversight. GE-18, at 19-20.

Dunn testified that DEA received documents in response to several subpoenas DEA served on the Respondent. Tr. 389. The Respondent's SOP Manual describes a Controlled Drug Volume Analysis Program that generates a monthly report that is reviewed by management. Tr. 308; GE-18, at 19. Dunn does not recall seeing one of these reports in any of the documents the Respondent produced in response to DEA's subpoena. Tr. 308. Dunn also does not recall seeing any such report or any reference to such a report in the materials he reviewed concerning the Respondent. Tr. 308-09.

The Respondent's SOP manual states that "[w]hen a suspicious pattern or purchase is identified by any of the above methods the customer is contacted in some but not all cases and asked for a written explanation for the unusual order. In all cases, a letter is sent to the DEA indicating a possible suspicious order." GE-18, at 20; Tr. 311-12, 391. In Dunn's opinion, this does not comply with DEA's regulations. Tr. 312.

The bulk of Dunn's testimony on direct examination was devoted to the Pro-Compliance Reports and Market Basket Analyses for the pharmacies listed in the OSC. Tr. 329-85, 402-03. Dunn did not review all of the Pro-Compliance Reports he received. Tr. 403. Dunn did not know how many Pro-Compliance Reports were received by DEA, but when Respondent's counsel asked, "If I represented to you that it was 7,999, would that sound in the ballpark?", Dunn answered, "It very well could." Tr. 403. Dunn also could not recall how many Market Basket Reports were received by DEA, but testified that he had no reason to disagree with Respondent's counsel's representation that it was about 42,000. Tr. 407. At the top of each Market Basket Report, there are two boxes labelled volume of controlled substances and total volume. GE-58, at 1; Tr. 408-09. Dunn believed the numbers in these boxes referred to dosage units and he does not know whether they in fact referred to dollar amounts. Tr. 408-09. He never asked whether the numbers represented dosage units or dollars. Tr. 409. Dunn testified that he believes analyzing a pharmacy's total cash volume is an arbitrary standard because it would include payments for non-controlled drugs and some non-controlled drugs are "extremely expensive" while controlled substances are "relatively cheap." Tr. 425.

Dunn testified about how a distributor may go about conducting due diligence of its customers. Tr. 392-95. Dunn never personally asked anyone who worked for the Respondent about the Respondent's policies. Tr. 397, 399-400. Dunn's testimony about the Respondent's policies is based on his own interpretation of the documents. Tr. 400.

Even though the Respondent produced some due diligence files to DEA, Dunn testified that a distributor "can conduct due diligence and ignore the red flags that are in [its] face and continue to ship. And that's what I feel like happened in this particular case." Tr. 463.

Dunn presented as a professional, objective regulator who had no stake in the outcome of the case. Further, Dunn provided testimony that was sufficiently detailed, plausible, consistent, and cogent to be fully credible.

The last witness the Government presented was Diversion Investigator **Theresa Bass** ("Bass"). Tr. 1105-11. Bass was called as a rebuttal witness. She briefly testified concerning her work history with the DEA, Tr. 1105-06, and provided testimony about attending a meeting at the Respondent's facility in August 2016, which one of the Respondent's witnesses, Louis Milione, also attended. Tr. 1106-08. Apparently, Bass was called to rebut Milione's testimony about whether the Respondent had attempted to sell a software product to the DEA during the August 2016 meeting. Bass testified that the Respondent was promoting a software program, similar to a prescription monitoring program. Tr. 1107-09.

While Bass presented as a professional, objective regulator who had no stake in the outcome of the case, I do not credit her testimony. Rather, I find the testimony of Milione more credible concerning the rather irrelevant issue raised by the Government of whether the Respondent attempted to sell a product to the DEA at the August 2016 meeting. I find his testimony on this point more credible based on my observation of his testimony and his demeanor as a witness. I also find his testimony more consistent with the content of Respondent Exhibit 11, the Power Point presentation delivered by the Respondent at the August 2016 meeting. A review of that document does not reveal any information concerning a prescription monitoring program. Furthermore, even if I were to credit Bass' testimony, it would have absolutely no effect on my assessment of Milione's credibility. In short, there was no need to call Bass as a witness.

## II.    The Respondent's Witnesses

The Respondent presented its case through the testimony of three witnesses and the introduction of 10 exhibits. The Respondent's first witness was **Kenneth A. Weinstein** ("Weinstein"). Tr. 501-689. Weinstein has been the Vice President of the consulting firm Analysis Group, Inc. ("AGI") for the past two-and-a-half years. Tr. 501-02. As Vice President of AGI, Weinstein leads consulting teams on projects related to the healthcare and pharmaceutical industries. Tr. 502. He has advised clients on matters involving controlled substances, the False Claims Act, kickbacks, and issues related to healthcare litigation. Tr. 502.

Weinstein received an undergraduate degree in 2003 from Harvard University in applied mathematics and economics. Tr. 504. In 2008 Weinstein earned a Master's in Business

Administration from the Massachusetts Institute of Technology ("MIT"). Tr. 504. Between Harvard and MIT Weinstein worked on litigation-related issues as an analyst and then senior analyst at AGI. Tr. 504-05. After earning his Master's Degree, Weinstein spent two years at Bridgespan Group, a consulting firm that serves government and non-profit agencies. Tr. 505. In 2010 Weinstein became an associate at AGI and was promoted to a manager in 2012. Tr. 505-06. He became Vice President in 2017. Tr. 506. Weinstein authenticated Respondent Exhibit 14, pages 15 to 19, and Exhibits 28 and 29. Tr. 506, 562-68.

Since re-joining AGI in 2010, Weinstein has worked on matters involving pharmaceutical manufacturers, distributors, pharmacies, and clinics. Tr. 508. He has had about 15 clients in these areas of the pharmaceutical industry since 2010. Tr. 508-09. He has worked specifically with manufacturers and distributors of controlled substances. Tr. 509. He has assisted several distributors and manufacturers in developing suspicious order monitoring ("SOM") systems. Tr. 509-10, 514. He has also developed SOM programs for a pharmacy chain. Tr. 514. He has also worked on projects involving the analysis of dispensing data to identify red flags and "to assist compliance with effective controls against diversion." Tr. 510. Weinstein agreed that cash payments and distance travelled by the patient can be red flags of diversion. Tr. 648-49. Weinstein added that these red flags cannot be identified by a distributor at the time an order is placed. Tr. 648-49. Further, Weinstein testified: "I'm not sure that I've seen guidance on red flags of dispensing diversion that state that a distributor cannot make subsequent shipments of controlled substances." Tr. 649.

Weinstein has made presentations to DEA and the Department of Justice regarding AGI's application of statistical modeling to controlled substances, specifically the application of the Tukey method. Tr. 510-11, 513. He has also presented on controlled substances to the Illinois Department of Public Health. Tr. 511. He has co-published articles on Law360 about the challenges of identifying suspicious orders, such as limited data and identifying orders in real time, and on opioid guidelines issued by the Center for Disease Control. Tr. 512, 520. In one of those articles, Weinstein opined that under the DEA's Final Order in *Masters Pharmaceuticals, Inc.*,[2] DEA views potentially suspicious orders as guilty until proven innocent. Tr. 651. In the same article he wrote that the *Masters* Final Order establishes a high bar for dispelling suspicion. Tr. 651.

---

[2] 80 Fed. Reg. 55418 (2015), *pet. for rev. denied*, 861 F.3d 206 (D.C. Cir. 2017).

Weinstein has applied the Tukey analytical model in developing SOM programs and in identifying outliers. Tr. 512-13, 521. Tukey is not the only method used in SOM programs, but it is a common one. Tr. 521-22. Weinstein agrees, however, that statistical analysis is an appropriate method for identifying suspicious orders. Tr. 654. He also agrees that the Tukey method is an appropriate method to conduct that analysis. Tr. 654.

In his work with pharmacies, Weinstein has interviewed pharmacists, warehouse staff, and compliance officers to gain an understanding of the business context and of "what would be helpful to them in reviewing red flags." Tr. 515-16, 519. By working with pharmacies Weinstein gained experience of how pharmacies manage their inventories and order new stock. Tr. 517-18. He has also looked at how pharmacists exercise their corresponding responsibility when dispensing controlled substances. Tr. 519. In his work with distributors, Weinstein has interviewed compliance officers and logistics staff. Tr. 515-16. Through this work, he has gained an understanding of how a distributor receives orders from pharmacies. Tr. 516. Weinstein has also gained experience of how controlled substances are regulated. Tr. 518.

Weinstein has attended several conferences related to the pharmaceutical industry, including the Healthcare Distribution Association; a controlled substances summit hosted by the American Conference Institute; the American Society for Pharmacy Law Conference; a pharmacy law symposium organized by the law firm Quarles & Brady; and the Prescription Drug Abuse Summit in Atlanta, Georgia. Tr. 520.

Weinstein was accepted as an expert, without objection, in statistical analysis related to controlled substance distribution and as an expert in pharmacy ordering and inventory management. Tr. 513-14, 520-21.

Weinstein highlighted two advantages to using the Tukey method to identify outlier transactions. Tr. 522. First, the Tukey method omits "anything that's extreme at the top or the bottom." *Id.* Second, the Tukey method works well with non-standard distribution patterns. *Id.*

The Respondent's law firm hired AGI to review the DEA's statistical analysis of suspicious orders in the OSC/ISO and to enhance the Respondent's "statistical approach" to monitoring orders of controlled substances. Tr. 502-03, 560, 644. Weinstein and AGI began working on the Respondent's SOM system in May 2018 shortly after DEA issued the OSC/ISO against Respondent. Tr. 560, 577, 640. Weinstein testified that AGI is being paid by the hour and payment is not contingent on its findings. Tr. 503.

Weinstein was also retained to analyze Rose's work in this case. Tr. 524. Weinstein testified that he "was able to confirm that [Rose's] math follows his description of the analysis." Tr. 557-58. Weinstein, however, was of the view that Rose's fixed-frame analysis produced unreliable results. Tr. 528. Weinstein also opined, however, that Rose's findings, contained on page 11 of the Government's demonstrative exhibits[3], do not accurately reflect the number of orders that the Respondent should have reported to DEA. Tr. 525, 558. In general, the main flaw of Rose's analysis, in Weinstein's opinion, is Rose's failure to consider context. Tr. 526, 541-42. More specifically, Weinstein opined that the deficiencies in Rose's analysis can be attributed to Rose's (1) use of a four-year fixed-frame as opposed to the look-back method; (2) his failure to consider the schedule change of hydrocodone; (3) failure to consider package size and formulation; and (4) use of the line item approach as opposed to a cumulative approach. Tr. 558. Weinstein testified about the contextual considerations that, in his opinion, paint a more accurate picture of which orders were outliers. Tr. 541-42. In Weinstein's opinion, statistical analysis alone is insufficient to identify diversion of controlled substances because there are contextual elements that cannot be gleaned from a pharmacy's ordering data. Tr. 558-59.

With respect to the first deficiency, Weinstein explained that Rose "us[ed] data that wasn't available at the time for any given order." Tr. 525. Weinstein testified that Rose's fixed-frame analysis took into account the entire time period of January 1, 2014 to April 30, 2018, to determine the outlier threshold and then compared all the orders against that threshold. Tr. 526-27. Weinstein understood Rose to testify that the Respondent could not have performed this analysis at the time it received an order in 2014, for example, because data from 2015-18 would not have been available at that time. Tr. 527. Weinstein testified that Rose's fixed-frame analysis is something a distributor could not do. Tr. 527. A distributor is obligated to evaluate an order for suspicious characteristics at the time the order is placed and the distributor cannot compare that order to transactions that have not yet occurred. Tr. 527-28. Weinstein opined that Rose's use of a fixed-frame analysis and failure to consider context renders his results unreliable. Tr. 528, 541. Weinstein also testified, however, that a fixed-frame analysis "wouldn't have an

---

[3] The Government's Demonstrative Exhibits are contained in ALJ-63, and will be cited to hereinafter as GDE. The Respondent's Demonstrative Exhibits, hereinafter RDE, are not contained in an ALJ exhibit, but they will be certified as part of the record and transmitted to the Acting Administrator in accordance with 21 C.F.R. § 1316.65(c).

impact on the results" was it not for some changes in the industry during the relevant time period. Tr. 528.

For Weinstein's review of Rose's analysis, he compared orders against transactions from the previous 12 months. Tr. 528-29, 659-60. Under this "look-back" approach where Weinstein looked back "only to the prior year, rather than to the full four years," Weinstein did not identify many of the orders identified in Rose's analysis. Tr. 528-29. Weinstein's analysis showed that over 60% of the orders from the seven exemplar pharmacies[4] in 2017 and 2018 identified as outliers by Rose "would not have been identified if compared only to the prior year." Tr. 529-31, 539. Further, about 50% of the orders from all customers identified by Rose as outliers in 2017-18 would not have been considered outliers if those orders were compared only to the prior year. Tr. 529-30, 568. Weinstein then testified about the results of comparing his analysis to Rose's analysis as represented on Respondent Demonstrative Exhibit 4. Tr. 537-38.

As for the second and third deficiencies, Weinstein testified that Rose did not consider the effects of hydrocodone's schedule change and the drugs' "item and package sizes." Tr. 526, 542. In late 2014 DEA rescheduled hydrocodone from Schedule III to Schedule II. Tr. 539. Because Schedule II is more restrictive than Schedule III, there were fewer orders for hydrocodone after it was rescheduled. Tr. 539. The fixed-frame method compared orders for hydrocodone in 2014 when it was a Schedule III drug to orders in 2015-18 when it was a Schedule II drug. Tr. 539-40. This means orders placed when hydrocodone was a Schedule III drug were identified as outliers based on a comparison to orders placed when hydrocodone was a Schedule II drug. Tr. 539-40. Weinstein also added that Rose's analysis did not take into account package size or formulation, such as pills or liquid form of the drug. Tr. 553, 557. In Weinstein's opinion, this consideration makes a difference. Tr. 553-54.

With respect to the fourth deficiency, Weinstein explained that he considered in his analysis whether a pharmacy placed all of its orders for a particular substance as one line item or as multiple line items. Tr. 543-44, 551-52. For example, looking at Respondent Demonstrative Exhibit 6, DEA identified an order of 2,000 dosage units of oxycodone placed by Bordelon's on March 12, 2018, as unusually large. Tr. 544-45. Weinstein noted, however, eight other orders of 2,000 dosage units of oxycodone placed by Bordelon's that DEA did not identify as unusually large. Tr. 544-45. The difference, Weinstein explained, is due to the fact that the March 12,

---

[4] Wallace, Bordelon's, Folse, Pharmacy Specialties, Dave's, Wellness, and Wilkinson. GDE, at 11.

2018 order was placed as a single line item for 2,000 dosage units while the other eight orders were for 2,000 dosage units broken across multiple line items. Tr. 544-45. For example, on March 22, 2017, Bordelon's ordered 2,000 dosage units of oxycodone broken down into two line items of 100 units, one line item of 300 units, one line item of 500 units, and one line item of 1,000 units. Tr. 545, 547-48.

In Weinstein's opinion, 2,000 dosage units of oxycodone was not an unusually large amount of oxycodone for Bordelon's to order, but it appeared unusually large compared to other orders for oxycodone that contained multiple line items of smaller amounts of the drug. Tr. 545-46. Weinstein opined that the order placed by Bordelon's on March 12, 2018, for 2,000 dosage units of oxycodone was not an outlier. Tr. 552. The only difference, in Weinstein's view, is how the order was entered into the system. Tr. 546. Because of this, Weinstein believes a distributor should look at the cumulative amount of a substance that is ordered and not individual line items. Tr. 546-47. Weinstein, however, did not incorporate this cumulative-based approach in any analysis he did in this case, including the analysis he conducted to produce the results reflected in Respondent Demonstrative Exhibit 4. Tr. 551.

Weinstein believes it is not possible to correct Rose's analysis for the problems caused by using a line item approach. Tr. 550, 552. In Weinstein's view, Rose's line item approach produced outliers that would not have been identified under the cumulative approach. Tr. 552. Weinstein also testified that Rose's line item approach misses outliers. Tr. 552-53. Ten thousand dosage units would be an "enormous" volume of controlled substances, but it would not be flagged by a line item approach if the 10,000 dosage units were ordered as 100 separate line items of 100 dosage units. Tr. 552-53.

An effective system for identifying suspicious orders, in Weinstein's opinion, should take a cumulative approach and consider factors such as package size, formulation, and brand name or generic versions of the drug. Tr. 554-57. A system that fails to take these types of factors into account may result in the distributor over-reporting orders that are not unusual and not suspicious. Tr. 556.

AGI began its work by developing "interim thresholds based on an enhanced statistical approach to evaluating Morris & Dickson's orders." Tr. 561. This involved establishing and implementing "item group thresholds for each customer by month." Tr. 561. Weinstein applied these interim thresholds to retail pharmacies and alternate care customers. Tr. 569. Weinstein

described an alternate care customer as a pharmacy that exclusively serves a particular facility or patient population and is not open to the general public to fill prescriptions on a walk-in basis. Tr. 570. The Respondent implemented the interim thresholds in May-June 2018 and kept them in place until October 2018 for retail pharmacies and January 2019 for alternate care customers. Tr. 570-71, 577, 667. The Respondent began operating an interim, automated SOM program within a few weeks of retaining AGI. Tr. 577-78. The Respondent implemented a permanent system for retail pharmacies on October 1, 2018, and a permanent system for alternate care customers on January 1, 2019. Tr. 579-80. Weinstein testified that comparing data from a retail pharmacy against an alternate care pharmacy is like comparing apples to oranges because they operate under different business models. Tr. 580, 639. In Weinstein's view, it is important to compare a pharmacy's orders to other pharmacies within the same peer group. Tr. 580-81.

Weinstein and AGI looked at DEA regulations on suspicious order monitoring, specifically 21 C.F.R. § 1301.74(b), and DEA guidance letters in designing the system for the Respondent. Tr. 626, 630, 634. Weinstein explained how the system looks for unusual size, deviations from a normal pattern, and unusual frequency. Tr. 627-29.

The Respondent's SOM program that Weinstein and AGI developed performs three core assessments: a monthly assessment based on the customer's ordering history; a monthly assessment comparing the customer to its peer group; and a daily assessment of "the highest priority item groups." Tr. 619. Respondent Demonstrative Exhibit 8 depicts how the peer group, own history, and daily assessments work in the Respondent's SOM system. Tr. 632-37. Other components of the system include peer and item group definitions. Tr. 619. The item groups are classified "into different levels of diversion risk that help determine exactly what statistical parameters are applied to each" item group. Tr. 572-76, 619. The item groups are divided into four categories of risk: priority (highest risk); high-risk subset consisting of oxycodone 30 mg; high risk; and other. Tr. 620-21. These risk classifications and their corresponding Tukey multipliers are depicted on Respondent Demonstrative Exhibit 9. Tr. 621-22, 655-56. When the SOM system identifies an outlier, the order is held for further review. Tr. 582, 625, 629. AGI has recommended to the Respondent the types of information it should look at when reviewing an outlier. Tr. 582. The Respondent looks at Enhanced Customer Profile data when an order is flagged. Tr. 641-42.

Weinstein testified that he continues to interact with the Respondent's staff, and members of the Respondent have provided feedback on how the system can be enhanced. Tr. 640, 643. In Weinstein's expert opinion, the Respondent is capable of identifying suspicious orders without outside assistance. Tr. 643.

Weinstein apparently was called as a witness for two reasons. First, Weinstein's testimony was presented to discredit the reliability of Rose's analysis concerning the number of outlier orders the Respondent had received between January 2014 and April 2018. Second, Weinstein's testimony was presented to demonstrate the effectiveness of the remedial measures the Respondent has taken to ensure that it is in compliance with laws and regulations concerning controlled substances.

With respect to the first reason, I do not find that Weinstein's testimony, or the Respondent's other evidence, discredits the reliability of Rose's analysis. I make this finding for several reasons. First, both experts agreed that the Tukey method is an appropriate method of statistical analysis to identify outlier transactions. Second, while Weinstein testified about four deficiencies in Rose's analysis, a close evaluation of those alleged deficiencies does not support Weinstein's premise. For example, Weinstein faulted Rose's analysis because Rose used a fixed-frame analysis rather than the look-back analysis Weinstein believes is superior, and Rose did not consider context. Yet Weinstein did not back up that assertion with convincing objective data, and he did not apply his look-back analysis to all of the available ARCOS date. When Rose accepted that challenge and used the look-back method to examine all of the relevant ARCOS data, the unrebutted results were substantially similar. Tr. 1091-92; GE-73-74. Those results significantly undercut all four of the deficiencies asserted by Weinstein. Third, the Respondent's own evidence undercuts Weinstein's assertions. In an effort to demonstrate its current and future compliance with DEA regulations, the Respondent introduced 58 suspicious order reports that it filed with the DEA in a period of less than three months. RE-20. In those 58 reports, the Respondent informed the DEA of about 3,915 suspicious orders. Thus, using a system designed by Weinstein, the Respondent identified close to 4,000 orders in less than 3 months, whereas Rose identified approximately 12,200 outlier orders that occurred over a period of 4 1/3 years. Granted, the Respondent only presented its suspicious order reports for the period from May 14, 2018 through July 29, 2018, but Weinstein testified that he had run the Respondent's sales data from a few months in early 2018, and he identified suspicious orders "in

a similar number to what's being identified currently." Tr. 666. Quite frankly, Weinstein's testimony did not refute Rose's analysis because the objective data is far more convincing than Weinstein's subjective expert testimony.

With respect to the second reason Weinstein was called as a witness, to demonstrate current and intended future compliance with DEA regulations, in part by using Weinstein's algorithms to identify suspicious orders, I find no reason to question his credibility. Certainly, Respondent Exhibit 20 serves as objective evidence of the effectiveness of those algorithms. I do note, however, an inconsistency in his testimony. While he testified that a distributor should evaluate each individual order at the time it is placed, Tr. 546, he also testified that in designing SOM systems, distributors should cumulate orders over time, such as a month's worth of orders. Tr. 555, 557.

Weinstein also testified that statistical analysis alone is not enough to *identify diversion*. Tr. 558-59. This misses the point of the statistical analysis, which was to identify suspicious orders for controlled substances based upon an order being significantly larger than normal. Distributers are to report "orders of unusual size," and that requirement is not linked to answering the question of whether the orders are being diverted for illegitimate purposes. The requirement is to report orders of unusual size, not orders of unusual size that the distributor identifies as being diverted. *See Masters Pharm., Inc.*, 80 Fed. Reg. at 55420, 55478. In addition, Weinstein's testimony that he had not seen guidance on red flags of dispensing diversion that state that a distributor cannot make subsequent shipments of controlled substances without resolving red flags of diversion, Tr. 649, suggests he either has not read, or does not understand, the *Masters* decision. Nevertheless, with the above caveats in the two preceding paragraphs, I find that Weinstein's testimony was sufficiently objective, plausible, and internally consistent. Therefore, I merit it as generally credible in this Recommended Decision, but give greater weight to the testimony of Mr. Rose.

The Respondent next presented the testimony of **Scott Irelan** ("Irelan"). Tr. 693-840. Irelan testified that the Respondent is a privately-held pharmaceutical distributor owned by the Dickson family and that the company has been in operation since 1841. Tr. 694-95. Irelan has worked for the Respondent for 31 years. Tr. 694. Irelan began his employment for the Respondent in 1988 working in the warehouse. Tr. 697. He then became a production manager and managed the Respondent's daily operations of shipping orders to customers. Tr. 697-98,

793. He became the senior operations manager at the end of 2017. Tr. 698, 793. As senior operations manager, Irelan had no involvement in ensuring compliance with DEA regulations. Tr. 698-99.

In May 2018, Irelan unofficially became the Respondent's Director of Corporate Compliance and Security ("Director"). Tr. 699, 791. It was unofficial because the Respondent did not have a corporate title for Director until officially creating that title in June or July 2018. Tr. 699, 791. Irelan's objective as Director is to ensure the Respondent has effective controls in place to prevent diversion. Tr. 700.

Irelan was not involved in the Respondent's due diligence before May 2018, but he "understood basic concepts of due diligence" to the extent it involved delivery drivers observing suspicious activity at stores. Tr. 710, 793. Irelan had no idea what a red flag was before May 2018. Tr. 793. Irelan also had no involvement in or responsibility for the Respondent's SOM system or for reporting suspicious orders from January 2014 to May 2018. Tr. 723, 731-32. He has an understanding, however, of how the Respondent handled suspicious orders based on his review of documents as Director, and his preparation for the hearing. Tr. 732.

As Director, Irelan learned about the Respondent's pre-May 2018 due diligence and compliance efforts by reviewing materials describing the Respondent's SOM system that was in place from January 2014 to May 2018. Tr. 727-28. Irelan also reviewed the company's pre-May 2018 software system when he assumed the role of Director. Tr. 710. The types of due diligence documents that Irelan reviewed are Pro-Compliance Reports, Market Basket Analyses, and information obtained by the Respondent's sales people and delivery drivers. Tr. 712, 719, 730. Irelan also testified later that the Respondent used the same information sources—Pro-Compliance Reports, Market Basket Analyses, and its employees—as the means of identifying suspicious orders. Tr. 730. Irelan testified that he was told by Pro-Compliance that information on Pro-Compliance Reports about the invalidity of a prescriber's DEA registration is not reliable. Tr. 766, 796-98.

Based on the documents he reviewed and the experience he has gained as Director, Irelan believes the Respondent's due diligence practices before May 2018 were insufficient, primarily because the due diligence documentation was "not properly maintained to be . . . easily retrievable." Tr. 720. Irelan also testified that although the Respondent conducted due diligence, that information was not applied at the order level. Tr. 720-21.

Irelan testified that before May 2018 the Respondent conducted "a tremendous amount of due diligence" of its customers. Tr. 704-05. The Respondent, however, did not keep the due diligence documentation "in such a way as to make it . . . easily accessible." Tr. 705, 720. There were due diligence notes on paper, in a database, and in the enhanced customer profile ("ECP"). Tr. 710, 741. Information from the Market Basket Analyses was stored in the ECP. Tr. 715. Irelan acknowledged that prior to becoming the Director he was not in a position to be involved with the Respondent's due diligence efforts, and that his testimony about those efforts before he became the Director was based upon his review of the Respondent's records. Tr. 710.

Irelan testified that he accepts responsibility on the Respondent's behalf for preventing reoccurrence of the Respondent's past failures regarding due diligence; for preventing reoccurrence of the failures of Respondent's old SOM system; and that he accepts responsibility on the Respondent's behalf for correcting the Respondent's failure to report suspicious orders and for preventing the reoccurrence of the Respondent's failure to report suspicious orders. Tr. 721-22, 731-32.

Irelan also testified that he accepts responsibility on the Respondent's behalf for the company's failure to apply its due diligence to orders of controlled substances; for the Respondent's failure to report suspicious orders; for shipping orders without resolving red flags; for the Respondent's SOM system being inconsistent with best practices; and for the Respondent having an insufficient compliance system from January 2014 to May 2018. Tr. 722-23, 730-33, 806-07.

On cross-examination, Irelan testified about specific paragraphs in the Order to Show Cause, and explained why Respondent could or could not accept responsibility for them. Tr. 813, 816-18, 824-25, 827-28, 830-31. Irelan stated he was not in a position to say whether Respondent accepted responsibility for allegations in some paragraphs. Tr. 821-23, 829-30, 832-33.

Irelan testified about the Respondent's old SOM system that was in place from January 2014 to May 2018. Tr. 728-30, 737-38, 740-46, 778. In Irelan's view, the Respondent's pre-May 2018 version of ECP was not as robust as it is currently. Tr. 737-38, 740. Irelan also testified why, in his opinion, the Respondent's old SOM system was inconsistent with best practices. Tr. 729-30, 778.

Irelan then testified about the Respondent's current SOM and ECP systems. Irelan testified about the Respondent's efforts to correct its past failures. Tr. 733. These efforts included recruiting a team of experts and implementing the thresholds developed by Weinstein. Tr. 733-34. The Respondent currently documents its due diligence of suspicious orders in the ECP. Tr. 737. Irelan described ECP as a "one-stop electronic dashboard for all customer due diligence" that presents information in an "instantly retrievable" format. Tr. 737. In his testimony, referring to screenshots in Respondent Exhibit 23A, Irelan offered detailed descriptions of how the current ECP system works, including commentary on how it improved upon the old system. Tr. 747-68. Irelan's testimony highlighted that one of the advantages of the Respondent's current ECP system is that it allows the Respondent to keep all of its due diligence information in an easily accessible format. Tr. 765. Irelan also testified about the process that occurs after the ECP system flags an order as suspicious. Tr. 770-71, 774, 776, 778. He added that the Respondent's current policy is to cancel most suspicious orders. Tr. 770-71, 776. As for reporting suspicious orders, Irelan testified that the Respondent sends a daily email to Group Supervisor Dunn at DEA with an attached Excel spreadsheet that lists all the flagged orders from the previous day. Tr. 779-83.

Irelan presented his testimony in a professional, candid, and straightforward manner. Several aspects of his testimony, however, are cause for concern. I give no weight to Irelan's opinion that the Respondent had conducted a "tremendous" amount of due diligence prior to May 2018. Tr. 704-05, 710. I give it no weight because his testimony is based upon his review of the Respondent's records. Tr. 710. In answering the question of whether those records support a finding that the Respondent had conducted a tremendous amount of due diligence, the records speak for themselves. Irelan's opinion of what the documents say is not relevant.

Second, Irelan was not in a position to be involved with the Respondent's due diligence efforts prior to becoming Director, and virtually all of his testimony about those efforts was based upon a review of the Respondent's records. Tr. 710. Much of Irelan's testimony about those efforts is simply his opinion about what those records demonstrate. I give limited weight to such opinion testimony. *See Wheatland Pharmacy*, 78 Fed. Reg. 69441, 69444 n.11 (2013) (giving no weight to affidavits in which the affiants had relied on hearsay).

I also give little weight to Irelan's testimony concerning his authority to terminate Guidepost Solution's relationship with the Respondent, or to settle lawsuits filed against the

Respondent. Irelan testified that he is the one who would decide to terminate the services of Guidepost. Tr. 803. He then testified that he assumed that "something of this nature would go to the Board." Tr. 804, 837. He also acknowledged that Paul Dickson, Sr., could terminate Guidepost any time he wanted to, or the Board could do so without his input. Tr. 804-05, 840. Irelan also testified that he could sign a settlement on behalf of the Respondent were the company to be sued, but then acknowledged that he had never done so. Tr. 837-39. In short, while Irelan asserted that he had the authority to terminate Guidepost and to settle lawsuits, his follow-up testimony significantly undercut his credibility concerning those assertions. Nevertheless, other than the above exceptions, Irelan's testimony was sufficiently objective, plausible, and internally consistent. Therefore, I merit it as generally credible in this Recommended Decision.

The last witness called by the Respondent was **Louis Milione** ("Milione"). Tr. 841-1057. He is currently the Senior Managing Director of Guidepost Solutions ("Guidepost"), a company that provides consulting services related to compliance issues concerning the Controlled Substances Act. Tr. 842-43. Milione is in charge of that portion of Guidepost's operation. Tr. 843. Paul Dickson, Sr., hired Guidepost in early May 2018. Tr. 844, 1011. Milione has provided similar consulting services to four or five other companies. Tr. 845. Before working for Guidepost, Milione was DEA's Assistant Administrator in the Diversion Control Division for two years. *Id.* Milione spent about 21 years with the DEA starting out as a special agent. Tr. 846. He retired from the DEA in June 2017. Tr. 940-41. As the Assistant Administrator, Milione had programmatic control over the Diversion Control Division. *Id.* The Respondent offered Milione as an expert "in diversion." Tr. 851. There being no objection from the Government, he was so recognized. *Id.*

Milione testified concerning when he first met Paul Dickson, Sr., and about a follow-up meeting Dickson invited him to at the Respondent's facilities in Shreveport, Louisiana. Tr. 852-53. Milione testified about attending the meeting, along with several other DEA employees in August 2016. Tr. 856-57, 941. At the meeting the Respondent discussed its suspicious order monitoring program, utilizing a Power Point presentation. Tr. 861, 864-870, 976, 1013-14.

Milione testified that after DEA issued an ISO to the Respondent, he contacted Paul Dickson, Sr. Tr. 877-78. Shortly thereafter, the Respondent retained Milione's firm, Guidepost, to enhance the Respondent's compliance system, to include its SOM system. Tr. 878-79.

Milione then discussed the work Guidepost has performed for the Respondent, detailing seven areas in which the Respondent's compliance has been improved. Tr. 882-900, 1008-09. In Milione's opinion, the Respondent's reporting of suspicious orders had been insufficient, Tr. 989, and the Respondent should have filed reports concerning pharmacies it had terminated as customers based upon the Respondent's SOM system. Tr. 1015-16.

Having observed Milione's demeanor on the witness stand, and assessing the content of his testimony against other evidence of record, I find his testimony was presented in an objective and unbiased manner. I, however, give no weight to his assessment of the commitment or sincerity of the Respondent's employees concerning their intent to comply with DEA regulations prior to issuance of the OSC. I do so because it is opinion evidence and because intent is not an issue. Further, I give no weight to the Government ethics/conflict-of-interest issue raised by the Government in its cross-examination of Milione. Tr. 945-52. I do so because issues concerning whether Milione needed permission from the DEA to testify in this case, or whether his testimony may have violated regulations or statutes, are not issues before me.

I have assessed Milione's testimony as I would the testimony of any other witness and, despite his interest in the case as a hired consultant to the Respondent, I find that he is a credible witness. I, however, give limited weight to Milione's testimony concerning whether a suspicious order report would be required when a distributor had knowledge that a pharmacy was dispensing controlled substances at a higher rate than the national average, or whether a significant number of its customers were paying cash for controlled substances, or whether a distributor is required to resolve red flags and document its due diligence efforts. I do so because I find his testimony regarding those issues to be inconsistent with published decisions of the DEA.

## THE FACTS

### I.    Stipulations

The Parties agree to **47** stipulations ("Stip."), which are accepted as facts in these proceedings:

1.    Respondent is currently registered with the DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RM0314790 at 10301 Highway 1 South,

Shreveport, Louisiana 71115. [As of the date this stipulation was entered into, t]his Certificate of Registration expire[d] by its own terms on January 1, 2019. ALJ-9; Tr. 10.

2. Respondent, d/b/a Spark Drug, Inc., is currently registered with the DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RM0335732 at 336 Saint George Avenue, Jefferson, Louisiana 70121. [As of the date this stipulation was entered into, t]his Certificate of Registration expire[d] by its own terms on January 1, 2019. *Id.*

3. Respondent is currently licensed with the Louisiana Board of Drug and Device Distributors under License No. 4299 at 10301 Highway 1 South, Shreveport, Louisiana 71115. [As of the date this stipulation was entered into, t]his license expire[d] by its own terms on December 31, 2018. *Id.*

4. Respondent, d/b/a Spark Drug, Inc., is currently licensed with the Louisiana Board of Drug and Device Distributors under License No. 2015 at 336 Saint George Avenue, Jefferson, Louisiana 70121. [As of the date this stipulation was entered into, t]his license expire[d] by its own terms on December 31, 2018. *Id.*

5. Oxycodone is listed by the DEA as a Schedule II controlled substance. *Id.*

6. Until October 6, 2014, hydrocodone was listed by the DEA as a Schedule III controlled substance. Since October 6, 2014, hydrocodone is listed by the DEA as a Schedule II controlled substance. *Id.*

7. Between January 1, 2014 and May 1, 2018, Respondent submitted a total of three suspicious order reports to the DEA. *Id.*

8. DEA maintains the Automation of Reports and Consolidated Orders System ("ARCOS"), which is an automated system developed and designed to allow DEA to maintain a current and historical record of selected controlled substance inventories and transactions from the point of manufacture to the point of sale, distribution, or other disposition, and finally, to the dispensing (consumption) level. *Id.*

9. Respondent is required to report to the ARCOS system shipments of all controlled substances in Schedule I and II and all narcotic controlled substances in Schedule III. *Id.*

10. Respondent reports its shipments of all controlled substances in Schedule I and II and all narcotic controlled substances in Schedule III to the ARCOS system on a monthly basis. *Id.*

11.   From at least October 1, 2017 until at least April 30, 2018, Respondent supplied the Wallace Drug Company (DEA No. FW6006363) with controlled substances, including oxycodone and hydrocodone. *Id.*

12.   From at least January 2014 until at least April 30, 2018, Respondent supplied the Bordelon's Super-Save Pharmacy (DEA No. AB6203549) with controlled substances, including oxycodone and hydrocodone. *Id.*

13.   From at least January 2014 until at least April 30, 2018, Respondent supplied the Folse Pharmacy (DEA No. BF0636451) with controlled substances, including oxycodone and hydrocodone. *Id.*

14.   From at least January 2014 until at least April 29, 2018, Respondent supplied Pharmacy Specialties Group (DEA No. FP4243589) with controlled substances, including oxycodone and hydrocodone. *Id.*

15.   From at least January 2014 until at least May 1, 2018, Respondent supplied the Dave's Pharmacy (DEA No. BD5662386) with controlled substances, including oxycodone and hydrocodone. *Id.*

16.   From at least April 2017 until May 2017, Respondent supplied Hephzibah Pharmacy LLC (DEA No. AV5145695) with controlled substances, including oxycodone and hydrocodone. ALJ-9; Tr. 10-11.

17.   From at least January 2014 until December 2017, Respondent supplied the Wellness Pharmacy (DEA No. BT7485166) with controlled substances, including oxycodone and hydrocodone. ALJ-9; Tr. 10.

18.   By letter dated December 16, 2017, the Wellness Pharmacy reported that it had gone out of business and retired its DEA Certificate of Registration. *Id.*

19.   From at least January 2014 until April 2017, Respondent supplied the Wilkinson Family Pharmacy (DEA No. FW3669198) with controlled substances, including oxycodone and hydrocodone. *Id.*

20.   On April 19, 2017, the Wilkinson Family Pharmacy voluntarily surrendered its DEA Certificate of Registration for cause. *Id.*

21.   On November 15, 2017, DEA conducted a periodic audit at Respondent's facilities. *Id.*

22.   On February 1, 2018, DEA served an administrative subpoena on Respondent seeking records pertaining to suspicious order reports filed by Respondent as well as records and

documents pertaining to due diligence or internal investigations conducted on possible suspicious orders for controlled substances from January 1, 2016 to February 1, 2018. *Id.*

23.    On February 2, 2018, DEA served an administrative subpoena on Respondent seeking records pertaining to the distribution of controlled substances to Wilkinson Family Pharmacy (Registration No. FW3669198) from June 1, 2015 through June 1, 2017. *Id.*

24.    On April 11, 2018, DEA served an administrative subpoena on Respondent seeking records reflecting Respondent's policies, guidance, and/or training for its employees with respect to the identification, investigation, and reporting of suspicious or potentially suspicious orders. *Id.*

25.    On May 2, 2018, the DEA Acting Administrator issued an Order to Show Cause and Immediate Suspension of Registration (the "ISO") to Respondent, immediately suspending both Registration Nos. RM0314790 and RM0335732. *Id.*

26.    On May 18, 2018, the DEA Acting Administrator rescinded the ISO issued on May 2, 2018, to the Respondent's Certificate of Registration numbers RM0314790 and RM0335732. Tr. 12.

27.    On May 29, 2014, DEA conducted a periodic audit at Respondent's Shreveport facility. [Proposed] Respondent Exhibit 9 is a true and accurate copy of a Notice of Inspection issued by DEA on May 29, 2014. ALJ-21; Tr. 11. [This exhibit was not offered as evidence.]

28.    On October 27, 2015, DEA conducted a periodic audit at Respondent's Shreveport facility. [Proposed] Respondent Exhibit 10 is a true and accurate copy of a Notice of Inspection issued by DEA on October 27, 2015. *Id.* [This exhibit was not offered as evidence.]

29.    On November 15, 2017, DEA conducted a periodic audit at Respondent's Shreveport facility. [Proposed] Respondent Exhibit 12 is a true and accurate copy of a Notice of Inspection issued by DEA on November 15, 2017. *Id.* [This exhibit was not offered as evidence.]

30.    [Proposed] Government Exhibit 1 is a complete and accurate copy of Respondent's DEA Certificate of Registration No. RM0314790. *Id.* [This exhibit was not offered as evidence.]

31.  [Proposed] Government Exhibit 2 is a complete and accurate copy of Respondent's DEA Certificate of Registration No. RM0335732. *Id.* [This exhibit was not offered as evidence.]

32.  Government Exhibit 3 is a complete and accurate copy of a letter from the then-Deputy Assistant Administrator, Office of Diversion Control, addressed to all distributor registrants dated September 27, 2006. *Id.*

33.  Government Exhibit 4 is a complete and accurate copy of a letter from the then-Deputy Assistant Administrator, Office of Diversion Control, addressed to all distributor registrants dated December 20, 2007. *Id.*

34.  [Proposed] Government Exhibit 5 is a true and accurate copy of a letter from the then-Deputy Assistant Administrator, Office of Diversion Control, addressed to all distributor registrants dated June 12, 2012. *Id.* [This exhibit was not offered as evidence.]

35.  Government Exhibit 6 is a true and accurate copy of three suspicious order reports submitted by Respondent to DEA, dated April 7, 2014; April 26, 2017; and April 26, 2017. *Id.*

36.  Government Exhibit 7 is a true and accurate copy of Administrative Subpoena No. GH-18-326222, issued February 1, 2018 (and certificate of service) served by DEA on Respondent. *Id.*

37.  Government Exhibit 8 is a true and accurate copy of Administrative Subpoena No. GH-18-327442, issued February 2, 2018 (and certificate of service) served by DEA on Respondent. *Id.*

38.  Government Exhibit 9 is a true and accurate copy of a written response by Respondent to DEA's administrative subpoenas contained in Government Exhibits 7 and 8 and received by DEA on or about February 23, 2018. *Id.*

39.  Government Exhibit 10 is a true and accurate copy of an email from David Lemoine to Jacob Dickson, dated March 16, 2018. *Id.*

40.  Government Exhibit 11 is a true and accurate copy of Respondent's written response to the email contained in Government Exhibit 10. *Id.*

41.  Government Exhibit 12 is a true and accurate copy of an email from Robin Hogue to Jacob Dickson, dated April 4, 2018. *Id.*

42.    Government Exhibit 13 is a true and accurate copy of a letter from Paul Dickson to Robin Hogue, dated April 9, 2018. *Id.*

43.    Government Exhibit 15 is a true and accurate copy of Administrative Subpoena No. GH-18-531012, issued April 11, 2018 (and certificate of service) served by DEA on Respondent. *Id.*

44.    Government Exhibit 16 is a true and accurate copy of a letter from Jacob Dickson to Robin Hogue, dated April 26, 2018. *Id.*

45.    Government Exhibit 19 is a true and accurate copy of a letter from Jacob Dickson to the "Agent in charge" of the New Orleans Division received on or about April 27, 2018. *Id.*

46.    Respondent Exhibits 20.001 through 20.115 are a complete and accurate recording of flagged orders reported by Respondent to the attention of Joel L. Dunn of the DEA New Orleans Field Division between May 14, 2018 through July 30, 2018. *Id.*

47.    Respondent Exhibits 20.001 through 20.115 are records of regular reporting made and transmitted to DEA; the data was kept in the course of a regularly conducted activity at Respondent and it was a regular practice of Respondent to create and transmit these records. *Id.*

## II.    Findings of Fact

### A Distributor's Regulatory Obligations

1.    Government Exhibit 3 is a September 27, 2006, letter that the DEA sent to distributors of controlled substances. Tr. 62-63; GE-3, at 1. Respondent received a copy of the letter. Tr. 63. The letter reminded distributors of their "responsibilities . . . in view of the prescription drug abuse problem our nation currently faces." GE-3, at 1. The letter reminded distributors of their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," and their duty to report suspicious orders to the DEA upon discovering the suspicious order. *Id.* at 2. In addition, the letter reminded distributors of their duty to exercise due diligence to avoid filling suspicious orders. *Id.* In addition, the letter provided distributors 14 examples of a customer's behavior that might be indicative of diversion. *Id.* at 3. The letter states that these examples are not all-inclusive. *Id.* The same letter was sent a second time on February 7, 2007. Tr. 64-65; GE-69.

2.  Government Exhibit 4 is a December 20, 2007, letter that the DEA sent to every distributor of controlled substances. Tr. 63-64; GE-4, at 1. The purpose of this letter was to remind distributors of the requirement to inform the DEA of suspicious orders. GE-4, at 1. The letter reminded distributors that in addition to "maintain[ing] effective controls against diversion," that they are also required to "report suspicious orders of controlled substances." *Id.* The letter instructed that such orders were to be reported "<u>when discovered</u> by the registrant." *Id.* (emphasis in original). The letter also reminded distributors "that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels." *Id.*

3.  The DEA maintains an Automation of Reports and Consolidated Orders System ("ARCOS"). Tr. 69-70. Distributors are required to report to ARCOS all shipments of controlled substances in Schedules I and II and all narcotic controlled substances in Schedule III. Stip. 9; Tr. 70.

4.  In April 2008, the DEA met with the Respondent (Paul Dickson) and discussed with him the legal obligations and requirements of a distributor, to include suspicious order requirements, the need to know its customers, and the need to do due diligence. Tr. 67-68. At the time, the DEA reviewed the ARCOS data with the Respondent to show them customers who had anomalies. Tr. 68-69.

5.  In 2013 and 2015, the DEA conducted distributor conferences and Jacob Dickson attended both conferences. Tr. 66-67. At one conference he was listed as the Respondent's president, and at the other conference he was listed as the Respondent's compliance officer. Tr. 67. The purpose of the conferences was to review laws and regulations. Tr. 66. The conferences included discussions of suspicious order monitoring and the requirement to "know your customer." Tr. 67.

6.  As part of its duty to maintain effective controls against diversion, a distributor is required to know its customers. Tr. 57-58. A distributer is required to know the customer's business activity and if the customer has a DEA registration. *Id.*

7.  A distributor is required to design and operate a system to detect suspicious orders of controlled substances. Tr. 58; 21 C.F.R. § 1301.74(b). This is a continuous process. *Id.*

8.    A distributor is not required to have a new customer fill out a questionnaire, but it would be helpful.  Tr. 77.  Using a questionnaire would be indicative of a distributor getting to know its customer.  Tr. 78.

9.    A distributor should check to see which physicians are the high-volume dispensing physicians for a customer pharmacy.  Tr. 79-80.

10.   A distributor should request the dispensing records of a pharmacy, and review those records.  Tr. 80.

11.   A distributor should check to see if its customer pharmacies are appropriately licensed.  Tr. 81.

12.   A suspicious order includes orders of unusual size or frequency, or those deviating from a normal ordering pattern.  Tr. 59, 479-80; 21 C.F.R. § 1301.74(b).  An order is suspicious if it meets any one of these criteria.  Tr. 647.  These are not the only criteria, however, that can be used to identify a suspicious order.  Tr. 58, 479-80, 647; 21 C.F.R. § 1301.74(b).  There are things that would require a distributor to send a suspicious order report to the DEA other than orders of unusual size, pattern, or frequency.  Tr. 1033-34.

13.   A system for identifying a suspicious order would be insufficient if it only flagged an order based on whether the order exceeded a certain percentage compared to the prior month's order (e.g., ten times more than the prior month).  Tr. 321-22, 482, 652; GE-4, at 2.

14.   A distributor does not need to believe a suspicious order is being diverted in order to trigger the distributor's obligation to report that order to DEA under 21 C.F.R. § 1301.74(b).  Tr. 497-98.

15.   The DEA does not endorse any particular system for identifying suspicious orders.  Tr. 59-60, 76, 210, 497, 646.  A distributor could use a manual system to detect suspicious orders.  Tr. 76-77, 497.

16.   A distributor is required to notify the DEA upon discovering that an order is suspicious.  Tr. 60-61, 85-87, 283, 479, 497, 1024; 21 C.F.R. § 1301.74(b).

17.   A distributor should evaluate every individual order at the time it is placed.  Tr. 527-28, 546.  A distributor, however, cannot compare that order to transactions that have not yet occurred.  Tr. 527-28.

18.    If through its own due diligence or from a reliable third party, a distributor learns that a pharmacy customer has been filling prescriptions written by a doctor whose DEA registration cannot be verified, and the pharmacy has submitted an order for controlled substances to the distributor, the distributor should submit a suspicious order report to the DEA. Tr. 1025-28.

19.    If a distributor receives reliable information that a customer pharmacy is dispensing controlled substances at a higher percentage rate than the national average, the distributor should investigate to determine why the pharmacy's percentage is high. Tr. 1028-33. Milione testified, however, that such information alone would not require the submission of a suspicious order report to the DEA. Tr. 1032-33.

20.    In Milione's opinion, if a distributor receives reliable information that a pharmacy customer is filling prescriptions for cash at a higher rate for controlled substances than for non-controlled substances, an order for controlled substances from that pharmacy is not necessarily a suspicious order. Tr. 1036-37.

21.    The distributor is obligated to report to DEA a suspicious order even if the distributor resolves the red flags that made the order suspicious. Tr. 480-81.

22.    Red flags for distributors include a pharmacy that: dispenses a high volume of narcotics; dispenses the trinity drug cocktail; dispenses disproportionally more controlled substances than non-controlled substances; fills prescriptions for customers who live far away from the pharmacy; fills prescriptions for a high volume of patients who pay for prescriptions in cash; fills prescriptions for practitioners whose DEA registrations cannot be verified; fills a disproportionate volume of controlled substance prescriptions written by only a few prescribers; and orders excessive quantities of a limited variety of controlled substances. Tr. 297, 299-301, 335, 411, 427, 489-90, 648-49, 681, 1037. Weinstein testified that red flags are visible in a pharmacy's dispensing data and not its ordering data. Tr. 679.

23.    Distributors should be aware of a pharmacy's relative volume of purchases of controlled versus non-controlled substances. Tr. 648. Fifteen percent[5] is considered the high end in

---

[5] *But see Masters Pharm., Inc.*, 80 Fed. Reg. 55418, 55480 (2015), *pet. for rev. denied, Masters Pharm., Inc. v. DEA*, 861 F.3d 206 (D.C. Cir. 2017) ("[I]n the *Southwood* decision, . . . the Agency had noted that the ratio of controlled to non-controlled substances dispensed by a typical retail pharmacy ranged up to 20 percent for controlled versus 80 to 90 percent for non-controlled drugs." (citing *Southwood Pharm., Inc.*, 72 Fed. Reg. 36487 (2007)));

terms of the percentage of prescriptions that a pharmacy fills that are controlled substances versus non-controlled substances. Tr. 327, 461. Any amount over 15% is a red flag. Tr. 351, 461.

24. Because 9% of the population does not have health insurance, it is a red flag if more than 9% of a pharmacy's controlled substance prescriptions are paid for in cash.[6] Tr. 327-28, 354, 427, 474, 494. Patients engaged in diversion prefer to pay in cash to avoid detection by insurance companies. Tr. 494-95.

25. Oxycodone, hydrocodone, benzodiazepines, and muscle relaxers, such as Soma, are all controlled substances that are sought for illicit use. Tr. 52.

26. A trinity drug cocktail consists of an opioid, such as hydrocodone, a benzodiazepine, such as alprazolam, and a muscle relaxant, such as Soma. Tr. 55, 300. The term, "trinity drug cocktail" is recognized in the registrant community. *Id.* It is still considered a trinity drug cocktail even if each element of the cocktail was prescribed by a different prescriber. Tr. 344.

27. It is a red flag where a prescriber's DEA registration number cannot be verified. Tr. 337-38, 341, 354.

28. A pharmacy's increase in dispensing oxycodone or hydrocodone, without an increase in other drugs, could be a red flag.[7] Tr. 364, 471-72.

29. A distributor should be concerned about a pharmacy that increases its orders for a particular controlled substance when it does not have a similar increase in orders for other medications. Tr. 471-74.

30. The presence of a red flag triggers a distributor's obligation to conduct due diligence. Tr. 295, 298, 301-02, 411, 426-27, 477, 496. When a distributor sees red flags on a Pro-

---

Tr. 462. The actual language in *Southwood*, however, is that a witness had testified that "in a typical retail pharmacy, controlled substances might amount to between five and twenty percent of the pharmacy's purchases with the other eighty to ninety (sic) percent of its purchases being non-controlled drugs." 72 Fed. Reg. at 36492. It is not clear from the *Southwood* decision that the "between five and twenty percent" is a factual finding, a legal conclusion, or just a reference to a witness' testimony. In this case, an expert witness testified that anything over 15% would be a red flag. Tr. 351. While that witness later acknowledged the 20% referenced in *Masters*, Tr. 461-62, nothing in this Administrative Record contradicts his expert testimony that anything over 15% would be a red flag. Furthermore, a Pro-Compliance Report stating that 17% "is slightly higher than national averages," GE-21, at 6, lends support to the testimony of the expert that anything over 15% would be a red flag.

[6] *But see* GE-27, at 26 (Pro-Compliance Report stating "cash payments for CS prescriptions (14%) is consistent than (sic) national averages"). Nevertheless, the unrebutted expert testimony in the Administrative Record is that more than 9% is a red flag.

[7] While the testimony was that such an increase could be a red flag, where the increase is significant it is a red flag. Tr. 471-72.

Compliance[8] Report, the distributor is obligated to exercise due diligence in investigating those red flags. Tr. 295, 298, 301-02, 328, 426-27, 474, 484, 492-93.

31.    When a distributor receives a Pro-Compliance Report that raises red flags, the distributor should conduct additional due diligence concerning those red flags. Tr. 474.

32.    Milione testified that it would not be necessary to resolve all red flags with established customers before shipping controlled substances to a customer, but with new customers red flags should be resolved. Tr. 1038-43, 1051.

33.    Even with established customers, if a distributor does not have records to show prior due diligence, a distributor needs to resolve red flags "almost like the new account question." Tr. 1052.

34.    A distributor must document the due diligence it conducts. Tr. 298, 302, 465, 474, 484, 493, 1037; *see* Tr. 1041 (Milione testifying that documentation, while not required by regulation, is a best practice). It would be difficult for a distributor to prove that it conducted due diligence if it failed to document the steps it took to resolve a red flag. Tr. 298-99, 302-03, 412, 484.

35.    Conducting due diligence of a pharmacy or practitioner could involve visiting a customer's physical location; asking the customer about red flags; looking at open-source information; considering whether the customer specializes in a particular patient population; reviewing a doctor's prescribing patterns; reviewing the percentage of payments that are cash; or reviewing the demographics of a customer, such as its location, proximity to hospitals or surgical centers, and the population it serves. Tr. 392-93, 410-11.

36.    As part of its due diligence, a distributor should request customer pharmacies to provide documentation of the pharmacies' efforts to resolve red flags. Tr. 475.

37.    It is appropriate for a distributor to ask a pharmacist about a particular prescribing practitioner. Tr. 394.

38.    Conducting a second analysis of a pharmacy's dispensing data six months after running the first analysis could be considered additional due diligence. Tr. 421.

---

[8] The Respondent received Pro-Compliance Reports. Tr. 93, 126. Pro-Compliance is an independent company that provides an analysis of a pharmacy's dispensing. GE-9, at 2.

39.   Even if a distributor conducts additional due diligence after identifying red flags, a distributor may not ship an order for controlled substances unless all the red flags have been resolved. Tr. 302, 328, 471, 476, 484. It would not be proper to ship an order of controlled substances before resolving all red flags. Tr. 302, 471. For example, if a distributor identifies that a customer pharmacy is dispensing an unusually high volume of oxycodone, the distributor should conduct due diligence to ensure those prescriptions are "going to a legitimate medical purpose." Tr. 298.

40.   If a customer's Pro-Compliance Report for one month raises red flags, and then the next month the customer places an order for controlled substances that is not suspicious in and of itself, a distributor should not ship that order unless the red flags from the previous month's Pro-Compliance Report have been resolved. Tr. 477-78. In other words, red flags from one month do not necessarily render an order made the following month suspicious, but a distributor is still obligated to resolve prior red flags before shipping future orders of controlled substances, even if those orders are not suspicious. Tr. 477-78.

41.   It is appropriate for a distributor to provide a pharmacy with an analysis of the pharmacy's dispensing, such as Pro-Compliance Reports, and to discuss red flags with the pharmacy. Tr. 393-94, 449.

42.   A distributor is not to ship an order that it has identified as suspicious if it is not able to resolve the concern about why the order was thought to be suspicious. Tr. 61-62, 85, 294.

43.   If the distributor fails to report a suspicious order, DEA has "no way of knowing it occurred" and cannot investigate that order. Tr. 283-84, 498.

**DEA's Investigation of Respondent & Respondent's Response to DEA Subpoenas**

44.   In 2017, the DEA in New Orleans was looking into pharmacies in Louisiana that sold high volumes of oxycodone and hydrocodone. Tr. 92. A common denominator of some of those pharmacies was that the Respondent was their supplier. *Id.* The DEA then conducted a cyclical audit of the Respondent, which lasted two days. Tr. 92-93.

45.   During the cyclical audit, the Respondent informed DEA that it used a company called Pro-Compliance to help identify suspicious orders. Tr. 93. The Respondent also stated

that it relied on its employees who filled the orders and on its drivers who delivered the orders to help identify suspicious orders. *Id.*

46.    The DEA served the Respondent with a subpoena, dated February 1, 2018, seeking the Respondent's documentation concerning any suspicious order reports it filed, and any documentation concerning its due diligence efforts or internal investigations conducted on possible suspicious orders from January 1, 2016, to February 1, 2018. Tr. 96-97; GE-7.

47.    The DEA served the Respondent with a subpoena, dated February 2, 2018, seeking the Respondent's records pertaining to the distribution of controlled substances to Wilkinson Family Pharmacy, to include due diligence files, from June 1, 2015, through June 1, 2017. Tr. 98-99; GE-8.

48.    In response to the DEA's February 2018 subpoenas, the Respondent sent an undated letter to DEA. GE-9; Tr. 99, 318. The letter was signed by Jacob Dickson, who identified himself as the Respondent's Vice President and suspicious order monitoring ("SOM") Manager. GE-9, at 5.

49.    The undated letter states that the Respondent submitted only two suspicious order reports to DEA because it "utilizes a pro-active approach to avoid diversion of controlled drugs, including:   screening new pharmacy customers; aggressively monitoring orders for controlled drugs; and eliminating pharmacy customers who fill orders for controlled drugs in excess of acceptable ratios, accept cash payments, prescribe the 'Holy Trinity' and/or other unacceptable practices." GE-9, at 1; Tr. 319.

50.    The undated letter also states that "DEA and applicable regulations do not require that a wholesale distributor maintain records of each and every internal investigation conducted on <u>possible</u> suspicious orders." GE-9, at 1-2 (emphasis in original); Tr. 319-20. In Dunn's opinion, this statement does not comply with what DEA requires of distributors because DEA has case law establishing that distributors are required to keep records of its investigations into suspicious orders. Tr. 320. Specifically, Dunn stated that the *Masters*[9] and *Southwood*[10] Final Orders stand for the proposition that distributors are required to maintain records of suspicious order investigations. Tr. 320. The letter

---

[9] *Masters Pharm., Inc.*, <u>80 Fed. Reg. 55418</u> (2015), *pet. for rev. denied*, <u>861 F.3d 206</u> (D.C. Cir. 2017).
[10] *Southwood Pharm., Inc.*, <u>72 Fed. Reg. 36487</u> (2007).

further explained that once the Respondent had cleared a possible suspicious order, "no record is maintained." GE-9, at 2.

51.    The undated letter explained that the Respondent used a "four-fold approach to monitor all prescription drug orders and detect unusual ordering patterns, amounts, and cash payments to identify potentially suspicious orders." GE-9, at 2; Tr. 321. The four-fold approach included: use of Pro-Compliance Reports; preparing a Market Basket Report of each customer on a monthly basis; since April 2017 use of software that identifies orders that are more than 10 times the "average dosage units ordered on a given drug on a certain day with the last 90 days of ordering patterns of the same drug"; the experience of the employees who fill the orders for controlled substances; and the input of delivery drivers and salesmen. GE-9, at 3-4.

52.    The undated letter says that the Respondent has an excessive order prevention software program in a beta-testing stage that is designed to identify orders of controlled substances that are 10 times the average. GE-9, at 3; Tr. 321. Identifying orders that are 10 times the average is arbitrary, and an order could be suspicious if it were 8 or 9 times the average. Tr. 322, 482.

53.    The undated letter says that "[o]n-the-ground employees often submit photos of the premises and photos of the store owner to the Compliance Officer." GE-9, at 4; Tr. 322. In the documents the Respondent produced to DEA, Dunn did not see any photographs. Tr. 322, 439.

54.    The undated letter describes three potentially suspicious orders identified by the Respondent's Compliance Officer that the Respondent stated were ultimately determined to be not suspicious. GE-9, at 4. The letter also mentions examples of pharmacies "mistakenly keying incorrectly high order quantities." GE-9, at 4. The letter says that in each example the Compliance Officer "spoke to the pharmacist" and "corrected the order before shipment." GE-9, at 4. This policy does not comply with DEA regulations and these orders should have been reported to DEA. Tr. 323, 478-79. This policy does not comply with DEA regulations because if a pharmacy places a suspicious order, the distributor cannot avoid its obligation to report suspicious orders simply based on the pharmacy's claim that it made a mistake. Tr. 478-79. If the distributor investigates the

claim and believes the pharmacy made a mistake, the distributor may ship the order but still must report to DEA the fact that the order appeared suspicious. Tr. 479.

55. The undated letter states that "[i]n the past decade, [Morris & Dickson] has ceased supplying 142 retail pharmacies due to questions and concerns that the pharmacies were over-dispensing controlled substances." GE-9, at 5; Tr. 470. The letter further asserted that after it had closed these bad accounts it had "seen very few examples which would justify the reporting of a suspicious order. In most cases, when a potentially suspicious order is investigated, there is a justifiable reason for the order." GE-9, at 5. The Respondent did not provide documentation of those reasons.

56. During the cyclical audit, the DEA asked the Respondent to produce copies of suspicious order reports it had made to the DEA. Tr. 94. The Respondent provided the DEA with two reports of suspicious orders, both dated April 26, 2017. *Id.*; GE-6, at 35-36. Although the reports concern two different pharmacies, the Respondent listed the same DEA number on each report. *Id.* Earlier, the Respondent submitted a suspicious order report to the DEA, dated, April 7, 2014. Tr. 95; GE-6, at 1-34. Only one of the reports details why the Respondent considered an order to be suspicious. GE-6, at 35. That report details that the pharmacy had submitted an order for 60 cartons of prefilled morphine syringes, when it had only ordered 1 carton during the previous 4 months. *Id.*

57. During the investigation, the DEA requested the Respondent to produce its due diligence files. Tr. 96-97, 295; GE-7, at 1.

58. The Respondent produced some due diligence files in response to DEA's subpoenas. Tr. 295, 463.

59. The documentation the Respondent produced to the DEA does not show whether the Respondent resolved red flags concerning orders it had received from pharmacy customers. Tr. 413.

60. The Respondent shared its Pro-Compliance Reports with its customer pharmacies. Tr. 449.

61. By email, dated March 16, 2018, the DEA sought clarification of the Respondent's reply to the subpoenas of February 1 and 2, 2018. Tr. 100-01; GE-10. The DEA sought clarification of whether the Respondent had fully responded to the subpoena concerning Wilkinson Family Pharmacy and provided all records it had concerning due diligence or

internal investigations from January 1, 2016, to "present." GE-10, at 1. Additionally, the DEA March email requested that the Respondent produce any records concerning due diligence or investigations with respect to 11 pharmacies the Respondent had identified to the DEA. *Id.* Finally, the DEA sought information and records concerning 16 pharmacies the Respondent had identified, specifically asking how the pharmacies were identified through the Respondent's system.[11] *Id.* at 2.

62.  Government Exhibit 11 is a supplemental response from the Respondent to subpoenas issued by the DEA. Tr. 144-45, 324. The response is not dated and is signed by Paul Dickson. Tr. 145; GE-11, at 2. This letter says that "[b]ecause formal records are not kept in the regular course of business on the investigation of orders which do not result in the finding of a 'suspicious order' per 21 C.F.R. 1301.74, the email communications produced herewith represent the most responsive records maintained." GE-11, at 2; Tr. 324. At the same time, the Respondent also produced an external hard drive containing documents in response to the February subpoenas. Tr. 146.

63.  The undated response also indicates that the Respondent provided DEA with delivery receipts for all orders to Wilkinson Family Pharmacy, as well as "every Market Basket Report and Pro Compliance Report in its records from January 1, 2016 to the present." GE-11, at 1. The undated response also informed the DEA that "[d]uring the normal course of business, excessive orders which are the result of coding mistakes are dealt with promptly via telephone and such incidents are usually not documented." *Id.* The response also indicated that the Respondent's SOM program resulted in several investigations based on a software alert, review of Pro-Compliance and Market Basket Reports, as well as concerns raised by the Respondent's employees. *Id.* The Respondent also noted that prior to receipt of the DEA subpoenas the Respondent conducted investigations of "unusual or potentially suspicious orders via telephone calls . . . and by salesman in-store calls." *Id.* at 2.

64.  In the materials the Respondent produced to DEA, Dunn did not see any evidence of orders that were identified as suspicious and therefore not shipped before the issuance of the OSC/ISO. Tr. 325-26.

---

[11]  The Administrative Record does not identify the names of the 11 and 16 pharmacies the DEA referred to in Government Exhibit 10.

65.    In the documents the Respondent produced to DEA, Dunn did not recall seeing any screenshots of the electronic customer profile that the Respondent had in place at that time. Tr. 439-40.

66.    Following receipt of Government Exhibit 11, on April 4, 2018, the DEA sent an email to the Respondent to determine if the Respondent believed it had fully complied with the DEA subpoenas of February 1 and 2, 2018. Tr. 147; GE-12.

67.    In response to the DEA's April 4, 2018 email, the Respondent sent a letter to the DEA on April 9, 2018. Tr. 148; GE-13. In the Respondent's letter, Paul Dickson informed the DEA that the Respondent believed that it had provided a full response to the subpoenas, but that it could not "unconditionally confirm that there are no other documents . . . ." GE-13, at 1. In addition, the Respondent provided a phone log that detailed conversations between the Respondent's compliance officer, Clara Guin, "some of which may relate to the subject of [the] subpoena request" concerning suspicious order reports and investigations. *Id.* Government Exhibit 14 is a copy of that phone log. Tr. 149-50.

68.    The phone log is 33 pages long, with the earliest entry dated January 5, 2016, and the most recent entry dated February 28, 2018. GE-14, at 1, 33. The phone log contains 14 entries that relate to some of the exemplar pharmacies mentioned in the OSC.[12] GE-14, at 4, 23, 24, 26, 31.

69.    The DEA served the Respondent with a subpoena, dated April 11, 2018, seeking the Respondent's documents pertaining to its "policies, guidance, and/or training for its employees with respect to the identification, investigation, and reporting of suspicious or potentially suspicious orders of controlled substances." Tr. 172-73; GE-15, at 1.

70.    On April 26, 2018, the Respondent replied to the DEA subpoena of April 11, 2018. Tr. 173-74; GE-16. In its reply, the Respondent informed DEA that its training of employees on suspicious order monitoring "does not necessitate or result in the production of documents." GE-16, at 1. The Respondent's reply included two policy

---

[12] There are two entries concerning the Pharmacy Specialties Group, with a DEA number ending in "589." GE-14, at 4, 31; GE-23, at 1. Those entries are dated March 7, 2016, and December 13, 2017. GE-14, at 4, 31. There is one entry concerning Dave's Pharmacy, with a DEA number ending in "386." GE-14, at 23; GE-24, at 1. That entry is dated February 16, 2017. GE-14, at 23. There are three entries concerning Hephzibah Pharmacy, with a DEA number ending in "695." GE-14, at 23, 26; GE-25, at 1. Those entries are dated March 17 and 21, 2017, and June 20, 2017. GE-14, at 23, 26. There are five entries concerning Wilkinson Family Pharmacy, with a DEA number ending in "198." GE-14, at 24; GE-27, at 1. Those entries are dated April 19, 20, 21, and 24, 2017. GE-14, at 24. There are three entries concerning Wallace Drugs, with a DEA number ending in "363." GE-14, at 31; GE-20, at 1. Those entries are all dated January 9, 2018. GE-14, at 31.

and procedure documents that contain "limited direction as to suspicious order monitoring." *Id.* Those documents were the Respondent's "Policies & Procedures Manual," and its "Standard Operating Procedures Manual." Tr. 174-76; GE-17-18.

**Pro-Compliance Reports & Market Basket Analysis Reports**

71.    Pro-Compliance Reports are an analysis of a pharmacy's dispensing data created by Pro-Compliance. Tr. 464-65, 716-17. The reports list key indicators of red flags of diversion, such as percentage of a customer's business that is controlled substances, volume of cash payments, and the amount of trinity drug cocktails. Tr. 716-17.

72.    Each Pro-Compliance Report contains the following statement, or a similar statement: "Since the passage of the Controlled Substances Act, emphasis has been placed on Manufacturers and Distributors, registered with DEA, to design and operate a system that will disclose suspicious orders of controlled substances and regulated chemical products by their customers. The responsibilities by DEA registered Manufacturers and Distributors is to assure DEA that all purchased and dispensed controlled substances and regulated chemical products are for legitimate use. The responsibility is not only for their customer but also their customer's customers." GE-23, at 11; Tr. 355.

73.    The Pro-Compliance Report provides a meaningful tool for the Respondent, but Milione did not find the DEA verification portion of the Pro-Compliance Report to be reliable.[13] Tr. 900-04, 955-56. Milione found that there were many false positives in the DEA verification section of the Pro-Compliance Reports and the Respondent could not rely on it in any meaningful way. Tr. 956-57. Milione has discussed this matter with Pro-Compliance. Tr. 901. Milione had no reason "to doubt the reliability of the rest of the reports." Tr. 957.

74.    Government Exhibit 20 contains the Respondent's client account profile for Wallace Drug, as well as a Pro-Compliance Report concerning that pharmacy. Tr. 151-52; GE-20, at 1, 4.

---

[13]    Both Irelan and Milione testified that the portion of the Pro-Compliance Reports concerning the verification of prescriber DEA numbers is unreliable. Tr. 765-66, 797, 901. Irelan had nothing to do with compliance issues on behalf of the Respondent until May 2018, and Milione was retained as a consultant by the Respondent in the same month. Tr. 699, 844. Thus, there is no evidence in the Administrative Record that before May 2018 the Respondent considered the information in the Pro-Compliance Reports concerning the verification of prescriber DEA numbers to be unreliable.

75.     Government Exhibit 57 is a Market Basket Analysis Report ("Market Basket Report") concerning Wallace Drug that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 162-63; GE-57.

76.     Government Exhibit 21 contains the Respondent's client account profile for Bordelon's, as well as a Pro-Compliance "Initial Risk Evaluation," and a Pro-Compliance Report concerning that pharmacy. Tr. 153-54; GE-21, at 1, 4, 13.

77.     Government Exhibit 58 is a Market Basket Report concerning Bordelon's that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-58.

78.     Government Exhibit 22 contains the Respondent's client account profile for Folse, as well as Pro-Compliance "Initial Risk Evaluations," and Pro-Compliance Reports concerning that pharmacy. Tr. 154-55; GE-22, at 1, 3, 8, 15, 24.

79.     Government Exhibit 59 is a Market Basket Report concerning Folse that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-59.

80.     Government Exhibit 23 contains the Respondent's client account profile for Pharmacy Specialties, as well as a Pro-Compliance "Initial Risk Evaluation," and Pro-Compliance Reports concerning that pharmacy. Tr. 155-56; GE-23, at 1, 4, 13, 15, 17.

81.     Government Exhibit 60 is a Market Basket Report concerning Pharmacy Specialties that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-60.

82.     Government Exhibit 24 contains the Respondent's client account profile for Dave's Pharmacy, as well as Pro-Compliance "Initial Risk Evaluations," and Pro-Compliance Reports concerning that pharmacy. Tr. 157; GE-24, at 1, 4, 15, 22, 31.

83.     Government Exhibit 61 is a Market Basket Report concerning Dave's Pharmacy that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-61.

84.     Government Exhibit 25 contains the Respondent's client account profile for Hephzibah Pharmacy, as well as a Pro-Compliance "Initial Risk Evaluation," and a Pro-Compliance Report concerning that pharmacy. Tr. 158-59; GE-25, at 1, 4, 13.

85.    Government Exhibit 62 is a Market Basket Report concerning Hephzibah Pharmacy that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-62.

86.    Government Exhibit 26 contains Pro-Compliance "Initial Risk Evaluations," and a Pro-Compliance Report concerning The Wellness Pharmacy that the Respondent provided to the DEA. Tr. 159-60; GE-26, at 1, 8, 13.

87.    Government Exhibit 63 is a Market Basket Report concerning The Wellness Pharmacy that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-63.

88.    Government Exhibit 27 contains the Respondent's client account profile for Wilkinson, as well as Pro-Compliance "Initial Risk Evaluations," and Pro-Compliance Reports concerning that pharmacy. Tr. 161-62; GE-27, at 1, 3, 17, 24, 33.

89.    Government Exhibit 64 is a Market Basket Report concerning Wilkinson that the Respondent provided to the DEA in response to the February 2018 administrative subpoenas. Tr. 164-66; GE-64.

*Folse Pharmacy*

90.    Government Exhibit 22 contains the Pro-Compliance Reports for Folse Pharmacy. GE-22; Tr. 328. Included in those reports is an Initial Risk Evaluation Report. GE-22, at 3-11. That evaluation informed the Respondent that Folse represented a "***high risk.***" *Id*. at 5 (emphasis in original). It also revealed that in September 2013, 33% of all the prescriptions filled by Folse were for controlled substances, and 41% of those prescriptions were paid for in cash. GE-22, at 7; Tr. 328-29.

91.    A second Pro-Compliance Report for the period from November 1, 2014 to November 29, 2014, informed the Respondent that 36% of all the prescriptions filled by Folse were for controlled substances, and of those prescriptions, 47% were for Schedule II drugs. GE-22, at 12; Tr. 330. It is a red flag whenever the percentage of controlled substances is over 15 percent. Tr. 327, 329, 351.

92.    From November 1, 2014 to November 29, 2014, 41% of all controlled substance prescriptions filled by Folse were paid for in cash. GE-22, at 12; Tr. 330. It is a red flag whenever more than 9% of prescriptions for controlled substances are paid for in cash. Tr. 327-28, 330, 354.

93.   Between September 2013 and November 2014, the number of oxycodone dosage units dispensed by Folse increased from 40,812 to 52,571.  GE-22, at 12; Tr. 330-31.  This is a "very big" red flag.  Tr. 331; *see also* Tr. 471-74.

94.   When the Respondent received a Pro-Compliance Report concerning Folse for November 2014, which showed an increase of almost 12,000 dosage units of oxycodone and that Folse's customers paid cash for 41% of their controlled substances, the Respondent should have determined why there was an increase of oxycodone and why the percentage of cash payments for controlled substances was so high.  Tr. 474-75; GE-22, at 12.

95.   From January 2, 2016 to January 30, 2016, 35% of all the prescriptions filled by Folse were for controlled substances and of those prescriptions, 46% were for Schedule II drugs.  GE-22, at 13; Tr. 331-33.

96.   From January 2, 2016 to January 30, 2016, 31% of all controlled substance prescriptions filled by Folse were paid for in cash.  GE-22, at 13; Tr. 333-34.

97.   In September 2016, 33% of all the prescriptions filled by Folse were for controlled substances and of those prescriptions, 50% were for Schedule II drugs.  GE-22, at 14; Tr. 334.

98.   In September 2016, 18% of all controlled substance prescriptions filled by Folse were paid for in cash.  GE-22, at 14; Tr. 335.

99.   In September 2016, Folse dispensed 22 trinity drug cocktails.  GE-22, at 14; Tr. 335. A pharmacy filling any prescriptions for a trinity drug cocktail is a red flag.  Tr. 300, 335, 353.

100.  A Pro-Compliance Report for June 2017, shows that 30% of all the prescriptions filled by Folse were for controlled substances and of those prescriptions, 49% were for Schedule II drugs.  GE-22, at 16; GE-35, at Summary tab; Tr. 335.  That Pro-Compliance Report also recommended that the Respondent talk with Folse, to "gain a better understanding of [its] dispensing practices," and that a site visit might be "prudent."  GE-22, at 17.

101.  In June 2017, 26% of all controlled substance prescriptions filled by Folse were paid for in cash.  GE-22, at 16; Tr. 336.  In addition, the number of dosage units of oxycodone and hydrocodone that Folse dispensed were both higher than the national average.  GE-22, at 17.

102.  In June 2017, Folse dispensed 9 trinity drug cocktails.  GE-22, at 17; Tr. 336.

103. In June 2017, Folse filled prescriptions for 23 practitioners whose DEA registrations could not be verified through "DEA-Verify.com." GE-22, at 17; Tr. 336. This is a red flag. Tr. 336-37, 341.

104. A Pro-Compliance Report for Folse indicates that Folse filled prescriptions in June 2017 for 194 practitioners whose DEA registrations could not be verified.[14] GE-35, at Summary tab; Tr. 337.

105. The Market Basket Report for Folse indicates that 51% of all the prescriptions filled by Folse in January 2016 were for controlled substances. GE-59, at 1; Tr. 338.

106. The Market Basket Report for Folse indicates that 44% of all the prescriptions filled by Folse in March 2017 were for controlled substances. GE-59, at 29; Tr. 338-39.

107. The Market Basket Report for Folse indicates that 42% of all the prescriptions filled by Folse in December 2017 were for controlled substances. GE-59, at 47; Tr. 339.

108. There is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Folse. Tr. 340.

*Bordelon's Super-Save Pharmacy*

109. A Pro-Compliance Report for Bordelon's indicates that 17% of all the prescriptions filled by Bordelon's in March 2017 were for controlled substances, that 30% of those prescriptions were in the hydrocodone family, and that 63% were Schedule II drugs. GE-21, at 5-6, 12; Tr. 340-41. In addition, the number of dosage units of oxycodone and hydrocodone that Bordelon's dispensed were both higher than the national average. GE-21, at 6.

110. In March 2017, Bordelon's filled prescriptions for 41 practitioners whose DEA registrations could not be verified. GE-21, at 6; Tr. 341.

111. In March 2017, Bordelon's filled prescriptions for 702 practitioners whose DEA registrations could not be verified.[15] GE-29, at Summary tab; Tr. 342-43.

112. In March 2017, Bordelon's dispensed 4 trinity drug cocktails. GE-21, at 6; Tr. 341.

---

[14] While the "Summary" tab of this report indicates there were 194 practitioners who could not be verified, the "DEA Concern" tab of the same report, lists only 23 names. GE-35, at Summary tab and DEA Concern tab. Thus, the "DEA Concern" tab is consistent with the number reported in the paper copy of the Pro-Compliance Report for the same time period. *See* GE-22, at 17; GE-35, at DEA Concern tab.

[15] While the "Summary" tab of this report indicates there were 702 practitioners who could not be verified, the "DEA Concern" tab of the same report lists only 41 names. GE-29, at Summary tab and DEA Concern tab. Thus, the "DEA Concern" tab is consistent with the number reported in the paper copy of the Pro-Compliance Report for the same time period. *See* GE-21, at 6; GE-29, at DEA Concern tab.

113.    From September 1, 2017 to an uncertain date in 2017, 17% of all the prescriptions filled by Bordelon's were for controlled substances. GE-21, at 18; Tr. 341-42.

114.    A Pro-Compliance Report for Bordelon's indicates that in September 2017, Bordelon's filled prescriptions for 618 practitioners whose DEA registrations could not be verified. GE-30, at Summary tab; Tr. 345-46. The "DEA Concern" tab of the same report, however, lists only 35 names, as does the paper copy of the same report. GE-30, at DEA Concern tab; GE-21, at 19.

115.    Government Exhibit 58 shows that the Respondent ran monthly Market Basket Analyses for Bordelon's from January 2016 through January 2018. GE-58; Tr. 423.

116.    The Pro-Compliance Report recommended that the Respondent talk with Bordelon's to "gain a better understanding of [its] dispensing practices," and that a site visit might be "prudent." GE-21, at 6. There is no evidence in the Administrative Record that the Respondent followed up on those recommendations or that it suspended any shipments of controlled substances to Bordelon's. Tr. 347-48.

***Wallace Drug Company***

117.    A Pro-Compliance Report for Wallace indicates that 31% of all controlled substance prescriptions filled by Wallace in August 2017 were paid for in cash. GE-20, at 5; Tr. 348.

118.    In August 2017, the amount of dosage units of hydrocodone and oxycodone that Wallace dispensed were higher than national averages. GE-20, at 5-6; Tr. 349. This is a red flag. Tr. 349.

119.    In August 2017, Wallace filled prescriptions for 23 practitioners whose DEA registrations could not be verified. GE-20, at 6; Tr. 349.

120.    A Pro-Compliance Report for Wallace indicates that in August 2017 Wallace filled prescriptions for 623 practitioners whose DEA registrations could not be verified. GE-28, at Summary tab; Tr. 350. The "DEA Concern" tab of the same report lists only 23 names, as does the paper copy of the same report. GE-28, at DEA Concern tab; GE-20, at 6, 13.

121.    In August 2017, Wallace dispensed 3 trinity drug cocktails. GE-20, at 5-6; GE-28, at Trinity tab; Tr. 349-50.

122.    A Market Basket Report for Wallace indicates that 23% of all the prescriptions filled by Wallace in October 2017 were for controlled substances. GE-57, at 1; Tr. 351.

123.    A Market Basket Report for Wallace indicates that 28% of all the prescriptions filled by Wallace in November 2017 were for controlled substances. GE-57, at 3; Tr. 351.

124.    A Market Basket Report for Wallace indicates that 37% of all the prescriptions filled by Wallace in December 2017 were for controlled substances. GE-57, at 5; Tr. 352.

125.    A Market Basket Report for Wallace indicates that 28% of all the prescriptions filled by Wallace in January 2018 were for controlled substances. GE-57, at 7; Tr. 352-53.

126.    The August 2017 Pro-Compliance Report recommended that the Respondent talk with Wallace "[t]o gain a better understanding of [its] dispensing practices," and that a site visit might be "prudent." GE-20, at 6. Other than a phone log entry on January 9, 2018, however, there is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Wallace. Tr. 353; GE-14, at 31.

*Pharmacy Specialties Group*

127.    A Pro-Compliance Report for Pharmacy Specialties indicates that 24% of all the prescriptions filled by Pharmacy Specialties in February 2016 were for controlled substances and of those prescriptions, 54% were for Schedule II drugs. GE-23, at 5; GE-36, at Summary tab; Tr. 353-54. In October 2016 the percentage of controlled substances had fallen to 18%, but in September 2017 the percentage had risen to 30%, but the percentages of those prescriptions that were Schedule II drugs were 53% and 62%, respectively. GE-23, at 16, 18; GE-37, at Summary tab; GE-38, at Summary tab.

128.    A Pro-Compliance Report for February 2016 indicates that 28% of all controlled substance prescriptions filled by Pharmacy Specialties were paid for in cash. GE-23, at 5-6; GE-36, at Summary tab; Tr. 354, 360. That same report recommended that the Respondent have a conversation with Pharmacy Specialties "[t]o gain a better understanding of [its] dispensing practices" and that an "on-site visit to discuss concerns may also be prudent." GE-23, at 6.

129.    In February 2016, Pharmacy Specialties filled prescriptions for three practitioners whose DEA registrations could not be verified. GE-23, at 6; Tr. 354.

130.    A Pro-Compliance Report for Pharmacy Specialties indicates that Pharmacy Specialties filled prescriptions in February 2016 for 12 practitioners whose DEA registrations could

not be verified. GE-36, at Summary tab; Tr. 359. The "DEA Concern" tab of the same report, however, lists only 3 names, as does the paper copy of the same report. GE-36, at DEA Concern tab; GE-23, at 6, 14; Tr. 354.

131.    Government Exhibit 23 reveals that Pharmacy Specialties had filled prescriptions for three practitioners whose DEA registration numbers could not be verified. GE-23, at 14. In fact, one of the numbers began with one letter, a "W," which indicates it was an application for registration that had not yet been approved by DEA. GE-23, at 14; Tr. 356-57; *see also* GE-23, at 19.

132.    In February 2016, Pharmacy Specialties dispensed 2 trinity drug cocktails. GE-23, at 6; Tr. 355.

133.    In October 2016, 27% of all controlled substance prescriptions filled by Pharmacy Specialties were paid for in cash. GE-23, at 16; GE-37, at Summary tab; Tr. 357-58, 360-61.

134.    A Pro-Compliance Report for Pharmacy Specialties indicates that Pharmacy Specialties filled prescriptions in October 2016 for 16 practitioners whose DEA registrations could not be verified. GE-37, at Summary tab; Tr. 360. The "DEA Concern" tab of the same report, however, lists only 2 names that could not be verified. GE-37, at DEA Concern tab.

135.    Pharmacy Specialties dispensed 1 trinity drug cocktail in October 2016 and 2 trinity drug cocktails in September 2017. GE-23, at 16, 18; Tr. 358-59.

136.    From February 2016 to October 2016, the number of dosage units of hydrocodone dispensed by Pharmacy Specialties increased 25 percent. GE-23, at 16; Tr. 358.

137.    A Pro-Compliance Report for Pharmacy Specialties indicates that 31% of all controlled substance prescriptions filled by Pharmacy Specialties from September 1, 2017 to an uncertain date were paid for in cash. GE-23, at 18; Tr. 358.

138.    From October 2016 to September 2017, the number of dosage units of oxycodone, hydrocodone, and benzodiazepines dispensed by Pharmacy Specialties increased 148%, 89%, and 106%, respectively. GE-23, at 18; Tr. 358-59. During this same period, however, the total number of prescriptions the pharmacy dispensed decreased by 1 percent. GE-23, at 18.

139. A Market Basket Report for Pharmacy Specialties indicates that 52% of all the prescriptions filled by Pharmacy Specialties in January 2016 were for controlled substances. GE-60, at 1; Tr. 361.

140. A Market Basket Report for Pharmacy Specialties indicates that 38% of all the prescriptions filled by Pharmacy Specialties in October 2017 were for controlled substances. GE-60, at 43; Tr. 361.

141. A Market Basket Report for Pharmacy Specialties indicates that 27% of all the prescriptions filled by Pharmacy Specialties in November 2017 were for controlled substances. GE-60, at 45; Tr. 361-62.

142. While the Respondent's employees apparently raised concern on March 7, 2016, and on December 13, 2017, about orders for controlled substances that Pharmacy Specialties had placed, there is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Pharmacy Specialties. Tr. 362; GE-14, at 4, 31.

### *Dave's Pharmacy*

143. A Pro-Compliance Report for Dave's, concerning March 2014, identifies several concerns regarding Dave's. GE-24, at 5-6; Tr. 362-63. Those concerns include the statistic that 20% of all the prescriptions filled by Dave's were for controlled substances. *Id.* Those concerns also include the fact that Dave's has filled prescriptions written by practitioners with 85 instances of trinity drug cocktails. *Id.* The Pro-Compliance Report classifies Dave's as "relatively *high risk* to Morris & Dickson." GE-24, at 6 (emphasis in original). This same report advised the Respondent that the quantity of hydrocodone that Dave's dispensed was "significantly high," and it encouraged the Respondent to discuss the concerns addressed in the report with Dave's and that an on-site visit "may also be prudent." *Id.*

144. From March 3, 2014 to March 31, 2014, 35% of all controlled substance prescriptions filled by Dave's were paid for in cash. GE-24, at 5; Tr. 363.

145. From January 2, 2015 to January 30, 2015, 22% of all the prescriptions filled by Dave's were for controlled substances, and of those prescriptions, 42% were for Schedule II drugs. GE-24, at 18; Tr. 364.

146. From January 2, 2015 to January 30, 2015, 35% of all controlled substance prescriptions filled by Dave's were paid for in cash. GE-24, at 18; Tr. 364.

147. From March 2014 to January 2015 the number of dosage units of oxycodone that Dave's dispensed increased from 17,889 to 29,994, a significant increase. GE-24, at 18; Tr. 364; *see also* Tr. 380, 471-74.

148. Between March 2014 and January 2015, Dave's dispensed 57 trinity drug cocktails. GE-24, at 18; Tr. 364.

149. In December 2015, 22% of all the prescriptions filled by Dave's were for controlled substances, and of those prescriptions, 45% were for Schedule II drugs. GE-24, at 19; Tr. 365.

150. In December 2015, 28% of all controlled substance prescriptions filled by Dave's were paid for in cash. GE-24, at 19; Tr. 365.

151. Between January 2015[16] and December 2015, Dave's dispensed 27 trinity drug cocktails. GE-24, at 19; Tr. 365.

152. Between January 2015 and December 2015, the number of dosage units of oxycodone that Dave's dispensed increased 205 percent. GE-24, at 19; Tr. 365-66. This is a significant concern. Tr. 366.

153. In June 2016, 23% of all the prescriptions filled by Dave's were for controlled substances. GE-24, at 20; Tr. 366.

154. In June 2016, 28% of all controlled substance prescriptions filled by Dave's were paid for in cash. GE-24, at 20; Tr. 366.

155. Between December 2015 and June 2016, Dave's dispensed 33 trinity drug cocktails. GE-24, at 20; Tr. 366.

156. In November 2016, 22% of all the prescriptions filled by Dave's were for controlled substances, and 17% were purchased using cash. GE-24, at 21; Tr. 367.

157. Between June and November 2016, the number of dosage units of oxycodone that Dave's dispensed increased 14 percent. GE-24, at 21; Tr. 367. This is a red flag. Tr. 367.

158. Between June and November 2016, Dave's dispensed 37 trinity drug cocktails. GE-24, at 21; Tr. 367.

---

[16] Although the Pro-Compliance Report reads "May 2014," this is likely a typographical error. Typically, by observation, the Pro-Compliance Reports compare data from the date of the previous report, which was January 2015. GE-24, at 18-19.

159.    In June 2017, 21% of all the prescriptions filled by Dave's were for controlled substances. GE-24, at 23; Tr. 368. In addition, the number of dosage units of oxycodone and hydrocodone that Dave's dispensed were both higher than the national average. GE-24, at 24.

160.    In June 2017, 19% of all controlled substance prescriptions filled by Dave's were paid for in cash. GE-24, at 23; Tr. 368.

161.    In June 2017, Dave's filled prescriptions from 11 practitioners whose DEA registrations could not be verified. GE-24, at 24, 30; Tr. 368.

162.    In June 2017, Dave's dispensed 14 trinity drug cocktails. GE-24, at 24; Tr. 369.

163.    A Pro-Compliance Report for Dave's lists identical DEA registration numbers for two different practitioners. GE-24, at 16, 32; Tr. 369-70. The Pro-Compliance Report indicates that the registration number could not be verified for either practitioner. *Id.* It is not possible for different practitioners to have the same DEA registration number. Tr. 370.

164.    There is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Dave's. Tr. 384-85.

***Hephzibah Pharmacy***

165.    A Pro-Compliance Report for Hephzibah indicates that 27% of all the prescriptions filled by Hephzibah in February 2017 were for controlled substances, and of those prescriptions, 41% were for Schedule II drugs. GE-25, at 5; GE-45, at Summary tab; Tr. 370-71. That percentage of controlled substances was higher than the national average. GE-25, at 6. In addition, the number of dosage units of oxycodone and hydrocodone that Hephzibah dispensed were both higher than the national average. GE-25, at 6. The report also encouraged the Respondent to discuss the concerns addressed in the report with Hephzibah "[t]o gain a better understanding of [its] dispensing practices," and that an on-site visit "may also be prudent." *Id.*

166.    A Pro-Compliance Report for Hephzibah contains a list of the names of 20 practitioners whose DEA registration numbers could not be verified. GE-25, at 14. The first name on the list is paired with an invalid DEA number, because it does not contain any letters. *Id.* DEA does not issue registration numbers to practitioners that are all numbers. GE-25, at

14; Tr. 371.  There are two letters at the beginning of each DEA registration number for practitioners.  Tr. 371.

167.    In February 2017, 36% of all controlled substance prescriptions filled by Hephzibah were paid for in cash.  GE-25, at 5; Tr. 371.

168.    In February 2017, Hephzibah dispensed 9 trinity drug cocktails.  GE-25, at 5-6; Tr. 371.

169.    In an email sent on December 13, 2017, Jacob Dickson informed Diversion Investigator Teri Bass that due to the Respondent's due diligence its account with Hephzibah was closed because Hephzibah wanted to change its business model, which the Respondent did not support.  GE-72, at 1; Tr. 372-73, 434-35.  The email states that Respondent did not find that Hephzibah "exhibit[ed] suspicious activity or excessive orders."  GE-72, at 1.  The Respondent's due diligence notes concerning Hephzibah, however, read as follows:

> 3/17/2017 After looking at their reports, we will open with the understanding of the customer that they must work on clearing up issues that Pro Compliance found, high cash, trinity & high quantities on Hydrocodone & Oxycodone. Will re-run in 90 days.
> 3/21/2017 Opened this account with an understanding of our compliance program.  After a couple of months, they decided they would rather change wholesalers than cooperate with our compliance program.
> 6/20/2017 Account closed.

GE-14, at 23, 26.

170.    There is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Hephzibah.  Tr. 384-85.

***The Wellness Pharmacy***

171.    Government Exhibit 26 contains the Pro-Compliance Reports for Wellness Pharmacy.  GE-26; Tr. 373.  Included in those reports is a 2013 Initial Risk Evaluation Report.  GE-26, at 1-7.  That evaluation informed the Respondent that Wellness represented a ***"low risk."***  *Id.* at 2 (emphasis in original).  It also revealed, however, that between April and June 2013, 67% of all the prescriptions filled by Wellness were for controlled substances, which was significantly higher than the national average, and 68% of those prescriptions were for either oxycodone or hydrocodone—46% of the total prescriptions.  GE-26, at 2, 7.  Government Exhibit 26 also contains four additional Pro-Compliance Reports concerning March 2015; April 2016; November 2016; and October 2017.  GE-

26, at 10-12, 14, 21.  Those reports show that the percentage of controlled substances that Wellness dispensed for each month was:  68%; 69%; 66%; and 64%, respectively.  *Id.* Further, the number of dosage units of oxycodone and hydrocodone that Wellness dispensed in October 2017 were both higher than the national average.  GE-26, at 15.  In addition, in October 2017, 91% of the controlled substances that Wellness dispensed were Schedule II drugs.  GE-26, at 21.  Finally, the Respondent was advised to discuss the concerns raised by the October 2017 report with Wellness and that an on-site visit "may also be prudent."  GE-26, at 15.

172.    A Market Basket Report for Wellness indicates that 84% of all the prescriptions filled by Wellness in January 2016 were for controlled substances.  GE-63, at 1; Tr. 374.

173.    A Market Basket Report for Wellness indicates that 92% of all the prescriptions filled by Wellness in December 2017 were for controlled substances.  GE-63, at 47; Tr. 374.

174.    There is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Wellness.  Tr. 384-85.

***Wilkinson Family Pharmacy***

175.    Government Exhibit 27 contains the Pro-Compliance Reports for Wilkinson Pharmacy. GE-27; Tr. 375-76.  Included in those reports is an Initial Risk Evaluation Report.  GE-27, at 3-16.  That evaluation informed the Respondent that Wilkinson represented a "***high risk.***"  *Id.* at 4 (emphasis in original).  It also revealed that in September 2013, 45% of all the prescriptions filled by Wilkinson were for controlled substances, and 46% of those prescriptions for controlled substances were paid for in cash.  *Id.* at 4, 16.

176.    A Pro-Compliance Report for Wilkinson indicates that 42% of all the prescriptions filled by Wilkinson in March 2014 were for controlled substances, noting that high quantities of oxycodone and hydrocodone had been dispensed.  GE-27, at 20; Tr. 376-77.  In addition, 38% of all controlled substance prescriptions filled by Wilkinson were paid for in cash, while only 11% of the non-controlled prescriptions were purchased with cash. *Id.*

177.    The March 2014 Pro-Compliance Report revealed that Wilkinson filled prescriptions for "[s]everal prescribers [who] have many incidences of prescribing Trinity combinations to their patients."  GE-27, at 20; Tr. 377.

178. In January 2015, 38% of all the prescriptions filled by Wilkinson were for controlled substances, and of those prescriptions, 52% were for Schedule II drugs. GE-27, at 21; Tr. 377-78.

179. In January 2015, 30% of all controlled substance prescriptions filled by Wilkinson were paid for in cash. GE-27, at 21; Tr. 378.

180. Between March 2014 and January 2015, Wilkinson dispensed 26 trinity drug cocktails. GE-27, at 21; Tr. 378.

181. In January 2016, 34% of all the prescriptions filled by Wilkinson were for controlled substances, and of those prescriptions, 54% were for Schedule II drugs. GE-27, at 22; Tr. 378.

182. In January 2016, 27% of all controlled substance prescriptions filled by Wilkinson were paid for in cash. GE-27, at 22; Tr. 379.

183. Between January 2015 and January 2016, Wilkinson dispensed 21 trinity drug cocktails. GE-27, at 22; Tr. 379.

184. In August 2016, 31% of all the prescriptions filled by Wilkinson were for controlled substances, and of those prescriptions, 55% were for Schedule II drugs. GE-27, at 23; Tr. 379.

185. In August 2016, 17% of all controlled substance prescriptions filled by Wilkinson were paid for in cash, while only 9% of all prescriptions were purchased with cash. GE-27, at 23; Tr. 379.

186. Between January 2016 and August 2016, the number of dosage units of oxycodone dispensed by Wilkinson increased 10 percent. GE-27, at 23; Tr. 379. When asked if this increase is a concern, Dunn testified, "It's definitely significant." Tr. 380.

187. Between January 2016 and August 2016, Wilkinson dispensed 20 trinity drug cocktails. GE-27, at 23; Tr. 380.

188. From January 2, 2017 to January 31, 2017, 30% of all the prescriptions filled by Wilkinson were for controlled substances, and of those prescriptions, 55% were for Schedule II drugs. GE-27, at 25-26, 32; Tr. 380. Further, the number of dosage units of oxycodone and hydrocodone that Wilkinson dispensed were both higher than the national average. GE-27, at 26, 32. This report also advised the Respondent to discuss the

concerns raised by the January 2017 report with Wilkinson and that an on-site visit "may also be prudent." GE-27, at 26.

189.   A Pro-Compliance Report for Wilkinson indicates that Wilkinson filled prescriptions from January 2, 2017 to January 31, 2017, for 46 practitioners whose DEA registrations could not be verified. GE-27, at 25-26, 32; Tr. 380-81.

190.   Between January 2, 2017 to January 31, 2017, Wilkinson dispensed 14 trinity drug cocktails. GE-27, at 26, 32; Tr. 381.

191.   There is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Wilkinson. Tr. 384-85.

**The Respondent's Policies & Procedures**

192.   The Respondent's Standard Operating Procedures Manual ("SOP Manual") is dated August 22, 2016. GE-18, at 1.

193.   The SOP Manual says that the details of the Respondent's suspicious order monitoring program "are confidential and therefore are not made a part of this manual." Tr. 306; GE-18, at 17.

194.   The SOP Manual says that the Respondent "keeps a system in operation which is designed to discover those purchasing patterns of controlled substances which exceed the norm and could possibly be related to diversion activities." Tr. 307; GE-18, at 19. Dunn testified that the requirements of 21 C.F.R. § 1301.74(b) are "a little more encompassing than just the statement exceed the norm." Tr. 307.

195.   The SOP Manual describes three methods for identifying suspicious orders: (1) Controlled Drug Volume Analysis Program; (2) Management Oversight; and (3) Employee Oversight. GE-18, at 19-20.

196.   The SOP Manual describes a Controlled Drug Volume Analysis Program that generates a monthly report that is reviewed by management. Tr. 308; GE-18, at 19. Dunn does not recall seeing one of these reports in any of the documents the Respondent produced in response to DEA's subpoenas. Tr. 308. Dunn also does not recall seeing any such report or any reference to such a report in the materials he reviewed concerning the Respondent. Tr. 308-09.

197.   The section on Management Oversight states that "[a] daily controlled drug sales report is reviewed by management each day." GE-18, at 20; Tr. 491. In the documents Dunn

reviewed for this case he does not recall seeing any daily controlled drug sales reports. Tr. 491.

198.   The SOP Manual states that "[w]hen a suspicious pattern or purchase is identified by any of the above methods the customer is contacted in some but not all cases and asked for a written explanation for the unusual order.  In all cases, a letter is sent to the DEA indicating a possible suspicious order.  Customer supplied information is included when available." GE-18, at 20; Tr. 311-12, 391.  In Dunn's opinion, this does not comply with DEA regulations because the distributor should contact the customer in every case where a suspicious order is identified.  Tr. 311-12, 484.

199.   Despite the SOP Manual saying that "[i]n all cases, a letter is sent to the DEA indicating a possible suspicious order," DEA only received three suspicious order reports from the Respondent between 2014 and 2018.  GE-18, at 20; Tr. 312, 731.

200.   Of the three suspicious order reports the Respondent sent to DEA, none of them contained customer-supplied information.  Tr. 312-13.

201.   The Respondent shipped each of the three orders for which it submitted suspicious order reports.  Tr. 294.

202.   Based on the SOP Manual, Dunn testified that the Respondent's suspicious order monitoring program did not look for the things required under 21 C.F.R. § 1301.74(b). Tr. 307-08.

203.   The Respondent's Policies & Procedures Manual for Prescription Drug Handling ("Policies & Procedures Manual") is dated February 2018.  Tr. 313; GE-17.

204.   The Policies & Procedures Manual describes its SOM program as "a three-fold approach to monitor all prescription drug and/or device orders, including unusual ordering patterns, amounts, and payments to identify any potential diversion or criminal activity." GE-17, at 12; Tr. 314.

205.   The Respondent's three-fold approach includes Pro-Compliance Reports, Market Basket Analysis Reports, and Order Processing and Delivery Personnel.  GE-17, at 12.

206.   The Policies & Procedures Manual says that Pro-Compliance Reports are run annually or "more frequently as needed at the discretion of the Compliance officer."  GE-17, at 12; Tr. 315.

207.  Between January 2014 and May 2018, Ms. Guin and Jacob Dickson were responsible for the Respondent's compliance program. Tr. 315, 401-02, 736, 794, 835-36. Ms. Guin's manager was Jacob Dickson. Tr. 794. Ms. Guin was removed as compliance officer in May 2018. Tr. 736.

208.  The description of the Market Basket Report in the Policies & Procedures Manual mentions a "normal range" for controlled drug orders. GE-17, at 12; Tr. 315. In the documents the Respondent produced to DEA, Dunn did not see any documents discussing normal ranges for any customer. Tr. 315-16.

209.  The description of the Market Basket Report in the Policies & Procedures Manual says that the Compliance officer "may stop shipment on any order if he or she finds the order to be unusually suspicious." GE-17, at 12; Tr. 316. In the documents the Respondent produced to DEA, Dunn did not see any documents indicating that the Compliance officer stopped shipment of any order of controlled substances identified as suspicious.[17] Tr. 315-16.

210.  The section of the Policies & Procedures Manual labeled "Order Processing and Delivery Personnel" refers to orders that diverge "from normal operations." GE-17, at 12. In the documents the Respondent produced to DEA, Dunn did not see any documents defining what would be considered "normal operations." Tr. 316.

211.  The section of the Policies & Procedures Manual labeled "Order Processing and Delivery Personnel" says that "personnel should watch for the appearance of criminal or suspect activity." GE-17, at 12; Tr. 316-17. In the documents the Respondent produced to DEA, Dunn did not see any documentation of criminal or suspect activity. Tr. 316-17.

212.  The section of the Policies & Procedures Manual labeled "Records" says that "[r]ecords of a suspect product investigation resulting in the finding of a suspect product shall be maintained in the Company's records for six (6) years. Records of investigations of illegitimate product must be kept for six (6) years, including a notation of the ultimate

---

[17]  Government Exhibit 14 is a phone log of the Respondent's Compliance officer, Clara Guin. *See* GE-13, at 1, para. 2. In the 33 pages of Government Exhibit 14, covering the period of January 5, 2016 to February 28, 2018, there is only one entry concerning a stopped shipment, that being the first entry of 1/9/2018. GE-14, at 31. There are, however, numerous entries suggestive of suspicious orders. *See, e.g.*, GE-14, at 3, entry of 2/1/2016, and second entry of 2/10/2016; at 4, entry of 3/7/2016; at 7, first entry of 6/10/2016; at 8, last entry of 7/20/2016; at 9, last entry of 8/8/2016; at 23, entry of 2/24/2017, entry of 3/17/2017, and first entry of 3/21/2017; at 24, first entry of 4/20/2017; at 25, second entry of 5/10/2017; at 26, second entry of 7/12/2017; at 27, last entry of 8/3/2017; at 29, second entry of 11/2/2017; at 31, first entry of 12/13/2017, and all three entries of 1/9/2018.

disposition of the product after investigation." GE-17, at 15-16. This section on records does not refer to suspicious order monitoring records or due diligence records. Tr. 317-18.

**The Tukey Method of Statistical Analysis**

213.    Rose applied the Tukey method to perform his analysis of Respondent's oxycodone and hydrocodone transactions. Tr. 199.

214.    Rose used the Tukey method because it is "a more flexible method for dealing with" irregular distribution patterns. Tr. 199; *see also* Tr. 522. (Weinstein testifying that Tukey "doesn't assume that [the data is] . . . a normal distribution"). Market data does not follow a normal distribution. Tr. 195, 522.

215.    The Tukey method of statistical analysis is a useful tool for identifying outlier transactions that a distributor should investigate. Tr. 225, 236-37. The Tukey method is a widely-recognized and commonly-used method of identifying statistical outliers. Tr. 200, 209, 236-37, 521-22, 654.

216.    The four components of the Tukey method are the 25th percentile (first quarter), the 75th percentile (third quarter), the interquartile range ("IQR"), and the IQR multiplier. Tr. 201-03. The IQR is the difference between the first and third quartiles, which is then multiplied by a factor of 1.5-6. Tr. 202. The IQR is applied to the third quartile, or 75th percentile, to identify "approximate indications of . . . unusuality." Tr. 202.

217.    There is no single correct IQR multiplier to apply in the Tukey method. Tr. 523. There is no rule requiring the use of an IQR multiplier of 3 ("3 IQR"). Tr. 523. The IQR multiplier should be selected based on the data being examined and what the analyst is looking for. Tr. 523.

218.    In general, higher IQR multipliers will identify fewer outliers because the higher multipliers raise the threshold of what is considered an outlier. Tr. 524. A 1.5 IQR produces an outside value and 3 IQR produces a "far out" value. Tr. 523.

219.    Applying a lower IQR multiplier, such as 1.5, would produce more outliers than a higher IQR multiplier. Tr. 202-03, 655-56. DEA did not want to be "overly onerous" on registrants so Rose applied a 3 IQR instead of 1.5. Tr. 202-03. Rose used a 3 IQR because he found it to "work[] very well at identifying what are called far out or extreme

outliers." Tr. 203, 233, 242. By using a 3 IQR, Rose calculated a smaller group of outliers than he would have had he used 1.5 IQR. Tr. 203.

220.    A transaction that falls outside of 3 IQR above the 75th percentile is an unusually large transaction, which would occur less than 1% of the time. Tr. 238-39.

**Rose's Analysis & Opinions**

221.    Government Exhibit 67 is a copy of Rose's curriculum vitae. Tr. 191.

222.    Rose was qualified, without objection, as an expert in "developing and implementing statistical models and methods of analyzing large and complex data sets." Tr. 192.

223.    Rose was provided a set of ARCOS data concerning Respondent's oxycodone and hydrocodone sales from January 1, 2014 to September 30, 2018. Tr. 193-94, 217. He later obtained data of Respondent's sales of oxycodone and hydrocodone through April 30, 2019. Tr. 194. ARCOS categorizes data by sales, distributions, transactions, and returns. Tr. 217.

224.    Rose analyzed data of Respondent's sales of oxycodone and hydrocodone from January 1, 2014 to April 30, 2018. Tr. 193-94, 198, 217. To conduct his analysis, Rose looked at transactions, which he defined as the number of dosage units of oxycodone and hydrocodone sold to a pharmacy. Tr. 196. Rose's analysis compared every transaction to a pharmacy made from January 1, 2014 to April 30, 2018, against every other transaction made during the same time period to the same pharmacy. Tr. 197-98, 226-27. Rose called this a fixed-frame analysis. Tr. 197.

225.    There was no material difference in the outcome between a fixed-frame and a "moving-frame," or "look-back," analysis.[18] Tr. 198-99, 227-28. Both types of analysis "produce the same basic result, which is to identify a body of outliers that . . . would be worthy of further study." Tr. 199.

226.    Rose used the easier fixed-frame method because he was looking for "a ballpark estimate of scale, of size of outlier population," not the exact number of outliers. Tr. 227, 234.

227.    Rose's initial analysis incorrectly applied the IQR to the median of the data set (the 50th percentile) instead of the 75th percentile. Tr. 208-09. This incorrect analysis produced "a much larger group of outliers." Tr. 209. Once the mistake was identified, Rose

---

[18]   Rose used the term "moving-frame" to describe what Weinstein called a "look-back" analysis. Tr. 198. Throughout the rest of this Recommended Decision, I will use the term "look-back" analysis.

corrected the analysis (the "corrected analysis") and he had his analyst "go back and check every other analysis he had done, and he verified that they all had been done correct." Tr. 209.

228. Government Exhibit 65 contains all the transactions concerning oxycodone shipments that Respondent reported to the DEA between January 1, 2014 and April 30, 2018. Tr. 71-72.

229. Government Exhibit 66 contains all the transactions concerning hydrocodone shipments that Respondent reported to the DEA between January 1, 2014 and April 30, 2018. Tr. 71-72.

230. Government Exhibits 65 and 66 also contain copies of the results of Rose's corrected analysis. Tr. 72, 211-12.

231. Rose's corrected analysis identified the following amounts of Respondent's oxycodone and hydrocodone sales as outliers from January 1, 2014 to April 30, 2018:

| Substance | 2014 | 2015 | 2016 | 2017 | 2018[19] | Total |
|---|---|---|---|---|---|---|
| Oxycodone | 2,097 | 1,857 | 1,546 | 1,361 | 391 | 7,252 |
| Hydrocodone | 1,919 | 1,314 | 1,006 | 536 | 173 | 4,948 |

Tr. 212-13; GE-65-66, at Summary tab; GDE, at 10.

232. Rose's corrected analysis identified the following amounts of Respondent's oxycodone and hydrocodone sales as outliers for seven exemplar pharmacies from January 1, 2014 to April 30, 2018:

| Pharmacy | Oxycodone | Hydrocodone |
|---|---|---|
| Wallace | 1 | 6 |
| Bordelon's | 50 | 2 |
| Folse | 58 | 68 |
| Pharmacy Specialties | 10 | 15 |
| Dave's | 103 | 14 |
| Wellness | 119 | 3 |
| Wilkinson | 2 | 49 |

Tr. 213-14, 216-17, 243; GDE, at 11.

233. The above tables reflect transaction size and not transaction frequency. Tr. 244.

[19] January 1, 2018 to April 30, 2018. Tr. 212, 226.

234. Rose also conducted a look-back analysis which produced results "consistent with what [he] found using the" fixed-frame method. Tr. 228, 235. In his look-back analysis, Rose looked at "the entire population" and not only the eight exemplar pharmacies in the OSC. Tr. 230.

235. In Rose's view, statistical analysis is "one piece of the analysis that is necessary" to comply with DEA's regulations governing distributors. Tr. 223-24.

236. When asked by Respondent's counsel whether Rose's analysis was "just math, right?", Rose answered, "Yes." Tr. 224.

237. Respondent's counsel asked Rose, "So the math is a piece of it, but then there has to be some context around it. Would you agree with that?", and Rose agreed. Tr. 225.

238. The analysis Rose conducted to identify outlier transactions was solely a mathematical analysis and did not consider the context of the transactions. Tr. 225, 234, 540.

239. In Rose's opinion, Respondent should have been conducting the type of statistical analysis that he did to identify outlier transactions for every order it received. Tr. 240-41.

240. The figures on page 11 of the Outlier Detection Overview in the Government Demonstrative Exhibit include data from 2014. Tr. 241-42; ALJ-63. The figures in Respondent Demonstrative Exhibit 4 do not include data from 2014. Tr. 242-43, 531, 539.

241. Government Exhibits 73 and 74 contain an analysis of the Respondent's controlled substance transactions for the period of January 1, 2014 to April 30, 2018, using the look-back analysis recommended by Weinstein rather than the fixed-frame analysis that the Government initially relied upon. Tr. 1084-90.

242. The look-back analysis for oxycodone transactions revealed 6,816 outlier transactions, a 6% reduction when compared to the fixed-frame analysis of 7,252, which the Government previously found. Tr. 1091; GE-73, at Summary tab.

243. The look-back analysis for hydrocodone transactions revealed 5,222 outlier transactions, a 5.5% increase when compared to the fixed-frame analysis of 4,948, which the Government previously found. Tr. 1092; GE-74, at Summary tab.

**Weinstein's Analysis & Opinions**

244. Respondent Exhibit 24, pages 15-19, is a copy of Weinstein's curriculum vitae. Tr. 506-07.

245. Weinstein does not believe that Rose's findings, contained on page 11 of the Government Demonstrative Exhibit, accurately reflect the number of orders that the Respondent should have reported to DEA. Tr. 525, 551. In Weinstein's opinion, Rose's analysis fails to reliably identify unusually large or suspicious orders. Tr. 558.

246. In Weinstein's opinion, the deficiencies in Rose's analysis can be attributed to Rose's (1) use of a four-year fixed-frame as opposed to the look-back method; (2) his failure to consider the schedule change of hydrocodone; (3) failure to consider package size and formulation; and (4) use of the line item approach as opposed to a cumulative approach. Tr. 525-28, 541-46, 558.

247. With respect to the first deficiency, Weinstein testified that Rose's fixed-frame analysis looked at "data that wasn't available at the time for any given order." Tr. 525. Weinstein testified that Rose's fixed-frame analysis took into account the entire time period of January 1, 2014 to April 30, 2018, to determine the outlier threshold and then compared all the orders against that threshold. Tr. 526-27. Weinstein understood Rose to testify that the Respondent could not have performed this analysis at the time it received an order in 2014, for example, because data from 2015-18 would not have been available at that time. Tr. 527. Weinstein testified that Rose's fixed-frame analysis is something a distributor could not do. Tr. 527.

248. Weinstein also testified that a fixed-frame analysis "wouldn't have an impact on the results" was it not for some changes in the industry during the relevant time period. Tr. 528.

249. In Weinstein's opinion, the results of Rose's analysis are not reliable even if the problem caused by the fixed-frame method is corrected. Tr. 525, 551.

250. With respect to the second deficiency Weinstein identified in Rose's analysis, Weinstein testified that in late 2014 DEA rescheduled hydrocodone from Schedule III to Schedule II. Tr. 539. Because Schedule II is more restrictive than Schedule III, there were fewer orders for hydrocodone after it was rescheduled. Tr. 539. The fixed-frame method compared orders for hydrocodone in 2014 when it was a Schedule III drug to orders in 2015-18 when it was a Schedule II drug. Tr. 539-40. In Weinstein's view, this means orders placed when hydrocodone was a Schedule III drug were identified as outliers

based on a comparison to orders placed when hydrocodone was a Schedule II drug.[20] Tr. 539-40.

251.   With respect to the third deficiency, Weinstein testified that Rose's analysis did not take into account package size or formulation, such as pills or liquid form of the drug. Tr. 553, 557. In Weinstein's opinion, this consideration makes a difference. Tr. 553-54.

252.   An effective system for identifying suspicious orders, in Weinstein's opinion, should take a cumulative approach and consider factors such as package size, formulation, and brand name or generic versions of the drug. Tr. 554-57. A system that fails to take these types of factors into account may result in the distributor over-reporting orders that are not unusual and not suspicious. Tr. 556.

253.   With respect to the fourth deficiency, Weinstein believes a distributor should look at the cumulative amount of a substance that is ordered and not individual line items. Tr. 546-47. A cumulative approach looks at the total number of units purchased (e.g., 2,000 total units of oxycodone). Tr. 545; RDE-6. A line item approach looks at the individual line items that make up the total number of units purchased. Tr. 545. For example, 2,000 dosage units—the cumulative total—may have been purchased by the pharmacy as five separate orders for 100, 100, 300, 500, and 1,000 units. Tr. 545. The line item approach takes into account each individual transaction (five separate orders for 100, 100, 300, 500, and 1,000 units) whereas the cumulative approach only considers the total amount purchased (2,000 units). Tr. 545. Weinstein, however, did not incorporate this cumulative-based approach in any analysis he did in this case, including the analysis he conducted to produce the results reflected in Respondent Demonstrative Exhibit 4. Tr. 550-51.

254.   Weinstein testified that it is not possible to correct Rose's analysis for the problems caused by using a line item approach. Tr. 550, 552.

255.   Weinstein testified that Rose's line item approach produced outliers that would not have been identified under the cumulative approach. Tr. 551-52. Weinstein also testified that Rose's line item approach misses outliers. Tr. 552-53.

---

[20]  This concern, even if accurate, would only impact 2014 orders for hydrocodone. According to Weinstein, because Schedule II is more restrictive than Schedule III, the Respondent received fewer orders for hydrocodone after it was rescheduled. Tr. 539.

256. Statistical analysis is an appropriate method for identifying suspicious orders. Tr. 654. The Tukey method is an appropriate method to conduct that analysis. Tr. 654. In Weinstein's opinion, however, statistical analysis alone is insufficient to identify *diversion* of controlled substances because there are contextual elements that cannot be gleaned from a pharmacy's ordering data. Tr. 558-59.

257. Weinstein testified that it is not possible to reliably and accurately identify suspicious orders from past years using a look-back analysis that is based solely on mathematical calculations. Tr. 684-85, 687-88. It is not possible because identifying outliers involves more than "just the math," and must account for other factors that are not easy to replicate retrospectively. Tr. 685-88. It is possible, however, to run past years' data through the current system. Tr. 688. While Weinstein could run old data through the system, and conduct the mathematical calculations, he would not know what information the Respondent had at the time it received an order that explained the order, such as if a new medical center opened near the customer that explained an increase in the customer's purchasing.[21] Tr. 688.

258. Weinstein agrees with Rose's description of how the Tukey method works. Tr. 655.

259. The data Weinstein used to conduct his analysis came from Government Exhibits 65 and 66. Tr. 534.

260. The mathematical calculations in Government Exhibits 65 and 66 are correct. Tr. 658.

261. For Weinstein's analysis, he compared orders against transactions from the previous 12 months. Tr. 528-29. Using this approach where Weinstein looked back "only to the prior year, rather than to the full four years," Weinstein did not identify many of the orders identified in Rose's analysis. Tr. 528-29. Weinstein's analysis showed that over 60% of the orders from the seven exemplar pharmacies[22] in 2017 and 2018 identified as outliers by Rose "would not have been identified if compared only to the prior year." Tr. 529-31, 539. And about 50% of the orders from all customers identified by Rose as outliers would not have been considered outliers if those orders were compared only to the prior year. Tr. 529-30, 568.

---

[21] Presumably, Weinstein would not know what the Respondent knew because the Respondent did not document what it knew. GE-9, at 1-2; GE-11, at 2, para. IV.

[22] Wallace, Bordelon's, Folse, Pharmacy Specialties, Dave's, Wellness, and Wilkinson. GDE, at 11.

262. Respondent Demonstrative Exhibit 4 represents the results of Weinstein's analysis. Tr. 531-32.

263. The table below reflects the difference between Weinstein's look-back analysis and Rose's fixed-frame analysis for 2017-18.[23] Tr. 537-38, 550-51, 693; RDE-4. Weinstein does not conclude, however, that the orders he identified should have been reported. Tr. 551.

| **Pharmacy** | | **2017-2018 Total** |
|---|---|---|
| Bordelon's | Rose | 23 |
| | Weinstein | 9 |
| Dave's | Rose | 24 |
| | Weinstein | 24 |
| Folse | Rose | 69 |
| | Weinstein | 2 |
| Wellness | Rose | 27 |
| | Weinstein | 8 |
| Pharmacy Specialties | Rose | 5 |
| | Weinstein | 3 |
| Wilkinson | Rose | 1 |
| | Weinstein | 1 |
| Wallace | Rose | 7 |
| | Weinstein | 7 |

264. Concerning the seven pharmacies, Weinstein's analysis identified 54 orders as outliers from January 1, 2017 to April 30, 2018. Tr. 537-38; RDE-4.

265. Weinstein's analysis does not include 2014 because he did not have data from 2013 to compare it to. Tr. 539.

266. Respondent Exhibits 28 and 29 contain Weinstein's look-back analysis of transactions identified by Rose as outliers from January 1, 2017 to April 30, 2018. Tr. 659-60. Those

[23] Weinstein also conducted a comparison of 2015-16 data. I, however, sustained the Government's objection to exclude that data because the Respondent failed to produce Weinstein's calculations for those years. Tr. 533-36, 690-93.

calculations compared each transaction against data from the previous year. Tr. 659-60. For example, for Weinstein's analysis of an order on January 1, 2017, he looked at all of the data from 2016. Tr. 660.

267.  Respondent Exhibits 28 and 29 identify which outliers identified by Rose would still be considered outliers if compared only to the prior year's data. Tr. 664. Those transactions that would still be considered outliers based on Weinstein's look-back analysis are marked with a "Y" in the final column. Tr. 664. Weinstein does not know how many transactions would still be outliers based on a look-back analysis, but agreed with Government counsel that it is "certainly in the hundreds. It may be over a thousand." Tr. 663-64. In fact, by count, Respondent Exhibit 28 identifies 1,356 outliers for oxycodone, and Respondent Exhibit 29 identifies 324 hydrocodone outliers from January 1, 2017, to April 30, 2018. RE-28-29; Tr. 663-64.

268.  In concluding that some outliers identified by Rose would still be considered outliers under a look-back approach, Weinstein was not concluding that those transactions are, in fact, outliers—only that they would "still be identified as outliers if compared only to the prior year and not making any other adjustments to address any of the other issues." Tr. 664.

269.  Weinstein did not conduct any analysis to flag outliers not identified by Rose. Tr. 660-61. He only "assessed [Rose's] outliers relative to the prior year to see if they would still be flagged." Tr. 661. Weinstein's analysis did not "attempt to identify new outliers." Tr. 662.

270.  Weinstein testified: "I haven't put forward an analysis of what should have been reported in this case. I've put forward an analysis of . . . one of the issues with Mr. Rose's analysis and the impact that that has." Tr. 550.

271.  Weinstein did not render an opinion concerning how many of the Respondent's orders between 2014 and April 2018 should have been flagged as suspicious. Tr. 665.

272.  It would be a red flag if a pharmacy received a substantially higher percentage of cash payments for controlled substances than it did for non-controlled substances. Tr. 681.

**The Respondent's Old SOM System**

273.  The version of ECP that the Respondent operated before May 2018 was not as robust as it is currently. Tr. 737-38, 740. The pre-May 2018 version of ECP allowed for "limited

information," such as "basic customer information, some basic licensing information, a limited space for notes," and links to Pro-Compliance Reports and Market Basket Reports. Tr. 740.

274.    Page 1 of Respondent Exhibit 31.001 contains notes taken on a customer that were part of the Respondent's pre-May 2018 ECP system. Tr. 741-43.

275.    Page 1 of Respondent Exhibit 31.002 contains notes taken on a customer that were part of the Respondent's pre-May 2018 ECP system. Tr. 743-46.

276.    Page 3 of Government Exhibit 19 is a screenshot of ECP as it existed in May 2018. Tr. 738.

277.    When the Respondent's pre-May 2018 SOM system flagged an order as suspicious, it sent an email or text message to the compliance officer, Ms. Guin. Tr. 728, 778. If Ms. Guin took no action on that flagged order, the order would be shipped because the system did not have the capability to hold the order. Tr. 728-29. To "hold the order," meant that the order would not be shipped. Tr. 778.

278.    In Irelan's opinion, the Respondent's pre-May 2018 SOM system was inconsistent with best practices because it did not hold suspicious orders and it did not give the Respondent the opportunity to resolve red flags before shipping the orders. Tr. 729, 778. It was also inconsistent with best practices because the threshold it used to flag orders was based on whether the order was 10 times larger than a 90-day average. Tr. 729-30; GE-9, at 3.

279.    Milione testified that the Respondent's reporting of suspicious orders had been insufficient. Tr. 989.

280.    The Respondent's old SOM program reportedly consisted of:  know your customer efforts; an electronic customer profile ("ECP"); a market basket system; reports from Pro-Compliance; direct contact with and soliciting of information from customers; and reliance on the Respondent's sales force and those who actually filled orders for controlled substances. Tr. 866-70; GE-9, at 2-3; GE-17, at 12; GE-18, at 19-20.

281.    The Respondent reportedly terminated 23 customers in 2014, 12 customers in 2015, and 7 customers in 2016, as a result of its old SOM system. Tr. 1014-15; RE-11, at 14. Because these customers were reportedly terminated as a result of the Respondent's SOM system, the Respondent should have submitted suspicious order reports to the DEA concerning the terminated customers. Tr. 1015-16.

**The Respondent's New SOM System**

282.    After the DEA issued the OSC/ISO to the Respondent, Milione contacted the Respondent.    Tr. 877-78.    The contact led to the Respondent retaining Guidepost to enhance the Respondent's entire DEA compliance program, specifically its SOM system. Tr. 878-79.

283.    Milione has worked as a consultant for the Respondent for a little over a year.    Tr. 879, 953.    Paul Dickson, Sr., authorized Guidepost to work for the Respondent.    Tr. 1011. Between May 8, 2018, and December 31, 2018, Guidepost employees have been at the Respondent's Shreveport offices every day.    Tr. 879.    Those employees included former DEA employees who were experienced in diversion matters.    Tr. 880.    Guidepost continues to have employees at the Respondent's facilities.    Tr. 881.    Guidepost employees are also logged into the Respondent's ECP system, and can confer with the Respondent's compliance employees in real time.    Tr. 882.

284.    When Milione began working with the Respondent he realized that enhancements needed to be made to the Respondent's SOM system.    Tr. 990-91.    In developing the Respondent's new SOM system, Milione testified that one of the "big things" that the Respondent needed was the capability to flag orders in real time and to report those orders to DEA.    Tr. 991, 993.    Milione testified that the Respondent "needed a system that would flag order[s] live time and then report those daily."    Tr. 993.

285.    After Milione began working for the Respondent as a consultant, the Respondent conducted investigations of prescribers' credentials and/or prescribing practices that did not meet the Respondent's obligations regarding compliance.    Tr. 1008.    The Respondent ceased doing business with some of the pharmacies that filled prescriptions written by those prescribers, and reported the same to the DEA.    Tr. 1008-09.

286.    Guidepost undertook seven corrective measures on the Respondent's behalf.    Tr. 882. Those measures included:    (1) establishing an anti-diversion compliance regulatory affairs team; (2) enhancing the Respondent's SOM system; (3) redeveloping the Respondent's ECP; (4) enhancing the Respondent's "know your customer protocols"; (5) enhancing the Respondent's due diligence investigative protocols; (6) conducting employee training; and (7) documenting everything and reporting to DEA.    Tr. 882-900.

287.  The Analysis Group, Inc., ("AGI") was also brought in to develop a "live real-time order monitoring system that would identify flagged orders for investigation, for canceling, for reporting to DEA." Tr. 885.

288.  The Respondent paid Guidepost almost $3,000,000 between the time the OSC/ISO was issued and May 2019 to get into compliance with DEA regulations. Tr. 973-74, 992. Milione testified that the Respondent has "spared no expense" in becoming compliant with DEA regulations. Tr. 992.

289.  Weinstein and AGI looked at DEA regulations on suspicious order monitoring, specifically 21 C.F.R. § 1301.74(b), and DEA guidance letters in designing the Respondent's new SOM system. Tr. 626, 630, 634.

290.  Weinstein used the Tukey method in developing the Respondent's new SOM system. Tr. 655.

291.  AGI began its work with the Respondent in May 2018 by developing "interim thresholds based on an enhanced statistical approach to evaluating Morris & Dickson's orders." Tr. 561. This involved establishing and implementing "item group thresholds for each customer by month." Tr. 561. Weinstein applied these interim thresholds to retail pharmacies and alternate care customers. Tr. 569. Weinstein described an alternate care customer as a pharmacy that exclusively serves a particular facility or patient population and is not open to the general public to fill prescriptions on a walk-in basis. Tr. 570. The Respondent implemented the interim thresholds in May-June 2018 and kept them in place until October 2018 for retail pharmacies and January 2019 for alternate care customers. Tr. 570-71, 577. The Respondent began operating an interim, automated SOM program within a few weeks of retaining AGI. Tr. 577-78. The Respondent implemented a permanent system for retail pharmacies on October 1, 2018, and a permanent system for alternate care customers on January 1, 2019. Tr. 579-80. Weinstein testified that comparing data from a retail pharmacy against an alternate care pharmacy is like comparing apples to oranges because they operate under different business models. Tr. 580, 639. In Weinstein's view, it is important to compare a pharmacy's orders to other pharmacies within the same peer group. Tr. 580-81.

292. The Respondent's current SOM system flags orders that exceed one of several thresholds. Tr. 668. Each customer's threshold is recalculated each month based on recent ordering patterns. Tr. 625, 638, 644-45, 668.

293. Under the Respondent's current system and policies in place since May 2018, all flagged orders are reported to DEA. Tr. 776-77.

294. The suspicious order reports concern orders the Respondent flagged the previous day. Tr. 779-80. They are attached to emails as Excel files. *Id.*

295. All the documents in Respondent Exhibits 20.001 to 20.115 are daily emails submitting suspicious order reports to the DEA. Tr. 781-83. The first email is dated May 14, 2018 (RE-20.001) and the last email is dated July 29, 2018 (RE-20.114).

296. Since May 14, 2018, the Respondent has sent suspicious order reports to DEA on a daily basis. Tr. 889. Since that time, the Respondent has stopped shipping to 12 or 13 customers. RE-20; Tr. 898, 890.

297. Between May 14, 2018 and July 29, 2018, the Respondent submitted 58 suspicious order reports to the DEA. RE-20. In those 58 reports, the Respondent informed the DEA of about 3,915 suspicious orders. *Id.* Applying the Respondent's new SOM program to its orders from early 2018 identified a similar number of suspicious orders.[24] Tr. 666.

298. The Respondent is currently identifying hundreds of flagged orders per month. Tr. 676, 682-83. This number is roughly consistent with the numbers that AGI obtained when it applied its system to the Respondent's sales data prior to AGI implementing its system for the Respondent. Tr. 666, 676, 682-83.

299. Once the customer's threshold for the month is reached, the Respondent's current SOM system holds that customer's orders as potentially suspicious and prevents them from being shipped. Tr. 668-69. If the customer places new orders the next month, the Respondent will ship those orders if all red flags and potential suspicion have been resolved. Tr. 669-70.

300. Under the Respondent's current SOM system, if a customer exceeds the threshold for one item group, the customer is still allowed to order controlled substances from the other

---

[24] Respondent Exhibit 20 demonstrates that between May 14, 2018 and July 29, 2018, the Respondent notified DEA of 3,915 suspicious orders. In addition, had the Respondent been applying its current SOM system to the orders the Respondent received in early 2018, the SOM system would have identified similar numbers of suspicious orders. Tr. 666. The Respondent, however, did not conduct any calculations to determine whether its new SOM system identified any suspicious orders in the Respondent's sales data before 2018. Tr. 682, 686.

item groups unless the Respondent places a hold on those other item groups as well. Tr. 670-72, 679-80.

301. The Respondent's SOM program that Weinstein and AGI developed performs three core assessments: a monthly assessment based on the customer's ordering history; a monthly assessment comparing the customer to its peer group; and a daily assessment of "the highest priority item groups." Tr. 619, 771. Other components of the system include peer and item group definitions. Tr. 619. The item groups are classified "into different levels of diversion risk that help determine exactly what statistical parameters are applied to each" item group. Tr. 619. The item groups are divided into four categories of risk: priority (highest risk); high-risk subset consisting of oxycodone 30 mg; high risk; and other. Tr. 620-21. These risk classifications and their corresponding Tukey multipliers are depicted on Respondent Demonstrative Exhibit 9. Tr. 621-22.

302. Respondent Demonstrative Exhibit 8 depicts how the peer group, own history, and daily assessments work in the Respondent's SOM system. Tr. 632-37.

303. When the SOM system identifies an outlier, the order is held for further review. Tr. 582, 625, 629, 672, 770, 1017-18. AGI has recommended to the Respondent the types of information it should consider when reviewing an outlier. Tr. 582.

304. Weinstein ran sales data from early 2018 through the new SOM system and the system identified a similar number of outliers to the amount being identified currently. Tr. 666, 676.

305. The Respondent's SOM system is currently flagging "hundreds" of orders of controlled substances per month for exceeding thresholds. Tr. 676-77, 682-83. When asked by Government counsel if it was multiple hundreds per month, Weinstein answered "Yes." Tr. 683. This amount is roughly consistent with the results Weinstein produced when he ran data from early 2018 through the Respondent's current SOM system. Tr. 676-77, 683.

306. If the Respondent ran its current SOM system on past years' data, the system would identify some outliers as suspicious. Tr. 685-86.

**The Respondent's Current ECP System**

307. The Respondent currently documents its due diligence of suspicious orders in the Enhanced Customer Profile ("ECP"). Tr. 716, 737. The ECP is a "one-stop electronic

dashboard for all customer due diligence" that presents information in an "instantly retrievable" format. Tr. 737. The Respondent operated a version of ECP before May 2018, but it was not as robust as it is currently. Tr. 737-38, 740.

308. The Respondent's current ECP system has two places for notes whereas the pre-May 2018 ECP system had only one place for notes. Tr. 760-61.

309. The Respondent no longer uses Market Basket Reports but continues to use Pro-Compliance Reports. Tr. 716.

310. When an order is flagged as suspicious, it is held for review. Tr. 770, 1017. The ECP system alerts the Respondent's compliance team of the flagged order and a team member is assigned to investigate it. Tr. 770, 778, 1017-18. The Respondent's policy is to presume the order should be cancelled. Tr. 770. In general, under the Respondent's current system and policies in place since May 2018, the majority of flagged orders are cancelled but the order may be shipped if the investigation reveals information justifying the order. Tr. 770-71, 776, 1017-18. Notes taken during investigation of a flagged order are stored in the system and are visible at a glance on a customer's ECP home screen. Tr. 774; RE-23A, at 1. The Respondent looks at ECP data when an order is flagged. Tr. 641-42.

311. Under the Respondent's current procedures, a flagged order for controlled substances will not be "released unless the Guidepost team blesses the release, reviews the justification and what's in the ECP." Tr. 886.

312. Respondent Exhibit 23A contains screenshots of the Respondent's current ECP system. Tr. 753. The amount of information and level of analysis presented in Respondent Exhibit 23A represent the Respondent's current ECP system, and did not exist on the old system displayed on page 3 of Government Exhibit 19. Tr. 738, 753.

313. Page 1 of Respondent Exhibit 23A is the home screen of a customer's ECP profile. Tr. 747. The home screen is divided into five sections. RE-23A, at 1; Tr. 747. The first section includes the customer's contact and licensing information, and the date of the customer's last Pro-Compliance Report. Tr. 747-48. The third section contains flagged order notes. Tr. 774. The home screen also displays information about flagged orders at the top of the page. Tr. 772.

314. Page 5 of Respondent Exhibit 23A is the first page of a site visit report. Tr. 757. Site visits are conducted "for a variety of reasons," including on-boarding a new customer or investigating red flags. Tr. 757.

315. Page 6 of Respondent Exhibit 23A displays two pages of an enhanced due diligence report. Tr. 758. An enhanced due diligence report is a report concerning a customer created by a member of the Respondent's compliance team that does not involve visiting the customer's physical location. Tr. 757-58. This is a full report that includes a customer's contact information, population, demographics, licensing information, employees, top prescribers, background searches, and board actions. Tr. 758.

316. Page 8 of Respondent Exhibit 23A is a snapshot of a customer's on-boarding questionnaire. Tr. 759-60. When the Respondent on-boards a new customer, the customer completes a questionnaire and submits some compliance documents, and a member of Respondent's staff prepares an enhanced due diligence report of that customer and has several phone conversations with the customer. Tr. 759-60.

317. Page 9 of Respondent Exhibit 23A displays purchasing history and threshold amounts. Tr. 751-52.

318. Page 30 of Respondent Exhibit 23A is a prescriber page that allows the Respondent to access information about individual prescribers. Tr. 763.

319. Page 31 of Respondent Exhibit 23A shows information about a specific prescriber. Tr. 764.

320. Page 32 of Respondent Exhibit 23A shows a note on a customer put in by a member of Respondent's compliance team. Tr. 764-65.

321. Page 38 of Respondent Exhibit 23A shows a list of flagged orders, the reason the order was flagged, the status of that flagged order, and the compliance team member who is responsible for investigating that order. Tr. 772-73.

322. Currently, the Respondent verifies the licenses of the pharmacies that place orders with the Respondent. Tr. 958. In addition, the Respondent checks, at minimum, the registrations of a pharmacy's top prescribers. Tr. 960.

323. The Respondent's current ECP system allows the Respondent to conduct due diligence and to keep all the information in a readily retrievable format. Tr. 765.

324.    The ECP profile contains a section where key information from Pro-Compliance Reports is displayed "so it's quickly viewable." Tr. 749-50.

325.    Pro-Compliance Reports and other pertinent documents, such as site visit reports and enhanced due diligence reports, are accessible through the customer's ECP profile. Tr. 748-49, 756.

326.    The Respondent has conducted about 230 customer site visits since the OSC/ISO was issued. Tr. 888.

327.    The Respondent sometimes conducts its own analysis of dispensing data. Tr. 756. The Respondent will store the results of that analysis in the ECP system. Tr. 756.

328.    If the Respondent's compliance team sees that a customer is dispensing a high volume of trinity prescriptions, the team will conduct additional due diligence. Tr. 750.

329.    The Respondent's current ECP system has the capability to verify a customer's DEA registration. Tr. 753-54. The status of the customer's DEA registration is updated every day around the same time. Tr. 754. The ECP system also displays a customer's state license information. Tr. 755.

330.    If a member of Respondent's compliance team sees that a customer has a large number of patients who travel long distances to fill prescriptions, the compliance team would conduct enhanced due diligence. Tr. 761.

**August 2016 Meeting**

331.    Milione was the Assistant Administrator of Diversion Control at DEA for two years, and before that he was a DEA Special Agent for about 21 years. Tr. 845-46. Milione retired from the DEA on June 24, 2017. Tr. 940-41. Milione currently works for Guidepost Solutions, which was hired in early May 2018 to enhance the Respondent's SOM system, due diligence, and customer protocols. Tr. 844, 985.

332.    Milione regularly met with registrants while he was the Assistant Administrator. Tr. 941.

333.    Milione first met Paul Dickson, Sr., in June 2016 at a meeting of the Health Distribution Management Association Board of Directors. Tr. 852.

334.    Subsequently, Paul Dickson, Sr., invited Milione to come to Shreveport, Louisiana, to see the Respondent's facility there. Tr. 853. Respondent Exhibit 21 is a copy of the email Milione received inviting him to visit the Respondent. Tr. 854.

335. Milione met with the Respondent at its facilities in Shreveport on August 17, 2016. Tr. 856-57, 941. Several other DEA employees attended the meeting, to include Diversion Investigator Bass. Tr. 857, 859. The Respondent's representatives at the August 2016 meeting included Paul Dickson, Jacob Dickson, Clara Guin, and Eric Mutter, who worked for Pro-Compliance. Tr. 859.

336. The August 2016 meeting lasted one-and-a-half to two hours. Tr. 860, 976. The Respondent's SOM system was discussed at the meeting. Tr. 861, 976, 1107.

337. Respondent Exhibit 11 is a Power Point presentation concerning the Respondent's SOM system that the Respondent presented to Milione at the August 2016 meeting.[25] Tr. 864-65, 1013-14.

338. The Power Point presentation indicates that utilizing its old SOM system the Respondent had cancelled the accounts of 42 pharmacies between 2014 and 2016. Tr. 1014-16; RE-11, at 14.

**The Respondent's Acceptance of Responsibility**

339. In May 2018, Irelan unofficially became the Respondent's Director of Corporate Compliance and Security. Tr. 699, 791. It was unofficial because the Respondent did not have a corporate title for Director of Compliance until officially creating that title in June or July 2018. Tr. 699, 791. Irelan's objective as Director of Corporate Compliance is to ensure the Respondent has effective controls in place to prevent diversion. Tr. 700. Mr. Dickson offered him the position. Tr. 699-700.

340. Paul Dickson, Sr. removed himself from oversight of the Respondent's compliance program around May 2018. Tr. 784. Since that time, Irelan has had limited interaction with Paul Dickson, Sr. Tr. 783-84.

341. Irelan had no involvement in or responsibility for the Respondent's SOM system from January 2014 to May 2018. Tr. 723. Irelan also had no involvement in or responsibility for reporting suspicious orders before May 2018. Tr. 731-32.

342. Irelan was also not involved in the Respondent's due diligence before May 2018, but he "understood basic concepts of due diligence" to the extent it involved delivery drivers

---

[25] Although the cover of Respondent Exhibit 11 bears the date "August 17, 2017," Milione testified that the presentation was in 2016. Tr. 864.

observing suspicious activity at stores. Tr. 710, 793. Irelan had no idea what a red flag was before May 2018. Tr. 793.

343. Irelan does not have any ownership interest in the Respondent, which is owned by the Dickson family. Tr. 694, 836.

344. Irelan testified that he has the authority to bind the Respondent in contractual agreements regarding certain matters, such as the purchase of equipment. Tr. 837-38.

345. Irelan has never signed an agreement settling a lawsuit against the Respondent. Tr. 839.

346. Irelan is not required to obtain approval from anyone regarding the Respondent's budget for its compliance team. Tr. 784.

347. No member of Paul Dickson, Sr.'s family has complained to Irelan about the expense of operating the Respondent's compliance team. Tr. 785.

348. Irelan is not required to discuss with any member of the Respondent's management about decisions he makes regarding suspicious order monitoring. Tr. 785.

349. No one at the Respondent has suggested to Irelan that he cannot take actions that he wants to take regarding compliance. Tr. 784.

350. No one has ever told Irelan he cannot hire or terminate a member of the Respondent's compliance team. Tr. 785. Irelan is the final decision maker regarding staffing the Respondent's compliance team. Tr. 785.

351. The Respondent's sales personnel have no influence on the compliance team's decision to cancel an order, to report an order to DEA, to reject a potential new customer, or to terminate a customer for compliance issues. Tr. 785-86.

352. The Respondent's compliance team works with AGI, Guidepost, and the law firm Cadwalader, and Irelan does not have any plans on ending the Respondent's working relationship with those firms. Tr. 801.

353. Irelan would not feel comfortable terminating the Respondent's employment of Guidepost or AGI without first taking that decision to the company's Board. Tr. 803-04, 837. The Board, however, could terminate the Respondent's employment of Guidepost or AGI without receiving input from Irelan. Tr. 840.

354. Paul Dickson, Sr. could fire Irelan, Guidepost, AGI, or Cadwalader. Tr. 804-05.

355. In Irelan's opinion, Ms. Guin and Jacob Dickson are to blame for the Respondent's compliance failures for which Irelan accepts responsibility. Tr. 807-09.

356. Irelan testified that based on his review of the Respondent's records, before May 2018 the Respondent conducted "a tremendous amount of due diligence" of its customers. Tr. 704-05, 710. Irelan testified, however, that the Respondent did not keep the due diligence documentation "in such a way as to make it . . . easily accessible." Tr. 705, 710, 720; *see, e.g.*, GE-9, at 2; GE-11, at 1, para. 3; GE-11, at 2, para. 4.

357. Based on his experience as Director of Corporate Compliance, Irelan believes the Respondent's due diligence practices before May 2018 were insufficient, primarily because the due diligence documentation was "not properly maintained to be . . . easily retrievable." Tr. 705, 720. Irelan also testified that although the Respondent conducted due diligence, that information was not applied at the order level. Tr. 720-21.

358. Irelan testified that he accepts responsibility on the Respondent's behalf for the Respondent's SOM system during January 2014 to May 2018 as being inconsistent with best practices. Tr. 730-31. He also testified that he accepts responsibility on the Respondent's behalf for preventing reoccurrence of the failures of Respondent's old SOM system. Tr. 731.

359. Irelan testified that he accepts responsibility on the Respondent's behalf "for preventing reoccurrence of the company's past failures with respect to application of customer due diligence." Tr. 721-22.

360. Irelan testified that he accepts responsibility on the Respondent's behalf "for the company's failures for the period between January 2014 and May 2018 to effectively apply its customer due diligence in assessing orders of controlled substances." Tr. 722-23.

361. Irelan testified that he accepts responsibility for the Respondent shipping orders of controlled substances from January 2014 to May 2018 without conducting due diligence of those orders. Tr. 806-07.

362. Irelan testified that he accepts responsibility on the Respondent's behalf for the Respondent's failure to report suspicious orders from January 2014 to May 2018. Tr. 732-33. Irelan also testified that he accepts responsibility on the Respondent's behalf for correcting the Respondent's failure to report suspicious orders and for preventing the reoccurrence of the Respondent's failure to report suspicious orders. Tr. 732.

363. Irelan testified that he accepts responsibility for the Respondent shipping orders of controlled substances from January 2014 to May 2018 without resolving red flags of those orders. Tr. 807.

364. Irelan testified that he accepts responsibility for the Respondent having a non-functioning compliance system from January 2014 to May 2018. Tr. 807.

365. Irelan testified that the Respondent accepts responsibility for the allegations in paragraphs 10, 17, 21, 23, 39, 47, 48, 51, 52, 66, and 73 of the OSC. Tr. 813, 816-18, 827-28, 830-31; ALJ-1, at 3, 5, 6, 8, 9, 11, 12.

366. Irelan testified that the Respondent does not accept responsibility for the allegations in paragraphs 22 and 35 of the OSC. Tr. 817, 825; ALJ-1, at 6-7.

367. Irelan testified that the Respondent does not accept responsibility for the allegations in paragraph 32 of the OSC except it does accept responsibility for the part about failing to report potentially suspicious orders. Tr. 824-25; ALJ-1, at 7.

368. Irelan testified that he is not in a position to say whether the Respondent accepts responsibility for the allegations in paragraphs 24, 29, and 82 of the OSC. Tr. 821-23, 831-33; ALJ-1, at 6-7, 10, 13.

369. With respect to the allegations in paragraph 63 of the OSC, Irelan testified that he could not speak on additional due diligence that was or was not conducted because of the Respondent's poor record keeping at the time. Tr. 829-30; ALJ-1, at 11.

370. With respect to the allegations in paragraph 91 of the OSC, Irelan testified that the Respondent conducted additional due diligence but it was not properly applied. Tr. 832-33; ALJ-1, at 14.

371. With respect to the allegations in paragraph 58 of the OSC, Irelan accepted responsibility except that he testified that the Respondent did conduct additional due diligence and that at some point the Respondent cut off Pharmacy Specialties, but he did not know when that occurred. Tr. 828-29.

372. When asked by Government counsel how the Respondent can ensure that its past failure to report suspicious orders is not repeated, Irelan pointed to "the enhancement of ECP" and daily suspicious order reports that are emailed to Dunn and reviewed by the Respondent's compliance team every day. Tr. 777-78.

## ANALYSIS

The Order to Show Cause afforded the Respondent the opportunity to demonstrate why its Certificate of Registrations should not be revoked pursuant to 21 U.S.C. § 824(a)(4).  Under that portion of the United States Code, a distributor's registration may be suspended or revoked upon a finding that the distributor "has committed such acts as would render [its] registration under section 823 of this title inconsistent with the public interest as determined under such section . . . ."  With regard to distributors of schedule II controlled substances Congress has set forth five factors to consider when determining whether the distributor's registration would be in the public interest.  The factors to be considered are:

> (1) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;
> (2) compliance with applicable State and local law;
> (3) prior conviction record of applicant under Federal or State laws relating to the manufacture, distribution, or dispensing of such substances;
> (4) past experience in the distribution of controlled substances; and
> (5) such other factors as may be relevant to and consistent with the public health and safety.

21 U.S.C. § 823(b).

The DEA considers these public interest factors separately.  *Ajay S. Ahuja, M.D.*, 84 Fed Reg. 5479, 5488 (2019); *Masters Pharm., Inc.*, 80 Fed. Reg. 55418, 55472 (2015), *pet. for rev. denied*, 861 F.3d 206 (D.C. Cir. 2017); *Robert A. Leslie, M.D.*, 68 Fed. Reg. 15227, 15230 (2003).  Each factor is weighed on a case-by-case basis.  *Morall v. DEA*, 412 F.3d 165, 173-74 (D.C. Cir. 2005).  Any one factor, or combination of factors, may be decisive.  *David H. Gillis, M.D.*, 58 Fed. Reg. 37507, 37508 (1993).  Thus, there is no need to enter findings on each of the factors.  *Hoxie v. DEA*, 419 F.3d 477, 482 (6th Cir. 2005); *Masters Pharm.*, 80 Fed. Reg. at 55473.  Furthermore, there is no requirement to consider a factor in any given level of detail.  *Trawick v. DEA*, 861 F.2d 72, 76-77 (4th Cir. 1988).  When deciding whether registration is in the public interest, the DEA must consider the totality of the circumstances.  *See generally Joseph Gaudio, M.D.*, 74 Fed. Reg. 10083, 10094-95 (2009) (basing sanction on all evidence of record).

With respect to Factor One, concerning the maintenance of effective control against diversion, the DEA has promulgated regulations to guide the regulated community.  Specifically,

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74(b). In addition, while the DEA regulations do not explicitly require a distributor to maintain records that document its efforts to maintain effective controls against diversion, "documenting . . . is still an essential part of maintaining effective controls against diversion." *Masters Pharm.*, 80 Fed. Reg. at 55428 n.21. Further, the requirement to report suspicious orders "exists to provide investigators in the field with information regarding potential illegal activity in an expeditious manner." *Southwood Pharm., Inc.*, 72 Fed. Reg. 36487, 36501 (2007).

As with all enforcement actions the DEA brings against a registrant, the Government bears the initial burden of proof, and must justify revocation by a preponderance of the evidence. *Steadman v. SEC*, 450 U.S. 91, 100-03 (1981); *Masters Pharm.*, 80 Fed. Reg. at 55473; 21 C.F.R. § 1301.44(e). If the Government makes a *prima facie* case for revocation, the burden of proof shifts to the registrant to show that revocation would not be inconsistent with the public interest. *Masters Pharm.*, 80 Fed. Reg. at 55473; *Med. Shoppe—Jonesborough*, 73 Fed. Reg. 364, 387 (2008); *Gregory D. Owens, D.D.S.*, 67 Fed. Reg. 50461, 50464 (2002). A registrant may prevail by successfully attacking the veracity of the Government's allegations or evidence. Alternatively, a registrant may rebut the Government's *prima facie* case for revocation by accepting responsibility for wrongful behavior and by taking remedial measures to "prevent the re-occurrence of similar acts." *Jeri Hassman, M.D.*, 75 Fed. Reg. 8194, 8236 (2010) (citations omitted). In addition, when assessing the appropriateness and extent of sanctioning, the DEA considers the egregiousness of the offenses and the DEA's interest in specific and general deterrence. *David A. Ruben, M.D.*, 78 Fed. Reg. 38363, 38385 (2013).

# I.    The Government's Position

The Government presented its position in an opening statement, Tr. 25-30, and in its Post-Hearing Brief ("Government Brief"), submitted on August 2, 2019.[26] I have read and considered the Government's opening statement, and its post-hearing brief, in preparing this

---

[26] The Government's Brief has been marked as ALJ-90.

Recommended Decision.

In its Brief, the Government's proposed findings of fact are essentially the same as the findings of fact set forth in this Recommended Decision. ALJ-90, at Appendix ("App.") A. To the extent the Findings of Fact in this Recommended Decision differ from those proposed by the Government, it is because I have found the Government's proposed findings to be in error or not relevant to resolve the issues in this case. I specifically reject some of the Government's proposed findings of fact.[27] The Government also utilizes 21 U.S.C. § 824(a) as a procedural framework. ALJ-90, at 27. While listing the five public interest factors of 21 U.S.C. § 823(b), the Government specifically notes that it does not rely on Factors Three or Five, and it makes no argument concerning Factor Two. *Id.* at 27-29 & n.12. The Government combines its analysis of Factors One and Four. *Id.* at 28-44. In addition, the Government clearly set forth its allegations concerning the Respondent. *Id.* at 6-12.

In its Brief, the Government argues that under the Controlled Substances Act, and its enacting regulations, the Respondent has numerous obligations. ALJ-90, at 13. Of those obligations, two are the most relevant in this case. First, a distributor must maintain effective controls against diversion of controlled substances, and second, a distributor must design and operate a system that can identify suspicious orders of controlled substances, so as to allow the distributor the ability to report those suspicious orders to the DEA. *Id.* These obligations create two related and partially overlapping obligations for the distributor: a due diligence requirement; and a reporting requirement. *Id.* at 14. These obligations are well-established and have been the subject of DEA decisions, written guidance, and presentations. *Id.* Citing *Masters Pharm., Inc.*, 80 Fed. Reg. at 55480 n.166, the Government notes that a registrant is charged with the knowledge of its regulatory responsibilities. ALJ-90, at 14. The Government argues that, based on the guidance from DEA, it has been clear for at least a decade that distributors cannot ship

---

[27] The Government's proposed findings of fact include the specific number of dosages of controlled substances the Respondent shipped to specific exemplar pharmacies. ALJ-90, App. A, paras. 96, 97, 108, 109, 130, 131, 145, 146, 170, 171, 179, 180, 203, 204, 227, 228. I reject those proposed findings for several reasons. First, the numbers of shipped dosages to the pharmacies that the Government now alleges in its Brief were not disclosed in the Order to Show Cause or in prehearing filings. Second, there is no testimony concerning the number of dosage units shipped to the pharmacies. Third, the Government's summary of evidence contained on its CD-ROMs does not detail the number of dosage units shipped to the pharmacies. ALJ-64, at 31-32. Lastly, while the total number of dosages may be documented in Government Exhibits 65 and 66, neither I, nor the Administrator, are obligated to break out a calculator and add up thousands of line entries contained in an Excel spreadsheet to confirm the accuracy of the Government's calculations. Suffice it to say, these exhibits show that the Respondent shipped thousands of orders of oxycodone and hydrocodone containing thousands of dosage units to the exemplar pharmacies. And the Respondent has not rebutted that evidence.

orders of controlled substances without conducting due diligence and that they must report suspicious orders to the DEA. *Id.* at 15.

**Customer-based Due Diligence**

Quoting from *Holloway Distributing*, 72 Fed. Reg. 42118, 42124 (2007), the Government notes that "a registrant has an affirmative duty to protect against diversion by knowing its customers and the nature of [their controlled substances] sales." ALJ-90, at 15 (alteration in original). Relying on *Masters Pharm., Inc.*, 80 Fed. Reg. at 55477, the Government also argues that a distributor's duty to perform due diligence concerning its customers is based on the requirement that a registrant provide effective controls and procedures to guard against theft and diversion of controlled substances. ALJ-90, at 15; *see also* 21 C.F.R. § 1301.71(a). To satisfy the due diligence requirement, a distributor should look for any information that raises a serious doubt as to the legality of the business practices of one of its customers. ALJ-90, at 15. In doing so, a distributor should realize that the threshold for suspicion is low. *Id.* at 16. To help distributors, the DEA issued a letter to distributors in 2006, which identified areas of concern for a distributor to evaluate. *Id.* DEA decisions have also identified areas of concern of which a distributor should be cognizant. *Id.* at 17. Examples of those concerns include: dispensing trinity drug cocktails; the ratio of controlled to non-controlled prescriptions dispensed by a pharmacy; and the percentage of prescriptions that are paid for in cash at a pharmacy. *Id.*

Citing *Holloway Distributing*, 72 Fed. Reg. at 42124, the Government argues that a distributor has an affirmative duty to seek out such information. ALJ-90, at 17. The distributor must conduct an investigation into these concerns before it ships an order to a customer. *Id.* at 18. Furthermore, "a registrant cannot claim that it has conducted meaningful due diligence or has an effective suspicious orders monitoring program when it ignores information it has acquired which raises a substantial question as to the legitimacy of a customer's dispensing practices." *Id.* at 18 (quoting *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478). Accordingly, the Government argues that, "[a] distributor who fails to dispel *all* indicia of suspiciousness about a customer's business practices *prior to shipment* of any controlled substances—or who fails to properly document the performance of this investigation—has failed to maintain effective controls against diversion and, thus, violates the CSA and the regulations." *Id.* at 18-19 (emphasis in original).

**Monitoring Orders and Reporting Requirements**

The Government argues that in addition to the obligation to conduct due diligence on its customers, a distributor must also review every order it receives and identify suspicious transactions before filling those orders. ALJ-90, at 19. In fact, the distributor has an affirmative duty to not fill an order until it determines that the order is legitimate. *Id.* (citing *Novelty Distribs., Inc.*, 73 Fed. Reg. 52689, 52699 (2008)). Thus, a distributor must: develop and implement a system to identify suspicious orders; conduct adequate due diligence to dispel concerns before shipping such an order; and report orders to the DEA where the indicia of suspiciousness could not be resolved. ALJ-90, at 19. Again, the Government notes that the threshold for suspiciousness is a fairly low standard. *Id.* at 20.

The Government also notes that suspicious orders are not limited to orders of unusual size, pattern, or frequency. ALJ-90, at 21. Information that raises concerns while conducting due diligence of a customer also might make an order suspicious even though the order is not of unusual size, pattern, or frequency. *Id.* at 22 (citing *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478).

In the Government's view, under 21 C.F.R. § 1301.74(b) a distributor has two options once it has identified a suspicious order. ALJ-90, at 22. The distributor can report the order to the DEA and decline to fill the order, or the distributor can conduct an investigation which dispels all indicia of suspiciousness and then fill the order. *Id.* at 22-23. The Government recognizes some conflict in its position with the testimony of several witnesses.[28] *Id.* at 22-23 n.8. There is language in *Masters Pharm., Inc.*, that indicates that a distributor has an obligation to report an order as suspicious once the distributor had "flagged" the order by use of its SOM system. *Id.* In essence, an order is perceptibly suspicious once it has been flagged. *Id.* When a

---

[28]  The Government also states that I need not resolve this conflict. ALJ-90, at 22-23 n.8. I agree with the Government that there is tension in the *Masters* Final Order about when a distributor is required to report suspicious orders and whether the distributor can be exempted from that requirement by resolving the suspicion. ALJ-90, at 22-23 n.8 (quoting *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478). Any language in *Masters* that suggests that a distributor can be exempted from reporting suspicious orders conflicts with the clear, unambiguous directive in the regulation to report suspicious orders "when discovered," not after an investigation fails to resolve the suspicion. 21 C.F.R. § 1301.74(b); 80 Fed. Reg. at 55478 & 55479 n.164. Furthermore, it even conflicts with other language in *Masters* that says that once an order arouses, or should arouse, suspicion and is held for review, that order meets the low standard for being suspicious and must be reported pursuant to 21 C.F.R. § 1301.74(b). 80 Fed. Reg. at 55487 n.178. I also agree with the Government that "[w]hatever Section 1301.74(b) requires, Respondent failed to do it." ALJ-90, at 22-23 n.8. Accordingly, I will follow the testimony of the witnesses, and the language of *Masters* that once an order has been placed on hold it already meets the criteria of being suspicious and must be reported. 80 Fed. Reg. at 55487 n.178.

distributor has obtained information that an order is suspicious but chooses to ignore that information and fails to report the order, the distributor has violated 21 C.F.R. § 1301.74(b). *Id.* at 23-24.

**Duty to Investigate Before Shipping**

Even if a distributor reports an order as suspicious to the DEA, the distributor still must conduct due diligence before filling that order. ALJ-90, at 24 (citing *Masters Pharm., Inc.*, 80 Fed. Reg. at 55479 n.164). Thus, as the DEA explained in its September 2006 letter to distributors, the obligation to report a suspicious order is in addition to the general requirement that a distributor maintain effective controls against diversion. ALJ-90, at 24. Thus, "the obligation to perform due diligence is ongoing throughout the course of a distributor['']s relationship with its customer." *Id.* at 25 (quoting *Masters Pharm., Inc.*, 80 Fed. Reg. at 55477). Furthermore, documenting the distributor's due diligence efforts is an essential part of maintaining effective controls against diversion. ALJ-90, at 25-26 (citing *Masters Pharm., Inc.*, 80 Fed. Reg. at 55428 n.21). In fact, the absence of documentation can serve as substantial evidence that a distributor did not perform the required due diligence. ALJ-90, at 26 (citing *Masters Pharm., Inc.*, 80 Fed. Reg. at 55428).

**Respondent Failed to Conduct Adequate Due Diligence**

The Government argues that the Respondent was plainly aware of its obligation to conduct due diligence. ALJ-90, at 29. The Respondent was also aware of what to look for, concerns such as: the trinity drug cocktail; the ratio of cash payments; the ratio of controlled substances dispensed; and excessive growth and dispensing of controlled substances. *Id.* at 30-31. Furthermore, the Respondent was routinely aware of its customer's performance in these areas because that performance was highlighted in the Pro-Compliance Reports the Respondent received. *Id.* at 31. In spite of the Respondent's awareness of these areas of concern, it did not conduct meaningful due diligence, and it did not document any explanations it may have received from its customer pharmacies. *Id.* The Respondent's conduct concerning the eight exemplar pharmacies illustrate the point. *Id.* at 32.

Hephzibah is one of the exemplar pharmacies. ALJ-90, at 32. When Hephzibah sought to open an account in March 2017, a Pro-Compliance Report was prepared. *Id.* That report showed that Hephzibah was dispensing a disproportionate amount of controlled substances; that an excessive amount of prescriptions were paid for in cash; that Hephzibah was dispensing high

quantities of both oxycodone and hydrocodone; that Hephzibah was filling prescriptions for practitioners whose DEA registration numbers could not be verified; and that Hephzibah was dispensing trinity drug cocktails. *Id.* at 32-33. In the Government's view, each of these issues raised a serious doubt about the legality of Hephzibah's business practices. *Id.* at 33. The Respondent, however, began shipping controlled substances to Hephzibah without restriction. *Id.* The Pro-Compliance Reports concerning the other exemplar pharmacies revealed similar concerns that the Respondent did not resolve. *Id.* at 34-35. Thus, the Respondent elected to "ignore information which raise[d] serious doubt as to the legality of a potential or existing customer's business practices." *Id.* at 36 (alteration in original) (quoting *Masters Pharm., Inc.*, 80 Fed. Reg. at 55477).

**Respondent Failed to Detect and Report Suspicious Orders**

The Government argues that despite being advised of its obligation to design and operate a system to detect suspicious orders, the Respondent made no effort to implement such a system until 2016. ALJ-90, at 37. As a result, there can be no serious dispute that the Respondent failed to comply with its obligations under 21 C.F.R. § 1301.74(b). *Id.* Furthermore, even after the Respondent established standard operating procedures in 2016, the Respondent apparently failed to follow its own procedures. *Id.* For example, those procedures required a daily drug sales report, but the Respondent produced no such report. *Id.* Those procedures also called for the Respondent to ask a customer pharmacy for a written explanation of an unusual order, but the Respondent produced no such written explanations. *Id.* Those procedures also stated that in all cases a letter would be sent to the DEA indicating a suspicious order, but the Respondent produced no such letters. *Id.* at 37-38.

In addition, the Government's reasonable and reliable statistical analysis demonstrated that between January 2014 and April 2018 the Respondent should have flagged around 12,000 orders for either oxycodone or hydrocodone as being potentially suspicious. ALJ-90, at 38, 40-44. There is no evidence in the record, however, that the Respondent identified, held, or investigated any of these potentially suspicious orders to dispel the indicia of suspiciousness. *Id.* at 38-39. It is thus fair to conclude that the Respondent was required to report all of these orders to the DEA. *Id.* at 39.

**Mr. Irelan Cannot Accept Responsibility for Respondent**

While the Government cites to 21 C.F.R. § 1316.50, it also acknowledges that it is not aware of any Agency decisions that address the question of who can accept responsibility on behalf of a corporate registrant. ALJ-90, at 46. Nevertheless, the Government argues that Mr. Irelan does not have standing to do so. *Id.*

The Government argues that a critical part of a registrant's burden is to "present sufficient mitigating evidence to assure the Administrator that it can be entrusted with the responsibility carried by such a registration." ALJ-90, at 47 (quoting *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 363, 387 (2008)). In addition, the Government notes that "because past performance is the best predictor of future performance, this Agency has repeatedly held that . . . the registrant must accept responsibility for its actions and demonstrate that it will not engage in future misconduct." *Id.* (citing *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. at 387; *Sun & Lake Pharmacy*, 76 Fed. Reg. 24523, 24533 (2011)). The Government also argues that an essential element of that showing is that the registrant and its principals accept responsibility for their misconduct. ALJ-90, at 47. Thus, the Government argues, the issue is whether the Respondent and its principals have accepted responsibility for the Respondent's wrongdoing. *Id.* at 48.

The Government argues that Mr. Irelan lacks credibility to demonstrate the Respondent's acceptance of responsibility. ALJ-90, at 48. Mr. Irelan lacks credibility because he is neither an owner nor a corporate officer of the Respondent, which is owned by the Dickson family. *Id.* Instead, Mr. Irelan can be removed at will by that family, and the DEA has long recognized that it can look beyond the corporate veil to determine who makes the decisions concerning the controlled substance business. *Id.* at 48-49. Mr. Irelan also lacks credibility because during the period of misconduct the decisions concerning the Respondent's compliance were made by members of the Dickson family, and the corporate ownership and leadership remains the same today as it did during the period of misconduct. *Id.* at 49.[29]

The Government also argues that Mr. Irelan's acceptance of responsibility was equivocal. ALJ-90, at 50-54. As an initial matter, the Government argues that Mr. Irelan did not understand what he was accepting responsibility for. *Id.* at 50. Citing *Pharmacy Doctors Enterprises*, 83

---

[29] The Government also asks that I draw an adverse inference from Paul Dickson's failure to testify. ALJ-90, at 49 n.24.

Fed. Reg. 10876, 10903 (2018), the Government argues that there can be no acceptance of responsibility where there is no understanding about how a registrant's conduct fell short of federal standards. ALJ-90, at 50.  As evidence of Mr. Irelan's lack of understanding, the Government argues that he was not prepared to address the specific allegations in the charging document.  *Id.* at 51.

The Government argues that Mr. Irelan's testimony was limited to three areas:  failure to apply due diligence information at the order level; a general acknowledgement that the Respondent's SOM system was not consistent with best practices and compliance; and the Respondent's failure to report suspicious orders.  ALJ-90, at 51-52.  In the Government's view, Mr. Irelan did not accept responsibility for the Respondent's failure to conduct adequate due diligence to resolve the numerous red flags identified in the Pro-Compliance Reports.  *Id.* at 52. In addition, Mr. Irelan's purported acceptance of responsibility was equivocal and at times vague.  *Id.* at 53.  Finally, the Government argues that since the Respondent has not tendered an unequivocal acceptance of responsibility, its remedial actions are not relevant in these proceedings.  *Id.* at 54.

**Egregiousness and Deterrence**

The Government argues that the Respondent's violations of the Controlled Substances Act and DEA regulations are so egregious that they outweigh any acceptance of responsibility and/or the Respondent's efforts at remediation.  ALJ-90, at 58-60.  Here, the Government cites to the tens of millions of dosage units of oxycodone and hydrocodone that the Respondent shipped to its customers, when it had ample reason to believe that those customers were engaging in illegitimate behavior.  *Id.* at 59.  Further, whether the Respondent became aware that its customers were engaged in suspicious practices, either through the Pro-Compliance Reports or from its own employees, or from the orders themselves, the Respondent ignored the information and continued to ship out orders.  *Id.* at 59-60.

Finally, the Government argues that DEA's oversight responsibilities include both specific and general deterrence considerations.  ALJ-90, at 60-61.  Given the egregious nature of the Respondent's violations, the Agency's interest in deterring similar behavior among the regulated community weighs heavily in favor of revocation.  *Id.* at 61 (citing *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. 74800, 74810 (2015)).

## II.    The Respondent's Position

The Respondent presented its position in an opening statement, Tr. 30-43, and in its Proposed Findings of Fact and Conclusions of Law ("Respondent's Brief"), submitted on August 2, 2019.[30]  I have read and considered the Respondent's opening statement, and its post-hearing brief, in preparing this Recommended Decision.

In its Brief, the Respondent's proposed findings of fact are essentially the same as the Findings of Fact set forth in this Recommended Decision. ALJ-89, at 4-59, paras. 1-180. To the extent the Findings of Fact in this Recommended Decision differ from those proposed by the Respondent, the difference is because I have found the Respondent's proposed findings to be in error or not relevant to resolve the issues in this case.  I specifically reject some of the Respondent's proposed findings of fact.[31]  In addition, many of the Respondent's proposed findings of fact are based upon exhibits that contain statements about what the Respondent claims it did in the past, without any other evidence of record to corroborate those claims.[32]  The Respondent also noted that there was no evidence presented concerning its New Orleans' registration. *Id.* at 2-3, and 11, para. 27.

The Respondent argues that the DEA failed to meet its burden that the Respondent's continued registration is not in the public's interest. ALJ-89, at 86-87, paras. 244-46.  The Respondent also argues that due process requires the Tribunal to consider only the allegations

---

[30] The Respondent's Brief has been marked as ALJ-89.

[31] For example, the Respondent relies on Respondent Exhibit 32 (for identification) in support of its position that Mr. Irelan had the authority to speak on the Respondent's behalf. Respondent refers to this proposed exhibit as 52 but it was marked for identification at the hearing as 32. Tr. 1077. That proposed exhibit was created and offered after Mr. Irelan testified and was not admitted. Tr. 1070-73. The proposed exhibit has no evidentiary value. Thus, it cannot be used to support the Respondent's proposed findings of fact, or its proposed conclusions of law. *See* ALJ-89, at 12, para. 32; at 65, para. 194; at 67, para. 198. In addition, Respondent Exhibit 5.001 (for identification), was never offered as an exhibit or admitted. ALJ-89, at 80, para. 231. Thus, it cannot be used to support the Respondent's conclusions of law. The same is true for Respondent's proposed exhibit 22. *Id.* at 63-64, para. 192.

[32] Examples of the Respondent creating a "fact" out of a document reporting that the Respondent did or did not do something are too pervasive to list. As examples, however, the Respondent's proposed findings of fact 34, 36-38, and 42-45 all cite to Government Exhibit 71, which clearly is a hearsay statement. The Respondent uses Government Exhibit 71 as proof of the actions the document says were performed. The same can be said of the Respondent's use of Government Exhibits 9, 11, 13, 18, 19. Indeed, the Respondent acknowledges this. The Respondent states that no DEA witness called into question the veracity of the Respondent's "descriptions of its suspicious order monitoring system provided to DEA in Respondent's responses to the Subpoenas." ALJ-89, at 15, para. 36 (emphasis added). Since the Respondent called no witness who could testify to the truth of the matters stated in the responses, I give little weight to proposed findings of fact that the Respondent did or did not take an action described in those responses, absent some corroborating evidence. For example, no evidence corroborates the Respondent's claim that it "ceased supplying 142 retail pharmacies," GE-9, at 5, but Government Exhibit 14 and its content provides some corroboration to the Respondent's claim that Government Exhibit 14 is a "phone log . . . kept by Clara Guin," GE-13, at 1.

regarding the Respondent's conduct in relation to the exemplar pharmacies in the OSC ("OSC Customers"). *Id.* at 88-89, paras. 248-50. According to the Respondent, the Government clearly indicated that the scope of its allegations regarding due diligence was limited to the OSC Customers. ALJ-89, at 89, para. 250. Thus, the Respondent's position is that the Tribunal should assume that all other conduct was lawful. *Id.* (citing *Wesley Pope, M.D.*, 82 Fed. Reg. 14944, 14984 (2017)). Therefore, the Respondent argues that the Government should be estopped from making any argument that the Respondent did not conduct due diligence relating to customers not identified in the OSC.[33] *Id.*

Nevertheless, the Respondent also argues that I incorrectly excluded evidence of due diligence documents unrelated to the OSC Customers.[34] ALJ-89, at 90-93, paras. 251-56. Specifically, the Respondent argues that the Tribunal's exclusion of attachments to Government Exhibit 9 was an error. ALJ-89, at 90, para. 252. The Respondent argues that the two exhibits were relevant and their authenticity was proven. ALJ-89, at 90-93.

**Suspicious Orders**

The Respondent argues that the Government failed to prove that it did not file suspicious order reports to the extent alleged in the OSC, and that the Government did not show that the orders met the regulatory definition of suspiciousness. ALJ-89, at 93-96, paras. 257-62. According to the Respondent, Mr. Rose's analysis was flawed and he utilized an unnecessarily rigid formula to try to prove that the Respondent did not conduct due diligence. ALJ-89, at 94-95, paras. 259-61. The Respondent argues that Mr. Rose's testimony should not be relied upon

---

[33] To the extent the Respondent argues it was not on notice of general allegations of its failure to conduct due diligence, or that the testimony of Mr. Rose concerning a "ballpark" number was a new allegation, I reject the arguments. *See* ALJ-89, at 88-89, paras. 248-50; at 96-97, para. 263-64. First, "[a]n agency is not required to give every respondent a complete bill of particulars as to every allegation that [the respondent] will confront." *Brian Thomas Nichol, M.D.*, 83 Fed. Reg. 47352, 47353 n.3 (2018) (quoting *Moore Clinical Trials, L.L.C.*, 79 Fed. Reg. 40145, 40159 n.34 (2014)). The allegations are "not judged by the standards applied to an indictment at criminal law." *Id.* Furthermore, paragraph 10 of the OSC clearly put the Respondent on notice with regard to general allegations of due diligence, not simply limited to the exemplar pharmacies. ALJ-1, at 3, para. 10. With regard to Mr. Rose's use of the phrase "ballpark" number, that testimony did not give rise to a new allegation. Mr. Rose is a statistician and he was simply describing what he was doing in layman's terms. Second, I find that if there was any confusion on the Respondent's part that as the hearing progressed there was clearly litigation by consent. *See Superior Pharmacy I & Superior Pharmacy II*, 81 Fed. Reg. 31310, 31321 n.14 (2016) (citing *Duane v. Dep't of Defense*, 275 F.3d 988, 995 (10th Cir. 2002)); *see also Grider Drug #1 & Grider Drug #2*, 77 Fed. Reg. 44070, 44077 n.23 (2012).

[34] I do not concede that I erred in excluding the attachments the Respondent offered to Government Exhibit 9, attachments the witness could not identify and which contained no relevant information. I can state, however, that their exclusion had absolutely no impact on my recommendation in this case. Nevertheless, the excluded documents are certified as part of the Administrative Record.

did not consider "context"; and was not intended to identify suspicious orders. *Id.* at 93-94, paras. 258-60. Furthermore, a distributor is not required to perform a statistical analysis of every order to determine whether it is suspicious. *Id.* at 95, para. 261 (citing *Masters Pharm., Inc.*, 80 Fed. Reg. at 55418).

With respect to what the Respondent terms the Ballpark Theory—i.e., the Government's use of "ballpark numbers" or "how many suspicious orders could theoretically have been missed"—the Respondent claims that the theory was raised for the first time at the hearing and the Respondent was not timely notified of these allegations. ALJ-89, at 96-97, para. 263. Moreover, the Respondent argues that these allegations of theoretically suspicious orders were not proven by a preponderance of the evidence. *Id.* at 97, para. 264. In fact, the Respondent argues that "[a] generalized accusation of a wide-ranging failure to file non-specific reports does not meet the Government's burden of establishing by a preponderance of the evidence which orders were suspicious under DEA regulations." *Id.* at 94, para. 259.

**Red Flags**

The Respondent argues that Group Supervisor Dunn incorrectly defined red flags. ALJ-89, at 97, para. 265. Specifically, the Respondent cites to the record where the Group Supervisor testified that a ratio of controlled substance dispensing to non-controlled substance dispensing exceeding 15% constitutes a red flag, but then conceded that the Agency has indicated the ratio is 20 percent. ALJ-89, at 97, para. 265. Further, the Respondent quoted the Group Supervisor's testimony "that a distributor must investigate and resolve all red flags related to a customer or a customer's orders before shipping any controlled substances to that customer." *Id.* at 98-99, para. 267. Mr. Weinstein, however, testified "that he was not aware of 'any guidance on red flags of dispensing diversion that state that a distributor cannot make subsequent shipments of controlled substances.'" *Id.* In addition, Mr. Milione testified "that a distributor does not have to stop shipping all controlled substances orders to a pharmacy that exhibits a customer-level, rather than order-level red flag." *Id.* According to the Respondent, these differences in testimony demonstrate that the Group Supervisor's standards were not instructive on how red flags were to be addressed. *Id.* In the Respondent's view, the Group Supervisor's standards would completely disrupt the supply of legitimate medicine.[35] *Id.*

---

[35] The Respondent states, "[i]f distributors were to cease shipping all controlled substance orders to pharmacy customers during the pendency of an investigation into a customer-level red flag unconnected to a particular order,

**The Government Did Not Prove that Respondent Failed to Conduct Due Diligence**

The Respondent next argues that the Government did not prove that it failed to conduct due diligence before shipping orders, either through testimony or documentary evidence. ALJ-89, at 100-03, paras. 269-76. When Group Supervisor Dunn was asked whether he knew if the Respondent "dispelled any red flags," he testified, "Without having the documentation, I wouldn't." *Id.* at 100, para. 270. Also, the Respondent argues that the Group Supervisor acknowledged that the DEA received documents demonstrating due diligence, and that in a prehearing filing, the Government's proposed testimony included the Group Supervisor's proposed testimony that "DEA requested that Respondent provide DEA with its written due diligence files, including these written explanations, and Respondent did not provide any such files or explanations."[36] *Id.* at 100, para. 271. Thus, according to the Respondent, the Group Supervisor's testimony that the DEA received documents from the Respondent is inconsistent with the allegation that it did not perform due diligence. *Id.* at 101, para. 271. The Respondent argues that because the Group Supervisor does not know whether the Respondent conducted due diligence, the Government cannot meet the preponderance of evidence standard to show that it did not. *Id.*

The Respondent also argues that the Government cannot rely on evidentiary presumptions to establish that the Respondent did not perform due diligence. ALJ-89, at 101, para. 272. Recognizing language from *Masters Pharm. Inc.*, that "[t]he absence of an entry, where an entry would naturally have been made if a transaction had occurred, should ordinarily be equivalent to an assertion that no such transaction occurred, and therefore should be admissible in evidence for that purpose," the Respondent argues that presumption does not apply in this case. *Id.* (quoting *Masters Pharm., Inc.*, 80 Fed. Reg. at 55428). The Respondent argues that this presumption does not apply because the "Respondent did not have a standard practice of documenting the due diligence it performed after receiving information that either an order or a customer might be suspicious." *Id.* at 101-03, paras. 272-74.

**No Requirement to Cease Shipments**

Similarly, the Respondent argues that there is no DEA rule or regulation that requires registrants to suspend all shipments to a customer while it investigates red flags. ALJ-89, at 104,

---

then the supply of legitimate medicine would be 'completely disrupt[ed].'" ALJ-89, at 99, para. 267 (alteration in original). While that may be true, it is also apparently what the Respondent now does. FF 299.

[36] Prehearing statements, however, do not constitute substantive evidence. Tr. 8.

para. 277.  The Respondent argues that the Administrator's decision in *Southwood Pharm., Inc.*, 72 Fed. Reg. 36487 (2007) stated that the registrant's actions of shipping to its customers while investigating red flags was considered as merely a factor but did not impose a regulatory duty on the Respondent to stop shipments altogether.  *Id.* at para. 278.  The Respondent further distinguishes the facts of *Southwood Pharm., Inc.*, where the registrant continued to make shipments even after the DEA informed it that its customers were under investigation.  *Id.* at 104-05, para. 279.  The Respondent argues that the red flags the Government claims were known to the Respondent, "were insufficient to impose on Respondent a duty to stop shipping all controlled substances to the OSC Customers."  *Id.* at 105, para. 280.

The Respondent argues that there are three differences in the red flags the Government identified in this case as opposed to the facts in *Southwood Pharm., Inc.*  ALJ-89, at 105, para. 280.  First, the DEA never informed the Respondent that the OSC Customers were being targeted.  *Id.* at 105-06, para. 281.  Second, DEA did not prove that the Respondent did not dispel the suspicions concerning the red flags.  *Id.* at 106, para. 282.  Third, the Group Supervisor's testimony concerning red flags should be called into question.  *Id.* at 106-07, para. 283.  Further, the Respondent urges the Tribunal to "ignore" the Group Supervisor's analysis of the Market Basket Reports because he (and those at DEA whom he supervised) did not understand whether the Reports "referred to dosage units, dollars, or both."  *Id.* at 106-07, para. 283.  The Group Supervisor's testimony concerning the Market Basket Reports is thus "unduly prejudicial" and "not probative of any fact."  *Id.*

The Respondent next argues that the Group Supervisor's "testimony regarding the Pro Compliance reports does not establish that Respondent was aware of red flags sufficient to impose on it a duty to stop shipments."  ALJ-89, at 107, para. 284.  The Respondent contends that the Group Supervisor's testimony demonstrated that the Pro-Compliance Reports do not tell the whole story because:  specialty drug stores could explain the high percentage of controlled substances; the drug store could be located close to a hospital;  or "a high percentage of cash payments could be due to demographics such as a large uninsured population."  *Id.*  The Respondent also argues that the Group Supervisor's testimony that, from DEA's perspective, one trinity prescription would be too many, is unsupported by any published guidance documents or DEA decisions.  *Id.*  Instead, the Respondent points to testimony from Mr. Irelan, Mr. Milione,

and even the DEA Section Chief to argue that it did not have to cease shipments during investigations of customers. *Id.* at 107-08, para. 285.

The Respondent also argues that the Group Supervisor's "opinion, albeit expert, is not determinative" and contrary to both the Respondent's expert's findings and the practical realities of the pharmaceutical distribution business because his opinion contained unworkable thresholds. ALJ-89, at 108-09, paras. 286-87. Although the Respondent argues that the Government did not prove that the Respondent did not dispel red flags, it also argues that it did not fail to maintain effective controls against diversion. *Id.* at 109, para. 288. Moreover, (yet somewhat contradicting itself), the Respondent relies upon Mr. Irelan's acceptance of responsibility for the Respondent's failure to perform effective due diligence. *Id.*

**Mr. Irelan's Authority to Accept Responsibility**

The Respondent contends that it has unequivocally accepted responsibility for both the Government's proven and unproven allegations. *See* ALJ-89, at 60-61, para. 187. According to the Respondent, Mr. Irelan, its Controlled Substance Compliance Officer, is qualified to accept responsibility on behalf of the Respondent. ALJ-89, at 62, para. 188. In this matter, Mr. Irelan testified on behalf of the Respondent to accept responsibility for the underlying misconduct contained within the Government's allegations. *Id.* at 62, para. 189. The Respondent argues that Mr. Irelan is "better positioned than anyone,"[37] to accept responsibility on its behalf, because: (1) he is in charge of remedial steps;[38] (2) DEA precedent holds that "a senior person who oversees corporate operations that relate to a respondent's alleged misconduct is qualified to accept responsibility;"[39] and (3) he was authorized by the Chairman of the Board of Directors to accept responsibility.[40]

First, "Mr. Irelan testified that he would . . . be responsible for preventing reoccurrence of Respondent's failures to implement an appropriate suspicious order monitoring system," and "preventing reoccurrence of Respondent's failure to apply customer due diligence at the order level," and "preventing reoccurrence of Respondent's prior failure to report suspicious orders." ALJ-89, at 62, para. 189. Second, the Respondent argues that in *Holiday CVS, L.L.C.*, 77 Fed. Reg. 62316 (2012), the respondent provided the testimony of its Vice President of Pharmacy

---

[37] ALJ-89, at 63, para. 190.
[38] ALJ-89, at 62, paras. 188-89.
[39] ALJ-89, at 63-64, paras. 191-93.
[40] ALJ-89, at 65, para. 194. As noted earlier, I specifically reject this as a fact. *Supra* note 31.

Operations to accept responsibility, and the Administrator did not rule that he was unable or unqualified to do so. ALJ-89, at 63, para. 191. Thus, it is the Respondent's position that someone other than the owner or highest ranking executive may accept responsibility on behalf of the corporate registrant. *Id.* at 63, para. 192. According to the Respondent, in *Holiday CVS*, the DEA did not establish "which corporate officer can or cannot accept responsibility." *Id.* at 64, para. 193. The Respondent also argues that the Chairman of the Board of Directors explicitly authorized Mr. Irelan to accept responsibility on behalf of the Respondent. *Id.* at 64-65, para. 194; at 67, para. 198.

**21 C.F.R. § 1316.50**

The Respondent argues that the regulatory section relied upon by the Government, 21 C.F.R. § 1316.50, does not apply to the issue of acceptance of responsibility. ALJ-89, at 65, para. 195. Rather, the Respondent states that "the provision is intended to notify litigants of who is permitted to conduct litigation on behalf of a respondent." *Id.* at 65-66, para. 196.

The Respondent states that this provision "has never been cited to prevent a respondent's employee from accepting responsibility." ALJ-89, at 66, para. 196. Moreover, the Respondent states that it "clearly disclosed that Mr. Irelan would accept responsibility on behalf of Respondent for all proved allegations." *Id.* at para. 197. Accordingly, the Respondent argues, the Government waived its attempt to preclude the noticed testimony. *Id.*

**Unequivocal Acceptance of Responsibility**

The Respondent argues that it accepted responsibility through Mr. Irelan, who fully accepted responsibility for the Government's general allegations. ALJ-89, at 67-70, paras. 199-205. The Respondent also argues that the Government did not call into question his acceptance of responsibility during cross-examination. *Id.* at 67, para. 199. However, the Respondent acknowledges that Mr. Irelan did not accept responsibility for certain allegations. Specifically, the Respondent argues that the Government did not prove or even offer evidence concerning the allegations that no due diligence was performed on the "OSC Customers" after the Respondent became aware of red flags. *Id.* at 71, para. 208. The Respondent contends that both the Market Basket Reports and the Pro-Compliance Reports (discussed during the Group Supervisor's testimony) support this assertion. *Id.*

The Respondent notes that the Government failed to prove that the Respondent did not conduct additional due diligence on Wallace Drug Company after January 9, 2018. ALJ-89, at

72, para. 211. Accordingly, the Respondent argues that Mr. Irelan did not admit to the alleged misconduct in paragraph 29 of the OSC, or accept responsibility for those narrow allegations. *Id.* However, the Respondent does not believe that this refusal amounts to an equivocal acceptance of responsibility because the evidence shows that the Respondent conducted additional due diligence. *Id.* at para. 212. Further, the Respondent states that "Mr. Irelan has unequivocally accepted responsibility for Respondent's general failure to conduct effective due diligence" and this clear and confident acceptance of responsibility outweighs any equivocation on his part. *Id.* at 73, para. 214.

Next, the Respondent concedes that Mr. Irelan did not accept responsibility for not conducting additional due diligence on Bordelon's Super-Save Pharmacy ("Bordelon's") on or about May 2017 (ALJ-1, at para. 35). ALJ-89, at 73-74, para. 217. The Respondent offers the content of Government Exhibit 58, Market Basket Reports that post-date this time period and, which in the Respondent's estimation, constitutes evidence that it conducted additional due diligence. *Id.* at 74, para. 217. However, the Respondent accepted responsibility for the allegations contained in paragraph 39 of the OSC, as it pertained to its conduct with Bordelon's. *Id.* at para. 218. Specifically, paragraph 39 of the OSC begins with the language, "Notwithstanding the above," which incorporated the allegations of failing to conduct adequate due diligence and failing to file suspicious order reports. *Id.*

The Respondent also accepted responsibility for misconduct relating to: Folse Pharmacy, ALJ-89, at 74-75, paras. 219-20; Pharmacy Specialties Group, *id.* at 75-76, paras. 221-23, and Dave's Pharmacy, *id.* at 76-77, paras. 224-26. The Respondent acknowledges that Mr. Irelan testified that he was not knowledgeable enough to admit to paragraph 63 of the OSC. *Id.* at para. 224. The Respondent states, however, that Mr. Irelan's lack of knowledge does not render his testimony concerning paragraph 63 as an equivocal acceptance of responsibility. *Id.* at 77, para. 225. That is because Government Exhibit 61, the Market Basket Reports, and the testimony of the Group Supervisor, demonstrate that the Respondent conducted due diligence. *Id.* Because the Government did not prove this failure to conduct additional due diligence, the Respondent argues that Mr. Irelan's acceptance of responsibility remained unequivocal. *Id.* Further, Mr. Irelan also accepted responsibility for OSC paragraph 66, which encompassed the Dave's Pharmacy orders. *Id.* at para. 226.

The Respondent admits that Mr. Irelan testified that he was without full knowledge to accept responsibility for paragraph 73 of the OSC, which pertains to failing to conduct any additional due diligence concerning Hephzibah. ALJ-89, at 77-78, para. 227. Mr. Irelan, however, accepted responsibility for the other misconduct and again answered in the affirmative that he accepted responsibility. *Id.* The Respondent further argues that the Government failed to prove that it conducted no due diligence on Hephzibah Pharmacy. *Id.*

With respect to paragraph 82 of the OSC, pertaining to the Respondent's misconduct related to Wellness Pharmacy, the Respondent argues that it accepted responsibility for this conduct during the hearing. ALJ-89, at 78-79, para. 229. The Respondent also reiterated that the Government offered no evidence that the Respondent failed to conduct due diligence and in fact, the Group Supervisor testified that the Respondent indeed provided due diligence files in its responses to the DEA subpoenas. *Id.*

Similarly, the Respondent states that with regards to paragraph 91 of the OSC, containing allegations of misconduct related to Wilkinson Family Pharmacy, Mr. Irelan again did not admit the "unproven" allegation that it conducted no additional due diligence. ALJ-89, at 79, para. 230. The Respondent states that Government Exhibit 64, containing the Market Basket Reports for Wilkinson, post-dates the time period in which the misconduct occurred; also, the Group Supervisor testified that due diligence files were provided in the Respondent's subpoena responses. *Id.* at 80, para. 231.[41]

---

[41] The Respondent also refers to Respondent Exhibit 5.001 to support its assertion that there is evidence of due diligence conducted on Wilkinson Family Pharmacy, but this exhibit was neither offered nor admitted into the record. *See* ALJ-89, at 80, para. 131 n.4. The Respondent seeks to admit this exhibit post-hearing, and the Respondent argues that this is appropriate because the "Respondent offered the exhibits, the Government had the opportunity to cross-examine witnesses about the exhibits, and introduce rebuttal testimony or evidence." ALJ-89, at 80, n.4 (citing *Brian Thomas Nichol, M.D.*, 83 Fed. Reg. 47352, 47353 n.4 (2018)). The Respondent, however, did not offer the exhibit into evidence. *See* Tr. 453-60. The statement of Respondent's counsel at the hearing that she "neglected to offer 5.001" did not clearly notify me at that time that she intended to formally move that document into evidence. Tr. 453. Furthermore, in *Nichol*, the respondent attempted to enter new exhibits into the record after the hearing had taken place; specifically, the respondent requested to enter back pages of certain DEA 222 forms to rebut the Government's testimony (and enter an accompanying affidavit of the individual who prepared the exhibit). 83 Fed. Reg. at 47353 n.4. The Administrator agreed with the ALJ's ruling to deny the admission of the Respondent's post-hearing proposed exhibit because the Respondent "had the originals of [the] exhibits at the hearing and made no attempt to offer" these copies. *Id.* (quoting the ALJ's Recommended Decision). In addition to timeliness, the ALJ and Administrator agreed that the proposed exhibit would be unfairly prejudicial to the Government due to the lack of opportunity to conduct cross-examination or present rebuttal evidence. *Id.* Therefore, it is apparent that the *Nichol* case does not provide a basis in which I can admit this exhibit post-hearing, absent the consent of the Government. This also applies to the "other documents about which there was an offer of proof but which the Tribunal did not receive in evidence." ALJ-89, at 80 n.4. Following past DEA cases, admitting

**Public Interest Factors**

The Respondent argues that its registration should not be revoked unless, after a five factor analysis, it is determined that it had committed such acts to render its registration inconsistent with the public interest. ALJ-89, at 110, para. 289. The Respondent then utilizes 21 U.S.C. § 823(b) as a procedural framework. *Id.* at para. 290. With respect to the first factor, maintaining effective controls against diversion, the Respondent notes that the Government did not produce any evidence concerning the Respondent's security practices. *Id.* at 111-12, paras. 292-94. Also concerning the first factor, the Respondent argues that it conducted due diligence of new customers and existing customers, noting that it was not as deficient as was the registrant in *Southwood Pharm., Inc. Id.* at 112, para. 295. As evidence that it conducted due diligence of new customers, the Respondent points out that a Pro-Compliance Report was commissioned on each new customer, and the Respondent's compliance officer analyzed the data contained in those reports. *Id.* at 112-13, para. 296. The Respondent also claims it terminated 142 customers as a result of its customer due diligence. *Id.* at 113, para. 297. The Respondent also routinely commissioned Pro-Compliance Reports and conducted its own Market Basket Reports on each existing customer. *Id.* at para. 298.

With respect to the second and fourth factors, the DEA should: consider whether the registrant has extensive experience in distributing controlled substances; whether the registrant has cooperated with the current and past DEA investigations; the number of years the registrant has distributed controlled substances; whether the registrant has received any warnings from the DEA; and if, after being warned, the registrant ignored the warning. ALJ-89, at 114-15, para. 301. In the Respondent's view, all of these considerations weigh in its favor. *Id.* at 115-17, paras. 302-03.

With respect to factors three and five, the Respondent argues that they weigh against revocation. *Id.* at 117-20, paras. 304-12. The Respondent noted that the Respondent and none of its principal officers have been convicted of any federal or state controlled substances laws. *Id.* at 117, para. 304. The Respondent also notes that none of the catch-all considerations of the fifth factor are applicable to this case. *Id.* at 118-20, paras. 306-12.

---

these exhibits into evidence would be inappropriate. However, because Respondent's proposed Exhibit 5.001 was discussed on the record, I will forward it to the Administrator as part of the Administrative Record.

In conclusion, the Respondent argues that if its registration is revoked a "178 year-old American business will be destroyed." ALJ-89, at 121, para. 313.  In its view, such a penalty would be "grossly disproportionate to the allegations in this case, devoid of support in the law, and undermine the public interest."  *Id.*  The Respondent further argues that although these proceedings are to be non-punitive, revocation in this case would constitute punishment.  *Id.* at 122, para. 316.  The Respondent asserts, "[n]o DEA regulation, guidance document, or precedent dictates that a fully-remediated registrant that has accepted responsibility to the extent that the Respondent has should have its DEA registration revoked."  *Id.*  Accordingly, the Respondent argues that its Certificates of Registration should not be revoked.[42]  *Id.* at para. 317.

## III.     Analysis of Factor One:  Maintenance of Effective Controls Against Diversion

The Order to Show Cause in this case is extensive.  In essence, however, the OSC contains two significant allegations against the Respondent.  First, it alleges that the Respondent failed to maintain "effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," in violation of 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.71(a).  ALJ-1, at 3, paras. 7, 10.  Second, the OSC alleges that the Respondent failed to adequately "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and report them to DEA, in violation of 21 C.F.R. § 1301.74(b).  ALJ-1, at 3, paras. 8, 10.  Thereafter, the OSC alleged specific examples of how the Respondent violated 21 U.S.C. § 823(b)(1) and 21 C.F.R. §§ 1301.71(a) and 1301.74(b).  Some of those specific allegations were proven by the Government, while some were not.

The Government alleged that the Respondent failed to maintain effective controls against diversion by failing to report to DEA thousands of unusually large orders for hydrocodone and oxycodone and by shipping those orders without resolving red flags of diversion, ALJ-1, at 2, para. 2.  Therefore, the allegations that the Respondent violated 21 U.S.C. § 823(b)(1) and 21 C.F.R. §§ 1301.71(a) and 1301.74(b) will be analyzed together.

The specific statutory language that the Respondent is alleged to have violated provides that:

> The Attorney General shall register an applicant to distribute a controlled substance in schedule I or II unless he determines that the issuance of such

---

[42]  The Respondent, however, did not discuss considerations of egregiousness and deterrence.

registration is inconsistent with the public interest. In determining the public interest, the following factors shall be considered: (1) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels . . . .

21 U.S.C. § 823(b)(1).[43] With respect to Factor One, concerning the maintenance of effective control against diversion, the DEA has promulgated regulations to guide the regulated community. Specifically,

All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances. In order to determine whether a registrant has provided effective controls against diversion, the Administrator shall use the security requirements set forth in [21 C.F.R.] §§ 1301.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion.

21 C.F.R. § 1301.71(a). While there are no issues of physical security involved in this case, there are issues of operating procedures. One of DEA's security regulations addressed above, concerning operating procedures, is relevant in this case. It provides that:

The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74(b).

The Controlled Substances Act sets forth the "maintenance of effective controls against diversion of particular controlled substances into other than legitimate . . . channels. . . ." as a factor to be considered in determining whether to issue a DEA registration to a distributor of controlled substances. 21 U.S.C. §§ 823(b)(1), (e)(1). All individuals or entities that are authorized by the DEA to handle controlled substances are required to "provide effective controls and procedures to guard against theft and diversion" of those substances. 21 C.F.R. § 1301.71(a). In furtherance of that overriding requirement the DEA's regulatory scheme

---

[43] 21 U.S.C. § 823(e) also applies to distributors of controlled substances. That section sets forth the identical factors to be considered regarding a registration to distribute controlled substances in schedules III, IV, and V, as are contained in 21 U.S.C. § 823(b) concerning schedules I and II. In addition, while these provisions speak of registering an applicant, it is appropriate to review the same factors when considering whether to revoke a registration. *See Zelideh I. Cordova-Velazco, M.D.*, 83 Fed. Reg. 62902, 62905 n.5 (2018) (holding that "the various grounds for revocation or suspension of an existing registration . . . are also properly considered in deciding whether to grant or deny a registration").

imposes three main obligations on distributors concerning controlled substances: (1) identify suspicious orders; (2) report suspicious orders to DEA; and (3) conduct due diligence of suspicious orders and red flags of diversion.

**Identifying Suspicious Orders**

To begin, the regulations require distributors to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). The regulations provide that, at minimum, a suspicious order includes "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.* These three criteria are non-exclusive and registrants may encounter other considerations beyond those spelled out in the regulation, which could qualify an order as suspicious. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55473-74; *Masters Pharm., Inc.*, 861 F.3d at 221 (noting the regulatory criteria for suspicion are "exemplary rather than exhaustive"). For example, in addition to exhibiting the characteristics set forth in the regulation, a distributor might find a pharmacy's orders for controlled substances to be suspicious based upon the "pharmacy's business model, dispensing patterns, or other characteristics." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55473-74.

When a distributor's suspicious order monitoring system ("SOMS") places a hold on a customer's order for controlled substances because the order is of unusual size, pattern, or frequency, the order meets the specific criteria of being suspicious under 21 C.F.R. § 1301.74(b). *Masters Pharm., Inc.*, 80 Fed. Reg. at 55479; *Masters Pharm., Inc.*, 861 F.3d at 216-17 (affirming the Acting Administrator's ruling that "orders held by the [distributor's SOMS] met the regulatory definition of 'suspicious orders'"). The receipt of a suspicious order triggers two regulatory obligations: due diligence and reporting. First, if the distributor wants to ship the order, the distributor is required to investigate the order and determine whether there are any circumstances that dispel the suspicion before shipping it. *Id.* In other words, the distributor may not ship that suspicious order without exercising due diligence to resolve the suspicion. *Id.* at 55479 n.164. Shipping an order identified as suspicious is analogous to a practitioner prescribing a controlled substance to a patient, while ignoring the results of diagnostic tests that contraindicate the need for such a prescription. *Ralph J. Chambers, M.D.*, 79 Fed. Reg. 4962, 4970 (2014) (citing *United States v. Moore*, 423 U.S. 122, 135, 142-43 (1975)). Second, orders for controlled substances placed on hold by a distributor's SOMS meet the criteria of being

suspicious and the distributor is, therefore, required to report those orders to DEA under 21 C.F.R. § 1301.74(b). *Id.* at 55487 n.178.

In order to conclude that an order for controlled substances is suspicious, a "distributor is not required to establish, to a statistical certainty, that a pharmacy was likely diverting controlled substances." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55480. In fact, suspicion is a low standard, and is defined as merely one's "'apprehension or imagination of the existence of something wrong based only on inconclusive or slight evidence, or possibly no evidence.'" *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478 (quoting Black's Law Dictionary 1585 (9th ed. 2009)). Thus, if a distributor is aware of any indication of "the existence of something wrong" concerning the size, frequency, or pattern of an order, the distributor is obligated to report it to the DEA. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478. Because suspicion is a low standard, a distributor's obligation to report suspicious orders is triggered long before the distributor would have probable cause to believe that a customer is engaged in diversion. *Id.* As *Masters* explains, suspicion is not contingent on evidence that the order will be diverted or that the customer is engaged in diversion. *Id.* Stated differently, when it comes to the reporting requirement, the emphasis is on *suspicion*, and not conclusive proof of diversion. *Id.* at 55420 (explaining that tying suspicion to evidence of diversion "imposes a higher standard than that of the plain language of the regulation, which requires only that the order be suspicious").

**Reporting Suspicious Orders**

In addition to operating a system to identify suspicious orders, DEA regulations also obligate distributors of controlled substances to report to DEA all suspicious orders when such orders are discovered. 21 C.F.R. § 1301.74(b). In other words, DEA regulations require distributors like the Respondent "to alert DEA when their retail-pharmacy customers *attempt* to obtain unusual amounts of a controlled substance, because such attempts are powerful evidence that the pharmacies are operating illegally." *Masters Pharm., Inc.*, 861 F.3d at 217-18 (emphasis in original). A distributor is required to report any suspicious order, however, not just those of unusual size, frequency, or pattern. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55480 (finding that where the distributor had information that 50% of the drugs a pharmacy dispensed were controlled substances, that information raised a strong suspicion as to the legitimacy of the pharmacy's dispensing practices). Furthermore, filing ARCOS reports does not satisfy a

distributor's obligation to notify DEA of suspicious orders. *Southwood Pharm., Inc.*, 72 Fed. Reg. at 36501.

The purpose of the DEA's reporting requirement is "to provide investigators in the field with information regarding potential illegal activity in an expeditious manner." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55483 n.169 (quoting *Southwood Pharm., Inc.*, 72 Fed. Reg. at 36501); FF 43. A distributor violates its regulatory obligation when it obtains "information that an order is suspicious but then chooses to ignore that information and fails to report the order." *Id.* at 55478. A distributor's obligation to notify DEA of suspicious orders is not unlike that cautionary advice frequently heard throughout this country's airports: "See Something, Say Something." If a distributor "sees something" that raises a suspicion concerning an order for controlled substances, the distributor must "say something" about it to the DEA.

The regulatory language concerning when a distributor is required to report a suspicious order is clear: the suspicious order must be reported to DEA "when discovered." 21 C.F.R. § 1301.74(b). Yet, the regulations do not elaborate on the meaning of "when discovered" or provide a deadline by which orders must be reported, leading to the question of how quickly after discovering a suspicious order must a distributor notify DEA. In the absence of regulatory guidance on this question, in *Masters* the Acting Administrator looked to a 2007 letter DEA issued to registrants. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478. That letter, while not providing a hard deadline by which an order must be reported, explained that reports submitted pursuant to a routine schedule, such as daily, weekly, or monthly, do not satisfy the "when discovered" standard. *Id.*; *see also* GE-4, at 1-2 (a 2007 letter issued to registrants containing the same language as the letter cited in *Masters*). The letter's main point, however, was not to define the phrase "when discovered," but to inform registrants that submitting a list of shipped orders to DEA on a periodic schedule "does not meet the regulatory requirement to report suspicious orders." *Id.*; *see also* GE-4, at 1 (same). While the letter shed little light on the meaning of "when discovered," it did emphasize those two words. FF 2.

Thus, the most appropriate reading of the regulation is to take the plain, unambiguous language at face value: where the regulation instructs distributors to notify DEA of suspicious orders "when discovered," it means when the distributor first discovers that the order is suspicious. Furthermore, since suspicion has such a low threshold, "when discovered" occurs much earlier than when a distributor determines after an investigation that an order is either

legitimate or illegitimate.  For example, just as soon as a distributor's SOM program puts a hold on an order, the order is suspicious and it must be reported.  *Masters Pharm, Inc.*, 80 Fed. Reg. at 55418 n.178.  Similarly, if a distributor finds cause to investigate an order, the order is already suspicious, as *Masters Pharm., Inc.*, explained that term.  *Id.* at 55478.  Accordingly, if a distributor finds a reason to investigate an order, that order has already met the criteria of suspiciousness for reporting purposes.  *Id.* Therefore, the Government's suggestion that upon receipt of a suspicious order a distributor has two choices:  (1) report and decline to fill; or (2) investigate and, if suspiciousness is dispelled, do not report (ALJ-90, at 22 n.8), is inconsistent with the plain language of 21 C.F.R. § 1301.74(b).

**Conducting Due Diligence**

"[I]n addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate . . . channels."  *Masters Pharm., Inc.*, 80 Fed. Reg. at 55421 (quoting letter dated September 27, 2006, issued by DEA to registered distributors); *see also* GE-3, at 2 (a letter dated September 27, 2006, containing the same language as the letter cited in *Masters*).  A distributor's duty to perform due diligence on its customers is based upon the language in 21 C.F.R. § 1301.71(a) that a registrant "shall provide effective controls and procedures to guard against theft and diversion of controlled substances," as well as Factor One under 21 U.S.C. §§ 823(b) and (e).  *Masters Pharm., Inc.*, 80 Fed. Reg. at 55477.

In conducting its due diligence of a customer, a distributor must do more than check the customer's DEA registration and state license; rather, it "must conduct a reasonable investigation 'to determine the nature of a potential customer's business before it' sells to the customer, and the distributor cannot ignore 'information which raise[s] serious doubt as to the legality of [a potential or existing customer's] business practices.'"  *Masters Pharm., Inc.*, 80 Fed. Reg. at 55477 (alteration in original) (quoting *Southwood Pharm., Inc.*, 72 Fed. Reg. at 36498). Furthermore, a distributor has a continuing obligation to perform due diligence of a customer throughout the distributor's relationship with the customer.  *Masters Pharm., Inc.*, 80 Fed. Reg. at 55477.

Although conducting due diligence is part of a distributor's obligation to maintain "effective controls and procedures" against diversion, 21 C.F.R. § 1301.71(a), the regulations themselves do not impose any requirement on distributors to document the due diligence that

they conduct. Despite the absence of any regulatory language concerning documentation of due diligence, in *Masters* the Acting Administrator reasoned that documentation is an indispensable component of the duty to maintain "*effective* controls" against diversion. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55428 n.21 (emphasis added). In essence, due diligence without documentation is ineffective due diligence and, in turn, is ineffective at guarding against diversion. "Even if [DEA] regulations do not require a distributor to document the reason provided by a customer to justify a suspicious order, documenting that reason is still an essential part of maintaining effective controls against diversion because subsequent events may provide information which shows that the reason was false." *Id.*

Further, the absence of documentation is evidence that the distributor did not determine whether there was justification for a suspicious order. *Masters Pharm., Inc.*, 861 F.3d at 218; *see also Pharmacy Doctors Enters. d/b/a Zion Clinic Pharmacy*, 83 Fed. Reg. 10876, 10887 (2018) (giving no weight to pharmacist's testimony that she resolved various red flags because she failed to produce documentary evidence to corroborate her claim); *Hills Pharmacy, L.L.C.*, 81 Fed. Reg. 49816, 49835-36 (2016) (holding that while there is no requirement that a pharmacist document the resolution of a red flag on a prescription itself, the fact that the pharmacist did not do so is not conclusive proof that the pharmacist failed to resolve the red flag, but it is probative evidence of that failure); *Belinda R. Mori, N.P.*, 78 Fed. Reg. 36582, 36587 (2013) (noting that a practitioner's failure to create medical records for a patient can give rise to the inference that the practitioner had not examined the patient or performed periodic evaluations of the patient).

I, thus, reject the Respondent's argument that the absence of due diligence documentation cannot be considered as evidence that the Respondent did not conduct due diligence. ALJ-89, at 101, para. 272. The Respondent correctly notes that in *Masters Pharm., Inc.*, the registrant had told the DEA that it retained all of its due diligence records, and thus, the absence of those business records could be used to prove that due diligence had not been conducted. ALJ-89, at 101-03, paras. 272-75. The Respondent also argues that "unlike *Masters*, there is no evidence establishing that Respondent had a regularly conducted practice of making or keeping records of the results of diligence it performed . . . ." *Id.* at 102, para. 274. That argument is not exactly true. First, the Respondent's SOP Manual indicated that when investigating suspicious orders some customers would be "asked for a written explanation." FF 198. Second, the Respondent's written policy was to send a letter to the DEA concerning suspicious orders, along with

"customer supplied information" when available. *Id.* Third, the SOP Manual also described a monthly report, as well as a "daily controlled drug sales report" that were viewed by management. FF 196-97. Fourth, the Respondent kept a proprietary database in its ECP. RE-11, at 5. Thus, the Respondent had some procedures that would have documented some due diligence. Furthermore, the *Masters Pharm., Inc.* Final Order put the Respondent on notice in 2015 that documentation is essential. 80 Fed. Reg. at 55428 n.21 ("Even if the Agency's regulations do not require a distributor to document the reason provided by a customer to justify a suspicious order, documenting that reason is still an essential part of maintaining effective controls against diversion . . . ."). The Respondent, however, introduced little evidence that it resolved red flags or queried customers about suspicious orders. For example, the Respondent did not produce: any request to a pharmacy to provide a written explanation or any such written explanation; customer supplied information along with the three suspicious order reports it submitted; its own monthly report;[44] or a copy of its daily report of sales of controlled substances.

Additionally, adequate due diligence is much more than simply asking the pharmacy for an explanation. A distributor fails to conduct meaningful due diligence that satisfies its regulatory duties where it merely "accept[s] at face value whatever superficial explanation" the pharmacy offers and then fails to independently verify it. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55457. In addition, conducting due diligence and then failing to act on the findings is not due diligence. *See Southwood Pharm., Inc.*, 72 Fed. Reg. at 36500 (finding the distributor's due diligence efforts to be inadequate where the distributor possessed information that customers were diverting controlled substances yet the distributor continued to provide them with controlled substances); *see also Chambers, M.D.*, 79 Fed. Reg. at 4970 (finding that a doctor exceeds the bounds of professional practice: when he prescribes controlled substances without performing a physical exam, or where he performs an inadequate exam; where he ignores the results of tests; and where he takes no precautions to guard against drug abuse or diversion of controlled substances). Similarly, the Respondent excuses Mr. Irelan's inability to accept responsibility for failing to conduct additional due diligence because the Administrative Record

---

[44] While it is possible that this monthly report was the Market Basket Report, the Respondent never presented any evidence identifying it as such. If in fact the monthly report was the same as the Market Basket Report, it would have been reasonable for the Respondent to address this issue after the Group Supervisor testified that he had not seen one of the monthly reports in any of the documents the Respondent had produced in response to the DEA subpoenas. *See* FF 196.

contains evidence that the Respondent conducted Market Basket Reports concerning the exemplar pharmacies on a monthly basis. ALJ-89, at 71, para. 208. Nevertheless, there is scant evidence that the Respondent utilized the Market Basket Reports it compiled.

**Red Flags**

In addition to the requirement to identify and report individual suspicious orders, part of a distributor's duty to maintain "effective controls" against diversion, 21 C.F.R. § 1301.71(a), is to act on information, or red flags, indicative of diversion. To satisfy its duties as a registered distributor of controlled substances, a distributor "cannot ignore information it obtains that raises a suspicion not only with respect to a specific order, but also as to the legitimacy of a customer's business practices." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478.

The term "red flag" is not defined in the CSA or DEA regulations. *JM Pharmacy Grp., Inc., d/b/a Farmacia Nueva & Best Pharma Corp*, 80 Fed. Reg. 28667, 28672 n.21 (2015). The term "red flag," however, has been used in DEA decisions as early as 1998 and in federal courts as far back as 1986. *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. 79188, 79195 n.23 (2016), *pet. for rev. denied*, 881 F.3d 823 (11th Cir. 2018). In general, a red flag is any "circumstance that does or should raise a reasonable suspicion as to the validity of a prescription [or order]." *Pharmacy Doctors Enters. d/b/a Zion Clinic Pharmacy*, 83 Fed. Reg. at 10896 n.31 (quoting *Hills Pharmacy, L.L.C.*, 81 Fed. Reg. at 49839). Red flags are, in essence, "warning signs" or "suspicious circumstances" that alert the registrant that something is not right. *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. at 79195 n.23. One dictionary defines "red flag" as "'a sign of danger, a warning, or a signal to stop.'" *Id.* (quoting The Compact Edition of the Oxford English Dictionary 1132 (1987)).

There are numerous circumstances that "raise a reasonable suspicion as to the validity" of a pharmacy's dispensing of controlled substances. *Pharmacy Doctors Enters. d/b/a Zion Clinic Pharmacy*, 83 Fed. Reg. at 10896 n.31. Such circumstances include a pharmacy that: dispenses a high volume of narcotics;[45] dispenses the trinity drug cocktail;[46] dispenses disproportionally

---

[45] *Masters Pharm., Inc.*, 80 Fed. Reg. at 5548-81 n.168 (explaining where a distributor had information that 50% of the prescriptions filled by a pharmacy were for controlled substances, and the average pharmacy only fills about 20%, the distributor "had substantial information which raised a strong suspicion as to the legitimacy of [the pharmacy's] dispensing practices"); GE-3, at 3.

more controlled substances than non-controlled substances;[47] fills prescriptions for a high volume of patients who pay for prescriptions in cash;[48] fills prescriptions for practitioners whose DEA registrations cannot be verified;[49] fills a disproportionate volume of controlled substance prescriptions written by only a few prescribers;[50] and orders excessive quantities of a limited variety of controlled substances.[51] FF 22.

A distributor fails to maintain effective controls against diversion where the distributor ships controlled substances to a pharmacy that exhibits red flags of diversion. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55457 (faulting the distributor for shipping controlled substances "while ignoring numerous red flags as to the legitimacy of the pharmacy's dispensing of controlled substances"); *cf. Top RX Pharmacy*, 78 Fed. Reg. 26069, 26082 (2013) (applying the same principle to pharmacies and explaining that a pharmacy may not fill a prescription in the face of a red flag unless the pharmacy has taken steps to resolve the red flag and ensure that the prescription is valid). Thus, supplying a pharmacy with controlled substances when the distributor is aware of red flags in the pharmacy's dispensing data is inconsistent with the distributor's obligation to guard against diversion. 21 U.S.C. §§ 823(b), (e); 21 C.F.R. § 1301.71(a).

Finally, if a distributor can be exempted from its obligation to report suspicious orders, the distributor's due diligence "must dispel all red flags indicative that a customer is engaged in diversion." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55478. "Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the [DEA] must be informed." *Id.*; *see also id.* at 55479 n.164 (same).

The following guidance from the D.C. Circuit Court of Appeals is instructive concerning a distributor's obligation to conform to DEA's due diligence and reporting requirements:

---

[46]    *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. at 79194 ("The combination of a benzodiazepine, a narcotic and carisoprodol is 'well known in the pharmacy profession' as being used 'by patients abusing prescription drugs.'" (quoting *E. Main St. Pharmacy*, 75 Fed. Reg. 66149, 66163 (2010))).
[47]    *Masters Pharm., Inc.*, 80 Fed. Reg. at 55421, 55456; GE-3, at 3.
[48]    *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. at 79194 ("'[A]ny reasonable pharmacist knows that a patient that (sic) wants to pay cash for a large quantity of controlled substances is immediately suspect.'" (quoting *E. Main St. Pharmacy*, 75 Fed. Reg. 66149, 66158 (2010))).
[49]    FF 27.
[50]    GE-3, at 3.
[51]    *Masters Pharm., Inc.*, 80 Fed. Reg. at 55421; GE-3, at 3.

As we have emphasized throughout this opinion, it is not necessary for a distributor of controlled substances to investigate suspicious orders if it reports them to DEA and declines to fill them. But if a distributor chooses to shoulder the burden of dispelling suspicion in the hopes of shipping any it finds to be non-suspicious, and the distributor uses something like the SOMS Protocol to guide its efforts, then the distributor must actually undertake the investigation. For example, when an employee uses the SOMS Protocol to confirm or dispel suspicion based on the amount of controlled medication the pharmacy is selling, the employee must request a 'UR,' *i.e.*, a document showing the pharmacy's 'actual dispensing[s] . . . of each drug.' [*Masters Pharm., Inc.*,] 80 Fed. Reg. [55418,] 55420 [(2015)]. Moreover, the investigating employee must 'document' customers' explanations for suspicious orders, so that he or she can verify those explanations and make sure they are consistent over time. *Id.* at 55,428 n.21. Additionally, if a customer's explanation for its order is 'inconsistent with other information the investigator has obtained about or from the customer, . . . the [investigator] must conduct 'additional investigation to determine whether [its customer is] filling legitimate prescriptions.' *Id.* at 55,477. Finally, the investigation must dispel all of the 'red flags' that gave rise to the suspicion that the customer was diverting controlled substances. *Id.* at 55,478. The Administrator recognized that, if investigating employees fail to take such basic steps, the SOMS (or similar protocol) does not function as an effective tool for dispelling suspicion.

*Masters Pharm., Inc.*, 861 F.3d at 222-23. If nothing else, the D.C. Circuit made clear that all red flags must be resolved before shipping an order identified as suspicious.

**Adverse Inference**

In the face of the allegations contained in the OSC, the Respondent did not produce a single witness with first-hand knowledge of the Respondent's policies and procedures it may have actually utilized to conduct due diligence of its customers and to identify suspicious orders. While the Respondent did call Mr. Irelan, its current Director of Compliance, he did not take over that position until May 2018. FF 339. In fact, the position Irelan took was created just for him, and it did not even exist during the relevant time period. *Id.* Before taking the position of Director of Compliance, Mr. Irelan had no involvement in the Respondent's SOM program or the due diligence efforts the Respondent may have engaged in. FF 341-42. In fact, prior to May 2018, Mr. Irelan did not know what the term "red flag" meant. FF 342. Mr. Irelan's testimony concerning what the Respondent may have done concerning due diligence and identifying suspicious orders was based upon his review of the Respondent's records. FF 356.

Prior to the hearing, on August 3, 2018, the Respondent had summarized the proposed testimony of Paul M. Dickson, identified as the Respondent's President, and Clara Guin, who

was one of the individual's previously responsible for the Respondent's compliance program. ALJ-8, at 5-16; FF 207; RE-1, at 12. Then on September 12, 2018, the Respondent further elaborated on the expected content of Ms. Guin's proposed testimony. ALJ-15, at 2-5. On March 26, 2019, the Respondent once again provided a summary of Mr. Dickson's proposed testimony. ALJ-53. At the hearing, however, neither Mr. Dickson nor Ms. Guin testified. Respondent's counsel stated that Mr. Dickson was asserting his Fifth Amendment privilege and was unavailable. Tr. 1062. No explanation was provided as to why Ms. Guin did not testify. I note that Jacob Dickson was also responsible for the Respondent's compliance during the relevant time period. Tr. 807-09. He also did not testify.

The Government has asked that I draw an adverse inference "from the fact that the Dickson family sat silent in the face of accusation." ALJ-90, at 49 n.24. The Respondent does not directly address this point, but argues that the Government may not "rely on evidentiary presumptions to establish that Respondent did not perform due diligence on its customers." ALJ-89, at 101, para. 272. Its argument is more directed towards the absence of documentation.

Here, the Respondent elected not to present any testimony from anyone who was directly involved in the Respondent's alleged due diligence efforts and its purported efforts to identify suspicious orders from its customers, whether through some sort of statistical analysis or closely scrutinizing its customers' business and dispensing practices. At a DEA administrative hearing, it is permissible to draw an adverse inference from silence, even in the face of a Fifth Amendment invocation. *See Hoxie v. DEA*, 419 F.3d 477, 483 (6th Cir. 2005) (citing *United States v. Hale*, 422 U.S. 171, 176 (1975) ("[S]ilence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation.")); *Joseph Baumstarck, M.D.*, 74 Fed. Reg. 17525, 17528 n. 3 (2009) (citing *Ohio Adult Parole Auth. v. Woodward*, 523 U.S. 272, 286 (1998)); *see also Kevin Dennis, M.D.*, 78 Fed. Reg. 52787, 52798 (2013) (holding that an adverse inference may be drawn where a practitioner does not challenge the accuracy of an allegation, even where the practitioner is not questioned about it); *T.J. McNichol, M.D.*, 77 Fed. Reg. 57133, 57150 (2012) (rejecting ALJ's decision not to apply an adverse inference from the respondent's failure to testify and concluded that the failure to testify warranted an inference that the respondent knowingly diverted controlled substances).

On the facts of this case, where the allegations are of a nature that a registrant, through its owners and/or its key employees, would be more likely than not to dispute them if untrue, an adverse inference based on the Respondent's silence is appropriate. Accordingly, as an evidentiary matter, it should be, and will be assumed that if Mr. Paul Dickson or Ms. Clara Guin, or any one of several members of the Dickson family or key employees of the Respondent who had first-hand knowledge of the Respondent's due diligence efforts had presented testimony, that testimony would have supported the Government's factual allegations.

**The Respondent's Policies**

In this case the Government alleged that the Respondent "consistently ignored and/or failed to implement its due diligence and suspicious order monitoring policies and failed to conduct meaningful due diligence into . . . orders to ensure that the controlled substances were not diverted." ALJ-1, at 3, para. 10. In addition, the Government alleged that the Respondent "failed to identify and report suspicious orders to DEA." ALJ-1, at 5, para. 21. To examine whether the Respondent either ignored or failed to implement its due diligence policy, an examination of the policy would be helpful.

During the course of DEA's investigation into the Respondent, the Respondent produced its Standard Operating Procedures Manual ("SOP Manual"), which was dated August 22, 2016, and its Policies & Procedures Manual for Prescription Drug Handling ("Policies & Procedure Manual") of February 2018. FF 70, 192, 203. Although the SOP Manual indicated that details of the Respondent's SOM program were "confidential and therefore are not made a part of this manual," it did detail that the Respondent "keeps a system in operation which is designed to discover those purchasing patterns of controlled substances which exceed the norm and could possibly be related to diversion activities." FF 193-94. To identify suspicious orders the SOP Manual outlines three methods the Respondent was to use: (1) Controlled Drug Volume Analysis Program; (2) Management Oversight; and (3) Employee Oversight. FF 195. The SOP Manual also stated that the Respondent's Controlled Drug Volume Analysis Program generated a monthly report that was reviewed by management. FF 196. In addition, under Management Oversight, the SOP Manual stated that "[a] daily controlled drug sales report is reviewed by management each day." FF 197. The SOP Manual envisioned that "[w]hen a suspicious pattern or purchase is identified by any of the above methods the customer is contacted in some but not all cases and asked for a written explanation for the unusual order. In all cases, a letter is sent to

the DEA indicating a possible suspicious order. Customer supplied information is included when available." FF 198.

In February 2018, the Respondent's Policies & Procedure Manual described its SOM program as "a three-fold approach to monitor all prescription drug and/or device orders, including unusual ordering patterns, amounts, and payments to identify any potential diversion or criminal activity." FF 204. As described, that three-fold approach included: Pro-Compliance Reports; Market Basket Reports; and input from Order Processing and Delivery Personnel. FF 205; *see also* FF 280. The Policies & Procedure Manual indicated that Pro-Compliance Reports were to be run annually or "more frequently as needed at the discretion of the Compliance officer." FF 206. Concerning the Market Basket Reports, the Policies & Procedure Manual mentions a "normal range" for controlled drug orders and that the Respondent's compliance officer "may stop shipment on any order if he or she finds the order to be unusually suspicious." FF 208-09. The Policies & Procedure Manual also referred to orders that diverge "from normal operations," but it did not define what was meant by "normal operations." FF 210.

The Respondent also provided information concerning its SOM program and its due diligence procedures in its responses to DEA subpoenas. FF 46-70. The Respondent informed the DEA that it utilized "a pro-active approach to avoid diversion of controlled drugs, including: screening new pharmacy customers; aggressively monitoring orders for controlled drugs; and eliminating pharmacy customers who fill orders for controlled drugs in excess of acceptable ratios, accept cash payments, prescribe the 'Holy Trinity' and/or other unacceptable practices." FF 49. The Respondent also asserted that it used a "four-fold approach to monitor all prescription drug orders and detect unusual ordering patterns, amounts, and cash payments to identify potentially suspicious orders." FF 51. The four-fold approach reportedly included: use of Pro-Compliance Reports; preparing a Market Basket Report of each customer on a monthly basis; since April 2017 use of software that identifies orders that are more than 10 times the "average dosage units ordered on a given drug on a certain day with the last 90 days of ordering patterns of the same drug"; the experience of the employees who fill the orders for controlled substances; and the input of delivery drivers and salesmen. *Id.* The Respondent also indicated that its "[o]n-the-ground employees often submit photos of the premises and photos of the store owner to the Compliance Officer." FF 53.

The Respondent also produced some of its due diligence files. FF 58. The Respondent asserted that it provided the DEA with "every Market Basket Report and Pro-Compliance Report in its records from January 1, 2016 to the present." FF 63. In fact, the Market Basket Reports for the eight exemplar pharmacies are contained in the Administrative Record. GE-57-64. The Respondent also provided the DEA with the January 5, 2016 through February 28, 2018 phone log of its former Compliance officer, Ms. Guin, submitting that some of the entries might relate to the subject of the DEA subpoena request concerning suspicious order reports and investigations. FF 67-68, 207. The Respondent also informed the DEA that "[d]uring the normal course of business, excessive orders which are the result of coding mistakes are dealt with promptly via telephone and such incidents are usually not documented." FF 63. The Respondent also asserted that its SOM program resulted in several investigations based on a software alert, review of Pro-Compliance and Market Basket Reports, as well as concerns raised by the Respondent's employees. *Id.* The Respondent also noted that prior to receipt of the DEA subpoenas the Respondent conducted investigations of "unusual or potentially suspicious orders via telephone calls . . . and by salesman in-store calls." *Id.*

The Respondent also informed the DEA that during the past decade it had "ceased supplying 142 retail pharmacies due to questions and concerns that the pharmacies were over-dispensing controlled substances." FF 55. Nevertheless, when the DEA asked the Respondent to provide copies of suspicious order reports it had submitted, the Respondent provided only two such reports, noting that it utilized "a pro-active approach to avoid diversion of controlled drugs." FF 49, 56. The Respondent then explained that it understood that the "DEA and applicable regulations do not require that a wholesale distributor maintain records of each and every internal investigation conducted on possible suspicious orders." FF 50.

The Respondent also presented a Power Point presentation of its SOM program to the DEA in August 2016. FF 337-38. During that presentation, the Respondent indicated that there were three components of its SOM program: Know your Customer – Enhanced Customer Profile ("ECP"); Order Monitoring; and External review of customer by third-party firm. RE-11, at 3. The Respondent briefed the DEA that as part of its ECP it kept "a proprietary database reserved solely for its SOM program. This database cover[ed] all areas pertinent to monitoring a customer for signs of suspicious orders or suspicious order patterns." RE-11, at 5. Under Order Monitoring, the Respondent indicated that it conducted ongoing internal review of the

purchasing habits of its customers. RE-11, at 8. The Respondent indicated that it conducted a "[c]ontinuous internal review . . . of the percentage of controlled substance items purchased by a pharmacy to that of total prescription items. This program also looks at trends in the pharmacy's purchasing patterns to detect any abnormal patterns of purchasing behavior." *Id.* The Respondent also indicated that it used Pro-Compliance Reports as a third-party review, and that it shared the results of these reports with its customers. RE-11, at 13, 15-16. Finally, the Respondent informed DEA that as a result of its SOM system it had ceased supplying controlled substances to 42 pharmacies from 2014 through 2016. FF 281; RE-11, at 14.

### Failure to Maintain Effective Controls Against Diversion

The Government alleged that the Respondent failed to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," in violation of 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.71(a). ALJ-1, at 3, paras. 7, 10. In support of that allegation, the Government presented evidence concerning eight of the Respondent's customer pharmacies, to demonstrate that the Respondent's due diligence was inadequate and that its controls against diversion were ineffective. The allegations include numerous instances where the Respondent failed to resolve red flags concerning each of the exemplar pharmacies.

### *Folse Pharmacy* ("Folse")

The Order to Show Cause ("OSC") alleged that the Respondent had received third-party vendor reports ("Pro-Compliance") concerning Folse. ALJ-1, at 8, para. 42. These reports indicated that a higher percentage than average of the prescriptions Folse filled were for controlled substances, and that a higher percentage than average of those prescriptions were paid for in cash. *Id.* The OSC also alleged that the Respondent's own Market Basket Reports concerning Folse revealed that a high percentage of Folse's total purchase volume was for controlled substances. ALJ-1, at 8, para. 43. The OSC alleged that the Pro-Compliance Reports and the Market Basket Reports identified red flags which the Respondent did not resolve. ALJ-1, at 8, para. 44. In addition, the Government alleged that between January 2014 and April 2018 the Respondent filled 58 unusually large orders for oxycodone and 68 unusually large orders for hydrocodone from Folse that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 8-9, paras. 46-48; ALJ-52, at 20.

The Respondent received at least four Pro-Compliance Reports concerning Folse. FF 91, 95, 97, 100. Those reports show that of all the prescriptions Folse filled, the percentage of controlled substances ranged from 30 to 36 percent. *Id.* In addition, between September 2013 and November 2014, the number of dosage units of oxycodone that Folse dispensed increased by 11,759 dosage units. FF 93. The percentage of Folse's customers who paid cash for their controlled substances ranged from 18 to 41 percent. FF 92, 96, 98, 101. In September 2016, Folse dispensed 22 trinity drug cocktails and in June 2017 it dispensed 9 cocktails. FF 99, 102. Also, in June 2017 the number of dosage units of oxycodone and hydrocodone that Folse dispensed were both higher than the national average. FF 101. In addition, in June 2017, the DEA registration numbers of 23 practitioners who wrote prescriptions that Folse filled could not be verified. FF 103-04. In addition, three monthly Market Basket Reports that the Respondent prepared concerning Folse revealed that the percentage of controlled substances filled by Folse, when compared to all of the prescriptions it filled, ranged between 42 and 51 percent.[52] FF 105-07. There is no evidence that the Respondent suspended any shipments of controlled substances to Folse. FF 108. In fact, the Respondent supplied controlled substances to Folse from January 2014 through April 2018. Stip. 13.

### *Bordelon's Super-Save Pharmacy* ("Bordelon's")

The OSC alleged that the Respondent had received a Pro-Compliance Report concerning Bordelon's. ALJ-1, at 7, para. 34. That report indicated that Bordelon's dispensed a higher percentage than the national average of both oxycodone and hydrocodone. *Id.* The OSC alleged that the Pro-Compliance Report identified red flags which the Respondent did not resolve. ALJ-1, at 7, para. 35. In addition, the Government alleged that between January 2014 and April 2018 the Respondent filled 50 unusually large orders for oxycodone and 2 unusually large orders for hydrocodone from Bordelon's that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 7-8, paras. 37-39; ALJ-52, at 20.

The Respondent received at least two Pro-Compliance Reports concerning Bordelon's. FF 109, 113. Those reports show that of all the prescriptions Bordelon's filled, the percentage of

---

[52] The Market Basket Reports do not indicate whether the percentage of controlled substances is based on dosages dispensed or on dollar value. Although Respondent's counsel, through questioning, implied that the percentage was based on dollar value, no evidence supports such a finding. I draw no conclusion on this issue as I have no evidence to support one. I simply note the percentage reported. *See* Tr. 408-09.

controlled substances was 17 percent. *Id.* In March 2017, Bordelon's dispensed 4 trinity drug cocktails. FF 112. Also, in March 2017 the number of dosage units of oxycodone and hydrocodone that Bordelon's dispensed were both higher than the national average. FF 109. In addition, in March 2017, the DEA registration numbers of 41 practitioners who wrote prescriptions that Bordelon's filled could not be verified. FF 110-11. In September 2017, the DEA numbers of 35 practitioners could not be verified. FF 114. There is no evidence that the Respondent suspended any shipments of controlled substances to Bordelon's. FF 116. Rather, the Respondent supplied controlled substances to Bordelon's from January 2014 through April 2018. Stip. 12.

### *Wallace Drug Company* ("Wallace")

The OSC alleged that the Respondent had received a Pro-Compliance Report concerning Wallace. ALJ-1, at 6, para. 26. That report indicated that Wallace dispensed a higher percentage than the national average of both oxycodone and hydrocodone, and that a higher percentage than average of Wallace's controlled substance prescriptions were paid for in cash. *Id.* The OSC alleged that the Pro-Compliance Report identified red flags which the Respondent did not resolve. ALJ-1, at 6, para. 27. The Government also alleged that between October 2017 and March 2018 the Respondent filled one unusually large order for oxycodone and six unusually large orders for hydrocodone from Wallace that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 7, paras. 30, 32; ALJ-52, at 20. The Government also alleged that the Respondent ignored the concerns of its own employees who voiced concern about Wallace's hydrocodone orders on January 9, 2018, by shipping those orders. ALJ-1, at 6-7, paras. 28-29, 32.

The Respondent received at least one Pro-Compliance Report concerning Wallace. FF 117. That report shows that the percentage of Wallace's customers who paid cash for their controlled substances was 31 percent. *Id.* In August 2017, Wallace dispensed 3 trinity drug cocktails. FF 121. In addition, that same month, the DEA registration numbers of 23 practitioners who wrote prescriptions that Wallace filled could not be verified. FF 119-20. That report also shows that the number of dosage units of oxycodone and hydrocodone that Wallace dispensed were both higher than the national average. FF 118. In addition, four monthly Market Basket Reports that the Respondent prepared concerning Wallace between October 2017 and January 2018 revealed that the percentage of controlled substances filled by Wallace, when

compared to all of the prescriptions it filled, ranged between 23 and 37 percent. FF 122-25. Phone log entries of January 9, 2018, seemingly indicate that some of the Respondent's employees were concerned about the amount of hydrocodone Wallace was ordering. GE-14, at 31. That phone log also indicates that on January 9, 2018, the Respondent stopped a shipment to Wallace and requested that Wallace return some items already shipped, which Wallace apparently did. *Id.* Other than that phone log entry, there is no evidence that the Respondent suspended any shipments of controlled substances to Wallace. FF 126. In addition, the Respondent acknowledged that it supplied controlled substances to Wallace from October 2017 through April 2018. Stip. 11.

***Pharmacy Specialties Group* ("Pharmacy Specialties")**

The OSC alleged that the Respondent had received a Pro-Compliance Report concerning Pharmacy Specialties. ALJ-1, at 9, para. 51. That report indicated that Pharmacy Specialties dispensed a higher percentage than the national average of controlled substances, and that a higher percentage than average of Pharmacy Specialties' prescriptions for controlled substances were paid for in cash. *Id.* The OSC alleged that the Pro-Compliance Report identified red flags which the Respondent did not resolve. ALJ-1, at 9, para. 52. The Government also alleged that between January 2014 and April 2018 the Respondent filled 10 unusually large orders for oxycodone and 15 unusually large orders for hydrocodone from Pharmacy Specialties that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 9-10, paras. 54-55, 59; ALJ-52, at 20. The Government also alleges that the Respondent also ignored the concerns of its own employees who voiced concern about Pharmacy Specialties' orders for controlled substances on March 7, 2017, (sic) and again on December 13, 2017, by shipping those orders. ALJ-1, at 10, paras. 56-59.

The Respondent received at least three Pro-Compliance Reports concerning Pharmacy Specialties. FF 127, 133, 137. Those reports show that of all the prescriptions Pharmacy Specialties filled, the percentage of controlled substances ranged from 18 to 30 percent. FF 127. The percentage of Pharmacy Specialties' customers who paid cash for their controlled substances ranged from 27-31%, and the June 2016 report specifically noted that 28% was higher than the national average. FF 128, 133, 137; GE-23, at 6. In addition, between February to October 2016, the number of dosages of hydrocodone that Pharmacy Specialties dispensed increased by 25 percent. FF 136. Further, between October 2016 and September 2017, the dosage units of

hydrocodone that Pharmacy Specialties dispensed increased by another 89%, and the number of dosage units of oxycodone increased by 148 percent. FF 138. In February 2016, Pharmacy Specialties dispensed two trinity drug cocktails, and in October 2016 it dispensed one. FF 132, 135. In addition, in February 2016, the DEA registration numbers of three practitioners, who wrote prescriptions that Pharmacy Specialties filled, could not be verified. FF 129-30. In fact, one of those numbers was a number for an application for a DEA registration. FF 131. In October 2016, the DEA registration numbers of 2 more practitioners who wrote prescriptions that Pharmacy Specialties filled could not be verified. FF 134. In addition, three monthly Market Basket Reports that the Respondent prepared concerning Pharmacy Specialties revealed that the percentage of controlled substances filled by Pharmacy Specialties, when compared to all of the prescriptions it filled, ranged between 27 and 52 percent. FF 139-41. While the Respondent's employees apparently raised concern on March 7, 2016, and on December 13, 2017, about orders for controlled substances that Pharmacy Specialties had placed, there is no evidence that the Respondent suspended any shipments of controlled substances to Pharmacy Specialties. FF 142. In fact, the Respondent acknowledged that it supplied controlled substances to Pharmacy Specialties from January 2014 through April 29, 2018. Stip. 14.

### Dave's Pharmacy ("Dave's")

The OSC alleged that the Respondent had received Pro-Compliance Reports concerning Dave's. ALJ-1, at 10-11, para. 62. Those reports indicated that Dave's presented a relatively high-risk to the Respondent. *Id.* The reports also indicated that Dave's dispensed a high quantity of hydrocodone and had high cash payments for controlled substances. *Id.* The OSC alleged that the Pro-Compliance Reports identified red flags which the Respondent did not resolve. ALJ-1, at 11, para. 63. In addition, the Government alleged that between January 2014 and April 2018 the Respondent filled 103 unusually large orders for oxycodone and 14 unusually large orders for hydrocodone from Dave's that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 11, paras. 65-67; ALJ-52, at 20.

The March 2014 initial Pro-Compliance Report concerning Dave's indicated that the pharmacy represented a relatively high-risk to the Respondent, with one prescriber alone issuing 85 prescriptions for trinity cocktails. FF 143; GE-24, at 6. The Respondent received at least six Pro-Compliance Reports concerning Dave's. FF 143, 145, 150, 153, 156, 159. Those reports

show that of all the prescriptions Dave's filled, the percentage of controlled substances ranged from 20 to 23 percent. FF 143, 145, 149, 153, 156, 159. Those same reports reveal that the percentage of Dave's customers who paid cash for their controlled substances ranged from 17 to 35%, and the report of June 2017 specifically noted that 19% was above the national average. FF 144, 146, 150, 154, 156, 160; GE-24, at 24. In addition, between March 2014 and January 2015 the number of dosage units of oxycodone that Dave's dispensed increased by 12,105 dosages. FF 147. Then from May 2014 through December 2015 the number of dosages of oxycodone that Dave's dispensed increased by 205%, and it increased another 14% from June through November 2016. GE-24, at 19, 21. The Pro-Compliance Reports also informed the Respondent that Dave's dispensed numerous trinity cocktails: 57 from March 2014 through January 2015; 33 from December 2015 through June 2016; and 14 in June 2017. FF 149, 155, 162. In addition, in June 2017, the DEA registration numbers of 11 practitioners who wrote prescriptions that Dave's filled could not be verified. FF 161. In fact, of those 11 practitioners, 2 were reported to Dave's as having the same DEA registration number. FF 163. Further, in June 2017 the number of dosages of oxycodone and hydrocodone that Dave's dispensed were both higher than the national average. FF 159. In addition, the Respondent supplied controlled substances to Dave's from January 2014 through May 1, 2018, and there is no evidence that the Respondent suspended any shipments of controlled substances to Dave's. Stip. 15; FF 164.

*Hephzibah Pharmacy* ("**Hephzibah**")

The OSC alleged that the Respondent had received a Pro-Compliance Report concerning Hephzibah. ALJ-1, at 11, para. 69. That report indicated that of the prescriptions that Hephzibah filled a higher percentage than average were for controlled substances, and that a large percentage of those prescriptions were paid for in cash. *Id.* The OSC alleged that the Pro-Compliance Report identified red flags which the Respondent did not resolve. ALJ-1, at 12, para. 70. The Government further alleged that the Respondent also ignored the concerns of its own employees who voiced concern about Hephzibah's need to clear up issues raised by the Pro-Compliance Report, including "high cash, trinity & high quantities on hydrocodone & oxycodone." ALJ-1, at 12, para. 72. Finally, in spite of the fact that the Respondent closed the Hephzibah account due to the Respondent's "due diligence efforts," the Respondent shipped all orders placed by Hephzibah and did not file a suspicious order report concerning any of Hephzibah's orders. ALJ-1, at 12, paras. 77-78.

The Respondent received at least one Pro-Compliance Report concerning Hephzibah. FF 165. That reports shows that of all the prescriptions Hephzibah filled in February 2017, 27% of them were for controlled substances, which was higher than the national average. *Id.* The report also documents that 36% of Hephzibah's customers paid cash for their controlled substances. FF 167. Hephzibah also filled 9 trinity drug cocktails in February 2017. FF 168. In addition, in February 2017, the DEA registration numbers of 20 practitioners who wrote prescriptions that Hephzibah filled could not be verified. GE-25, at 6. Also in that month, the number of dosage units of oxycodone and hydrocodone that Hephzibah dispensed were both higher than the national average. FF 165. Phone log notes of March 17, 2017, reflect that the Respondent's employees were concerned about the issues raised in the Pro-Compliance Report for Hephzibah. FF 169. Specifically, those notes reflect that Hephzibah needed to clean up issues concerning "high cash, trinity & high quantities on Hydrocodone & Oxycodone." *Id.* In other due diligence notes concerning Hephzibah, the Respondent indicated that the account was closed because Hephzibah "would rather change wholesalers than cooperate with our compliance program." FF 169. There is no evidence that the Respondent suspended any shipments of controlled substances to Hephzibah before closing its account. FF 170. The Respondent supplied Hephzibah with controlled substances from April 2017 through May 2017. Stip. 16.

***The Wellness Pharmacy* ("Wellness")**

The OSC alleged that the Respondent had received a Pro-Compliance Report concerning Wellness. ALJ-1, at 13, para. 80. That report indicated that of the prescriptions that Wellness filled a higher percentage than average were for controlled substances, and that Wellness dispensed high quantities of oxycodone and hydrocodone. *Id.* The OSC also alleged that the Respondent's own Market Basket Reports concerning Wellness revealed a high percentage of Wellness' total purchase volume was for controlled substances. ALJ-1, at 13, para. 81. The OSC alleged that the Pro-Compliance Reports and the Market Basket Reports identified red flags which the Respondent did not resolve. ALJ-1, at 13, para. 82. In addition, the Government alleged that between January 2014 and April 2018 the Respondent filled 119 unusually large orders for oxycodone and 3 unusually large orders for hydrocodone from Wellness that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 13, paras. 84-85, 88; ALJ-52, at 20.

The Respondent received at least four Pro-Compliance Reports concerning Wellness. FF 171; GE-26, at 10-12. Those reports show that of all the prescriptions Wellness filled, the percentage of controlled substances ranged from 64-69%, and the initial report showed that 46% of all prescriptions Wellness dispensed were for either oxycodone or hydrocodone. FF 171. Further, in October 2017 the number of dosage units of oxycodone and hydrocodone that Wellness dispensed were both higher than the national average, and 91% of the controlled substances dispensed were Schedule II drugs. *Id.* In addition, the Respondent prepared two monthly Market Basket Reports concerning Wellness, one in January 2016 and the other in December 2017. FF 172-73. The first showed that 84% of all the prescriptions filled by Wellness were for controlled substances, and the other recorded 92 percent. *Id.* There is no evidence that the Respondent suspended any shipments of controlled substances to Wellness. FF 174. Between January 2014 and December 2017, the Respondent supplied Wellness with controlled substances. Stip. 17.

***Wilkinson Family Pharmacy* ("Wilkinson")**

The OSC alleged that the Respondent had received Pro-Compliance Reports concerning Wilkinson. ALJ-1, at 14, para. 90. Those reports indicated that of the prescriptions that Wilkinson filled a higher percentage than average were for controlled substances, that Wilkinson dispensed high quantities of oxycodone and hydrocodone, and that a large percentage of the controlled substances that Wilkinson dispensed were paid for with cash. *Id.* The OSC alleged that the Pro-Compliance Reports identified red flags that the Respondent did not resolve. ALJ-1, at 14, para. 91. In addition, the Government alleged that between January 2014 and April 2017 the Respondent filled 2 unusually large orders for oxycodone and 49 unusually large orders for hydrocodone from Wilkinson that the Respondent's due diligence failed to identify as suspicious and which the Respondent failed to report. ALJ-1, at 14, paras. 93, 96-97; ALJ-52, at 20.

The Respondent received at least five Pro-Compliance Reports concerning Wilkinson, and the initial report identified Wilkinson as "***high risk.***" FF 175, 178, 181, 184, 188. Those reports show that of all the prescriptions Wilkinson filled, the percentage of controlled substances ranged from 30-45%, and they were mainly Schedule II drugs. *Id.* Four of those same reports reveal that the percentage of Wilkinson's customers who paid cash for their

controlled substances ranged from 17 to 38 percent.[53]    FF 176, 179, 182, 185.    The Pro-Compliance Reports for Wilkinson also showed that the pharmacy had filled prescriptions for trinity cocktails: filling many in March 2014; 26 from March 2014 through January 2015; 21 from January 2015 through January 2016; and 20 from January through August 2016.    FF 177, 180, 183, 187.    Between January through August 2016, the number of dosage units of oxycodone that Wilkinson dispensed increased by 10 percent.    FF 186.    In addition, in January 2017 the number of dosage units of oxycodone and hydrocodone that Wilkinson dispensed were both higher than the national average.    FF 188.    Further, in January 2017, the DEA registration numbers of 46 practitioners who wrote prescriptions that Wilkinson filled could not be verified. FF 189.    Finally, there is no evidence that the Respondent suspended any shipments of controlled substances to Wilkinson.    FF 191.    The Respondent did, however, supply controlled substances to Wilkinson from January 2014 through April 2017.    Stip. 19; GE-64, at 31-40.

**Analysis of the Evidence Concerning the Exemplar Pharmacies**

With respect to the eight pharmacies discussed above, virtually every entry represents a red flag the Respondent was obligated to resolve before shipping controlled substances to the pharmacies.    As a general rule, red flags for distributors include a pharmacy that: dispenses a high volume of narcotics; dispenses the trinity drug cocktail; dispenses disproportionally more controlled substances than non-controlled substances; fills prescriptions for a high volume of patients who pay for prescriptions in cash; fills prescriptions for practitioners whose DEA registrations cannot be verified; fills a disproportionate volume of controlled substance prescriptions written by only a few prescribers; and orders excessive quantities of a limited variety of controlled substances.    FF 22.

Concerning dispensing controlled substances versus non-controlled substances, a pharmacy's suspicion should be aroused any time that percentage exceeds 15 percent.    FF 23.    In most instances addressed above, however, based on Pro-Compliance Reports the Respondent was aware of many percentages well above 20 percent, with a range between 14-68 percent.[54] The Respondent's own Market Basket Reports, as discussed above, revealed even higher percentages with a range between 23-92 percent.    There is no persuasive evidence in the record

---

[53] The most recent Pro-Compliance Report for Wilkinson showed a cash payment of 14% for controlled substances. GE-27, at 25.
[54] One Pro-Compliance Report concerning Wallace in August 2017 shows controlled substances at 14 percent.    GE-20, at 11.

that the Respondent performed any effective due diligence to determine whether there was a legitimate explanation for the pharmacies having high percentages of controlled substances when compared to the non-controlled substances the pharmacies dispensed.

With respect to cash payments for controlled substances, a pharmacy's suspicion should be aroused any time that percentage exceeds 9 percent. FF 24. In most instances addressed above, however, based on Pro-Compliance Reports the Respondent was aware of many percentages above 25%, within a range between 14-41 percent. There is no persuasive evidence in the record that the Respondent performed any effective due diligence to determine whether there was a legitimate explanation for the pharmacies accepting a high percentage of cash payments for the prescriptions for controlled substances they filled.

It is also a red flag when a pharmacy fills a combination of prescriptions that equate to a trinity drug cocktail. FF 22, 25-26. In a response to the DEA, the Respondent acknowledged its concern about trinity drug cocktails. FF 49. Nevertheless, concerning the eight pharmacies discussed above, the Pro-Compliance Reports informed the Respondent that seven of the pharmacies had been filling trinity drug cocktails, with reports ranging from 1 cocktail to 85 cocktails. Particularly troubling was the March 2016 report concerning Dave's. That Pro-Compliance Report advised the Respondent that Dave's had filled 85 trinity cocktail prescriptions, all written by the same practitioner. While the Respondent did contact Dave's, it apparently did not do so until almost a year later on February 16, 2017, and it is not possible to determine exactly what was discussed. FF 68; GE-14, at 23. In addition to the report of the 85 trinity drug cocktails, as detailed above, the Respondent was on notice of five additional reports of these pharmacies filling 20 or more trinity prescriptions: Dave's, an additional 57 and 23; Wilkinson, 26 and 20; and Folse, 22. Other than the one rather cryptic note in the Respondent's phone log concerning Dave's, however, there is no persuasive evidence in the record that the Respondent performed any effective due diligence to determine whether there were legitimate explanations for these customer pharmacies filling so many trinity prescriptions.

The Pro-Compliance Reports also informed the Respondent that seven of the above pharmacies were filling prescriptions written by practitioners whose DEA numbers could not be verified. Filling such prescriptions is a red flag. FF 22, 27. As detailed above, the range of unverified DEA numbers in the Pro-Compliance Reports was between 2 and 46, with 6 reports

indicating 20 or more DEA numbers that could not be verified.[55]   While both Milione and Irelan testified that they learned that the DEA verification portion of the Pro-Compliance Report was not reliable, they both learned that information after the Order to Show Cause was issued.   There is no persuasive evidence in the record that the Respondent performed any effective due diligence, or due diligence of any kind, to resolve the question of whether or why its customer pharmacies were filling prescriptions written by practitioners whose DEA registrations could not be verified.

It is also a red flag when a pharmacy dispenses a high volume of narcotics, or when it orders an excessive quantity of a limited variety of controlled substances.   FF 22.   The Pro-Compliance Reports concerning the eight pharmacies contain information that raised these red flags.   For example, as discussed above, the reports specifically advised the Respondent that seven of the pharmacies' orders for both hydrocodone and oxycodone exceeded the national average.   Those reports also informed the Respondent that of those seven pharmacies, the percentage of controlled substances those pharmacies dispensed compared to other prescriptions they filled was also well above the national average.

Although the Pro-Compliance Reports for the eighth pharmacy, Pharmacy Specialties, did not indicate that it was dispensing hydrocodone and oxycodone higher than the national average, it did report significant increases in its orders.   For example, Pharmacy Specialties increased its purchases of hydrocodone by 25% between February to October 2016, and by another 89% between October 2016 and September 2017.   During that later period, Pharmacy Specialties increased its orders for oxycodone by 148 percent.   Dave's also had a significant increase in its dispensing of oxycodone:  increasing by 12,000 dosages between March 2014 and January 2015; followed by an increase of 205% between May 2014 and December 2015; and another increase of 14% between June and November 2016.   With regard to Folse, between September 2013 and November 2014 the number of dosage units of oxycodone it dispensed increased by over 11,000.   Such increases are very big red flags.   FF 28, 93.   Here, there is no persuasive evidence in the record that the Respondent performed any effective due diligence to

---

[55]   While some of the Pro-Compliance Reports contained on the CD-ROM exhibits submitted by the Government reflect far larger numbers of unverified DEA numbers, *see* FF 104, 114, 120, I have used the lower numbers because other portions of the reports actually list the names of the practitioners that correspond with the lower numbers. *Supra* notes 14 & 15.

resolve red flags concerning the high volume of controlled substances that these eight pharmacies were dispensing.

When a distributor receives a Pro-Compliance Report that raises red flags, the distributor should conduct additional due diligence concerning those red flags. FF 31; *Masters Pharm., Inc.*, 861 F.3d at 222-23. In fact, the presence of a red flag triggers a distributor's obligation to conduct due diligence. FF 30. When a distributor sees red flags on a Pro-Compliance Report, the distributor is obligated to exercise due diligence in investigating those red flags. *Id.* It is essential that a distributor document the resolution of red flags. FF 34; *Masters Pharm., Inc.*, 80 Fed. Reg. at 55428 n.21. In essence, due diligence without documentation is ineffective due diligence and, in turn, ineffective at guarding against diversion. In this case, except as noted, there is no documentation that the Respondent resolved the red flags addressed above.

The Respondent acknowledged the paucity of documentation to show that it had resolved red flags. FF 50, 54, 356, 357. Contrary to the Respondent's argument (ALJ-89, at 101-03, paras. 272-75), the absence of documentation of resolving red flags, however, is evidence that the red flags were never resolved. *Masters Pharm., Inc.*, 861 F.3d at 218. While the Respondent did conduct some due diligence, such as by obtaining Pro-Compliance Reports, and by preparing its own monthly Market Basket Reports of its customers, it is not enough to simply order the reports without taking appropriate action based on the content of those reports. *Chambers*, 79 Fed. Reg. at 4970 (citing *Moore*, 423 U.S. at 142-43). Further, while the Respondent had written policies and procedures, those policies and procedures only identified three suspicious orders over a period of four years and four months that were reported to the DEA. In addition, the Respondent's written policy was to contact customer pharmacies only in some, but not all, cases. FF 198. Quite obviously, as acknowledged by the Respondent, those procedures were not working. FF 277-79, 357; Tr. 720-21. The Respondent also had a policy of producing monthly and daily reports, yet none are in the Administrative Record. FF 196-97. In addition, the Respondent kept a proprietary database, RE-11, at 5, yet introduced no due diligence records from it. Thus, I agree with the assessment of the Group Supervisor, an expert witness, that even though the Respondent produced some due diligence files to DEA, a distributor "can conduct due diligence and ignore the red flags that are in [its] face and continue to ship. And that's what I feel like happened in this particular case." Tr. 463; *see also* Tr. 80 (testimony of Prevoznik: "[Y]ou can ask for all these things, but you have to do something with it."). And as the evidence

shows, the Respondent continued to ship controlled substances despite the red flags raised in those due diligence files, which makes the due diligence ineffective at guarding against diversion.

Finally, the Respondent produced no witness with first-hand information to rebut the allegations contained in the OSC. Specifically, the Government alleged that the Respondent "consistently ignored and/or failed to implement its due diligence and suspicious order monitoring policies and failed to conduct meaningful due diligence into . . . orders to ensure that the controlled substances were not diverted." ALJ-1, at 3, para. 10; at 5, para. 21. Therefore, it is appropriate to draw the adverse inference that if Mr. Paul Dickson or Ms. Clara Guin, or, for that matter, any one of several members of the Dickson family or key employees of the Respondent who had first-hand knowledge of the Respondent's due diligence efforts, had presented testimony, that testimony would have supported the Government's factual allegations.

Based on the above evaluation of the evidence concerning the exemplar pharmacies, I find that the allegations that the Respondent failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels in violation of 18 U.S.C. § 823(b)(1) and 21 C.F.R. § 1301.71(a), and that it failed to adequately design and operate a system to disclose to the registrant suspicious orders of controlled substances in violation of 21 C.F.R. § 1301.74(b), are **SUSTAINED**. Specifically, the allegations detailed above concerning the exemplar pharmacies, are **SUSTAINED**. These violations weigh in favor of revoking the Respondent's Certificates of Registration and denying any pending applications. Those allegations contained in the Order to Show Cause that the Respondent did not conduct **any** additional due diligence concerning the exemplar pharmacies, as set forth in paragraphs 27, 29, 35, 44, 52, 63, 70, 82, and 91 of the OSC, are **NOT SUSTAINED**.[56] Those allegations contained in the Order to Show Cause concerning the specific number of shipments, and the number of dosage units shipped to the exemplar

---

[56] The Government's own evidence disproves the allegation that the Respondent did not conduct *any* additional due diligence. The Respondent routinely prepared monthly Market Basket Reports concerning each exemplar pharmacy. GE-57-64; Tr. 423. In addition, the Respondent frequently obtained new Pro-Compliance Reports concerning these pharmacies, GE-20-56, and a Government expert acknowledged that those reports could be considered additional due diligence. Tr. 421.

pharmacies, as set forth in paragraphs 30, 36, 45, 53, 64, 71, 83, and 92, are **NOT SUSTAINED.**[57]

**Failure to Report Suspicious Orders**

The Order to Show Cause and the Government's Third Supplemental Prehearing Statement alleged that based on statistical analysis, between January 1, 2014 and April 30, 2018, the Respondent shipped 7,252 unusually large orders of oxycodone, totaling 12,594,100 dosage units and 4,948 unusually large orders of hydrocodone, totaling 22,042,800 dosage units. ALJ-1, at 5, para. 18; ALJ-52, at 19. The OSC also alleged that the Respondent shipped these orders and only reported three orders as being suspicious. ALJ-1, at 5, para. 20. In light of that high volume of unusually large orders for oxycodone and hydrocodone, and only reporting three orders as suspicious, the OSC also alleged that the Respondent failed to maintain effective controls against diversion of controlled substances into other than legitimate channels in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1), and 21 C.F.R. § 1301.71, and that the Respondent failed to report and identify suspicious orders to the DEA in violation of 21 C.F.R. § 1301.74(b). ALJ-1, at 5, para. 21. The Government also alleged that there were specific orders of unusual size that the Respondent filled for all of the exemplar pharmacies, except Hephzibah. ALJ-1, at 6-15; ALJ-52, at 20. With respect to the exemplar pharmacies, the Government alleged the Respondent filled the following numbers of unusually large orders of oxycodone and hydrocodone for the identified pharmacies:

---

[57] Both prior to the hearing and during the hearing, I advised the parties that they had the obligation to highlight the evidence each side was relying upon to prove their respective cases. *See* ALJ-49, at 2-3; Tr. 1095-96. Quoting from *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36487, 36503 n.25 (2007), I advised that "when a party intends to rely on evidence contained in a CD-ROM, it has the obligation to prepare a summary setting forth what the data contained therein show. . . . It is not the responsibility of the ALJ . . . to plumb the depths of such an exhibit to determine what the data show." ALJ-49, at 3. Although the Government did produce a Summary of Exhibits Produced in Native Format, it does not detail the numbers of orders or dosages as is contained in the OSC. ALJ-66, at 30-32. In addition, the number of shipments and dosages listed in the OSC and asserted as facts in the Government's Brief are not the same. Compare, for example, the paragraphs cited above with ALJ-90, Appendix A, at 27, paras. 96-97; at 31, paras. 108-09; at 39, paras. 130-31; at 45, paras. 145-46; at 55, paras. 170-71; at 57, paras. 179-80; and at 65, paras. 203-04. Furthermore, these numbers of shipments and numbers of dosage units as alleged in the OSC, and as asserted in the Government's Brief, were not addressed at the hearing or contained in the Government's Prehearing Statements. Without question, however, Government Exhibits 65 and 66 document that the Respondent shipped a very large number of shipments and an even larger number of dosage units of both oxycodone and hydrocodone to each of the exemplar pharmacies.

| Pharmacy | Oxycodone | Hydrocodone |
|----------|-----------|-------------|
| Wallace | 1 | 6 |
| Bordelon's | 50 | 2 |
| Folse | 58 | 68 |
| Pharmacy Specialties | 10 | 15 |
| Dave's | 103 | 14 |
| Wellness | 119 | 3 |
| Wilkinson | 2 | 49 |

ALJ-52, at 20.

Statistical analysis is an appropriate method for identifying suspicious orders and the Tukey method is an appropriate method to conduct that analysis. FF 256. The Tukey method is a widely-recognized and commonly-used method of identifying statistical outliers. FF 215. It is also a useful tool for identifying outlier transactions that a distributor should investigate. *Id.* The Government applied the Tukey method to analyze the Respondent's sales of oxycodone and hydrocodone for the period between January 1, 2014 and April 30, 2018. FF 213, 224. In fact, the Government calculated the number of the Respondent's outlier orders two different ways while using the Tukey method. FF 213, 224, 231, 234, 241-43. First, the Government analyzed the Respondent's orders using a fixed-frame analysis. FF 224. Later, the Government analyzed the Respondent's orders using a look-back analysis. FF 234. Based upon the Tukey method, using a fixed-frame analysis, the Respondent filled 12,200 orders[58] between January 1, 2014 and April 30, 2018, that were significantly larger than normal. FF 215, 228, 231, 233. For the same time period, based upon the Tukey method, but using a look-back analysis, the Respondent filled 12,038 orders that were significantly larger than normal. FF 241-43. Between January 1, 2014 and April 30, 2018, however, the Respondent only submitted three suspicious order reports. FF 54, 199-201; Stip. 7. Furthermore, none of the three reports contained customer supplied information, as mentioned in the Respondent's SOP Manual. FF 198, 200, 202.

I accept the testimony of the Government statistical expert witness that he was using the Tukey method in this case to determine "a ballpark estimate" of the Respondent's outlier orders.

---

[58] Because this figure was calculated using data taken from the ARCOS system, the figure represents filled orders. FF 223.

While the Government's statistical expert referred to his analytical findings as "just math" (FF 236), he is a statistician, not an expert on the "requirements imposed on DEA registrants." Tr. 282. Thus, I also accept the expert testimony of the Group Supervisor, the Government's other expert, that these outliers are, in fact, suspicious orders that should have been reported. Tr. 294

I make this finding in spite of the testimony of the Respondent's expert in "statistical analysis related to controlled substance distribution," and in "pharmacy ordering and inventory management," Tr. 513-14, 520-21, who testified that the Government's analysis was unreliable. FF 245. As explained earlier in this opinion, I give greater weight to the testimony of the Government's statistician. Nevertheless, the Respondent's own evidence supports the conclusion that the Respondent received at least 10,000 suspicious orders between January 2014 and April 2018. Specifically, Respondent Exhibit 20 contains copies of the Respondent's suspicious order reports that the Respondent filed with the DEA between May 14, 2018 and July 29, 2018. RE-20. That exhibit contains 58 reports in which the Respondent informed the DEA of 3,915 suspicious orders. FF 297. The Respondent identified these suspicious orders using its new SOM system, which is based upon the Tukey method. FF 290. Although Respondent Exhibit 20 only covers a period of 11 weeks, Weinstein testified that he had run the Respondent's ordering data from early 2018 through his new system and the amounts were roughly consistent with what is contained in Respondent Exhibit 20. FF 297. In essence, he testified that the Respondent's new SOM system is catching about the same number of outliers on post-OSC data as it did on pre-OSC data. Tr. 666. Using a fixed-frame analysis the Government, however, identified only 564 suspicious orders in the first four months of 2018 (16 weeks). FF 231. That number pales when compared to the Respondent's own evidence showing almost 4,000 suspicious orders identified by the Respondent in 11 weeks between mid-May and the end of July 2018, a number similar to what the Respondent discovered when applying its new SOM system to the early months of 2018. Since Weinstein testified that the number of outliers the new SOM system is identifying on current data is similar to what it identified on pre-OSC data, and the Respondent's new SOM system identified 3,915 suspicious orders in 11 weeks on post-OSC orders, it is reasonable to conclude that over a period of 4 years and 4 months the number of suspicious orders would have been at least 10,000.

The Respondent also explained its lack of documentation, noting that keying errors made by a pharmacy were corrected by a phone call to the pharmacy, and then the order was shipped. FF 54. Such actions by the Respondent violated the reporting requirement of 21 C.F.R. § 1301.74(b). It does so for two reasons. First, as soon as the order was held for review, the order "met the criteria of a suspicious order," and the Respondent was required to report the order as suspicious. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55487 n.178. Second, "the suspicious order regulation requires the reporting of an order, regardless of whether the order is rejected entirely or edited by reducing the amount that is actually shipped." *Id.* at 55483. Thus, the Respondent's policy of editing an order and reducing the quantity of controlled substances its customer pharmacy had ordered essentially defeated the reporting requirement contained in the regulation. Further, the lack of documentation is evidence that the Respondent did not resolve these issues and that its due diligence was not effective.[59] *Masters Pharm., Inc.*, 861 F.3d at 218.

The Respondent's phone log also provides evidence of instances where the Respondent should have submitted a suspicious order report, but did not. Under the Respondent's old SOM system, the Respondent relied, in part, on input from its own employees who filled the orders. FF 280. Further, as noted above, as soon as the Respondent held the order for review, the order "met the criteria of a suspicious order." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55487 n.178. When the Respondent's employees raised concerns on March 7, 2016, and on December 13, 2017, about orders for controlled substances that Pharmacy Specialties had placed, there is no evidence in the Administrative Record that the Respondent suspended any shipments of controlled substances to Pharmacy Specialties or filed any suspicious order reports concerning that pharmacy. FF 142. There is evidence, however, that the Respondent continued to supply that pharmacy with oxycodone and hydrocodone. Stip. 14; RE-65-66. With respect to Hephzibah, the Respondent's phone log clearly indicates that the pharmacy was unwilling to cooperate with the Respondent's program, the Respondent closed the account.[60] FF 169. No suspicious order reports were filed concerning Hephzibah Pharmacy. Then on January 9, 2018, the Respondent's employees were concerned about orders placed by Wallace. GE-14, at 31. In fact, the Respondent stopped a shipment to Wallace due to that concern, and Wallace actually

---

[59] The Respondent's lack of documentation is another reason I accord lesser weight to the testimony of Weinstein. Weinstein testified that without context the Government's statistical results were not reliable. Tr. 541. Nevertheless, the Respondent's lack of documentation also prevents the ability to demonstrate context.

[60] Oddly, however, in an email to the DEA, the Respondent stated that it did not close the Hephzibah account due to suspicious activity. FF 169. I put greater weight on the content of the Respondent's contemporaneous phone log.

returned some hydrocodone that had already been shipped. *Id.* Again, there is no evidence that the Respondent reported these suspicious orders from Wallace.

The Respondent also informed DEA that as a result of its SOM system it had ceased supplying controlled substances to 42 pharmacies from 2014 through 2016. FF 281; RE-11, at 14. The Respondent's expert witness "in diversion," Tr. 851, acknowledged that if the Respondent had terminated those pharmacies based upon its SOM program, the Respondent should have filed suspicious order reports concerning those 42 pharmacies. Tr. 1015-16. There is no evidence that the Respondent did so.

Not only did the Respondent fail to report suspicious orders as required by 21 C.F.R. § 1301.74(b), the Respondent did so because it also failed to adequately "design and operate a system to disclose to the registrant suspicious orders of controlled substances." *Id.* The numbers themselves tell the story. Prior to April 2018, the Respondent's SOM program had identified less than 60 suspicious orders (3 suspicious order reports; 42 pharmacies with closed accounts; and possibly 15 orders identified in the Respondent's phone log). *Supra* note 17. Yet in the first 11 weeks of running its new SOM program, the Respondent identified almost 4,000 suspicious orders. In addition, even in those documented instances where the Respondent's employees identified concerns, FF 142, 169; *supra* note 17, there is no evidence that the Respondent filed a suspicious order report because of those concerns. Further, Irelan testified that the Respondent's old system could not hold orders[61] and there were limited places for notes. FF 277-78, 308. Thus, it is clear the Respondent's SOM system, as it existed before the issuance of the Order to Show Cause, was not effective. This finding is also consistent with the testimony of the Respondent's witnesses, Irelan and Milione. Tr. 720, 989, 1015-16.

Finally, the Government introduced evidence from the Government expert that supports the specific numbers of unusually large orders of oxycodone and hydrocodone that the Respondent shipped to seven of the exemplar pharmacies. FF 232. The evidence shows that between January 2014 and April 2018 the Respondent filled 500 unusually large orders for these two controlled substances for the seven exemplar pharmacies. *Id.* Further, the Government's evidence shows that the Respondent filled 156 of these orders between January 2017 and April

---

[61] Although Irelan testified that the old system could not hold orders, FF 278, the evidence establishes that some orders were held. For example, the Respondent reported that before filling orders where the ordering pharmacy mistakenly over-ordered, the Respondent would not fill the order, but rather it would call the pharmacy and "correct" the order before filling it. FF 54. In addition, the Respondent stopped shipment of an order to Wallace. GE-14, at 31 (first entry dated 1/9/18).

2018. FF 263. As previously discussed, I credit the testimony of the Government's statistical expert over that of the Respondent. I also credit the testimony of the Group Supervisor who testified that all of these unusually large orders were suspicious orders and should have been reported to the DEA. Tr. 294. Even if I accepted the calculations of the Respondent's statistical expert, I would still find that the Respondent filled 54 unusually large orders for oxycodone and hydrocodone for the seven exemplar pharmacies between January 2017 and April 2018. FF 263-64. Similarly, accepting the expert testimony of the Group Supervisor, I would find that these 54 orders should have been reported to the DEA.

The preponderance of the evidence establishes that the Respondent should have filed at least 10,000 suspicious order reports to the DEA between January 2014 and April 2018. At a minimum, the Respondent should have filed more than three suspicious order reports during that time period. The Respondent's own evidence supports this finding. First, Weinstein testified that his analysis of orders the Respondent filled identified about 50% of the outliers the Government had identified. FF 261. Second, another of the Respondent's experts, Milione, testified that the Respondent should have filed suspicious order reports at least in equal number to the number of pharmacies whose accounts the Respondent had closed based upon its old SOM system. FF 281. Third, the Respondent's phone log contained entries of approximately 15 suspicious orders. FF 209; *supra* note 17. It is also telling that during an 11 week period after the Respondent's new SOM system became operational, the Respondent reported well over 3,000 suspicious orders to the DEA, when compared to only 3 in the preceding four years. In addition, I note that when the Government applied the Tukey method, using the Respondent's look-back analysis, the Government found that the number of unusually large orders were roughly the same as when the fixed-frame analysis was used. FF 234, 242-43.

Based on the above evaluation of the evidence, when considered against the requirements to report suspicious orders, I find that the allegations contained in paragraph 21 of the Order to Show Cause that the Respondent failed to maintain effective controls against diversion of controlled substances into other than legitimate channels in violation of 21 U.S.C. §§ 823(b)(1), and 21 C.F.R. § 1301.71, and that the Respondent failed to report and identify suspicious orders to the DEA in violation of 21 C.F.R. § 1301.74(b), and the allegations contained in paragraphs 37, 46, 54, 65, 84, and 93, of the OSC, and ALJ-52, at 20, that the Respondent failed to report suspicious orders it filled for the seven exemplar pharmacies, also in violation of 21 U.S.C.

§ 823(b)(1), and 21 C.F.R. §§ 1301.71, and 1301.74(b), are **SUSTAINED.** These violations weigh in favor of revoking the Respondent's Certificates of Registration and denying any pending applications. The portions of the allegations in the Order to Show Cause in paragraphs 2, 19, 30, 36, 37, 45, 46, 53, 54, 64, 65, 74, 83, 84, 92, and 93, that refer to a specific number of dosage units of oxycodone or hydrocodone are **NOT SUSTAINED** because the Government either failed to introduce evidence in support of those allegations or it did not identify, either prior to or during the hearing, where in the Administrative Record the evidence supporting those specific numbers of dosage units can be found.[62]

## DISCUSSION AND CONCLUSIONS OF LAW

As noted earlier, I have not sustained all of the Government's allegations. The allegations I have sustained, however, are enough to support my conclusion that the Respondent's continued registration is inconsistent with the public interest and my recommended sanction of revocation. Those sustained allegations concern the Respondent's failure to conduct effective due diligence of red flags of diversion with respect to eight exemplar pharmacies. Specifically, I have sustained the Government's allegations that the Respondent shipped controlled substances to the eight exemplar pharmacies for up to a period of about four years without resolving red flags raised in Pro-Compliance and Market Basket Reports. Those red flags included high percentages of cash payments; orders for controlled substances that far exceeded the national average; pharmacies that had a marked increase in the quantities of controlled substances they dispensed; pharmacies that dispensed 20 or more trinity drug cocktails; and pharmacies that filled prescriptions written by practitioners whose DEA registrations could not be verified. Although the Respondent conducted some due diligence that identified these red flags in the form of Pro-Compliance, Market Basket Reports, and a few phone calls, the Respondent's failure to resolve the red flags in those reports rendered its due diligence ineffective. Because the Respondent continued to supply controlled substances despite being aware of adverse information documented in due diligence reports, the Respondent's due diligence was ineffective at guarding against diversion, and therefore, the Respondent violated 21 C.F.R. § 1301.71(a) and 21 U.S.C. §§ 823(b) and (e).

---

[62] *Supra* note 57.

I have also sustained the Government's allegations concerning the Respondent's failure to report suspicious orders to DEA. Specifically, I have sustained the Government's allegation that the Respondent filed only three suspicious order reports to DEA over a period of about four years, when it should have filed thousands more. The Administrative Record does not conclusively establish the exact number of suspicious order reports that should have been filed during that period, but the preponderance of the evidence shows that the Respondent filled far more than only three orders that met the criteria of being suspicious.

The Government's expert identified (using the Respondent's own look-back method) approximately 12,000 outlier orders that were unusually large. The Government's expert also found roughly the same number of outliers using his own, fixed-frame method. And when the Respondent's expert applied his look-back method to outliers identified by the Government's expert over a period of only 16 months, the Respondent's own expert identified 1,680 outliers. FF 267. With respect to seven of the exemplar pharmacies, the Government's expert identified 500 outliers over a period of about four years. FF 232. Using his look-back approach, the Respondent's expert found 54 outliers for 16 of those months. FF 263-64. In addition, the Respondent claims that by applying its SOM policies that it ceased shipping orders to 42 pharmacies between 2014 and August 2016, yet the Respondent only submitted 3 suspicious order reports. FF 281, 338. While the Government has not proved the exact number of suspicious orders that should have been reported, the Government's evidence and the Respondent's analysis of that evidence, and the Respondent's new SOM system, show that it was at least 10,000. Significantly, these suspicious orders only include those of unusual size, not those of an unusual pattern or frequency. Simply put, three suspicious order reports barely scratched the surface. Thus, a preponderance of the evidence shows that during the relevant time period the Respondent failed to file suspicious order reports for thousands of orders that were of unusually large size in violation of 21 C.F.R. § 1301.74(b).

Folded into the allegation concerning failure to report suspicious orders is the allegation that the Respondent failed to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). With the Respondent failing to file approximately 10,000 suspicious order reports, it follows that the Respondent's system for identifying suspicious orders was ineffective. It also follows that the Respondent's suspicious order monitoring system was ineffective at "guard[ing] against . . . diversion of controlled

substances," in violation of 21 C.F.R. § 1301.71(a).    Thus, I have also sustained the Government's allegation that the Respondent's pre-May 2018 SOM system violated these regulations.[63]

In sum, based on a preponderance of all the evidence, I have sustained the Government's allegations that the Respondent (1) shipped controlled substances without resolving red flags; (2) failed to file suspicious order reports; and (3) failed to operate a system that would identify suspicious orders.  These sustained allegations support a finding that the Respondent harmed the public interest over a period of about four years and four months, and that its continued registration is therefore inconsistent with the public interest.

***Prima Facie* Showing and Balancing**

In its Brief, the Government set forth the five public interest factors to be considered when deciding whether a registration should be granted to, or revoked from, a distributor, citing both 21 U.S.C. §§ 823(b) and (e).  ALJ-90, at 27 n.11.  While the Government specifically noted that it was not making any allegations against the Respondent concerning Factors Three or Five, I note that it also made no argument in its Brief concerning Factor Two.  *Id.* at 28 n.12.  In arguing its case, the Government combines Factors One and Four, but does not conduct any specific analysis concerning Factor Four.  *Id.* at 28-44.  Rather, the Government concludes that the "magnitude and nature of Respondent's violations weigh heavily in favor of revocation."  *Id.* at 44.  The Respondent also cites the public interest factors, and conducts an analysis of all five factors, concluding that each weighs in favor of the Respondent.  ALJ-89, at 110-20, paras. 289-312.

These public interest factors are considered separately.  *Masters Pharm., Inc.*, 80 Fed. Reg. at 55472; *Ajay S. Ahuja, M.D.*, 84 Fed. Reg. 5479, 5488 (2019).  Each factor is weighed on a case-by-case basis.  *Masters Pharm., Inc.*, 80 Fed. Reg. at 55473; *Morall v. DEA*, 412 F.3d 165, 173-74 (D.C. Cir. 2005).  Any one factor, or combination of factors, may be decisive.

---

[63] Even if the Respondent had the option to investigate the unusually large orders and determine they were not suspicious, an option I find to be inconsistent with the express language of 21 C.F.R. § 1301.74(b), in retrospect that option is not available to the Respondent.  It is not available because the Respondent kept no records documenting the resolution of the question of why its customer pharmacies had submitted these unusually large orders.  Without question, the pharmacies could have supplied numerous explanations to provide a legitimate reason for the large orders, which would have allowed the Respondent to ship the orders.  Without documentation of those reasons, however, the orders remain suspicious, and serve as proof of the Respondent's lack of due diligence, its failure to design and operate a system to identify suspicious orders, and its failure to maintain *effective* controls against diversion.

*David H. Gillis, M.D.*, 58 Fed. Reg. 37507, 37508 (1993). Thus, there is no need to enter findings on each of the factors. *Masters Pharm., Inc.*, 80 Fed. Reg. at 55473; *Hoxie v. DEA*, 419 F.3d 477, 482 (6th Cir. 2005). Further, there is no requirement to consider a factor in any given level of detail. *Trawick v. DEA*, 861 F.2d 72, 76-77 (4th Cir. 1988). When deciding whether registration is in the public interest, the totality of the circumstances must be considered. *See generally Joseph Gaudio, M.D.*, 74 Fed. Reg. 10083, 10094-95 (2009). Given the nature of this case, however, I have found it appropriate to focus only on Factor One, which weighs heavily in favor of revocation of the Respondent's Certificates of Registration.

After the Government presents a *prima facie* case for sanction, the Respondent has the burden of production "to show why its continued registration would not be inconsistent with the public interest." *Masters Pharm., Inc.*, 80 Fed. Reg. at 55473; *Southwood Pharm., Inc.*, 72 Fed. Reg. at 36498. DEA precedent has established two avenues for rebutting a *prima facie* showing for sanction: (1) accepting responsibility, and (2) remediation. *Ajay S. Ahuja, M.D.*, 84 Fed. Reg. at 5497. In addition, when assessing the appropriateness and extent of sanctioning, the DEA considers the egregiousness of the offenses and the DEA's interest in specific and general deterrence. *David A. Ruben, M.D.*, 78 Fed. Reg. 38363, 38385 (2013).

To rebut the Government's *prima facie* case, the Respondent "'must accept responsibility for its actions and demonstrate that it will not engage in future misconduct.'" *Masters Pharm., Inc.*, 80 Fed. Reg. at 55501 (quoting *Medicine Shoppe*, 73 Fed. Reg. at 387). Acceptance of responsibility must be unequivocal in order to successfully demonstrate that a respondent can be trusted with a DEA registration. *Daniel A. Glick, D.D.S.*, 80 Fed. Reg. 74800, 74801 (2015). Where a respondent's testimony is "equivocal and unpersuasive" concerning acceptance of responsibility, it is appropriate to conclude that the respondent has not produced sufficient evidence to demonstrate that he can be trusted with DEA registration. *Perry Cty. Food & Drug*, 80 Fed. Reg. 70084, 70090 (2015). In addition, "candor is an important and typically dispositive consideration" in determining whether a registrant has accepted responsibility for its actions. *Jeri Hassman, M.D.*, 75 Fed. Reg. 8194, 8236 (2010).

The Respondent may accept responsibility by providing evidence of its remorse, its efforts at rehabilitation, and its recognition of the severity of its misconduct. *Robert A. Leslie, M.D.*, 68 Fed. Reg. 15227, 15228 (2003). In accepting responsibility a respondent is required to acknowledge all acts of misconduct that are proven by the Administrative Record. *See Mark*

*William Andrew Holder, M.D.*, 80 Fed. Reg. 71617, 71628 n.25 (2015) (collecting cases). In other words, a registrant "is not required to accept responsibility for misconduct which has not been proved on the record." *David Ruben, M.D.*, 78 Fed. Reg. at 38386 n.49; *Mark G. Medinnus, D.D.S.*, 78 Fed. Reg. 62683, 62684 (2013) (citing *Jeffrey P. Gunderson, M.D.*, 61 Fed. Reg. 26208, 26211 (1996)).

For an acceptance of responsibility to be effective, a respondent must show "true remorse" for wrongful conduct. *Michael S. Moore, M.D.*, 76 Fed. Reg. 45867, 45877 (2011). The respondent's expression of remorse and acknowledgment of wrongdoing are relevant considerations in the acceptance of responsibility inquiry. *Wesley G. Harline, M.D.*, 65 Fed. Reg. 5665, 5671 (2000). Simply acknowledging, however, that the registrant's practices need improvement is not an effective acceptance of responsibility. *Darryl J. Mohr, M.D.*, 77 Fed. Reg. 34998, 35019 (2012). Relatedly, a respondent does not accept responsibility for its actions simply by taking remedial measures. *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 & 5195*, 77 Fed. Reg. 62316, 62346 (2012). The DEA can require an applicant to acknowledge the full extent of his proven misconduct before granting (or continuing) registration; thus, even if the applicant or registrant undertook remedial measures, refusal to acknowledge the *full scope of misconduct* is a risk to the public interest. *Arvinder Singh, M.D.*, 81 Fed. Reg. 8247, 8250-51 (2016). The DEA's reliance on acceptance of responsibility has been sustained on review. *MacKay v. DEA*, 664 F.3d 808, 819-20 (10th Cir. 2011).

The purpose of requiring registrants to present evidence of remediation or corrective measures is to assure the DEA that similar misconduct will not be repeated. *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. 79188, 79217 (2016). An effective acceptance of responsibility is necessary in order for remedial evidence to be a relevant consideration. *Ajay S. Ahuja, M.D.*, 84 Fed. Reg. at 5498 n.33; *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. at 79202; *The Medicine Shoppe*, 79 Fed. Reg. 59504, 59510 (2014). Thus, where a respondent fails to accept responsibility, "there is no need to address whether the remedial measures [respondent] claims to have instituted are adequate to protect the public interest." *Id.* (citing *Medicine Shoppe—Jonesborough*, 73 Fed. Reg. 364, 387 (2008)).

"[E]ven where a registrant accepts responsibility and demonstrates that he has undertaken remedial measures, in determining the appropriate sanction, the [DEA] can still consider the

need to deter both the particular registrant, as well as others, from engaging in similar acts." *David A. Ruben, M.D.*, 78 Fed. Reg. at 38385. Acceptance of responsibility and remedial measures are, therefore, balanced against the "egregiousness of the violations and the [DEA's] interest in deterring similar misconduct by [the] Respondent in the future as well as on the part of others." *David A. Ruben, M.D.*, 78 Fed. Reg. at 38364. Thus, in addition to weighing the respondent's acceptance of responsibility and evidence of remediation, the DEA considers the egregiousness of the respondent's misconduct and the need for deterrence in crafting the appropriate sanction.

Although these proceedings are remedial in nature, rather than punitive, the DEA, and other administrative agencies, have consistently considered deterrence in determining the appropriate sanction. *Samuel S. Jackson, D.D.S.*, 72 Fed. Reg. 23848, 23853 (2007); *see also McCarthy v. SEC*, 406 F.3d 179, 188-89 (2d Cir. 2005) (affirming SEC's use of "deterrence, both specific and general, as a component in analyzing the remedial efficacy of sanctions"). Thus, "even when a proceeding serves a remedial purpose, an administrative agency can properly consider the need to deter others from engaging in similar acts." *Southwood Pharm., Inc.*, 72 Fed. Reg. at 36504. "Consideration of the deterrent effect of a potential sanction is supported by the CSA's purpose of protecting the public interest" and by "the broad grant of authority" delegated to DEA in the Controlled Substances Act. *Southwood Pharm., Inc.*, 72 Fed. Reg. at 36504; *see also Butz v. Glover Livestock Comm'n Co., Inc.*, 411 U.S. 182, 186-87 (1973) (concluding that the Department of Agriculture's sanction authority achieved statutory objectives by deterring potential violators).

The DEA considers specific and general deterrence. Specific deterrence is the DEA's interest in ensuring that a registrant complies with the laws and regulations governing controlled substances in the future. *Glick*, 80 Fed. Reg. at 74810. General deterrence concerns DEA's responsibility to deter conduct similar to the proven allegations against the respondent for the protection of the public at large. *Id.*

"[W]hile proceedings under 21 U.S.C. §§ 823 and 824 are remedial in nature, there are cases in which, notwithstanding a finding that a registrant has credibly accepted responsibility, the misconduct is so egregious and extensive that the protection of the public interest nonetheless warrants the revocation of a registration or the denial of an application." *William J. O'Brien, III,*

*D.O.*, 82 Fed. Reg. 46527, 46527 (2017) (quoting *Hatem Ataya, M.D.*, 81 Fed. Reg. 8221, 8244 (2016)) (citation omitted).

**Acceptance of Responsibility**

At the hearing, Government counsel asked Mr. Irelan whether he brought with him "any notarized power of attorney or other authority showing that you have proof to speak for the company?" Tr. 790. Mr. Irelan said he did not. *Id.* Government counsel then pointed to 21 C.F.R. § 1316.50, arguing that it "deals with attorney representatives but also, I believe, deals with corporate representatives." Tr. 791. Section 1316.50, titled "Appearance; representation; authorization," provides that a respondent may appear in DEA administrative proceedings "in person or by a representative." 21 C.F.R. § 1316.50. It then provides that "[a] representative must either be an employee of the [respondent] or an attorney at law." *Id.* It then states that "[a]ny representative may be required . . . to present a notarized power of attorney showing his authority to act in such representative capacity and/or an affidavit or certificate of admission to practice." *Id.*

In its Brief, the Government continues to rely upon 21 C.F.R. § 1316.50. ALJ-90, at 46. The Government, however, acknowledges that it "is not aware of any Agency decisions specifically addressing who can accept responsibility on behalf of a corporate (or other non-individual) registrant." *Id.* In general support of its position, the Government cites to *OTC Distribution Co.*, 68 Fed. Reg. 70538 (2003). *Id.* Without citation to any primary authority the Respondent argues that 21 C.F.R. § 1316.50 "is intended to notify litigants of who is permitted to conduct litigation on behalf of a respondent," and it "simply does not address the capacity of a corporate representative to accept responsibility." ALJ-89, at 65-66, para. 196. In its argument that Mr. Irelan was qualified to accept responsibility on behalf of the Respondent, the Respondent relies on *Holiday CVS, L.L.C.*, 77 Fed. Reg. 62316 (2012). ALJ-89, at 63-64, paras. 191-93.

The DEA cases tend to support the Respondent's argument that 21 C.F.R. § 1316.50 addresses counsel issues. Section 1316.50 is cited almost exclusively with respect to a respondent's right to retain legal counsel. *Kenneth N. Woliner, M.D.*, 83 Fed. Reg. 7223, 7223 (2018); *Thomas Horiagon, M.D.*, 81 Fed. Reg. 79051, 79051 (2016); *Jana Marjenhoff, D.O.*, 80 Fed. Reg. 29067, 29069 n.4 (2015); *Stephanie A. Tarapchak, M.D.*, 77 Fed. Reg. 73677, 73677 (2012); *Linda Sue Cheek, M.D.*, 76 Fed. Reg. 66972, 66975 (2011); *Shawn M. Gallegos, D.D.S.*,

76 Fed. Reg. 66986, 66987 n.5 (2011); *Richard A. Herbert, M.D.*, 76 Fed. Reg. 53942, 53942 (2011); *Sheryl Lavender, D.O.*, 76 Fed. Reg. 48897, 48897 (2011); *Michael W. Dietz, D.D.S.*, 66 Fed. Reg. 52937, 52937 (2001); *William Peterson, M.D.*, 66 Fed. Reg. 52943, 52943 (2001). A review of the DEA's final orders did not reveal any case in which the Administrator held that corporate respondents must abide by 21 C.F.R. § 1316.50 when designating witnesses to testify on the corporation's behalf.

I note, however, that the case that comes closest to supporting the Government is the case it cited, *OTC Distribution Co.*, 68 Fed. Reg. 70538 (2003), where the president-owner of a corporate respondent filed a power of attorney pursuant to Section 1316.50 authorizing an individual to serve as the respondent's corporate representative in the DEA proceeding. *Id.* at 70539. That individual testified at the hearing on the respondent's behalf, but the Administrator's decision did not say that a power of attorney was required in order for the witness to testify or that corporate respondents must comply with Section 1316.50 when selecting representatives to testify. *Id.* In fact, the decision adds no commentary whatsoever on how Section 1316.50 applied, or was even relevant, to that situation. *Id.* The Administrator's lone reference to Section 1316.50 seems more of a factual or procedural note rather than a statement of law concerning that section. Thus, although the reference to Section 1316.50 in *OTC Distribution* comes closer than any other DEA case in supporting the Government's position, it does not provide any authority for the proposition that the Respondent was required to submit a power of attorney to testify as the company's corporate representative.

This does not mean, however, that the Respondent is in the clear, especially when it comes to Mr. Irelan's authority to accept responsibility on the company's behalf. The Respondent itself cannot accept responsibility because the Respondent is a family-owned business. Acceptance of responsibility, therefore, must come from an individual or individuals. Where the registrant is not an individual, but rather a company, the DEA has long held that the misconduct of the company's owners, directors, or managers are properly considered in determining whether to revoke the company's registration. *Chip RX, L.L.C., d/b/a City Ctr. Pharmacy*, 82 Fed. Reg. 51433, 51438 (2017) (citing *G & O Pharmacy of Paducah*, 68 Fed. Reg. 43752, 43753 (2003)). Similarly, the DEA's position in cases where the registrant was not a person is that the company's "principals" need to take responsibility. *Sun & Lake Pharmacy,*

*Inc.*, 76 Fed. Reg. 24523, 24533 (2011); *R & M Sales Co., Inc.*, 75 Fed. Reg. 78734, 78744 (2010).

Given DEA's position that it will examine the misconduct of owners, directors, or managers when a registrant is a company, and that principals need to take responsibility for misconduct, the Respondent's assertion that Mr. Irelan is "better positioned than anyone at Respondent to discuss Respondent's past failings" is disingenuous and reflects a lack of candor on the Respondent's part. ALJ-89, at 63, para. 190. Although Mr. Irelan was a manager with the Respondent prior to the issuance of the OSC, he was not an owner of the company or a director of the company. FF 343, 353; Tr. 689. Furthermore, prior to the issuance of the OSC, Mr. Irelan's managerial position had nothing to do with the Respondent's SOM program or its due diligence efforts. FF 341-42. Finally, his testimony concerning the Respondent's SOM program and its due diligence efforts was based upon his review of the Respondent's records, not first-hand knowledge. FF 356.

As noted earlier, the Respondent relies on *Holiday CVS, L.L.C.*, 77 Fed. Reg. 62316 (2012), in its argument that Mr. Irelan could accept responsibility for the Respondent's misconduct. ALJ-89, at 63-64, paras. 191-93. I find that reliance to be misplaced. In support of its argument that in *Holiday CVS, L.L.C.*, "[t]he Administrator did not dictate which corporate officer can or cannot accept responsibility and did not require that the individuals who committed the misconduct must have accepted responsibility themselves," the Respondent quoted the following from that decision: "the fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists." *Id.* at 64, para. 193. As the Respondent has pointed out repeatedly throughout this case, context is important. Immediately preceding the language quoted above from *Holiday CVS*, the decision discussed an exception that had been filed in that case to the decision of the Administrative Law Judge. The exception asserted that:

> other DEA revocation cases bear a crucial distinction from this case: in virtually all of those cases, the individual doctor or independent pharmacy owner/ pharmacist was both the one accused of wrongdoing and the registrant. As such, these individuals were in a position to apologize for their own misconduct or that of the retail pharmacy they owned or operated.

*Holiday CVS, L.L.C.*, 77 Fed. Reg. at 62323. In direct response to that exception, the Administrator of DEA wrote:

> Be that as it may, the Agency's rule is clear and the fact that CVS is a large
> corporation provides no reason to excuse it from explicitly acknowledging the
> misconduct of Respondents and their pharmacists. Therefore, I decline to create
> one rule for chain pharmacies and another rule for closely held or sole-proprietor
> owned pharmacies. Because Respondents have failed to satisfy this requirement,
> the ALJ properly held that they have not accepted responsibility for their
> misconduct.

*Id.* (emphasis added). In context, it is clear that the Administrator was not creating a different rule for chain pharmacies, rather the Administrator anticipated that acceptance of responsibility should always come from individuals who were "in a position to apologize for their *own* misconduct or that of the [company] they *owned or operated.*"[64] *Id.* (emphasis added). This language is consistent with earlier decisions from the DEA that where the registrant is a company, the principals are required to take responsibility for their misconduct. *Sun & Lake Pharmacy, Inc.*, 76 Fed. Reg. at 24533; *R & M Sales Co., Inc.*, 75 Fed. Reg. at 78744. Mr. Irelan, however, engaged in none of the alleged, and proven, misconduct, and at the time of the misconduct he was not a principal.

For all of the above reasons, I find that Mr. Irelan lacked standing to accept responsibility for the Respondent. Even if Mr. Irelan was a proper individual to accept responsibility on the Respondent's behalf, however, there are several factual considerations that cut against the weight of his acceptance of responsibility, and thus whether the offered acceptance of responsibility was unequivocal.

First, although Mr. Irelan currently appears to enjoy nearly total control over the Respondent's compliance program, he does not truly have the final say. For example, Mr. Irelan testified that he is not required to obtain approval from anyone regarding the Respondent's budget for its compliance team; no member of the Dickson family has complained to him about the expense of operating the Respondent's compliance team; he is not required to discuss with any member of the Respondent's management about decisions he makes regarding suspicious order monitoring; no one at the Respondent has suggested to him that he cannot take actions that he wants to take regarding compliance; no one has ever told him he cannot hire or terminate a

---

[64] In *Holiday CVS*, the Administrator agreed with the ALJ that CVS did not accept responsibility for the actions underlying the Government's *prima facie* case. *Holiday CVS, L.L.C.*, 77 Fed. Reg. at 62323. The Administrator noted that during the testimony of the Vice President of Pharmacy Operations for CVS, the Vice President never acknowledged that CVS had engaged in any misconduct. *Id.* Further, it is not clear from the decision whether the Vice President held that position with CVS at the time of the alleged misconduct.

member of the Respondent's compliance team; and that he is the final decision maker regarding staffing the Respondent's compliance team. FF 346-50.

This testimony suggests that after the OSC Mr. Irelan has been the primary decision maker regarding how the Respondent spends money on compliance; who works for the Respondent's compliance team; and how the compliance program is run. Apparently the Respondent trusts Mr. Irelan with these duties since he does not have to obtain approval regarding the compliance program's budget and does not have to discuss decisions regarding suspicious order monitoring with the Respondent's management. FF 346, 348.

Yet, Mr. Irelan also testified that Paul Dickson, Sr., could terminate the Respondent's employment of Guidepost, AGI, and Mr. Irelan with virtually no notice. FF 353-54. In fact, the Government asked Mr. Irelan at the hearing, "if Mr. Dickson, Sr., the president, wanted to fire you tomorrow, could he?", and Mr. Irelan responded, "Yes." Tr. 804. The Government followed by asking whether Mr. Dickson, Sr., could fire Guidepost, AGI, and Cadwalader "tomorrow," and Mr. Irelan responded that Mr. Dickson could fire all of them. Tr. 805. While employment decisions are the Respondent's prerogative and maintaining Mr. Irelan's employment is certainly not required in order to be compliant, the fact that individuals at the Respondent (who did not testify at the hearing) could abruptly terminate the company's Director of Corporate Compliance as soon as the day after he testified gives me pause.

For the same reasons it gives me pause that the same individuals at the Respondent (who, again, did not testify at the hearing) could also terminate the company's relationship with Guidepost and AGI. When Government counsel asked Mr. Irelan who would have the final decision regarding how long to employ Guidepost and AGI, Mr. Irelan initially answered, "At this point, I would," but then explained that the decision would have to go up the chain of command to the Vice President of Operations, then to Paul Dickson, Sr., then to the company's Board of Directors. Tr. 803-04. If Mr. Irelan believed, as Director of Corporate Compliance, that the Respondent needed to continue its relationship with these firms in order to remain compliant, that decision, ultimately, would not be his to make.

Because Mr. Irelan and these firms could be fired so easily by the company's President, then Mr. Irelan's authority is still subject to higher authorities within the company who may not always sign-off on Mr. Irelan's work, even though they have done so thus far. Therefore, a question remains whether the Respondent might not return to its old ways if those responsible

for the Respondent's reform efforts (Mr. Irelan, AGI, and Guidepost) can be abruptly terminated by individuals who did not appear in these proceedings. All we have is the word of one employee who could be fired "tomorrow." Tr. 804. While these considerations do not completely discredit or undermine Mr. Irelan's acceptance of responsibility, they do diminish its weight and power to persuade. These considerations also call into question the extent to which Mr. Irelan speaks for the company. These considerations impact the determination of whether the Respondent's acceptance of responsibility was unequivocal.

Second, as noted earlier, "candor is an important and typically dispositive consideration" in determining whether a registrant has accepted responsibility for its actions. *Jeri Hassman, M.D.*, 75 Fed. Reg. at 8236. The issue is not simply one of Mr. Irelan's candor, but also the candor of the Respondent. Here, the Respondent elected to send its newly-appointed compliance officer to accept responsibility for misconduct of which he was not involved. In fact, he had no first-hand knowledge of any of the misconduct. His testimony about acceptance of responsibility was based on his review of company records, which the Respondent did not produce as evidence.[65] While the Respondent suggests that Mr. Irelan was the best witness the Respondent had to accept responsibility, the Respondent fails to explain why Paul Dickson, Sr., Jacob Dickson, or Clara Guin, would not have been in a better position to accept responsibility for the misconduct that occurred on their watch. *See Holiday CVS, L.L.C.*, 77 Fed. Reg. at 62323 (stating that acceptance of responsibility should come from an individual who can apologize for his or her "own misconduct" or for the company he or she "owned or operated"). Furthermore, the Respondent is a family-owned business, and Paul Dickson was the President during the relevant period of time. In this family environment, had Mr. Dickson significantly offended another family member, how sincere would that family member find Mr. Dickson's apology to be if the apology was delivered by someone else? In essence, that is what happened here—the apology was offered by someone not responsible for the wrongdoing. It is worth repeating, candor is an important and typically dispositive consideration in determining whether a registrant has accepted responsibility for its actions. When a corporate or family-owned registrant decides

---

[65]   In its Brief, the Respondent stated that it was unfair for the Government to have offered only portions of documents, citing the "rule of completeness." ALJ-89, at 92, para. 255. I reject the Respondent's argument for several reasons. First, the Respondent did not raise the rule of completeness during the hearing. Second, the Respondent was on notice for many months of the documents the Government intended to offer. Third, the Respondent failed to identify additional documents it wished to offer prior to the hearing that would have made the Government's exhibits "whole." Fourth, the Respondent called no witnesses to identify such evidence, such as the possible attachments to Government Exhibit 9.

to send a representative who has no first-hand knowledge of, and who was not responsible for, proven violations of the CSA and its implementing regulations, to accept responsibility on behalf of the registrant, while principals who still work for the registrant and who were responsible, at least in part, for the proven misconduct could have testified, that decision calls into question the registrant's candor in accepting responsibility. This, in turn, impacts the determination of whether the Respondent's acceptance of responsibility was unequivocal.

Third, a respondent must accept responsibility for all the misconduct that the Government proved. *Lon Alexander, M.D.*, 82 Fed. Reg. 49704, 49730 n.54 (2017). Furthermore, a registrant is required to acknowledge the full extent of its misconduct and the failure to acknowledge the scope of one's misconduct is a risk to the public interest. *Id.*; *Arvinder Singh, M.D.*, 81 Fed. Reg. 8247, 8250-51 (2016). While there was no reason for Mr. Irelan to accept responsibility for the Respondent failing to conduct "any" additional due diligence because the Government did not prove that repeated allegation, his failure to accept the scope of the Respondent's misconduct renders his attempted acceptance of misconduct to be less than unequivocal. For example, the Government proved that the Respondent failed to report thousands of suspicious orders. Yet, the Respondent's apparent position is that the Government did not prove that any of the orders for hydrocodone or oxycodone that the Respondent filled were suspicious. ALJ-89, at 34-42, paras. 98-118. The scope of the Respondent's misconduct is that it shipped suspicious orders without reporting them to the DEA. Nowhere in Mr. Irelan's testimony is it clear that he accepted responsibility for such misconduct. In fact, to have done so would have been inconsistent with the Respondent's presentation of Mr. Weinstein's testimony that the Government's statistical analysis was unreliable and that the Government did not prove that outliers identified by the analysis were in fact suspicious orders. Furthermore, Mr. Irelan testified that he was not in a position to accept responsibility for, or he could not speak to, some of the allegations contained in the OSC. FF 368-69.

In addition, Mr. Irelan's attempted acceptance of responsibility for filling orders to the exemplar pharmacies without resolving the numerous red flags identified in the numerous Pro-Compliance Reports, seemingly was limited to the Respondent's failure to apply due diligence. Tr. 720-21. Nevertheless, the Government clearly proved that the Respondent's due diligence efforts were inadequate and ineffective, not simply that the Respondent failed to apply its due diligence. Furthermore, based upon the lack of documentation of due diligence efforts, it is clear

153

that little was performed. Clearly, Mr. Irelan did not acknowledge the *scope* of the Respondent's misconduct. *Arvinder Singh, M.D.*, 81 Fed. Reg. at 8250-51. This impacts the determination of whether the Respondent's acceptance of responsibility was unequivocal.

Whether something is unequivocal requires consideration of several factors. Among those factors are questions of whether the witness: has the authority to speak for the registrant; demonstrates knowledge of the misconduct, the scope of the misconduct, and what the law requires; is the best witness the registrant could produce to accept responsibility; was responsible for some or all of the misconduct; and accepts responsibility for the proven allegations and the scope of the misconduct. In addition, the Respondent's candor in its acceptance of responsibility is another factor. Given those considerations, and the analysis set forth above, I find that the Respondent's acceptance of responsibility was equivocal.

**Remediation**

Without question, the remedial actions the Respondent has taken since the issuance of the OSC have been impressive. FF 284-88, 291-301, 303, 307-08, 310-11, 322-330. "The Agency has recognized[, however,] that a cessation of illegal behavior only when 'DEA comes knocking at one's door,' can be afforded a diminished weight borne of its own opportunistic timing." *Mireille Lalanne, M.D.*, 78 Fed. Reg. 47750, 47777 (2013) (quoting *Liddy's Pharmacy, L.L.C.*, 76 Fed. Reg. 48887, 48897 (2011)). Although a respondent's post-OSC remediation may be impressive and is relevant in determining whether respondent rebutted the Government's case, the DEA will not ignore the fact that the respondent decided to become compliant with regulatory requirements only *after* the initiation of administrative enforcement proceedings. *Liddy's Pharmacy, L.L.C.*, 76 Fed. Reg. at 48897. In other words, it should not take the issuance of an OSC to motivate a registrant to take its regulatory obligations seriously. But that is what appears to have happened in this case.

It should come as no surprise that the Respondent's "after-the-fact good works" merit "a skeptical eye." *Swinton v. Potomac Corp.*, 270 F.3d 794, 815 (9th Cir. 2001). Considering that the Respondent has been in operation since 1841, it is not the new kid on the block in terms of distributing pharmaceuticals; it has *178 years of experience* working in the industry. *See, e.g.*, GE-6, at 1; Tr. 694. Thus, it is hard to fathom why it took such an experienced company 177 years, receipt of several DEA letters explaining the requirement to report suspicious orders,

personal meetings with DEA representatives reinforcing those requirements, and the receipt of an OSC/ISO to realize that it needed a better SOM system and improved due diligence practices.

In *Southwood Pharmaceuticals, Inc.*, the Deputy Administrator gave no weight to the respondent's "stroke-of-midnight decision" to cease supplying suspect pharmacies with controlled substances and to employ a compliance officer. 72 Fed. Reg. at 36503. The evidence of record here suggests that the Respondent's rapid enhancement of its SOM system and due diligence were "stroke-of-midnight decision[s]" spurred by the OSC/ISO. *Id.* Furthermore, where a registrant has not unequivocally accepted responsibility, as in the case here, remedial measures are not relevant. *Ajay S. Ahuja, M.D.*, 84 Fed. Reg. at 5498 n.33. Accordingly, I give no weight to the Respondent's remediation efforts.

**Deterrence**

I find that general deterrence weighs in favor of recommending revocation.[66] Given the egregiousness of the Respondent's misconduct, recommending anything less than revocation in this case would suggest that no matter how badly a registrant violates the CSA, the registrant could keep its COR so long as it tenders a semi-unequivocal acceptance of responsibility and introduces evidence that it will follow the law in the future. *David A. Ruben, M.D.*, 78 Fed. Reg. at 38387. The Administrator's reasoning in *David A. Ruben, M.D.*, is worth quoting in full:

> In short, [continuing a practitioner's COR with conditions, rather than imposing a revocation,] would send the message that a practitioner can unlawfully distribute controlled substances until he/she gets caught, and as long as he/she then acknowledges wrongdoing and puts on evidence that he/she has reformed, he/she will get a slap on the wrist. This is the entirely wrong message to send to those practitioners who contemplate using their prescribing authority for illicit purposes.

*Id.* The same is true here. Continuing the Respondent's COR or issuing a suspension—in other words, anything less than revocation—would communicate to DEA registrants that despite their transgressions, no matter how egregious, they will get a mere "slap on the wrist" and a second chance so long as they acknowledge their sins and vow to sin no more. *See Hatem Ataya, M.D.*, 81 Fed. Reg. at 8244 (stating that even if Administrator credited respondent's acceptance of responsibility and considered his remedial evidence, he "would nonetheless find that his conduct was so egregious that the protection of the public interest warrants the revocation of his

---

[66] I would make this same finding, even if I had found that the Respondent had accepted responsibility, and even considering the Respondent's impressive remedial measures.

registrations and the denial of his pending applications"). If it were that easy to escape sanction, no registrant would take its responsibilities seriously until it was caught, because it would only need to apologize and promise to reform to get one more bite at the apple. Registrants do not merit a second bite when the first bite was as huge as the bite the Respondent took, one resulting in thousands of unreported suspicious orders being shipped and countless dosages of addictive and potentially lethal controlled substances flooding the market for many years.

The regulated community must know, however, that violating the CSA will result in "serious consequences." *Trinity Pharmacy II*, <u>83 Fed. Reg. 7304,</u> 7336 (2018). Acceptance of responsibility and evidence of remediation are not get-out-of-jail-free cards that erase the harm caused by years of cavalier disregard for the duties of a DEA registrant. Allowing the Respondent to keep its registration would tell distributors that it is acceptable to take a relaxed approach to DEA regulations until they are caught at which point they only need to throw millions of dollars at the problem to make DEA go away. As Milione stated, the Respondent has "spared no expense" in becoming compliant. FF 288. But this was expense that should have been spent *before* DEA began investigating, not after the Administration conducted a full investigation and decided to issue an OSC.

**Relationship between the Shreveport and Jefferson Certificates of Registration**

The Respondent currently possesses two Certificates of Registration, one for its location in Shreveport, Louisiana, and one for its location in Jefferson, Louisiana. Stips. 1-2. The Respondent argues that there is not a single allegation contained in the OSC concerning the Jefferson location, and that no testimony was presented concerning that location. ALJ-89, at 11, para. 27. The Respondent also argues that "[t]here was not a scintilla of evidence or testimony at the hearing regarding the [Jefferson] registration." *Id.* at 2-3. The Respondent is technically correct. The OSC does not allege that violations occurred at the Jefferson location. ALJ-1. For that matter, however, the OSC also does not allege that the violations occurred at the Shreveport location. *Id.* In addition, there is no testimony or evidence specifying that violations occurred at the Jefferson location, or, for that matter, that the violations occurred at the Shreveport location, though Respondent Exhibit 1 does indicate that the Respondent has one distribution center, which is located in Shreveport, from which distributions are made. RE-1, at 15, 17. Rather, the OSC simply alleged that the Respondent committed the violations. ALJ-1. Furthermore, the

Jefferson location is owned by the Respondent, and the company uses it to "secure controlled substances . . . in transit." RE-1, at 16.

The DEA treats "two separately organized business entities as one integrated enterprise . . . based on the overlap of ownership, management, and operations of the two entities." *Jones Total Health Care Pharmacy, L.L.C., & SND Health Care, L.L.C.*, 81 Fed. Reg. at 79222 (citing *MB Wholesale, Inc.*, 72 Fed. Reg. 71956, 71958 (2007)). In this case, the evidence clearly established that there is an overlap in ownership, management, and operations.

In terms of ownership, it is clear from the record that the Respondent owns both the Shreveport and Jefferson locations. RE-1, at 15-16. As far as management and operations, the Respondent is a "family-owned" business, and Paul Dickson, Sr., is the President of the business. RE-1, at 13; Tr. 694, 803, 835. In addition, Paul Dickson, Jr., is the company's Vice President of Operations, Tr. 804, and Jacob Dickson had been the company's compliance officer/SOM Manager/Vice President of Marketing. Tr. 67, 401-02, 452, 794, 809; GE-9, at 5; GE-72, at 2.

Because of the obvious commonality of ownership, management, and operations, it is abundantly clear that if the Respondent's Shreveport COR was revoked, but the Respondent was allowed to keep its Jefferson COR, the Respondent could continue distributing out of its Jefferson location. Accordingly, due to that commonality, it is appropriate to treat the Respondent's two locations and two CORs as one integrated enterprise.

# RECOMMENDATION

The Government established that the Respondent's continued registration is inconsistent with the public interest. The Government established a *prima facie* case for revocation by proving that the Respondent (1) shipped large quantities of controlled substances without resolving red flags; (2) failed to file thousands of required suspicious order reports; and (3) failed to operate a system that would identify suspicious orders. Because the Respondent's failure to comply with the requirements of the Controlled Substances Act and DEA regulations implementing that Act was so egregious, and because the DEA has the responsibility to consider general deterrence, the most severe sanction is appropriate in this case. Accordingly, I **RECOMMEND** that the Respondent's DEA COR Numbers RM0314790 and RM0335732 be **REVOKED,** and that any application for renewal or modification of these registrations be **DENIED.**

Dated:  August 29, 2019

Charles Wm. Dorman
U.S. Administrative Law Judge

## CERTIFICATE OF SERVICE

This is to certify that the undersigned, on August 29, 2019, caused a copy of the foregoing to be delivered to the following recipients: (1) Counsel for the Government, Paul A. Dean, Esq., and John E. Beerbower, Esq., Office of Chief Counsel, Drug Enforcement Administration, via email to the DEA Government Mailbox at: dea.registration.litigation@usdoj.gov; and to (2) Counsel for Respondent, Jodi L. Avergun, Esq., Keith M. Gerver, Esq., and Joshua P. Arnold, Esq., Cadwalader, Wickersham & Taft, LLP, via email to: jodi.avergun@cwt.com, keith.gerver@cwt.com, and joshua.arnold@cwt.com.


Karen M. Wilson
Secretary
Office of Administrative Law Judges

# EXHIBIT H

1

UNITED STATES DEPARTMENT OF JUSTICE

DRUG ENFORCEMENT ADMINISTRATION

PRE-HEARING CONFERENCE          2018 AUG 13 PM 1:23

RECEIVED
OFFICE OF ADMINISTRATIVE

IN THE MATTER OF:              :
                              :
                              :
MORRIS & DICKSON CO., LLC.    : Docket No. 18-31
                              :
                              :
                              :

                    Friday,
                    August 10, 2018

                    Courtroom A
                    Drug Enforcement Administration
                    Office of Administration Law Judges
                    1550 Crystal Drive
                    Suite 901
                    Arlington, Virginia

                    The above-entitled matter came on
for hearing, pursuant to notice, at 2:00 p.m.

BEFORE:     THE HONORABLE CHARLES WM. DORMAN,
            U.S. Administrative Law Judge

1   public interest under 21 U.S.C. Sections

2   824(a)(4) and 823(b) and (e).

3          Government Counsel, do you have any

4   objection to that statement of issue?

5          MR. DEAN: No, Your Honor.

6          JUDGE DORMAN: Respondent's Counsel?

7          MS. AVERGUN: No, Your Honor.

8          JUDGE DORMAN: Just to go over some of

9   the rules of the Hearing and some of my

10  idiosyncrasies, Federal rules of evidence do not

11  apply in this forum.  That's 21 C.F.R Section

12  1316.41.

13         Evidence is admissible under 21 C.F.R

14  Section 1316.59 if it is component, relevant

15  material and not unduly repetitious.  Hearsay

16  rules do not apply but the hearsay nature of

17  evidence is considered in weighing the evidence

18  that's presented.

19         Exhibits must be produced in an

20  original and three copies in a three-ring binder

21  with tabs.  Witnesses need to be ready to testify

22  without delay or interruption to the Hearing.

23         All Sections I like to try to start on

24  time.  Civility is a must, professional decorum

25  will be maintained.

1    Since we're doing it in this Hearing

2    facility, obviously you can bring in your cell

3    phones but I'd ask that you have them turned off

4    or on silent or vibrate during the sessions of

5    the Hearing.

6    There's no need for continuing

7    objections since the Federal rules of evidence do

8    not strictly apply.  Each side will have the

9    opportunity for opening and closing statements.

10    Testimony will be conducted in what I

11    like to consider to be the normal fashion.  That

12    is direct, cross, redirect, recross, with each

13    examination following direct limited to the

14    substance of that testimony that immediately

15    preceded it.

16    I reserve the right to interrupt

17    Counsel at any time to seek clarification of the

18    witness's testimony.  I'll be assisted throughout

19    this Hearing by my law court, Mr. Devin deBruyn.

20    Any questions on those Hearing procedures?

21    MS. AVERGUN:  No, Your Honor.

22    MR. DEAN:  No, Your Honor.

23    JUDGE DORMAN:  I'd like to move in

24    start talking about stipulations.  Before I do

25    that, just kind of a general statement, if

1    parties have stipulated to a fact, I don't need

2    to hear testimony in that matter.

3              For example, you both agree that the

4    Wilkinson   Family   Pharmacy   surrendered   its

5    certificate of registration, at least it appears

6    that you both agreed to that stipulation, Number

7    20.

8              Then in the Government's pre-Hearing

9    statement I read that the Diversion Investigator,

10   I'm not how you pronounce it, Lemoine -- is that

11   how you pronounce his name? -- will testify that

12   the Wilkinson Family Pharmacy surrendered its

13   certificate of registration.

14             And     then    in    the    Respondent's

15   pre-Hearing statement I read that Mr. Dickson

16   will testify that Wilkinson's Family Pharmacy

17   surrendered its certificate of registration.    I

18   don't need to hear that three times.

19             I only need to hear it once and I'll

20   be kind of proactive if I'm hearing things that

21   are already stipulated too, I may just cut you

22   off.    But just keep that in mind, if you

23   stipulate to it, it's in the record.

24             You are stipulating to it as a fact so

25   I don't need to hear it again.  I don't need to

1   have an Exhibit that documents something that

2   you've already stipulated.  If you stipulate to

3   it, it is a fact, it's established.  We're not

4   going to argue over it.

5           If you have to show the witness an

6   Exhibit for some reason because there's something

7   on it that you might want to elaborate because

8   there's something on the document over and above

9   what you've stipulated to, that's fine.

10          But  just  for  example,  if  you're

11  talking about a prescription, and I don't think

12  we have them in this particular case but say in

13  another case involving a prescription that was

14  issued,  and  both  sides  have  agreed  that  the

15  prescription was issued, I don't need a copy of

16  the  prescription  being  offered  into  evidence

17  because it's uncontested.

18          Moving  to  the  stipulations,  the

19  Government has proposed 20 stipulations and the

20  Respondent  has  proposed  23  new  stipulations.

21  Now, Ms...pronounce it again?

22          MS. AVERGUN:  Avergun.

23          JUDGE DORMAN:   Avergun, okay.   In

24  reading through your pre-Hearing statement, you

25  have agreed to the Government's 20 stipulations,

1    fulsome and in accord with the Court's order.

2             JUDGE DORMAN:  But nothing specific

3    that you want to raise at this point?

4             MS. AVERGUN:  Well, certainly, with

5    regards  to  the  statistical  analyses  and  the

6    mentions  of  the  fact  that  Mr.  Rose  did

7    statistical analysis, we don't have any of the

8    data underlying his analysis.

9             So we can't, as our expert witness,

10   Mr. Weinstein,  said,  really  see  what  their

11   analysis shows or not.

12            JUDGE DORMAN:  I apologize to both

13   sides at this point.  When I first got this case

14   and I saw that it was going to a Hearing on the

15   ISO then in Louisiana, I kind of assumed that

16   perhaps  there  had  been  an  exchange  of

17   documentation.

18            I guess that's incorrect or that you

19   have not seen the Governments Exhibits that they

20   are planning on introducing in this Hearing.

21            Not for this Hearing.  We've certainly

22   seen a partial administrative record that the

23   District Court there required them to file.

24            JUDGE DORMAN:  All right, I do have

25   some comments and perhaps some questions for the

1   Government  that  would  be  helpful  to  me  in

2   preparing for the case.

3           And first of all, Mr. Dean, what are

4   the inclusive dates of the allegations against

5   the Respondent?

6           I read various dates contained in the

7   pre-Hearing statement and the order show of cause

8   but I'm not exactly sure what the parameters are.

9   Is it January of 2014 all the way through April

10  of 2018?

11          MR. DEAN:  That's correct, Your Honor.

12          JUDGE DORMAN:  And who is going to be

13  identifying Exhibits 20 through 68?  Is that

14  going to be all through Mr. Rose?

15          The pre-Hearing statement doesn't tell

16  me that but I'm guessing that.

17          MR. DEAN:  The Government's Diversion

18  Investigator, Robin Hogue, who served the

19  subpoenas and received the replies.  I'm sorry,

20  Your Honor.

21          JUDGE DORMAN:  20 through 68?

22          MR. DEAN:  20 through 64 would be

23  Diversion Investigator, Hogue.  65 through 68

24  would be Mr. Rose.

25          JUDGE DORMAN:  So,  you  said  20

1    through...?

2                MR. DEAN:  64.

3                JUDGE DORMAN:  ...64 is Mr. Hogue?

4                MR. DEAN:  Ms. Hogue.

5                JUDGE DORMAN:  And 65 through 68 is

6    Mr. Rose?

7                MR. DEAN:  That's correct, Your Honor.

8                JUDGE DORMAN:  As I read through your

9    pre-Hearing statement, Mr. Dean, I saw that in

10   essence,   you   had   anticipated   filing   a

11   supplemental   pre-Hearing   statement,   is   that

12   correct?

13               MR. DEAN:  That's correct, Your Honor.

14               JUDGE DORMAN:  I'm going to highlight

15   some  things  to  you  that  I  would  like  you  to

16   address  in  your  pre-Hearing  statement,  your

17   supplemental pre-Hearing statement.

18               I  read  through  the  testimony  of

19   Lemoine and you say he is going to be testifying

20   regarding  communicates  he  had  with  the

21   Respondent.  That's on Page 5.

22               I'm not sure what those communications

23   are.  What about the communications?  Who did he

24   have communications with?

25               Testimony   of   Hogue   should   be

1    testifying regarding communications he had with

2    Respondent regarding subpoenas.         What

3    communications?  What about the communications?

4    Who did she communicate with?

5            Testimony of Dunn, will he testify the

6    Respondent's due diligent practices were

7    inconsistent?  Or you say that he will testify

8    that the Respondent's due diligent practices were

9    inconsistent with its own practices.

10           As I read this, what I'm wondering is

11   what are the Respondents due diligent practices

12   that you're going to present and how were they

13   inconsistent with the Respondent's policies?

14           In relation to Dunn, also he said he's

15   got to testify that DEA was concerned about the

16   Respondent's lack of records.  What records?  Are

17   there specific due diligent records that the DEA

18   was looking for?

19           Testimony of Mr. Rose, will he testify

20   that the results presented in the order to show

21   cause incorrectly applied the TODM.

22           Excuse me, you say that he will

23   testify that the results presented in the order

24   to show cause incorrectly applied the TODM and

25   used an incorrect threshold.

1      My perception when I read that is that

2  by itself that sentence is very confusing and

3  it's kind of a great example of the use of a

4  passive voice to say nothing.  I don't know what

5  it means.

6      Am I correct in this interpretation,

7  that when preparing the order to show cause, the

8  Government relied on Mr. Rose's analysis that the

9  Respondent later demonstrated was incorrect?  Is

10  that what that sentence says?

11      MR. DEAN:  Yes, Your Honor.

12      JUDGE DORMAN:  Since it is correct,

13  then  my  next  question  is  where  in  the

14  Government's pre-Hearing statement do I find what

15  those areas were and what the Government contends

16  the correct figures are.

17      I don't know and I would guess that

18  the Respondent doesn't know either.  She kind of

19  said  so  today  and  she  said  so  in  their

20  pre-Hearing statement.

21      MR. DEAN:  Your Honor?  The correct

22  figures I believe are at the top of Page 8.

23      JUDGE DORMAN:  But there are specific

24  allegations in relation to each of the pharmacies

25  and I don't see anything in your pre-Hearing

1    statement that addresses -- I don't know if any

2    of that changed.

3         In your pre-Hearing statement, the

4    Government states Mr. Rose will be testifying

5    regarding the results of his analysis without

6    ever revealing what the results are.

7         It says that I think three different

8    times, which I think is not very consistent with

9    -- you're looking puzzled at me, I'll give you

10   the page number if you're wondering where it is.

11        It's on Page 8, Mr. Rose will testify

12   regarding the result of his analysis with respect

13   to the number of unusually large transactions.

14   Mr. Rose will testify regarding the results of

15   his analysis of the updated data set.

16        Then Mr. Rose will testify to the

17   results of his analysis of the data with respect

18   to the number of unusually large transactions.

19        In my order for pre-Hearing

20   statements, I specifically say summarizations of

21   testimony that a witness will testify regarding

22   or to an issue are generally inadequate.  I have

23   no idea what he's going to say.

24        So in your supplemental pre-Hearing

25   statement, I'd like you to enlarge upon that

1    considerably.

2                  MR. DEAN:  Understood, Your Honor.

3                  JUDGE DORMAN:  Government, turning to

4    you, do you have any objections to the

5    summarizations of testimony that are contained in

6    the Respondent's pre-Hearing statement?

7                  MR. DEAN:  Yes, Your Honor.  Two

8    specific points and one I think is more a matter

9    of clarification.

10                 The first issue is the testimony of

11   Ms. Guin, Clara Guin, I think this is her second

12   witness.  Page 16 of their pre-Hearing statement.

13                 JUDGE DORMAN:  All right.

14                 MR. DEAN:  It just says she's going to

15   corroborate testimony but it's not clear what

16   testimony is being corroborated.

17                 Obviously the president of the company

18   and a compliance officer would have different

19   perspectives and it's not clear what personal

20   knowledge she has as to what she'll be testifying

21   about.

22                 So, we'd like further detail with

23   respect to what specifically she will be

24   testifying regarding.

25                 JUDGE DORMAN:  I obviously have made

1  notes in preparation of this Hearing and I

2  actually had a note about Ms. Guin. I guess

3  that's how you pronounce it.

4          My note is that based on your

5  summarization, her testimony will be limited to

6  corroborating the testimony of Mr. Dickson.

7          MS. AVERGUN: That's correct, Your

8  Honor.

9          JUDGE DORMAN: So to that extent, I

10  can tell what she's going to testify to but at

11  the same time, it requires an attentive ear

12  during the testimony of Dickson to make sure that

13  she is not saying or testifying something that he

14  hasn't already testified to.

15          To that extent also, if what she's

16  saying is pretty much uncontradicted, you may not

17  need to present her testimony at all.

18          If all it is is corroborating what was

19  already said and you've listened to the cross-

20  examination, my questions, and all these things

21  that have happened, and you're pretty comfortable

22  that, well, it's pretty clear that's what

23  happened.

24          You may not need to corroborate.

25          MS. AVERGUN: I understand, Your

1  Honor, and I have as much interest as the Court

2  might in moving this along quickly.

3          JUDGE DORMAN:  You probably have more

4  interest in it because you're getting paid by the

5  hour and I'm getting paid a salary.  Anyway, Mr.

6  Dean, you said you had a second concern?

7          MR. DEAN:  I did.

8          Perhaps the Respondent's Counsel can

9  just   clarify   this   but   with   respect   to

10  Respondent's Exhibit 5 and 33, they both refer to

11  email  communications  that  will  be  produced  in

12  response to -- they're both a unnumbered amounts

13  of email communication.

14          It's not clear how many there are or

15  what  we  were  dealing  with.   To  the  extent  that

16  once  they're  produced  to  us,  the  Exhibits  are

17  actually  produced,  that's  all  that's  going  to

18  come in from these Exhibits, that will be fine.

19          We just wanted to clarify that.

20          JUDGE DORMAN:  You said five and what?

21          MR. DEAN:  33, Your Honor.

22          MS. AVERGUN:  Yes, Your Honor, I can

23  clarify  that  there  were  several  administrative

24  subpoenas in this case.

25          Those included email communications in

1 │ transcript down in Louisiana, if that comes in, I

2 │ don't anticipate sitting here reading 300 pages

3 │ of something I don't even think is relevant.

4 │ So, it's going to be upon you to show

5 │ me there's something in those 300 pages. Judge,

6 │ I'd like to direct your attention to Page 12

7 │ through 16, okay?

8 │ MS. AVERGUN: Understood, sir.

9 │ JUDGE DORMAN: So just keep that in

10 │ mind that that's your obligation. As I like to

11 │ say, it's your jobs to help me decide the case.

12 │ Your job over there is to help me

13 │ decide the case in favor of the Government, your

14 │ job is to help me decide the case in favor of

15 │ your client. And that's how I view your roles.

16 │ We all want to come up with a right

17 │ decision and to the extent that you can direct me

18 │ that way as opposed to saying, here's a bunch of

19 │ stuff, you just look at it. That doesn't help me

20 │ a whole lot.

21 │ Mr. Dean, anything else before we move

22 │ into scheduling?

23 │ MR. DEAN: No, Your Honor.

24 │ JUDGE DORMAN: Ms. Avergun, anything

25 │ else before we move into scheduling?

1          MS. AVERGUN:  Shall we talk about the

2     other    matters   Section   of   the   pre-Hearing

3     statements,  Your  Honor  or  is  that  part  of

4     scheduling?

5          JUDGE DORMAN:    I  think  your  other

6     matters -- what would you like to talk about?

7          MS. AVERGUN:  Well, first of all, Your

8     Honor, with regards to the Lucia case, this is

9     obviously no disrespect intended to the Court but

10    we do think that it's a significant issue that

11    should  we  proceed  to  hearing,  we  do  want  to

12    address and I would like to file a motion about

13    it.  So, I need --

14         JUDGE DORMAN:  Well, if you're going

15    to file a motion about it, I obviously would need

16    to take a look at it.

17         I'm  aware  of  a  solicitor  general

18    opinion that basically suggested if anybody files

19    a motion, the Judge is recused or needs to recuse

20    himself.

21         Because of Lucia, the absolutely silly

22    portion of that decision that says the Judge that

23    heard  the  case  can't  hear  it  a  second  time,

24    although that happens in Federal Court all the

25    time and in State Court all the time, but as an

1  Administrative Law Judge, we don't have the

2  capability to hear something twice.

3           Apparently, if you file a motion,

4  there's a good chance you'll wind up with a

5  different Judge.

6           MS. AVERGUN:  Fair enough.

7           JUDGE DORMAN:  That's not a threat,

8  I'm just telling you, again, just putting you on

9  notice that that's what's likely to happen.

10           MS. AVERGUN:  I understand, Your

11  Honor.

12           JUDGE DORMAN:  Anything else that you

13  want to talk about, preliminary matters or other

14  matters?

15           MS. AVERGUN:  No, just the motion

16  schedule when we talk through the schedule.

17           JUDGE DORMAN:  Mr. Dean how soon can

18  you have your Exhibits to the Respondent?

19           MR. DEAN:  Within a week, Your Honor.

20           MS. AVERGUN:  So would that be before

21  the supplemental statement?

22           JUDGE DORMAN:  That's my plan, yes.

23  Obviously, you're expert witness would probably

24  like to look at it because your supplemental

25  pre-Hearing statement elaborating, he needs to

1    obviously take a look at those documents.

2              Today is the 10th and you say you can

3    have them to the Respondent by next Friday the

4    17th?

5              MR. DEAN:  Yes, Your Honor.

6              JUDGE DORMAN:  Ms. Avergun, do you

7    have your Exhibits ready?

8              MS. AVERGUN: They're generally ready,

9    yes, Your Honor.

10             JUDGE DORMAN:  I don't care if they're

11   necessarily in the exact order that you're going

12   to give to me because I'm not telling you to have

13   them to me by next Friday.

14             But  could  you  also  exchange  the

15   documents by email next Friday as well?

16             MS.  AVERGUN:  I believe that we can

17   except perhaps for Mr. Weinstein's analysis.

18             JUDGE   DORMAN:     Because   that's

19   dependent a little bit on what you get from the

20   Government?

21             MS. AVERGUN:  Correct.

22             JUDGE DORMAN:  Well, let me ask you to

23   do this, give him everything that you can at this

24   time, not at this time but by next Friday.  But

25   nothing's coming to me, you just need to exchange

50

### C E R T I F I C A T E

This is to certify that the foregoing transcript

In the matter of: Morris and Dickson Co., LLC

Before: US Drug Enforcement Administration

Date: 08-10-18

Place: Arlington, VA

was duly recorded and accurately transcribed under
my direction; further, that said transcript is a
true and accurate record of the proceedings.

_____

Court Reporter

# EXHIBIT I

# UNITED STATES DEPARTMENT OF JUSTICE
## Drug Enforcement Administration

In the Matter of

**Morris & Dickson Co., LLC**

**Docket No. 18-31**

## PREHEARING RULING

On August 10, 2018, the Parties participated in a prehearing conference at the DEA Hearing Facility in Arlington, Virginia. This Prehearing Ruling conforms to 21 C.F.R. § 1316.55.

## I.  Issue

Whether the record as a whole establishes by a preponderance of the evidence that the DEA Certificates of Registration of Morris & Dickson, Co., LLC, No. RM0314790, and Morris & Dickson, Co., LLC, d/b/a Spark Drug, Inc., No. RM0335732,[1] should be revoked, and any pending applications be denied, because their continued registrations would be inconsistent with the public interest under 21 U.S.C. §§ 824(a)(4), and 823(b) and (e).

## II.  Stipulations

The Parties agreed to the following stipulations:

1.    Respondent is currently registered with the DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RM0314790 at 10301 Highway 1 South,

---

[1] The COR number of Spark Drug is provided in the OSC and the Government's Prehearing Statement as ending in either -132 or -732. OSC, at 1; at 2 para. 4; Gov't PHS, at 1. Since neither Party knew which ending was correct, I decided to use the number ending in -732 unless the Parties inform me it is incorrect.

Shreveport, Louisiana 71115. This Certificate of Registration expires by its own terms on January 1, 2019. Gov't PHS, at 1.

2.  Respondent, d/b/a Spark Drug, Inc., is currently registered with the DEA as a distributor in Schedules II through V under DEA Certificate of Registration No. RM0335732 at 336 Saint George Avenue, Jefferson, Louisiana 70121. This Certificate of Registration expires by its own terms on January 1, 2019. *Id.*

3.  Respondent is currently licensed with the Louisiana Board of Drug and Device Distributors under License No. 4299 at 10301 Highway 1 South, Shreveport, Louisiana 71115. This license expires by its own terms on December 31, 2018. *Id.* at 2.

4.  Respondent, d/b/a Spark Drug, Inc., is currently licensed with the Louisiana Board of Drug and Device Distributors under License No. 2015 at 336 Saint George Avenue, Jefferson, Louisiana 70121. This license expires by its own terms on December 31, 2018. *Id.*

5.  Oxycodone is listed by the DEA as a Schedule II controlled substance. *Id.*

6.  Until October 6, 2014, hydrocodone was listed by the DEA as a Schedule III controlled substance. Since October 6, 2014, hydrocodone is listed by the DEA as a Schedule II controlled substance. *Id.*

7.  Between January 1, 2014 and May 1, 2018, Respondent submitted a total of three suspicious order reports to the DEA. *Id.*

8.  DEA maintains the Automation of Reports and Consolidated Orders System ("ARCOS"), which is an automated system developed and designed to allow DEA to maintain a current and historical record of selected controlled substance inventories and transactions from the point of manufacture to the point of sale, distribution, or other disposition, and finally, to the dispensing (consumption) level. *Id.*

9.  Respondent is required to report to the ARCOS system shipments of all controlled substances in Schedule I and II and all narcotic controlled substances in Schedule III. *Id.*

10. Respondent reports its shipments of all controlled substances in Schedule I and II and all narcotic controlled substances in Schedule III to the ARCOS system on a monthly basis. *Id.*

11.  From at least October 1, 2017 until at least April 30, 2018, Respondent supplied the Wallace Drug Company (DEA No. FW6006363) with controlled substances, including oxycodone and hydrocodone. *Id.*

12.  From at least January 2014 until at least April 30, 2018, Respondent supplied the Bordelon's Super-Save Pharmacy (DEA No. AB6203549) with controlled substances, including oxycodone and hydrocodone. *Id.*

13.  From at least January 2014 until at least April 30, 2018, Respondent supplied the Folse Pharmacy (DEA No. BF0636451) with controlled substances, including oxycodone and hydrocodone. *Id.*

14.  From at least January 2014 until at least April 29, 2018, Respondent supplied Pharmacy Specialties Group (DEA No. FP4243589) with controlled substances, including oxycodone and hydrocodone. *Id.* at 3.

15.  From at least January 2014 until at least May 1, 2018, Respondent supplied the Dave's Pharmacy (DEA No. BD5662386) with controlled substances, including oxycodone and hydrocodone. *Id.*

16.  From at least April 2017 until May 2017, Respondent supplied Hephzibah Pharmacy LLC (DEA No. AV5145695) with controlled substances, including oxycodone and hydrocodone. *Id.*

17.  From at least January 2014 until December 2017, Respondent supplied the Wellness Pharmacy (DEA No. BT7485166) with controlled substances, including oxycodone and hydrocodone. *Id.*

18.  By letter dated December 16, 2017, the Wellness Pharmacy reported that it had gone out of business and retired its DEA Certificate of Registration. *Id.*

19.  From at least January 2014 until April 2017, Respondent supplied the Wilkinson Family Pharmacy (DEA No. FW3669198) with controlled substances, including oxycodone and hydrocodone. *Id.*

20.  On April 19, 2017, the Wilkinson Family Pharmacy voluntarily surrendered its DEA Certificate of Registration for cause. *Id.*

21.  On November 15, 2017, DEA conducted a periodic audit at Respondent's facilities. Resp't PHS, at 3.

22.  On February 1, 2018, DEA served an administrative subpoena on Respondent seeking records pertaining to suspicious order reports filed by Respondent as well as records and documents pertaining to due diligence or internal investigations conducted on possible suspicious orders for controlled substances from January 1, 2016 to February 1, 2018. *Id.*

23.  On February 2, 2018, DEA served an administrative subpoena on Respondent seeking records pertaining to the distribution of controlled substances to Wilkinson Family Pharmacy (Registration No. FW3669198) from June 1, 2015 through June 1, 2017. *Id.*

24.  On April 11, 2018, DEA served an administrative subpoena on Respondent seeking records reflecting Respondent's policies, guidance, and/or training for its employees with respect to the identification, investigation, and reporting of suspicious or potentially suspicious orders. *Id.*

25.  On May 2, 2018, the DEA Acting Administrator issued an Order to Show Cause and Immediate Suspension of Registration (the "ISO") to Respondent, immediately suspending both Registration Nos. RM0314790 and RM0335732. *Id.*

The Government did not agree to Respondent's proposed stipulations 29, 31, 32, 33, 35, 36, 39, 40, 41, and 43. The Government also indicated that it was not in a position at the time of the prehearing conference to agree to Respondent's remaining proposed stipulations 21, 22, 23, 24, 34, 37, 38, and 42. Government counsel stated that further investigation was necessary to determine whether the Government could agree to those proposed stipulations.

During the conference, I explained that, if the Parties have stipulated to a fact, as a general matter, I do not need to hear testimony on the matter. For example, the Parties have agreed that the Wilkinson Family Pharmacy surrendered its certificate of registration (stipulation 20). Then in the Government's Prehearing Statement I read that Diversion Investigator ("DI") David Lemoine will testify that the Wilkinson Family Pharmacy surrendered its registration, and in the Respondent's Prehearing Statement I read that Mr. Dickson will testify that Wilkinson Family Pharmacy surrendered its registration. The point of the stipulation is to eliminate the need for such testimony. The bottom line is that if the Parties stipulate to a fact, there is no need to waste time during the hearing, and space in the transcript, taking testimony about a fact the Parties have already agreed to, and then later reading about it once again in the transcript.

I also asked Respondent's counsel about the relevance of Respondent's proposed stipulations 34-38, which concern the preliminary injunction hearing on the immediate

suspension order. After hearing Respondent counsel's argument, I indicated that I was unconvinced about the relevance of this information and would raise the same question again to Respondent's counsel at the hearing. I also explained that the issue of the immediate suspension order is not before me. I questioned the relevance of Respondent's Exhibits 1-4, which also concern the preliminary injunction hearing, for the same reasons.

Accordingly, the Parties are **directed** to attempt to draft additional mutually agreeable joint stipulations. Factual issues for such joint stipulations might include: the brand name, generic equivalents, and schedules of relevant controlled substances; academic degrees and licensure; and admissibility of exhibits. The joint stipulations shall be filed by **2:00 p.m. Eastern Time ("ET") on October 23, 2018**. Such joint stipulations will be included in the record prior to commencement of the hearing.

### III. Witnesses

In their respective prehearing statements, the Government identified **4** witnesses for the hearing, and Respondent identified **5** witnesses.

When prompted to raise any objections to the adequacy of the proposed testimony in the Government's Prehearing Statement, Respondent's counsel stated that the summarizations were deficient. Respondent's counsel also stated that she has yet to receive any information underlying the Government's statistical analysis.

I then raised several issues regarding the adequacy of the Government's Prehearing Statement. I first asked Government counsel about the inclusive dates of the allegations against Respondent, and Government counsel indicated that the allegations cover January 2014 to April 2018. I then asked the Government which witness will be identifying Government Exhibits 20-68. Government counsel responded that Diversion Investigator ("DI") Hogue will identify exhibits 20-64, and Mr. Rose will identify exhibits 65-68. I also pointed out the need to clarify ambiguity in the proposed testimony of DI Lemoine and DI Hogue, both of whom will testify "regarding communications [they] had with Respondent" about subpoenas. Gov't PHS, at 5-6. Regarding Mr. Dunn, I noted the ambiguity of his proposed testimony that "Respondent's due diligence practices were inconsistent with its own policies," and his anticipated testimony concerning Respondent's lack of records. *Id*. at 9-10. Turning to Mr. Rose, I highlighted that

the summarization of his proposed testimony indicates he will testify about errors in his original analysis, but fails to disclose the nature of those errors. *Id.* at 7. I further drew attention to page 8 of the Government's Prehearing Statement where the Government indicates three times that Mr. Rose will testify about the results of his analysis, but leaves the details of those results a mystery.

Government counsel then raised a few objections to Respondent's Prehearing Statement. First, the Government challenged the adequacy of Ms. Guin's proposed testimony, and I indicated that based on its current one-sentence summary, Ms. Guin will be limited to corroborating the testimony of Mr. Dickson. Resp't PHS, at 16. Government counsel then sought clarification regarding the contents of Respondent's Exhibits 5 and 33. The Government then stated that it was unclear which documents were used to produce Mr. Weinstein's reports, and Respondent's counsel indicated those documents would be produced.

I then raised a few additional issues with the disclosures in Respondent's Prehearing Statement. I first asked Respondent's counsel to what extent Mr. Dickson will be accepting responsibility. I then noted that Mr. Dickson's proposed testimony concerning his company's history is not relevant to the issues before me. I indicated the same is true of his expected testimony about SOMLink, and the reputational and financial impact of the immediate suspension. Resp't PHS, at 7-8, 14-15. I also pointed out the ambiguity of Mr. Dickson's testimony that "Hephzibah did not comply with Respondent's conditions." *Id.* at 12. This statement leaves me wondering which conditions Hephzibah failed to follow.

Both Parties expressed the need for supplemental prehearing statements. Accordingly, the supplemental prehearing statements of both Parties are to be filed by **2:00 p.m. ET** on **August 31, 2018.** The Parties are reminded that **testimony that has not been disclosed in the prehearing statements or subsequent filings may be excluded at the hearing.**

## IV. **Documents**

The Parties are directed to exchange with each other copies of the exhibits and documentary evidence that the Parties identified in their prehearing statements by **2:00 p.m. ET** on **August 17, 2018.** If the Parties identify additional documents in their supplemental prehearing statements, the Parties are directed to exchange with each other copies of those

additional exhibits by **2:00 p.m. ET** on **August 31, 2018.** If the Parties wish to exchange responding affidavits, they are to be exchanged by **2:00 p.m. ET** on **September 7, 2018.**

The Parties shall also file with the Hearing Clerk a copy of all exhibits, affidavits, and documents to be used at the hearing by **2:00 p.m. ET** on **October 11, 2018**. Documents and exhibits filed with this office must be filed as hard copies in a three-ring binder, pre-marked for identification (*e.g.*, **Dkt. No. 18-31**), and tabbed with exhibit numbers, for use during the hearing. The Government's exhibits and the Respondent's exhibits will be numbered and paginated (*e.g.*, **GE-1, page 1 of 18**, or **RE-1, page 1 of 18**). The binder must include a Table of Contents, which identifies each exhibit by subject matter, exhibit number, and the total number of pages in the exhibit. Documents must also be rotated in the proper orientation to allow images and text to be viewed as intended, so as to minimize the need to turn the binder to read any individual page of the document. If the documents filed with the Hearing Clerk are different in any respect to the documents the Parties exchanged on August 17 and August 31, 2018, the Parties shall also serve a copy on the other party on October 11, 2018.

Parties are advised that **documents must be rotated in the proper orientation** to allow images and text to be viewed as intended, so as to minimize the need to turn the exhibit binder to read any individual page of the document.

I also emphasized that when presenting exhibits that contain many pages, and/or excel spreadsheets, it is incumbent on the party presenting the document to direct my attention to the relevant portion of the document. It is the Parties' obligation and not mine "to sift through the records and highlight that information which is probative of the issues in the proceeding." *Top RX Pharmacy*, 78 Fed. Reg. 26069, 26070 n.7 (2013).

Parties are also advised to bring a copy of their exhibits to the hearing to be used by witnesses during testimony. Additionally, the Parties shall bring a **record copy** of their documents and/or affidavits to the hearing. The Parties must present their record copies in three-ring binders, marked for identification, and tabbed with exhibit numbers. The record copy will become part of the official record that is transmitted to the Administrator and will contain the Parties' exhibits that are stamped as having been admitted into evidence at the hearing, as well as those exhibits offered but not admitted. As such, the record copy should conspicuously state on the front of the binder **"Record Copy"** so as to make it quickly identifiable as the binder that will become part of the official record.

## V.  Subpoenas

Any request for **Subpoenas** must be filed by **2:00 p.m. ET on October 30, 2018.**  Parties must complete subpoenas in advance and file them with a request for issuance.  A subpoena template is available at http://www.justice.gov/dea/ops/oalj.shtml.  Subpoena requests that do not comply with these instructions will be returned to the requestor without further action.  The requestor is responsible for ensuring proper service of subpoenas.

## VI.  Other Matters

If either party anticipates any **motions** or **objections** requiring the submission of briefs, such briefs are due no later than **2:00 p.m. ET** on **October 23, 2018.**  Any responsive filings are due by **2:00 p.m. ET on the third business day** following the filing of a motion.[2]  If the opposing party fails to properly respond by the response deadline, that party waives any right of response, and the motion shall be considered unopposed.

If an extension of time is needed to comply with <u>any</u> of the filing dates contained in this Ruling, the party requesting the extension must do so in writing and the request must be filed at least 24 hours before the scheduled deadline.  Any such request and any motion will also include a statement of whether the request or motion is opposed by the other party.  Failure to comply with any of the filing dates established in this Ruling, or other dates or procedures detailed in this Ruling or contained in the Order for Prehearing Statements, will be deemed an implied withdrawal of the Respondent's request for hearing.  *See Kamir Garces-Mejias, M.D.*, 72 Fed. Reg. 54931, 54932 (2007); *Andrew Desonia, M.D.*, 72 Fed. Reg. 54293, 54294 (2007).

If the Parties reach a mutually agreeable settlement, they should inform me as early as possible.  Both Parties and their counsel should explore settlement options in a timely fashion.  Insofar as practicable, the Parties should advise me by **November 6, 2018**, of any settlement agreement, joint or unopposed termination motion, or other action obviating the need for contested proceedings.

In the event that the Parties have not reached an agreeable settlement by that date, the Parties are to file the names of those who will attend the hearing, as an attorney, representative,

---

[2]  For example, if a motion is filed on a Monday, then the response will be due by 2:00 p.m. ET on Thursday.

witness or observer along with the dates of birth for those individuals.  That information is to be filed by **2:00 p.m. ET** on **November 6, 2018.**

### VII.  <u>Hearing</u>

Based on <u>5 U.S.C. § 554(b)</u> and discussion during the prehearing conference, the hearing on the merits will be conducted on **November 13-19, 2018,** in Courtroom A of the DEA Hearing Facility, located at **1550 Crystal Drive, Suite 901, Arlington, Virginia 22202.**  Pursuant to <u>21 C.F.R. §§ 1316.44</u> and <u>1316.53</u>, regulatory provisions requiring publication of the time and place of the hearing in the *Federal Register* are waived.

Dated:  August 13, 2018

Charles Wm. Dorman
U.S. Administrative Law Judge

### CERTIFICATE OF SERVICE

This is to certify that the undersigned, on August 13, 2018, caused a copy of the foregoing to be delivered to the following recipients:  (1) Counsel for the Government, Paul A. Dean, Esq., Office of Chief Counsel, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152, via email to the DEA Government Mailbox at: dea.registration.litigation@usdoj.gov; and to (2) Counsel for the Respondent, Jodi L. Avergun, Esq., by email at:  jodi.avergun@cwt.com; and Keith Gerver, Esq., by email at: keith.gerver@cwt.com.

Carlene R. Thomas
Secretary to Judge Charles Wm. Dorman
Office of Administrative Law Judges

# EXHIBIT J

**UNITED STATES DEPARTMENT OF JUSTICE**

**Drug Enforcement Administration**

In the Matter of

**Morris & Dickson Co., LLC**

**Docket No. 18-31**

**SECOND PREHEARING RULING**

On October 26, 2018, Respondent notified the Tribunal that it was seeking declaratory and injunctive relief in the United States District Court for the Western District of Louisiana ("District Court") in light of the Supreme Court's decision in *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018). While the District Court considered Respondent's claims, I issued an Order Staying Proceedings on November 1, 2018, staying the case until January 7, 2019. On November 15, 2018, I issued a Notice to Respondent and Government extending the stay until April 5, 2019.

On December 31, 2018, Respondent notified the Tribunal that on December 28, 2018, the District Court ruled that it lacked jurisdiction to hear Respondent's claims. On January 2, 2019, I ordered a telephonic status conference to be conducted on January 9, 2019.

During the conference, counsel for Respondent stated that Respondent intends to file an expedited appeal of the District Court's ruling to the United States Court of Appeals for the Fifth Circuit. Respondent requested that these administrative proceedings be stayed while the Fifth Circuit decides its appeal. Respondent also noted that it intends to request a ruling from the Fifth Circuit on the merits of Respondent's claims. Respondent stated that it anticipates filing its appeal by the end of next week. Respondent additionally noted that if I lift the stay and proceed to hearing, Respondent would file a motion to recuse me from presiding over this case any further.

The Government voiced its opposition to Respondent's request to stay these proceedings. The Government's main contention is that it is contrary to the public's interest to stay these proceedings any longer. The Government indicated that it would be ready for trial in February if

I lift the stay.

Accordingly, Respondent may file a motion to this Tribunal requesting to maintain the stay in this case by **2:00 p.m. Eastern Time** ("ET") on **January 18, 2019.** Respondent's motion should include the anticipated filing deadlines of its expedited appeal. If Respondent files a motion, the Government's response shall be filed by **2:00 p.m. ET on the third business day** following the filing of Respondent's motion.[1]

Although there is a possibility I will not preside over a hearing in this case, that issue remains to be determined, and I raised several issues during the conference in the event that I remain the presiding ALJ in the case.

First, I requested that Respondent stop submitting filings in letter format. Respondent's filings should be properly captioned and clearly indicate in the heading what Respondent is seeking or responding to.

Second, I asked that if Respondent intends to seal certain exhibits or portions of testimony at the hearing based on confidentiality, that Respondent submit a filing before the hearing explaining which documents and testimony are protected by 5 U.S.C. § 552(b). I noted that every exhibit submitted by Respondent is stamped with a request for confidential treatment, which is rather meaningless considering that not all of the exhibits are eligible for confidential treatment.

Third, counsel for Respondent indicated that her client intends to accept responsibility at the hearing. Respondent's counsel additionally stated that she is aware of DEA precedent that accepting responsibility is a prerequisite for the admissibility of remedial measures.

Fourth, I informed the Parties that I will not accept proposed stipulations 45 and 48 in the Parties' Joint Stipulations, dated October 23, 2018, because those stipulations are not facts. Although I will not accept them as stipulations of fact, I will recognize on the record at the hearing what the Parties have agreed to in those stipulations.

Fifth, I asked the Government to file an explanation before the hearing of the differences, if any, between pages 1 and 2 of proposed Government Exhibits ("GE") 7, 8, and 15. I noted that pages 1 and 2 of GE-7 look identical to each other; that pages 1 and 2 of GE-8 look identical to each other; and that pages 1 and 2 of GE-15 look identical to each other.

Sixth, with respect to proposed Government Exhibits 28-56 and 65-66, and proposed Respondent Exhibits 26 and 27, the Parties must provide a summary of the data contained in those

---

[1] For example, if a motion is filed on a Monday, then the response will be due by 2:00 p.m. ET on Thursday.

CD-ROM exhibits before the hearing and serve a copy on the opposing party in accordance with *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36487 (2007). The Parties must also have available at the hearing copies of their summaries for the opposing party, witnesses, myself, and the record. "[W]hen a party intends to rely on evidence contained in a CD-ROM, it has the obligation to prepare a summary setting forth what the data contained therein show. That summary must be prepared and served on opposing counsel along with a copy of the CD-ROM in advance of the hearing. It is not the responsibility of the ALJ or this Office to plumb the depths of such an exhibit to determine what the data show." *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. at 36503 n.25.

Seventh, I noted that there are only two motions I have not ruled on—both are Government motions *in limine*. The Government declined the opportunity to supplement those motions and Respondent declined the opportunity to supplement its responses to those motions.

Eighth, I asked Respondent why it needs proposed Respondent Exhibit ("RE") 24, which contains a declaration of Kenneth Weinstein, if Mr. Weinstein will be testifying at the hearing. Counsel for Respondent indicated that RE-24 constituted Mr. Weinstein's prehearing statement, but Respondent's Prehearing Statement, dated August 3, 2018, already contains 10 pages of proposed testimony for Mr. Weinstein. Counsel for Respondent indicated she would follow-up on this issue.

Dated: January 10, 2019

Charles Wm. Dorman
U.S. Administrative Law Judge

### CERTIFICATE OF SERVICE

This is to certify that the undersigned, on January 10, 2019, caused a copy of the foregoing to be delivered to the following recipients:  (1) Counsel for the Government, Paul A. Dean, Esq., and John E. Beerbower, Esq., Office of Chief Counsel, Drug Enforcement Administration, via email to the DEA Government Mailbox at: dea.registration.litigation@usdoj.gov; and to (2) Counsel for the Respondent, Jodi L. Avergun, Esq., and Keith Gerver, Esq., Cadwalader, Wickersham & Taft, LLP, via email to: jodi.avergun@cwt.com and keith.gerver@cwt.com.

Rhonda L. Gore
Secretary to Judge Charles Wm. Dorman
Office of Administrative Law Judges

# EXHIBIT K

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

In the Matter of

**MORRIS & DICKSON CO., LLC**

**Docket No. 18-31**

ADMINISTRATIVE LAW JUDGE

CHARLES WM. DORMAN

**RESPONDENT'S SUPPLEMENTAL PREHEARING STATEMENT**

Jodi L. Avergun
Keith M. Gerver
Cadwalader, Wickersham & Taft LLP
700 Sixth Street NW
Washington, DC 20001
(202) 862-2456 (office)
(202) 862-2400 (facsimile)
jodi.avergun@cwt.com
keith.gerver@cwt.com

Dated: September 12, 2018

**SUPPLEMENTAL PREHEARING STATEMENT OF MORRIS & DICKSON CO., LLC**

Pursuant to the Administrative Law Judge's August 13, 2018 Prehearing Ruling, as modified by the Administrative Law Judge's September 4, 2018 Order Granting Government's Second Motion for Extension of Time to File Supplemental Prehearing Statements, Respondent Morris & Dickson Co., LLC ("Respondent"), by and through undersigned counsel, hereby submits its Supplemental Prehearing Statement in the above-captioned matter.

## I.    SUPPLEMENTAL SUMMARY OF TESTIMONY

1.    Clara Guin

Ms. Guin will testify that she has been employed by Respondent for approximately 35 years and, for at least the past decade, has been responsible for security and compliance matters related to controlled substances. She will testify that prior to her employment with Respondent, she worked as a pharmacy technician for 10 years.

Ms. Guin will testify that in both roles she interacted with DEA Diversion Investigators. She will testify that these interactions informed her understanding of diversion and other red flags associated with pharmacy, prescriber, or patient practices. Ms. Guin will testify that her experience as a pharmacy technician also exposed her to such indicators. She also will testify that she attended training provided by the DEA in 2008.

Ms. Guin will testify that she assisted Paul Dickson and other Respondent employees in the creation and operation of analytical tools to identify potential red flags associated with customer purchasing. She will testify that these tools included the Controlled Drug Analysis Report, which looked at the percentage of customer purchasing of controlled substances in dollar volume, and the Market Basket Analysis, which compared a customer's controlled substance purchases against a "market basket" of non-controlled items in terms of both dollars and, after 2008, dosage units. She will testify that in 2013 she began to work closely with the independent

analysis firm ProCompliance to develop reports that analyzed usage by Respondent's customers. Ms. Guin will testify that she used the ProCompliance reports to identify customers that needed further review.

She will testify that she worked with Respondent's IT department to establish parameters for an early version of ECP software to generate automated emails to prompt her to take certain actions with respect to customer accounts. Ms. Guin will testify that such actions included:

- checking customer purchases to determine whether Respondent should order or re-run a ProCompliance report;
- checking a customer's percentage of controlled substance purchases to ensure that it was not growing at an inappropriate rate;
- directing a sales person to visit the customer; and
- entering notes about a customer into ECP based on conversations with sales people.

Ms. Guin also will testify that she began working with Mr. Dickson and Respondent's IT department in 2016 to develop an automated order monitoring system.

Ms. Guin will testify that she worked closely with Respondent's controlled substances vault team, including vault manager Tim Wallis, its salesforce, and its delivery truck drivers to educate them about red flags so that they could identify them and other potential risks associated with customers. She will testify that she regularly spoke with Mr. Wallis who often flagged to Ms. Guin orders that he thought warranted further investigation. Ms. Guin will testify that Mr. Wallis would alert her to any purchasing discrepancies or otherwise unusual order patterns. She will testify that she instructed Respondent's sales team and truck drivers to look for signs of possible diversion at both Respondent's pharmacy customers and, in some cases, those customers' prescribers, including by looking for large groups of customers arriving at the same time,

customers making all-cash purchases, and by listening to the kind of conversations that were taking place at these locations. Ms. Guin will testify that she reviewed ProCompliance reports with Respondent's sales staff and directed the sales team to engage Respondent's customers on issues of concern, including when the customers had controlled to non-controlled ratios of more than 20%, "trinity" prescriptions, or large volumes of cash purchasing.

Ms. Guin will testify that she maintained handwritten notes, some computerized files, and some notations in ECP dating back to 2007 about customers whose accounts with Respondent were closed due to compliance concerns. She recently compiled all of those disparate notes and files and created a list of 261 customers whose accounts Respondent eventually closed. She will testify that this list of 261, which was last updated on September 7, 2018, expands on the list previously provided in response to DEA subpoenas. Ms. Guin will testify that she had identified additional customers whose accounts Respondent closed during her review of due diligence files following the issuance of the ISO. She will testify that Respondent's compliance concerns included, but were not limited to, the customer's ratio of controlled to non-controlled purchases, its filling of "trinity" prescriptions, or its high volume of cash purchases of controlled substances. Ms. Guin will testify that Respondent typically would identify these concerns to the customer and provide them an opportunity to rectify those practices. She will testify that if the customer was unwilling or failed to do so, Respondent would terminate the customer's ability to purchase controlled substances or close the account. Ms. Guin will testify regarding examples of such customers, such as Hart Pharmacy and Econo Pharmacy. She will testify that she thought that her compliance processes complied with DEA's regulatory requirements and that it was her intent and that of Respondent to comply with its legal obligations.

Ms. Guin also will corroborate Mr. Dickson's testimony regarding customer due diligence and review of potentially suspicious orders.

2.    Kenneth A. Weinstein

Since Respondent submitted its Prehearing Statement on August 3, 2018, the Government produced Government Exhibits GE 65 and GE 66—spreadsheets that provide supporting data and calculations for DEA's Prehearing Statement—on August 17, 2018, as well as a corrected copy of Government Exhibit GE 66 on August 30, 2018. Mr. Weinstein has since reviewed those exhibits and this supplemental prehearing statement reflects modifications to Mr. Weinstein's opinion regarding DEA's methodology on the basis of that review. The summary of Mr. Weinstein's testimony provided in Respondent's August 3, 2018 Prehearing Statement otherwise remains unchanged and is incorporated by reference.

a.    Revised Opinion of DEA Methodology

Mr. Weinstein will testify regarding his understanding of Gamaliel S. Rose's analysis on behalf of DEA, based on his review of DEA's July 20, 2018 Prehearing Statement and the supporting exhibits produced on August 17, 2018, which were corrected again on August 30, 2018. Mr. Weinstein will testify that DEA's approach in identifying potentially suspicious orders has significant flaws—including counting return transactions as actual orders—that make its conclusions about unusual orders unreliable. This remains his opinion even after the updates to the methodology that DEA made since the ISO.

Subsequent to the ISO being issued, Mr. Rose updated DEA's analysis to address one of several errors Mr. Weinstein identified in a May 15, 2018 Declaration (the "Weinstein Declaration") submitted in support of Respondent's motion for a preliminary injunction. Specifically, the Weinstein Declaration demonstrated that DEA incorrectly implemented the Tukey method of identifying statistical outliers by using the median rather than the 75th percentile,

and thus vastly over-identified the number of orders that the ISO characterized as "unusually large." Although DEA's updated approach (the "Partially Corrected Method") concedes that error and corrects it, Mr. Weinstein will testify that DEA's summary and the supporting exhibits do not reveal any revised analysis addressing any of the other oversights identified in the Weinstein Declaration.

Mr. Weinstein understands that Mr. Rose's revised analysis incorporates seven additional months of data from October 2017 through April 2018. The original version of Government Exhibit GE 66 inexplicably omitted hydrocodone data for April 2018; the version provided to Respondent on August 30, 2018 includes this data.

Mr. Weinstein will testify that, in his recent review of the latest versions of Government Exhibits GE 65 and GE 66 (the "Partially Corrected Analysis"), he found an entirely new error that appears both in the newly added months of October 2017 to April 2018 and also in the January 2014 to September 2017 time period covered by DEA's original analysis in support of the ISO. Specifically, Mr. Weinstein will testify that in the Partially Corrected Analysis, DEA counted transactions in which customers *returned* products to Respondent as *shipments from* Respondent *to* its customers. No such transactions appeared in DEA's original analysis. These returns appear to comprise all of the 6,215 transactions added to the original January 2014 to September 2017 time period and 520 of the 122,992 transactions for the months of October 2017 through April 2018 that were included in the Partially Corrected Analysis.

Mr. Weinstein will testify that, for example, the Partially Corrected Analysis includes a 100-unit oxycodone transaction for Red Oak Drug on April 7, 2017, that was not in the data DEA produced in support of the ISO. He will testify that his review of the ARCOS data that Respondent provided to DEA shows that the added transaction was clearly marked with a transaction code of

"R," indicating a return. Furthermore, he will testify that Respondent's sales data show that the transaction had a negative quantity shipped, confirming that it was a return. Mr. Weinstein will testify that erroneously treating returns as shipments has a material impact on DEA's results, because 1) the added transactions are incorporated into statistical distributions, leading to changes in the cutoffs above which orders are defined as unusual, and 2) some transactions that were themselves returns are inappropriately identified as "unusually large." He will testify that the erroneous inclusion of returns largely explains why he was not able to exactly replicate DEA's Partially Corrected Analysis in his original Prehearing Statement.

Mr. Weinstein will testify that by relying on the data in the Partially Corrected Analysis, he has replicated DEA's analysis, which he does not concede is accurate or appropriate. By replicating DEA's analysis, even though it is fatally flawed, he has obtained results that are identical to the figures reported in DEA's Prehearing Statement and shown in the produced spreadsheets. He will testify that, after applying the Partially Corrected Method and even incorporating seven additional months of data in its analysis, the number of orders identified by DEA as "unusually large" is still nearly 50 percent lower than what was alleged in the ISO. As an example, he will testify that Hephzibah Pharmacy, which was reported in the ISO to have had 16 unusually large orders of oxycodone in 2017, had no orders identified as unusually large in the Partially Corrected Analysis.

Mr. Weinstein will testify that he removed the returned products that DEA erroneously included in its Partially Corrected Analysis and recalculated the number of orders that DEA would have identified as unusually large. He will testify that had returns not been treated as shipments, there would be 152 fewer oxycodone orders and 85 fewer hydrocodone orders that DEA identified as unusually large in the Partially Corrected Analysis. Of the specific transactions in the Partially

Corrected Analysis in 2017-2018, he will testify that 12 apparent oxycodone returns and 18 apparent hydrocodone returns were themselves identified as unusually large "***orders***"; five of the 18 hydrocodone returns inappropriately identified as unusually large "orders" were transactions for Wallace Drug, one of the customers named in the ISO. He will testify that these apparent returns account for nearly half of the 11 Wallace Drug transactions identified as unusually large in the Partially Corrected Analysis.

*For all subsequent analyses described in this statement, Mr. Weinstein has removed the apparent returns from the data in the Partially Corrected Analysis and used as a starting point the 7,252 oxycodone orders and 4,948 hydrocodone orders that DEA would have identified as unusual using the Partially Corrected Method had returns not been included in the data.* He will testify that his conclusions regarding the other flaws in DEA's approach are materially the same as those in his Prehearing Statement. In certain instances, he will testify that relying upon the data from the Partially Corrected Analysis has led to small changes relative to the replication analysis Mr. Weinstein relied upon for his Prehearing Statement; such changes are reflected in the discussion below.

Mr. Weinstein will testify regarding significant remaining flaws in the Partially Corrected Method, namely: DEA's approach continues to rely on data not available to Respondent at the time orders were made, and thus cannot be used to show that Respondent should have identified those orders as unusually large; and DEA's individual-order approach still does not take into account ordering and inventory practices in the context of the pharmaceutical distribution business, and thus inappropriately identifies orders as unusual. Mr. Weinstein will testify regarding his updated assessment of these issues.

Specifically, Mr. Weinstein will testify that DEA's approach continues to identify orders as unusually large based on a comparison to orders that occurred much later in time. He will testify that the addition of seven months of data in the Partially Corrected Analysis exacerbates the issue relative to the ISO analysis discussed in the Weinstein Declaration. That is, the threshold used by DEA to determine whether an order placed in January 2014 was unusually large now relies on data from orders placed in April 2018; Respondent never could have derived such thresholds to compare against its orders from the earlier date, because the data used to calculate the threshold did not yet exist. He will testify that it is impossible for a distributor to identify an order as unusually large (and potentially suspicious) if it only appears so compared to orders that have yet not been placed at the time the order was made. He will testify that this approach is a substantial factor in causing DEA significantly to overstate the number of orders it identifies as "unusually large."

Mr. Weinstein will testify that under DEA's approach, the average monthly number of "unusually large" orders declines significantly from year to year due to decreases in order volume over time, with the most orders identified in 2014. He will testify that DEA's approach identifies 73 percent fewer hydrocodone orders and 44 percent fewer oxycodone orders per month as unusually large in 2018 as in 2014.

He will further testify that he has analyzed what results DEA would have obtained had it applied its Partially Corrected Method only to orders made in the year prior to a given order date, *i.e.*, to orders that would have been available to Respondent at the time orders were placed.

Mr. Weinstein will testify that he has assessed the specific impact of this modified approach on the customers named in the ISO. The results of his assessment are similar to those in his Declaration, but incorporate the additional seven months of data in the Partially Corrected Analysis

and thus reflect some changes. He will testify that, had DEA applied the Partially Corrected Method to the actual data available to the Respondent at the time that it was analyzing an order, over 65 percent of the hydrocodone orders and over 60 percent of the oxycodone orders identified by DEA as unusually large for these customers in 2017-2018 would not have exceeded an individual-order threshold based on the prior year's data, leaving only 11 of the 33 hydrocodone orders and only 43 of the 123 oxycodone orders still identified under the modified approach limited to the prior year's data. As an illustrative example, he will testify that Folse Pharmacy, which using the Partially Corrected Method would have 68 orders in 2017-2018 identified as unusually large, would have had only two of these orders identified as unusually large using the modified approach that evaluates only orders made in the year prior to a given order date.

Mr. Weinstein also will testify that with this modified approach, of the overall number of orders identified by the Partially Corrected Method as unusually large in 2017-2018 not limited to customers named in the ISO, over 50 percent of hydrocodone orders and over 20 percent of oxycodone orders would not have exceeded an individual-order threshold based on the prior year's data. He will testify that he expects the number of orders identified in years prior to 2017-2018 would also be reduced under the modified approach. He will testify that the limited adjustments made in the modified approach do not address all of the flaws in DEA's approach and should not be construed as a "correct" number of suspicious orders for the customers named in the ISO or overall.

Mr. Weinstein also will testify that DEA's approach continues to focus on an extremely narrow view of the data—individual line-item order amounts placed by a given customer—that fails to take into account the context of the pharmaceutical distribution business and leads to substantial conceptual flaws. He will testify that in September 2006, DEA issued guidance that

"distributors should consider the totality of the circumstances when evaluating an order for controlled substances, just as DEA will do when determining whether the filling of an order is consistent with the public interest . . . " and that the choice of what data to consider for analysis— what information forms "the totality of the circumstances"—goes hand-in-hand with the statistical method used for calculation. He will testify that the choice to take this narrow line-item view of the data leads to conceptual flaws that render DEA's characterization of "unusually large" orders unreliable. He will testify that, for example, DEA continues to identify as "unusually large" some orders that were for 500 units of oxycodone or for 1,000 units of hydrocodone, *i.e.*, for the smallest available package size potentially available for pharmacies to order for a given formulation. Furthermore, he will testify that DEA's focus on individual order sizes, as opposed to total order amounts even at the daily level, fails to take into account any reasonable considerations that could cause variation in individual order amounts without any corresponding increase in cumulative volume. Mr. Weinstein will testify that DEA's method could identify "unusually large" orders for a pharmacy that is shipped the same total amount by Respondent each day, but varies in the number and size of its individual orders throughout the day.

> b.     Revised Opinion With Respect to Specific Orders Identified in the ISO

Mr. Weinstein will testify regarding the impact of DEA's line-item approach on specific orders identified as unusually large for the customers named in the ISO. For example, he will testify regarding the two oxycodone orders that DEA identified as unusually large for Wilkinson Pharmacy. He will testify that the first, in May 2015, was an order for 5,000 units. He will testify that Wilkinson Pharmacy ordered 77,800 total units of oxycodone in May 2015, an amount consistent with past ordering and *less than* its monthly total in any of March, April, June, or July, months in which DEA did not identify any individual oxycodone orders as unusually large. He

will testify that the second Wilkinson Pharmacy order identified by DEA as unusually large, in April 2017, was for 6,000 units. He will testify that, due to Wilkinson Pharmacy surrendering its DEA license, it was not an active customer for the full month of April 2017. However, he will testify that its total orders of 45,000 units in the partial month were on pace for approximately 70,000 to 75,000 total units in April, which would have exceeded the volume of only one of the 12 prior months, thus consistent with past ordering. Mr. Weinstein will testify that a reasonable approach to identifying unusually large orders would take into account the context in which orders were placed and the cumulative volume to which they corresponded; neither of the oxycodone orders for Wilkinson Pharmacy appear large in such context. He will testify that an analysis of other customers named in the ISO would reveal similar patterns.

Mr. Weinstein also will testify that per the ISO, orders identified by DEA's statistical approach should only have been identified as "potentially 'suspicious.'" He will testify that even had Respondent applied DEA's flawed approach and identified certain orders as exceeding a threshold, upon review and investigation Respondent might reasonably have determined that the orders were not suspicious and would not have had to report them.

In light of DEA's failure to address the issues described above, Mr. Weinstein intends to testify that its method is not capable of demonstrating that Respondent failed to report suspicious orders.

## II.  SUPPLEMENTAL EXHIBITS

Respondent has identified the following additional potential exhibits.

| Respondent Exhibit No. 38 | Respondent Corrections to Government Exhibit GE 65 Identifying Returns and Revised Calculations (1 Excel file) |
| --- | --- |

| | |
|---|---|
| Respondent Exhibit No. 39 | Respondent Corrections to Government Exhibit GE 66 Identifying Returns and Revised Calculations (1 Excel file) |
| Respondent Exhibit No. 40 | Backup Data for Oxycodone "Lookback" Calculations for 2017-2018 (1 Excel file) |
| Respondent Exhibit No. 41 | Backup Data for Hydrocodone "Lookback" Calculations for 2017-2018 (1 Excel file) |
| Respondent Exhibit No. 42 | List of Morris & Dickson Compliance-Related Customer Account Closures (1 Excel file) |
| Respondent Exhibit No. 43 | Additional Customer Due Diligence Files (22 pages) |

Dated: September 12, 2018

Respectfully Submitted,

Jodi L. Avergun
Keith M. Gerver
Cadwalader, Wickersham & Taft LLP
700 Sixth Street NW
Washington, DC 20001
(202) 862-2456 (office)
(202) 862-2400 (facsimile)
jodi.avergun@cwt.com
keith.gerver@cwt.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2018, I caused the foregoing to be filed with the DEA Office of Administrative Law Judges by electronic mail at ECF-DEA@usdoj.gov, and I caused a copy of the same to be sent by electronic mail to the Government's counsel Paul A. Dean, Esq., at Paul.A.Dean@usdoj.gov and John Beerbower, Esq., at John.E.Beerbower@usdoj.gov.

# EXHIBIT L

# CADWALADER

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W., Washington, DC 20001
Tel +1 202 862 2200  Fax +1 202 862 2400
www.cadwalader.com

Confidential Treatment Requested by Morris & Dickson Co., LLC
Pursuant to 5 U.S.C. § 552(b)

October 11, 2018

**BY HAND AND EMAIL**

Devin deBruyn
Law Clerk to the Hon. Charles Wm. Dorman
Office of Administrative Law Judges
U.S. Drug Enforcement Administration
1550 Crystal Drive, 9th Floor
Arlington, VA 22202
Email: Devin.A.deBruyn@usdoj.gov

Re:    Morris & Dickson Co., LLP, Dkt. No. 18-31

Dear Mr. deBruyn:

Pursuant to Administrative Law Judge Dorman's August 13, 2018 Prehearing Ruling, please find enclosed hard copies of Respondent Morris & Dickson Co., LLP's exhibits in three-ring binders, pre-marked for identification, and tabbed with exhibit numbers, for potential use during the trial.  As discussed by telephone yesterday afternoon and confirmed in your email communication this morning, Respondent is not producing demonstrative exhibits at this time.

Please note that Respondent also may utilize some of the Government's exhibits at trial in its case in chief, but has not sought to re-duplicate those or separately mark them as Respondent's exhibits.

Very truly yours,

Jodi L. Avergun

Enclosures

cc:    Paul Dean, Esq.
       John Beerbower, Esq.

# EXHIBIT M

## UNITED STATES DEPARTMENT OF JUSTICE
### Drug Enforcement Administration

In the Matter of

**Morris & Dickson Co., LLC**

**Docket No. 18-31**

## ORDER STAYING PROCEEDINGS AND DENYING GOVERNMENT'S REQUEST FOR INTERLOCUTORY APPEAL

On October 26, 2018, Respondent submitted a letter ("Respondent's letter") notifying the Tribunal that it moved for declaratory and injunctive relief on the same day in the United States District Court for the Western District of Louisiana ("the District Court"). Respondent attached to its letter copies of the complaint for declaratory and injunctive relief, and motion for preliminary injunction and supporting memorandum of law, that Respondent filed in U.S. district court ("Respondent's Motions"). Because Respondent's filings in the District Court challenge the constitutional validity of my appointment as an administrative law judge ("ALJ") and the constitutionality of DEA's administrative scheme, Respondent's letter requested a stay of this matter, including the hearing scheduled to begin on November 13, 2018, until the District Court rules on Respondent's Motions.

On Saturday, October 27, 2018, the Government filed a Notice of Intent to Respond to Respondent's Motion to Stay Proceedings. Therein, the Government indicated that "it intends to file a response to Respondent's motion." On October 29, 2018, pursuant to the directions in the Prehearing Ruling ("PHR") about responding to motions, I ordered the Government to file its response to Respondent's letter by October 31, 2018. PHR, at 8. The Government timely filed an Opposition to Respondent's Untimely Motion to Stay ("Government's Opposition").[1]

---

[1] Shortly after the Government filed its Opposition, Respondent submitted a letter to the Tribunal responding to the Government's Opposition. Because I am staying this case pending the resolution of Respondent's District Court motions, I do not believe it is necessary to address Respondent's response to the Government's Opposition at this time. For the same reason, I will withhold ruling on the Government's Opposition to Respo[n]dent's Motion for Leave to File Second Supplemental Prehearing Statement, filed on October 31, 2018, and Respondent's letter reply filed on November 1, 2018. Appropriate deference to the District Court also requires that I defer ruling on any substantive motions that have been submitted to this Tribunal during the pendency of the Respondent's Motions.

Respondent's Motions are based on the United States Supreme Court's recent decision in *Lucia v. Securities & Exchange Commission*, 138 S. Ct. 2044 (2018), which held that ALJs are officers for purposes of Article II's Appointments Clause of the United States Constitution. U.S. Const. art. II, § 2, cl. 2. Respondent's Motions contend that the DEA's ALJs have not been properly appointed under the Appointments Clause or ratified to conform to *Lucia v. SEC*. Respondent's Motions additionally argue that the current procedure for removal of ALJs renders these administrative proceedings unconstitutional. Respondent argues that if this proceeding continues as scheduled, then Respondent will be subjected to an unconstitutional administrative process in violation of its due process rights and will suffer irreparable injury as a result.

The Government's Opposition focuses on the fact that Respondent filed its letter requesting a stay three days after the motions' deadline. This is true. The Prehearing Ruling, dated August 13, 2018, set the motions' deadline for October 23, 2018. Respondent submitted its letter on October 26, 2018. The Government argues that Respondent has waived[2] its opportunity to raise an Appointments Clause challenge by failing to file such challenge by the motions' deadline. Gov't Opp., at 4-6. The Government also argues that "Respondent has yet to raise any *Lucia* objection before the Tribunal." *Id.* at 7. This is also true to some extent. The Respondent's letter only informed the Tribunal of the motions the Respondent filed with the District Court, and Respondent did not submit an Appointments Clause challenge directly to the Tribunal. The Government additionally argues that Respondent has failed to show good cause to excuse its untimely request. *Id.* at 6-7. The Government cites several pre-*Lucia* cases to contend that a party waives its right to raise an Appointments Clause challenge by failing to do so by the appropriate deadline. *Id.* at 5-6 & n.1. The Government requests that I certify my ruling to the Acting Administrator for interlocutory appeal if I stay these proceedings. *Id.* at 8.

I am not persuaded by the Government's argument that a stay is unjustified simply because Respondent requested a stay three days after the motions' deadline. Respondent's Motions in the District Court raise constitutional challenges to key components of the DEA's administrative adjudication framework, including the constitutionality of its ALJs' appointments,

---

[2] Even though I do not need to decide whether Respondent waived its right to raise an Appointments Clause challenge, I note that there is a difference between waiving a right and forfeiting one, and the courts treat them differently. *See United States v. Olano*, 507 U.S. 725, 733-34 (1993) (distinguishing waiver and forfeiture). At least one court, the Sixth Circuit, has excused a party's forfeiture of its Appointments Clause claim. *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 677 (6th Cir. 2018). Thus, I give little weight to the Government's argument that Respondent's request for stay should be disregarded because it was "untimely" in the Government's eyes.

as well as the validity of the Administrative Procedure Act's removal process for ALJs. Furthermore, I am not in a position to rule on the constitutionality of my appointment as an ALJ or on any other matter raised in Respondent's District Court motions. *See Jones Bros.*, 898 F.3d at 673 ("[An] administrative agency . . . has no authority to entertain a facial constitutional challenge to the validity of a law. An administrative agency may not invalidate the statute from which it derives its existence and that it is charged with implementing."). Given the gravity of these issues, I believe staying this administrative proceeding is warranted while Respondent litigates these constitutional claims in the District Court. A stay also accords the District Court appropriate deference.

Accordingly, it is **ORDERED**[3] that the administrative proceedings in this matter, and all upcoming deadlines in this matter, including the hearing scheduled for November 13-19, 2018,[4] are **STAYED** until either (1) **January 7, 2019,** or until (2) the United States District Court for the Western District of Louisiana rules on Respondent's motions for injunctive and declaratory relief ("Respondent's Motions"), whichever occurs first.

Beginning the date of this Order, the Parties are directed to file with this Tribunal, **no later than 2:00 p.m. Eastern Time ("ET"), a status update report on the 15th and 30th of each month** until either (1) further notice, or until (2) the date the pending litigation concerning the Respondent's Motions is concluded in the Federal Courts. Either Party may file a single joint status report for both Parties so long as it reflects the agreed understanding of both Parties. If either the 15th or 30th day of the month falls on a weekend of a holiday, the report will be due at the same time on the next business day.

---

[3] Taking no position on the merits of the Respondent's Motions, I issue the following Orders recognizing the fact that those motions pending in federal District Court challenge the constitutionality of the DEA's administrative process and the constitutional validity of my appointment as an ALJ. While a stay of these proceedings is warranted to allow the Parties to litigate Respondent's Motions in the District Court, it is prudent, and not unduly burdensome to the Parties, to ask them to notify the Tribunal of the status of the pending litigation so that administrative proceedings may recommence when appropriate, if at all, depending on the resolution of the Respondent's Motions. I am also aware of the Solicitor General's guidance regarding ALJ reassignment upon a timely Appointment's Clause challenge under *Lucia*, 138 S. Ct. 2044, 2055. That guidance provides that if an administrative proceeding recommences after a respondent makes a timely Appointments Clause objection, the matter "should be assigned to a different, properly appointed ALJ for a **'new** hearing.'" (Emphasis Added). Until that time, however, someone at this Tribunal should be kept informed of the developments of the litigation of Respondent's Motions. As the ALJ currently assigned to hear the case, it is reasonable that I serve that function until the time comes to terminate these proceedings or turn them over to another ALJ, or whatever other course of action is appropriate. I do not believe it violates Respondent's due process rights to ask for status updates of the pending litigation and to be served a copy of the District Court's decision on the pending litigation.

[4] The currently scheduled hearing is cancelled. It will be rescheduled by the ALJ presiding over this case if administrative proceedings in this matter recommence.

Additionally, within one business day of receipt, Respondent is directed to file with this Tribunal via ECF **a copy of any decision issued by the court where Respondent's Motions are pending**. The Government may also file the District Court's decision with this Tribunal.

At **2:00 p.m. ET** on **January 7, 2019** (or sooner if a decision on Respondent's Motions is issued earlier) I will hold a telephonic status conference with the Parties.

The dates outlined here may be modified or extended by the Tribunal in accordance with the progress of the litigation of Respondent's Motions in District Court.

DEA regulations provide that a party may file an interlocutory appeal with the DEA Administrator with the ALJ's consent and where "the allowance of an interlocutory appeal is clearly necessary to prevent exceptional delay, expense, or prejudice to any party or substantial detriment to the public interest." 21 C.F.R. § 1316.62. At this time, the Government has provided neither a convincing basis for an interlocutory appeal nor an explanation that meets the regulatory standard for granting an interlocutory appeal. Stated differently, based on the content of the Government's request, I am presently unable to certify that "the allowance of an interlocutory appeal is clearly necessary to prevent exceptional delay, expense, or prejudice to any party or substantial detriment to the public interest." *Id.* Accordingly, the Government's request for an interlocutory appeal is **DENIED.**


Dated:  November 1, 2018

Charles Wm. Dorman
U.S. Administrative Law Judge

### CERTIFICATE OF SERVICE

This is to certify that the undersigned, on November 1, 2018, caused a copy of the foregoing to be delivered to the following recipients: (1) Counsel for the Government, Paul A. Dean, Esq., and John E. Beerbower, Esq., Office of Chief Counsel, Drug Enforcement Administration, via email to the DEA Government Mailbox at: dea.registration.litigation@usdoj.gov; and to (2) Counsel for the Respondent, Jodi L. Avergun, Esq., and Keith Gerver, Esq., Cadwalader, Wickersham & Taft LLP, via email at: jodi.avergun@cwt.com and keith.gerver@cwt.com.

Rhonda L. Gore
Secretary to Judge Charles Wm. Dorman
Office of Administrative Law Judges

# EXHIBIT N

**Privileged and Confidential Attorney Work Product**



**U.S. Department of Justice**

Office of the Solicitor General

*Washington, D.C. 20530*

---

To:        Agency General Counsels

From:    The Solicitor General

Subject:    Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.)

---

This memorandum supplements our legal guidance to agencies that employ administrative law judges (ALJs) in the wake of the Supreme Court's decision in *Lucia v. SEC*, No. 17-130 (S. Ct.) (June 21, 2018), the President's recent Executive Order related to ALJs, and OPM's guidance related to that Executive Order.[1]

In light of *Lucia,* we offer the following legal advice to agencies with ALJs appointed under 5 U.S.C. 3105 and, as discussed below, similarly situated administrative judges.  Our advice is designed to reduce litigation risk in the wake of *Lucia*, but we do not expect that these steps will insulate all administrative proceedings from challenge.  We also recognize that agency-specific questions will arise.  We encourage affected agencies to raise their specific issues with us, and we have provided a list of contacts for such questions at the end of this memorandum.

As discussed below, to the extent feasible and consistent with law, we advise agencies (1) to arrange promptly for the appropriate Department Head to ratify and approve the appointment of existing ALJs and similarly situated adjudicatory officers; (2) to fill new ALJ vacancies in the manner provided by the President's recent

---

[1] The *Lucia* decision is available at https://www.supremecourt.gov/opinions/17pdf/17-130_4f14.pdf.  The President's recent Executive Order placing the position of ALJ in the excepted service is available at https://www.whitehouse.gov/presidential-actions/executive-order-excepting-administrative-law-judges-competitive-service/.  OPM's guidance regarding that Executive Order is available at https://chcoc.gov/content/executive-order-%E2%80%93-excepting-administrative-law-judges-competitive-service.

Privileged and Confidential Attorney Work Product

Executive Order; (3) in pending cases in which no Appointments Clause challenge was timely made and preserved, to argue that any such challenge is forfeited; and (4) in pending cases in which an Appointments Clause challenge was timely made and preserved, to seek a voluntary remand to the agency to provide a hearing before a different, properly appointed ALJ, consistent with *Lucia*. We also address the minimum contours of the "new hearing" required by *Lucia*, as well as the prospect of separation-of-powers challenges based on the statutory "for cause" removal protection for ALJs.

### A.  *Lucia* And Its Implications For Other ALJs And Similarly Situated Administrative Judges

A threshold question is who exactly is covered by the Supreme Court's decision in *Lucia*. Although the Court's specific holding is narrow, its reasoning sweeps more broadly. For the reasons discussed below, we conclude that all ALJs and similarly situated administrative judges should be appointed as inferior officers under the Appointments Clause, and that Department Heads should ratify and approve the appointments of existing ALJs and administrative judges accordingly.

1. *SEC ALJs, and other ALJs who exercise similar powers, are inferior officers and must be appointed as such.* The Supreme Court held in *Lucia* that ALJs of the Securities and Exchange Commission are inferior officers, not regular employees, for essentially the same reasons that the special trial judges of the Tax Court were held to be inferior officers in *Freytag v. Commissioner*, 501 U.S. 868 (1991). The Court emphasized that SEC ALJs possess "the four specific (if overlapping) powers *Freytag* mentioned": they take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. Slip op. 8-9. In this sense, the Court observed, SEC ALJs "have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of federal trial judges." *Id.* at 8. In addition, at the conclusion of the adversarial proceedings over which they preside, SEC ALJs issue initial decisions "containing factual findings, legal conclusions, and appropriate remedies," which can become the final decision of the agency without further review. *Id.* at 9. On that basis, the Court held that SEC ALJs are inferior officers of the United States who must be appointed in the manner required by the Appointments Clause.

The Supreme Court's holding in *Lucia* only addresses the constitutional status of the SEC's ALJs. The Department of Justice understands the Court's reasoning, however, to encompass all ALJs in traditional and independent agencies who preside over adversarial administrative proceedings and possess the adjudicative powers highlighted by the *Lucia* majority. All such ALJs must be appointed (or have their

2

**Privileged and Confidential Attorney Work Product**

prior appointments ratified) in a manner consistent with the Appointments Clause, as discussed in Part B below.

2. *Other ALJs should likewise be appointed as inferior officers.* The Court's decision in *Lucia* does not directly address the constitutional status of administrative law judges appointed under 5 U.S.C. 3105 who do not preside over adversarial administrative hearings or possess powers equivalent to those of the SEC ALJs in *Lucia*. For example, *Lucia* does not squarely resolve the status of ALJs who preside over ex parte hearings for applicants seeking federal benefits. Nonetheless, much of the reasoning of *Lucia* applies with equal force to such ALJs: while they may not preside over adversarial trials, they do take testimony, preside over hearings, receive and weigh evidence, and employ various mechanisms for obtaining compliance with their orders. Accordingly, taking into account both the Supreme Court's reasoning in *Lucia* and the importance of ensuring the President's oversight of the execution of the laws, the Department of Justice no longer plans to argue that such ALJs are employees rather than inferior officers. Agencies should appoint all ALJs as inferior officers.

3. *Similarly situated administrative judges should also be appointed as inferior officers.* The *Lucia* decision addresses only ALJs appointed under 5 U.S.C. 3105. Many agencies, however, use other non-ALJ officials—often termed "administrative judges" or "administrative appeals judges"—to preside over hearings and issue initial or appellate decisions in agency adjudications. While there will be case-by-case questions, we anticipate that many of these adjudicative officials will qualify as inferior officers under *Lucia*, especially if they preside over adversarial hearings and have the four specific forms of authority highlighted by the Court in *Lucia*. Again, taking into account both the Supreme Court's reasoning in *Lucia* and the importance of ensuring the President's oversight of the execution of the laws, the Department does not expect to defend the appointment of such officials by individuals other than the Department Head on the ground that they are mere employees. Accordingly, we recommend that agencies appoint such non-ALJ adjudicators as inferior officers in the same manner as ALJs, consistent with the advice in this memorandum, or contact us with further questions, as appropriate.

**B.    The Mechanics Of Appointing And Ratifying ALJs After *Lucia***

1. *In general—appointment by Department Head required.* As discussed, all ALJs and similarly situated adjudicative officers should be appointed in a manner consistent with the Appointments Clause. In most cases, this means the ALJ's appointment must be made or approved by the "[H]ead[]" of the relevant Executive "Department[]." U.S. Const., Art. II, sec. 2, cl. 2. The Department Head must have authority derived from a statute (or from a valid regulation promulgated through

statutory authority) to make the appointment.  Although the Department Head may rely on agency human resources officials or other staff to vet applications, conduct interviews, and the like, the final appointment must be made or approved by the Department Head personally; this authority cannot be delegated.

For independent agencies headed by multi-member bodies, such as the SEC, the Department Head for Appointments Clause purposes is typically the multi-member body itself, acting by majority vote, rather than (for example) a commission chairman.  For traditional agencies in the Executive Branch, the relevant Department Head is the head of the Executive Department to which your agency or office belongs.  If you have questions about the identity of the appropriate Department Head, or if you have concerns about the appropriate authority for ALJ appointments under your agency's organic statute, please contact the Department of Justice at the email address below.

2. *New appointments.*  On July 10, 2018, President Trump signed an Executive Order entitled "Excepting Administrative Law Judges from the Competitive Service." The Executive Order is available at https://www.whitehouse.gov/presidential-actions/executive-order-excepting-administrative-law-judges-competitive-service/. OPM guidance regarding that order is available at https://chcoc.gov/content/executive-order-%E2%80%93-excepting-administrative-law-judges-competitive-service.  The Executive Order places the position of ALJ in the excepted service, and OPM will no longer administer competitive examinations for ALJ appointments.  By the terms of the order, Department Heads may begin making Schedule E appointments to vacant ALJ positions immediately.  For questions regarding the effect of the Executive Order, please contact the Office of Personnel Management using the contact information in the OPM guidance.

The Executive Order does not address the appointment of non-ALJ adjudicators, such as administrative judges.  Vacancies in such positions should be filled using existing authorities, taking care to ensure that the Department Head personally makes or approves the appointment under proper authority.

3. *Ratification and approval of prior appointments.*  Consistent with our advice during the pendency of the *Lucia* case, many Department Heads ratified the prior appointments of their agencies' ALJs.  We now advise all Department Heads to ratify the prior appointments of any ALJs or similar adjudicative officials whose appointments have not yet been ratified.  The ratification decision need not take any particular form, and it may be brief, but it should be properly memorialized, and it should make clear that the appropriate Department Head endorses and accepts responsibility for the prior appointments.  We suggest appropriate language below.

**Privileged and Confidential Attorney Work Product**

We also recommend that Department Heads make clear in ratifying an ALJ's prior appointment that the Department Head not only accepts the prior appointment as of the time it was made, but also approves that appointment *today*. The Department Head's present approval therefore can satisfy the Appointments Clause, even if the retroactive ratification were for some reason held invalid. Again, we suggest appropriate language below.

Regardless, agencies should anticipate that ratifications will be challenged in court. Indeed, the *Lucia* petitioners challenged the SEC's ratification of the prior appointment of its ALJs. As we argued to the Supreme Court (Reply Br. 19-21), ratification is an established principle under the common law, and we have good arguments that ratification by the Department Head cures any constitutional defect in the initial appointment. *See Edmond* v. *United States*, 520 U.S. 651 (1997); *CFPB* v. *Gordon*, 819 F.3d 1179 (9th Cir. 2016); *Intercollegiate Broadcasting Sys., Inc.* v. *Copyright Royalty Bd.*, 796 F.3d 111 (D.C. Cir. 2015); *Doolin Sec. Sav. Bank, F.S.B.* v. *Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998); *FEC* v. *Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996). The Supreme Court in *Lucia* did not address the validity of the SEC's ratification order, however, concluding it was unnecessary to reach that question. Slip op. 13 n.6. Thus, there remains risk that a court might determine in a future case that a ratification was ineffective. Nevertheless, we strongly urge Department Heads to ratify and approve the prior appointments of ALJs and similarly situated adjudicators in order to limit litigation exposure and permit the important work of ALJs to continue.

4. *Model ratification language and practice.* As noted, a ratification order or decision need not take any particular form. As a guide, however, we offer the following model language.

For agencies that have not previously ratified the appointment their ALJs, we recommend language along the following lines:

> I hereby ratify the prior appointment of Jane Doe [or "the individuals listed below"] to the office of administrative law judge in [agency], and I today approve her appointment [or "these appointments"] as my own under the Constitution.

For agencies that previously ratified the appointment of their ALJs, it is not necessary to do so again after *Lucia*. Agencies that can do so easily and consistent with their practice, however, may wish to issue a supplemental order along the following lines:

**Privileged and Confidential Attorney Work Product**

> On [date], we ratified the appointment of Jane Doe to the office of administrative law judge in [agency]. In an abundance of caution and for avoidance of doubt, we today reiterate our approval of her appointment as our own under the Constitution.

Additionally, it would be fitting for the ratifications to be accompanied by an appropriate degree of public ceremony and formality. To the extent consistent with law and agency practice, for example, a Department Head might re-administer the oath of office to incumbent ALJs in a public ceremony, or on the record of a regular public hearing or meeting. These steps are not strictly necessary, but they will underscore that the Department Head has satisfied the purposes of the Appointments Clause by accepting public responsibility for the appointment of specific persons to the office of ALJ.

## C.     Recommended Steps In Pending Proceedings

1. *Agencies should no longer argue that ALJs are employees.* As noted above, in light of *Lucia,* the Department of Justice will no longer argue that ALJs or similarly situated adjudicators are employees rather than inferior officers. We urge agencies to take steps to ensure that enforcement staff or other agency representatives in pending administrative proceedings conform their arguments accordingly.

2. *Agencies should request voluntary remands in cases in which an Appointments Clause challenge has been timely made and preserved.* In *Lucia,* the Supreme Court explained that the "appropriate remedy" for "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is "a new hearing before a properly appointed official." Slip op. 12 (quotation marks omitted). The petitioner in *Lucia* made such a timely challenge, the Court stressed, because "[h]e contested the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and this Court." *Id.*

Accordingly, in light of *Lucia,* the Department of Justice will seek voluntary remands of matters pending in federal court in which an invalidly appointed ALJ participated, but *only* in those cases in which an Appointments Clause challenge to the ALJ was timely raised and preserved both before the agency (consistent with applicable agency rules) and in federal court. The Department of Justice will not argue that any Appointments Clause defect constituted harmless error, or that a court of appeals can nevertheless affirm the final decision of an agency in a case where an improperly appointed ALJ participated and the issue was properly preserved. This is

true even in cases (like *Lucia* itself) in which the ALJ's initial decision was reviewed de novo by the Department Head. In short, we construe *Lucia* to require a remand in all cases in which a timely Appointments Clause challenge was raised. We recommend that agencies with independent litigating authority follow the same practice.

We stress that where a challenger has failed to properly raise and preserve an Appointments Clause challenge, agencies should consider arguing that any such challenge has been forfeited. Errors in the appointment of agency officials do not go to the jurisdiction of courts reviewing those officials' decisions. See, *e.g.*, *GGNSC Springfield LLC* v. *NLRB*, 721 F.3d 403, 406 (6th Cir. 2013) ("Errors regarding the appointment of officers under Article II are 'nonjurisdictional.'") (quoting *Freytag* v. *Commissioner*, 501 U.S. 868, 878-79 (1991)). Especially in light of the *Lucia* Court's emphasis on the need for a timely objection, we have strong arguments that Appointments Clause challenges to ALJs are subject to the usual principles of waiver and forfeiture. See, *e.g.*, *In re DBC*, 545 F.3d 1373, 1377-81 (Fed. Cir. 2008) (litigant forfeited Appointments Clause argument by failing to raise it before agency); see also *Intercollegiate Broad. Sys., Inc.* v. *Copyright Royalty Bd.*, 574 F.3d 748, 755-56 (D.C. Cir. 2009). The Supreme Court's decision in *Lucia* therefore should not upset final administrative decisions made without a proper challenge to the appointment of any ALJ involved.

In this regard, we understand that agencies have different practices concerning when and how a party must raise a challenge for it to be properly considered by the agency and preserved for judicial review. See, *e.g.*, 15 U.S.C. 78y(c)(1) (Securities and Exchange Commission requires legal objections to be raised before the Commission itself). Each agency should evaluate whether an Appointments Clause claim has properly been raised in its own proceedings. To the extent possible, moreover, we encourage agencies to construe or clarify their rules to require the presentation of Appointments Clause claims in administrative proceedings. No principle of law prevents an administrative agency from entertaining such claims in the first instance, as the SEC did in *Lucia* itself, or from reassigning the case to an adjudicator who was appointed by the Department Head in order to avoid an Appointments Clause challenge. Requiring the timely presentation of such claims to the agency will reduce the ability of parties simply to await the outcome of their administrative proceedings and then, if dissatisfied, raise an Appointments Clause claim in federal court to secure a remand.

3. *Administrative proceedings with preserved Appointments Clause challenges should be assigned to a different ALJ for a new hearing.* As noted, the Supreme Court in *Lucia* stated that a person who raises a timely objection is entitled to "a new hearing before a properly appointed official." Slip op. 12. The Court additionally specified that this

new hearing could not be conducted by the same ALJ who heard the case initially, even if that ALJ subsequently received a constitutional appointment. *Id.* "To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing[.]" *Id.* at 12-13.

To the extent practical and permitted by law, therefore, all pending administrative proceedings—including proceedings remanded from the courts—in which litigants have properly raised Appointments Clause challenges should be assigned to a different, properly appointed ALJ for a "new hearing." (See below for advice concerning the minimum contours of that "new hearing.") This includes matters currently pending before ALJs, as well as matters on pending review before the agency itself. All such cases should be reassigned to a different, properly appointed ALJ—provided, again, that an Appointments Clause challenge to the presiding ALJ was duly raised and preserved under the agency's rules. For this purpose, a "properly appointed ALJ" includes either (1) a new ALJ appointed pursuant to the Executive Order, or (2) an ALJ whose prior appointment has been properly ratified by the Department Head.

We recognize that *Lucia*'s requirement that matters be assigned to different ALJs for further proceedings will pose a significant administrative burden, especially in those agencies with a high volume of cases. Some agencies, moreover, have only one ALJ, or only use ALJs on loan from other agencies. The Supreme Court stated in footnote 5 of the *Lucia* opinion that it was not "hold[ing] that a new officer is required for every Appointments Clause violation." Slip op. 12-13 n.5. But the Court appears to have contemplated deviations from that rule only in very narrow circumstances: the Court stated that the "rule of necessity would presumably kick in" if "no substitute decisionmaker" were available. *Id.* If your agency does not have a "substitute decisionmaker," or if reassigning cases would present similarly substantial obstacles, please contact us.

4. *The "new hearing" should include, at a minimum, a new opportunity for the parties to contest the admission, exclusion, or weighing of evidence, and must result in a new decision that does not presume the correctness of the prior ALJ decision.* Consistent with *Lucia*, the new decisionmaker should provide a "new hearing." Slip op. 13. While the Supreme Court did not elaborate on what the "new hearing" must entail, the Court plainly contemplated more than a perfunctory ratification of the prior ALJ's decision. If your agency is in a position to provide a full soup-to-nuts redo of the administrative proceeding, that will be the safest course. While litigants may be expected to argue otherwise, however, we do not believe a complete do-over is constitutionally required. We believe that a "new hearing" will be constitutionally adequate as long as the new ALJ is careful to avoid any taint from the prior ALJ's decision. Thus, we do not think

Privileged and Confidential Attorney Work Product

it is necessarily fatal if the new ALJ starts with the existing record in the proceeding (including hearing transcripts), much of which there would be little purpose in generating anew. But the new ALJ should at a minimum afford the parties a new opportunity to challenge the exclusion, admission, or weighing of particular evidence, thus ensuring that the final state of the record reflects the new ALJ's own judgment. Similarly, where credibility is at issue, it may be advisable for the new ALJ to rehear the disputed testimony of the relevant witnesses. The new ALJ should also issue a new decision in the proceeding. While the new ALJ may acknowledge and draw upon any opinion authored by the original ALJ, the new ALJ should make clear that she is not giving any weight to that earlier opinion or treating any factual finding or legal conclusion in that earlier decision as presumptively correct.

Agencies that wish to avoid any litigation over the issue in particular cases may prefer to conduct entirely new hearings.

5. *Agencies should notify the Department of Justice of challenges to the statutory removal restrictions for ALJs.* The Constitution not only specifies the manner in which officers of the United States must be appointed, but also limits the extent to which officers may permissibly be shielded from removal by the Department Head. *See generally Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010). Many litigants have already argued that ALJs are impermissibly shielded from removal because, by statute, ALJs can only be removed "for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). We expect more such challenges in the wake of *Lucia.* The Executive Order recently issued by the President does *not* alter ALJs' statutory removal protections, and will not insulate agencies from such challenges.

The Department of Justice is prepared to defend the constitutionality of Section 7521, as properly construed. As the government argued in the Supreme Court in *Lucia*, Section 7521's "good cause" standard for removal is properly read to allow for removal of an ALJ who fails to perform adequately or to follow agency policies, procedures, or instructions. Resp. Br. 50. An ALJ cannot, however, be removed for any invidious reason or to influence the outcome in a particular adjudication. As so construed, and provided MSPB review is suitably deferential to the determination of the Department Head, the Department of Justice will argue that Section 7521 gives the President a constitutionally adequate degree of control over ALJs. This is true of ALJs who work at independent agencies, as well as ALJs at traditional Executive Branch agencies.

Privileged and Confidential Attorney Work Product

If a plaintiff in one of your cases raises a removal-based challenge to an ALJ, please notify us immediately so that the Department of Justice may coordinate the government's arguments concerning the interpretation and validity of Section 7521.

\* \* \* \* \*

We recognize that there will be case-by-case and agency-specific questions that arise in connection with the implementation of this guidance and the challenges raised by individual litigants. We anticipate working closely with your agencies to resolve those questions and provide additional guidance as needed. In the interim, please do not hesitate to contact us with questions about the implementation of the Supreme Court's *Lucia* decision and the Executive Order.

**For litigation-related questions about ratification, removal, or other matters currently pending in the courts of appeals:** Contact the DOJ litigation team at ALJLitigation.Appellate@usdoj.gov.

**For questions about the Executive Order or how to make a proper appointment of your ALJs:** Consult OPM guidance regarding the Executive Order, available at https://chcoc.gov/content/executive-order-%E2%80%93-excepting-administrative-law-judges-competitive-service. The OPM guidance also includes several points of contact if you have additional questions.

# EXHIBIT O

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

| In the Matter of | |
|---|---|
| **MORRIS & DICKSON CO., LLC** | |

**Docket No. 18-31**

ADMINISTRATIVE LAW JUDGE

CHARLES WM. DORMAN

**RESPONDENT MORRIS & DICKSON CO., LLC'S
EXCEPTIONS TO RECOMMENDED RULINGS,
FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION**

Jodi L. Avergun
Keith M. Gerver
Joshua P. Arnold

Cadwalader, Wickersham & Taft LLP
700 Sixth Street NW
Washington, DC 20001
(202) 862-2456 (office)
(202) 862-2400 (facsimile)
jodi.avergun@cwt.com
keith.gerver@cwt.com
joshua.arnold@cwt.com

Dated:  October 8, 2019

# Table of Contents

Page

Table of Authorities ................................................................................................. iii

**I.**    Introduction ...................................................................................................... 3

**II.**    The ALJ's Errors and this Proceeding's Procedural Deficiencies Violate
Respondent's Right to Due Process ................................................................. 7

**III.**    The ALJ Erred in Determining that Respondent's Compliance Officer Lacked
Standing to Accept Responsibility and that Respondent's Acceptance of
Responsibility Was Equivocal ...................................................................... 10

    A.    Respondent's Compliance Officer Was Qualified to Accept Responsibility ....... 10

    B.    Respondent's Acceptance of Responsibility Was Unequivocal .......................... 16

        1.    Respondent Duly Authorized Mr. Irelan to Accept Responsibility ............ 16

        2.    Respondent Accepted Responsibility with Complete Candor ..................... 18

        3.    Respondent Accepted Responsibility for All Proven Conduct .................... 21

**IV.**    The ALJ's Refusal to Give Any Weight to Respondent's "Impressive" Remedial
Actions Was Erroneous .................................................................................. 26

**V.**    The ALJ's Recommendation that Deterrence Demands Revocation Was
Erroneous ...................................................................................................... 29

    A.    The ALJ Erred in Refusing to Credit the August 2016 Meeting with DEA
and Other Evidence of Respondent's Credibility and Reliability ....................... 31

    B.    The ALJ Erred by Failing to Consider the Deterrent Effect of Lesser
Sanctions ........................................................................................................... 33

    C.    The ALJ Erred by Adopting Disparate Treatment of Respondent,
Imposing Harsher Standards for Deterrence than Similarly-Situated
Registrants ........................................................................................................ 34

**VI.**    The ALJ Made Multiple Errors Regarding Its Recommendations with Respect to
Respondent's Failure to Report Suspicious Orders ....................................... 37

    A.    The ALJ Erred In Finding that the Government Expert's "Look-Back"
Analysis Undercuts the Four Deficiencies Identified by Respondent's
Expert ................................................................................................................ 38

B.      The ALJ Erred by Asserting that Weinstein Did Not Support His Critique of Rose's Analysis with "Objective Data".............................................................. 39

C.      The Results of Rose's Look-Back Analysis Were Not "Substantially Similar" or "Consistent" with His Fixed Frame Analysis ..................................... 43

D.      The ALJ Erred in Accepting that Rose's Analysis Offered a "Ballpark Estimate" of the Number of Outliers that Should Have Been Reported as Suspicious Orders, Rather Than Identifying Specific Outlier Orders .................. 44

E.      The ALJ is Inconsistent in Accepting Rose's Analysis as a "Ballpark Estimate" While Accepting Group Supervisor Dunn's Testimony that the Specific Orders Identified by Mr. Rose's Analysis Were Suspicious Orders................................................................................................................... 46

F.      The ALJ Incorrectly Described Weinstein's Testimony Regarding Distributors' Responsibility to Evaluate Orders When Placed as "Inconsistent" with His Testimony that Distributors Should Accumulate Orders Over Time ................................................................................................. 48

G.      The ALJ Was Inconsistent in Finding that Weinstein's Look-Back Analysis Identified "Unusually Large Orders" of Hydrocodone and Oxycodone as Outliers.......................................................................................... 49

VII.   The ALJ Erred In Revoking Respondent's Jefferson Registration...................................50

# Table of Authorities

**Page(s)**

**Cases:**

*Am. Sur. Co. v. Baldwin*,
287 U.S. 156 (1932)................................................................21

*Athineos v. Andromeda Invs. Co.*,
No. 13 Civ. 5076, 2014 WL 2990330 (S.D.N.Y. July 1, 2014) ............................16

*Colo. Springs Co. v. Am. Publ'g Co.*,
97 F. 843 (8th Cir. 1899) ................................................................13

*Cont'l Cas. Co. v. Holmes*,
266 F.2d 269 (5th Cir. 1959) ................................................................13

*David A. Ruben, M.D.*,
78 Fed. Reg. 38,387 (June 26, 2013) ................................................................33

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
232 F.3d 1258 (9th Cir. 2000) ................................................................19

*Energy W. Mining Co. v. Oliver*,
555 F.3d 1211 (10th Cir. 2009) ................................................................6

*Free Enter. Fund v. Pub. Co. Acct. & Oversight Bd.*,
561 U.S. 477 (2010) ................................................................ 7-8

*Holiday CVS, L.L.C.*,
77 Fed. Reg. 62,316 (Oct. 12, 2012)........................................................ *passim*

*Howard N. Robinson, M.D.*,
79 Fed. Reg. 19,356 (Apr. 8, 2014) ................................................................29

*Jeffrey Stein, M.D.*,
84 Fed. Reg. 46,968 (Sept. 6, 2019) ................................................................27

*John H. Kennedy*, M.D.,
71 Fed. Reg. 35,705 (June 21, 2006) ................................................................10

*Jones Total Health Care Pharmacy LLC*
*881 F.3d 823 (11th Cir. 2018)*........................................................ 13, 16

*Joseph Gaudio, M.D.*,
74 Fed. Reg. 10,083 (Mar. 9, 2009) ................................................................28

**Page(s)**

*Kamal Tiwari, M.D.*,
    76 Fed. Reg. 71,604 (Nov. 18, 2011) ................................................................2

*Lane Hollow Coal Co. v. Dir., U.S. Dep't of Labor*,
    137 F.3d 799 (4th Cir. 1998) ........................................................... 5-6, 6

*Lawrence E. Stewart, M.D.*,
    81 Fed. Reg. 54,822 (Aug. 17, 2016) ........................................ 20-21

*Liddy's Pharmacy, L.L.C.*,
    76 Fed. Reg. 48,887 (Aug. 9, 2011) ...........................................25

*Lindsey v. Normet*,
    405 U.S. 56 (1972) .............................................................6, 21

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) .................................................................7

*MacKay v. DEA*,
    664 F.3d 808 (10th Cir. 2011) .............................................13, 16

*Masters Pharm., Inc.*,
    80 Fed. Reg. 55,418 (Sept. 15, 2015) .......................................40

*Medicine Shoppe-Jonesborough*,
    73 Fed. Reg. 364 (Jan. 2, 2008) ...............................................10

*Paz Sec., Inc. v. SEC*,
    494 F.3d 1059 (D.C. Cir. 2007) ................................................27

*R & M Sales Co.*,
    75 Fed. Reg. 78,734 (Dec. 16, 2010) ................................ 9, 9-10

*Rose v. Clark*,
    478 U.S. 570 (1986) ......................................................................6

*Samuel S. Jackson*, DDS,
    72 Fed. Reg. 23,848 (May 1, 2007) ..........................................10

*Southwood Pharmaceuticals, Inc.*,
    72 Fed. Reg. 36,487 (July 3, 2007) ...................................... 25-26

*Steadman v. SEC*,
    450 U.S. 91 (1981) .....................................................................40

*Sun & Lake Pharmacy, Inc.*,
    76 Fed. Reg. 24,523 (May 2, 2011) ............................ 9, 10, 10-11

**Page(s)**

*Swinton v. Potomac Corp.*,
   270 F.3d 794 (9th Cir. 2001) ...............................................................26

*Trinity Pharmacy II*,
   83 Fed. Reg. 7336 (Feb. 20, 2018) ......................................................33

*United States v. Mendoza-Lopez*,
   481 U.S. 828 (1987) ...............................................................................6

*Wilson v. Lakner*,
   228 F.R.D. 524 (D. Md. 2005) ..............................................................18

**Statutes & Other Authorities:**

21 U.S.C. § 823(b)(5) ..................................................................................31

21 C.F.R. § 1301.44(e) ................................................................................40

Fed. R. Civ. P. 30(b)(6) .......................................................................... 18-19

Joint Appendix, *Masters Pharm., Inc. v. DEA*, No. 15-1335
   Doc. No. 1619357 (D.C. Cir. June 14 2016) ........................................33

Memorandum Order, *Cochran v. SEC.*, No. 19-10396,
   (5th Cir. Sept. 24, 2019)..........................................................................8

Annual Report, P05000088620, Sun & Lake Pharmacy Service, Inc. (May 7, 2007),
   Florida Department of State, Division of Corporations),
   http://search.sunbiz.org/Inquiry/CorporationSearch/ByDocumentNumber ..........................10

Pursuant to 21 C.F.R. § 1316.66(a), Respondent Morris & Dickson Co., LLC ("Respondent" or the "Company"), by and through its undersigned counsel, hereby submits the following Exceptions to the Recommended Rulings, Findings of Fact, Conclusions of Law, And Decision, issued August 29, 2019 (the "ALJ Recommendation").

## I.     Introduction

DEA wants to put a fully remediated registrant out of business and DEA refuses to consider less radical sanctions. The ALJ, relying on errors of law and fact, agreed with DEA. The ALJ's recommendation should not be adopted. The law does not say that license revocation is a punishment fit for those mistakes. In fact, the Controlled Substances Act ("CSA") is not retributive—it does not compel DEA to respond to compliance failures by revoking DEA registrations. On the contrary, DEA proceedings are supposed to be "non-punitive." The ALJ agrees. ALJ Recommendation at 146 (noting that "these proceedings are remedial in nature, rather than punitive"). Nonetheless, the ALJ's legal and analytical errors led him to an untenable and undeniably retributive conclusion: that the continued registration of a fully remediated registrant with an "impressive" anti-diversion regime, along with evidence of good-faith desire to prevent diversion, does not serve the public interest. Apparently, that remains true after Respondent unequivocally accepted responsibility for its mistakes, after it commissioned former top DEA officials to design their ideal anti-diversion system, and after it replaced its compliance officer with a new compliance department empowered with full independence and resources. Rather, the only way DEA sees fit to serve the public interest is to ensure that a 178-year-old family company is out of business once and for all—its hundreds of jobs gone forever from a small community, its patients across the American South left scrambling to find new pharmaceutical suppliers who may

or may not employ such "impressive" anti-diversion controls. That is not the logical end of a regulator seeking public interest, it is the logical end of a retributive crusade seeking relief from public and political pressure.

Only days ago, the Department of Justice Office of the Inspector General ("OIG") released its September 2019 Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids (the "Report," attached hereto as "Exhibit A").[1] This Report exposed a culture of failure within the agency—failure to promulgate clear rules to regulated entities, failure to monitor how many suspicious order reports it received, and failure to use those reports properly.

The Report is also the latest step in a recent escalation of public pressure on DEA, urging the agency to take more aggressive action against distributors. Not coincidentally, the ALJ himself—an employee of the embattled agency—seeks to make an example of Respondent, using all of DEA's resources to seek the harshest sanction. DEA seeks to put Respondent out of business without even entering negotiations or considering alternative sanctions, including options for both immediate penalties and long-term accountability. DEA's pursuit and the ALJ's recommendation of an extraordinary sanction treats Respondent entirely differently than similarly situated registrants, particularly any registrant that has accepted responsibility and adopted remedial measures. The contrast between this case and other DEA precedent is set forth in detail below. DEA has no reason in fact or law to treat Respondent differently, but, especially in light of the

---

[1]    The DEA Administrator can and should take Official Notice of Exhibit A as a public document not subject to reasonable dispute. *See Kamal Tiwari, M.D.*, 76 Fed. Reg. 71604, 71606 & n.4 (Nov. 18, 2011) (Administrator taking official notice of a government website by noting that "an agency may take official notice of facts at any stage in a proceeding—even in the final decision[]") (internal quotation omitted).

OIG's recently published Report of its investigation of DEA begun in 2017, DEA has every political reason to single out Respondent for harsher sanctions.

The ALJ asks "why it took such an experienced company 177 years . . . to realize that it needed a better [suspicious order monitoring ("SOM")] system and improved due diligence practices." ALJ Recommendation at 154. As the ALJ well knows, the CSA was passed in 1971—130 years after Respondent was founded—and was the subject of reinterpretation and constantly evolving DEA case law in the ensuing decades. The ALJ's sarcastic and gratuitous remarks are disturbing and cast a shadow on the objectivity of the remainder of the opinion. They are ironic as well, given that the OIG Report has now exposed DEA's failure over the past *45 years* to make use of filed suspicious order reports, create and maintain a viable national database of suspicious orders, or even implement a clear rule defining what exactly distributors should flag as a "suspicious order." The OIG also noted multiple failures by DEA to keep pace with modern information technology tools such as electronic prescriptions that the healthcare community, Morris & Dickson included, has long mastered. The Report's findings are unmistakable:

> Finally, in 2008 DEA developed the Suspicious Order Reporting System (SORS) to house reports that manufacturers and distributors of controlled substances are required by federal regulation to provide DEA when they detect suspicious orders, including those of unusual quantities or deviations from normal ordering practices. *However, during the scope of our review, we found that the SORS database included reports from only 8 of the approximately 1,400 manufacturers and distributors of controlled substances.* Each of those 8 manufacturers and distributors had provided their reports directly to DEA headquarters, while the remaining registrants reported suspicious orders to DEA field divisions.

Ex. A at 10 (emphasis added).[2]

---

[2] Other sections of the OIG Report provide additional details to this revelation, including how DEA claims ARCOS is its primary data tool while receiving inconsistent and limited information in ARCOS.

The ALJ's recommendation is a death sentence for Respondent based on its having failed to file suspicious order reports—but, as the OIG report has revealed, the DEA would not have used the suspicious order reports if Respondent had filed them. As a matter of fairness, the DEA should not shut the Respondent down for failing to alert DEA to issues that it demonstrably would have ignored. Respondent accepted responsibility for failing to submit suspicious order reports to its DEA field division. ALJ Recommendation at 86-87. But DEA field divisions were equally complicit in failing to use or maintain suspicious order reports, showing that DEA is seeking retribution against Respondent, and the ALJ is recommending Respondent's demise for failing to comply with an administrative task that DEA did not even use to prevent diversion:

> During interviews, we asked DEA headquarters officials where the remaining suspicious order reports were located for the roughly 1,400 registered manufacturers and distributors of controlled substances; we were informed that DEA requires field divisions to maintain custody of the suspicious order reports. ***However, when we asked DEA field division staff to locate these reports at multiple sites throughout the country, staff were unaware of the requirement to maintain the reports and could not locate them.*** One Diversion Program Manager (DPM) described the SORS database as a "joke," noting that DEA field division staff did not receive access to the SORS database until 2017, nearly 10 years after it was created. We believe that the lack of consistent procedures for reporting suspicious orders, and uploading those reports into the SORS database, hampers DEA's ability to detect and target the diversion of controlled substances, including pharmaceutical opioids.

Ex. A at 31 (emphasis added).

---

*See, e.g.*, Ex. A at 27 ("Additionally, while DEA's consolidated Suspicious Order Reporting System (SORS), established in 2008, is a potentially useful regulatory tool, we found during our review that it captured suspicious orders from very few registrants. Because SORS does not have data and information on all 1.7 million registrants, we believe that DEA is hampered in its ability to identify and combat the diversion of controlled substances."); Ex. A at 28 ("Although DEA officials and staff told us that ARCOS was the primary data tool used to detect the diversion of controlled substances, we found that some manufacturers and distributors report ordering information for Schedule I and II controlled substances to ARCOS on a monthly basis while others report this information on a quarterly basis.").

After DEA's failure to implement consistent procedures for reporting suspicious orders, Respondent failed to sufficiently report.  As the Inspector General accurately noted, ambiguous current regulatory language "results in inconsistencies in reporting because registrants seemingly are applying varying standards and thresholds regarding unusual ordering behavior." Ex. A at 31.  Respondent agrees "that DEA should establish regulations, policies, and procedures that specifically define what constitutes a suspicious order, as well as what information should be included in a suspicious order report."  Ex. A at 32.  In fact, as part of its good-faith effort to meet its registration obligations, Respondent has raised these issues with the DEA and other government officials.  Respondent unequivocally accepted responsibility for its mistakes, and DEA should do the same.  Respondent does not ask to be excused for its proven conduct—conduct for which it has unequivocally accepted responsibility.  Far from it, Respondent simply asks for treatment commensurate with other distributors, credit for its acceptance of responsibility and remedial program, and the opportunity to continue providing needed medicine in its region.  A host of factual and analytical errors, chronicled below, led the ALJ to deny Respondent that opportunity. The Administrator should not adopt those mistakes—particularly where, had the Respondent more consistently reported suspicious orders with the DEA, it has been established that the reports would have been ignored.  Nor should the Administrator perpetrate an injustice on a Respondent that had never before been found to violate its obligations under the CSA and that has fully and indisputably remediated its prior compliance inadequacies.

## II.     The ALJ's Errors and this Proceeding's Procedural Deficiencies Violate Respondent's Right to Due Process

"'Due Process' is a versatile term designed for the daunting task of assuring justice to anyone from whom the state, or someone using the machinery of the state, wishes to take life,

liberty, or property." *Lane Hollow Coal Co. v. Dir., U.S. Dep't of Labor*, 137 F.3d 799, 806 (4th Cir. 1998) (citation omitted) (ALJ and Department decision vacated on due process grounds). "'Due process requires that there be an opportunity to present every available defense'". *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (citation omitted). There is no doubt that this requirement of due process is "fully applicable" to administrative proceedings. *Lane Hollow*, 137 F.3d at 806 n.13. The Due Process Clause guarantees that an administrative process "as a whole is sufficiently fair and reliable that the law should enforce its result." *Energy W. Mining Co. v. Oliver*, 555 F.3d 1211, 1219 (10th Cir. 2009) (Gorsuch, J.). Errors that "'necessarily render a trial fundamentally unfair'" may "deny effective judicial review of administrative determinations." *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 n. 17 (1987) (*quoting Rose v. Clark*, 478 U.S. 570, 577 (1986)). When faced "with procedural outrages" (*Energy W.*, 555 F.3d at 1219), a respondent may challenge the administrative proceedings on due process grounds without showing that the result would change absent the violation. *See Lane Hollow*, 137 F.3d at 807. Indeed, the Due Process Clause "creates a right *not to lose* without fair opportunity to defend oneself." *Id.* (emphasis in original).

Here, the ALJ's Recommendation to revoke Respondent's registration is the predetermined result of DEA's fundamentally unfair process. The procedural deficiencies in these administrative proceedings and the ALJ's multiple analytical errors and fatally flawed findings of fact and conclusions of law, individually and cumulatively together, deprived Respondent "of the opportunity to mount a meaningful defense to the proposed deprivation of its property; consequently it was denied due process of law." *Lane Hollow*, 137 F.3d at 808. For example, it was fundamentally unfair for DEA to require Respondent to effectively concede its guilt and accept responsibility as a precondition to introducing its "impressive" remediation defense only to

disregard such acceptance of responsibility on the ground that Respondent did not designate *DEA's* preferred individuals for offering penance.  ALJ Recommendation at 154; *see* Section III *infra*.

By imposing, after the hearing and without prior notice, a newly created rule that only Respondent's owners or directors can adequately accept responsibility, the ALJ deprived Respondent of fair process.  *See* Section III *infra*.  The ALJ's finding unfairly penalizes Respondent for its employees' and officers' exercise of their constitutional right not to testify and risk incriminating themselves in already-pending *DEA-initiated* criminal proceedings.  *See* ALJ Recommendation at 118 (citing Tr. at 1062).  By forcing Respondent to produce individuals subject to criminal prosecution, designate an employee the ALJ found unsatisfactory or deny responsibility altogether, DEA would effectively create a "cruel trilemma," of which the Star Chamber itself would be envious.  Revoking Respondent's registrations based on its pre-May 2018 conduct while ignoring its post-May 2018 remediation evidence is similarly outrageous because Respondent's current conduct is the best evidence that its continued registration is consistent with the public interest.  *See infra* Section IV.

Moreover, as Respondent has repeatedly and consistently objected, including at the hearing, this entire proceeding was unconstitutional.  *See* Tr. at 20:23-22:17.  The presiding ALJ in this matter was unconstitutionally appointed when these proceedings began and unconstitutionally continued to preside over these proceedings after the Attorney General purportedly ratified his appointment.  *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018). Additionally, the restrictions preventing the President and the Attorney General from removing the presiding ALJ without the Merit System Protection Board's approval similarly violate the

Constitution's separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. & Oversight Bd.*, 561 U.S. 477, 542 (2010).[3]

The ALJ's flawed analysis and various erroneous findings addressed herein and this proceeding's procedural deficiencies all impacted each other, producing a synergistic and compounding effect. Individually and cumulatively, they rendered these administrative proceedings fundamentally unfair and prevented Respondent from mounting a meaningful defense. Accordingly, adopting the ALJ's Recommendation, revoking Respondent's registrations and shuttering its business would deprive Respondent of due process.

## III. The ALJ Erred in Determining that Respondent's Compliance Officer Lacked Standing to Accept Responsibility and that Respondent's Acceptance of Responsibility Was Equivocal

The ALJ incorrectly concluded that Respondent's Director of Corporate Compliance and Security ("Compliance Director"), Scott Irelan, lacked standing to accept responsibility on behalf of Respondent. ALJ Recommendation at 150. The ALJ erred again when it incorrectly concluded that Respondent's acceptance of responsibility was equivocal. *Id.* at 150, 154. Respondent objects to each of these conclusions. Mr. Irelan was authorized by Respondent and an appropriate person to accept responsibility on behalf of Respondent at the hearing. And, in fact, Mr. Irelan so accepted, without equivocation, responsibility for conduct determined by the ALJ to have been proven. As a result of these errors, the ALJ determined that Respondent's admittedly "impressive" remedial actions were not relevant and gave them no weight at all. *Id.* at 154-55. Thus, the ALJ's conclusions of law regarding Respondent's acceptance of responsibility

---

[3]  *See also* Memorandum Order, *Cochran v. SEC.*, No. 19-10396 (5th Cir. Sept. 24, 2019) (enjoining an administrative proceeding during pendency of constitutional challenge to ALJ removal scheme) (per curiam)

are material errors that require reversal of the ALJ's recommendation that Respondent's Registrations be revoked.

### A.     Respondent's Compliance Officer Was Qualified to Accept Responsibility

The ALJ incorrectly found that Mr. Irelan lacked "standing" to accept responsibility on behalf of Respondent for its proven conduct.  ALJ Recommendation at 147-50.  The ALJ based its determination on a fundamental misstatement of applicable law: that where a registrant is a company, not an individual, "the company's principals need to take responsibility."  *Id.* at 148, 150 (*citing Sun & Lake Pharmacy, Inc.*, 76 Fed. Reg. 24,523 (May 2, 2011); *R & M Sales Co.,* 75 Fed. Reg. 78,734, 78,744 (Dec. 16, 2010)).  Significantly, however, nothing in the cases cited by the ALJ, or other applicable law, support the ALJ's finding that a company's "principals" are required to take responsibility for a registrant's misconduct.  Further compounding its mistake, the ALJ then erred again when it concluded, without citing any case or other authority, that Respondent's Compliance Director is not a "principal" of the Company able to accept responsibility for Respondent's conduct.  ALJ Recommendation at 149, 150.

The ALJ's reliance on two DEA administrative decisions in reaching its conclusion was misplaced.  In *R & M Sales*, the Administrator did not address, let alone decide, which individuals or employees are able to accept responsibility for a registrant.  *See* 75 Fed. Reg. at 78,734, 78,745.  Rather, the Administrator determined that the respondent's remediation efforts in that case were neither credible nor effective based on the testimony of a witness who happened to be a principal of the registrant.  *See id.*  Critically, the witness's role as principal was not a prerequisite for the Administrator's assessment of the respondent's mediation efforts.  *See id.*  Nor does *Sun & Lake Pharmacy*, support the ALJ's conclusion that a principal needs to take responsibility for a corporate registrant.  In that case, both the pharmacy respondent's owner and

his pharmacist wife elected not to testify or accept responsibility for respondent's misconduct. *See* 76 Fed. Reg. at 24,525, 24,533. Although the *Sun & Lake Pharmacy* decision recites language that an "essential element" of rebutting the Government's *prima facie* case is showing "that the registrant and its principals accept responsibility for their misconduct," again the Administrator did not address in that case, let alone decide, which corporate employees have standing to accept responsibility. *See* 76 Fed. Reg. at 24,533. Further, the cases cited by the Administrator in *Sun & Lake Pharmacy* in support of this "principals" language either involved individual respondents, not corporate entities, or did not address which individuals have standing to accept responsibility. *See id.* (citing *Samuel S. Jackson*, DDS, 72 Fed. Reg. 23,848, 23853 (May 1, 2007); *John H. Kennedy*, M.D., 71 Fed. Reg. 35,705, 35,709 (June 21, 2006); *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364, 387 (Jan. 2, 2008).

To the extent *Sun & Lake Pharmacy* is relevant at all, it only further undermines the ALJ's erroneous conclusion that standing is limited to owners and directors of a corporate registrant. In that case, Mr. Fosu, a registered pharmacist, was the director and owner of the respondent. His wife, Mrs. Fosu, was a registered pharmacist and "involved in [the respondent's] operations." *Id.* 76 Fed. Reg. at 24,525. Significantly, Mrs. Fosu was neither an owner nor a director of the respondent Sun & Lake Pharmacy.[4] Nevertheless, the Administrator commented on Mrs. Fosu's failure to accept responsibility in explaining why the respondent failed to rebut the Government's *prima facie* case. *Id.* at 24,533 (both of "*the Fosus (and Respondent)* have failed to accept responsibility for their misconduct") (emphasis added). Thus, under the rationale of *Sun & Lake Pharmacy*, as a manager at the Company and, eventually, the Compliance Director directly

---

[4]  *See* Annual Report, P05000088620, Sun & Lake Pharmacy Service, Inc. (May 7, 2007), Florida Department of State, Division of Corporations), http://search.sunbiz.org/Inquiry/CorporationSearch/ByDocumentNumber.

involved in implementing Respondent's suspicious order monitoring system (ALJ Recommendation at 28-29, 84 ¶ 339), Mr. Irelan has authority and standing to accept responsibility on behalf of the Company.

It should be no surprise that the administrative decisions cited by the ALJ do not support its conclusion that standing is restricted to owners and directors of a corporate registrant. To the contrary, DEA precedent demonstrates that a senior employee with responsibilities relating to a respondent's alleged misconduct may be qualified to accept responsibility. *See Holiday CVS, L.L.C.,* 77 Fed. Reg. 62,316 (Oct. 12, 2012). In *Holiday CVS*, the corporate respondent offered its Vice President of Pharmacy Operations to accept responsibility for misconduct that occurred at two of its pharmacies. *See id.* at 62,323. Notwithstanding that the witness was neither an owner nor a director of respondent, the Administrator assessed the substance of the testimony and determined on the merits that it was equivocal and insufficient without addressing whether the employee had standing to do so based on his role at the company. *See id.* at 62,323-24. The Administrator did not rule that the CVS Vice President could not have accepted responsibility as a matter of law. *See id.* Indeed, if CVS's directors or largest shareholders were the only persons who could have legally accepted responsibility, then the Administrator would not have reviewed the CVS Vice President's testimony at all. How much easier it would have been for the Administrator simply to rule that the CVS Vice President lacked standing to accept responsibility. Because the Administrator did not dictate which employees can or cannot accept responsibility for the registrant, and implicitly accepted that a designated corporate officer could, under certain circumstances, accept responsibility for the respondent's conduct, the *Holiday CVS* case supports Mr. Irelan's standing in this case.

The ALJ misconstrued the Administrator's decision in *Holiday CVS,* and erroneously quoted the litigant's brief in that case as though it constituted the Administrator's ruling. ALJ Recommendation at 150. In *Holiday CVS*, the registrant took exception to Chief Administrative Law Judge Mulrooney's recommended ruling in that its acceptance of responsibility was insufficient. The respondent sought to excuse its failure to acknowledge that its chain pharmacies had engaged in misconduct on the grounds that it was a large corporation and, thus, distinguishable from cases where the individual doctor or independent pharmacy owner was both the one accused of wrongdoing and the registrant. *See Holiday CVS,* 77 Fed. Reg. at 62,323. Taking the respondent's argument at face value, the Administrator refused to create a separate rule for large corporate registrants which would exempt them from acknowledging their misconduct and accepting responsibility:

> Be that as it may, the Agency's rule is clear and the fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists. Therefore, I decline to create one rule for chain pharmacies and another rule for closely held or sole-proprietor owned pharmacies.

*Id.*

Applying this same rule for both individual proprietor pharmacies and large corporate chains makes sense, and is precisely why here Respondent designated Mr. Irelan as its corporate representative now in charge of compliance issues to expressly acknowledge and unequivocally accept responsibility for Respondent's past compliance failures. RE-52; Tr. 1072:13-1074:25; ALJ Recommendation at 51, ¶¶ 344, 355-65. The ALJ's Recommendation, however, quotes language from the *Holiday CVS* decision that the Administrator was in turn quoting from *the respondent's unsuccessful exception* to create from whole cloth the new

requirement that "acceptance of responsibility" should always come from respondents who were "in a position to apologize for their *own* misconduct or that of the [company] they *owned or operated.*"  ALJ Recommendation at 150 (quoting *Holiday CVS*, 77 Fed. Reg. at 62,323) (emphasis in ALJ Recommendation).  As demonstrated above, the ALJ's newly proposed requirement has no basis in applicable law and ignores well-settled principles of corporate law and agency which recognize that companies may designate their own agents with authority to bind a company.  *See Cont'l Cas. Co. v. Holmes*, 266 F.2d 269, 278 (5th Cir. 1959) (company imbued agent with authority to bind it through "written or spoken words or other conduct of the principal"); *Colo. Springs Co. v. Am. Publ'g Co.*, 97 F. 843, 845-46 (8th Cir. 1899) (duly authorized corporate officers and agents may bind the company).

Denying Mr. Irelan standing to accept responsibility on behalf of Respondent based on the ALJ's newly created categorical rule that only owners and directors of registrants companies can accept responsibility not only ignores the corporate governance context in which many registrants operate, but also undermines DEA's stated rationale for requiring registrants' acceptance of responsibility.  Multiple United States Courts of Appeal have upheld DEA's acceptance of responsibility requirement as rational on the grounds that if a respondent "does not understand the extent of the past misconduct or its current responsibilities under the law, the DEA rationally could doubt that the [respondent] would faithfully comply in the future with its obligations under the CSA."  *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 833 (11th Cir. 2018); *accord MacKay v. DEA*, 664 F.3d 808, 820 (10th Cir. 2011) (admittance of fault is relevant to Administrator's consideration of whether a respondent will change its future behavior).  As Respondent's current Compliance Director, Mr. Irelan has assessed Respondent's past controlled substance compliance failures and is responsible for preventing their reoccurrence.

ALJ Recommendation at 85-86 ¶¶ 355-65; ALJ Recommendation at 150. Mr. Irelan is therefore the appropriate individual to acknowledge Respondent's past failings and to reassure the Administrator why they will not reoccur. Implicitly acknowledging the impropriety of his own newly proposed categorical rule, the ALJ elsewhere suggests that Clara Guin—who also is indisputably not a principal, owner or director of Respondent—should have accepted responsibility on behalf of Respondent. *Id.* at 152. The ALJ therefore misconstrues not only applicable law, but also his own categorical rule that has no basis in law. The ALJ's refusal to give weight to Respondent's acceptance of responsibility on the grounds that Mr. Irelan lacked standing to do so was in error.

**B.      Respondent's Acceptance of Responsibility Was Unequivocal**

The ALJ committed an additional error in finding "that Respondent's acceptance of responsibility was equivocal." ALJ Recommendation at 154. The ALJ purportedly based this determination on its views regarding Mr. Irelan's authority and candor and the scope of his acceptance of responsibility. *Id.* at 150-54. In fact, however, Respondent—through its duly authorized Compliance Director, Mr. Irelan—candidly and unequivocally accepted responsibility on behalf of Respondent for all of the Government's proven conduct.

**1.      Respondent Duly Authorized Mr. Irelan to Accept Responsibility**

The ALJ found that the fact that, as Compliance Director, Mr. Irelan was subject to possible termination by Respondent's senior management or its corporate board of directors "diminished [the] weight" of Respondent's acceptance of responsibility and its "power to persuade." ALJ Recommendation at 152. The ALJ was wrong to discredit the testimony of Mr. Irelan on such grounds.

There is no basis for the ALJ to question Mr. Irelan's authority to accept responsibility or discount Mr. Irelan's testimony based on his role at the Company. As the ALJ acknowledges, Mr. Irelan has been employed by Respondent for over 30 years. *Id.* at 28. As Compliance Director, Mr. Irelan:

> is not required to discuss with [management] about decisions he makes regarding suspicious order monitoring; no one at the Respondent has suggested to him that he cannot take actions that he wants to take regarding compliance; no one has ever told him he cannot hire or terminate a member of the Respondent's compliance team; and . . . he is the final decision maker regarding staffing the Respondent's compliance team.

ALJ Recommendation at 150-51; *id.* at 85 ¶¶ 346-50. Additionally, Respondent's Chairman of the Board specifically and expressly authorized Mr. Irelan "to speak on behalf of the company" and "make all compliance decisions related to the company's suspicious order monitoring process." RE-52; Tr. 1072:13-1074:25.

The ALJ completely and erroneously ignores this affidavit from Respondent's Chairman of the Board confirming Mr. Irelan's authority at the Company. The ALJ instead relies on speculative hypotheticals regarding Mr. Irelan's possible termination that, according to the ALJ, "call into question the extent to which Mr. Irelan speaks for the company." ALJ Recommendation at 152. The ALJ's suggestion that "a question remains whether the Respondent might not return to its old ways if those responsible for the Respondent's reform efforts . . . can be abruptly terminated" (*id.* at 151-52) is directly and overwhelmingly refuted by record evidence of Respondent's significant investment of time and money in its new suspicious order monitoring system. *Id.* at 77-83 ¶¶ 284-88, 291-301, 303, 307-08, 310-11, 322-30. The evidence shows that Respondent has invested considerable resources and time empowering Mr. Irelan, his team, and their outside advisors. ALJ Recommendation at 85 ¶ 352. It is absurd to find that Respondent

would, after fighting for its life in this proceeding, terminate its compliance program.  Yes, it is *possible*, but possible does not equal probable, or even likely.  The ALJ made this point clear at the hearing:

> Well, I hear these questions in every single hearing I go to where the witness is asked, is it possible that this could happen?  And the answer should always be yes because anything is possible.  Where it does me any good whatsoever is highly doubtful because . . . is it possible?  Yes, it's possible.  I already know the answer; it's possible.

Tr. 412:24–10.

Similar to its conclusions regarding Mr. Irelan's standing, the ALJ Recommendation ignores basic principles of corporate governance and the necessary practicalities of bringing proceedings against a corporate entity that can only act through its employees.  *See* Section III(A) *supra* (citing *Jones*, 881 F.3d at 833; *MacKay*, 664 F.3d at 820); *see also Athineos v. Andromeda Invs. Co.*, No. 13 Civ. 5076, 2014 WL 2990330, at *2 (S.D.N.Y. July 1, 2014) ("Corporations can only be created by and act at the behest of individuals; people run them and people perform the actions that are attributed to corporations").  Like any non-closely held corporation, Respondent has a board of directors that holds ultimate authority for employment and staffing decisions.  Indeed, under the ALJ's rationale, no single person could unequivocally accept responsibility for Respondent because every officer and employee—even Company President, Paul Dickson, Sr.—is subject to termination at the discretion of the Board of Directors.

### 2.    Respondent Accepted Responsibility with Complete Candor

The ALJ found that Respondent's designation of Mr. Irelan to testify rather than different Company officers and employees personally involved or responsible for oversight of

compliance issues during the relevant time period "calls into question the registrant's candor in accepting responsibility." ALJ Recommendation at 152-53. This finding is erroneous.

There is no justifiable grounds for discounting Mr. Irelan's testimony and penalizing Respondent for designating the employee personally responsible for bringing Respondent's suspicious order monitoring system into compliance to accept responsibility on that very issue. The ALJ Recommendation cites one case, *Holiday CVS*, for the proposition that "acceptance of responsibility should come from an individual who can apologize for her 'own misconduct' or for the company he or she 'owned or operated.'" ALJ Recommendation at 152. But, as demonstrated above, *Holiday CVS* does not support that proposition. *See* Section III(A) *supra* (citing *Holiday CVS, 77 Fed. Reg. at 62,323*). The ALJ Recommendation simply misreads that case by substituting the Administrator's decision with quoted language from the unsuccessful registrant in that case. *See id.*

Nor does the ALJ Recommendation point to any legitimate reason to doubt Mr. Irelan's candor. The notion that Mr. Irelan—as the Compliance Director engaged in May 2018 after receipt of the Order to Show Cause and Immediate Suspension of Registration ("OSC" or "ISO") to spearhead Respondent's remediation and compliance efforts—did not have first-hand knowledge of the proven misconduct is a red herring. There is no dispute that Mr. Irelan reviewed Company records and educated himself regarding Respondent's past practices both to enable himself and his compliance team to implement their indisputably "impressive" remedial actions and to candidly and unequivocally accept responsibility on behalf of the Respondent. ALJ Recommendation at 29-30. It is well-accepted that individuals designated to testify—particularly to make admissions—on behalf of a corporate entity may and must rely on their review of corporate documents and conversations with other individuals at the company with relevant

knowledge.  *See* <u>Fed. R. Civ. P. 30(b)(6)</u>; *Wilson v. Lakner*, <u>228 F.R.D. 524, 528</u> (D. Md. 2005)

(preparing corporate the designee requires "a good faith effort on the party of the designate to find

out the relevant facts—to collect information, review documents, and interview employees with

personal knowledge").

Further, the ALJ acknowledges that Mr. Irelan's "testimony about acceptance of

responsibility was based on his review of company records," and the ALJ gratuitously and

erroneously adds that Respondent purportedly "did not produce [such company records] as

evidence."  ALJ Recommendation at 152.  This is demonstrably false.  The record is replete with

evidence of Respondent's due diligence.[5]  The record regarding Respondent's due diligence would

be more fulsome had not the ALJ erroneously prohibited the admission and, incredibly, the very

introduction of, company records produced to DEA evidencing its customer due diligence.  *See*

Tr. 448:2-460:21 (ALJ erroneously prevented cross-examination of DEA Supervisor Joel Dunn

with due diligence records produced to DEA at RE-5.001 and RE-5.002); *see also* Tr. 455:1-

456:22 (ALJ erroneously prevented cross-examination of DEA agents with documents produced

by Respondent to DEA in response to its subpoenas).

Respondent should not be prejudiced for designating Mr. Irelan to testify on its

behalf rather than different individuals apparently preferred by the ALJ, namely, Clara Guin, Jacob

Dickson, or Paul Dickson, Sr.  The ALJ's adverse inference and assumption that testimony from

these individuals would have supported Government's allegations (ALJ Recommendation at 119)

is beside the point.  Respondent accepted responsibility for all of DEA's proven conduct, and the

inference drawn from the absence of testimony from other Company officers and employees

---

[5]    *See, e.g.*, ALJ Recommendation at 97 n.31, 105 n.41; RE-23A, RE-31.001, RE-31.002; Tr. 704:23–
705:5; Tr. 709:23–710:12; Tr. 712:8–20; Tr. 870:5–15.

cannot as a matter of law refute, let alone overcome, Respondent's acceptance of responsibility through the competent testimony of Mr. Irelan.  *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[A]dverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer.").

Contrary to the ALJ's unsupported assumptions, testimony from either of those individuals would not have furthered DEA's stated policy for acceptance of responsibility.  Indeed, Clara Guinn and Jacob Dickson were removed from their positions in compliance following receipt of the OSC and, therefore, any acknowledgement by them of past misconduct or expression of remorse would have no bearing on Respondent's current and future compliance with the Controlled Substances Act.  Paul Dickson, Sr. had not been regularly involved in compliance oversight since approximately 2008, and his undisputed actions of replacing Ms. Guin and Jacob Dickson with Mr. Irelan, Mr. Milione, AGI, and Guidepost at considerable cost and expense speak for themselves.  *See* Tr. 736:18-736:23.  Moreover, for the ALJ to hold Ms. Guin's absence against Respondent is perverse irony considering Respondent did not object to DEA calling Ms. Guin as its own witness and agreed to accept service of a subpoena for Ms. Guin's attendance at the hearing.  It was the ALJ himself who refused to issue the subpoena and called Respondent's offer to accept service meaningless.

### 3.    Respondent Accepted Responsibility for All Proven Conduct

The ALJ's conclusion that Respondent failed to accept the scope of the Respondent's misconduct rests on three underlying findings—each of which is flawed.

### a.    Respondent Clearly Accepted Responsibility for Not Reporting All Proven Suspicious Orders

The ALJ found that it was not "clear" from Mr. Irelan's testimony that Respondent accepted responsibility for shipping suspicious orders without reporting them to DEA.  ALJ Recommendation at 153 ("the scope of the Respondent's misconduct is that it shipped suspicious orders without reporting them to the DEA.  Nowhere in Mr. Irelan's testimony is it clear that he accepted responsibility for such misconduct").  This finding is demonstrably wrong and flies in the face of the record evidence.  The ALJ's own factual findings acknowledge that Respondent accepted responsibility for "Respondent's failure to report suspicious orders from January 2014 to May 2018."  ALJ Recommendation at 86 ¶ 362 (citing Tr. 732-33); *see also id.* at 87 ¶ 363 (citing Tr. 807); Tr. 731:20-22 (Respondent's three suspicious order reports to DEA between 2014 and 2018 were "insufficient").

To the extent that the ALJ Recommendation suggests that Mr. Irelan's acceptance of responsibility on behalf of Respondent was faulty because Respondent contested the numeric calculations and quantitative conclusions of DEA's expert, such reasoning is inappropriate.  DEA did not prove how many suspicious orders Respondent shipped between January 2014 and May 2018.  Indeed, the ALJ expressly acknowledges this deficiency in DEA's proof.  ALJ Recommendation at 90 n.27.  There is no citation for the ALJ's bald assertion that DEA proved that Respondent shipped thousands of suspicious orders, which assertion is in fact refuted by the ALJ's own findings and the record evidence.  *See id.*; *see also* Section VI *infra*.

Significantly, Respondent's criticisms of DEA's statistical evidence regarding outlier orders are not inconsistent with and cannot as a matter of law undermine Respondent's independent acceptance of responsibility.  Due process requires allowing a respondent in an administrative hearing to present all defenses available to it, including "refuting the factual basis

of the [Government's] allegations. *Lawrence E. Stewart, M.D.*, 81 Fed. Reg. 54,822, 54,827 (Aug. 17, 2016); *see also Lindsey*, 405 U.S. at 66 (due process affords litigant right to "present every available defense") (quoting *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)).  The fact that Respondent here presented an expert witness in its defense and disproved certain of DEA's allegations regarding the reliability of the statistical evidence put forth against it, thus, does not abrogate or undermine Respondent's acceptance of responsibility.

Respondent never disputed that it failed to file suspicious order reports.  *See* ALJ Ex. 89 at 42, ¶ 118 (acknowledging that Respondent failed to file suspicious order reports in the context of critiquing Mr. Rose's method for identifying particular suspicious orders); ALJ Recommendation at 86 ¶ 362 (citing Tr. 732-33).  Rather, Mr. Weinstein testified that Mr. Rose's analysis was unreliable, in so far as many of the particular transactions he identified as outliers likely were not actual outliers, due to his use of the fixed-frame analysis and his failure to incorporate important context around line item orders.  *See* ALJ Recommendation at 71-72 ¶¶ 245-55.  The ALJ (along with DEA) stubbornly misunderstands Mr. Weinstein's criticism of Mr. Rose's analysis.  Mr. Weinstein's criticism was directed at the suggestion that a registrant should use something like Mr. Rose's analysis to reliably identify suspicious orders and thereby meet its obligations under 21 C.F.R. § 1301.74(b).  Respondent maintains that an analysis as simple and unrefined as Mr. Rose's would invariably over-report orders that were not suspicious as defined by the regulation and under-report orders that actually would meet the regulatory definition.  Accordingly, the ALJ's mistaken reliance on Respondent's challenges to DEA's statistical evidence in determining that Respondent did not accept responsibility for the full scope of proven conduct was erroneous.

### b.    Respondent accepted responsibility for all proven inadequacies or ineffective efforts with respect to due diligence

According to the ALJ, Respondent's acceptance of responsibility "seemingly was limited to the Respondent's failure to apply due diligence," whereas DEA "clearly proved that the Respondent's due diligence efforts were inadequate and ineffective, not simply that the Respondent failed to apply its due diligence."  ALJ Recommendation at 153.  This ALJ Recommendation is vague to the point of incoherence.  The ALJ provides zero explanation as to the difference between the conduct Respondent "seemingly" accepted responsibility for and the conduct the Government proved.  Indeed, there is no material difference between a "failure to apply due diligence" and "inadequate and ineffective due diligence," and the ALJ certainly does not point to any such difference in its analysis or Recommendation.  This ALJ Recommendation is particularly confounding given its acknowledgment that "there was no reason for Mr. Irelan to accept responsibility for the Respondent failing to conduct 'any' additional due diligence because the Government did not prove that repeated allegation."  *Id.* at 153.

Moreover, Respondent's acceptance *actually* was not so limited.  In addition to accepting responsibility for not applying customer due diligence at the order level, as the ALJ concedes (ALJ Recommendation at 86-87 ¶¶ 357, 359-60 (citing Tr. 720-23)), Respondent indisputably acknowledged and accepted responsibility for the following inadequacies and ineffective due diligence efforts:

- "Respondent's due diligence practices before May 2018 were insufficient" (ALJ Recommendation at 86 ¶ 357);

- Respondent's due diligence documentation was not "easily accessible" or "properly maintained to be . . . easily retrievable" (*id.* at 86 ¶¶ 356-57);

- "Respondent shipp[ed] orders of controlled substances from January 2014 to May 2018 without conducting due diligence of those orders" (*id.* at 86 ¶ 361); and

- "Respondent shipp[ed] orders of controlled substances from January 2014 to May 2018 without resolving red flags of those orders" (*id.* at 87 ¶ 363).

Thus, Respondent did not merely *attempt* to accept responsibility for filling orders without resolving red flags, but expressly and indisputably did so. Respondent also unequivocally accepted responsibility for DEA's allegation that it, among other things, "consistently ignored and/or *failed to implement its due diligence* and suspicious order monitoring policies and *failed to conduct meaningful due diligence* into. . . [these] orders to ensure that the controlled substances were not diverted into other than [legitimate channels]." ALJ Recommendation at 87 ¶ 365, 134 (emphasis added).

Respondent's acceptance of responsibility with respect to its due diligence efforts applied both generally and specifically to the exemplar pharmacies. To be clear, though, Respondent also accepted responsibility for proven conduct specific to those exemplar pharmacies:

- Respondent accepted responsibility for DEA's allegation in paragraph 39 of the OSC that it "failed to conduct adequate due diligence sufficient to resolve concerns over the unusual nature of" certain controlled substances orders at Bordelon's pharmacy (Tr. at 827:20-23);

- Respondent accepted responsibility for DEA's allegation in paragraph 66 of the OSC that it "failed to conduct adequate due diligence sufficient to resolve concerns over the unusual nature of" certain controlled substances orders at Dave's pharmacy (Tr. at 830:12-14);

- Respondent accepted responsibility for DEA's allegation in paragraph 73 of the OSC that "M&D did not conduct any additional due diligence on Hephzibah or report any orders to DEA" and further testified that "whether or not [Respondent] did the due diligence, it definitely wasn't used to resolve red flags and orders were not reported." (Tr. at 827:20-23, 830:18-831:5); and

- Respondent accepted responsibility for DEA's allegation in paragraph 82 of the OSC that "M&D did not conduct any additional due diligence on Wellness" and further testified that whatever due diligence was performed did not resolve red flags and was not used to report orders. (Tr. at 831:9-25).

### c. Respondent Had No Duty to Accept Responsibility for Unproven Allegations

Finally, the ALJ found that Respondent "was not in a position to accept responsibility for, or could not speak to, some of the *allegations* contained in the OSC." ALJ Recommendation at 153 (emphasis added). Although the ALJ does not state the extent to which this finding impacted its conclusion that Respondent's acceptance was not unequivocal, the ALJ's apparent reliance on this finding is troubling and constitutes error.

Respondent is under no duty to accept responsibility for unproven allegations. And there can be no doubt that the allegations which Respondent "was not in a position to accept responsibility for" were not proven allegations. ALJ Recommendation at 153 (citing Recommendation at 87 ¶¶ 368-69). The DEA allegations cited by the ALJ are set forth in paragraphs 24, 29, 82, and 91 of the OSC. *See id.* The ALJ expressly held that the Government did not prove its allegations contained in paragraphs 29, 82, and 91. *Id.* at 87, ¶¶ 368-69. And, at the hearing, the ALJ made clear that DEA's allegation set forth in paragraph 24 of the [OSC] was a discursive mishmash for which acceptance of responsibility would be "meaningless." Tr. at 821-23.[6]

The multiple errors of fact and unsupported conclusions of law described above with respect to Respondent's acceptance of responsibility require rejection of the ALJ's Recommendation and, at minimum, a new hearing.

---

[6] Paragraph 24 of the OSC confusingly incorporates by reference multiple other paragraphs in the OSC and alleges that Respondent failed to conduct due diligence for five unidentified "sample" pharmacies. As the ALJ expressly stated at the hearing after multiple attempts by counsel to reduce paragraph 24 into something intelligible: "Let me say this, Mr. Dean, what you're asking him [Mr. Irelan] to do as far as I'm concerned is pretty meaningless concerning what is packed into paragraph 24." Tr. 823:13–16.

IV.    **The ALJ's Refusal to Give Any Weight to Respondent's "Impressive" Remedial Actions Was Erroneous**

The ALJ concluded that Respondent's "impressive" remedial actions should be given no weight on the grounds that (a) Respondent's enhancement of its suspicious order monitoring system and due diligence were opportunistic "stroke-of-midnight decisions" spurred by the OSC and (b) Respondent did not unequivocally accept responsibility.    ALJ Recommendation at 155.  This latter reason for ascribing no weight to the substantial evidence of remediation in this case constitutes error for the reasons above.  *See* Section III *supra*.  The ALJ's refusal to give any weight to Respondent's "impressive" remedial actions because of the timing of their implementation is likewise contrary to both applicable law and the factual record.

Each of the cases cited in the ALJ Recommendation for the proposition that evidence of remediation may have "diminished weight" when implemented after notice of regulatory action do not support the ALJ's conclusion and, in fact, demonstrate why Respondent's remediation evidence should have been considered by the ALJ.  In *Liddy's Pharmacy, L.L.C.*, 76 Fed. Reg. 48,887 (Aug. 9, 2011), the Administrator held that a registrant's commitment to its regulatory obligations was rightly viewed with skepticism because the respondent in that case "put on no evidence as to what steps it has undertaken to reform its practices" following its receipt of a DEA search warrant and order to show cause.  *See id.* at 48,897.  The respondent in that case could not overcome the Administrator's skepticism regarding its motivation for ceasing its offending practices because there was no additional evidence of the respondent's reform.  *See id.*  Here, Respondent not only stopped engaging in the conduct alleged in the OSC, but also implemented a robust remediation program that the DEA does not dispute is an effective anti-diversion system.  The ALJ's cited case of *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487 (July 3, 2007) similarly undermines its refusal to consider Respondent's remedial actions.  In that case, the

respondent's retention of new compliance personnel was "too little, too late" and clearly ineffective because it continued violating the Controlled Substances Act. *Id.* at 36,503. Again, the circumstances in *Southwood* are completely dissimilar to Respondent's efforts in establishing its newly minted suspicious order monitoring system and demonstrating unquestioned commitment to preventing diversion.[7]

   The evidence of Respondent's remedial actions and good faith efforts to meet its anti-diversion obligations both before and after the OSC/ISO is sufficient to overcome the ALJ's skepticism regarding Respondent's commitments to compliance. Indeed, the ALJ should not find it "hard to fathom" why Respondent implemented its current due diligence and suspicious order monitoring system only after the OSC. ALJ Recommendation at 154. Until the OSC, Respondent believed, albeit mistakenly, that it was in compliance with the CSA and its obligations as a distributor. Respondent's belief was reasonable in light of the fact that it received regular periodic audits with no prior warnings or adverse findings regarding its suspicious order monitoring system. Respondent also invited DEA officials to its headquarters and made a detailed presentation regarding its suspicious order monitoring system more than a year prior to receiving the OSC/ISO without receiving any indication from DEA that its practices were not in compliance. ALJ Recommendation at 83-84 ¶¶ 331-38.

   Further, the ALJ is only able to conclude that Respondent waited until the stroke of midnight to improve its suspicious order monitoring system because it is only too willing to discount Mr. Milione's testimony regarding Respondent's pre-OSC intent to comply with DEA

---

[7] The ALJ's reliance on *Swinton v. Potomac Corp.*, 270 F.3d 794, 815 (9th Cir. 2001), is similarly misplaced. That case involved allegations of discrimination, and the Ninth Circuit was considering whether a jury would find the defendant's evidence of remediation credible. The ALJ conveniently ignores language from the Ninth Circuit that "the jury might [also] find that such remedial actions were indeed bona fide efforts to repent and prevent the reoccurrence of similar harassment in the future." *Id.*

regulations, to ignore Paul Dickson, Sr.'s sworn federal court testimony, and to ignore evidence regarding the August 2016 meeting between Respondent and DEA officials regarding its suspicious order monitoring system. ALJ Recommendation at 33, 154-55. As the former Assistant Administrator for the DEA Office of Diversion Control, and an undisputed expert, Mr. Milione's opinion testimony regarding Respondent's commitment and sincerity regarding diversion efforts was well within his experience and highly relevant. Under applicable law and a full, accurate review of the record, Respondent's bona fide remediation efforts, which the Government did not challenge, are credible, effective, and deserving of the Administrator's consideration.

## V.    The ALJ's Recommendation that Deterrence Demands Revocation Was Erroneous

The ALJ erred by disregarding evidence that Respondent is not likely to repeat its past mistakes and, therefore, that a less dire sanction would provide sufficient deterrence. The ALJ found that the interest of general deterrence "weighs in favor of recommending revocation." ALJ Recommendation at 155. Respondent objects to this finding. The interest of general deterrence can be satisfied with proportionate sanctions less extreme than revocation. The ALJ should have considered both Respondent's impressive remediation and long record of good-faith efforts to comply with its regulatory obligations, supported by the testimony of its former regulator and its past interactions with DEA, as evidence that Respondent "has credibly and candidly demonstrated that [it] will not repeat the same behavior" at issue in this proceeding. *Jeffrey Stein, M.D.*, 84 Fed. Reg. 46,968, 46,973 (Sept. 6, 2019) (suspending, rather than fully revoking, a registration even after the respondent admitted to criminal misconduct).

Although deterrence may be considered as part of the remediation inquiry, "'general deterrence is not, by itself, sufficient justification for expulsion or suspension'" of a registration. *Paz Sec., Inc. v. SEC*, 494 F.3d 1059, 1066 (D.C. Cir. 2007) (citation omitted).

Instead, given the remedial purpose of administrative proceedings, DEA is supposed to consider its interest in deterring similar acts by the Respondent or other registrants. *See Joseph Gaudio, M.D.*, 74 Fed. Reg. 10,083, 10,095 (Mar. 9, 2009). This consideration is part of the "totality of circumstances" determining the public interest. *Id*. at 10,083. The totality of circumstances here must include the deterrent effect of harm already caused by the OSC and ISO, the evidence of Respondent's past good-faith efforts to collaborate with DEA, and the "impressive" compliance system Respondent uses today. Each of these factors demonstrate that Respondent will not repeat its past failures. Each of these factors was disregarded by the ALJ.

The ALJ's general deterrence argument turns on how much *additional* harm to Respondent is necessary to dissuade the community of registrants from similar misconduct. The ALJ's unreasonably flawed general deterrence Recommendation jumped straight to the most severe penalty. DEA could have pursued a bevy of sanctions, short of revocation, to deter misconduct without putting Respondent permanently out of business, destroying hundreds of jobs, and depriving Company customers and regional hospitals and caregivers a much-needed source for medicine. The ALJ never even entertained the possibility of a less-harsh sanction accomplishing the same goal. Instead, the ALJ offered a conclusory and unsupported characterization that "anything less than revocation in this case would suggest that no matter how badly a registrant violates the CSA, the registrant could keep its [Certificate of Registration] so long as it tenders a semi-unequivocal acceptance of responsibility and introduces evidence that it will follow the law in the future." ALJ Recommendation at 155.

That is a mere caricature of Respondent's behavior and disregards the totality of circumstances that serve the public interest. A sanction other than revocation would at least give an impression that DEA means what it says in describing its proceedings as non-punitive

evaluations of the public interest.  *Howard N. Robinson, M.D.*, <u>79 Fed. Reg. 19,356</u>, 19,369 (Apr. 8, 2014).  A different sanction would also suggest that remediation is not mere dead-letter law.  It would show that a company like Respondent, which has for years invited DEA compliance collaboration and demonstrated a good-faith desire to prevent diversion, can maintain its registration after fully implementing a state-of-the-art compliance system and accepting responsibility for all proven violations.  Respondent accepts both immediate sanctions and long-term accountability and poses no ongoing threat to the public interest.  The ALJ waves away Respondent's entire remedial regime with unsupported armchair speculation that "no registrant would take its responsibilities seriously until it was caught" if its license was not fully revoked. The record shows that is not what happened in this case and that the ALJ's Recommendation is inconsistent with DEA precedent.

A.    **The ALJ Erred in Refusing to Credit the August 2016 Meeting with DEA and Other Evidence of Respondent's Credibility and Reliability**

The record demonstrates Respondent's good-faith desire to comply with the CSA, and its sincere intentions to comply with its regulatory obligations.  Respondent's own former regulator, Lou Milione, testified to this very fact.  ALJ Recommendation at 33.  Mr. Milione acknowledged that Paul Dickson, Sr. initiated an unorthodox meeting between Respondent and its regulator so DEA could "hear from [Respondent's] perspective what they were doing to try to educate their customers, to intervene and prevent diversion downstream."  Tr. 852:19–853:16; RE-21 at 4–5.  Mr. Dickson also communicated to DEA his personal motivation of preventing further family loss and overdose deaths through Respondent's anti-diversion efforts.  Tr. 853:6–12; RE-21 at 3.  Mr. Dickson's email conveyed a willingness by Respondent to cooperate on those areas of "mutual concern" and serve as a "force multiplier."  Tr. 855:23, 856:10.  Mr. Dickson believed

Mr. Milione's "unprecedented" openness to meeting with Respondent held "immense potential to make substantial gains against diversion."  RE-21 at 3.  He stated that Respondent was "excited about the idea that we can work with DEA, constructively and effectively, towards this shared goal" of preventing diversion.  *Id.*  Mr. Dickson said that he "look[ed] forward to showing [Mr. Milione] and [his] team what all we are doing to combat diversion so far and look forward to developing more."  *Id.*

The ALJ correctly found that Mr. Milione's testimony about the meeting "was presented in an objective and unbiased manner."  ALJ Recommendation at 33.  Nevertheless, the ALJ gave this objective and unbiased testimony no weight "because it is opinion evidence and because intent is not an issue."  The ALJ was wrong.

Mr. Milione's first-hand account of his August 2016 meeting with Respondent cannot be dismissed as unsubstantiated opinion, and his admittedly expert views of Respondent's sincerity in working with DEA to stop diversion is certainly at issue.  Mr. Milione's sworn testimony reflected his direct observations and impressions of Respondent in his capacity as a regulator, not rank speculation that can be ignored under the inaccurate label of "opinion" evidence.  Mr. Milione's description of Respondent's sincere desire and serious effort to meet its anti-diversion responsibilities is also highly relevant, notwithstanding any admitted failures in execution.  The ALJ inexplicably and erroneously made only passing observation of the fact that Respondent sought out a meeting with DEA to share its resources and insights on diversion control.  *See* ALJ Recommendation at 33, 83-84.  Mr. Milione's observations of Respondent's intent speaks directly to its good faith and sincerity, which flatly contradict the ALJ's intent-laden description of Respondent's compliance failures as "cavalier."  ALJ Recommendation at 156.  Respondent's

intent, sincerity and good faith are also directly relevant to its credibility and reliability in avoiding recidivism—unquestioned factors in the public interest inquiry.

The ALJ's failure to credit the sworn testimony of Paul Dickson, Sr. taken at Respondent's hearing before the United States District Court for the Western District of Louisiana constituted additional error. This testimony is relevant evidence of Respondent's credibility and good faith intent in working with DEA to stop diversion. RE-01 at 30:14-23, 34:12–35:8, 43:2-7, 46:6–53:10, 60:19–61:23. Mr. Dickson's testimony also speaks to the public harm that would result if its customers were denied its medical distribution services. RE-01 at 13:14–21, 15:21–16:01. The ALJ Recommendation's failure to address this evidence as a factor of whether revocation was consistent with public health and safety was unreasonable and erroneous. *See* 21 U.S.C. § 823(b)(5).

**B.    The ALJ Erred by Failing to Consider the Deterrent Effect of Lesser Sanctions**

The ALJ was wrong to disregard the likely deterrent effects of sanctions other than revocation. A variety of sanctions are available to DEA, including pecuniary penalties, leadership changes, and long-term accountability such as a monitor. Even before considering alternative sanctions, the issuance of the OSC ISO itself will deter the community of registrants. It is not merely a "slap on the wrist," as this ALJ finds. ALJ Recommendation at 155. Respondent sought to introduce evidence of this harm but the ALJ suppressed it on the grounds that "evidence of financial and reputational harm" that is "aimed at showing how it [Respondent] had been hurt by the OSC/ISO" was not relevant. Order on Gov't Mot. in Limine 8 (Apr. 10, 2019) (Dorman, J.). Respondent had argued that such information was relevant to the ALJ's consideration of the appropriate sanction and general deterrence:

> To ensure that the DEA proceeding remains non-punitive, Respondent must be allowed to submit evidence regarding the damage that it has and will incur. In submitting this evidence, Respondent does not argue, as the Government suggests, that it has "been 'sufficiently' punished for its wrongdoing." Gov't Motion at 8. Instead, Respondent argues that the Tribunal should hear evidence regarding the importance of Respondent's registration. A policy of specific or general deterrence requires evidence that shows the consequences of a DEA sanction.

Respondent's Opp'n to Motion in Limine 10–11 (Oct. 2, 2018).

The materiality of the harm suffered by the Respondent and its community as a result of the OSC ISO, which evidence the ALJ excluded *in limine*, is substantiated by the ALJ's finding that revocation is *necessary* for general deterrence. Had Respondent been permitted, it could have shown the consequences and harm of the OSC and ISO, which included loss of revenue, contracts, and reputational harm. The community of registrants could have reviewed those consequences and concluded that even the institution of a DEA proceeding, whether or not the registrant prevails at the hearing, was harmful enough to dissuade them from similar misconduct.

Although the most severe penalty is assuredly a sufficient deterrence, it is not always a necessary one. If it were, then the punishment for every crime would be a life sentence. Such a conclusion would be absurd, but according to this ALJ the interest of general deterrence demands it. The ALJ's fundamentally flawed assumption is that anything short of putting Respondent out of business amounts to a get-out-of-jail-free-card. ALJ Recommendation at 156. Clearly, then, the proper question—which the ALJ never seriously addressed—is not only whether revocation will generally deter other registrants, but whether a lesser punishment would also deter other registrants. As discussed below, DEA's standard practice indicates that lesser punishments also provide general deterrence. Nothing in the ALJ's conclusory statements prove otherwise.

**C.      The ALJ Erred by Adopting Disparate Treatment of Respondent, Imposing Harsher Standards for Deterrence than Similarly-Situated Registrants**

The ALJ's findings of general deterrence ignore long-standing precedent at DEA. Respondent should not receive treatment disparate from that applied to other remediated registrants, including larger distributors who also (and even more spectacularly and repeatedly) failed to comply with reporting requirements. It is true that in the cases the ALJ cites, involving a doctor and a pharmacy, *David A. Ruben, M.D.*, 78 Fed. Reg. 38,387 (June 26, 2013), and *Trinity Pharmacy II*, 83 Fed. Reg. 7336 (Feb. 20, 2018), the Administrator found that general deterrence required revocation. The ALJ ignores multiple DEA actions involving distributors in which the Administrator did not conclude that revocation was necessary:

DEA has developed a distinct pattern dating back to 2007 of addressing registrants similarly situated as Respondent—*i.e.*, distributor or manufacturer registrants that DEA alleged failed to maintain effective controls against diversion or failed to detect and report suspicious orders. Almost without exception, regardless of whether DEA was investigating the registrant, or whether the investigation culminated in serving an Immediate Suspension Order or Order to Show Cause, DEA engaged in settlements with the registrant. In all but one case—where the registrant refused to accept responsibility[8]—DEA reached a settlement with the registrant in question. In each of these cases, DEA apparently determined that it could achieve general deterrence without revoking the registrant's license (let alone all licenses held by a common owner, as required under

---

[8]      The case against Masters Pharmaceutical, LLC is the only similar case that did not end in a settlement. However, that case is distinguishable. Despite DEA precedent, Masters entered into a stipulation (Joint Appendix at 153, *Masters Pharm., Inc. v. DEA*, No. 15-1335, Doc. No. 1619357 (D.C. Cir. Jun. 14 2016)) that it did not accept responsibility for any alleged misconduct. Based on that stipulation, it is rational to assume that Masters was not interested in settling the allegations against it with DEA. In this case, Respondent unequivocally accepted responsibility for its past compliance failures.

the ALJ's tortured logic discussed in Section VII *infra*).  The ALJ and the Administrator cannot explain why Respondent is different than the following cases:

- Amerisource Bergen Company (2007) – settled with DEA after an Immediate Suspension Order was issued;

- Cardinal Health (2008) – settled with DEA after an Immediate Suspension Order was issued;

- McKesson Corporation (2008) – settled with DEA;

- Masters Pharmaceutical (2009) – settled with DEA;

- Harvard Drug (2011) – settled with DEA after an Immediate Suspension Order was issued;

- Cardinal Health (2012) – settled with DEA after an Immediate Suspension Order was issued;

- Walgreens (2013) – settled with DEA after an Immediate Suspension Order was issued;

- McKesson (2017) – settled with DEA after investigation but no charging documents filed; and

- Mallinckrodt (2017) – settled with DEA after investigation but no charging documents filed.

In fact, the list above shows that DEA has even permitted registrants who were *repeat offenders* to not only engage in settlement negotiations but to actually execute settlement agreements before receiving a tribunal's judgment.  Stated differently, DEA allowed registrants who violated the first settlement agreement with DEA to then negotiate and execute a second settlement agreement with DEA.  By any reasonable standard of general deterrence, recidivist registrants should warrant harsher sanctions than Respondent.  But that is not what happened, because unlike its larger competitors, Respondent is the one who faces license revocation.

Based on how DEA responded to these similarly situated registrants, it is impossible to avoid noting the striking disparity in DEA's treatment of Respondent.  In every other

case involving a similarly situated DEA registrant, DEA engaged in traditional pre-litigation settlement negotiation process that ultimately culminated in a mutually agreeable settlement. Thinking DEA would continue this widely known practice, Respondent made good faith, written settlement offers.  However, with no explanation whatsoever, DEA flatly refused to respond to any of these offers.  Instead, DEA either vaguely demanded a "better" offer, stalled, or just ignored Respondent altogether.  This absolute failure to allow Respondent *even the opportunity to engage DEA* in settlement negotiations is clear evidence of DEA's disparate treatment of Respondent. Even more shocking is the fact that the Respondent engaged in good faith negotiations and successfully settled the civil penalty case involving the same allegations with the United States Attorney's Office for the Western District of Louisiana to the satisfaction of all parties.  *See* Ex. B attached hereto.

There is no explanation for why Respondent merits such uniquely severe sanctions to achieve general deterrence.  The public interest is not promoted by denying Respondent the settlement negotiation DEA extends to other registrants, or denying Respondent the lesser sanctions DEA affords to Respondent's competitors.  DEA's rationale in pursuing enforcement against Respondent is, however, made clear by the Inspector General's investigation, which, unbeknownst to Respondent and well known to DEA (by which the ALJ is employed), was pending as of the time DEA initiated the instant proceedings.  Unlike the ALJ's recommendation of revocation, a comprehensive administrative settlement would provide a myriad of additional deterrent protections, including the use of an independent third party to monitor future compliance and the potential for a concrete term of years of registration consequences.

In sum, the ALJ's broad conclusion that only general deterrence will suffice, his suppression of evidence that was material to this finding, and his disregard for the practical impact caused by years of DEA investigations constitute error and must be rejected.

## VI. The ALJ Made Multiple Errors Regarding Its Recommendations with Respect to Respondent's Failure to Report Suspicious Orders

The ALJ's erroneous factual findings and flawed analysis of the expert evidence introduced by the parties' in these proceedings totally undermine the ALJ's Recommendation to revoke Respondent's registrations.  As set forth below, the ALJ fundamentally misunderstood criticisms levied by Respondent's expert, Kenneth A. Weinstein ("Weinstein"), with respect to the statistical analysis conducted by the Government's expert, Gamaliel Rose ("Rose") regarding certain orders of controlled substances.  The ALJ 's mistakes caused it to overstate both the quantity of suspicious orders at issue and the severity of conduct proved by the Government while simultaneously understating the significance of Respondent's acknowledgment of its (actual) proven conduct.  Each of these errors are material and require rejection of the ALJ's recommendation.

### A. The ALJ Erred In Finding that the Government Expert's "Look-Back" Analysis Undercuts the Four Deficiencies Identified by Respondent's Expert

Weinstein testified that the analysis Rose conducted for the Government to identify outlier orders did not reliably identify orders of unusual size, pattern, or frequency, Tr. 525, 558, due to four deficiencies.  The ALJ accurately summarized the four deficiencies as: (1) the use of a four-year fixed-frame as opposed to the look-back method, (2) failure to consider the schedule change of hydrocodone, (3) failure to consider package size and formulation, and (4) the use of a line item approach instead of a cumulative approach.  ALJ Recommendation at 23, 71 ¶ 246.  As

Weinstein described it, these four deficiencies reflect "context" that Rose failed to consider. *Id*. at 23.

After detailing the deficiencies identified by Weinstein, the ALJ confusingly concluded that "a close evaluation of those alleged deficiencies does not support Weinstein's premise" that Rose's analysis did not reliably identify outlier orders. ALJ Recommendation at 27. The ALJ, without explanation or support, claims that the results of Rose's 11th-hour look-back analysis "significantly undercut all four of the deficiencies asserted by Weinstein." *Id*. This is absurd. At most, the results of Rose's look-back analysis logically address only the first of the four deficiencies. Rose himself acknowledged that his look-back analysis did not take into account the "context" of the three other deficiencies identified by Weinstein. Tr. 1093. ("Q: Okay. And it still does not take into account the context that we discussed, is that right? A: That was beyond my scope."). Indeed, Rose has never acknowledged or attempted to grapple with those deficiencies.

Even more confusingly, the ALJ accepts multiple Findings of Fact that severely undermine his assertion. First, he found that "[t]he analysis Rose conducted to identify outlier transactions was solely a mathematical analysis and did not consider the context of the transactions." ALJ Recommendation 70 ¶ 238. Second, the ALJ accepted that the mathematical calculations performed by Weinstein and Rose in their respective look-back analyses were identical, with the only difference being that Rose "used the look-back method to examine all of the relevant ARCOS data," rather than just the data from 2016 through 2018, as Weinstein did. ALJ Recommendation at 27; *see also id*. at 15 (describing how Rose conducted his look-back analysis); ALJ Recommendation at 24 (describing Weinstein's look-back analysis). Third, and most importantly, the ALJ found that Weinstein's look-back analysis merely identified which

orders identified as outliers in Rose's fixed-frame analysis would still be outliers without "making any other adjustments to address any of the other issues," *i.e.*, the other three deficiencies. *Id.* at 75 ¶ 268. It is difficult to understand how Rose's look-back analysis could "significantly undercut all four of the deficiencies" when the ALJ found that it did not address three of those deficiencies.

**B.     The ALJ Erred by Asserting that Weinstein Did Not Support His Critique of Rose's Analysis with "Objective Data"**

The ALJ asserted that a primary basis for his finding that Weinstein did not "refute" Rose's analysis was because Weinstein did not support his criticism with "convincing objective data." ALJ Recommendation at 27, 28 ("For example, Weinstein faulted Rose's analysis because Rose used a fixed-frame analysis rather than the look-back analysis Weinstein believes is superior, and Rose did not consider context. "Yet Weinstein did not back up that assertion with convincing objective data, and he did not apply his look-back analysis to all the available ARCOS date [sic]."), *id*. at 28 ("Quite frankly, Weinstein's testimony did not refute Rose's analysis because the objective data is far more convincing than Weinstein's subjective expert testimony."). In reaching this conclusion, the ALJ does not address the copious objective data offered by Weinstein, even though the ALJ included much of that data in his findings of fact. His conclusion, therefore, is unsupported by the evidence.

Each of Weinstein's critiques was supported by objective data. With respect to his critique of the fixed-frame analysis, Weinstein conducted a look-back analysis that showed that "over 60% of the orders from the seven exemplar pharmacies in 2017 and 2018 identified as outliers by Rose 'would not have been identified if compared only to the prior year," ALJ Recommendation at 73 ¶ 261, and "about 50% of the orders for all customers identified by Rose as outliers would not have been considered outliers if those orders were compared only to the prior

year." *Id*.; *see also id*. at 24.  Weinstein also offered objective data regarding how the hydrocodone

rescheduling affected Rose's fixed-frame analysis.  He explained that, in part because Rose failed

to take into account the rescheduling of hydrocodone from Schedule III to Schedule II, the results

of Rose's analysis clearly show that "2014 has about three times as many outliers per month as

2018."  Tr. 540.

Weinstein also offered objective data in support of his claim that Rose's analysis

was unreliable because it failed to take into account package size and formulation.  He explained

that this is especially problematic given Rose's line-item approach.  *See* Tr. 544-545, 553-554.

Specifically, Weinstein offered the example of Bordelon's Pharmacy, for which Rose identified a

single 2,000 dosage unit line item order of oxycodone as an outlier transaction (which consisted

of four 500-unit bottles), but failed to identify other orders entered as multiple line items, but were

placed on the same day and totaled 2,000 units, as outliers.  *See* ALJ Recommendation 24-25.  He

explained how certain formulations simply come in larger package sizes, formulations that for

price or patient-specific reasons, the pharmacy must purchase.  *See id.* at 24.  Pharmacy ordering,

Weinstein testified, is not "going up a ramp," but rather "going up a staircase": pharmacies "have

to make orders in certain amounts to get any of a given product."  Tr. 554.  He also testified about

a generic example of how Rose's line item approach would allow a pharmacy to make 10,000 line

item orders of 100 dosage unit bottles in a single day, "but none of those individual line items of

100 units would ever get identified as unusual."  Tr. 553; *see also* ALJ Recommendation at 25.

This is not "subjective expert testimony," ALJ Recommendation at 28, but rather concrete

examples demonstrating the unreliability and ultimate uselessness of Rose's analysis.

The ALJ's true critique appears to be that Weinstein did not offer a competing

analysis that addresses the various deficiencies associated with Rose's line item approach or

"render an opinion concerning how many of the Respondent's orders between 2014 and April 2018 should have been flagged as suspicious."  ALJ Recommendation at 75 ¶¶ 270, 271 ("Weinstein testified: 'I haven't put forward an analysis of what should have been reported in this case.  I've put forward an analysis of . . . one of the issues with Mr. Rose's analysis and the impact that that has.'").  *Id.* at 25 ("Weinstein, however, did not incorporate this cumulative-based approach in any analysis he did in this case.").

True, Weinstein did not conduct an original analysis to determine, retrospectively, which of Respondent's orders from 2014 through 2018 should have been identified as suspicious.  But it was not his job nor was it the Respondent's burden to do so.  *See Steadman v. SEC*, 450 U.S. 91, 100-03 (1981); *Masters Pharm., Inc.*, 80 Fed. Reg. 55,418, 55,473 (Sept. 15, 2015); 21 C.F.R. § 1301.44(e).  Not providing such an analysis is not the same as failing to offer "objective data" regarding all of the deficiencies in Rose's analysis.  The ALJ effectively ignores all of the instances in which Weinstein used objective data to explain these deficiencies, which, together, amounted to a devastating critique of Rose's flimsy analysis.

Indeed, it is the Government that failed to credibly address Weinstein's criticisms.  Rose even acknowledged that he had no response.  *See* Tr. 1093.  ("Q: Okay.  And it still does not take into account the context that we discussed, is that right?  A: That was beyond my scope.").  The Government had more than a year to consider and respond to the deficiencies identified by Weinstein, as he noted them within weeks of the issuance of the ISO/OSC and described them in a May 2018 Declaration in support of a Motion for Preliminary Injunction.  He reiterated the deficiencies in his pre-hearing statements (ALJ Ex. 8, 15) in the exhibits produced prior to the hearing (RE-28, RE-29), and at the hearing itself.  *See* ALJ Recommendation at 23-25.  The Government offered a response to only the first deficiency (the fixed-frame vs. look-back issue),

a response that was a stroke-of-midnight update to Mr. Rose's analysis that was not provided in any pre-hearing statement and was offered only as impermissible and prejudicial rebuttal testimony, which did not directly challenge or rebut Mr. Weinstein's testimony and thus should not have been either admitted or considered.[9]  For the other three deficiencies, the Government appears to have made a choice to ignore them in the hope that the ALJ would do the same.  It is immaterial whether this choice was made because the Government simply did not understand the deficiencies, did not agree that they were deficiencies, or perhaps saw no way to address the deficiencies without admitting error.  In dismissing Weinstein's testimony as "subjective" despite the several points of clearly objective data listed above, the ALJ has no factual basis in any testimony or exhibits offered by the Government to simply wave away the deficiencies he identified.

### C.     The Results of Rose's Look-Back Analysis Were Not "Substantially Similar" or "Consistent" with His Fixed Frame Analysis

The ALJ incorrectly found that the "unrebutted" results of Rose's look-back analysis are "substantially similar" to his fixed-frame analysis, ALJ Recommendation at 15, 27, and that there was "no material difference in the outcome between a fixed-frame and a 'moving frame,' or 'look-back' analysis."  *Id.* at 68 ¶ 225.  While it is true that the total number of outliers identified by Rose using the look-back method varied between 5-6% from the number of outliers he found using his fixed-frame analysis, the analyses found substantially different outliers.  It

---

[9]     DEA offered Mr. Rose for rebuttal testimony, ostensibly to rebut Mr. Weinstein's critique of Mr. Rose's analysis.  But DEA mischaracterized Mr. Weinstein's testimony by claiming he testified that Mr. Rose found an "inappropriately greater number of outliers than a look-back analysis."  Tr. 1083:6–9.  Mr. Weinstein said no such thing.  In reality, Mr. Weinstein testified that Mr. Rose's fixed-frame analysis identified *completely different outliers* than would have been identified through a look-back analysis.  Tr. 529:15–19, 530:16–18, 568:9–24.  That remains true even if Mr. Rose's look-back analysis identified "basically the same *number* of outliers" as his fixed-frame method.  Tr. 1092:24.  As a result, Mr. Rose's May 16, 2019 testimony rebutted nothing and instead offered only inadmissible new evidence.

strains the limits of the English language to suggest that analyses that produced substantially different results somehow produced "substantially similar" results just because the two data sets produced by the analyses were approximate in size.

The ALJ acknowledged that the analyses produced different results in both paragraphs 267 and 268 of the ALJ's recommended findings of fact.  ALJ Recommendation at 75 ¶ 268.  Paragraph 267 correctly described Respondent Exhibits 28 and 29, which contained Weinstein's look-back analysis that "identif[ied] which outliers identified by Rose would still be considered outliers if compared only to the prior year's data."  ALJ Recommendation at 75 ¶ 267 (emphasis added).  The exhibits, correspondingly, identified the particular transactions that would not be considered outliers under the look-back method.  *See* RE-28 (rows marked with "-" in "Transaction outlier based on prior year's data" column); RE-29 (rows marked with "-" in "Transaction outlier based on prior year's data" column).  Weinstein's unrebutted testimony was that nearly half of all of the outliers from 2017 and 2018 identified in Rose's fixed-frame analysis would not have been considered outliers when using a look-back analysis.  ALJ Recommendation at 24.  A nearly fifty percent disparity cannot be considered "substantially similar" and certainly represents a "material difference."

Paragraph 268 of the ALJ's recommended findings of fact accurately characterizes Weinstein's testimony that "[i]n concluding that some outliers identified by Rose would still be considered outliers under a look-back approach, [he] was not concluding that those transactions are, in fact, outliers—only that they would 'still be identified as outliers if compared only to the prior year and not making any other adjustments to address *any of the other issues*.'"  ALJ Recommendation at 75 ¶ 268 (emphasis added).

**D.  The ALJ Erred in Accepting that Rose's Analysis Offered a "Ballpark Estimate" of the Number of Outliers that Should Have Been Reported as Suspicious Orders, Rather Than Identifying Specific Outlier Orders**

Rose testified that his analysis aimed at establishing "'a ballpark estimate of scale, of size of outlier population,' not the exact number of outliers."  ALJ Recommendation at 13, see also ALJ Recommendation at 136, ¶ 226.  The ALJ accepted this testimony as a Finding of Fact and, incredibly, stated that Rose "was simply describing what he was doing in layman's terms." ALJ Recommendation at 98 n.33.  The ALJ's characterization, however, ignores how Rose's analysis was presented as part of the OSC and throughout the Government's pre-hearing statements: as a "set of orders that Morris & Dickson should have identified and reported."  Tr. 657.  This accurate characterization is supported by the Government's listing of specific orders pulled from that analysis as being "unusually large" in the OSC.  *See* ALJ Ex. 1 ¶¶ 37, 46, 54, 65, 74, 84, and 93.

Both Rose's "fixed-frame" and look-back analyses unquestionably identify specific transactions as outliers.  *See* GE 65, 66, 73, and 74 at Transaction tab, "Transaction Outlier" column.  Moreover, the Government's charging document makes abundantly clear that Rose's analysis was meant to provide a list of specific transactions that DEA believed should be reported under 21 C.F.R. § 1301.74(b), *see* ALJ Ex. 1 ¶¶ 37, 46, 54, 65, 74, 84, 93, and to develop an exact count of overall orders that should have been reported.  *See* ALJ Ex. 1 ¶¶ 19–21.  Indeed, it is difficult to understand how "the Government introduced evidence from the Government expert that supports the specific numbers of unusually large orders of oxycodone and hydrocodone that the Respondent shipped to seven of the exemplar pharmacies," but that same evidence did not identify particular outliers.  ALJ Recommendation at 139, 69 ¶ 232.

Based on those facts, it is simply disingenuous to suggest that Rose's analysis was aimed at providing "not the exact number of outliers," ALJ Recommendation at 13, but rather a "ballpark." A "ballpark" analysis would have concluded that some range of transactions—without listing them—could be considered outliers. For example, Rose could have offered a statement that there were "ten to fifteen thousand outliers." That is a ballpark estimate. Instead, he testified to an exact number of outlier transactions. *See* ALJ Recommendation at 14, 70 ¶¶ 242, 243.

Why did the Government suddenly change course and claim that the analysis conducted by Rose was not intended to identify specific transactions? Because Weinstein's criticisms contained in his prehearing statements and RE-28 and RE-29 clearly demonstrated the unreliability of the results of that analysis. Unable to explain why the Administrator should rely on an analysis that, if one simple change is made, produces an entirely different set of results, *see* ALJ Recommendation at 73 ¶ 261, the Government instead claimed that it never meant to identify a particular set anyway. That is ridiculous.

E.    **The ALJ is Inconsistent in Accepting Rose's Analysis as a "Ballpark Estimate" While Accepting Group Supervisor Dunn's Testimony that the Specific Orders Identified by Mr. Rose's Analysis Were Suspicious Orders**

The ALJ's recommendation exhibits a deep, incoherent tension between his characterization of Rose's analysis as merely providing a "ballpark estimate," ALJ Recommendation at 68 ¶ 226, of the number of outliers that should have been reported, and his acceptance of Group Supervisor Dunn's testimony that "these outliers are, in fact, suspicious orders that should have been reported." *Id.* at 137. The ALJ and the Government simply cannot have it both ways.

To the extent that the ALJ is relying on Group Supervisor Dunn's "expert testimony" to convert the "ballpark" number of outliers identified by Rose's analysis into actual,

specific suspicious orders that should have been reported under 21 C.F.R. § 1301.74(b), that reliance is built on sand.   First, Group Supervisor Dunn was qualified as an expert in "the identification of common red flags suggestive of an illicit pharmaceutical operations and as well as with respect to the requirements imposed on DEA registrants to identify and investigate such red flags when they become aware of them."   ALJ Recommendation at 16.   He was not qualified as an expert on the identification of suspicious orders.   Indeed, Group Supervisor Dunn did not even know how many outliers Rose's analysis identified, as he testified that there were "roughly[] 14,000 orders," approximately 2,000 more than actually identified by Rose.   *See* Tr. 294 (Q: What did they tell you? A: That there were roughly, 14,000 orders that should have been reported as suspicious based on the quantity that was ordered."); ALJ Recommendation at 17, 70 ¶¶ 242, 243.

Second, Group Supervisor Dunn's expert testimony that these outliers should have been reported—despite the complete disavowal of these orders as the "exact number of outliers" by the Government, ALJ Recommendation at 13—was nothing more than a summary of what Rose's team told him:

> A: We had requested statistical analysis to quantify, you know, just how many orders are we talking about that fell outside of just a normal pattern or set amount.  And so we had Gam Rose's group conduct that analysis.
>
> . . .
>
> Q: What did those results tell you?
>
> A: Original or second – the second analysis they provided?
>
> Q: Let's talk more generally.  What was it specifically – what were they – all right.  Let's talk about the second.  What did they tell you?
>
> A: That there were roughly, 14,000 orders that should have been reported as suspicious based on the quantity that was ordered.

Tr. 294.

There is nothing in this testimony suggesting that Group Supervisor Dunn applied any kind of expert knowledge to the set of outliers identified by Rose and concluded that they, in fact, were suspicious orders that should have been reported.

Lastly, accepting Group Supervisor Dunn's testimony that *these* outliers were suspicious orders that should have been reported deeply undermines the Government's narrative that Rose's analysis was not intended to produce a specific set of outliers. By showing that a few minor modifications to Rose's analysis radically altered the identified outliers, Weinstein demonstrated that the results were unreliable. It is an error to make a finding that a specific number of orders should have been reported as suspicious when the analysis supporting the identification of those specific orders was shown by expert testimony to be unreliable.

F.    **The ALJ Incorrectly Described Weinstein's Testimony Regarding Distributors' Responsibility to Evaluate Orders When Placed as "Inconsistent" with His Testimony that Distributors Should Accumulate Orders Over Time**

The ALJ erred in identifying an "inconsistency" in Weinstein's testimony: "While he testified that a distributor should evaluate each individual order at the time it is placed, Tr. 546, he also testified that in designing SOM systems, distributors should cumulate orders over time, such as a month's worth of orders. Tr. 555, 557." ALJ Recommendation at 28. There is no inconsistency in this testimony.

In response to a question regarding how distributors should review "line item orders," Weinstein testified:

> Based on the cumulative amount that that line item combined with some reasonable time period of previous orders, such as, you know, overall over the course of a month, the total cumulative amount that a pharmacy has ordered ***up to and including that line item*** is what I would evaluate.

Tr. 546 (emphasis added).  Weinstein then was explicitly asked if this meant that systems designed by him do not evaluate "individual orders."  *Id.*  He replied, correctly, "No, absolutely not."  *Id.*  He continued, testifying that:

> Every individual order in my experience should get evaluated at the time it's placed, but part of that evaluation isn't based on simply saying, what's the number on this line item compared to the amount on other line items?  Instead, it's, is the amount that this pharmacy is going to receive or has received from the distributor up to this point, unusual in total?

Tr. 546.  It is clear from this testimony that Weinstein is saying that individual orders should be evaluated at the time they are placed, but with reference to the cumulative amount of orders placed over time, such as in a one-month period.

The ALJ, however, bizarrely claims that this testimony is "inconsistent" with Weinstein's discussion of how and why distributors should accumulate orders.  *See* Tr. 555 (explaining that distributors can account for package size variation by "looking at a cumulative amount [of the drug] over some period of time"); Tr. 557 (explaining that "one way to address [the tendency to identify large packages as unusual] is simply to accumulate orders over some period of time").  In other words, Weinstein is explaining that distributors should consider whether a particular order is unusual in the context of how much a customer purchases over a period of time.  If a distributor did not do so, it would tend to identify as unusual orders that, for example, simply were for larger package sizes.  He is not suggesting, however, that distributors not evaluate the orders at all, as suggested by the ALJ.

G.     **The ALJ Was Inconsistent in Finding that Weinstein's Look-Back Analysis Identified "Unusually Large Orders" of Hydrocodone and Oxycodone as Outliers**

The ALJ found that Respondent expert, in conducting his look-back analysis, identified 54 "unusually large orders for oxycodone and hydrocodone for the seven exemplar pharmacies between January 2017 and April 2018." ALJ Recommendation at 140; *see also id.* at 142 ("Using his look-back approach, the Respondent's expert found 54 outliers"); *id.* at 74 ¶¶ 263-64 ("Concerning the seven pharmacies, Weinstein's analysis identified 54 orders as outliers from January 1, 2017 to April 30, 2018"). At the same time, the ALJ found that "Weinstein was not concluding that those transactions are, in fact, outliers." *Id.* at 75 ¶ 268. The evidence presented at the hearing shows that Weinstein did not consider these 54 orders to be outliers and the ALJ is wrong to put such words in Weinstein's mouth.

Weinstein's look-back analysis had one, very simple purpose that continues to evade understanding by both the ALJ and the Government: to show that there was a "big difference in the results"—that is, the particular outliers identified by the Tukey analysis, not some "ballpark count" of the outliers—when looking at only the prior years' worth of transactions to calculate the Tukey threshold, rather than using Rose's "fixed frame." Tr. 549, 551 ("[I]f Mr. Rose had corrected only for the time period analysis . . . which I think would have been quite feasible within the data, *much of what he identified as outliers would not have been identified as outliers*.") (emphasis added). Indeed, Weinstein clearly stated that his look-back analysis should not be construed as his "description of what should be identified as outliers." *Id.* Nevertheless, the ALJ simply decided it should be so construed, despite sworn testimony to the contrary.

Strangely, though, the ALJ is not even consistent on this point. While he found that "Weinstein's analysis identified 54 orders [for the exemplar pharmacies] as outliers," ALJ

Recommendation 74 ¶ 264, he also found that "Weinstein was not concluding that those transactions are, in fact, outliers—only that they would 'still be identified as outliers if compared only to the prior year and not making any other adjustments to address any of the others issues.'" *Id.* at 75 ¶ 268.  Given the totality of Weinstein's testimony, it is clear that when he said that his analysis identified the transactions that would "still be identified as outliers," he did not agree that they were, in fact, outliers because his look-back analysis did not make "any other adjustments to address any of the other issues" that made Rose's analysis unreliable.  *Id.*

**VII.    The ALJ Erred In Revoking Respondent's Jefferson Registration**

In addition to its distribution center located in Shreveport, Louisiana, Respondent operates a second DEA-registered facility in New Orleans (Jefferson Parish), Louisiana[10] under DEA Registration No. RM0335732.  RE-01 at 16:10–11; ALJ Ex. 1 ¶ 4.  Respondent indisputably demonstrated that DEA neither alleged any misconduct to have occurred at Respondent's Jefferson location or adduced any evidence or testimony at the hearing regarding Respondent's Jefferson registration.  ALJ Recommendation at 156.  The ALJ agrees.  *Id.*  ("The Respondent is technically correct," *i.e.* the best kind of correct).

Based on the foregoing, the only justifiable conclusion is that the Government failed to establish a *prima facie* case to revoke Respondent's Jefferson registration.  The ALJ, however, recommended revocation of the Jefferson registration on the grounds that Respondent is the common owner of both Shreveport and Jefferson locations and that Respondent "could" continue distributing out of its Jefferson facility if only the Shreveport registration was revoked. The ALJ's Recommendation to revoke the Jefferson registration is erroneous.

---

[10]   The ALJ refers to this registrant as Respondent's "Jefferson" location or registration, and therefore it is similarly referred to as such herein.

The ALJ's recommended revocation of Respondent's Jefferson registration betrays the preordained result of DEA's administrative proceeding—Respondent must be brought to heel. Except in this case, common ownership has never justified revocation of every registered facility belonging to a DEA respondent.  As set forth above, similarly situated respondents often settle with DEA and shift resources and business operations to other facilities with DEA approval.  *See* Section V(C) *supra*.  This disparate treatment of Respondent is unjust and unwarranted.  The ALJ's speculation that "Respondent could continue distributing out of its Jefferson location," is similarly unsupported by any facts or evidence—indeed, it determined there was no such evidence regarding the Jefferson location.  The ALJ's revocation of the Jefferson registration on this record is illegitimate.  Adoption of this Recommendation would eliminate all limits on DEA's power by excusing it from having to link Respondent's violation with the registrant property subject to enforcement.  Accordingly, the ALJ cannot be correct.

## <u>CONCLUSION</u>

For the foregoing reasons, Respondent respectfully requests that the Administrator reject the ALJ's Recommended Rulings, Findings Of Fact, and Conclusions Of Law to which the Respondent has asserted exceptions, that the Administrator reject the ALJ's Recommendation of revocation of each and both of Respondent's certificates of registration, or, at minimum, that a new hearing be ordered before a constitutionally appointed and removable ALJ.

Dated:  October 8, 2019

**CADWALADER, WICKERSHAM & TAFT LLP**

By: ___ */s/ Jodi L. Avergun* _____
   Jodi L. Avergun
   Keith M. Gerver
   Joshua P. Arnold

700 Sixth Street NW
Washington, D.C.  20001
Telephone:  (202) 862-2456
Facsimile:  (202) 862-2400
jodi.avergun@cwt.com
keith.gerver@cwt.com
joshua.arnold@cwt.com

*Counsel for Respondent Morris & Dickson Co., LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2019, I caused the foregoing to be filed with the DEA Office of Administrative Law Judges by electronic mail at ECF-DEA@usdoj.gov, and I caused a copy of the same to be sent by electronic mail to the Government's counsel Paul A. Dean, Esq., at Paul.A.Dean@usdoj.gov and John Beerbower, Esq., at John.E.Beerbower@usdoj.gov.

*/s/ Jodi L. Avergun*
Jodi L. Avergun

**<u>Exhibit A</u>**



# Office of the Inspector General
U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids

Evaluation and Inspections Division 19-05                    September 2019



# Executive Summary

*Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids*

## Introduction

In this review, the Office of the Inspector General (OIG) examined the regulatory activities and enforcement efforts of the Drug Enforcement Administration (DEA) from fiscal year (FY) 2010 through FY 2017 to combat the diversion of opioids to unauthorized users. According to the Centers for Disease Control and Prevention (CDC), as of 2017 in the United States more than 130 people die every day from opioid overdose. Since 2000, more than 300,000 Americans have lost their lives to an opioid overdose. The misuse of and addiction to opioids, including prescription pain relievers, heroin, and synthetic opioids such as fentanyl, has led to a national crisis that affects not only public health, but also the social and economic welfare of the country. As a result, in October 2017 the White House declared the opioid epidemic a public health emergency.

**Figure 1**

**The Three Waves in the Rise of Opioid Overdose Deaths**



Source: CDC National Vital Statistics System Mortality File

DEA enforces Titles II and III of the Controlled Substances Act of 1970 (CSA), which require importers, exporters, manufacturers, distributors, dispensers, and healthcare practitioners that handle controlled substances, collectively known as registrants, to register with DEA. DEA's Office of Diversion Control is responsible for ensuring that all controlled substance transactions take place within the closed system of distribution established by Congress. When controlled substance transactions fall outside the closed system of distribution, the activity constitutes diversion. Registrants that violate the CSA or its implementing regulations may be subject to DEA administrative enforcement actions or may face civil penalties or criminal prosecution by the U.S. Department of Justice (Department).

## Results in Brief

We found that DEA was slow to respond to the significant increase in the use and diversion of opioids since 2000. We also found that DEA did not use its available resources, including its data systems and strongest administrative enforcement tools, to detect and regulate diversion effectively. Further, we found that DEA policies and regulations did not adequately hold registrants accountable or prevent the diversion of pharmaceutical opioids. Lastly, we found that while the Department and DEA have recently taken steps to address the crisis, more work is needed.

*DEA Was Slow to Respond to the Dramatic Increase in Opioid Abuse and Needs to More Fully Utilize Its Regulatory Authorities and Enforcement Resources to Detect and Combat the Diversion of Controlled Substances*

We found that the rate of opioid overdose deaths in the United States grew, on average, by 8 percent per year from 1999 through 2013 and by 71 percent per year from 2013 through 2017. Yet, from 2003 through 2013 DEA was authorizing manufacturers to produce substantially larger amounts of opioids. For example, the Aggregate Production Quota (APQ) of oxycodone in the United States, which DEA establishes annually, increased over 400 percent between 2002 and 2013. It was not until 2017 that DEA significantly reduced the APQ for oxycodone, by 25 percent. In 2018, DEA further reduced the APQ for oxycodone by 6 percent.

We identified other areas in which DEA's regulatory and enforcement efforts could have been more effective in combating opioid diversion. First, DEA's preregistration process did not adequately vet all new applicants before DEA registration was granted. Second, we found that DEA has regulations that fail to assess the suitability of potential new registrants, which may prevent DEA from identifying registrants whose applications merit heightened scrutiny. Third, while electronic prescriptions can prevent prescription fraud in many instances, DEA has not taken steps to revise its regulations and require all prescribers to submit prescriptions electronically. Fourth, stringent DEA headquarters requirements for field divisions to complete their headquarters-assigned Diversion Control work plans left little room for targeting registrants suspected of diversion. Finally, beginning in 2013, DEA rarely used its strongest enforcement tool, the Immediate Suspension Order, to stop registrants from diverting prescription drugs and DEA continues to experience challenges in rendering timely final decisions in administrative actions against registrants for diversion and other alleged violations.

# Executive Summary

*Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids*

*Improved Data Systems Would Facilitate Better Detection of the Diversion of Pharmaceutical Opioids and New Opioid Analogues*

We found that DEA does not capture sufficient data to detect the diversion of opioids or emerging drug trends in a timely manner. DEA investigators rely on a number of databases, including the Automated Reports and Consolidated Orders System (ARCOS) and the Suspicious Order Reporting System (SORS), to identify emerging trends in diversion and drug abuse.

We found multiple deficiencies in ARCOS data. Specifically, because some registrants report ordering information to ARCOS on a monthly or quarterly basis, DEA often must wait a full year before ARCOS contains all of the ordering information DEA needs to fully analyze the data and develop leads and trends. In addition, ARCOS does not track the diversion of all pharmaceuticals, including some Schedule III and all Schedule IV and V opioids and other controlled substances. As a result, DEA cannot create ARCOS targeting packages for those drugs and is not tracking drugs, such as benzodiazepines, which are Schedule IV controlled substances often used in conjunction with opioids. Due to these deficiencies, we believe that DEA is ill-equipped to effectively monitor ordering patterns for all pharmaceutical opioids, which could enable the diversion of these prescription drugs and compromise public safety.

We also found that the SORS database, developed in 2008 to house suspicious order reports that federal regulations require manufacturers and distributors of controlled substances to send to DEA, is incomplete and therefore cannot be used effectively to detect diversion. We determined that this was due to the fact that most suspicious order reports are sent to DEA field divisions and that those reports are never uploaded into the SORS database. As a result, of the approximately 1,400 manufacturers and distributors required to report suspicious orders to DEA, the SORS database included reports from only the 8 manufacturers and distributors that had agreements with DEA to send such reports to DEA headquarters. When we asked DEA for records of suspicious orders reports sent to field divisions rather than headquarters, DEA was unable to locate them.

We did, however, find that DEA is currently working more closely with its federal partners, including the U.S. Department of Health and Human Services (HHS) and the HHS Office of Inspector General, to obtain the data it needs to identify diversion through Medicare billing records. Collaboration with federal partners also enhances DEA's data sharing capabilities, which facilitates data-driven oversight and improves regulatory oversight. However, we also learned that DEA faces challenges accessing states' Prescription Drug Monitoring Programs (PDMP), which contain physician and patient prescription histories. The level of DEA access to PDMP data varies across states; however, if DEA had greater access to this information, while also ensuring protection of sensitive patient medical data, DEA could improve its ability to investigate registrants that may be diverting pharmaceutical opioids. Further, we found that DEA must continue to improve its information sharing with state and local medical and pharmacy boards to ensure that all parties are aware of enforcement actions against registrants that may have violated conditions of their state licenses or registrations.

*The Department and DEA Have Taken Steps to Address the Opioid Epidemic as a National Crisis*

We found that the Department and DEA have recently taken steps to address the opioid epidemic, but more work remains. For example, in November 2015 DEA implemented its 360 Strategy, which focuses on law enforcement coordination, diversion control and regulatory enforcement efforts, and community outreach. However, we found that the goals of DEA's 360 Strategy do not specifically address diversion control enforcement efforts and that DEA cannot determine whether the program's diversion-related activities have improved its field offices' diversion control enforcement capabilities.

We also found that DEA has taken steps to increase enforcement staffing and enforcement actions. In response to a national decline in enforcement staffing, DEA is making an effort to increase both Diversion Investigator and Special Agent staffing levels in the field divisions hardest hit by the opioid epidemic. DEA also conducted a 45-day enforcement surge that resulted in 273 enforcement actions, although we found that some of these actions were scheduled investigations that were routinely conducted as part of DEA's annual Diversion Control work plan. Additionally, the Department's Opioid Fraud and Abuse Detection Unit started providing targeting packages to 12 U.S. Attorney's Offices (USAO). As a result, we were told that USAOs have been able to generate leads and supplement ongoing DEA investigations.

## Recommendations

In this report, we make 9 recommendations to improve the Department's and DEA's ability to combat the diversion of pharmaceutical opioids and effectively target and regulate registrants that engage in diversion.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

    Background ........................................................................ 1

    Historical Perspective on the Opioid Epidemic ........................................ 2

    The Closed System of Distribution, Regulating Registrants, and
    Investigating the Diversion of Controlled Substances ................................ 6

    DEA Registrant Enforcement Process and Actions .................................... 11

    Scope and Methodology of the OIG Review .......................................... 12

RESULTS OF THE REVIEW ............................................................ 13

    DEA Was Slow to Respond to the Dramatic Increase in Opioid Abuse and
    Needs to More Fully Utilize Its Regulatory Authorities and Enforcement
    Resources to Detect and Combat the Diversion of Controlled Substances ... 13

    Improved Data Systems Would Facilitate Better Detection of the
    Diversion of Pharmaceutical Opioids and New Opioid Analogues ................ 27

    The Department and DEA Have Taken Steps to Address the Opioid
    Epidemic as a National Crisis ................................................... 36

CONCLUSION AND RECOMMENDATIONS .......................................... 45

    Conclusion ....................................................................... 45

    Recommendations ................................................................ 46

APPENDIX 1: PURPOSE, SCOPE, AND METHODOLOGY .................................... 48

    Standards ........................................................................ 48

    Data Analysis .................................................................... 48

    Site Visits ....................................................................... 48

    Interviews ........................................................................ 48

    Policy and Document Review ...................................................... 49

APPENDIX 2: DEA DATABASES USED TO COMBAT THE DIVERSION OF
    CONTROLLED SUBSTANCES ...................................................... 51

    Automated Reports and Consolidated Orders System ............................ 51

    Drug Theft or Loss Reporting Requirements ...................................... 51

Registrant Information Consolidated System ........................................... 51

Suspicious Order Reporting System........................................................ 52

APPENDIX 3:   PRIOR WORK ON DEA DIVERSION EFFORTS .............................. 53

APPENDIX 4:   DEA'S RESPONSE TO THE DRAFT REPORT ................................. 55

APPENDIX 5:   OIG ANALYSIS OF DEA'S RESPONSE .......................................... 63

APPENDIX 6:   THE DEPARTMENT'S RESPONSE TO THE DRAFT REPORT.............. 68

APPENDIX 7:   OIG ANALYSIS OF THE DEPARTMENT'S RESPONSE ..................... 70

# INTRODUCTION

The Office of the Inspector General (OIG) undertook this review to assess the Drug Enforcement Administration's (DEA) regulatory activities and enforcement efforts involving opioid manufacturers, distributors, doctors, and pharmacies. We examined whether DEA's efforts effectively prevented registrants from diverting controlled substances, particularly opioids, from fiscal year (FY) 2010 through FY 2017.[1]

## Background

DEA's Diversion Control Program seeks to prevent, detect, and investigate the redirection of controlled pharmaceuticals and listed chemicals from illegitimate sources while ensuring an adequate and uninterrupted supply for legitimate medical, commercial, and scientific needs.

According to DEA, controlled pharmaceuticals can be diverted from legitimate channels through theft or fraud during the manufacturing and distribution process by anyone involved in the process, including medical and pharmacy staff and individuals involved in selling or using pharmaceuticals.[2] Registrants that violate the CSA or its implementing regulations may be subject to DEA administrative enforcement actions or, depending on the seriousness of the violations, face civil penalties or criminal prosecution by the U.S. Department of Justice (Department, DOJ).[3]

In recent years, the United States has confronted one of the worst drug epidemics in its history. According to the Centers for Disease Control and Prevention (CDC), in 2017 the United States experienced more than 70,237 overdose deaths, of which 47,600 (67.8 percent) involved an opioid, averaging 130 opioid overdose deaths each day.[4] National Institute on Drug Abuse data also shows that nearly 80 percent of people who began abusing illicit opioids

---

[1] While OIG did assess DEA's enforcement efforts with respect to pharmaceutical opioids, we did not assess these efforts with regard to illicit opioids such as heroin nor did we examine DEA's transnational trafficking and money laundering operations involving synthetic opioids such as fentanyl and fentanyl analogues. For more information about these topics, see U.S. Government Accountability Office (GAO), *Illicit Opioids: While Greater Attention Given to Combating Synthetic Opioids, Agencies Need to Better Assess Their Efforts,* GAO-18-205 (March 2018), www.gao.gov/assets/700/690972.pdf (accessed September 25, 2019).

[2] DEA defines "diversion" as any activity whereby legitimately made controlled substances that are intended to be used for lawful purposes are sold or exchanged in the illegitimate drug market as illicit substances. Controlled substances are contained in Drug Schedules I–V and are regulated by DEA.

[3] 21 U.S.C. § 801 et seq. and 21 C.F.R. § 1300 et seq.

[4] CDC, "Drug Overdose Deaths in the United States, 1999–2017," www.cdc.gov/nchs/products/databriefs/db329.htm, and "Drug and Opioid-Involved Overdose Deaths—United States, 2013–2017," www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm?s_cid=mm675152e1_w (both accessed September 25, 2019).

during the 2000s started by abusing a prescription opioid.[5]  Further, misuse of and addiction to opioids, including prescription pain relievers, heroin, and synthetic opioids such as fentanyl, has led to a serious national crisis that affects not only public health but also the social and economic welfare of the country.  For example, according to the National Institute on Drug Abuse, the economic burden of the opioid epidemic is an estimated $78.5 billion every year, with state and local governments funding 25 percent of that burden.[6]  In addition, increased healthcare and substance abuse treatment costs contributed $28.9 billion to this economic burden, with over 14 percent of the aggregate costs of the opioid epidemic being funded by public health insurance programs such as Medicare, Medicaid, and Veterans Administration benefits.[7]

Below, we provide a historical perspective on the opioid epidemic.  We also describe DEA's management of its Diversion Control Program through a closed system of distribution within the regulatory population, its reporting databases, registrant enforcement actions, and overall efforts to combat the opioid epidemic.

## Historical Perspective on the Opioid Epidemic

In October 2017, with pharmaceutical prescription drugs and illicit opioids such as heroin contributing to more than 300,000 overdose deaths in the United States since 2000, the White House declared the opioid epidemic a public health emergency.[8]  CDC has reported that from 2000 through 2014 drug overdose deaths increased by 137 percent, including a 200 percent rise in overdose deaths involving opioids due to the abuse of pain relieving prescription drugs and heroin.[9]  In fact, the rate of drug overdose deaths involving prescription opioids other than methadone increased by 45 percent from 2016 through 2017.[10]

*Origin of the Opioid Epidemic:  The OxyContin® Crisis of the Late 1990s and Early 2000s*

During the late 1990s and early 2000s, the abuse of prescription drugs was a growing problem.  In 1998, 2.5 million Americans admitted to abusing prescription

---

[5] National Institutes of Health (NIH) National Institute on Drug Abuse, "Prescription Opioids and Heroin," www.drugabuse.gov/publications/research-reports/relationship-between-prescription-drug-heroin-abuse/prescription-opioid-use-risk-factor-heroin-use (accessed September 25, 2019).

[6] NIH National Institute on Drug Abuse, "Opioid Overdose Crisis," www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis (accessed September 25, 2019).

[7] NIH National Institute on Drug Abuse, "Opioid Overdose Crisis."

[8] White House, "Ending America's Opioid Crisis," www.whitehouse.gov/opioids (accessed September 25, 2019).

[9] CDC, "Increase in Drug and Opioid Overdose Deaths—United States, 2000–2014," www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (accessed September 10, 2019).

[10] CDC, "Drug Overdose Deaths in the United States, 1999–2017."

drugs, and by 2001 that number had nearly doubled to 4.8 million.[11]  DEA estimated that by 2003 the number of people who were abusing prescription drugs roughly equaled the number who abused cocaine, which was about 2–4 percent of the U.S. population.[12]

For example, according to DEA, OxyContin was one of the most abused prescription drugs of the late 1990s and early 2000s.  In 1996, pharmaceutical manufacturer Purdue Pharma introduced OxyContin as a time-released form of oxycodone to treat people with chronic pain.  DEA told us that OxyContin was being diverted through fraudulent prescriptions; over-prescribing; theft and illegal sales; and "doctor shopping," the practice of going to different doctors until one prescribes the narcotic the patient seeks.  According to DEA, OxyContin became a target for diverters and abusers due to its large amount of oxycodone and the ability of abusers to easily compromise its controlled release mechanism.[13]  Simply crushing a tablet negates the timed effect of the drug, enabling abusers to swallow, inhale, or inject the drug for a powerful, morphine-like high.  In 2009, the U.S. Department of Health and Human Services' (HHS) Drug Abuse Warning Network Live (DAWN Live) reported that emergency room visits for oxycodone overdoses were more than 100 percent higher in 2000 than in 1998.[14]

The President's Commission on Combating Drug Addiction and the Opioid Crisis noted in its June 2018 report to the President that the large-scale manufacture and distribution of opioids during the 1990s was one factor that led to overprescription of painkillers.[15]  Further contributing to the opioid epidemic at that time were "black tar" heroin networks and the proliferation of pill mill medical

---

[11]  DEA, "History, 1999–2003," 91, www.dea.gov/sites/default/files/2018-07/1999-2003%20p%2091-118.pdf (accessed September 25, 2019).

[12]  DEA, "History, 1999–2003," 113.

[13]  A controlled release mechanism (in contrast to immediate-release dosage) delivers a drug delayed, over a prolonged period of time or to a specific part of the body (targeted-release dosage).  Controlled release was put in place for OxyContin to prevent the user from achieving a "high," or feeling of euphoria, upon its immediate release into the bloodstream.

[14]  DAWN gathered information from hospitals, emergency rooms, and medical examiners to monitor trends in the types of drugs being abused and patterns of abuse in certain areas.  HHS discontinued DAWN in 2011.

[15]  White House, *The President's Commission on Combating Drug Addiction and the Opioid Crisis* (November 2017), 20, www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf (accessed September 25, 2019).  According to this report:

> Aggressive promotion of an oxycodone brand from 1997–2002 led to a 10-fold rise in prescriptions to treat moderate to severe noncancer pain, and increases in prescribing of other opioids.  Subsequently, the highest strengths permissible was increased for opioid-tolerant patients, likely contributing to its misuse….  It has been hypothesized that the marked rise in heroin and other illicit synthetic opioids is, in part, associated with unintended consequences of reformulation of OxyContin, and a reduced supply and greater expense of prescription opioids.

clinics (sometimes called pain management clinics).[16] (See the text box for a timeline of the opioid epidemic).

*DEA's Response to the OxyContin Crisis*

To combat the growing OxyContin crisis, in the spring of 2001 DEA initiated an OxyContin National Action Plan.[17] According to DEA, this was the first time in DEA's history that it developed a plan to target a brand-specific controlled substance with a focus on enforcement and regulatory investigations that targeted key points of diversion. The plan directed DEA field divisions and DEA's Office of Diversion Control (OD) to conduct in-depth investigations of OxyContin's

> **Timeline of the Opioid Epidemic**
>
> **1984:** Purdue Pharma releases MS Contin, a time-released morphine painkiller marketed to cancer patients.
>
> **1995:** The U.S. Food and Drug Administration (FDA) approves OxyContin for use in the United States.
>
> **1996:** Purdue Pharma releases OxyContin, time-released oxycodone, which is marketed largely for chronic pain.
>
> **1998:** FDA approves Actiq (fentanyl), the first pain medicine approved to treat cancer breakthrough pain.
>
> **1997–2002:** OxyContin prescriptions for non-cancer related pain increase from about 670,000 in 1997 to about 6.2 million in 2002.
>
> **2000:** Xalisco black tar heroin networks emerge; during the scope of our review, they still existed in at least 17 states.
>
> **Mid-2000s:** Operation Tar Pit, the largest joint DEA/Federal Bureau of Investigation operation and first drug conspiracy case to stretch from coast to coast, targets Xalisco heroin networks.
>
> **2006:** DEA launches Operation Black Gold Rush, a second operation targeting Xalisco heroin networks across the country.
>
> **2007:** Purdue Pharma and three of its executives plead guilty to misdemeanor charges of false branding of OxyContin and are fined $634 million.
>
> **2008:** Drug overdoses, mostly from opiates, surpass auto fatalities as a leading cause of accidental death in the United States.
>
> **2014:** FDA approves Zohydro, a time-released hydrocodone painkiller with no abuse deterrent. It also approves Purdue Pharma's Targiniq ER, the opiate abuse antidote that combines time-released oxycodone with naloxone.
>
> Sources: Quinones, *Dreamland,* and FDA

manufacturer and distributors to determine their compliance with regulatory requirements designed to prevent diversion.[18] The plan also sought to coordinate enforcement and intelligence sharing with federal, state, and local agencies; take regulatory and administrative action to limit abusers' access to OxyContin; and

---

[16] "Black tar" heroin is a generally less expensive form of heroin that is dark in color and sticky like tar. Pill mills are clinics that distribute—without a legitimate medical purpose—large amounts of controlled substances such as painkillers or antianxiety medications. Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* (New York: Bloomsbury Press, 2015).

[17] DEA Office of Diversion Control (OD), "OxyContin®: Diversion and Abuse," October 2003, www.media.washingtonpost.com/wp-srv/politics/documents/giuliani_dea_action_plan_oct2003.pdf (accessed September 25, 2019).

[18] In September 2016, the OD was restructured and became known as the Diversion Control Division. For purposes of consistency in this report, we refer to this division as OD because that was the name of the division during the majority of our review period.

conduct outreach, awareness, and education initiatives to educate the public on the dangers of abusing OxyContin.

According to a 2003 U.S. Government Accountability (GAO) report, part of DEA's National Action Plan set the Procurement Quota for oxycodone at levels lower than requested by Purdue Pharma, OxyContin's manufacturer.[19]  Specifically, when OxyContin was first introduced to the market in 1996, DEA granted Purdue Pharma's initial Procurement Quota request but began to notice dramatic increases in sales.  As a result, DEA required Purdue Pharma to provide additional information to support its requests to increase the quota and DEA set the Procurement and Aggregate Production Quotas for oxycodone at lower levels in 2002.  However, in the years following the OxyContin crisis, DEA increased the Aggregate Production Quota (APQ) for oxycodone, which we discuss later in this report.  DEA told GAO about the difficulty it had faced in determining an appropriate Production Quota level that ensured that adequate quantities were available for legitimate medical use while also seeking to limit abuse and diversion.[20]

GAO reported that other federal agencies, including the U.S. Food and Drug Administration (FDA), also took action in response to the OxyContin crisis.  In April 2001, FDA and Purdue Pharma developed a risk management plan to help detect and prevent the abuse and diversion of OxyContin.[21]  The plan ultimately strengthened the safety, or "black box," warnings on OxyContin's label for professionals and patients; required training for Purdue's sales force on the revised label; directed that Purdue conduct comprehensive education programs for healthcare professionals; and directed Purdue to develop a database for identifying and monitoring abuse and diversion of OxyContin.  Purdue also reiterated to its sales representatives that failure to promote products according to the approved label, promotional materials, and applicable FDA standards would result in disciplinary action by the company.[22]

Despite these responses by DEA and other federal agencies to the OxyContin crisis, since the early 2000s there has been a steady increase in the rate of opioid overdose deaths caused by natural and semisynthetic opioids, such as oxycodone and hydrocodone, which coincided with an increase in the production quotas for these controlled substances.  We specifically discuss the increase in the APQ for oxycodone later in this report.  Since approximately 2010, the rate of overdose

---

[19]  The Procurement Quota is issued to registered manufacturers that desire to obtain any Schedule I and/or II basic class of controlled substances in order to further manufacture that substance by packaging, repackaging, labeling, relabeling, or using it to produce dosage forms or other substances.  See 21 C.F.R. § 1303.13.

[20]  GAO, *Prescription Drugs:  OxyContin Abuse and Diversion and Efforts to Address the Problem,* GAO-04-110 (December 2003), www.govinfo.gov/app/details/GAOREPORTS-GAO-04-110 (accessed September 25, 2019).

[21]  GAO, *OxyContin Abuse and Diversion.*

[22]  GAO reported that, according to Purdue Pharma, from April 2001 through May 2003 at least 10 Purdue employees were disciplined for using unapproved materials in promoting OxyContin. Disciplinary actions included warning letters, suspension without pay, and termination.

deaths from heroin has also risen sharply.  As a result, while nearly 3 opioid overdose deaths occurred per 100,000 people in the year 2000, by 2017 that number had more than quadrupled to 15 opioid overdose deaths per 100,000 people.[23]  Figure 2 outlines the rate of overdose deaths for various types of opioids from 2000 through 2017.

**Figure 2**

**Overdose Deaths Involving Opioids, by Type of Opioid, United States 2000–2017**



Source:  CDC National Center for Health Statistics, National Vital Statistics System, "Overdose Deaths Involving Opioids, by Type of Opioid, United States, 2000–2017"

### The Closed System of Distribution, Regulating Registrants, and Investigating the Diversion of Controlled Substances

Under the CSA, DEA is responsible for ensuring that all controlled substance transactions take place within a congressionally mandated closed system of distribution.  The closed system of distribution regulates the flow of controlled substances from the different types of registrants, which include importers, manufacturers, distributors, practitioners, and dispensers.  When controlled substance transactions fall outside the closed system of distribution, the activity constitutes diversion.

DEA's OD manages the Diversion Control Program to regulate the registrant population and investigate diversion matters.  The Diversion Control Program has two major objectives with respect to practitioner-level diversion:  (1) identify,

---

[23]  CDC National Center for Health Statistics, National Vital Statistics System, "Overdose Deaths Involving Opioids, by Type of Opioid, United States, 2000–2017," www.cdc.gov/drugoverdose/images/data/OpioidDeathsByTypeUS.PNG (accessed September 25, 2019).

investigate, and prosecute violators that are operating in a manner that requires federal action and (2) assist the states with their regulatory responsibilities through active investigations and information sharing.  Although these objectives address diversion at the practitioner level, OD initiates investigations resulting from complaints against registrants at every level, including manufacturers and distributors.[24]

*DEA Oversight and Management of the National Diversion Control Program*

DEA's United Nations Reporting and Quota Section, also referred to as the "Quota Section," sets the domestic quotas and international estimates for the manufacture, import, and export of controlled substances on Schedules I–IV and some List I chemicals.[25]  Each calendar year, the Quota Section determines three types of pharmaceutical quotas for the basic classes of controlled substances and ensures that DEA is compliant with its diversion control responsibilities pursuant to United Nations treaties:

1. The APQ, or the national quota, in part comprises the total amount of the Individual Manufacturing Quotas issued to registered bulk manufacturers. The APQ is the maximum amount of each basic class of Schedule I and II controlled substances the DEA Administrator deems necessary for manufacture in a calendar year, by all pharmaceutical manufacturers combined, for the estimated medical, scientific, research, and industrial needs of the United States or for lawful export.  DEA receives estimates from FDA for the amount of controlled substances that FDA believes should be manufactured during a calendar year.  Once DEA considers FDA's viewpoint, the DEA Administrator sets the APQ.

2. The Individual Manufacturing Quota is the amount of a basic class of controlled substances the DEA Administrator allocates, in consultation with the Quota Section, to specific registered bulk manufacturers in order to manufacture the substance by producing, preparing, propagating, compounding, or processing it from another substance.

3. The DEA Administrator, in consultation with the Quota Section, sets the Procurement Quota to registered manufacturers that desire to obtain any Schedule I and/or II basic class of controlled substance in order to continue manufacturing that substance by packaging, repackaging, labeling, relabeling, or producing dosage forms or other substances.

---

[24]  DEA Diversion Control Manual, October 2017, Section 5245.1, Introduction, 16.

[25]  DEA, "Quotas," www.deadiversion.usdoj.gov/mtgs/man_imp_exp/conf_2013/dang_1.pdf#search=Quota (accessed June 28, 2018).  See also DEA, "Drug Scheduling," www.dea.gov/drug-scheduling and "List I and List II Chemicals," www.deadiversion.usdoj.gov/chem_prog/34chems.htm (both accessed September 25, 2019).

Later in this report, we discuss how DEA set these quotas during the scope of our review.[26]

DEA also has Tactical Diversion Squads (TDS) to investigate registrants, particularly doctors and pharmacists, that divert controlled substances outside the scope of their professional medical practice.[27]  These squads investigate criminal diversion cases with a nexus to prescription drugs that are diverted for profit.[28]  A typical TDS consists of Diversion Investigators; Special Agents; Intelligence Analysts and, at times, other federal law enforcement professionals, who work alongside state and local Task Force Officers to investigate the diversion of controlled pharmaceuticals.

In addition, DEA Diversion Investigators enforce the CSA, the Chemical Diversion and Trafficking Act of 1987, and DEA regulations to ensure compliance by all current and prospective registrants.[29]  Although some Diversion Investigators are assigned to a TDS exclusively, others focus primarily on conducting scheduled regulatory investigations based on a work plan established by DEA headquarters, which sets the cycle of regulatory inspections as well as investigations of registrants that are based upon complaints, discovery of noncompliance, or as part of criminal investigations brought to their attention.  When the diversion unit of a DEA field division receives a tip, Diversion Investigators, whether or not they are assigned to a TDS group, may also conduct criminal investigations of registrants suspected of diverting pharmaceutical drugs for illicit use.

DEA's Office of Chief Counsel (CCD), Diversion & Regulatory Litigation Section, represents the government in all administrative hearings held by DEA's Office of Administrative Law Judges.  In regulatory cases, CCD Attorneys litigate administrative actions against registrants (doctors, pharmacies, distributors, manufacturers, or anyone that holds a DEA registration to handle controlled

---

[26]  See 21 C.F.R. § 1303.11 (Aggregate Production Quota) and § 1303.13 (Procurement Quota) and 21 C.F.R. §§ 1303.21–1303.27 (Individual Manufacturing Quota).

[27]  DEA, Press Release, "Announcement of New Tools to Address Opioid Crisis," November 29, 2017, www.dea.gov/pr/speeches-testimony/2017t/112917t.pdf (accessed September 25, 2019).

As of August 2017, DEA had established 77 TDS groups in 44 states.

[28]  TDS members are authorized to work only on investigations that have a connection to prescription pills, such as OxyContin and hydrocodone.  A TDS is not authorized to work on investigations that involve only non-pill related drugs, including heroin, or synthetic opioids, such as fentanyl, that were manufactured in other countries and smuggled into the United States.  The proscription on TDS members' work is due to funding regulations that aim to preserve diversion funds exclusively for diversion activities.

[29]  The Chemical Diversion and Trafficking Act of 1987 amended the CSA to establish recordkeeping and reporting requirements for the manufacture, distribution, importation, and exportation of listed precursor and essential chemicals.  The Chemical Diversion and Trafficking Act prohibits the distribution of such chemicals unless the recipient provides a certification of lawful use and proper identification.  See P.L. 100-690 and 21 U.S.C. §§ 801–971.

substances) that are potentially in violation of the CSA and DEA regulations.[30] Regulatory violations that warrant an administrative enforcement action, such as an Order to Show Cause (OTSC) or an Immediate Suspension Order (ISO), described in more detail below, are referred by Diversion Investigators to CCD for litigation. DEA uses OTSCs and ISOs to hold registrants accountable for violations, such as poor recordkeeping; inadequate security; practicing without a state medical license; and unlawfully prescribing any federally controlled substance, including a prescription opioid, outside the usual course of professional practice.[31]

In accordance with the Administrative Procedure Act of 1946, 5 U.S.C. § 551, DEA Administrative Law Judges (ALJ) conduct formal hearings in regulatory cases and provide a recommended decision in cases referred by Diversion Investigators to CCD as a result of a registrant's violations.[32] ALJs track the number of cases filed by CCD and report statistical information and significant trends to the DEA Administrator. In all regulatory cases in which an OTSC or an ISO is issued, the DEA Administrator makes the final agency decision.

*DEA Registrant Databases and Reporting Systems*

Following the enactment of the CSA in 1971, DEA began to systematically collect and maintain registrant records regarding production and ordering information, theft and loss, and suspicious orders.[33] Beginning in the late 1970s, pursuant to 21 C.F.R. § 1304.33, all manufacturers and distributors of select controlled substances were required to report their controlled substance activity to DEA using the Automated Reports and Consolidated Orders System (ARCOS). DEA developed ARCOS to monitor ordering information from manufacturers and distributors for Schedule I, Schedule II, and some Schedule III controlled substances.[34] Also, federal regulations require registrants to report drug theft or

---

[30] CCD exercises DEA's authority under 21 C.F.R. §§ 1301.31–46 and 1316.41–68, which establish procedures for DEA to revoke, deny, or suspend registrations and set a standard of imminent danger to the public health for issuing an Immediate Suspension Order (ISO). However, CCD does not decide whether administrative cases are viable. Rather, senior leadership of the Office of Chief Counsel makes decisions on whether and how to proceed in any administrative DEA case.

[31] When DEA issues an OTSC, the registrant is permitted to continue operations unless the registrant voluntarily surrenders its registration prior to an administrative hearing. If DEA issues an ISO, a registrant must immediately suspend operations until the case is resolved by an administrative hearing and a final decision is issued. A registrant subject to an ISO may also voluntarily surrender its registration.

[32] The Administrative Procedure Act of 1946 applies to all Executive Branch agencies, including some independent government agencies, and prescribes procedures for agency actions such as rulemaking, as well as standards for judicial review of agency actions.

[33] Effective May 1, 1971, the CSA, § 827 of the *U.S. Code,* required DEA to report controlled substance activity to the U.S. Attorney General.

[34] DEA, "ARCOS Reporting," www.deadiversion.usdoj.gov/arcos/index.html (accessed June 28, 2018). Most manufacturers and distributors must use ARCOS to report inventories, acquisitions, and dispositions of all controlled substances on Schedules I and II, as well as gamma-hydroxybutyric acid controlled substances on Schedule III.

loss to their local DEA field division in writing within 1 business day of discovering the loss.[35]  The DEA Theft or Loss Reports System database houses these reports.[36]

Additionally, the Registrant Information Consolidated System (RICS), also known as "CSA II," is a database that consolidates several of DEA's internal systems, each with its own uniquely different functions, including Quota information, ARCOS, and providing access to registrant actions and other information.  DEA uses RICS to manage all registrant records.[37]

Finally, in 2008 DEA developed the Suspicious Order Reporting System (SORS) to house reports that manufacturers and distributors of controlled substances are required by federal regulation to provide DEA when they detect suspicious orders, including those of unusual quantities or deviations from normal ordering practices.  However, during the scope of our review, we found that the SORS database included reports from only 8 of the approximately 1,400 manufacturers and distributors of controlled substances.  Each of those 8 manufacturers and distributors had provided their reports directly to DEA headquarters, while the remaining registrants reported suspicious orders to DEA field divisions.[38]  We discuss these systems later in this report and in greater detail in Appendix 2.

<u>Collaboration with State Partners and the Prescription Drug Monitoring Program</u>

As indicated above, one of the objectives of DEA's Diversion Control Program is to assist the states, through active investigations and information sharing, with monitoring the prescribing and dispensing practices of practitioners to prevent diversion and prescription drug abuse.[39]  According to DEA, its field divisions and headquarters communicate with state medical and pharmacy boards to share information about DEA regulations and registrant reporting requirements.  DEA told OIG that it is through information sharing that it keeps state partners apprised of administrative enforcement actions, such as suspensions or revocations of DEA registrations.

While databases such as ARCOS capture ordering information reported to DEA from manufacturers and distributors of controlled substances, DEA does not have the ability to capture prescription information on doctors, dentists, pharmacies, and patients.  Instead, Prescription Drug Monitoring Programs (PDMP) are state-run databases that capture this information through electronic monitoring.

---

[35]  21 C.F.R. § 1301.76(b).

[36]  DEA, "Report Theft or Loss of Controlled Substances," www.deadiversion.usdoj.gov/ 21cfr_reports/theft/index.html (accessed September 25, 2019).

[37]  DEA, "Privacy Impact Assessment for the Registrant Information Consolidated System," www.dea.gov/sites/default/files/2018-06/rics_%20pia_060414.pdf (accessed September 25, 2019).

[38]  According to 21 C.F.R. § 1301.74(b), registrants "shall notify the local DEA field division when suspicious orders are discovered."

[39]  DEA Diversion Manual, 5245.12, Objectives, 16.

According to DEA's 2017 National Drug Threat Assessment, as of April 2017 all 50 states and Guam have active PDMPs tracking in-state prescriptions and the District of Columbia has been given authorization to create a PDMP.  The goal of the PDMP is to assist medical professionals in the identification and prevention of prescription drug abuse.  Some Diversion Investigators and Special Agents work with their state partners to access data from the PDMP on an ad hoc basis because some states limit or prohibit federal law enforcement's access to this information.

<u>Federal Interagency Coordination</u>

According to DEA, DEA collaborates with HHS on some cases to obtain information related to doctors and pharmacies that participate in healthcare fraud.  DEA told us that these types of investigations increasingly have ties to the diversion of controlled pharmaceuticals, including opioids.  When registrants lose their eligibility to participate in federal programs such as the Medicare and Medicaid program due to involvement in healthcare fraud, DEA has the authority to revoke a registrant's DEA registration.  (We further discuss DEA's collaboration with HHS later in the report.)  DEA also works with the U.S. Postal Service to combat the illegal importation of controlled substances, including pharmaceutical opioids, through the mail and with the U.S. Department of Homeland Security to combat the smuggling of controlled substances through U.S. ports of entry, particularly along the Southwest border.[40]  Finally, DEA works with the Office of National Drug Control Policy to draft guidance, in collaboration with all of the Executive Branch agencies, on a National Drug Control Strategy for illicit and pharmaceutical controlled substances.[41]

**DEA Registrant Enforcement Process and Actions**

In accordance with 21 U.S.C. §§ 824(c)(2)(A) and 824(d)(1), DEA uses administrative enforcement actions to suspend, revoke, or deny a DEA registration.  DEA may issue a registrant an OTSC to explain the basis for DEA's initiation of administrative proceedings that may lead to revoking the registration.[42]  Registrant violations that are more egregious in nature may require immediate action.  In these cases, DEA will encourage the registrant to voluntarily surrender its registration.  If the registrant does not, DEA will also issue an ISO against the registrant to immediately suspend the registration if there is evidence of "imminent danger to public health or safety."[43]  If the violations do not warrant immediate

---

[40]  OIG also reviewed cooperation between the Departments of Justice and Homeland Security in Southwest border criminal investigations.  See DOJ OIG, *A Joint Review of Law Enforcement Cooperation on the Southwest Border between the Federal Bureau of Investigation and Homeland Security Investigations,* Evaluation and Inspections Report 19-03 (July 2019), www.oig.justice.gov/reports/2019/e1903.pdf (accessed September 10, 2019).

[41]  Despite the ongoing national impact of the opioid epidemic, the Office of National Drug Control Policy did not publish the current National Drug Control Strategy until late January 2019.

[42]  21 U.S.C. § 824(c)(2)(A).

[43]  21 U.S.C. § 824(d)(1).

action, DEA will encourage the registrant to voluntarily surrender its registration or it may use an OTSC to initiate the revocation process.

In April 2016, Congress enacted the Ensuring Patient Access and Effective Drug Enforcement Act of 2016, or the "Marino Bill," which created a new standard of proof necessary for DEA to issue an ISO. Pursuant to 21 U.S.C. § 824(d)(2), in order to issue an ISO against a registrant, DEA must prove that the registrant's conduct was an "imminent danger to the public health or safety" because the registrant failed to maintain effective controls against diversion, or to otherwise comply with the obligations of DEA registration, and there is a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance would occur unless there is an immediate suspension of the registration.[44]

A Letter of Admonition is an administrative enforcement action that DEA uses to bring a registrant into compliance for minor infractions, such as recordkeeping violations. In addition, DEA may use a Memorandum of Agreement (MOA) to establish a written contract between DEA and a registrant to resolve more severe violations, such as failing to report all suspicious orders. An MOA, typically issued in a case that has nationwide impact, establishes the basis for more severe administrative enforcement actions when violations persist.

**Scope and Methodology of the OIG Review**

This review examined DEA's regulatory activities and enforcement efforts to combat the diversion of opioids to unauthorized users. Specifically, we evaluated (1) DEA's enforcement regulations, policies, and procedures; (2) DEA's use of enforcement actions involving manufacturers, distributors, physicians, and pharmacists that violate these regulations, policies, and procedures; and (3) DEA's coordination with state and local partners to combat the opioid epidemic. Our fieldwork occurred from August 2017 through June 2018 and consisted of document review, data analysis, and interviews. We assessed DEA's enforcement efforts involving registrants that occurred from FY 2010 through FY 2017.

We conducted interviews with officials at DEA, U.S. Attorney's Offices, and the Office of the Deputy Attorney General. We also reviewed DEA policies and procedures and charging documents and conducted extensive analysis of DEA data. Additionally, we reviewed data related to all of DEA's opioid anti-diversion activities, including investigations opened and closed by OD; civil and criminal case filings against distributors, manufacturers, pharmacies, and doctors; Letters of Admonition, MOAs, ISOs, and OTSCs concerning registrants; voluntary registrant surrenders of DEA registration, including the number of such surrenders related to DEA enforcement actions; and actions brought against distributors and manufacturers. We also reviewed all fines that DEA levied against registrants, including the amount, date, and recipient of each fine. For more details about our scope and methodology, see Appendix 1.

---

[44]   21 U.S.C. §§ 823 and 824(d)(2).

# RESULTS OF THE REVIEW

**DEA Was Slow to Respond to the Dramatic Increase in Opioid Abuse and Needs to More Fully Utilize Its Regulatory Authorities and Enforcement Resources to Detect and Combat the Diversion of Controlled Substances**

We found that DEA did not fully utilize its available regulatory authorities as part of its effort to combat the diversion of pharmaceutical opioids, even as the rate of opioid use and abuse in the United States increased dramatically from 1999 to 2017.  Due mostly to opioid abuse, the rate of opioid overdose deaths in the United States grew, on average, by 8 percent per year from 1999 through 2013 and by 71 percent per year from 2013 through 2017.[45]  Yet, from 2003 to 2013, DEA authorized manufacturers to produce substantial amounts of opioids.[46]  For example, the Aggregate Production Quota (APQ) of oxycodone in the United States increased over 400 percent, from 34,482 kilograms in 2002 to a high of 153,750 kilograms in 2013.  From 2014 to 2016, DEA slightly reduced the APQ for oxycodone, from the high of 153,750 kilograms in 2013 to 139,150 kilograms in 2016.[47]

However, it was not until 2017 that then acting DEA Administrator Chuck Rosenberg reduced the APQ for most controlled substances, including oxycodone, by 25 percent.  Rosenberg approved a reduction in the APQ of oxycodone from 139,150 kilograms in 2016 to 101,500 kilograms in 2017.  In 2018, DEA further reduced the APQ for oxycodone by 6 percent, to 95,692 kilograms.  See Figure 3 below for the historical trends in APQs for oxycodone.

---

[45]  Centers for Disease Control and Prevention, "Drug Overdose Deaths in the United States, 1999–2017," www.cdc.gov/nchs/products/databriefs/db329.htm (accessed September 25, 2019).

[46]  As discussed in the Introduction, DEA approves the amount of the basic class of controlled substances that individual pharmaceutical manufacturers can produce each year, which is known as the Individual Manufacturing Quota.  The Aggregate Production Quota (APQ) is the total combined amount of quotas set by the DEA for all manufacturers producing basic classes of controlled substances.  The Controlled Substances Act of 1970 requires DEA to establish aggregate production quotas by July 1 of the year preceding the year to which the quota applies.  For example, for quota year 2015 the proposed notice was published on July 2, 2014.  See 21 C.F.R. § 1303.21.

[47]  The APQ for oxycodone was 149,375 kilograms in 2014; 141,375 kilograms in 2015; and 139,150 kilograms in 2016.

**Figure 3**

**Aggregate Quota Production for Oxycodone (in Kilograms of Anhydrous Base)**



Source:  OIG analysis of DEA data

In March 2018, then Attorney General Jeff Sessions directed DEA "to evaluate and consider whether or not to amend its regulations governing the aggregate production quota."[48]  At the time, DEA's regulations already contained a catch-all provision that enabled the DEA Administrator to consider "any relevant factor" in making quota decisions.  Pursuant to those existing regulations, then acting Administrator Rosenberg ordered a substantial reduction in the 2017 APQ for opioids and other controlled substances, as noted above.  In response to Sessions' direction, DEA proposed a regulation that explicitly detailed the additional factors, including the diversion of pharmaceutical opioids and the opioid epidemic, that DEA can consider in setting quotas.[49]

---

[48]  DOJ, Press Release No. 18-255, "Attorney General Sessions Takes Further Action to Combat Opioid Crisis—Directs the DEA to Evaluate Aggregate Production Quotas," March 1, 2018, www.justice.gov/opa/pr/attorney-general-sessions-takes-further-action-combat-opioid-crisis-directs-dea-evaluate (accessed September 25, 2019).

[49]  Proposed Rules, 21 C.F.R. Part 1303, Docket No. DEA–480, RIN 1117–AB48, Controlled Substance Quotas, 83 Fed. Reg. 76,17329 (Apr. 19, 2018), www.deadiversion.usdoj.gov/fed_regs/rules/2018/fr0419.htm (accessed June 28, 2018).  On July 16, 2018, the proposed rule became final, and it became effective on August 15, 2018.  See Final Rule, 21 C.F.R. Part 1303, Docket No. DEA–480, RIN 1117–AB48, Controlled Substance Quotas, 83 Fed. Reg. 136,32784 (Jul. 16, 2018).

*DEA's Administrative Enforcement Actions Have Not Been Fully Effective in Detecting and Combating the Diversion of Opioids and Other Controlled Substances*

We identified other areas in which DEA's regulatory and enforcement efforts could have been more effective in combating opioid diversion. First, DEA's preregistration process did not adequately vet all new applicants before granting DEA registration.[50] Second, DEA policy allowed, and still allows, registrants that have had their registration revoked, or that have surrendered it, to reapply for registration the day after a revocation is enforced or a surrender occurs.[51] Third, in 2010, DEA gave practitioners the option to use electronic prescriptions instead of paper prescriptions to keep pace with technology and combat prescription fraud. However, despite the rampant use of paper prescriptions to divert pharmaceutical opioids, DEA took no additional steps to further revise its regulations to require that all prescriptions be electronic, considering the opioid crisis.[52] Fourth, DEA headquarters had stringent requirements for field divisions to complete their annual Diversion Control work plans, which left little room for targeting registrants suspected of diversion.[53] Finally, beginning in 2013, DEA rarely used its strongest enforcement tool, the Immediate Suspension Order (ISO), to stop registrants from diverting prescription drugs, and DEA continues to experience challenges in rendering final decisions on administrative actions in a timely manner.

<u>Preregistration Investigations Did Not Adequately Vet Applicants</u>

The Controlled Substances Act of 1970 (CSA) requires that each person or firm that proposes to handle controlled substances or List I chemicals obtain a DEA registration unless exempted.[54] The purpose of a preregistration investigation is to determine the fitness and suitability of the applicant to engage in the activities for which registration is requested and to ensure that the applicant is familiar with its responsibilities to prevent diversion. However, we found that DEA's preregistration process did not appropriately safeguard against the diversion of pharmaceutical opioids, or any other drug, because DEA did not conduct background checks on all new applicants and relied instead on the good faith of applicants to disclose relevant information, even in cases in which the applicant had previously engaged in criminal activity.

According to the Associate Section Chief of DEA's Regulatory Section, DEA conducts preregistration inspections only on "Type B" registrants, which includes manufacturers, distributors, exporters, importers, narcotic treatment programs, and applicants whose registration previously had been suspended or revoked. Therefore, "Type A" registrants, which include physicians, dentists, and

---

[50] DEA Diversion Control Manual, October 2017, Sections 5221.1, 5221.3, and 5222.1.

[51] 21 C.F.R. § 1301.13.

[52] 21 C.F.R. § 1304.04(h)(4).

[53] DEA Diversion Control Manual, Sections 5231.11 and 5231.12.

[54] According to DEA's Diversion Control Manual, applicants can receive exemption from DEA registration under 21 U.S.C. § 822(c) or 21 C.F.R. §§ 1301.23–1301.27, 1309.25, or 1309.26.

pharmacists, are rarely required to undergo a preregistration investigation.  We also found that only two DEA field divisions routinely conducted preregistration investigations on pharmacy applicants.  All other field divisions issued a registration if a pharmacy applicant had a valid state license.

During interviews, some field division staff expressed concerns about the lack of vetting of physicians and pharmacies during the preregistration process.  One Diversion Program Manager (DPM) told us that if a pharmacy owned by a corporation is sold to another corporation, the new corporation could circumvent the preregistration process and DEA would have no knowledge of any conduct inconsistent with holding a DEA registration.  The new corporation could assume the previous corporation's registration and order as much oxycodone or any other controlled substance as desired without obtaining a new DEA registration.[55]  Another DPM told us that, due to local issues with some pharmacy applicants, routine preregistration checks would be helpful.  However, the DPM also told us that in general practice such checks are discouraged because DPMs are directed to do their work only within the annual Diversion Control work plan.

Further, we found that if a potential registrant does not disclose past criminal history, suspensions, revocations, or other unbecoming conduct, DEA does not inquire further.  During interviews, several Diversion Investigators told us that, if an applicant with a valid state license does not answer "yes" to the registrant application's liability questions (as to whether the applicant has had issues with previous state licenses or allegations of misconduct), DEA approves the application without further verification from the state medical and pharmacy boards.  As a result, an applicant that falsifies answers on the application could fraudulently obtain a DEA registration.  The Associate Section Chief of the Regulatory Section told us that with 1.7 million registrants there is no way for DEA to know whether applicants are being untruthful unless DEA is already aware of disqualifying information.  Indeed, one Diversion Investigator told us that, even if an applicant answered answers "yes" to one or more of the liability questions, some of her colleagues do not follow up to determine whether the applicant should be denied a DEA registration.

In response to a working draft of this report, DEA provided a copy of its policy prohibiting DEA Diversion Control staff from using the Federal Bureau of Investigation's National Crime Information Center (NCIC) database to perform criminal background checks on registrants' employees, as well as DEA's own Narcotics and Dangerous Drugs Information System (NADDIS), which captures

---

[55]  See 21 C.F.R. § 1301.52.  According to DEA's Registration Section, if a registrant is incorporated or is a limited liability company it is considered a legal entity.  If someone buys the legal entity in its entirety and the legal entity has not ceased to exist, in effect nothing has changed and DEA does not need to be notified.

information collected during DEA investigations generally.[56]  According to DEA, Diversion Control staff rely on information obtained from a privately run proprietary database to conduct background checks on registrants' employees, which limits the staff's ability to conduct criminal background checks during the preregistration process.

DEA's preregistration investigations are an important tool for vetting applicants to ensure that they are suitable candidates for handling controlled substances.  While we are not questioning the validity of state medical and pharmacy board investigations, we believe that DEA's failure to conduct preregistration investigations on all applicants, including pharmacies, creates the risk that DEA would be unaware that some of these registrants may have engaged in conduct or criminal activity that would render them unfit to obtain a DEA registration.

<u>The Impact of Revoking a Registration Is Limited because Registrants Can Reapply for Registration Immediately Following Revocation</u>

We found that registrants that have had their registration revoked, or that have surrendered it, can reapply for registration the day after the enforcement action or surrender occurs.[57]  As a result, registrants that potentially pose a significant risk of diverting pharmaceutical opioids may be given the opportunity to do so once again.  Moreover, as one DEA Chief Counsel Attorney told us, when a registrant reapplies the Diversion Investigator is required to reinvestigate the applicant because the burden is on DEA to prove that the former registrant should not receive a new DEA registration.  In addition, under the CSA, a registrant must be issued an Order to Show Cause (OTSC) and provided the opportunity to be heard by a DEA Administrative Law Judge (ALJ) before DEA can deny the registrant's application.[58]

Several Diversion Control staff also told us that, typically, if a revoked registrant immediately reapplies for a registration, staff will request an OTSC to prevent the registrant from receiving a new registration.  However, a DEA Chief

---

[56]  Joseph Rannazzisi, Deputy Assistant Administrator, Office of Diversion Control, DEA, Policy Regarding the Use of NADDIS and NCIC for Criminal History Checks for DEA Registrants, DFN:  060-01, April 25, 2011.

NCIC is a computerized index of criminal justice information (i.e., criminal record history information, fugitives, stolen properties, missing persons) that is available to federal, state, and local law enforcement and other criminal justice agencies to provide ready access to information from other criminal justice agencies.  The information is used in apprehending fugitives, locating missing persons, locating and returning stolen property, as well as in the protection of the law enforcement officers encountering the individuals described in the system.

NADDIS is a computerized database containing information regarding DEA narcotics investigations that is used across DEA field divisions.

[57]  21 C.F.R. § 1301.13.

[58]  21 U.S.C. §§ 824(c)(1) and (2).  The statute and its implementing regulations, 21 C.F.R. §§ 1300, et seq., are silent with respect to circumstances wherein a registration is previously revoked or surrendered for cause and the registrant immediately reapplies for DEA registration.

Counsel Attorney told us that there are cases in which an OTSC was not issued and a new DEA registration was granted even though the registrant had prior violations. He said that in one case the field division was simply "worn out" because it had spent years putting together the original revocation case. Once the registrant reapplied, the field division considered pursuing a Memorandum of Agreement (MOA), which is a less stringent enforcement tool than an OTSC. He explained that these cases were the hardest for him because the field division and DEA's Office of Chief Counsel (CCD), Diversion & Regulatory Litigation Section, was aware of the registrant's history of diversion yet the regulations permitted the registrant to obtain a new registration.

In another example, also provided by a Chief Counsel Attorney, a doctor, who had engaged in serious misconduct and had his registration revoked, moved to another state under the authority of a different DEA field division and immediately reapplied for and was granted a new DEA registration, even though the field division that revoked the previous registration expressed concerns. The same attorney stated that renewing the doctor's registration was "a terrible mistake" and that such cases really "defang" diversion control. (See the text box for an example of a registration that was reinstated under similar circumstances.)

We believe that registrants who reapply for registration immediately after revocation or surrender may pose a heightened risk to public safety and that, therefore, it is in the public's interest for DEA to ensure that those registrants' reapplications receive heightened scrutiny.[59] In view of our finding that DEA has granted applications for registration after the applicants' DEA registration had been recently revoked or surrendered, DEA should take steps to (1) ensure that DEA Diversion Control staff responsible for adjudicating registrant reapplications are fully informed of the applicants' prior history and (2) improve information provided to staff about the standards to apply in making decisions on such applications. These steps should be designed to

> **Reinstatement of Registrant Dentist with a History of Substance Abuse and a Criminal Record**
>
> We learned that DEA reinstated the registration of a dentist who had voluntarily surrendered his medical license and DEA registration on two separate occasions. The dentist had a 25-year history of substance abuse and had had interactions with federal and state law enforcement. The dentist allegedly bought a firearm from an undercover police officer after having been convicted of a felony and allegedly purchased cocaine and heroin during the course of an unrelated investigation. The dentist also failed an initial drug test, having tested positive for marijuana.
>
> In light of this information, the DEA Diversion Investigator requested that an OTSC be issued to prevent the approval of the dentist's reapplication. However, according to the Diversion Investigator, DEA's CCD declined to issue an OTSC because the dentist's transgressions were over 5 years old. Instead, DEA entered into an MOA with the dentist, which enabled him to obtain another DEA registration.
>
> Source: OIG analysis

---

[59] 21 U.S.C. §§ 824(a)(1–5) of the CSA outline the factors considered when determining whether a DEA registration should be suspended or revoked. Specifically, 21 U.S.C. § 824(a)(4) states that DEA considers acts committed by a registrant that are "inconsistent with the public interest" as grounds for suspension or revocation of a DEA registration.

provide DEA Diversion Control staff a sufficient basis, consistent with law, to deny registration to such applicants absent changed circumstances and could include:

- enhancing existing guidance and training and developing guidance for DEA Diversion Control staff on the factors that should be considered in determining whether to grant such applications, including changed circumstances and passage of time;

- ensuring that all Diversion Control staff have access to information through a national database relating to registrants that have been subject to prior revocations, surrenders, or loss of state medical licenses;

- requiring that Diversion Control staff provide a written explanation describing the change of circumstances if their decision is to grant a registration to an applicant whose registration had previously been revoked or surrendered or whose state medical license had been revoked; and

- considering revisions to DEA's registration form to gather additional information relevant to the decision from applicants.

<u>DEA Does Not Mandate Electronic Prescriptions for Controlled Substances</u>

Various DEA staff told us that paper prescriptions are far less secure and are more susceptible to prescription fraud, a pervasive issue throughout the country that has led to opioid diversion. We found that in 2010 DEA revised its regulations to allow practitioners to issue electronic prescriptions to combat prescription fraud.[60] However, DEA did not mandate electronic prescriptions for all DEA registrants. Former acting DEA Administrator Robert Patterson told us that DEA has not mandated that all registrants issue electronic prescriptions because some smaller pharmacies could not meet the computer requirements for electronic prescriptions.

Diversion Control staff described to us "prescription rings" that involve street-level dealers working alongside medical professionals and "runners" fraudulently obtaining paper prescriptions and filling them at local pharmacies. We learned that, in an effort to prevent prescription fraud, several states, such as Connecticut, New York, Massachusetts, Minnesota, and Maine, have passed legislation mandating electronic prescribing and that California, Missouri, Vermont, Texas, and Ohio are considering similar legislation. In light of the pervasive nature of prescription fraud, and given that several states already mandate electronic prescriptions, DEA should consider changing its regulations to assist in preventing prescription fraud and to enable DEA to focus on other forms of diversion.

---

[60] Interim Rule, 21 C.F.R. Parts 1300, 1304, 1306, and 1311, Docket No. DEA–218, RIN 1117–AA61, Electronic Prescriptions for Controlled Substances, <u>75 Fed. Reg. 16,236</u> (Mar. 31, 2010), as codified in <u>21 C.F.R. § 1306.08</u>, Electronic Prescriptions, and <u>21 C.F.R. § 1304.06</u>, Records and reports for electronic prescriptions.

<u>DEA's Work Plan Requirements Hinder Diversion Investigators' Ability to
Inspect Registrants That Are Most Likely Involved in Diversion</u>

We found that DEA headquarters has stringent requirements for Diversion
Control work plans.  The work plans detail the type of registrants that field divisions
must investigate each year, and Diversion Investigators must complete the
investigations within specific timeframes.  We also found that field divisions are
evaluated based on whether they complete their work plans, which leaves little
room for quickly responding to new information targeting local registrants
suspected of prescribing or dispensing opioids outside the scope of legitimate
medical practice.

According to DEA's Diversion Control Manual, the Office of Diversion Control
(OD) develops Diversion Control work plans for the field divisions.  The work plans
provide a schedule for conducting on-site investigations of non-practitioners to
ensure their compliance with the CSA and continued eligibility for DEA registration.
Diversion Control work plans require Diversion Investigators to conduct three levels
of scheduled investigations:  (1) primary/full investigations every 3 to 5 years,
(2) secondary/follow-up investigations within 1 year of an administrative action,
and (3) new registrant investigations no later than 1 year from a registrant's initial
registration.  The manual further states that the priority for the Scheduled
Investigations Program is considered obligatory.

Diversion Control staff in DEA field divisions voiced concerns regarding the
obligations of their work plan.  For example, a DPM told us that her field division
implemented an operation from 2013 through 2016 to eradicate pharmacies that
were dispensing a large amounts of pills in that region.  Through this initiative, her
office's Diversion Control group secured 134 voluntary registration surrenders and
issued 24 OTSCs to pharmacies.  However, the operation was not in the field
division's work plan and the DPM told us that, despite the impact of the group's
actions, she felt that her field division leadership did not "appreciate" the group's
targeted approach and just wanted the work plan completed.  A Diversion
Investigator told us of his frustration that following the work plan requires Diversion
Investigators to inspect the same registrants over and over since there were no
requirements for how often a registrant must be inspected.[61]

Former acting DEA Administrator Patterson acknowledged the constraints of
Diversion Control work plans, which limit the field divisions' input on prioritizing
investigations based on local issues.  He understood that some Diversion Control
staff in the field were frustrated over their lack of input.  He told us that, from a

---

[61] To ensure compliance with the CSA and a registrant's eligibility for continued registration
with DEA, the Diversion Control Manual requires DEA to conduct periodic on-site investigations of all
controlled substance manufacturers; distributors; reverse distributors; importers; exporters; narcotic
treatment programs; and Drug Abuse Treatment Act of 2000 waived physicians, also known as DATA
waived physicians.  DATA waived physicians are permitted to treat narcotic dependence with
Schedule III–V narcotic controlled substances.  The manual requires these registrants to be
reinvestigated at least once every 3 years, with the exception of DATA waived physicians, who are
reinvestigated once every 5 years.

Special Agent in Charge's perspective, working solely on the items in the work plan is too rigid and "not the way it needs to be," especially given the opioid epidemic. Patterson said that a working group was attempting to create more flexibilities in the work plans.[62]  Further, an Assistant Special Agent in Charge expressed concerns about how the work plan affects employees' work ethic.  He stated that, because the division's work plan sets inspection requirements at the beginning of the year, some Diversion Investigators end up investigating only what is required of them.  OIG believes that, if true, this may result in missed opportunities to identify and detect serious diversion.

We believe that it is important for DEA to allow for flexibilities in Diversion Control work plans so that Diversion Investigators can balance the need to target noncompliant registrants that may be diverting pharmaceutical opioids and other dangerous drugs with the need to conduct routine investigations.[63]

### DEA Rarely Used Its Strongest Enforcement Tool, the ISO, to Stop Registrants That Were Diverting Opioids and Other Prescription Drugs

We found that DEA's use of the ISO, its strongest enforcement tool, significantly decreased from FY 2011 through FY 2015, and again in FY 2017, as compared to prior years.  Under the CSA, if a registrant's violation poses an "imminent threat" to public health or safety, DEA may issue an ISO, which immediately deprives the registrant of the right to manufacture, distribute, prescribe, or dispense controlled substances.[64]  If a registrant or applicant violates the law but the threat is not imminent, DEA may issue an OTSC to the registrant, which must then prove why its registration should not be revoked, suspended, or denied.

We found that DEA reduced its use of ISOs by over 80 percent (38 to 6) between FYs 2010 and 2017, including by nearly 70 percent (45 to 14) in FY 2013 alone.  Even prior to our review period, there was a 42 percent decrease (24 to 14) in ISOs issued between FYs 2008 and 2013.  In fact, DEA issued more ISOs in

---

[62]  In November 2015, the DEA Diversion Control Division formed a Field Advisory Committee, composed of five DPMs and four Assistant Special Agents in Charge, to facilitate communication between DEA field divisions and headquarters by providing a platform for input, discussion, and prioritization regarding issues facing the Diversion Control Program.  In the spring of 2017, a working group began reviewing DEA's Diversion Control investigation work plans for the various field divisions and provided recommendations to the OD to modify them for FY 2019.

[63]  In response to a working draft of this report, DEA provided the OIG with DEA's September 2018 policy, which modifies and provides greater flexibilities in the FY 2019 field division scheduled work plans to allow Diversion Control staff to better respond to the opioid epidemic.  John Martin, Assistant Administrator, Diversion Control Division, DEA, Modification of the Controlled Substance and Chemical Regulatory Work Plan, DFN:  630-15, September 7, 2018.

[64]  21 U.S.C. §§ 823 and 824.  In April 2016, Congress passed legislation that included a definition of "imminent danger" that raised the standard of proof necessary for DEA to issue an ISO. We discuss this change in greater detail below.

FY 2012 than FYs 2013–2017 combined.[65]  By comparison, since FY 2014 the number of OTSCs issued by DEA has generally increased.  See Figure 4.

**Figure 4**
**ISOs and OTSCs Issued by DEA, FYs 2008–2017**



Source:  OIG analysis of DEA documents

We sought to determine the basis for the significant decrease between FY 2011 and FY 2017 in DEA's use of the one administrative tool that can immediately stop a registrant from diverting controlled substances.  We were told about several factors that may have affected DEA's use of ISOs during this time period.[66]  For example, the CCD Section Chief for the Diversion & Regulatory Litigation Section referenced a temporary restraining order issued by a U.S. District Court Judge in Washington, D.C., on February 3, 2012, that initially prevented DEA from enforcing an ISO against Cardinal Health, Inc.[67]  The U.S. District Court Judge

---

[65]  The data we used to determine the number of ISOs and OTSCs that were issued in FYs 2008–2009 was derived from our previous report, *Review of the Drug Enforcement Administration's Adjudication of Registrant Actions*, Evaluation and Inspections (E&I) Report I-2014-003 (May 2014), www.oig.justice.gov/reports/2014/e1403.pdf (accessed September 25, 2019).  See Appendix 3 for information on prior work related to DEA diversion control efforts.

[66]  In response to a working draft of this report, DEA acknowledged additional factors that it believed had contributed to the decrease in ISOs during our scope.  Specifically, DEA noted that prescriptions declined nationwide, in many cases administrative enforcement actions were taken that did not result in ISOs, DEA did not pursue ISOs against registrants when it conflicted with an ongoing U.S. Attorney's Office (USAO) criminal investigation, Diversion Control staff had been insufficiently trained regarding administrative diversion remedies, and registration surrenders increased during the first few years of our scope.

[67]  At the time of the Cardinal Health case, the CCD Section Chief for the Diversion & Regulatory Litigation Section worked as a DOJ Civil Division attorney and was defending the case on behalf of the U.S. government.  According to Department protocol, if a registrant appeals an ISO in federal court, the government's case is defended by either the Department's Narcotics and Dangerous Drug Section or its Civil Division.  Later in 2012, this official joined DEA as the CCD Section Chief for the Diversion & Regulatory Litigation Section.

granted the temporary restraining order because he could not determine how Cardinal Health posed an imminent threat to the community based on the evidence presented by the government.  On February 29, the court held a preliminary injunction hearing and the government presented additional evidence demonstrating why an ISO against Cardinal Health was warranted.  After learning the full extent of the government's evidence, some of which was not presented initially, the court ruled in the government's favor and allowed DEA to enforce the ISO against Cardinal Health.

However, in doing so, the CCD Section Chief told us that the U.S. District Court Judge was critical of DEA's evidentiary presentations in a number of cases.  Specifically, according to the CCD Section Chief, the judge stated that, if DEA had presented all of its evidence against Cardinal Health initially, he never would have granted the temporary restraining order in Cardinal Health's favor.  Further, in talking with colleagues regarding DEA cases, the court believed that "DEA is cutting corners" and "is not doing a good enough job with its evidentiary presentations and [DEA] needs to do better."  The DPM with direct involvement in this case also told us that she recalled the judge advising DEA to include more evidence in its ISOs because DEA cannot shut down a business without telling the registrant why.  After this case, the DPM said that DEA's use of ISOs started to "slow down."  The CCD Section Chief told us that he keeps the court's feedback in mind moving forward as he wants every case to be able to stand up in court.[68]

Additionally, a former DEA Assistant Administrator, who led the OD from August 2015 to June 2017, advised us that an unusually high volume of ISOs from FY 2010 through FY 2012 resulted from DEA's Operation Pill Nation I (2011) and Operation Pill Nation II (2012) investigations in Florida.  Collectively, Operations Pill Nation I and II resulted in ISOs against 63 DEA registrations.  Thus, according to the former Assistant Administrator, the reduction in ISOs appears more pronounced from FY 2013 onward because those operations ended in FY 2012.[69]  See the text box below for information regarding the effect of the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (the "Marino Bill") on DEA's use of ISOs.

---

[68]  The CCD Section Chief also stated that, based on his discussions with DEA leadership, between 2011 and 2012 DEA made a strategic decision "to go after" pharmaceutical suppliers such as distributors and pharmacies.  In doing so, he acknowledged that these cases were more resource intensive and complicated and that the number of cases made against physicians would decline.

[69]  Based on our analysis of DEA charging documents, we found that 46 percent (65 out of 142) of all ISOs between FY 2010 and FY 2012 were issued throughout the state of Florida.  We believe that these ISOs were largely the result of DEA's Operations Pill Nation I and II, which combined led to 118 arrests, the surrender of more than 80 DEA registrations, the seizure of more than $19 million in assets, and the closure of at least 40 pain clinics.  While we recognize that the high volume of ISOs in Florida may partly explain the sharp decrease we found since FY 2012, DEA issued only one ISO in Florida between FY 2013 and FY 2017.  The CCD Section Chief for the Diversion & Regulatory Litigation Section acknowledged that this seemed low but said that the field did not refer cases to CCD that warranted more ISOs in Florida.

Finally, we found that the Diversion Control and CCD staffs had a poor working relationship, which sometimes hindered diversion investigations and the issuance of ISOs. Former acting DEA Administrator Patterson characterized the relationship between field division Diversion Control staff, OD, and CCD as historically "toxic." As one example of the issues between CCD and Diversion Control staff in the field, a DEA Special Agent told us about, and CCD acknowledged, problems during the investigation of an oxycodone and hydrocodone "pill mill" case in September 2016 that delayed the resolution of this case for over a year. The delay was particularly of concern because the doctor was allegedly linked to multiple individuals who fatally overdosed from the drugs he prescribed. After the Special Agent requested information from the initial CCD attorney, the attorney described his interaction with the Special Agent in an email exchange with the CCD Section Chief for the Diversion & Regulatory Litigation Section:

---

**Effect of the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 on DEA's Use of ISOs**

During the course of our review, we also considered the passage of the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (Act) and its effect on DEA's use of ISOs. The Act's definition of imminent danger to the public health or safety required DEA to meet a higher standard of proof before issuing an ISO. While we were told that the new proof standard could negatively affect DEA's future ability to use ISOs effectively, we found, as shown in Figure 4, that DEA's use of ISOs had already decreased sharply in the years prior to the bill's passage. Given that the bill did not become law until April 2016, there was not yet sufficient data available during our fieldwork to assess the legislation's actual impact on DEA's ability to use ISOs.

Former acting DEA Administrator Patterson told us that he believed the only challenge the Act presented to DEA was that it required Diversion Investigators to be diligent about providing evidence to CCD attorneys as soon as they received it in order to satisfy the bill's imminent threat standard. Patterson stated that, if an alleged harm occurred a year before the investigator presented the case to the Chief Counsel, the imminent threat standard could not be met and the investigator would have to pursue another course of action, such as an OTSC.

Sources: OIG analysis and interviews

---

> [Special Agent] called me. He was really pissed, telling me not to talk to the [Assistant U.S. Attorney (AUSA)], demanding my work product on the case, etc. I basically lost it with him, explained (to the extent I was able) why it is problematic to proceed administratively, told him [not] to ask you for my work product (as I don't [think] that is appropriate under these circumstances). I also told him to lose the attitude, and to act more professionally.

In interviews, the Special Agent told us that CCD repeatedly had asked him to submit and resubmit investigative materials because CCD had misplaced them, which caused delays. It was not until a new CCD attorney was assigned months later that the case moved forward and DEA issued an OTSC against the doctor. Although the CCD Section Chief acknowledged the communication issues between the initial attorney and the Special Agent, he told us that a parallel U.S. Attorney's

Office (USAO) investigation and expert witness issues also may have caused delays.[70]

     In another example, Diversion Control staff expressed concerns to us that CCD did not take swift and aggressive action to issue an ISO in a particularly egregious case involving criminal conduct.  Staff told us about a March 2015 request to CCD by a Tactical Diversion Squad (TDS) for an ISO against a California doctor.  The TDS had obtained pictures and text messages showing that in exchange for opioid pharmaceuticals the then 62-year-old doctor was having sex with three patients, all of whom were addicts between the ages of 20 and 25.  Diversion Control staff told us that CCD did not authorize the ISO.  When we asked CCD about the case, CCD stated that in May 2015 it emailed TDS investigators a case file analysis describing the concerns it had and providing guidance about the evidence it would need to prove improper prescribing practices.  Specifically, CCD told us:

> Although the allegations of improper prescribing were deeply troubling, the case file lacked essential evidence needed to proceed forward with an administrative case.  Among other concerns, the case file lacked any of the prescriptions that DEA maintained that [the doctor] issued improperly, as well as the patient files corresponding to those prescriptions.

CCD responded to the TDS that once all the identified issues were addressed CCD would pursue an administrative enforcement action.[71]  After receiving CCD's assessment, which the TDS Group Supervisor said he perceived as CCD "slamm[ing] the case," he instead referred the case to the USAO, which later indicted the doctor.  The doctor pled guilty and is serving a 30-month prison sentence.

     These examples illustrate a poor working relationship between the Diversion Control and CCD staffs.  As a result of the difficulties that Diversion Control and CCD staffs had working together, CCD attorneys and numerous headquarters and field division Diversion Control staff told us that there was a reluctance on the part of the field to bring cases, particularly ISO referrals, to CCD.

     We note that DEA has recently implemented a number of reforms to improve the working relationship between the Diversion Control and CCD staffs.  In 2016 DEA implemented a new enforcement action intake process, which includes a conference call with CCD, the DEA Pharmaceutical Investigations Section, and field

---

[70]  The CCD Section Chief for the Diversion & Regulatory Litigation Section said that DEA was not allowed to use the USAO's medical expert, who concluded that the doctor had issued prescriptions outside the course of legitimate medical practice.  The CCD Section Chief also told us that another medical expert whom DEA was allowed to use did not reach the same conclusion.

[71]  According to CCD, while the Diversion Control Unit Chief responded that he would consult with investigators about how to proceed, CCD officials stated that CCD "heard nothing further from either Diversion Control or San Diego [Field Division] on this matter for approximately 14 months."  CCD told us that an OTSC against the doctor was issued on September 27, 2016.  In November 2016, the doctor waived his right to a hearing on the OTSC and surrendered his DEA registration.

division Diversion Control staff, so that all parties can offer input and feedback on new cases.[72]  DEA also co-located the Pharmaceutical Investigations Section and CCD to facilitate a more collaborative working relationship.  Finally, CCD assigned attorneys to work with specific field divisions to improve relationships with field division Diversion Control staff.

*Timeliness on the Part of the DEA Administrator Plays a Crucial Role in DEA Administrative Enforcement Actions*

DEA's regulatory process provides that the DEA Administrator is the final decision maker in an administrative enforcement action.  We found that in prior years a lack of timeliness significantly delayed revocations.[73]  Based on our review of OTSCs, we determined that from FY 2010 through FY 2017, on average, the former acting DEA Administrator took nearly 10 months (302 days), and in a few cases approximately 2 years, to render a final decision after an ALJ issued a recommendation.  However, we also observed that the DEA Administrator's timeliness in issuing final decisions showed signs of improvement during the scope of our review, decreasing from an average of 440 days in FY 2011 to an average of 103 days in FY 2017.[74]  Nonetheless, this

> **DEA Did Not Consistently Meet Its Timeliness Guidelines**
>
> In 2014, DEA established timeliness guidelines for adjudicating OTSCs.  The new guidelines generally provided the Office of the Administrator 180 days to issue a final decision after receiving the ALJ's recommendation.  In addition, DEA's guidelines altered the timeline for the entire administrative process for OTSCs to 360 days.  Despite the establishment of these guidelines, we found that, following their implementation, 25 percent (27 out of 110 cases) of all OTSCs that culminated in a final decision from the DEA Administrator did not meet the timeliness guidelines.  We also found that on average five of these cases took the Administrator 13 months (390 days) to issue a final decision after the ALJ's recommendation.
>
> Although we found indications that DEA has improved its timeliness in adjudicating OTSCs, we believe that additional improvement is necessary, given that registrants subject to an OTSC may continue to divert pharmaceutical opioids and endanger the community until the Administrator renders a final decision.
>
> Source:  OIG analysis of DEA documents

---

[72]  Under the previous process, the OD and CCD evaluated administrative referrals from the field.

The administrative referral process begins when DEA issues an OTSC or an ISO to suspend or revoke a registration.  According to 21 C.F.R. § 1301.43(a), a hearing with an ALJ takes place only if the registrant files a formal request within 30 days of being issued the OTSC or ISO.  After pre-hearing statements and conferences are held with both DEA and the registrant, an administrative hearing occurs.  Following the deadline for filing post-hearing briefs, the ALJ issues a recommended decision, which is forwarded to DEA's Office of the Administrator for final review.  The DEA Administrator issues a final decision by adopting, modifying, or rejecting the ALJ's recommended decision.

[73]  Although we reviewed DEA Administrator decisions for every ISO and OTSC that DEA issued during the scope of our review, our analysis includes only those 70 cases in which the date of the ALJ's recommendation was provided for an OTSC.

[74]  Our analysis excluded cases that had not received a final decision from the DEA Administrator as of the end of FY 2017.  Although our analysis appears to indicate that DEA improved its timeliness, we recognize that the results for the later years of our scope may be skewed because pending cases, which may linger for years, were not included in our analysis.  For example, the sample size for our analysis for FY 2017 was limited to 4 cases, compared to 20 cases for FY 2011.

continuing failure to render a timely final decision is particularly concerning as registrants may continue to do business and potentially divert pharmaceutical opioids until DEA revokes their registrations.

DEA's inability to adjudicate enforcement actions in a timely manner is a challenge that has persisted for several years.  OIG first identified this issue in our May 2014 report on DEA's adjudication of registrant actions, in which we found that, with the exception of ISOs, DEA generally did not have timeliness standards in place for the adjudication of registrant actions.  In response to recommendations made in our 2014 report, DEA established timeliness guidelines for its administrative actions, including for OTSCs.[75]  While our review of DEA records appears to indicate that DEA has improved its timeliness in adjudicating OTSCs since the implementation of timeliness guidelines, it also appears that additional improvement is needed.  See the text box above.

## Improved Data Systems Would Facilitate Better Detection of the Diversion of Pharmaceutical Opioids and New Opioid Analogues

While DEA is responsible for setting the annual quotas for opioid production by manufacturers, and therefore was aware of the substantial growth in the demand for opioids over the past 20 years, we found that DEA did not capture (and still does not capture) sufficient data at the manufacturer, distributor, practitioner, and prescriber levels to enable it to detect the diversion of opioids and identify emerging drug abuse trends.

As described below, DEA uses the Automated Reports and Consolidated Orders System (ARCOS) to monitor manufacturer and distributor inventories, acquisitions, and dispositions of controlled substances.  However, the system does not contain current, up-to-date information and does not capture information about all pharmaceutical opioids.  Additionally, while DEA's consolidated Suspicious Order Reporting System (SORS), established in 2008, is a potentially useful regulatory tool, we found during our review that it captured suspicious orders from very few registrants.  Because SORS does not have data and information on all 1.7 million registrants, we believe that DEA is hampered in its ability to identify and combat the diversion of controlled substances.  Further, we found that DEA's ability to use data to respond to emerging drug threats is limited since DEA discontinued the Medical Examiners Database in 2007 and the U.S. Department of Health and Human Services (HHS) discontinued the Drug Abuse Warning Network Live (DAWN

---

[75]  In the 2014 report, OIG made three recommendations to improve DEA's timeliness in adjudicating registrant actions:  (1) establishing timeliness standards for adjudicating all OTSCs, (2) establishing policy and procedures for forwarding a case to the Office of the Administrator for final decision when a hearing is waived or terminated, and (3) instituting a formal process for tracking the timeliness of each adjudication.  We note that DEA also established several exceptions to its timeliness guidelines, including delays due to other pending cases, record size, case complexity, and the quality of the ALJ's recommendation.  DOJ OIG, *DEA's Adjudication of Registrant Actions.*  See Appendix 3 for more information.

Live) in 2011.[76]  Although DEA is now working with federal and state partners to share data and information, additional improvements, including gaining more access to information from some state-run Prescription Drug Monitoring Programs (PDMP), are necessary.  Finally, we found that DEA must continue to strengthen its external partnerships and improve information sharing with state medical and pharmacy boards.

*DEA Does Not Capture Sufficient Data to Promptly Detect the Diversion of Opioids and Identify Emerging Drug Trends*

We learned that, in order to detect the diversion of controlled substances, DEA investigators use a number of databases, including ARCOS; SORS; and, at one time, DAWN, to detect emerging drug abuse trends.  While DEA's diversion detection efforts are critically important in combating the opioid epidemic, we found significant deficiencies that could prevent DEA from promptly detecting potential diversion.

<u>Automated Reports and Consolidated Orders System</u>

According to DEA, ARCOS contains ordering information from about 1,100 manufacturers and distributors for all Schedule I and II controlled substances and certain Schedule III and IV controlled substances.[77]  Although DEA officials and staff told us that ARCOS was the primary data tool used to detect the diversion of controlled substances, we found that some manufacturers and distributors report ordering information for Schedule I and II controlled substances to ARCOS on a monthly basis while others report this information on a quarterly basis.  This dichotomy of reporting schedules forces DEA to wait a full year before ARCOS contains all of the ordering information needed to fully analyze the data and develop leads and trends.  The Associate Section Chief of DEA's Pharmaceutical

---

[76]  In 2019, HHS announced that it would reestablish the DAWN Live database.  For more information on DAWN, see HHS Substance Abuse and Mental Health Services Administration, "Drug Abuse Warning Network," www.datafiles.samhsa.gov/study-series/drug-abuse-warning-network-dawn-nid13516 (accessed September 25, 2019).

In response to a working draft of this report, DEA provided the OIG with documentation regarding the expansion of its collaboration with the National Forensics Laboratory Information System (NFLIS), which is as a centralized data collection effort of drug chemistry analysis results from federal, state, and local forensic laboratories (now called NFLIS-Drug).  According to DEA, since 1997 NFLIS-Drug has become an operational information system that includes data from 98 percent of the nation's forensic laboratories, reporting approximately 1.5 million drug cases annually.  These laboratories analyze substances secured in law enforcement operations across the country, and reporting serves as a valuable resource for monitoring drug trafficking and abuse trends.  DEA recently conducted a feasibility study and initiated the expansion of NFLIS to include toxicology and medical examiner and coroner reporting.

[77]  More specifically, ARCOS contains ordering information about bulk and/or dosage form controlled substances from manufacturers and distributors that must report inventories, acquisitions, and dispositions of all substances on Schedules I and II, as well as narcotic and gamma-hydroxybutyric acid substances on Schedule III (see 21 C.F.R. § 1308).  In addition, manufacturers must report synthesizing activities involving all substances on Schedules I and II, narcotic and gamma-hydroxybutyric acid substances on Schedule III, and selected psychotropic controlled substances on Schedules III and IV (see 21 C.F.R. § 1304.33).

Investigations Section told us that, for example, he would not be able to create the 2017 ARCOS data targeting packages until he received all of the data for 2017, sometime in 2018. Thus, the 2017 ARCOS targeting packages reflected ordering information from 2017 but DEA would not be able to identify issues emerging in 2018 until sometime in 2019. Moreover, DEA cannot create targeting packages for some Schedule III, and all of Schedule IV and V controlled substances, including some opioids, because the registrants for these substances are not required to report ordering information to DEA.

We also found that ARCOS does not contain all of the information necessary to detect the diversion of all pharmaceutical opioids. Some manufacturers and distributors of certain pharmaceutical opioids on Schedules III, IV, and V are not required to report ordering information to DEA. A DEA official told us that DEA did not consider requiring all manufacturers and distributors to report all ordering information when it standardized ARCOS reporting in the late 1970s because DEA thought it was more important to require this of registrants manufacturing and distributing the most dangerous categories of pharmaceuticals, those on Schedules I and II. In fact, as many as 9 opioid compounds found in over 20 pharmaceutical brands were not reported in ARCOS, making it much more difficult to detect the diversion of these prescription drugs.[78]

We are concerned that the nine opioid compounds not reported in ARCOS are just as dangerous to public safety as those on Schedules I and II. For example, a 2016 Florida Medical Examiners Commission report found that tramadol, a Schedule IV controlled substance used to treat moderate to severe pain, was detected in 949 overdose fatalities in Florida since 2015.[79] In addition, ARCOS does not contain ordering information for certain codeine products (such as cough syrup containing codeine, a Schedule V controlled substance) that are particularly susceptible to abuse.[80] DEA officials told us that cough syrups containing codeine are commonly abused throughout the country, particularly along the Southwest border of the United States; however, DEA does not have sufficient data to monitor codeine ordering patterns.

---

[78] Pharmaceutical opioids not captured by ARCOS include dextropropoxyphene, difenoxin, tramadol, codeine preparations, difenoxin preparations, dihydrocodeine preparations, diphenoxylate preparations, ethyl morphine preparations, and opium preparations.

[79] Florida Department of Law Enforcement Medical Examiners Commission, *Drugs Identified in Deceased Persons by Florida Medical Examiners, 2016 Annual Report* (November 2017), www.fdle.state.fl.us/MEC/Publications-and-Forms/Documents/Drugs-in-Deceased-Persons/2016-Annual-Drug-Report.aspx (accessed September 25, 2019).

[80] In 2012, DEA reported that more than 1 out of 10 teenagers were abusing cough syrups. Commonly, cough syrups may be abused through drink concoctions such as "lean," a mixture of prescription-strength cough medicine in a soft drink with fruit-flavored candy. Some prescription-strength cough syrups used to make lean also include promethazine, an antihistamine that causes sedative effects and can impair motor function. DEA, *Prescription for Disaster: How Teens Abuse Medicine,* 2nd edition (August 2012), www.getsmartaboutdrugs.gov/sites/getsmartaboutdrugs.com/files/publications/DEA_Prescription-For-Disaster_508ver.pdf (accessed September 25, 2019).

We believe that increasing the reporting requirement in ARCOS to include all controlled substances will allow for a more complete picture of the transactional data of controlled substances.  A number of DEA officials we spoke with said that they also believe that the reporting requirement should be expanded, and DEA continues to work with legislators to achieve this.

Further, we learned that ARCOS does not contain ordering information for benzodiazepines, which are Schedule IV controlled substances.[81]  DEA officials and staff told us that benzodiazepines, while not opioids, are often used in conjunction with opioids and can produce a particularly lethal drug cocktail often referred to as the "holy trinity."[82]  The National Institute on Drug Abuse reported that more than 30 percent of overdoses involving opioids also involve benzodiazepines.[83]  The Associate Section Chief of the DEA Pharmaceutical Investigations Section acknowledged ARCOS's shortcomings related to benzodiazepines and other potentially diverted pharmaceuticals.  He told us that DEA was "missing the cocktails," i.e., lacking data on the Schedule III, IV, or V controlled substances that are often taken with a Schedule I or II substance.  He told us that he wished that ARCOS collected ordering information for all controlled substances.  We believe that, due to these deficiencies in ARCOS data, DEA is ill-equipped to effectively monitor ordering patterns for all pharmaceutical opioids, which could enable the diversion of these prescription drugs and compromise public safety.

<u>Suspicious Order Reporting System</u>

Federal regulations require DEA registrants that manufacture and distribute controlled substances to identify and report suspicious orders to DEA and to maintain a system to disclose suspicious order reports to DEA.  The *Code of Federal Regulations* defines suspicious orders as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency," each of which is a red flag for diversion.[84]  In 2008, DEA developed the SORS database, which is maintained and overseen by DEA headquarters to consolidate and house these suspicious order reports.

---

[81]  According to the National Institute on Drug Abuse, benzodiazepines are pharmaceutical sedatives, including alprazolam, diazepam, and clonazepam, which are commonly prescribed for anxiety or to help with insomnia.  National Institutes of Health (NIH) National Institute on Drug Abuse, "Benzodiazepines and Opioids," March 2018, www.drugabuse.gov/drugs-abuse/opioids/benzodiazepines-opioids (accessed September 25, 2019).

[82]  An AUSA from the USAO for the Eastern District of New York told OIG that the "holy trinity" consists of an opioid used in conjunction with a benzodiazepine and a muscle relaxant such as carisoprodol.

[83]  The National Institute on Drug Abuse warns that combining opioids and benzodiazepines can be unsafe because both sedate users, suppress breathing, and impair cognitive functioning and can cause overdose fatalities.  NIH National Institute on Drug Abuse, "Benzodiazepines and Opioids."

[84]  In addition to reporting a suspicious order to DEA, a registrant that determines that an order is suspicious must not fill it.  See also 21 U.S.C. § 823, which codifies 21 C.F.R. § 1301.74.

We found that the SORS database did not include all suspicious reports provided to DEA, thereby significantly impacting its usefulness. This was due largely to the fact that most DEA registrants are not required to report suspicious orders to DEA headquarters. Instead, consistent with federal regulation, nearly all such information is sent to DEA field division offices and DEA has not created a mechanism whereby reports sent to its field divisions are uploaded into the SORS database.[85] As of August 2017, approximately 1,400 DEA registrants were manufacturers and distributors of controlled substances and ARCOS contained ordering information from about 1,100 of these registrants. Yet, we found that the SORS database contained suspicious order reports from only eight registrants. All eight of those registrants were currently, or had been, subject to a Memorandum of Agreement (MOA) with DEA (due to prior violations of DEA regulations) that required them to submit suspicious order reports directly to DEA headquarters.[86]

During interviews, we asked DEA headquarters officials where the remaining suspicious order reports were located for the roughly 1,400 registered manufacturers and distributors of controlled substances; we were informed that DEA requires field divisions to maintain custody of the suspicious order reports. However, when we asked DEA field division staff to locate these reports at multiple sites throughout the country, staff were unaware of the requirement to maintain the reports and could not locate them. One Diversion Program Manager (DPM) described the SORS database as a "joke," noting that DEA field division staff did not receive access to the SORS database until 2017, nearly 10 years after it was created. We believe that the lack of consistent procedures for reporting suspicious orders, and uploading those reports into the SORS database, hampers DEA's ability to detect and target the diversion of controlled substances, including pharmaceutical opioids.

We further found that the current language of 21 C.F.R. § 1301.74(b) does not require manufacturers and distributors reporting suspicious orders to state why they believe an order is suspicious. This results in inconsistencies in reporting because registrants seemingly are applying varying standards and thresholds regarding unusual ordering behavior. This apparent lack of consistent standards creates a risk that suspicious orders may be underreported. The Associate Section Chief of the Pharmaceutical Investigations Section told us that it would help enforcement efforts to have some information on the record regarding why the reporting registrant considered a specific transaction suspicious.

To address these shortcomings, two DEA officials told us that DEA is revising its regulations to mandate that all manufacturers and distributors report suspicious

---

[85] Pursuant to 21 C.F.R. § 1301.74(b), registrants "shall notify the local DEA field division when suspicious orders are discovered."

[86] The Associate Section Chief of the Pharmaceutical Investigations Section stated that SORS generally captures suspicious orders only from registrants that have an existing MOA that mandates they report suspicious orders to DEA headquarters. Moreover, because MOAs do not exceed 5 years, the number of manufacturers and distributors that are submitting reports to the SORS database fluctuates over time. At the time of our interview with the Associate Section Chief, only one registrant was still required to report suspicious orders to DEA headquarters.

orders to headquarters, not to the field divisions, so that SORS has complete information that can be monitored and analyzed for all registrants. The Associate Section Chief of the Pharmaceutical Investigations Section told us that the revised regulation would help ensure that the data is reported to DEA headquarters consistently from all registrants and that it is appropriately vetted. We agree that the regulations, policies, and procedures should clearly instruct registrants where they should send suspicious order reports and that DEA should ensure that all reports are included in its SORS database. We also believe that DEA should establish regulations, policies, and procedures that specifically define what constitutes a suspicious order, as well as what information should be included in a suspicious order report.[87] This is important because most of the major enforcement actions taken against manufacturers and distributors of controlled substances heavily relied on suspicious order reports, or a lack thereof, as evidence that led to administrative actions and settlements that prevented future diversion.

### Discontinuation of the Medical Examiners Database in 2007

In 2005, DEA began working with medical examiners to develop a drug abuse warning network called the Medical Examiners Database. We were told that, because medical examiners are often the first to observe the impact of new drugs or analogues, the database allowed them to share their information with DEA, which assisted DEA in more quickly identifying new opioid analogues and assessing emerging overdose trends.[88] Specifically, once a medical examiner determined that a new opioid analogue had caused an overdose death, DEA could receive this "real-time" data and use it to justify formally scheduling the analogue by showing how it had caused harm to the public. In addition, the database improved information sharing among medical examiners, as they could use the data to run toxicology screens and find new drug compounds.

Despite the early success of the Medical Examiners Database, in 2007 then DEA Administrator Michele Leonhart discontinued it after HHS argued that the database contained the same information as HHS's DAWN Live. The current DEA Principal Deputy Administrator, Preston Grubbs, acknowledged that a drug abuse warning network would be beneficial in helping DEA combat the opioid epidemic.

---

[87] The Substance Use–Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act, also known as the SUPPORT for Patients and Communities Act, Pub. L. No. 115-271, became effective in October 2018. To address the issues discussed above, Sections 3291–3292 on preventing drug diversion codify new standards and definitions with respect to what constitutes a suspicious order. We discuss this change in the law in greater detail at the end of this report.

[88] A controlled substance analogue is a substance that is intended for human consumption, is structurally and pharmacologically similar to or is represented as being similar to a Schedule I or Schedule II substance, and is not an approved medication in the United States. See 21 U.S.C. § 802(32)(A).

*DEA Is Working with Federal and State Partners to Share Data, but Additional Improvements Are Necessary*

We found that DEA is working with its federal partners, such as HHS and the USAOs, to enhance its data sharing capabilities to facilitate data-driven oversight and improve its regulatory oversight. However, we also found that DEA faces challenges in some field divisions when seeking information from some state-run PDMPs. Such information is vital to DEA's work, given that DEA does not collect information on the prescribing and dispensing behavior of practitioners and pharmacists.

<u>HHS Medicare Data</u>

We found that DEA is working with HHS to facilitate data-driven oversight and improve its regulatory oversight. For instance, the Associate Section Chief of the DEA Pharmaceutical Investigations Section informed us that DEA recently entered into a data-sharing agreement with the HHS Office of Inspector General and that DEA now receives Medicare data, which among other things identifies physicians that are excluded from Medicare billing.[89] The Associate Section Chief told us that if a physician is unable to bill Medicare he or she generally can sustain a practice only through cash payments, which is a red flag for diversion. He also said that if the data shows that a physician was excluded from Medicare due to fraudulent activity DEA can issue an OTSC against the registration.

We note that in October 2018 Congress passed the Substance Use–Disorder Prevention That Promotes Opioid Recovery and Treatment for Patients and Communities Act (SUPPORT Act), which contains multiple provisions requiring consultation between HHS and DEA.[90] For example, the SUPPORT Act requires HHS, in consultation with DEA, to develop national milestones to measure their success in curbing the opioid epidemic, to report on the impact of federal and state laws and regulations on opioid prescriptions, and to recommend additional steps to limit the over-prescribing of opioids by medical practitioners. The SUPPORT Act also requires DEA to work with HHS to develop special registration procedures for telemedicine. Later in this report, we discuss additional requirements that the SUPPORT Act directed at the Department of Justice and DEA.

In addition, DEA is coordinating with the USAO for the Eastern District of Michigan, which has a program in place to evaluate a series of HHS Medicare data metrics in order to identify physicians throughout the country that may be at high risk for diverting drugs. According to the Associate Section Chief of DEA's Pharmaceutical Investigations Section, the USAO provides DEA headquarters with information packages identifying registrants suspected of diverting controlled substances based on its analysis, which includes HHS Medicare data. DEA headquarters subsequently forwards the information packages to the appropriate

---

[89] According to DEA, the data sharing agreement with HHS requires the sharing of data/documentation every 6 months. HHS is sharing with DEA mandatory exclusionary documentation on registrants that have controlled substance or Title 18 convictions. DEA is sharing with HHS final disposition arrest data on registrants and non-registrants, as its exclusion authority is extensive.

[90] The SUPPORT Act, Pub. L. No. 115-271, Title VII, Subtitle C, Public Health Provisions, §§ 7021–7024.

field divisions.  Later in this report, we discuss how these information packages generate leads and result in diversion investigations.

<u>Prescription Drug Monitoring Programs</u>

As described in the <u>Introduction</u>, PDMPs are state-run databases that include prescription information on doctors, dentists, pharmacies, and patients and that electronically monitor and house records regarding dispensed pharmaceutical drugs that contain controlled substances.  The goal of the PDMP is to assist medical professionals and state regulators in the identification and prevention of prescription drug abuse.  However, numerous DEA Diversion Investigators and Special Agents told us that they experience challenges in accessing PDMP information, which hinders their ability to investigate registrants that are suspected of diverting prescription drugs.

DEA staff told us that state-run PDMPs contain important and useful prescription information that helps investigators identify anomalies in physicians' prescribing practices.  States, however, have significantly varying requirements regarding how DEA can obtain access to this information.  Some states permit DEA to access their PDMP data provided there is an open law-enforcement investigation, while other states require DEA to have an administrative subpoena or a search warrant.[91]  One state, Vermont, prohibits law enforcement from obtaining PDMP information under any circumstance, which we were told creates significant challenges for DEA Diversion Investigators in a state with one of the highest opioid overdose rates in the country.[92]

---

[91]  Under federal law, law enforcement must demonstrate probable cause that a crime has occurred in order to meet the threshold for a search warrant (see Rule 41 of the *Federal Rules of Criminal Procedure*).  For an administrative subpoena, law enforcement must demonstrate only reasonable suspicion that a crime has occurred, a much lower threshold (see <u>21 U.S.C. § 876</u>).

We note that in FY 2003 the Department's Bureau of Justice Assistance developed the Harold Rogers Prescription Drug Monitoring Grant Program to assist in the implementation and enhancement of state-run PDMPs, including by developing data-driven strategies to address prescription drug abuse, misuse, and diversion within local communities.  The grant announcement envisions that states will collaborate and share data and information regarding unsolicited prescriber and patient prescription histories with law enforcement investigators, regulatory agencies, and licensing boards to target prescription drug abuse and diversion.  The announcement also states that the Bureau of Justice Assistance administers the program in coordination with several federal agencies, including DEA.  While we did not evaluate this program as part of this review, it is puzzling to OIG that DEA Diversion Investigators and Special Agents, who should be able to receive PDMP data and information from this DOJ-funded program, still face challenges to their ability to access the PDMP in some states, especially given that the Department has funded this program since FY 2003.

See DOJ Office of Justice Programs Bureau of Justice Assistance, "Harold Rogers Prescription Drug Monitoring Program, FY 2016 Competitive Grant Announcement," April 16, 2016, OMB No. 1121-0329, <u>www.bja.gov/funding/PDMP16.pdf</u> (accessed September 25, 2019).

[92]  According to the National Institute on Drug Abuse, Vermont had 101 opioid-related overdose deaths in 2016, a rate of 18.4 deaths per 100,000 persons, which exceeds the national rate of 13.3 opioid-related overdose deaths per 100,000 persons.  NIH National Institute on Drug Abuse, "Vermont Opioid Summary," March 2019, <u>www.drugabuse.gov/opioid-summaries-by-state/vermont-opioid-summary</u> (accessed September 25, 2019).

In response to these issues, the Department and DEA have taken steps to enhance DEA's access to PDMP data.  In 2017, a Ninth Circuit decision held that an administrative subpoena was sufficient to obtain PDMP information and that access did not violate privacy interests.[93]  In turn, several states within the Ninth Circuit, including Utah and California, began allowing DEA to use an administrative subpoena to gain PDMP access, rather than requiring a search warrant.  An Attorney Advisor with the Department's Office of Legislative Affairs stated that DEA has engaged with and will continue to work with congressional offices on solutions that will furnish law enforcement with access to state PDMP data while protecting individual patient privacy.

The Associate Section Chief of the Pharmaceutical Investigations Section also told us that in December 2017 DEA started negotiating a data sharing agreement with states that were seeking ARCOS data from DEA, which in turn may afford DEA improved access to these states' PDMP data.  Finally, the Bureau of Justice Assistance funded a PDMP data hub, called RxCheck, which offers states the opportunity to securely and efficiently share PDMP data with other states.  As of June 2018, RxCheck could facilitate prescription data sharing with only 5 states (Florida, Oklahoma, Alabama, Maine, and Kentucky) and 10 more states were in the process of joining the program.[94]

For DEA to better perform its regulatory responsibilities and to cooperate with states to prevent any future epidemics, we believe that the Department and DEA should continue to work with states to reach agreements that will enable DEA to have timely access to PDMP prescription data as needed to effectively perform its regulatory and law enforcement responsibilities while also ensuring adequate protections for the important healthcare privacy interests of patients.

<u>State Pharmacy and Medical Boards</u>

Another area in which DEA needs to improve its information sharing is with state medical and pharmacy boards.  For example, we learned that DEA is not always notified in a timely manner of actions that state pharmacy and medical boards take against physicians, pharmacists, and pharmacies.  We were told that, as a result, physicians were able to continue to prescribe opioids and other controlled substances even after their medical licenses were revoked because DEA was not aware of the license revocations.

In addition, a former Tactical Diversion Squad (TDS) Group Supervisor told us that DEA needs to foster better working relationships with its external stakeholders, including state boards.  According to this former DEA official, the

---

[93]  See *Oregon Prescription Drug Monitoring Program* v. *U.S. Drug Enforcement Admin.*, 860 F.3d 1228 (9th Cir. 2017).

[94]  According to the Bureau of Justice Assistance, an additional 9 states (West Virginia, Tennessee, Rhode Island, Arizona, North Dakota, Nebraska, Wisconsin, Georgia, and Vermont) have expressed interest in joining RxCheck.  Their participation, added to that of the states mentioned above, would expand the initiative to as many as 24 states.

state Board of Pharmacy he was working for when we interviewed him had 50 inspectors, all of which were licensed pharmacists.  He stated that given their subject matter expertise these inspectors would be a great resource for DEA to use during pharmacy inspections, which DEA recently added to the Diversion Control work plan.  However, at the time of our interview such coordination had not occurred.[95]

We believe that DEA must continue to work to foster relationships with state medical and pharmacy boards in order to keep these state entities informed about DEA regulations and registrant reporting requirements, as well as any administrative enforcement actions that DEA takes against registrants.  This would also help to ensure that DEA is kept apprised of any administrative actions that state boards take against registrants.

## The Department and DEA Have Taken Steps to Address the Opioid Epidemic as a National Crisis

We found that the Department and DEA have taken steps to address the opioid epidemic as a national crisis.  For example, in November 2015 DEA announced the piloting of its 360 Strategy to combat the opioid epidemic.[96]  The strategy involves coordinated law enforcement efforts with federal, state, and local partners; diversion control enforcement actions; and community outreach through local partnerships to provide support in outreach, education, and prevention.  In 2018 DEA conducted a 45-day enforcement surge, which resulted in 273 enforcement actions; however, we found that some of these actions were scheduled investigations routinely conducted as part of DEA's annual Diversion Control work plan.  Additionally, DEA is making an effort to increase both Diversion Investigator and Special Agent staffing levels in the field divisions located in areas hardest hit by the opioid epidemic.  Further, the Department's Opioid Fraud and Abuse Detection Unit began providing targeting packages to the USAOs, which have generated leads and resulted in ongoing DEA investigations.  Finally, as discussed

---

[95]  At the time of our review, DEA had several opioid-related initiatives with state and federal partners, including the National Healthcare Fraud Takedown, National Takeback Initiative, Memoranda of Understanding with state Attorneys General for Data Sharing, and National Opioid Strike Forces with the Department and other federal partners.  In addition, the DEA Special Operations Division and Diversion Control Division are in discussions with the U.S. Food and Drug Administration to collaborate on a joint "Warning Letter" campaign to officially notify purported internet pharmacy website owners to discontinue their alleged illegal activity.

In addition to this review, OIG is conducting an audit of DEA's prescription drug take back activities.

[96]  At the time of our review, DEA had deployed its 360 Strategy in 12 pilot cities for 1 year in each city.  DEA, "DEA 360 Strategy:  Overview," www.dea.gov/prevention/360-strategy/360-strategy.shtml (accessed September 25, 2018).

above, the SUPPORT Act, enacted in October 2018 to combat the opioid epidemic, includes several provisions that may help DEA increase its enforcement efforts.

*DEA's 360 Strategy Has Improved Its Community Outreach Efforts, but DEA Needs to Assess the Effect on Diversion Control Enforcement Actions*

In November 2015, DEA began implementing its 360 Strategy in cities across the country to respond to the heroin and prescription opioid pill crisis.  According to DEA, its 360 Strategy combats opioid abuse using a three-pronged approach: (1) coordinating law enforcement actions against drug cartels and heroin traffickers in specific communities, (2) leveraging diversion control enforcement actions against DEA registrants operating outside the law, and (3) pursuing community outreach through local partnerships that empower communities to take back affected neighborhoods and prevent problems from recurring.[97]  Based on interviews with DEA officials, including those responsible for implementing the 360 Strategy in West Virginia and Ohio, two states hit hard by the opioid epidemic, we found that the program has improved DEA's community outreach efforts to raise awareness of the dangers of opioids and increased intelligence sharing with law enforcement in the community.[98]

However, we found that the goals of DEA's 360 Strategy do not specifically address diversion control enforcement efforts and that DEA cannot determine how the program's diversion-related activities impact the field divisions' diversion control enforcement capabilities.[99]  According to the DEA headquarters official responsible for the 360 Strategy, in 2017 DEA hired an independent, third-party consultant to

---

[97]  Diversion control enforcement actions consist of ISOs, OTSCs, MOAs, and Letters of Admonition.  Depending on the severity of a registrant's conduct, DEA may suspend, revoke, or deny a DEA registration by issuing an ISO or OTSC; enter into a written contract, known as an MOA, with the registrant, which could place greater restrictions or conditions on the registrant; or issue a Letter of Admonition, which officially warns the registrant to resolve minor infractions.  Based on our review of DEA's administrative enforcement data, we found that the 360 Strategy did not have a material effect on DEA's administrative enforcement actions in 360-designated locations.  For instance, while DEA launched the 360 Strategy in Manchester, New Hampshire; Charleston, West Virginia; and Dayton, Ohio, in FY 2017, DEA issued only one OTSC and no ISOs against registrants operating in these three states during FY 2017.

OIG is conducting an audit of DEA's community-based efforts to combat the opioid crisis.  See DOJ OIG, "Ongoing Work," www.oig.justice.gov/ongoing/dea.htm (accessed September 25, 2019).

[98]  The Assistant Special Agent in Charge in the West Virginia field office at the time of our review told us that the 360 Strategy facilitated greater coordination with law enforcement in the community.  However, he also said that intelligence sharing and deconfliction among DEA, local law enforcement, and the USAO was an ongoing issue that needed to be resolved.  Consequently, he believes that law enforcement is "missing a lot of the boat on exploiting [the] case beyond the borders."

[99]  According to DEA, the goals of the 360 Strategy include:  (1) stopping the deadly cycle of heroin and opioid pill abuse by eliminating drug trafficking organizations and gangs fueling violence on the streets and cycles of addiction in our communities, (2) partnering with the medical community and others to raise awareness of the dangers of prescription opioid misuse and the link to heroin, and (3) strengthening community organizations best positioned to provide long-term help and support for building drug-free communities.

assess DEA's implementation efforts for two 360 Strategy pilot cities with a goal to evaluate additional pilot cities to measure the effectiveness of the program.  We reviewed two independent consultant reports completed during our review and found that they do not address or evaluate DEA's diversion control enforcement efforts.  Also, according to three DPMs that oversee DEA's Diversion Control Program in 360 Strategy pilot cities, the program has not enhanced their field divisions' diversion control enforcement efforts.[100]

In addition, a 2018 U.S. Government Accountability Office (GAO) report found that the 360 Strategy did not include goals or performance measures for two parts of the strategy:  "enforcement operations and diversion control initiatives."[101] GAO recommended that the DEA Administrator establish goals and outcome-oriented performance measures for enforcement and diversion control activities and establish outcome-oriented performance measures for community engagement activities within the 360 Strategy.[102]  According to GAO, DEA was considering applying its Threat Enforcement Planning Process to the 360 Strategy to develop outcome-oriented metrics, which includes an impact report that assesses the strategy's effect of DEA's enforcement and diversion control activities.[103]  However, GAO noted that these efforts are yet to be fully implemented and it is too soon to assess whether these efforts fully address GAO's recommendation.

While DEA's community outreach efforts are notable, DEA cannot demonstrate that the implementation of its 360 Strategy has changed its diversion control enforcement efforts in response to the opioid crisis.  We believe that DEA must assess whether the program is meeting all of its objectives and that DEA must establish measureable performance metrics that show how the 360 Strategy enhances DEA's ability to bring diversion control enforcement actions against registrants that may be diverting pharmaceutical opioids.

<u>DEA Has Taken Steps to Pursue Administrative Cases</u>

Unlike DEA's response to the OxyContin crisis, which targeted all registrants, including opioid distributors and manufacturers, in February 2018 DEA surged its enforcement and administrative resources to identify and investigate prescribers and pharmacies that dispensed disproportionately large amounts of controlled substances.  During the surge, DEA suspended its scheduled regulatory

---

[100]  Additionally, in June 2018 the Section Chief for the DEA Planning and Resource Section stated that, while DEA provides additional funding to 360 Strategy pilot city offices, these funds are largely allocated for public outreach efforts as opposed to bolstering offices' diversion control enforcement efforts against registrants that may be diverting controlled substances.

[101]  See GAO, *Illicit Opioids:  While Greater Attention Given to Combating Synthetic Opioids, Agencies Need to Better Assess Their Efforts,* GAO-18-205 (March 2018), www.gao.gov/assets/700/690972.pdf (accessed September 25, 2019).

[102]  GAO, *Illicit Opioids,* 65.

[103]  According to DEA's FY 2019 budget request, the Threat Enforcement Planning Process uses data analysis to maximize the allocation of resources and personnel against DEA-wide national level threats.

investigations so that the DEA Diversion Control staff could focus on specific leads and targets.[104]  The goal of the surge was to remediate or remove prescriber and pharmacy registrants whose actions "perpetuate the controlled prescription drug crisis in America, particularly opioid drugs."[105]

According to DEA, the 45-day enforcement surge resulted in 273 enforcement actions.  However, we found that these actions included scheduled regulatory investigations that DEA would have conducted as part of its annual Diversion Control work plan and that these scheduled investigations did not specifically target the diversion of pharmaceutical opioids.  The inclusion of these scheduled investigations increased DEA's reported enforcement data by almost 15 percent.  Additionally, we found that only 15 (5 percent) of the 273 enforcement actions that DEA issued were OTSCs (10) or ISOs (5).[106]

*While DEA's Diversion Control Staffing Had Declined Nationally During the Opioid Epidemic, DEA Is Now Making Efforts to Increase Staff in Locations Hardest Hit by the Opioid Epidemic*

Although the DEA registrant population has increased on average by about 40,000 registrants each year, we found that DEA's enforcement staffing has not grown at the same rate during the opioid epidemic.  Over the last decade, the registrant population grew from about 1.29 million registrants in FY 2007 to over 1.7 million registrants by the end of FY 2017.  As a result, the ratio of registrants to Diversion Investigators increased by over 30 percent in the past decade, from about 2,500 to 1 in FY 2007 (a total of 509 Diversion Investigators) to about 3,300 to 1 by FY 2017 (a total of 511 Diversion Investigators).

Based on our review of DEA data, we found that Diversion Investigator staffing increased by about 20 percent during our scope (from 422 in FY 2010 to 511 in FY 2017) but has slightly decreased since FY 2015.  Meanwhile, Special Agent staffing decreased by about 10 percent from FY 2010 to FY 2017 (from 5,006 in FY 2010 to 4,506 in FY 2017).  See Figure 5 below.

---

[104]  DOJ, Press Release No. 18-290, "DEA Surge in Drug Diversion Investigations Leads to 28 Arrests and 147 Revoked Registrations," April 2, 2018, www.justice.gov/opa/pr/dea-surge-drug-diversion-investigations-leads-28-arrests-and-147-revoked-registrations (accessed September 25, 2019).

In response to a working draft of this report, DEA provided to the OIG a January 2018 email from the Deputy Assistant Administrator, Office of Diversion Control Operations, to Special Agents in Charge, Assistant Special Agents in Charge, and DPMs in all DEA field divisions regarding the suspension of regulatory scheduled investigations during the 45-day enforcement surge.  The 45–60 day suspension of scheduled investigations was imposed so that DEA diversion staff could focus on specific leads and targets.

[105]  DOJ, Press Release No. 18-290.

[106]  Former acting DEA Administrator Patterson told us that he did not know why the results from scheduled investigations were included in the reported numbers because these activities were already part of the field division work plans that were approved at the beginning of FY 2017.  He further stated that although these scheduled investigations did not specifically target pharmaceutical opioid diversion, they coincidentally produced results during the 45-day surge.

**Figure 5**

**Diversion Investigator and Special Agent Staffing, FYs 2010−2017**



Source: OIG analysis of DEA data

Throughout the course of our review, many DEA officials and staff told us that DEA did not have adequate staffing to combat the opioid epidemic in their local areas. For instance, by 2016 West Virginia had the highest rate of opioid-related overdose deaths (43.4 deaths per 100,000 people) in the United States, with the majority of deaths attributed to synthetic opioids, such as oxycodone, hydrocodone, and heroin.[107] However, we found that until 2016 DEA had established only one TDS to cover the entire state of West Virginia.[108] As of August 2017, DEA's two West Virginia offices had 13 Special Agents and 6 Diversion Investigators that were responsible for regulating over 10,000 registrants throughout the entire state.[109] In addition, a DPM told us that DEA did not have adequate staffing in Florida, a state that has historically faced challenges with combating the diversion of opioids.[110]

---

[107] See NIH National Institute on Drug Abuse, "West Virginia Opioid Summary," March 2019, www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/west-virginia-opioid-summary (accessed September 25, 2019).

[108] In 2016, DEA established a second TDS located in Clarksburg, West Virginia.

[109] In January 2018, DEA established the Louisville Field Division to manage its diversion control efforts in West Virginia, Tennessee, and Kentucky. According to DEA, the new division was established to unify DEA's drug trafficking investigations throughout the Appalachian mountain region, which has been "impacted by an increasing amount of activity related to heroin, fentanyl, and prescription opioid trafficking." In addition, the new division provides better alignment between DEA and corresponding USAO districts.

[110] As we discussed above, there was a high volume of diversion in Florida during the early part of our scope. In fact, it was in Florida that DEA launched both Operation Pill Nation (2011) and Operation Pill Nation II (2012), which together led to 118 arrests, the surrender of more than 80 DEA registrations, the seizure of more than $19 million in assets, and the closure of at least 40 pain clinics.

The official told us that DEA had only about 20 Diversion Investigators that were responsible for regulating over 88,000 Florida registrants in the "pill mill capital of the world."

During our interview with then acting DEA Administrator Patterson, he acknowledged DEA's staffing shortfalls but noted that DEA could bring on only so many new staff at one time due to physical limitations at its training academy.[111] He told us that DEA anticipates hosting 2 new Diversion Investigator classes and 7 new Special Agent classes through FY 2019, which together will add 100 new Diversion Investigators and 350 new Special Agents to DEA's roster of employees. In addition, the Section Chief for the Planning and Resources Section told us that DEA plans to more than double its Diversion Investigator staffing, to about 1,100 positions nationwide over the next decade. The Section Chief added that if Congress provided DEA with direct hiring authority for diversion staff, as it has for Special Agent positions, DEA could hire candidates more quickly.[112] However, as of June 2019, DEA had not made a formal request to obtain direct hiring authority to staff Diversion Investigator positions.

*To Supplement DEA's Diversion Control Efforts, the Department Created the Opioid Fraud and Abuse Detection Unit*

The Department is responsible for prosecuting opioid-related cases primarily through the U.S. Attorney's Offices (USAO), with Assistant U.S. Attorneys (AUSA) exercising their discretion in determining whether and how to move forward with a case once a DEA Diversion Investigator or Special Agent presents evidence of violations.[113] However, we found that DEA's ability to bring federal criminal charges against registrants is challenging, due in part to a lack of resources within some USAOs to prosecute pharmaceutical opioid cases.

---

[111] In contrast to most DEA positions, Diversion Control staff, including TDS Special Agents, are funded by the Diversion Control Fee Account, which collects registration fees from manufacturers, distributors, dispensers, importers, and exporters of controlled substances and certain regulated chemicals. Although Congress must still approve proposed increases to DEA's staffing levels, DEA's Diversion Control funding is not limited to the traditional resource constraints of most government agencies. For instance, DEA reported that the Diversion Control Fee Account had generated over $416 million through registrant fees and maintained a balance of $175 million in FY 2017. Meanwhile, DEA reported that the National Diversion Control Program cost $420 million in FY 2017.

[112] According to our review on gender equity throughout the Department's law enforcement components, the Bureau of Alcohol, Tobacco, Firearms and Explosives; Federal Bureau of Investigation; and DEA may all use excepted service hiring authority for certain positions and issue position announcements in specific locations or cities based on need. The use of excepted service hiring authority increases an agency's applicant pool and offers targeted recruitment opportunities. See DOJ OIG, *Review of Gender Equity in the Department's Law Enforcement Components,* E&I Report 18-03 (June 2018), www.oig.justice.gov/reports/2018/e1803.pdf (accessed September 25, 2019). Although DEA may use excepted service hiring authority for Special Agents, Intelligence Research Specialists, and Task Force positions, DEA does not have this authority for diversion-specific positions.

[113] DEA Diversion Control Manual, Section 5263.2, 37.

To address this issue, in the fall of 2017 the Department established the Opioid Fraud and Abuse Detection Unit, a pilot program that uses data to focus on opioid-related healthcare fraud cases.[114]  The Opioid Fraud and Abuse Detection Unit provides targeting packages, which identify registrants suspected of diverting controlled substances, to AUSAs selected from USAO districts across the country to assist in identifying and prosecuting individuals that are contributing to the opioid epidemic.[115]  During our interviews with AUSAs assigned to the Opioid Fraud and Abuse Detection Unit, we learned that these packages have supplemented some of DEA's diversion efforts, generated leads, and resulted in ongoing investigations of overprescribing medical professionals and pharmacy thefts.  We also learned that requests for targeting packages have expanded beyond the initial 12 USAO districts.  We believe that these packages have the potential to benefit more USAOs across the country.[116]

*Legislation Intended to Combat the Opioid Epidemic May Help DEA Increase Its Enforcement Efforts*

In October 2018, the SUPPORT Act was signed into law to combat the opioid crisis.  The SUPPORT Act includes provisions to reduce the number of illegal opioids and excess prescription opioids that are available, to share data to address over-prescribing, and to authorize new support for community efforts to reduce the

---

[114]  DOJ, Press Release No. 17-861, "Attorney General Sessions Announces Opioid Fraud and Abuse Detection Unit," August 2, 2017, www.justice.gov/opa/pr/attorney-general-sessions-announces-opioid-fraud-and-abuse-detection-unit (accessed September 25, 2019).

[115]  At the time the program started, the Department initially selected 12 USAOs including the (1) Middle District of Florida, (2) Eastern District of Michigan, (3) Northern District of Alabama, (4) Eastern District of Tennessee, (5) District of Nevada, (6) Eastern District of Kentucky, (7) District of Maryland, (8) Western District of Pennsylvania, (9) Southern District of Ohio, (10) Eastern District of California, (11) Middle District of North Carolina, and (12) Southern District of West Virginia.  In response to a working draft of this report, the Executive Office for U.S. Attorneys told us that the Eastern District of California was no longer participating in the program.

[116]  In response to a working draft of this report, the Executive Office for U.S. Attorneys told us that dissemination is not limited to particular USAOs and that any USAO that requests a package can get one.  Additionally, the DOJ Criminal Division and DEA noted additional steps taken by the Department, DEA, and state and federal partners to address the opioid epidemic as a national crisis.  These steps include the creation of the Appalachian Regional Prescription Opioid Strike Force in October 2018, as well as some actions taken outside the scope of this review, such as two National Health Care Fraud Takedowns in July 2017 and June 2018.

DOJ, Press Release, "Appalachian Regional Prescription Opioid Strike Force Takedown," April 17, 2019, www.justice.gov/usao-sdwv/pr/appalachian-regional-prescription-opioid-strike-force-takedown-0 (accessed September 25, 2019).

DOJ, Press Release No. 18-1388, "Justice Department's Criminal Division Creates Appalachian Regional Prescription Opioid Strike Force to Focus on Illegal Opioid Prescriptions," October 25, 2018, www.justice.gov/opa/pr/justice-department-s-criminal-division-creates-appalachian-regional-prescription-opioid (accessed September 25, 2019).

DOJ, Press Release No. 18-866, "National Health Care Fraud Takedown Results in Charges Against 601 Individuals Responsible for Over $2 Billion in Fraud Losses," June 28, 2018, www.justice.gov/opa/pr/national-health-care-fraud-takedown-results-charges-against-601-individuals-responsible-over (accessed September 25, 2019).

availability of illicit opioids.  According to DEA officials, the SUPPORT Act also increases some of DEA's authorities to combat the opioid epidemic.  Based on our review of the SUPPORT Act, as well as DEA documents summarizing its provisions, we found that it amends several provisions of the Controlled Substances Act of 1970 (CSA), codifies DEA regulations, and creates new reporting requirements for DEA to Congress and the states, which could address some of the concerns we identified throughout this report.[117]

For example, the SUPPORT Act codifies the new quota regulation regarding the factors that the DEA Administrator can consider when determining the Aggregate Production Quota (APQ).[118]  We also found that the SUPPORT Act requires DEA to establish a centralized database for collecting reports of suspicious orders from all registrants.  In addition, it requires DEA to make a standardized report regarding suspicious orders available to state regulatory and licensing agencies, Attorneys General, and law enforcement agencies.  The SUPPORT Act explicitly defines the term "suspicious order" to ensure consistency and aid registrants in making reports.[119]

Further, the SUPPORT Act includes several provisions regarding the Automated Reports and Consolidated Orders System (ARCOS), which we found cannot detect the diversion of all pharmaceuticals, including some Schedule III and all Schedule IV and V opioids and other controlled substances.  Below, we list the SUPPORT Act requirements that are relevant to our review:

- On a quarterly basis, DEA will provide drug manufacturers and distributors with access to anonymized information from ARCOS to assist them in identifying, reporting, and stopping suspicious orders of opioids.  All registered manufacturers and distributors must review the information provided by DEA.[120]  The SUPPORT Act also amends the CSA to establish civil and criminal penalties for registered manufacturers and distributors for failing

---

[117]  The CSA requires that each person or firm that proposes to handle controlled substances or List I chemicals obtain a DEA registration unless exempted.

[118]  Proposed Rules, 21 C.F.R. Part 1303, Docket No. DEA-480, RIN 1117-AB48, Controlled Substance Quotas, 83 Fed. Reg. 76,17329 (Apr. 19, 2018), www.deadiversion.usdoj.gov/fed_regs/rules/2018/fr0419.htm (accessed June 28, 2018).  On July 16, 2018, the proposed rule became final, and it became effective on August 15, 2018.  See Final Rule, 21 C.F.R. Part 1303, Docket No. DEA-480, RIN 1117-AB48, Controlled Substance Quotas, 83 Fed. Reg. 136,32784 (Jul. 16, 2018).

As discussed in the Introduction, the APQ is the maximum amount of each basic class of Schedule I and II controlled substances that the DEA Administrator deems necessary for manufacture in a calendar year, by all pharmaceutical manufacturers combined, for the estimated medical, scientific, research, and industrial needs of the United States or for lawful export.

See also the SUPPORT Act, Pub. L. No. 115-271, Title VII, Subtitle C, Quota Reform, §§ 3281–3282.

[119]  The SUPPORT Act, Title III, Subtitle B, Chapter 9, §§ 3291–3292.

[120]  Title III, Subtitle B, §§ 3272 and 3273 of the SUPPORT Act establish that if the Department initiates proceedings against a registered manufacturer or distributor based on the failure of the registrant to maintain effective controls against diversion or for violations of the CSA, the Department may take into account that anonymized ARCOS data was made available to the registrant.

to review quarterly ARCOS data, failing to report suspicious orders of opioids, or failing to maintain effective controls.[121]

- The Department will prepare a standardized report and make it available to state regulatory and licensing agencies, Attorneys General, and law enforcement agencies in those states that the Department determines have the highest rate of opioid abuse. The report will contain descriptive and analytic information on the actual distribution patterns gathered from ARCOS, which includes detailed amounts, outliers, and trends of distributor and pharmacy registrants in such states for Schedule II controlled substances.[122] The report must be provided to the entities every 6 months.

- The Department will report to Congress on how the Department is using ARCOS to identify and stop suspicious activity, including whether the Department is looking at aggregate orders from individual pharmacies to multiple distributors that in total are suspicious, even if no individual order rises to the level of a suspicious order to a given distributor.[123]

Finally, the SUPPORT Act includes provisions requiring DEA to promulgate certain regulations. For example, while the legislation does not mandate electronic prescribing, it does instruct DEA to update its regulations that require multifactor authentication to access e-prescribing tools so that they include biometric components, such as fingerprint, thumbprint, and voice, as an approved means of authentication.[124]

Given that the SUPPORT Act was passed in October 2018, we are unable to measure or even predict its effect on the opioid crisis or DEA's opioid enforcement efforts. However, we believe that the legislation contains several provisions that could help DEA address some of the issues that we identified in this report.

---

[121] The SUPPORT Act, Title III, Subtitle B, § 3273(c), Using Data to Prevent Opioid Diversion, amends 21 U.S.C. § 842 and § 402 of the CSA.

[122] The SUPPORT Act, Title III, Subtitle B, § 3273(b), amends 21 U.S.C. § 873 and § 503 of the CSA.

[123] The SUPPORT Act, Title III, Subtitle B, § 3274.

[124] The SUPPORT Act, Title II, § 2003, Every Prescription Conveyed Securely.

# CONCLUSION AND RECOMMENDATIONS

**Conclusion**

As the United States is confronted with one of the worst drug epidemics in its history, with opioid-related overdoses accounting for more than 47,600 deaths in 2017, an estimated 35 percent of which involved a prescription opioid, we found that DEA was slow to respond to this crisis in a number of ways. First, unlike past drug crises, in combating the current opioid epidemic DEA failed to develop a comprehensive national strategy that could have focused and directed its regulatory and enforcement efforts. For example, as the rate of opioid use and abuse in the United States continued to increase from 1999 to 2016, the amount of opioid manufacturing authorized by DEA also increased dramatically during that same time. We found that DEA did not reduce the Aggregate Production Quota for most controlled substances until 2016, the year during which opioid production fell by 25 percent.

Second, in November 2015 DEA initiated its 360 Strategy, which was publicly touted as a program with a focus on law enforcement efforts, diversion control, and community outreach. However, we found that the goals of DEA's 360 Strategy do not specifically address diversion control enforcement efforts and that DEA cannot determine how the program's diversion-related activities impact its field divisions' diversion control enforcement capabilities. While DEA's community outreach efforts are notable, we believe that DEA must assess how the 360 Strategy impacts DEA's ability to bring diversion control enforcement actions against registrants that may be diverting pharmaceutical opioids.

Third, DEA does not capture sufficient data to detect the diversion of opioids or identify emerging drug abuse trends. Specifically, we found that DEA's system that monitors registrants' ordering patterns and behavior cannot detect the diversion of all pharmaceuticals, including some Schedule III, IV, and V opioids and other controlled substances. As a result, possible prescription abuse and diversion of these controlled substances are likely undetected. We also found that DEA's database to track registrant suspicious order reports is not used by the majority of its registrants, with only 8 registrants reporting suspicious orders to DEA in this manner. While we were told that the remaining registrants continue to report suspicious orders to local field division offices, DEA field division staff at multiple sites could not locate suspicious order reports when we asked them.

Fourth, we believe that DEA needs to bolster its recent efforts to work more closely with other federal and state partners to improve data sharing. For example, we found that DEA Special Agents and Diversion Investigators continue to face challenges accessing pharmacy and patient-level information from state-run Prescription Drug Monitoring Programs. The level of access to this data varies across states, and we believe that timely and consistent access to this information could improve DEA's ability to investigate registrants that may be diverting pharmaceutical opioids.

Fifth, DEA did not fully utilize its regulatory authorities and enforcement resources to detect diversion. We found that DEA regulations fail to assess the suitability of potential new registrants, which may prevent DEA from identifying registrants whose applications merit heightened scrutiny. These regulations hinder DEA's ability to prevent the diversion of all controlled substances, including pharmaceutical opioids. We also found that DEA did not maximize its resources to investigate diversion. Specifically, in the majority of cases DEA did not use its strongest enforcement tool, the Immediate Suspension Order (ISO), to combat diversion. Despite reports that pointed to the Ensuring Patient Access and Effective Drug Enforcement Act of 2016, or the "Marino Bill," as impeding DEA's ability to issue ISOs, we found that there was a reduction in the number of ISOs issued by DEA 3 years before the passage of this legislation. Also, we believe that the decline in ISOs was related to two key factors: the end of DEA's successful efforts to take down "pill mills" and the poor working relationship between DEA's Office of Chief Counsel and Diversion Control staff.

Further, we found that the Department and DEA have taken some recent steps to address the opioid epidemic, but that significant work remains. While DEA's enforcement staffing declined nationally during the opioid epidemic, at the time of our review DEA was making efforts to increase Diversion Investigator and Special Agent staffing levels. The Department's Opioid Fraud and Abuse Detection Unit also began providing targeting packages to 12 U.S. Attorney's Offices across the country, which, we were told, produced leads and supplemented ongoing opioid-related investigations. Finally, the enactment of the Substance Use–Disorder Prevention That Promotes Opioid Recovery and Treatment for Patients and Communities Act in October 2018 directed the Department and DEA to take several important steps to enhance enforcement efforts to combat the opioid epidemic. We believe that these legislative changes are a positive step; however, more must be done, including the possibility of additional regulatory changes, for the Department and DEA to effectively target registrants that engage in the diversion of opioids.

## Recommendations

To more effectively target registrants that engage in the diversion of opioids, we recommend that DEA:

1.  Develop a national prescription opioid enforcement strategy that encompasses the work of all DEA field divisions tasked with combating the diversion of controlled substances, and establish performance metrics to measure the strategy's progress.

2.  Require criminal background investigations of all new registrant applicants.

3.  Implement electronic prescribing for all controlled substance prescriptions.

4.  Require that all suspicious orders reports be sent to DEA headquarters.

5.  Take steps to ensure that DEA diversion control personnel responsible for adjudicating registrant reapplications are fully informed of the applicants'

history resulting in a prior registration being revoked by DEA, surrendering a prior registration for cause, losing a state medical license, or other conduct which may threaten the public health and safety by improving information provided to such personnel about the standards to apply in making decisions on such applications.

6.  Revise field division work plan requirements to allow the flexibility to target registrants for investigation.

7.  Revive a drug abuse warning network to identify emerging drug abuse trends and new drug analogues and respond to these threats in a timely manner.

To improve its efforts to combat the diversion of pharmaceutical opioids, as well as prosecute registrants that divert pharmaceutical opioids, we recommend that the Department:

8.  Make efforts to enlist state and local partners to provide DEA with consistent access to state-run Prescription Drug Monitoring Programs.

9.  Consider expanding the Opioid Fraud and Abuse Detection Unit pilot to additional U.S. Attorney's Offices and increasing the number of federal prosecutors dedicated to prosecuting opioid-related cases.

# PURPOSE, SCOPE, AND METHODOLOGY

## Standards

OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Data Analysis

We reviewed data related to all opioid anti-diversion activities from FY 2010 through FY 2017. Data included all investigations opened and closed by the Office of Diversion Control (OD); civil and criminal case filings against distributors, manufacturers, pharmacies, and doctors; Immediate Suspension Orders (ISO), Orders to Show Cause (OTSC), Letters of Admonition, and Memoranda of Agreement against registrants; voluntary surrenders; and other administrative enforcement actions brought against opioid distributors and manufacturers. We also reviewed all fines that DEA levied against opioid manufacturers, distributors, doctors, and pharmacies, including the amount, date, and recipient of each fine.

## Site Visits

We visited or conducted virtual site visits with eight DEA field divisions: (1) Washington, D.C.; (2) New England; (3) San Diego; (4) Los Angeles; (5) Miami; (6) New York; (7) Detroit; and (8) Denver. We selected these sites based on our analysis of opioid overdose data from the Centers for Disease Control and Prevention. In total, we spoke to DEA staff in 17 states and territories that were impacted by the opioid epidemic: (1) California; (2) Connecticut; (3) Denver; (4) Florida; (5) Maine; (6) Maryland; (7) Massachusetts; (8) Michigan; (9) New Hampshire; (10) New York; (11) Ohio; (12) Rhode Island; (13) Utah; (14) Vermont; (15) Virginia; (16) Washington, D.C.; and (17) West Virginia.

## Interviews

The team conducted 252 interviews during the course of our review, including interviews with DEA Diversion Investigators, Special Agents, Task Force Officers, Intelligence Analysts, Diversion Program Managers, Assistant Special Agents in Charge, and Special Agents in Charge. We also conducted interviews with senior officials at DEA headquarters, including the former acting DEA Administrator; the Principal Deputy Assistant Administrator; the Chief of Operations; current and former Assistant Administrators for the OD; the Deputy Chief Counsel; Section Chiefs or Associate Section Chiefs for the United Nations Reporting and Quota Section, Pharmaceutical Investigations Section, Planning and Resources Section, Community Outreach and Prevention Support Section, Liaison and Policy Section, Regulatory Drafting and Policy Support Section, Regulatory Section, Diversion & Regulatory Litigation Section, and Registration and Program

Support Section; and Chief Counsel attorneys.[125]  In addition, we interviewed officials and staff across 31 U.S. Attorney's Offices, including Assistant U.S. Attorneys, Narcotics Chiefs, Criminal Chiefs, Civil Chiefs, and the U.S. Attorney for the District of New Hampshire.  Finally, we interviewed senior officials in the Department's Office of the Deputy Attorney General and the Section Chief for the Criminal Division's Narcotic and Dangerous Drug Section.

**Policy and Document Review**

We reviewed diversion control regulations, policies, procedures, and charging documents, including every ISO and OTSC that DEA issued from FY 2010 through FY 2017.  In addition, we reviewed case file documents for eight cases, as well as corresponding case emails.

*Timeliness Analysis*

To evaluate DEA's timeliness in adjudicating administrative enforcement actions against registrants, we reviewed 642 ISOs and OTSCs, as well as subsequent DEA Administrator decisions provided to us by DEA.  During our review of these documents, we captured many fields of information, including but not limited to the name of the registrant, the type of registrant, the type of administrative enforcement action, the date that the administrative enforcement action was issued, the registrant's proposed hearing date, the submission date of the Administrative Law Judge's (ALJ) recommendation to the Office of the Administrator (when available), and the date of the DEA Administrator's final decision (when applicable).  To assess DEA's timeliness, we calculated the length of time it took for the Office of the Administrator to issue a final decision after receiving the ALJ's recommendation and the total length of time to complete the administrative process (from issuance to final decision).

Although our methodology allowed for both qualitative and quantitative analysis, it also produced several limitations.  First, we could measure the total length of time for only about 40 percent (265 out of 642 cases) of all cases we reviewed because many cases did not culminate with a final decision by the DEA Administrator during our scope.  For instance, we excluded from our analysis registrants that surrendered their DEA registration after receiving the charging document or whose case remained pending at the end of our scope.  Second, we were able to determine the submission date of the ALJ's recommendation for only about 35 percent (97 out of 265 cases) of all cases that resulted with a final decision by the DEA Administrator during our scope because that information was not regularly provided in the DEA Administrator's decision.  In addition, even when we could determine the ALJ's submission date for certain cases, the majority of these cases arose during the first half of our scope, which made it more difficult for us to conduct a reliable annual assessment of DEA's timeliness efforts.  Lastly, due to differences in methodology, we were unable to compare our timeliness analysis

---

[125]  The OIG made several attempts to obtain technical comments and feedback from former acting DEA Administrator Robert Patterson on our working draft report.  Despite our efforts, we were unable to obtain Patterson's comments and input.

to OIG's 2014 report, which also assessed DEA's timeliness in adjudicating enforcement actions against registrants.

<div align="right">**APPENDIX 2**</div>

# DEA DATABASES USED TO COMBAT THE DIVERSION OF CONTROLLED SUBSTANCES

In the Introduction for this report, we briefly describe a number of databases that DEA uses to combat the diversion of controlled substances and to target registrants that may be diverting pharmaceutical opioids.  We discuss these systems in greater detail below.

## Automated Reports and Consolidated Orders System

The Automated Reports and Consolidated Orders System (ARCOS) is DEA's automated system to monitor Schedule II and some Schedule III controlled substances.  ARCOS reporting requirements are specific to manufacturers and distributors under 21 C.F.R. § 1304.  Manufacturers and distributors must use ARCOS to report inventories, acquisitions, and dispositions to DEA.  ARCOS allows DEA to maintain current and historical records of inventories and transactions of selected controlled substances from drug manufacturers to distributors and other entities within the closed system of distribution, including pharmacies at the dispensing level.

## Drug Theft or Loss Reporting Requirements

DEA requires all registrants that handle controlled substances to report theft or loss of a controlled substance to their local DEA field division in writing within 1 business day of discovering the loss, according to the *Code of Federal Regulations*.[126]  Registrants have the option to report a lost or stolen controlled substance to DEA by paper submission; however, to minimize errors, DEA encourages registrants to report theft or loss of a controlled substance through the online Theft or Loss System.[127]

## Registrant Information Consolidated System

The Registrant Information Consolidated System (RICS), also known as CSA II, is a database that consolidates several of DEA's internal systems, including the Quotas, ARCOS, and CSA databases, providing real-time access to registrant actions and information.  DEA uses RICS to manage all registrant records.  In addition, RICS allows DEA field divisions to know when registrants are being investigated at the national level to avoid duplicate efforts.

---

[126]  21 C.F.R. § 1301.76(b).

[127]  Registrants may also report the theft or loss of controlled substances regulated by DEA using DEA Form 106.  DEA's Theft or Loss System, the online equivalent to the DEA Form 106, allows registrants to report information with fewer errors using the National Drug Code to populate fields that would identify the manufacturer, product, dosage format, and size of the package.

**Suspicious Order Reporting System**

Under the *Code of Federal Regulations,* manufacturers and distributors are required to develop and maintain a system to identify suspicious order requests and to report the information to DEA.[128] Manufacturers and distributors are further required, in accordance with the *U.S. Code,* to maintain effective controls to keep substances from being diverted outside of legitimate medical, scientific, or industrial needs.[129] Most suspicious orders should be reported directly to the local DEA field division unless the registrant has been directed through a Memorandum of Agreement to submit such activity to the Suspicious Order Reporting System (SORS) overseen by DEA headquarters. Suspicious orders are defined as unusual quantities or deviations from normal ordering practices. DEA registrant numbers are linked to suspicious order reports and, once such reports are populated in SORS, the system can show suspicious order activity throughout the nation.

---

[128] 21 C.F.R. § 1301.74(b).

[129] 21 U.S.C. § 823.

APPENDIX 3

# PRIOR WORK ON DEA DIVERSION EFFORTS

Related to opioid enforcement, DOJ OIG and the U.S. Government Accountability Office (GAO) have conducted eight previous reviews, which examined whether DEA has taken steps to improve its ability to control the diversion of opioids:

1. DOJ OIG, *Review of the Drug Enforcement Administration's Control of the Diversion of Controlled Pharmaceuticals* (September 2002).[130]  The review concluded that DEA was slow to commit sufficient resources to address the widespread problem of controlled pharmaceutical diversion and abuse.  We also found that DEA continued to devote a significantly lower percentage of its criminal investigation resources to controlled pharmaceutical diversion than to criminal investigations of illicit drugs, such as cocaine, heroin, and methamphetamines.

2. DOJ OIG, *Follow-Up Review of the Drug Enforcement Administration's Efforts to Control the Diversion of Controlled Pharmaceuticals* (July 2006).[131]  The review concluded that although DEA had taken steps to combat the diversion of controlled pharmaceuticals, some areas needed further improvement.  We also found that, since our September 2002 review, diversion using the internet had become a growing threat and that DEA had not provided Diversion Investigators with the tools necessary to conduct successful investigations.

3. DOJ OIG, *The Drug Enforcement Administration's Adjudication of Registrant Actions* (May 2014).[132]  The review concluded that DEA's process to adjudicate registrants' actions and issue final decisions was compliant with applicable laws and regulations.  However, the review found that DEA did not have timeliness standards for the adjudication process and that DEA was slow to reach final adjudication.

4. GAO, *Prescription Drugs:  OxyContin Abuse and Diversion and Efforts to Address the Problem* (December 2003).[133]  This review concluded that although federal and state agencies and Purdue Pharma, OxyContin's manufacturer, had taken actions to address the abuse and diversion of OxyContin, there was room for improvement.  GAO recommended that the U.S. Food and Drug Administration and Purdue Pharma implement a stronger safety warning on OxyContin's label and that both use a coordinated risk

---

[130]  See DOJ OIG, *Review of the Drug Enforcement Administration's Control of the Diversion of Controlled Pharmaceuticals,* E&I Report I-2002-010 (September 2002), www.oig.justice.gov/reports/ DEA/e0210/index.htm (accessed September 25, 2019).

[131]  See DOJ OIG, *Follow-Up Review of the Drug Enforcement Administration's Efforts to Control the Diversion of Controlled Pharmaceuticals,* E&I Report I-2006-004 (July 2006), www.oig.justice.gov/reports/DEA/e0604/index.htm (accessed September 25, 2019).

[132]  See DOJ OIG, *The Drug Enforcement Administration's Adjudication of Registrant Actions,* E&I Report I-2014-003 (May 2014), www.oig.justice.gov/reports/2014/e1403.pdf (accessed April 16, 2019).

[133]  See GAO, *Prescription Drugs:  OxyContin Abuse and Diversion and Efforts to Address the Problem,* GAO-04-110 (December 2003), www.gpo.gov/fdsys/pkg/GAOREPORTS-GAO-04-110/pdf/GAOREPORTS-GAO-04-110.pdf (accessed September 25, 2019).

management plan to help detect and prevent OxyContin abuse.  DEA's OxyContin National Action Plan and its successes were highlighted as an effective means of addressing the abuse and diversion of this drug.

5. GAO, *Controlled Substances:  DEA Should Take Additional Actions to Reduce Risks in Monitoring the Continued Eligibility of Its Registrants* (May 2016).[134]  The review concluded that DEA had established controls for determining registrant eligibility to handle and prescribe controlled substances.  However, limitations in DEA's controls did not help to ensure that individual registrants were and remained eligible and did not present issues that may increase the risk of illicit diversion.

6. GAO, *Department of Justice, Drug Enforcement Administration: Implementation of the Provision of the Comprehensive Addiction and Recovery Act of 2016 Relating to the Dispensing of Narcotic Drugs for Opioid Use Disorder* (February 2018).[135]  The review found that a new provision in statute allowed DEA to expand the categories of practitioners that may dispense Schedule III, IV, and V narcotic drug treatments for opioid abuse.

7. GAO, *Prescription Opioids:  Medicare Needs Better Information to Reduce the Risk of Harm to Beneficiaries* (May 2018).[136]  The review concluded that while the Centers for Medicare and Medicaid Services provided guidance to opioid prescription plan sponsors, recent criteria did not provide sufficient information on the large population of beneficiaries at risk of harm from opioid use.

8. GAO, *Prescription Drugs:  More DEA Information About Registrants' Controlled Substances Roles Could Improve Their Understanding and Help Ensure Access* (June 2015).[137]  The review found that some DEA registrants, particularly chain pharmacy and distributor corporate offices, had better communication with DEA about their regulatory roles and responsibilities. The review concluded that some chain and individual pharmacies, distributors, and practitioners wanted improved communication and guidance from DEA regarding regulatory requirements.

---

[134]  See GAO, *Controlled Substances:  DEA Should Take Additional Actions to Reduce Risks in Monitoring the Continued Eligibility of Its Registrants,* GAO-16-310 (May 2016), www.gao.gov/products/GAO-16-310 (accessed September 25, 2019).

[135]  See GAO, *Department of Justice, Drug Enforcement Administration:  Implementation of the Provision of the Comprehensive Addiction and Recovery Act of 2016 Relating to the Dispensing of Narcotic Drugs for Opioid Use Disorder,* B-329747 (February 2018), www.gao.gov/products/D18622 (accessed September 25, 2019).

[136]  See GAO, *Prescription Opioids:  Medicare Needs Better Information to Reduce the Risk of Harm to Beneficiaries,* GAO-18-585T (May 2018), www.gao.gov/products/GAO-18-585T (accessed September 25, 2019).

[137]  See GAO, *Prescription Drugs:  More DEA Information About Registrants' Controlled Substances Roles Could Improve Their Understanding and Help Ensure Access*, GAO-15-471 (June 2015), www.gao.gov/products/GAO-15-471 (accessed September 25, 2019).

**APPENDIX 4**

## DEA'S RESPONSE TO THE DRAFT REPORT



**U. S. Department of Justice**
Drug Enforcement Administration

---

*www.dea.gov*

SEP 2 5 2019

MEMORANDUM

TO:      Nina Pelletier
             Assistant Inspector General for
             Evaluation and Inspections
             Office of the Inspector General

FROM:   Mary B. Schaefer
             Chief Compliance Officer
             Office of Compliance

SUBJECT:  DEA Response to the OIG Final Report, "Review of Regulatory and Enforcement
             Efforts to Control the Diversion of Opioids"

The Drug Enforcement Administration (DEA) has reviewed the Department of Justice (DOJ) Office
of the Inspector General's (OIG) Evaluation and Inspections Division report entitled, "Review of
Regulatory and Enforcement Efforts to Control the Diversion of Opioids." DEA appreciates the
OIG's assessment of DEA's ongoing efforts to combat the diversion of prescription opioids. While
the report rightly identifies areas for improvement, we believe that it is important to both highlight
the positive progress that DEA has made in the last several years, and to provide context to some of
the key observations made in the report.

The DEA uses a wide array of tools – administrative, civil, and criminal – to fight the diversion of
controlled substances. While only a minute fraction of the more than 1.8 million DEA registrants
are involved in unlawful activity of this nature, DEA works to identify and root out the bad actors –
whether they are manufacturers, distributors, pharmacies, or prescribers. In the past eight years,
DEA has removed approximately 900 registrations annually, preventing further diversion of
controlled substances. Working with United States Attorney's Offices across the country, an
increasing number of individuals and corporations are facing civil and criminal charges for actions
that have fueled the opioid crisis. The information below provides recent highlights of DEA's
efforts in this area:

- In July 2019, two former corporate officers of Miami-Luken, a pharmaceutical distributor,
  and two pharmacists were indicted on charges that they conspired to illegally distribute and
  dispense controlled substances. The indictment alleges that the distributor and its officials
  filled suspicious orders, including distributing over a four year period more than 3.7 million
  hydrocodone pills to a pharmacy in a town of 400 people.

Nina Pelletier, Assistant Inspector General for Evaluation and Inspections      Page 2

- In April 2019, in a first-of-its-kind prosecution, two executives of Rochester Drug Cooperative (RDC), one of the ten largest pharmaceutical distributors in the United States, and the distributor itself were charged with drug trafficking and conspiring to defraud the DEA. As alleged, RDC knowingly and intentionally violated the federal narcotics laws by distributing dangerous, highly addictive opioids to pharmacy customers that it knew were being sold and used illicitly.

- DEA has pursued civil actions against some of the nation's largest drug distributors. In FY 2017, DEA secured more than $194 million in civil penalties, which is more than the total of the prior seven years combined. As of August 2019, DEA has secured over $51 million in civil penalties.

- In the last three years, DEA has reduced by over 45% the aggregate production quota for the seven most frequently diverted controlled substance opioids. DEA's 2020 quota proposal would bring this to 53% if implemented. There has been a precipitous decline in the number of opioid prescriptions since the beginning of this Administration as well: comparing January 2017 to August 2019, the number of prescriptions for those seven opioids has decreased by nearly 30%.

- DEA also works to educate its registrant community in an effort to stop potential diversion before it occurs. DEA has educated over 13,000 pharmacists and other pharmacy personnel in all 50 states, D.C., and Puerto Rico, and is now hosting similar events for practitioners (*e.g.*, doctors, dentists, veterinarians) to educate them on pre-emptive steps that can be taken to prevent diversion. Since May 2018, DEA has held 25 conferences in 13 locations, reaching over 5,800 healthcare professionals.

- DEA also utilizes its administrative authority to remove registrations from individuals or entities who act contrary to the public interest. Last fiscal year, DEA issued 20 Immediate Suspension Orders (ISOs), 71 Orders to Show Cause (OTSC), and obtained 774 surrenders for cause. The statistics for this fiscal year are likely to meet or exceed those from FY 2018.

These recent accomplishments build on several years of impactful partnership between DEA's Diversion Control Division and the Office of Chief Counsel. Below, we provide additional information in response to the report's findings that DEA did not use its available resources, including its administrative enforcement tools and data systems, to detect and regulate diversion effectively.

In finding that DEA's use of the ISO enforcement tool decreased from FY 2011 through FY 2015, and again in FY 2017, as compared to prior years, the report does not fully take into account the factors that contributed to that decline. As acknowledged in the report, DEA previously identified several factors relevant to the decrease.[1] These included: the substantial decline in opioid prescriptions since 2012 and the concomitant shift in diversion from prescription opioids to heroin/fentanyl, the past reluctance of U.S. Attorney's Offices to allow DEA to proceed administratively if parallel criminal investigations/matters were pending, DEA's strategic shift in 2011-2012 to target "upstream" registrants, the increase of registration surrenders, and the lack of

---

[1] *See* Report at 23-24, nn. 67 & 69.

adequate training of DEA investigation personnel on administrative remedies (including ISOs).

The report focuses only on two of these factors—"the end of DEA's successful efforts to take down 'pill mills' and the poor working relationship between DEA's Office of Chief Counsel and Diversion Control staff."[2] While DEA concurs that the end of Operations Pill Nation I & II in Florida, and other large-scale DEA enforcement operations was unquestionably significant in terms of the decline in ISOs after 2012, DEA believes that the report overstates the purported impact of the working relationship between the Office of Chief Counsel and the Office of Diversion Control on the decline in ISOs.

For example, although DEA produced files on 992 cases, the report discusses only two of them. Thus, in over 99% of the cases, the OIG appears to have found no evidence that discord between the Office of Chief Counsel and Diversion Control Division played a role in the decision to pursue an ISO. Moreover, even in the two cases discussed in the report, a lack of cooperation was not the reason that an ISO was not issued in either case. In one case, investigative personnel did not seek administrative action against the target for over a year after the alleged misconduct occurred. The ISO was not issued because at that point it was too late to show "imminent danger" based on the evidence presented. In the second case, as the report correctly recognizes, the Office of Chief Counsel was denied access to a medical expert. In that case, the testimony was essential to support administrative action and the ISO could not be issued without it.[3]

The report accurately observes that federal courts reviewing DEA ISOs had previously faulted DEA for presenting insufficient evidence.[4] In response to this criticism, DEA redoubled its efforts to ensure that the cases it presented were supported by adequate evidence. Though two subsequent cases were discussed where further information was requested by the Office of Chief Counsel, these requests were consistent with what the courts and pertinent case law require.

In failing to give adequate consideration to the other factors contributing to the decline in ISOs, the report disproportionately suggests that the decline in ISOs was due primarily to shortcomings at DEA. In fact, as the additional information DEA provided demonstrates, positive factors such as the decline in opioid prescriptions since 2012 and the increase in registration surrenders also contributed to the decline in ISOs.

As the case disposition data that DEA provided to OIG shows, although DEA issued fewer ISOs after 2012, between FY 2010 and FY 2019, the DEA charged 68.5% of the cases presented. This number rises to 82.6% when one accounts for cases that were favorably terminated prior to the issuance of a charging document (e.g., registrants surrendered their registration prior to charging).[5]

Additionally, the Office of Chief Counsel has declined only 7.6% of the cases opened during the review period, and when years FY 2018 and FY 2019 are included, that number drops to 6.5%.[6]

---

2 Report at 47.

3 Report at 25, n.71.

4 *See* Report at 23-24 (discussing *Cardinal* ISO federal court litigation).

5 *Id.* FY2019 data was provided through June 26, 2019.

6 *Id.* Since DEA charged or terminated 82.6% of the cases and declined to charge 7.6% of them, the remaining cases were either settled prior to the issuance of a charging document (4%) (*e.g.*, McKesson), held at the request of DEA investigators

Importantly, the percentage of cases declined has decreased by over 60% during the review period. For the first half of the review period (FY 2010-FY 2013), the declination rate was 9.7%. For the second half (FY 2014-FY 2017), the declination rate was less than half that, or 4.0%. When the second portion of the review period is extended to include FY2018 and FY2019 to date, the percentage of cases declined drops to 2.8%. No case has been declined since FY 2016.

DEA believes that this additional context is important to clarify the reasons for the declines in ISOs during the review period. DEA appreciates OIG's recognition that although discord once existed between the Office of Chief Counsel and the Diversion Control Division, it does not exist today, and has not for years. DEA further believes that collaboration between the Office of Chief Counsel and the Diversion Control Division has produced demonstrable results. Changes in DEA senior leadership in 2015-2016 substantially improved the relationship between the two offices, which currently enjoy a productive, collaborative working relationship.

Other factors also enhanced the working relationship between the offices. For more than three years now, the Office of Chief Counsel's Diversion & Regulatory Litigation Section (CCD) and the Diversion Control Division's Pharmaceutical Investigations Section (DOP) have partnered to provide additional training and assistance to DEA investigators, jointly conducting hundreds of site visits and trainings to increase field investigative personnel's awareness of, and familiarity with, DEA administrative proceedings and the associated evidentiary requirements.

This training regarding case investigation and preparation, in combination with the revised case intake process, has significantly improved the quality of case files presented for administrative action, which in turn speeds case initiation. As the quality of case files improves, cases can be charged more quickly. In FY 2016, for example, the median amount of time between receiving a case file and issuing a charging document was 24 days. By FY 2018, that time had declined to 15 days. As of the end of FY 2018, there were no uncharged cases pending in the Office of Chief Counsel, which has the capacity and capability to review additional cases.

These improvements in training and process have yielded results. In FY 2018, for example, DEA charged 91 cases administratively (71 OTSCs, 20 ISOs). This upward trend continues, as DEA has charged 100 cases (72 OTSCs, 28 ISOs) in FY2019 to date.[7] And as noted previously, no cases have been declined since FY 2016.

DEA anticipates that this positive cycle will continue. Many investigative personnel who previously worked in DOP and alongside CCD have now been promoted to senior leadership positions in various field divisions. Due to their expertise in administrative revocation proceedings, these personnel are working to remedy many of the training issues noted in the past. These personnel are also poised to collaborate with CCD and facilitate even greater use of the DEA administrative process.

With respect to parallel proceedings, the Office of Chief Counsel and Diversion Control Division have jointly worked with field investigative personnel to ensure that DEA pursues ISOs when feasible in parallel with criminal investigations/matters. As such collaborations continue to be

---

or US Attorney's Offices (5.5%), or are cases in which investigative personnel are working to obtain additional materials (0.3%).

7 FY2019 aggregate case data through September 12, 2019.

successful, DEA is optimistic that the historical reticence to allow DEA to proceed administratively in parallel with criminal proceedings will dissipate.

\*\* \*\* \*\*

OIG made a total of nine recommendations in this report, in which seven recommendations are directed to DEA. DEA provides the following responses to its recommendations:

**Recommendation 1. Develop a national prescription opioid enforcement strategy that encompasses the work of all DEA field divisions tasked with combatting the diversion of controlled substances, and establish performance metrics to measure the strategy's progress.**

<u>DEA RESPONSE</u>

DEA concurs with this recommendation. Although the Office of National Drug Control Policy is the entity within the federal government responsible for developing a national opioid enforcement strategy, DEA will undertake an internal review to develop a DEA-wide national prescription opioid enforcement strategy that incorporates the work of all DEA field divisions, to include metrics of performance to measure the strategy's progress.

**Recommendation 2. Require criminal background investigations of all new registrant applicants.**

DEA RESPONSE

DEA concurs with the recommendation. DEA agrees that it would be useful to require background investigations of all new registrant applicants. Currently, Diversion Control Division's Registrant Program Specialists (RPS) are authorized to request background checks on new registrant applications through a third party company. The Diversion Control Division is in the final approval process of issuing a guidance memorandum to its RPS staff that background checks on new registrant applications are mandatory, effective immediately. The scheduled issue date of the memorandum is anticipated to be October 1, 2019. DEA will provide OIG with a copy of this memorandum as soon as it is issued.

**Recommendation 3. Implement electronic prescribing for all controlled substance prescriptions.**

DEA RESPONSE

DEA concurs with the recommendation. The electronic prescribing of controlled substance prescriptions is already authorized for those practitioners who wish to do so. On March 31, 2010, DEA published in the Federal Register an interim final rule entitled, "Electronic Prescriptions for Controlled Substances." The effective date of this rule was June 1, 2010. Additionally, the SUPPORT Act (PL 115-271) signed into law on October 24, 2018, requires DEA, within one year of the law's enactment, to update the requirements for the biometric component of multifactor authentication with respect to electronic prescriptions of controlled substances. DEA is working to publish a final rule on the electronic prescribing of controlled

substances. This rule is on the Unified Agenda as a DOJ and Administration priority.

**Recommendation 4: Require that all suspicious orders reports be sent to DEA headquarters.**

**DEA RESPONSE**

DEA concurs with the recommendation. DEA agrees that all suspicious order reports should be sent to DEA headquarters. Registrants are currently required to report suspicious orders to the Field Division Office. 21 C.F.R. 1301.74(b). The SUPPORT Act requires that DEA establish a centralized database for collecting reports of suspicious orders within one year of the law's enactment. DEA is currently working to finalize the database for release by the statutorily mandated deadline of October 23, 2019. Additionally, DEA is drafting regulations pertaining to suspicious orders. This regulation is on the Unified Agenda as a DOJ and Administration priority.

**Recommendation 5. Take steps to ensure that DEA diversion control personnel responsible for adjudicating registrant reapplications are fully informed of the applicants' history resulting in a prior registration being revoked by DEA, surrendering a prior registration for cause, losing a state medical license, or other conduct which may threaten the public health and safety by improving information provided to such personnel about the standards to apply in making decisions on such applications.**

**DEA RESPONSE**

DEA concurs with the recommendation. DEA's current registration application forms already include a set of liability questions that require the applicant to disclose, on pain of a material falsification charge, information including registration revocations/surrenders and state licensure actions.

When an applicant answers any liability question in the affirmative, DEA initiates a pre-registration inquiry to further explore the applicant's response.

It is important to note that DEA lacks the authority to amend or alter the Controlled Substances Act (CSA) via guidance documents. Rather, guidance must come from agency case law applying the CSA, which specifies the legal considerations that guide the public interest analysis in DEA administrative proceedings, including reapplications. This case law provides extensive guidance on the application of the CSA's remedial framework and the relevant factors that DEA must consider under the CSA. For many years, DEA's Diversion Control Division has published all registration adjudication opinions on its website, which is available to the public and DEA investigative personnel.

Since 2015, DEA's Office of Chief Counsel has also produced its Deskbook, a reference handbook for diversion investigative personnel that is intended to address common questions and issues that frequently arise in registration investigations/adjudications. The Office of Chief Counsel has revised and disseminated the Deskbook three times. The Deskbook explains the pertinent criteria and legal analysis that DEA must apply under the CSA.

In response to this recommendation, DEA will examine the current pre-registration inquiry process and guidance to see if improvements can be made to better ensure that DEA Diversion Control Division personnel responsible for adjudicating registrant reapplications are fully informed of the standards of review when conducting a pre-registration inquiry. DEA will then report to the OIG on any changes that are deemed necessary.

**Recommendation 6. Revise field division work plan requirements to allow the flexibility to target registrants for investigation.**

**DEA RESPONSE**

DEA concurs with the recommendation. DEA agrees that it is important to allow flexibility to target registrants for investigation. The 2019 work plan was modified to allow the flexibility for the field to investigate threats in their area of responsibility. Per the FY 2019 work plan parameters, scheduled investigations were required to be completed on a registrant within five years of the last completed scheduled investigation. As such, the FY 2019 work plan covered FY 2019 – FY 2023. It allowed each division to have the flexibility to create their scheduled investigation work plan, based on identified concerns by division management and to choose a time frame for a scheduled investigation between one to five years. It is important to note that these dates are fluid and can be modified at any time to meet the threat assessment in each field division's area of responsibility. The Diversion Control Division has the authority to issue new work plans as needed to outline any changes that are determined to be necessary to address the ever changing landscape of diversion of controlled substances. The Diversion Control Division's strategy is to focus efforts on investigations that will aggressively combat the opioid epidemic and emerging drug threats. The Diversion Control Division is in the final approval stages of issuing a memorandum with new scheduled investigation guidance for FY2020. The anticipated issue date of this memorandum is October 1, 2019, and it will be distributed to all of the Diversion Control Division field offices. DEA will provide OIG with a copy of this memorandum as soon as it is issued.

**Recommendation 7. Revive a drug abuse warning network to identify emerging drug abuse trends and new drug analogues, and respond to these threats in a timely manner.**

**DEA RESPONSE**

DEA agrees that identifying and responding to emerging drug abuse trends is important to protect public health and safety, and the Diversion Control Division has a number of existing programs and initiatives to identify new and emerging drug threats.

The National Forensic Laboratory Information System (NFLIS) began in September 1997 as a single data collection effort of drug chemistry analysis results from local, state, and federal forensic laboratories (now called NFLIS-Drug). These laboratories analyze substances recovered/seized in law enforcement operations across the country. NFLIS-Drug is a valuable resource for monitoring illegal drug abuse and trafficking, including the diversion of legally manufactured pharmaceutical drugs into illegal markets. NFLIS-Drug data is used to support drug regulatory and scheduling efforts and to inform drug policy and drug enforcement initiatives nationally and in local communities.

NFLIS-Drug includes data from forensic laboratories that conduct analyses of approximately 98% of the Nation's approximate 1.5 million annual drug cases. As of February 2019, NFLIS-Drug includes 50 State systems and 104 local or municipal laboratories/laboratory systems, representing a total of 283 individual laboratories. A recent example of how NFLIS data is used is the NFLIS-Drug Special Release Maps, which highlight fentanyl and selected fentanyl-related substances reported to NFLIS-Drug in 2016 and 2017, and can be found on the NFLIS website.

Recently, DEA expanded the NFLIS program to include (1) public and private toxicology laboratory (NFLIS-Tox) data regarding postmortem and antemortem toxicological testing, and (2) medical examiner and coroner office (NFLIS-MEC) data regarding deaths in which drugs were identified. These two continuous data collection programs complement NFLIS-Drug and further support the DEA's drug regulatory and scheduling efforts. NFLIS recently reported findings from the 2017 Toxicology Laboratory Survey and 2017 Medical Examiner and Coroner Survey in support of starting the NFLIS-Tox and NFLIS-MEC programs.

In addition to the existing NFLIS system and our NFLIS enhancements, DEA recently initiated a contract with the University of California at San Francisco (UCSF) whereby biological samples generated from overdose victims of synthetic drugs can be further analyzed. This program's goal is to connect symptom causation and newly emerging synthetic drugs (i.e. synthetic cannabinoids, synthetic cathinones, fentanyl-related substances, other hallucinogens etc.). In addition to identifying new and emerging drugs of abuse, this program will assist investigators in building "death resulting from" cases against those who traffic controlled substances.

DEA will work with OIG to provide proof of these efforts and move towards closure of this recommendation.

Thank you for the opportunity to respond and address the OIG's concerns. If you have any questions regarding this response, please contact DEA's Audit Liaison Team at 202-307-8200.

# OIG ANALYSIS OF DEA'S RESPONSE

OIG provided a draft of this report to DEA.  DEA's formal response to the recommendations in the report is included in Appendix 4.  DEA concurred with all of OIG's recommendations.  Below, we discuss OIG's analysis of DEA's formal response and actions necessary to close the recommendations.

Separately, DEA's response questions the report's finding that a historically poor working relationship between the Office of Chief Counsel (CCD) and the Office of Diversion Control (OD) impacted DEA's use of Immediate Suspension Orders (ISO).  In support of its position, DEA states that it "produced files on 992 cases [and] the report discusses only two of them.  Thus, in over 99% of the cases, the OIG appears to have found no evidence that discord between [CCD] and [OD] played a role in the decision to pursue an ISO."  We do not agree with DEA's position.  First, DEA's response fails to mention what we were told by former long-time DEA agent and acting DEA Administrator Patterson, namely that the relationship between field division Diversion Control staff, OD, and CCD had historically been "toxic."  Second, as clearly stated in the report, the two cases discussed were cited as examples of the discord we found, consistent with former acting Administrator Patterson's statement.  The fact that the report does not discuss the remaining 990 cases does not support a conclusion that "OIG appears to have found no evidence of discord" in those cases.  We continue to believe that our finding is supported by the evidence we obtained during our review; however, as stated in the report, and as DEA describes in its response, we believe that DEA has taken recent steps to address the issue and improve this relationship.

**Recommendation 1:**  Develop a national prescription opioid enforcement strategy that encompasses the work of all DEA field divisions tasked with combating the diversion of controlled substances, and establish performance metrics to measure the strategy's progress.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation and stated that it will undertake an internal review to develop a national prescription opioid enforcement strategy that incorporates the work of all DEA field divisions and includes performance metrics to measure the strategy's progress.

**OIG Analysis:**  DEA's actions are responsive to our recommendation.  By January 3, 2020, please provide OIG with a status update regarding DEA's efforts to develop a national prescription opioid enforcement strategy that includes performance metrics to measure the strategy's progress and incorporates the work of all DEA field divisions.

**Recommendation 2:**  Require criminal background investigations of all new registrant applicants.

**Status:**  Resolved.

**DEA Response:** DEA concurred with the recommendation and agrees that it would be useful to require background investigations on all new registrant applicants. Currently, the Diversion Control Division's Registrant Program Specialists (RPS) are authorized to request background investigations on new registrant applications through a third party company. On October 1, 2019, the Diversion Control Division plans to issue a guidance memorandum to its RPS staff requiring mandatory background investigations on new registrant applications. DEA will provide OIG with a copy of this memorandum as soon as it is issued.

**OIG Analysis:** DEA's actions are responsive to our recommendation, provided that the anticipated guidance memorandum requires RPS staff to request "criminal" background investigations on all new registrant applications. By January 3, 2020, please provide a copy of the guidance memorandum to RPS staff and confirm that the type of background investigations now required are in fact "criminal" background investigations.

**Recommendation 3:** Implement electronic prescribing for all controlled substance prescriptions.

**Status:** Resolved.

**DEA Response:** DEA concurred with the recommendation. The electronic prescribing of controlled substance prescriptions is already authorized for those practitioners who wish to do so. On March 31, 2010, DEA published in the *Federal Register* an interim final rule entitled, "Electronic Prescriptions for Controlled Substances," which became effective on June 1, 2010. Additionally, the Substance Use–Disorder Prevention That Promotes Opioid Recovery and Treatment for Patients and Communities Act (SUPPORT Act) (PL 115-271), signed into law on October 24, 2018, requires DEA, within 1 year of the law's enactment, to update the requirements for the biometric component of multifactor authentication with respect to electronic prescriptions of controlled substances. DEA is working to publish a final rule on the electronic prescribing of controlled substances. This rule is on the Unified Agenda as a Department and Administration priority.

**OIG Analysis:** DEA's anticipated actions are partially responsive to our recommendation. While there are several rules DEA proposed on the Unified Agenda of the Office of Management and Budget at various stages in the rulemaking process, the OIG was unable to locate publicly available documentation that pertains to the publication of a final rule on mandatory electronic prescribing for all controlled substances. By January 3, 2020, please provide a status update and clarification regarding the publication of this anticipated final rule.

**Recommendation 4:** Require that all suspicious orders reports be sent to DEA headquarters.

**Status:** Resolved.

**DEA Response:** DEA concurred with the recommendation and agrees that all suspicious order reports should be sent to DEA headquarters. In accordance

with 21 C.F.R. 1301.74(b), registrants are currently required to report suspicious orders to DEA Field Divisions. However, since the enactment of the SUPPORT Act, DEA is required to implement the use of a centralized database for the collection of suspicious order reports. The statute requires that the database is functional by October 23, 2019. Additionally, DEA is drafting regulations pertaining to suspicious orders. This regulation is on the Unified Agenda as a Department and Administration priority.

**OIG Analysis:** DEA's actions are responsive to our recommendation. The OIG has confirmed that the proposed rule, which defines the term "suspicious order" and provides clarity to the registrant community on its reporting obligations, directly addresses the corrective action recommended in our report. In addition, the implementation of a centralized database for the collection of suspicious order reports also directly addresses the corrective action recommended. By January 3, 2020, please provide documentation confirming that suspicious order reports are being collected and housed in the new database and provide a status update regarding the proposed rulemaking regarding suspicious orders.

**Recommendation 5:** Take steps to ensure that DEA diversion control personnel responsible for adjudicating registrant reapplications are fully informed of the applicants' history resulting in a prior registration being revoked by DEA, surrendering a prior registration for cause, losing a state medical license, or other conduct which may threaten the public health and safety by improving information provided to such personnel about the standards to apply in making decisions on such applications.

**Status:** Resolved.

**DEA Response:** DEA concurred with the recommendation. DEA's current registration application forms already include a set of liability questions that require the applicant to disclose, on pain of a material falsification charge, information including registration revocations/surrenders and state licensure actions. When an applicant answers any liability question in the affirmative, DEA initiates a pre-registration inquiry to further explore the applicant's response.

It is important to note that DEA lacks the authority to amend or alter the Controlled Substances Act (CSA) via guidance documents. Rather, guidance must come from agency case law applying the CSA, which specifies the legal considerations that guide the public interest analysis in DEA administrative proceedings, including reapplications. This case law provides extensive guidance on the application of the CSA's remedial framework and the relevant factors that DEA must consider under the CSA. For many years, DEA's Diversion Control Division has published all registration adjudication opinions on its website, which is available to the public and DEA investigative personnel.

Since 2015, DEA's CCD also produced, revised, and disseminated its Deskbook, a reference handbook for diversion investigative personnel that is intended to address common questions and issues that frequently arise in

registration investigations/adjudications.  The Deskbook explains the pertinent criteria and legal analysis that DEA must apply under the CSA.

In response to this recommendation, DEA will examine the current pre-registration inquiry process and guidance to see whether improvements can be made to better ensure that DEA Diversion Control Division personnel responsible for adjudicating registrant reapplications are fully informed of the standards for review when conducting a pre-registration inquiry.  DEA will then report to OIG on any changes that are deemed necessary.

**OIG Analysis:**  DEA's actions are responsive to our recommendation.  By January 3, 2020, please provide a status update regarding DEA's examination of the current pre-registraton inquiry process and guidance documents associated with that process and describe any improvements DEA plans to make.

**Recommendation 6:**  Revise field division work plan requirements to allow the flexibility to target registrants for investigation.

**Status:**  Resolved.

**DEA Response:**  DEA concurred with the recommendation and reported that its FY 2019 Diversion Control work plan was modified to allow flexibility for each field division to investigate threats in its area of responsibility.  More specifically, DEA stated that the FY 2019 work plan allowed each division to create its scheduled investigation work plan based on concerns identified by division management and to choose a time frame for a scheduled investigation between 1 to 5 years.  DEA also acknowledged that these dates are fluid and can be modified at any time to meet the threat assessment in each field division's area of responsibility.  Further, DEA stated that the Diversion Control Division has the authority to issue new work plans as needed to outline any changes that are determined to be necessary to address the ever changing landscape of the diversion of controlled substances.  Moreover, DEA reported that the Diversion Control Division is in the final approval stages of issuing a memorandum with new scheduled investigation guidance for FY 2020.  DEA anticipates that this guidance will be issued to all Diversion Control Division field offices on October 1, 2019.  DEA will provide OIG with a copy of this memorandum as soon as it is issued.

**OIG Analysis:**  DEA's anticipated actions are responsive to our recommendation.  By January 3, 2020, please provide OIG with a copy of the FY 2020 scheduled investigation guidance memorandum that extends the flexibilities outlined in the FY 2019 work plan.

**Recommendation 7:**  Revive a drug abuse warning network to identify emerging drug abuse trends and new drug analogues and respond to these threats in a timely manner.

**Status:**  Resolved.

**DEA Response:** DEA agreed with the recommendation and reported that its Diversion Control Division uses a number of programs and initiatives to identify new and emerging drug threats.  Specifically, DEA stated that it uses the National Forensic Laboratory Information System (NFLIS), established in September 1997 and now called NFLIS-Drug, as a single data collection effort of drug chemistry analysis results from local, state, and federal forensic laboratories.  In addition, DEA noted that these laboratories analyze substances recovered and seized in law enforcement operations across the country and monitor trafficking and illegal drug abuse, including the diversion of legally manufactured pharmaceutical drugs into illegal markets.  Further, DEA reported that NFLIS-Drug includes data from forensic laboratories that conduct analyses of approximately 98 percent of the nation's annual drug cases and that as of February 2019 included 283 laboratories across the nation.  DEA also stated that NFLIS-Drug data is used to support drug regulatory and scheduling efforts to inform drug policy and drug enforcement initiatives nationally and in local communities.

In addition, DEA stated that it recently expanded the NFLIS program to include (1) public and private toxicology laboratory data regarding postmortem and antemortem toxicological testing and (2) medical examiner and coroner office data regarding deaths in which drugs were identified.  Moreover, DEA reported that it recently initiated a contract with the University of California at San Francisco whereby biological samples generated from overdose victims of synthetic drugs can be further analyzed.  DEA stated that the goal of the program is to connect symptom causation and newly emerging synthetic drugs (i.e., synthetic cannabinoids, synthetic cathinones, fentanyl-related substances, other hallucinogens, etc.).  The program will assist investigators in building "death resulting from" cases against those who traffic controlled substances.

**OIG Analysis:** DEA's actions are responsive to our recommendation.  By January 3, 2020, please provide OIG with documentation supporting DEA's efforts to expand the NFLIS program to include public and private toxicology laboratory data regarding postmortem and antemortem toxicological testing and medical examiner and coroner office data regarding deaths in which drugs were identified. Also, please provide OIG with information regarding the quality and frequency with which these types of data will be entered into the NFLIS system, and how DEA will use this information to respond to emerging drugs threats.

**APPENDIX 6**

# THE DEPARTMENT'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

**Office of the Deputy Attorney General**

---

*Bradley Weinsheimer*
Associate Deputy Attorney General

*Washington, D.C. 20530*

**MEMORANDUM**

**TO:**      Nina S. Pelletier
              Assistant Inspector General
              Evaluation and Inspections Division
              Office of the Inspector General

                            *g. Bradley Weinsheimer*

**FROM:**    Bradley Weinsheimer
              Associate Deputy Attorney General
              Office of the Deputy Attorney General

**DATE:**     September 25, 2019

**SUBJECT:**   Response to OIG's Draft Report: "Review of the Drug Enforcement
              Administration's Regulatory and Enforcement Efforts to Control the Diversion of
              Opioids, Assignment Number A-2017-003"

      The Office of the Deputy Attorney General (ODAG) appreciates the review undertaken by the Office of the Inspector General (OIG) and the opportunity to comment on OIG's draft report, "Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids, Assignment Number A-2017-003" (the "Report").

      The Report sets forth several recommendations. Recommendations One through Eight are directed at the Drug Enforcement Administration (DEA). However, the Report also directs two separate recommendations for the Department below.

   1. **Make efforts to enlist state and local partners to provide DEA with consistent access to state-run Prescription Drug Monitoring Programs**

      While the Department concurs with this recommendation, and will coordinate with DEA and state and local partners to effectuate it, we do wish to raise a few practical and legal concerns. As the OIG Report itself notes, state jurisdictions substantially limit law enforcement access to its Prescription Drug Monitoring Programs (PDMP). State authorities often require heightened legal cause (e.g. search warrant) to access PDMPs and sometimes prohibit access altogether. In jurisdictions that provide greater access to "state and local partners" than federal law enforcement, state law enforcement may not be able to share PDMP information with the DEA under state and local law.

<div align="center">1</div>

Accordingly, we request that OIG's assessment of Department "efforts" recognize that it may not be feasible or legal for state law enforcement to afford DEA complete access to PDMPs in the manner contemplated by this recommendation.

2. **Consider expanding the Opioid Fraud and Abuse Detection Unit pilot to additional U.S. Attorney's Offices and increasing the number of federal prosecutors dedicated to prosecuting opioid-related cases.**

The Department concurs with the recommendation. While the Department certainly will consider expanding the Opioid Fraud and Abuse Detection Unit pilot program upon its conclusion and will determine whether it would be feasible and appropriate to increase the number of federal prosecutors dedicated to prosecuting opioid-related cases, the allocation of limited prosecutorial resources is a matter reserved to the discretion of Department leadership. These decisions require policy determinations entailing careful cost and resource balancing of different strategic priorities and objectives.

<div align="right">**APPENDIX 7**</div>

# OIG ANALYSIS OF THE DEPARTMENT'S RESPONSE

OIG provided a draft of this report to the Office of the Deputy Attorney General (ODAG). ODAG's formal response is included in Appendix 6. ODAG concurred with all of OIG's recommendations. Below, we discuss OIG's analysis of ODAG's formal response and actions necessary to close the recommendations.

**Recommendation 8:** Make efforts to enlist state and local partners to provide DEA with consistent access to state-run Prescription Drug Monitoring Programs.

**Status:** Resolved.

**ODAG Response:** While the Department concurs with this recommendation and will coordinate with DEA and state and local partners to effectuate it, the Department wishes to raise a few practical and legal concerns. As the OIG report notes, state jurisdictions substantially limit law enforcement access to their Prescription Drug Monitoring Programs (PDMP). State authorities often require heightened legal cause (e.g., search warrants) to access PDMPs and sometimes prohibit access altogether. In jurisdictions that provide greater access to "state and local partners" than federal law enforcement, state law enforcement may not be able to share PDMP information with the DEA under state and local law.

Accordingly, we request that OIG's assessment of Department "efforts" recognize that it may not be feasible or legal for state law enforcement to afford DEA complete access to PDMPs in the manner contemplated by this recommendation.

**OIG Analysis:** ODAG's planned actions are responsive to our recommendation. OIG understands the limitations that the Department and DEA face in obtaining greater access to PDMP information. By January 3, 2020, please provide OIG with a status update regarding the efforts that the Department has made to enhance coordination between DEA and its state and local partners to obtain greater access to this information.

**Recommendation 9:** Consider expanding the Opioid Fraud and Abuse Detection Unit pilot to additional U.S. Attorney's Offices and increasing the number of federal prosecutors dedicated to prosecuting opioid-related cases.

**Status:** Resolved.

**ODAG Response:** The Department concurred with the recommendation. While the Department certainly will consider expanding the Opioid Fraud and Abuse Detection Unit pilot program upon its conclusion and will determine whether it would be feasible and appropriate to increase the number of federal prosecutors dedicated to prosecuting opioid-related cases, the allocation of limited prosecutorial resources is a matter reserved for the discretion of Department leadership. These decisions require policy determinations entailing careful cost and resource balancing of different strategic priorities and objectives.

**OIG Analysis:**  ODAG's planned actions are responsive to our recommendation.  By January 3, 2020, please provide OIG with a status update regarding any future plans for the maintenance and expansion of the Opioid Fraud and Abuse Detection Unit pilot program.



The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.

To report allegations of waste, fraud, abuse, or misconduct regarding DOJ programs, employees, contractors, grants, or contracts please visit or call the **DOJ OIG Hotline** at oig.justice.gov/hotline or (800) 869-4499.

**U.S. DEPARTMENT OF JUSTICE OFFICE OF THE INSPECTOR GENERAL**
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

| **Website** | **Twitter** | **YouTube** |
|---|---|---|
| oig.justice.gov | @JusticeOIG | JusticeOIG |

Also at Oversight.gov

**Exhibit B**



U.S. Attorneys » Western District of Louisiana » News

### Department of Justice

U.S. Attorney's Office

Western District of Louisiana

FOR IMMEDIATE RELEASE                                    Friday, May 24, 2019

# U.S. Attorney David C. Joseph announces settlement with Louisiana drug distributor, resolving claims it failed to report suspicious opioid orders to DEA

## Morris & Dickson Company to pay $22 million in civil penalty claims

**SHREVEPORT, La.** – United States Attorney David C. Joseph announced today that Morris & Dickson Company LLC has agreed to pay the United States $22 million in civil penalties to resolve claims that it violated the Controlled Substances Act by failing to report suspicious orders of hydrocodone and oxycodone.

"The fight against opioid abuse is among our nation's most pressing law enforcement and public health initiatives," said U.S. Attorney David C. Joseph. "Opioids are now the leading cause of accidental death in the United States – killing approximately 130 Americans every day. About 40 percent of these deaths involve prescription drug abuse. This settlement demonstrates the Justice Department's continued commitment to use all of the tools at its disposal to stem the opioid epidemic. Louisiana citizens should know that my office and our local DEA agents will continue to investigate and aggressively prosecute any manufacturer, distributor, pharmacy, or doctor who, whether negligently or intentionally, fail in their duty to appropriately control the distribution and use of these deadly drugs."

In addition to paying $22 million in settlement funds, Morris & Dickson also agreed during the course of the negotiations to make significant upgrades to its compliance program by investing millions of dollars to hire additional staff and implement new protocols and standards to ensure compliance with federal regulations requiring them to report suspicious orders of controlled substances.

This settlement arises from a Drug Enforcement Administration Office of Diversion Control investigation into Morris & Dickson's failure to report suspicious orders of hydrocodone and oxycodone. Since January 2014, DEA Diversion agents have identified more than 12,000 allegedly suspicious retail pharmacy orders that should have been reported. Under the Controlled Substances Act and its implementing regulations, distributors are required to report suspicious orders to the DEA. Reporting suspicious orders and maintaining effective controls against diversion of controlled substances are critical components of the government's effort to stop the illegal distribution and sale of opioids.

DEA Special Agent in Charge Brad L. Byerley said, "The failure to report suspicious orders as required by federal regulations contributes to the opioid epidemic, which has caused devastating harm to individuals and

our communities.  The settlement with Morris & Dickson demonstrates the resolve by DEA to use all available tools to address this crisis at every level and reduce the availability of highly addictive, dangerous drugs."

Morris & Dickson is the largest privately owned wholesale pharmaceutical distributor in the United States and the fourth largest wholesale distributor in the country, reporting total revenues of over $4 billion in its fiscal year ending January 31, 2018.  Since January 2014, Morris & Dickson distributed controlled substances to approximately 800 retail pharmacies across 17 states, distributing over 600,000,000 dosage units.  Morris & Dickson services hospitals, alternative and other health care providers, and retail pharmacies out of its Shreveport, Louisiana facility.

Mr. Joseph thanked the diversion investigators of DEA's Office of Diversion Control - New Orleans Division for their work in this matter.  Mr. Joseph was assisted in handling this matter by Assistant U.S. Attorney Melissa Theriot and former Assistant U.S. Attorney Shannon Brown.

The Centers for Disease Control and Prevention ("CDC") estimates that more than 630,000 Americans died from drug overdoses from 1999 to 2016.  In 2016 alone, approximately 42,000 people died of opioid-related causes.  The number of opioid-overdose deaths has reached epidemic proportions:  in 2016 there were five times as many such deaths as there were in 1999.

For information about the harmful effects of illicit drug use, visit www.JustThinkTwice.com    for teens and www.GetSmartAboutDrugs.com    for parents, educators, and caregivers.  To report suspected opioid-related crimes, the public is encouraged to contact the DEA at www.deadiversion.usdoj.gov/tips_online.htm.

---

**Topic(s):**
Prescription Drugs

**Component(s):**
Drug Enforcement Administration (DEA)
Diversion Control Program (DEA)
USAO - Louisiana, Western

Updated May 24, 2019

## CIVIL SETTLEMENT AGREEMENT

This Civil Settlement Agreement ("Civil Settlement Agreement") is entered by and between the United States Attorney's Office for the Western District of Louisiana ("USAO"), acting on behalf of the United States Department of Justice and the United States Drug Enforcement Administration ("DEA") (collectively referred to as the "United States") and Morris & Dickson Company, LLC ("Morris & Dickson") (each a "Party" and collectively the "Parties").

## RECITALS

A.    Morris & Dickson owns and operates (or has previously owned and operated) two (2) distribution centers that are or were registered with DEA as distributors of Schedule II – V controlled substances under the provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 et seq. (Controlled Substances Act or "CSA") (each a "Distribution Center" and collectively the "Distribution Centers").

B.    In determining whether to register an applicant to distribute Schedule II – V controlled substances, the Attorney General, acting through the DEA, must consider the applicant's maintenance of effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels. 21 U.S.C. §823(b)(1) and (e)(1).

C.    Section 1301.74(b) of Title 21 of the Code of Federal Regulations requires registrants to operate a system to identify suspicious orders of controlled substances and inform the DEA of suspicious orders when discovered.

D.    Morris & Dickson acknowledges that its DEA-registered distribution centers were and are required to comply with the CSA and the regulations promulgated thereunder, including the requirement described in Paragraph C.

E.      The DEA, by its Administrator, has pending an Order to Show Cause for Morris &

Dickson to appear and show cause why the DEA registration of Morris & Dickson should not be

revoked. *See In the Matter of Morris & Dickson Co., LLC*, DEA Administrative Court Docket No.

18-31.

F.      In parallel to the DEA Administrative Proceeding set forth in Paragraph E, the

United States Attorney's Office for the Western District of Louisiana conducted a civil

investigation with the assistance of the DEA's New Orleans Field Division into alleged failures by

Morris & Dickson to inform the DEA of suspicious orders of controlled substances as required by

21 C.F.R. § 1301.74(b).

G.      The United States contends that Morris & Dickson failed to inform the DEA of

suspicious orders as required by 21 C.F.R. §1301.74(b). The United States further contends that

these violations subject Morris & Dickson to civil penalties under 21 U.S.C. §§842(a)(5) and

(c)(1), as well as injunctive relief under 21 U.S.C. §843(f).

H.      This Settlement Agreement is neither an admission of liability by Morris & Dickson

nor a concession by the United States that its claims are not well founded.

I.      To avoid the delay, expense, inconvenience, and uncertainty of litigating the above-

referenced claims, and in consideration of the mutual promises and obligations of this Agreement,

the Parties agree and covenant as follows:

## <u>TERMS AND CONDITIONS</u>

1.      Paragraphs A-I set forth above are fully adopted herein.

2.      For purposes of this Agreement, "Covered Conduct" shall mean the followings:

      i.      Failure, between January 1, 2014 and March 8, 2019, by Morris & Dickson

            to timely identify suspicious orders of controlled substances and inform the

            DEA of those orders, as required by 21 C.F.R. § 1301.74(b); and

ii.   Failure, between January 1, 2014 and March 8, 2019, by Morris & Dickson to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. § 1301.74, including the failure to make records and reports required by the CSA and DEA's regulations for which a penalty may be imposed under 21 U.S.C. § 842(a)(5).

3.    Morris & Dickson shall pay to the United States the total sum of TWENTY-TWO MILLION U.S. DOLLARS ($22,000,000.00) (the "Settlement Amount"), within ten (10) business days after the Effective Date of this Agreement by electronic funds transfer pursuant to the written instructions provided to Morris & Dickson by the United States Attorney's Office for the Western District of Louisiana. Failure of Morris & Dickson to pay the Settlement Amount as set forth herein will void this Agreement and, in such an event, the United States may pursue any and all available remedies against Morris & Dickson for any of the Covered Conduct herein.

4.    In consideration of the undertakings by Morris & Dickson contained herein, and subject to the exceptions in Paragraph 5 below (concerning excluded claims), and conditioned upon Morris & Dickson's full payment of the Settlement Amount within the requisite time frame, the United States agrees to:

(i)    Fully and finally release Morris & Dickson from any and all civil penalty claims under 21 U.S.C. § 842, as well as any and all claims for injunctive relief under 21 U.S.C. § 843, that the United States could have asserted, or may assert in the future, against Morris & Dickson related to the Covered Conduct; and

(ii)   Refrain from filing any action for civil penalties under 21 U.S.C. §842 or any action for injunctive relief under 21 U.S.C. §843 against Morris & Dickson or any of its

subsidiaries, affiliates, predecessors, successors, parent companies, and assigns of each, based on, arising from, or related to the Covered Conduct.

5.    Notwithstanding the release given in Paragraph 4 of this Agreement, the United States specifically reserves and does not release:

   i. Any administrative action by the DEA based on or related to the Covered Conduct, but which does not solicit or impose civil penalties;

   ii. Any federal criminal liability;

   iii. Any criminal, civil or administrative claim arising under Title 26, United States Code (Internal Revenue Code);

   iv. Any liability under the False Claims Act, 31 U.S.C. §3729 or the Program Fraud Civil Remedies Act, 31 U.S.C. § 3801-3812;

   v. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct; and/or

   vi. Any liability based on obligations created by this Agreement.

6.    In consideration of the undertakings of the United States contained herein, Morris & Dickson fully and finally releases the United States, its agencies, officers, employees, servants, and agents from any claims (including attorney's fees, costs and expenses of every kind and however denominated) that Morris & Dickson has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, employees, servants, and agents related to the investigation, prosecution, and settlement of the Covered Conduct, provided, however, that Morris & Dickson reserves and does not release any liability based on obligations created by this Agreement. Morris & Dickson also reserves and does not release any liability based on the appointment and removal of administrative law judges under the CSA and the regulations

promulgated thereunder, unless and until such action becomes moot by the termination of the DEA Administrative Proceeding (18-31).

7.     Nothing in the Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue law, Title 26 of the United States Code.

8.     This Agreement binds and is intended to benefit only the Parties. This Agreement is not intended to be, and shall not be interpreted to constitute, a release of any person or entity not identified or referred to herein.

9.     Each Party shall bear its own legal or other costs incurred in connection with this matter, including the preparation, execution and performance of this Agreement.

10.     Each Party and signatory to this Agreement represents that he, she or it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

11.     This Agreement is governed by the laws of the United States. Each Party may seek judicial enforcement of this Agreement upon a material breach by the other Party. The Parties agree that the jurisdiction and venue for any dispute arising between and among the Parties will be the United States District Court for the Western District of Louisiana, Shreveport Division.

12.     For the purposes of construing this Agreement, the Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not be construed against any Party for that reason in any subsequent dispute.

13.     This Agreement constitutes the complete agreement between the Parties. All material representations, understandings, and promises of the Parties are contained in this Agreement. Each of the Parties expressly agrees and acknowledges that, in entering this Agreement, it is relying on only the statements and promises expressly set forth in this written

Agreement. This Agreement cannot be amended, nor any provisions waived, except in writing and when signed by all Parties to this Agreement.

14.     The undersigned individuals represent and warrant that they are fully authorized to execute this Agreement on behalf of the Parties listed below.

15.     This Agreement may be executed in counterparts, including by facsimile, pdf, or other electronic form or signature, each of which constitutes an original and all of which constitute one and the same Agreement.

16.     This Agreement is binding on Morris & Dickson and its successors, transferees, heirs, and assigns.

17.     The Parties may disclose the existence of and information about this Agreement to the public without restriction.

18.     This Agreement shall be effective (final and binding) on the date of signature by the last signatory to the Agreement (the "Effective Date" of this Agreement).

**[Signatures to begin on next page]**

**ON BEHALF OF MORRIS & DICKSON COMPANY, LLC**

DATED: _May 9_, 2019

Paul Dickson, CEO
Morris & Dickson Company, LLC

DATED: _____, 2019

Jodi Avergun
Cadwalader, Wickersham & Taft, LLP
Counsel for Morris & Dickson Company, LLC

**ON BEHALF OF THE UNITED STATES**

By: _____

DATED: _May 10_, 2019

David C. Joseph
United States Attorney
Western District of Louisiana

ON BEHALF OF MORRIS & DICKSON COMPANY, LLC

_____     DATED: _____, 2019
Paul Dickson, CEO
Morris & Dickson Company, LLC

_____     DATED: 10 May_____, 2019
Jodi Avergun
Cadwalader, Wickersham & Taft, LLP
Counsel for Morris & Dickson Company, LLC

ON BEHALF OF THE UNITED STATES

By:_____     DATED: _____, 2019
    David C. Joseph
    United States Attorney
    Western District of Louisiana

# EXHIBIT P

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

In the Matter of

**Docket No. 18-31**

**MORRIS & DICKSON CO., LLC**

ADMINISTRATIVE
LAW JUDGE
CHARLES WM.
DORMAN

**RESPONDENT MORRIS & DICKSON CO., LLC'S MOTION
TO REOPEN THE ADMINISTRATIVE RECORD**

Jim Walden
John Curran
Veronica Wayner
James Meehan
**Walden Macht & Haran LLP**
250 Vesey Street, 27th Floor
New York, New York 10281

Ricardo Solano Jr.
Philip Biegler
**Friedman Kaplan Seiler & Adelman LLP**
7 Times Square
New York, New York 10036-6516

Dated: January 5, 2022

On behalf of our clients Morris & Dickson Co., LLC and Morris & Dickson Co., LLC d/b/a Spark Drug, Inc. (together, "M&D"), we respectfully request to reopen the administrative record to permit the admission of new evidence.

## PRELIMINARY STATEMENT

On August 29, 2019, ALJ Charles Wm. Dorman (the "ALJ") recommended a virtual death sentence—revocation of M&D's certificates of registration—based on violations during a roughly four-year period in the 181-year history of a Shreveport-based family company that distributes vital medications to hospitals, hospices, nursing facilities, state institutions, and pharmacies throughout the country.  To date, the Administrator has issued no final order.  In addition to numerous substantive errors detailed in M&D's Exceptions to the Recommendation, dated October 8, 2019 (the "Exceptions"), the ALJ's recommendation that M&D's registrations to distribute controlled substances be revoked is based on stale and outdated information received during an administrative hearing held 31 months ago.  Over those 31 months that have elapsed since the hearing, M&D has continued its transformational remediation program, while simultaneously performing—to this very day—a critical role on the front lines of the nation's fight against COVID-19.  In the process, it has established through its conduct, and beyond any doubt, that it has fully accepted responsibility for its past failings and implemented a comprehensive and world-class remediation program.  M&D's remedial efforts, as well as its role in combatting COVID-19, present new and compelling evidence that continuing M&D's registration is manifestly consistent with the public interest and should be considered by the Administrator prior to a final order in this case.

As set forth below, in the nearly three years that have elapsed since the Administrative Law Judge's Recommended Rulings, Findings of Fact, Conclusions of Law, and Decision

("Recommended Rulings"), M&D has replaced management and continued to enhance its compliance program, which has been characterized as "state-of-the-art" by compliance consultant Krista Tongring of Guidepost Solutions, LLC ("Guidepost").[1]  Moreover, M&D has continued over the past 31 months to distribute controlled substances, without any regulatory violations. Indeed, the new evidence presented would include M&D's successful completion of a DEA audit on August 25, 2021, and an additional three-day audit by Guidepost ending on March 25, 2021, which found a vigorous anti-diversion program.[2]  In short, M&D is not only much better than it was, from a compliance perspective, but even better than most other drug distributors.

In addition, over the past 31 months, M&D has successfully taken on a unique and critical role in the country's fight against the COVID-19 global pandemic, delivering critical medications and more than 1.2 million vaccine doses to children and underserved communities.  For this reason, on May 6, 2021, the Louisiana House of Representatives commended M&D for its community service and recognized the company for the "vitally important role it has played during the ongoing pandemic" by issuing a public proclamation and recognizing its service to the state of Louisiana "over the last one hundred fifty years" with hopes that M&D "continue[s] to serve Louisiana when it is called upon to help."[3]

With these facts, both parties are in a litigation posture that may be *sui generis*.  The time that has elapsed since the Recommended Rulings has demonstrated with clarity that the ALJ's

---

[1] Ms. Tongring is a senior managing director in Guidepost's Monitoring, Compliance, and Investigations Practice.  Before joining Guidepost in 2018, Ms. Tongring worked at the Department of Justice for nearly 20 years, including with DEA, where she served as the Acting Section Chief in the Office of Compliance. While a senior attorney in the Diversion and Regulatory Litigation Section, she supervised investigations to ensure compliance with the Controlled Substances Act and litigated administrative actions.

[2] In the event this motion is granted, M&D is prepared to provide witnesses who can testify as to the new evidence cited herein.

[3] House Res. No. 56, 2021 Reg. Sess. (La. 2021), https://trackbill.com/bill/louisiana-house-resolution-56-commendations-commends-morris-dickson-co-llc-for-its-community-service/2108061/

speculation that M&D might "relapse" into noncompliance—which was a critical basis of his findings and rulings (despite the ALJ's finding that M&D's compliance reforms were "without question . . . impressive")—were wrong.  Based on the ALJ's other errors, a final order from the Administrator based on the Recommended Rulings is unlikely to withstand appellate review (putting aside the substantial constitutional issues that would be raised by an appeal, which might dismantle DEA's entire ALJ system).  But depriving M&D of the chance to supplement the stale record would be further grounds to upend any final order.  And COVID-19 has introduced another major complication, with the prospect of DEA eliminating a critical player in the pandemic response based on that outdated record and erroneous findings.  Fundamental fairness and due process—not to mention substantial public policy considerations—requires giving M&D the opportunity to complete the record.[4]

It is well established that the Administrator has discretionary authority to reopen the administrative record prior to issuance of a final order where, as here, relevant and material evidence becomes available only after the record has been transmitted by the Administrative Law Judge to the Administrator for a final decision.  In particular, precedent establishes the propriety of reopening the record where evidence concerning the respondent's post-hearing conduct is probative of the public interest factors required to be considered in connection with the potential revocation of a registration to distribute controlled substances under 21 U.S.C. § 824(a)(4).

---

[4] As the Administrator may be aware, new counsel for M&D has requested an opportunity to try to resolve the administrative matter with a consensual settlement.  A meeting for that purpose has been arranged with DEA's Chief Counsel for January 13, 2022, at which time M&D's counsel will offer additional reforms to guarantee that its compliance improvements continue unabated.  For that reason, we request that—should the Administrator reject this motion to reopen the administrative record—she at least delay the issuance of a final order until after M&D's new counsel has had an opportunity to resolve the matter with DEA's Chief Counsel.

**PROCEDURAL HISTORY**

On May 3, 2018, DEA served M&D with an Order to Show Cause and Immediate Suspension of Registration ("OSC/ISO"), immediately suspending the DEA Certificates of Registration ("COR"), Numbers RM0314790 and RM0335732, of M&D, pursuant to 21 U.S.C. § 824(d), and proposing to revoke M&D's CORs and deny any pending applications for renewal or modification, pursuant to 21 U.S.C. §§ 823(b),824(a)(4).  *See* May 2, 2018 Order to Show Cause & Immediate Suspension of Registration.  In response to the OSC/ISO, M&D timely requested a hearing, which was held in Arlington, Virginia, on May 13–16, 2019, before the ALJ.  The parties submitted post-hearing briefing and proposed findings of fact and conclusions of law on August 2, 2019.  *See* Government's Post-Hearing Brief (Aug 2, 2019); M&D's Proposed Findings of Fact and Conclusions of Law (Aug. 2, 2019).

The ALJ issued the Recommended Rulings ("RR") on August 29, 2019, concluding that M&D's continued registration was inconsistent with the public interest and recommending that M&D's CORs be revoked.  RR at 141.  While the ALJ did not sustain all of the Government's allegations against M&D, he found support for allegations concerning M&D's failure to conduct effective due diligence regarding "red flags" of diversion with respect to eight pharmacies, as well as allegations that M&D shipped controlled substances to those pharmacies for a period of roughly four years without resolving the red flags.  *Id.*

The ALJ also sustained the Government's allegations concerning M&D's failure to report suspicious orders to DEA.  RR at 142.  Specifically, while acknowledging that the "Administrative Record does not conclusively establish the exact number of suspicious order reports that should have been filed" by M&D, the ALJ nonetheless sustained the Government's allegation that M&D filed only three suspicious order reports to DEA over a period of about four years, when it should

have filed "thousands more." *Id.* Accordingly, the ALJ concluded that M&D failed to "design and operate a system to disclose to the registrant suspicious orders of controlled substances," as required under 21 C.F.R. § 1301.74(b). *See* RR at 142.

The ALJ then considered whether M&D had successfully rebutted the Government's *prima facie* case by showing that M&D had accepted responsibility and demonstrated sufficient remedial measures. RR at 146–55. At bottom, he refused to credit M&D's remediation because he refused to credit M&D's contrition. In that regard, the ALJ found that M&D's Director of Corporate Compliance and Security Scott Irelan lacked "standing" to accept responsibility on behalf of M&D, apparently because he was not a "principal" or owner of the company, and despite his role as the head of compliance and his receipt of express authorization by M&D's board of directors to act as a corporate representative in these proceedings. RR at 150. Further, the ALJ found that M&D's acceptance of responsibility was equivocal. RR at 154.[5]

In short, while acknowledging that, "[w]ithout question, **the remedial actions [M&D] has taken since the issuance of the OSC have been impressive**," RR at 154 (emphasis added), the ALJ gave those remediation efforts "no weight," reasoning that "[M&D]'s rapid enhancement of its SOM system and due diligence were 'stroke-of-midnight decisions[s]' spurred by the OSC/ISO" and that, in any case, M&D's remediation efforts were "not relevant" in light of the ALJ's conclusion that it had failed to unequivocally accept responsibility for the proven violations. RR at 155.

---

[5] The ALJ relied on three grounds in reaching this decision. First, the ALJ found that Mr. Irelan did not have final decision-making authority because M&D's president, Paul Dickson, could fire him and compliance consultants Analysis Group, Inc. and Guidepost at any time. RR at 85, 151–52. Second, the ALJ concluded that Mr. Irelan was not the proper representative to accept responsibility because he had no knowledge of, and was not responsible for, M&D's alleged violations. RR at 152–53. Third, the ALJ determined that Mr. Irelan did not accept responsibility for the full scope of the alleged violations. RR at 153–54.

Finally, the ALJ concluded that, in light of the proven violations and the ALJ's finding that M&D failed to rebut the Government's *prima facie* case, "general deterrence weighs in favor of recommending revocation."  RR at 155.

On October 8, 2019, M&D timely filed its Exceptions, in which it detailed why the ALJ's conclusion that Mr. Irelan did not have the capacity to accept responsibility was entirely wrong— legally and factually.  Exceptions at 8–24.  M&D argued that not only did the ALJ misconstrue DEA precedent on this point, he also erroneously quoted DEA's brief in this case as if it were an Administrator's precedential opinion.  *See* Exceptions at 9–14.  Further, in sharp contrast to the ALJ's findings, M&D unequivocally accepted responsibility for all violations that the ALJ determined were proven by DEA.  *See id.* at 9–24.  In addition, M&D further argued that the ALJ erred in refusing to admit and consider evidence showing years of the company's good faith compliance efforts, which not only bolstered the credibility of its ongoing remediation program but was also directly relevant to whether M&D's continued registration is consistent with the public interest.  *See id.* at 25–31.  The Exceptions remain pending before the Administrator.

## <u>LEGAL STANDARD</u>

The Administrator's authority to reopen the record is well established.  In *Robert M. Golden, M.D.*, <u>61 Fed. Reg. 24808</u> (1996), then-Deputy Administrator Stephen H. Greene explained the basis and parameters for that authority as follows:

> [T]he Deputy Administrator notes that he has discretionary authority to request that the Administrative Law Judge reopen the record to receive newly discovered evidence **on the basis that a final order must be issued based upon a full and fair record**.  See 5 U.S.C. [§] 556; 21 U.S.C. [§] 824(c); 21 CFR [§] 1316.67.  However, to prevail on such a motion, the moving party must show that the evidence sought to be introduced (1) was previously unavailable and (2) would be material and relevant to the matters in dispute.

7

*Id.* at 24812 (citing *I.N.S. v. Abudu*, 485 U.S. 94, 96 (1988)) (emphasis added). DEA has repeatedly reaffirmed this authority.[6] Consistent with the standard articulated in *Golden*, DEA has routinely granted applications to reopen the record, both before and after issuance by the ALJ of recommended rulings.[7] As these decisions recognize, reopening the record is appropriate where facts and circumstances relevant to the Administrator's final determination occurred or came to light only after the hearing.

The decision in *Wesley G. Harline, M.D.*, 65 Fed. Reg. 5665 (2000), is particularly instructive. There, DEA sought to revoke the Certificate of Registration for a cosmetic surgeon based on allegations that he had improperly prescribed controlled substances to patients and failed to maintain complete patient records. *Id.* at 5665, 5668. The Utah Administrative Code authorized the revocation of a state license to handle controlled substances if the holder prescribed or administered any controlled substance for weight control for more than a specified number of days, and also required recordkeeping and documentation of prescriptions and refills, as well as accurate records of the examination, evaluation and treatment of all patients. *Id.* at 5665–66. Following a

---

[6] *See, e.g.*, *Johnson Matthey Inc.*, 67 Fed. Reg. 39041, 39042 (2002) (noting that while "[i]n an adjudication, the Deputy Administrator issues his final order based on the record made before the Administrative Law Judge," the "Deputy Administrator has the authority" to request to reopen the record); *Lyle E. Craker, PhD*, 76 Fed. Reg. 51403, 51405 n.1 (2011) ("DEA also adheres to the Supreme Court's decision in *Interstate Commerce Comm'n* v. *Bhd. of Locomotive Eng'rs*, 482 U.S. 270 (1987), regarding the reopening of proceedings where it is alleged that new evidence or changed circumstances render the agency's original order inappropriate.").

[7] For example, numerous cases have held that reopening the administrative record is appropriate where post-hearing developments implicate the status of the respondent's state license. *See Trenton F. Horst, D.O.*, 80 Fed. Reg. 41079, 41083 (2015) (Deputy Administrator granted motion to remand to ALJ for further proceedings in light of post-hearing change in status of respondent's state authorization to dispense controlled substances); *George Mathew, M.D.*, 75 Fed. Reg. 66138, 66139 (2010) (ALJ repeatedly reopened the record); *Randall M. Schaffer, D.D.S.*, 67 Fed. Reg. 35590, 35590 (2002) (Administrator remanded proceeding to ALJ because "new and previously unavailable evidence had recently been acquired by the Government"); *Michael G. Dolin, M.D.*, 65 Fed. Reg. 5661, 5662 (2000) (ALJ granted motion to reopen record to receive evidence that state court had lifted stay of revocation of respondent's medical license); *Michael J. Pine, D.D.S.*, 64 Fed. Reg. 33318, 33318 (1999) (ALJ granted motion to reopen record to receive evidence of post-hearing revocation of dentist's state license).

hearing, the ALJ issued an opinion in which she recommended that the respondent's certificate of registration be revoked. *Id.* at 5665. In doing so, the ALJ also denied the respondent's motion to reopen the hearing record to admit evidence that was not available during the hearing. *Id.* In particular, the respondent had sought to reopen the record to admit a post-hearing report by a physician who reviewed respondent's patient records for compliance pursuant to the terms of a Stipulation and Order with state professional licensing authorities. *Id.* at 5666, 5671. The respondent filed exceptions to the ALJ's recommendations, arguing, among other things, that the post-hearing report was improperly excluded. *Id.* at 5671. In response to those exceptions, DEA argued that the ALJ "properly excluded the report since it added nothing to the record in this matter and in order to properly assess the value of the report, the reviewing physician would need to testify and be subjected to cross-examination." *Id.* Respondent countered that the new evidence demonstrated that he followed procedures that ensured accurate records of the examination, evaluation and treatment of all patients. *Id.* at 5669. The Deputy Administrator disagreed with DEA, holding that the excluded report showed the "extent" of the respondent's compliance, which was "clearly relevant" to the public-interest inquiry. The Deputy Administrator explained his reasoning as follows:

> The Deputy Administrator finds that [ALJ] Bittner should have reopened the record to allow Respondent to introduce into evidence the October 2, 1997 report from the reviewing physician and to provide the Government with an opportunity to cross-examine the physician and/or introduce rebuttal evidence. Clearly, this report was not available to Respondent until October 2, 1997, after the conclusion of the hearing in this matter. In addition, the Deputy Administrator finds that this report is clearly material and relevant to the issue in this proceeding. Both Government counsel and Judge Bittner state that the report merely shows that Respondent is complying with the state's Stipulation and Order, which is presumed. However, the Deputy Administrator finds that this report also shows the extent of Respondent's compliance. ***The issue in this proceeding is whether Respondent's continued registration is***

> ***inconsistent with the public interest. The state of Respondent's
> current practice is clearly relevant and this information was not
> available until after the conclusion of the hearing.***

*Id.* at 5671 (emphasis added). Not only did the Deputy Administrator find that the report was improperly excluded, he declined to remand the matter to the ALJ for further proceedings, concluding that revocation of the respondent's certificate of registration was not warranted. *Id.* at 5671–72.

The reasoning in *Harline*—under which a respondent's post-hearing track record of compliance may be probative of the public interest factors considered in connection with a potential revocation of a DEA registration—has been applied consistently. *See, e.g.*, *Harrell E. Robinson, M.D.*, 74 Fed. Reg. 61370, 61371 (2009) (granting Government's motion to reopen record to introduce post-hearing stipulation and order by state medical board, noting that the Government had made a "*prima facie* case for reopening the record" because the "Board's order is clearly material to the public interest inquiry" and "was not available at the time of the hearing"); *AML Corp., d/b/a G & O Pharmacy, and G & O Pharmacy*, 61 Fed. Reg. 8973, 8973, 8975–76 (1996) (noting that the ALJ granted the Government's motion to reopen the record to receive evidence regarding respondent's improper post-hearing transfer of ownership of a pharmacy, and finding this post-hearing conduct "significant" in the public interest inquiry).

## <u>ARGUMENT</u>

Reopening of the administrative record is undoubtedly warranted because: (1) the evidence M&D seeks to introduce is material and relevant to the matters in dispute; (2) the evidence was not previously available; and (3) the reopening of the record is necessary to provide a complete record of the Agency's reasoning for purposes of judicial review.

## I.    Background

To prevail on a motion to reopen the administrative record, the "moving party must show that the evidence sought to be introduced . . . would be material and relevant to the matters in dispute." *Robert M. Golden, M.D.*, 61 Fed. Reg. at 24812.

After DEA presents a *prima facie* case for sanction, the respondent has the burden of production "to show why its continued registration would not be inconsistent with the public interest." *Masters Pharm., Inc.*, 80 Fed. Reg. 55418, 55473 (2015).  In particular, DEA precedent establishes that, to rebut the Government's *prima facie* case, the respondent "must accept responsibility for its actions and demonstrate that it will not engage in future misconduct."  *Id.* at 55501 (quoting *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364, 387 (2008)).  In other words, it must show both remediation and acceptance of responsibility.  In addition, when assessing the appropriateness and extent of sanctions, DEA considers the egregiousness of the offenses and DEA's interest in specific and general deterrence.  *David A. Ruben, MD.*, 78 Fed. Reg. 38363, 38385 (2013).  Ultimately, the central question animating these inquiries is whether the respondent's continued registration would be consistent with the public interest.  *See* 21 U.S.C. § 824(a)(4).

## II.    The Evidence Sought To Be Introduced Is Material And Relevant To The Matters In Dispute

The evidence M&D seeks to introduce concerning its post-hearing conduct, including the company's extensive compliance and remediation efforts and its key role in the government's response to the pandemic, is directly relevant to the three primary issues presently before the Administrator: (1) M&D's acceptance of responsibility, (2) the extent and effectiveness of M&D's remediation efforts, and (3) the appropriate sanction for proven violations.

### A.     M&D's Thirty-One-Month Post-Hearing Track Record Demonstrates Its Acceptance Of Responsibility

As detailed in the Exceptions, the ALJ incorrectly concluded that Mr. Irelan lacked standing to accept responsibility on behalf of M&D, and further erred in concluding that M&D's acceptance of responsibility was equivocal.  RR at 150, 154; Exceptions at 8.  As a result, the ALJ determined that M&D's admittedly "impressive" remedial actions were not relevant and gave them no weight at all.  RR at 154–55.  The ALJ's recommendations with respect to acceptance of responsibility were clearly erroneous as a matter of law.  *See* Exceptions at 9–24.

Regardless, M&D's history of consistent exemplary post-hearing conduct confirms beyond any doubt that M&D has fully accepted responsibility for shortcomings in their past compliance efforts and implemented a robust remediation program that confirms the propriety of continuing its registration.  In fact, Paul Dickson retired from his post as CEO and President, and new management has continued M&D's "impressive" compliance efforts, as evidenced by two successful post-hearing audits, one by DEA and one by Guidepost.  Further, Jacob Dickson, who oversaw compliance in the pre-hearing era, has also resigned from M&D.

The reason that "acceptance of responsibility" is considered relevant to the public interest analysis is because it is considered a reasonable proxy for, or predictor of, future *actual* compliance.  Indeed, multiple Courts of Appeal have upheld DEA's acceptance-of-responsibility requirement as rational on the grounds that if a respondent "does not understand the extent of the past misconduct or its current responsibilities under the law, the DEA rationally could doubt that the [respondent] would faithfully comply *in the future* with its obligations under the CSA."  *See, e.g.*, *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 833 (11th Cir. 2018) (emphasis added); *accord MacKay v. DEA*, 664 F.3d 808, 820 (10th Cir. 2011) (admittance of fault is relevant to Administrator's consideration of whether a respondent will change its future

behavior). Both the Government and the ALJ have embraced this rationale in this very case, asserting that "past performance is the best predictor of *future* performance." Government's Response to Exceptions, dated Nov. 7, 2019 ("Gov't Response") at 7 (emphasis added) (quoting *Lesly Pompy, M.D.*, 84 Fed. Reg. 57749, 57761 (2019)); *see also* RR at 95 (citing *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. at 387; *Sun & Lake Pharmacy*, 76 Fed. Reg. 24523, 24533 (2011)).

Of course, the underlying premise of this rationale is that it is necessary to rely on a "predictor" of future performance, however imperfect, because administrative decisions must be issued without the ability to know with certainty what the future will hold. **Here, however, there is no rational basis to rely on such a proxy, when the Administrator may examine 31 months of *actual* post-hearing conduct that demonstrates M&D's acknowledgement of those failures and a sustained commitment to compliance and remediation.** In this unique context, the failure to even consider M&D's actual track record of compliance and contributions to public health would contravene the stated rationale for the acceptance-of-responsibility-requirement; indeed, it would be arbitrary and capricious.[8] *See Sierra Club v. EPA*, 671 F.3d 955, 965–66 (9th Cir. 2012) (overturning as arbitrary and capricious agency's action where agency failed to provide an adequate explanation for its reliance on outdated data); *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (agency action was arbitrary and capricious where agency "recognized that it was relying on outdated data and that it had been presented with

---

[8] As the Government notes: "[T]he obligation to accept responsibility is not merely some *pro forma* ritual. Nor is it demonstrated by some talismanic recitation of certain words. Rather, it is a critical part of the registrant's burden to 'present sufficient mitigating evidence to assure the Administrator that it can be entrusted with the responsibility carried by such a registration.'" Gov't Response at 11 (quoting *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. at 387). Quite so, but that is all the more reason for the Administrator to focus her attention on M&D's actual track record of post-hearing compliance, which clearly demonstrates that the ALJ's "prediction" that M&D might "return to its old ways" was erroneous.

more recent data, but it chose to continue relying on the outdated data without explaining why");
*cf.* RR at 144 (acknowledging that "[w]hen deciding whether registration is in the public interest,
the DEA must consider the totality of the circumstances" (citing *Joseph Gaudio, M.D.,* 74 Fed.
Reg. 10083, 10094-95 (2009))).

M&D's post-hearing conduct is also highly relevant to controvert the ALJ's erroneous
conclusion that Mr. Irelan was not an appropriate spokesperson for M&D's contrition and reform,
and thus not a reliable predictor of future compliance.  In this matter, DEA has argued that
acceptance of responsibility "is particularly applicable here where [M&D]'s owners and
executives were extensively and personally involved in [M&D]'s wrongdoing, and remain in
charge of [M&D]'s operations."  Gov't Response at 12.  According to DEA, "[a]bsent evidence
that the true decision-makers accept responsibility for [M&D]'s misconduct, the Agency cannot
be assured that [M&D] 'can be entrusted with the responsibility carried by such a registration.'"
*Id.* at 14 (quoting *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. at 387).  Similarly, the ALJ
concluded that Mr. Irelan's acceptance of responsibility on behalf of M&D was inadequate given
the theoretical possibility that he could be fired "tomorrow," in which case the ALJ speculated that
M&D might "return to its old ways."  RR at 150–52.

While in some cases it may be necessary for DEA to seek indirect "assurances" of future
compliance—and, depending on the facts, it may even be necessary to seek such assurances from
the principals of certain closely held businesses—this is not such a case.  M&D's 31-month track
record of post-hearing compliance corroborates and confirms its acknowledgment of wrongdoing
and its commitment to compliance going forward.  Mr. Irelan has not been fired.  The compliance
department continues to grow—expanding from a single individual in May 2018 to nine full time
employees today.  Guidepost remains in place as does M&D's compliance consultant, headed by

Ms. Tongring, who spent several years litigating administrative actions, including the *Masters Pharmaceutical* action. Should the record be opened, we expect Ms. Tongring's testimony to provide powerful evidence of M&D's reform, including a compliance function she believes is "state-of-the-art." Moreover, as stated above, Paul and Jacob Dickson have resigned from M&D, and thus no longer supervise the compliance function. M&D has thus not returned to its "old ways." Indeed, an August 2021 DEA administrative inspection of M&D's Shreveport facility identified no compliance violations. The ALJ's speculation about potential future compliance relapses—made 28 months ago—have proved to be unfounded.

Ultimately, the Government cannot have it both ways. Either M&D's principals control M&D, or they do not. But it cannot be that M&D's acceptance of responsibility through its Compliance Director is given no weight on the theory that he does not "really" direct M&D's compliance program, while at the same time, M&D is afforded no credit for its actual, *proven* track record of compliance for more than 31 months following the hearing—presumably at the direction (on DEA's theory) of M&D's principals.

### B.   M&D's Post-Hearing Conduct Demonstrates Extraordinary Remediation Efforts

Although the ALJ concluded that M&D's remedial actions following issuance of the Order to Show Cause were "impressive," he gave those remediation efforts no weight on the purported grounds (i) that the Company had failed to unequivocally accept responsibility (addressed above) and (ii) that "after-the-fact good works merit a skeptical eye." RR at 154–55. Again, the ALJ's reasoning was demonstrably flawed and constituted error. *See* Exceptions at 25–29. But even were the Administrator inclined to credit the ALJ's skepticism, M&D's 31-month post-hearing track record demonstrates that such skepticism was analytically flawed and overly cynical.

As an initial matter, the ALJ's skepticism made no sense. Companies often reform only

after a problem is exposed.  If no company could show effective remediation unless it took action before a problem was identified by DEA (or other federal and state agencies), many, many companies would be out of business.  Dismissing M&D's efforts as "after-the-fact" made even less sense, since the ALJ identified no basis on which to be specifically critical of M&D's efforts. They hired the preeminent consulting firm to assist in their efforts, which was headed by none-other-than Louis J. Milione, now the Principal Deputy Administrator.  M&D spent millions of dollars on this effort.  It fundamentally revamped the compliance system into a "state-of-the-art" program.  Even the ALJ conceded the efforts were "without question . . . impressive."  RR at 154. The ALJ's generic and injudicious dismissal of M&D's reform efforts flies in the face of commonsense, let alone experienced enforcement officials, such as Andrew Weissman, former Chief of DOJ's Fraud Section, who recognized that "encouraging appropriate and timely remediation is important to reducing corporate recidivism and detecting and deterring individual wrongdoing."[9]  For these reasons, numerous judges have upheld registration where the registrant has demonstrated rehabilitative and corrective efforts after DEA first identified a problem with compliance.  *See, e.g.*, *Abbas E. Sina, M.D.*, 80 Fed. Reg. 53191, 53202 (2015) (finding that respondent produced sufficient evidence of successful rehabilitation and commitment to recovery and was therefore entitled to be registered); *Howard N. Robinson, M.D.*, 79 Fed. Reg. 19356, 19357–58 (2014) (holding that respondent's immediate corrective efforts upon being informed of violations and complete compliance warranted vacatur of the suspension upon respondent's successful completion of a probationary period); *Tyson D. Quy, M.D.*, 78 Fed. Reg. 47412, 47418 (2013) (finding that respondent's rehabilitative steps and demonstration of a commitment to fully

---

[9] Memorandum from Andrew Weissman, Chief, Fraud Section, Criminal Division, DOJ 7 (Apr. 5, 2016), https://www.justice.gov/archives/opa/blog-entry/file/838386/download.

complying with DEA regulations weighed in favor of granting respondent a conditional DEA registration and that "[t]he paramount issue [was] . . . whether . . . [the] Respondent ha[d] learned from past mistakes and ha[d] demonstrated that he would handle controlled substances properly if entrusted with a DEA registration"); *Barry H. Brooks, M.D.*, 66 Fed. Reg. 18305, 18309 (2001) (concluding that the evidence demonstrated that respondent had taken responsibility for past misconduct, fully cooperated, and was unlikely to repeat his past mistakes and therefore his continued registration was consistent with the public interest).

The evidence of M&D's compliance efforts—the granular details of which show why Ms. Tongring describes the program as "state-of-the-art"—are too voluminous for this submission, but are readily provable through witnesses and documents, should the record be reopened. For example, since the hearing, M&D—with help from Guidepost—identified pharmacies purchasing highly diverted controlled substances and terminated accounts it determined were placing suspicious orders (in addition to the hundreds it terminated before the Order to Show Cause, as it was trying to comply with DEA's regulations, a subject on which the ALJ refused to take evidence despite its obvious relevance). M&D also augmented its customer due diligence software to allow for real-time analysis of customer ordering and dispensing, redeveloped its enhanced customer profile (which provides quick access to a broad array of customer information), and now requires customers to complete due diligence questionnaires and certify their compliance with the Controlled Substances Act and DEA regulations. Beginning in January 2020, M&D deployed an algorithmic system to automatically cancel and report daily to DEA orders that exceed a numeric threshold, based on peer-group and historic purchasing. In 2021 alone, M&D reported 5,291 orders to DEA and canceled 5,033 of these orders. And since May 2019, M&D has reported 18,926 orders, canceled 16,544 orders, terminated its relationship with 21 pharmacies, and refused

to onboard 36 potential customers.

This year, Guidepost has also reviewed physical and operational security, electronic systems and procedures and processes concerning controlled substances; conducted customer due diligence; inspected M&D's warehouse (including vaults and cages); interviewed Compliance personnel, site management staff, and company executives; and conducted physical inventories of controlled substances.

Therefore, it would be arbitrary and capricious to deny M&D an opportunity to establish its extensive post-hearing track record and remedial successes to refute the speculative and unsupported conjecture that its "compliance-related expenditures are a reluctant and temporary cost that [M&D] does not intend to maintain," as the Government argued below. Gov't Response at 29 n.23.

### C.    M&D's Post-Hearing Conduct Is Highly Probative Of Continued Registration Being In The Public Interest And The Appropriate Sanction

The revocation of a distributor's registration is not a routine penalty for any compliance failures. Rather, DEA should only revoke a respondent's registration if the Administrator finds, after a five-factor analysis, that respondent "has committed such acts as would render [its] registration . . . inconsistent with the public interest." 21 U.S.C. § 824(a)(4). A decision here to put a 181-year-old company out of business—and hundreds of employees out of work—based on the current outdated record, without considering the irrefutable fact that M&D has implemented a robust, effective, and fully-tested compliance program and that it also has served effectively to help address the gravest public health crisis in a century, would never survive judicial scrutiny.

More specifically, to evaluate whether a distributor's continued registration is inconsistent with the public interest, the following factors "shall be considered" by the Administrator: (1) "maintenance of effective control against diversion of particular controlled substances into other

than legitimate medical, scientific, and industrial channels;" (2) "compliance with applicable State and local law;" (3) "prior conviction record of applicant under Federal or State laws relating to the manufacture, distribution, or dispensing of such substances;" (4) "past experience in the distribution of controlled substances;" and (5) "such other factors as may be relevant to and consistent with the public health and safety." 21 U.S.C. § 823(b)(1)–(5).

Here, not only does every one of these factors weigh against the sanction of revocation recommended by the ALJ, but every one of these factors requires an analysis based on the most reasonably up-to-date information available. As DEA recognized in *Harline*, because "[t]he issue in this proceeding is whether Respondent's continued registration is inconsistent with the public interest," "[t]he state of Respondent's ***current practice is clearly relevant*** and this information was not available until after the conclusion of the hearing." 65 Fed. Reg. at 5671 (emphasis added). Indeed, it would be arbitrary and capricious to ignore (for example) the adequacy of the company's "control against diversion" during the most recent, and relevant years of operation. 21 U.S.C. § 823(b)(1). This is particularly so given the Government's almost exclusive reliance on the first factor, *see* RR at 90, and the ALJ's conclusion that it was "appropriate to focus only on Factor One, which weighs heavily in favor of revocation of the Respondent's Certificates of Registration." RR at 144. Likewise, there is no reason to exclude consideration of M&D's compliance with applicable law and past experience in the distribution of controlled substances over the past 31 months, each of which, along with other evidence, strongly weighs against revocation. *See* 21 U.S.C. § 823(b)(2), (4).

The fifth factor comprises "such other factors as may be relevant to and consistent with the public health and safety." 21 U.S.C. § 823(b)(5). This factor is effectively a catch-all, and sometimes includes considerations from other factors. *See, e.g.*, *Holloway Distrib.*, 72 Fed. Reg.

42118, 42125 (2007).  Here, the ALJ's recommendation to put a 181-year-old, fully remediated company out of business failed to consider and properly weigh numerous factors compelling a contrary conclusion.  But there are some factors that the ALJ did not consider because they were not before him.  Specifically, the ALJ did not have the benefit of evaluating M&D's substantial contributions to the country's ongoing battle against the COVID-19 pandemic.  Surely, in considering the public interest in continued registration, this factor should be afforded substantial weight.

Indeed, if the Recommended Rulings are adopted, DEA would shutter a key player in America's health care infrastructure in the midst of an ongoing global pandemic, thereby interrupting the supply of critical lifesaving and therapeutic treatments to hospitals and pharmacies.  M&D has served the southern United States region heroically throughout the COVID-19 pandemic.  Louisiana has been particularly hard hit by COVID-19, having experienced over 859,000 total cases and 15,000 deaths.[10]  And as the COVID-19 Delta and Omicron variants continue to proliferate rapidly throughout the country, M&D remains vital to the front lines of Louisiana's response, after the government turned to it in 2020 to distribute all COVID-19 vaccine doses in Louisiana outside of hospital systems, designating it the state's vaccine distribution facility.[11]  In total, M&D has distributed more than 1.2 million COVID-19 vaccine doses.  M&D has proven indispensable to that effort because it owns the only facility in Louisiana with the ultra-cold storage equipment, packing, and shipping capability to safely deliver the Pfizer vaccine.  It has used its assets to deliver the Pfizer vaccine to hundreds of medical facilities statewide, totaling 730,047 Pfizer vaccine doses delivered to date, pursuant to Louisiana's equitable "low and wide"

---

[10] *See Covid-19 Information*, La. Dep't of Health, https://ldh.la.gov/Coronavirus/ (last visited Jan. 3, 2022).

[11] *See Shreveport Companies Behind Statewide COVID Vaccine Delivery*, KSLA News (Dec. 5, 2020), https://www.ksla.com/2020/12/05/shreveport-companies-behind-statewide-covid-vaccine-delivery/.

distribution plan. Under the "low and wide" distribution plan, M&D distributes low quantities of vaccine doses to remote locations throughout the state that other suppliers do not have the capability to reach and that otherwise would not have had access to this critical tool in defeating the virus.[12] Without M&D, Pfizer vaccine distribution to all but the largest medical centers in Louisiana would not have been possible.

M&D's vaccine distribution was not limited to the Pfizer vaccine. To date, the company distributed 299,240 doses of the Moderna vaccine and 61,955 doses of the Johnson & Johnson vaccine. Recently, M&D has worked tirelessly to deliver COVID-19 vaccines to Louisiana children ages 5–11, having already distributed approximately 132,680 doses to 514 locations throughout the state. And beyond its vaccine distribution, M&D has also partnered with Louisiana to distribute lifesaving COVID-19 testing and treatments at no cost, including delivery of COVID-19 tests to K-12 schools throughout the state. As referenced above, as a result of its extraordinary efforts, the Louisiana House of Representatives issued a Commendation in May 2021 praising M&D's enormous contribution to the state's health during the pandemic, and affirming that the company "is most deserving of recognition for the vitally important role it has played during the ongoing pandemic and for its service to the state of Louisiana."[13] And on December 1, 2021, the Louisiana Department of Health recognized that "[b]y using M&D," "Louisiana trends well below the national average for vaccine wastage."[14] Without M&D's "vital role" throughout the pandemic, public health and safety would have greatly suffered. The DEA has implicitly relied

---

[12] A map illustrating the locations that M&D has delivered vaccines to under the "low and wide" distribution plan is annexed to the Declaration of Jim Walden ("Walden Decl.") as Ex. 1.

[13] House Res. No. 56, 2021 Reg. Sess. (La. 2021), https://www.morrisdickson.com/wp-content/uploads/2021/06/LAHouseResMorrisDickson.pdf.

[14] *See* Provider/Partner COVID-19 Update Call, La. Dep't of Health, at 37 (Dec. 1, 2021), annexed to Walden Decl. as Ex. 2.

on M&D's contribution to the public interest by allowing the company to continue its lifesaving operations in the pandemic.

Additionally, in the 31 months since the hearing, M&D has proved indispensable during natural disasters. In February 2021, Louisiana was hit by a rare winter ice storm that knocked out power and disrupted water supply in the state, leading President Biden to issue a major disaster declaration.[15] Whereas other suppliers were immobilized by the storm, M&D continued to deliver critical pharmaceuticals throughout the state. And when Category 4 Hurricane Ida struck Louisiana in August 2021 as the second-most damaging hurricane in Louisiana history behind only Hurricane Katrina, M&D continued its distributions. On October 18, 2021, the Louisiana Department of Public Safety and Corrections Public Safety Services and the Louisiana State Police recognized M&D's heroic efforts during Hurricane Ida, praising it for "the supplies [it] graciously donated to support [state] troopers, Louisiana National Guard personnel, and others working in response to Hurricane Ida," which "were invaluable to those working tirelessly in the relief efforts."[16]

Proceeding to decision on the current, stale administrative record would disregard all of this new evidence directly relevant to the public interest, and that failure would be manifestly unfair and contrary to that same public interest; therefore, the Administrator should remand the case to ensure the new evidence is properly considered.

---

[15] *See Biden Declares Major Disaster in Louisiana After Ice Storm*, U.S. News (Mar. 9, 2021), https://www.usnews.com/news/best-states/louisiana/articles/2021-03-09/biden-declares-major-disaster-in-louisiana-after-ice-storm.

[16] *See* Letter from Captain Michael Mayeux, Troop G Commander, Louisiana State Police, to Paul Dickson Jr. and Morris & Dickson Company (Oct. 18, 2021), annexed to Walden Decl. as Ex. 3.

### III.    The Evidence Sought To Be Introduced Was Previously Unavailable

There can also be no dispute that the evidence sought to be introduced regarding M&D's post-hearing conduct was, by definition, previously unavailable.  As shown above, M&D's extensive post-hearing track record of compliance is the best evidence that its continued registration is consistent with the public interest.  *See Harline,* 65 Fed Reg. at 5671.  It would be arbitrary—and contrary to DEA's mission of furthering the public interest—to turn a blind eye to this probative evidence when Agency precedent clearly establishes a framework for reopening the record in appropriate cases.

### IV.    Reopening The Record Is Necessary To Provide A Complete Record Of The Agency's Reasoning For Purposes Of Judicial Review

Both the Administrator's decision regarding whether to reopen the record, as well as the final order in this matter when it is issued, will be subject to judicial review.  21 U.S.C. § 877; *see also Fry v. DEA,* 353 F.3d 1041, 1044 (9th Cir. 2003) (DEA decision on motion to reopen record is subject to abuse-of-discretion review).  A court reviewing the Agency's final decision, while ordinarily confined to the administrative record, may look outside of that record in certain circumstances, including where "evidence arising after the agency action shows whether the decision was correct or not."  *Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 5 (D.D.C. 2015) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).  As explained above, this is such a case, as M&D's post-hearing conduct is directly relevant to assessing the ALJ's predictions regarding its future conduct.  This is all the more reason for DEA to reopen the administrative record now and formally consider M&D's post-hearing conduct, which may in any event be considered by a reviewing court.  No legitimate purpose would be served in depriving a reviewing court of the benefit of DEA's expertise in assessing such post-hearing conduct.

### A.    Should The Record Be Reopened, Exculpatory Evidence And Evidence Of M&D's Good-Faith Compliance Is Properly Admitted

The ALJ's refusal to give any weight to—and in some instances, even consider—evidence of M&D's good faith efforts to comply with DEA regulations before the Order to Show Cause was erroneous.  *See, e.g., Harline,* 65 Fed. Reg. at 5671 ("The issue in this proceeding is whether Respondent's continued registration is inconsistent with the public interest.  The state of Respondent's current practice is clearly relevant and this information was not available until after the conclusion of the hearing.").  Among other things, these decisions will form the basis of an appeal of any final revocation order.  Because the administrative record should be reopened for all of the reasons discussed *supra*, reopening the record to allow M&D to introduce its historical good-faith compliance with DEA regulations would ameliorate the evidentiary error in excluding the evidence and would eliminate one more ground for appeal.

DEA has charged M&D with violating 21 C.F.R. § 1301.74(b).[17]   Under that provision, a registrant:

> shall design and operate a system to disclose to the registrant suspicious orders of controlled substances.  The registrant shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant.  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

21 C.F.R. § 1301.74(b).  Neither the federal regulations nor DEA administrative case law define the terms "unusual size" and "order of unusual frequency," or what it means for an order to "deviat[e] substantially from a normal pattern."

Unsurprisingly, DEA has been criticized often for failing to provide clarity on these terms

---

[17] DEA has also charged M&D with violating 21 C.F.R. § 1301.71(a).

and what is required under § 1301.74(b).[18]  In fact, a September 2019 report from the Office of the Inspector General recognized the provision's "shortcomings" and found that "the current language … results in inconsistencies in reporting because registrants seemingly are applying varying standards and thresholds regarding unusual ordering behavior."[19]  The report concluded, "DEA should establish regulations, policies, and procedures that specifically define what constitutes a suspicious order, as well as what information should be included in a suspicious order report."[20]

Against this backdrop of uncertainty, M&D has made valiant, good-faith efforts to establish and operate a system that complied with its DEA obligations.  Beginning in or around 2008, M&D developed a Market Basket Analysis approach.  *See* M&D's Proposed Findings of Fact and Conclusions of Law at ¶ 37.  Under this system, M&D created a report that showed a customer's controlled substances purchases by month, including the total dosage units of prescriptions most at risk of diversion and the percentage of trinity purchases by dollar amount

---

[18] *See* U.S. Gov't Accountability Off., GAO-16-737T, *DEA: Additional Actions Needed to Address Prior GAO Recommendations* 17 (2016) (concluding that DEA "guidance around best practices in developing suspicious order monitoring systems" and enhanced "proactive communication with distributors" would have been "key to addressing distributors' concerns, because without sufficient guidance and communication from DEA, distributors may not be fully understanding or meeting their roles and responsibilities under the CSA for preventing diversion"); *see also Industry Groups Cautious About DEA Changes to Opioid Quotas*, Controlled Substances Handbook Newsletter, July 2018 (quoting Anne McDonald, Senior Vice President of the Pharmaceutical Research Manufacturers of America, that DEA must "'expedite guidance related to monitoring for suspicious orders of controlled substances to provide additional clarity to DEA registrants … as they seek to address the opioid crisis'").

[19] *Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids*, Office of the Inspector General 31 (Sept. 2019).

[20] *Id.* at 32; *see also* U.S. Gov't Accountability Off., GAO-15-471, *More DEA Information about Registrants' Controlled Substances Roles Could Improve Their Understanding and Help Ensure Access* Preamble (2015) (recognizing that without "adequate guidance and communication from DEA, registrants may not fully understand or meet their CSA roles and responsibilities").  DEA has recently proposed amending §§ 1300.01, 1301.74(b) to define a "suspicious order," as "includ[ing]" but "not limited to" orders of unusual size, orders of unusual frequency, and orders that deviate substantially from a normal pattern.  Suspicious Orders of Controlled Substances, 85 Fed. Reg. 69282, 69298 (proposed Nov. 2, 2020). The proposed amendment also requires a registrant to operate a system to "identify suspicious orders based on facts and circumstances that may be relevant indicators of diversion in determining whether a person (or a person submitting an order) is engaged in, or is likely to engage in, the diversion of controlled substances."

and dosage. *Id.* at ¶ 38. Over time, the system was improved to include a customer's total monthly purchases, which provided M&D a complete picture of the customer's purchases with M&D. Where a customer had a high ratio of controlled substances to total purchases, the compliance officer assigned to that customer was authorized to investigate and stop shipment if the order proved to be suspicious. *Id.* at ¶¶ 38–39.

In 2013, M&D supplemented the Market Basket Analysis by retaining Pro Compliance Pharmacy Verification Systems ("Pro Compliance") as a consultant to analyze and report on the dispensing patterns of M&D customers. *Id.* at ¶ 42. Pro Compliance's reports examined, among other information, the customer's: (1) dispensing of controlled substances; (2) dispensing of highly diverted substances, such as oxycodone and hydrocodone; (3) prescriptions paid with cash; (4) top ten prescribers; and (5) "trinity" dispensing. *Id.* at ¶¶ 41, 44. Pro Compliance ultimately assigned each customer a risk rating and flagged those customers it considered to be high risk. M&D conducted a follow up investigation on any flagged customer to determine whether there was a legitimate explanation for the customer's high-risk business. *Id.* at ¶ 43. M&D terminated customers that could not justify their purchases. *Id.* Between 2008 and 2017, M&D terminated approximately 142 customers in a good-faith attempt to meet its anti-diversion responsibilities.

In addition to these efforts, M&D also undertook several efforts to develop software to enhance its suspicious order monitoring system. For example, in or around 2011, M&D tested software developed by third-party vendor SOM Link. *See* M&D's Prehearing Statement at 7–8. After testing, M&D determined that the software did not accurately capture suspicious orders. *Id.* In 2017, M&D attempted to develop in-house software that would send an email or text message to a compliance officer when a customer submitted a daily purchase request that was ten times greater than the customer's average per day purchase of that particular drug over the preceding 90

days. *See* M&D's Proposed Findings of Fact and Conclusions of Law at ¶ 45. This system unfortunately also proved unusable. Nevertheless, these efforts demonstrate M&D's commitment to comply with its obligations under DEA regulations.

Moreover, in 2016, M&D took the proactive approach of extending an invitation to then-DEA Assistant Administrator Lou Milione to its facility in Shreveport, Louisiana, which Mr. Milione accepted. *See* M&D's Proposed Findings of Fact and Conclusions of Law at ¶¶ 57–61. During the meeting in August 2016, M&D discussed its compliance efforts with Mr. Milione, as well as its ideas on how to improve regulations designed to combat diversion. *Id.* at ¶ 65. Mr. Milione later described M&D's presentation as "passionate, direct, and sincere." *Id.* ¶ 65 (quoting Tr. 861:13–17).

All this substantial evidence of M&D's historical good faith efforts to comply with DEA regulations is relevant to whether M&D's continued registration is in the public interest. *See infra* § 1(C). Yet the ALJ refused to consider this evidence in making his recommendation that M&D's licenses be revoked. *See* RR at 97–98; Transcript of Hearing at 115:12–14 (May 13, 2019). However, as detailed in a post-trial submission, this evidence is relevant to the determination of whether M&D maintained effective controls against diversion. *See* M&D's Proposed Findings of Fact and Conclusions of Law at ¶¶ 251–56. The ALJ therefore reached his decision on an incomplete record and the resulting ruling was arbitrary and capricious.

A final order by the Administrator that results in the revocation of M&D's DEA licenses will not survive judicial scrutiny. In addition, an appeal from an adverse final order will also expose the constitutional errors with DEA's entire ALJ system. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) (holding that ALJs are officers of the United States under the Constitution's Appointments Clause, and therefore must be appointed by the President, a court of law, or a

department head, and directing the SEC to remand all pending administrative cases for new proceedings before constitutionally appointed ALJs); *see also Marchant on behalf of A.A.H. v. Berryhill*, 2019 WL 2268982, at *2 (E.D. Pa. May 28, 2019) (citing *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018)) (extending *Lucia* to Department of Labor Federal Mine Safety and Health Review Commission ALJs); *Assoc. Mortg. Bankers, Inc. v. Carson*, 2019 WL 108882, at *7 (D.D.C. Jan. 4, 2019) (extending *Lucia* to Department of Housing and Urban Development ALJs).  Indeed, the Fifth Circuit recently ruled in *Cochran v. U.S. Sec. & Exch. Comm'n*, 2021 WL 5876747, at *2–4 (5th Cir. Dec. 13, 2021) that the statutory judicial review scheme in 15 U.S.C. § 78y does not strip the district court's jurisdiction over constitutional removal power challenges, and therefore a party need not exhaust the administrative process before bringing such a challenge.  By reopening the record to admit evidence of M&D's good faith efforts to comply with DEA regulations, DEA would eliminate an argument that is otherwise ripe for appeal.

## **CONCLUSION**

For all the foregoing reasons, M&D respectfully requests that the Administrator remand this case to an Administrative Law Judge with a request to reopen the record and receive evidence regarding M&D's demonstrated track record of remediation, compliance, and acceptance of responsibility over the past 31 months following the hearing, and to permit M&D to introduce exculpatory evidence and evidence of good-faith compliance with DEA's regulations, which the ALJ improperly excluded.

Thank you for your consideration of this request.

Respectfully submitted,

_____

Jim Walden
John Curran
Veronica Wayner
James Meehan
**Walden Macht & Haran LLP**
250 Vesey Street, 27th Floor
New York, New York 10281


_____

Ricardo Solano Jr.
Philip Biegler
**Friedman Kaplan Seiler & Adelman LLP**
7 Times Square
New York, New York 10036-6516


cc:     Robert C. Gleason
        Paul Dean
        John Beerbower