# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| MORRIS & DICKSON COMPANY, L.L.C., )<br><br>Petitioner, )<br><br>v. )<br><br>DRUG ENFORCEMENT ADMINISTRATION, )<br><br>Respondent. ) | No. 23-60284 |

## OPPOSITION TO PETITIONER'S MOTION
## FOR A STAY PENDING APPEAL

Petitioner is a wholesale drug distributor whose license to distribute controlled substances has been revoked by the Drug Enforcement Administration (DEA) for its repeated failure to comply with safety and reporting requirements. DEA has already delayed the revocation until August 28, 2023. Petitioner seeks an additional stay from this Court, but petitioner's claims are unlikely to succeed on the merits, and it cannot meet its burdens of demonstrating that it will suffer irreparable harm absent a stay and that the balance of equities favors a stay.[1]

---

[1] A certificate of interested persons is unnecessary as respondent is a United States agency. Fifth Cir. R. 27.4, 28.2.1.

Petitioner asserts that the administrative law judge (ALJ) who oversaw the administrative hearing in its case was improperly insulated from removal. But DEA's ALJs are protected by only a single, permissible layer of removal protection. Nor can petitioner demonstrate that it was harmed by the ALJ's removal protections, as is required to obtain relief.

Petitioner also complains that at the outset of the administrative proceeding, the ALJ had not yet been appointed to his position by the Attorney General. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018). But petitioner forfeited this claim by declining to seek relief it knew to be available. Moreover, petitioner's claim fails on the merits.

Petitioner challenges the merits of the revocation decision itself, but the record here amply supports the agency's decision. Petitioner does not deny that it committed widespread violations in the past and the agency was not required to accept petitioner's assertions that it has reformed when petitioner continues to minimize its past misconduct.

And petitioner's irreparable harm arguments prove too much. If business partners seeking stability are already unwilling to deal with petitioner even though the revocation order will not be effective for several months, there is little reason to think a temporary stay from this Court will protect petitioner from further economic harm.

## STATEMENT

### A.     Legal Framework

The Controlled Substances Act (CSA), 21 U.S.C. § 801, *et seq.*, establishes a "comprehensive regime" with the main objectives of "control[ling] the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 12 (2005).  In enacting the CSA, "Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels." *Id.* at 12-13.  "To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Id.* at 13.  All persons in the "legitimate distribution chain" of controlled substances must be registered with DEA under criteria set forth in 21 U.S.C. § 823.  *See* H. Rep. No. 91-1444, pt. 1, at 23 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4589.  To prevent diversion, registered distributors are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" such as orders of unusual size or frequency.  21 C.F.R. § 1301.74(b).

The Administrator may revoke a registration upon a finding that a registrant "has committed such acts as would render [its] registration

under section 823 . . . inconsistent with the public interest." 21 U.S.C.
§ 824(a)(4).  Under 21 U.S.C. § 823(b) and (e), the statutory public interest
factors for a distributor are:

> (1)  maintenance of effective control against diversion of particular
> controlled substances into other than legitimate medical, scientific,
> and industrial channels;
> (2)  compliance with applicable State and local law;
> (3)  prior conviction record of applicant under Federal or State laws
> relating to the manufacture, distribution, or dispensing of such
> substances;
> (4)  past experience in the distribution of controlled substances; and
> (5)  such other factors as may be relevant to and consistent with the
> public health and safety.

*Morris & Dickson Co., LLC; Decision and Order*, 88 Fed. Reg. 34,523,
34,532 (May 30, 2023).  Any one or a combination of factors may support
revocation.  *See id.* at 34,533.

## B.    Factual Background

DEA developed evidence that from January 2014 until April 2018,
petitioner shipped approximately 7,000 unusually large orders of
oxycodone and almost 5,000 unusually large orders of hydrocodone yet

filed only 3 suspicious order reports with DEA. 88 Fed. Reg. at 34,523. In May 2018, DEA commenced an administrative proceeding to revoke petitioner's registrations to distribute controlled substances in schedules II through V (the schedules for pharmaceutical substances). *Id. See* 21 U.S.C. §§ 823(b), (e), 824(a).

Petitioner requested a hearing before a DEA ALJ and then later sued DEA in district court, seeking to enjoin the administrative proceeding based on Appointments Clause and separation-of-powers challenges to the ALJ. 88 Fed. Reg. at 34,542. The district court dismissed the complaint for lack of jurisdiction. *Morris & Dickson Co. v. Whitaker*, 360 F. Supp. 3d 434, 437 (W.D. La. 2018). Petitioner appealed but then dismissed its appeal before filing an opening brief. *Morris & Dickson v. Barr*, No. 19-30043 (5th Cir.).

Proceedings continued before the ALJ, and DEA presented evidence that petitioner's continued registrations would be inconsistent with the public interest. 88 Fed. Reg. at 34,523-24. Expert and fact witness testimony was presented regarding the regulatory requirements for distributors, the statistical analysis used to determine that petitioner failed to report suspicious orders, and the DEA regulatory requirements imposed on registrants to identify and investigate red flags. *Id.* at 34,523. Red flags

can include a pharmacy dispensing a high volume of narcotics; dispensing disproportionally more controlled substances than non-controlled substances; filling prescriptions for customers who live far away from the pharmacy; and filling prescriptions for a high volume of patients who pay for prescriptions in cash.  *Id.*  Exemplary evidence regarding a handful of petitioner's pharmacy customers showed that petitioner repeatedly ignored such red flags.  *Id.* at 34,527-29.

The administrative proceeding culminated in review before the DEA Administrator, who found that the government had established a *prima facie* case that petitioner committed acts inconsistent with the public interest and that petitioner had failed to rebut that conclusion by unequivocally accepting responsibility for its misconduct and offering sufficient mitigating evidence to assure the Administrator that it should be entrusted with registrations.  88 Fed. Reg. at 34,537.  Petitioner's compliance officer had admitted that due diligence was not applied at the ordering level, that petitioner failed to implement and maintain a suspicious order monitoring system, that only three suspicious order reports were sent to DEA, and that orders of controlled substances were shipped for over four years without resolving red flags of potential diversion.  Yet his testimony minimized the extent of petitioner's

misconduct and did not establish the necessary unequivocal acceptance of responsibility.  *Id.* at 34,538.

Although, the Administrator's decision was originally to have taken effect 30 days after publication, the Administrator delayed the effective date for 90 days, *i.e.*, August 28, 2023.  88 Fed. Reg. at 34,522.

## STANDARD OF REVIEW

To obtain a stay pending appeal, petitioner must show: (1) a likelihood of success on the merits; (2) irreparable harm would occur absent a stay; (3) the potential harm to the movant outweighs the harm to the opposing party; and (4) the stay would serve the public interest.  *Vidal v. Gonzales*, 491 F.3d 250, 254 n.17 (5th Cir. 2007).  A stay pending appeal is not a matter of right, even if irreparable injury might otherwise result to the appellant.  *Nken v. Holder*, 556 U.S. 418, 427 (2009).

## ARGUMENT

## I.    PETITIONER IS NOT LIKELY TO SUCCEED ON THE MERITS

### A.    Petitioner Is Not Entitled To Retrospective Relief Based On Its Removal Challenge

**1.**  Petitioner's administrative hearing was held before an ALJ who could be removed for "good cause" by the Attorney General, 5 U.S.C. § 7521(a), who himself is removable at will by the President.  That single-layer of removal restrictions is constitutional.  *See Morrison v. Olson*, 487

U.S. 654, 691-93 (1988) (upholding statute that allowed the Attorney General to remove an inferior officer for "good cause"); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2192 (2020) ("Congress [may] provide tenure protections to certain *inferior* officers with narrowly defined duties."); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133 (9th Cir. 2021) (holding that "the President has sufficient control over [Department of Labor] ALJs to satisfy the Constitution"); *see also Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022) (recognizing that "not all removal restrictions are constitutionally problematic" and that inferior officers "may retain some amount of for-cause protection from firing"), *pets. for cert. pending* Nos. 22-859, 22-991 (U.S.).

Petitioner mistakenly argues that the ALJ's removal restrictions here are unconstitutional under *Jarkesy*, which held that the removal protections for ALJs of the Securities and Exchange Commission are unconstitutional (while declining to decide whether that conclusion would entitle the plaintiff to vacatur of the challenged agency decision). *See* 34 F.4th at 463-65, 463 n.17. Petitioner wrongly claims that there is "no material difference between SEC ALJs and DEA ALJs" (Mot. 10), ignoring that *Jarkesy* was decided on the understanding that "the SEC Commissioners may only be removed by the President for good cause," and

thus there were "two layers of insulation" that "impede[d] the President's power to remove" SEC ALJs, 34 F.4th at 464-65. By contrast, there is no doubt that the President may remove the Attorney General at will, so—unlike *Jarkesy*—there is only a single layer of removal restrictions.

Petitioner contends that because ALJ removals are reviewed by the Merit Systems Protection Board (MSPB), whose members have removal restrictions of their own, 5 U.S.C. § 1202(d), DEA ALJs are doubly insulated from removal. *Jarkesy* made passing reference to MSPB's removal restrictions, 34 F.4th at 464, but the Court emphasized the removal protections of the SEC Commissioners, not the MSPB.

And with good reason. It is the head of the employing agency (here, the Attorney General) who makes the policy decision of whether an ALJ should be removed. The MSPB's role is confined to determining whether the employing agency has demonstrated the good cause necessary to support the removal. It does not create a second, vertically integrated level of removal protection within a single executive agency.

Independent adjudication of whether cause for removal has been established does not represent an additional layer of removal restrictions. A contrary rule would render any removal restriction unenforceable and largely theoretical. Accordingly, the Supreme Court has seen no

"constitutional problem" in "judicial review of the removal decision" because the "possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority." *Morrison*, 487 U.S. at 693 n.33; *see United States v. Perkins*, 116 U.S. 483, 485 (1886) (reviewing removal of Navy officer). And if it is constitutional for a court—wholly beyond the control of the President—to adjudicate whether cause for removal has been demonstrated, it is *a fortiori* constitutional for an officer accountable to the President to conduct the same adjudication, which does not "put any additional burden on the President's exercise of executive authority." *Morrison*, 487 U.S. at 693 n.33.

A contrary holding would have remarkable implications. Various officers through the Executive Branch, including immigration judges, can only be removed "for such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a), and those removal decisions are reviewed by the MSPB, *id.* § 7513(d). That system of removal—which has consistently been understood to involve only a single layer of removal restriction—is constitutional. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 507 (2010) ("Nothing in our opinion, therefore, should be read to cast doubt on the use of what is colloquially known as the civil

service system within independent agencies.").  Indeed, the Supreme Court in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), conspicuously chose to *retain* removal restrictions for inferior officers, holding that other remedies ensured that those officers would be supervised in constitutionally adequate ways.  *Id.* at 1986-87.

**2.**  Even if the ALJ's removal protections created a separation-of-powers problem, petitioner has failed to demonstrate any prejudice that would entitle it to retrospective relief.  As the Supreme Court has explained, invalid removal restrictions do not necessarily unfairly affect a proceeding. *Collins v. Yellen*, 141 S. Ct. 1761, 1788-89 (2021); *see also Jarkesy*, 34 F.4th at 463 n.17 (referencing *Collins*).  Instead, a challenger must show that the removal restriction "cause[d] harm" by in fact prejudicing the President's control of the administrative proceeding—for example, by identifying a public statement in which the President "express[es] displeasure with actions taken by" the Commission and "assert[ing] that he would remove" the Commissioners "if the statute did not stand in the way."  *Collins*, 141 S. Ct. at 1789.

Applying *Collins*, this Court has held that there are "three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the

actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor." *Community Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022), *denying cert. to review this holding*, No. 22-663 (U.S.), *granting cert. on other grounds*, No. 22-448 (U.S.).  Petitioner does not attempt to satisfy any of those requirements, and there is no indication that the President attempted to remove the ALJ here or is dissatisfied with the ALJ's performance.  That failure is dispositive, as "plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire" the officer "*affected the complained-of decision*."  *Community Fin. Servs. Ass'n*, 51 F.4th at 632. Because petitioner has not shown "*a connection* between the President's frustrated desire to remove the actor and the agency action complained of," it is not entitled to retrospective relief.  *Id.* at 632-33; *accord Decker Coal*, 8 F.4th at 1137 (similar).[2]

Petitioner does not seriously contest that it cannot show prejudice as would be necessary to demonstrate entitlement to relief under this

---

[2] Limitations on the functions performed by DEA ALJs impose further obstacles to tracing any harm to the ALJ's removal protections. DEA ALJs issue only recommended decisions, 21 C.F.R. § 1316.65, which do not directly harm petitioner because only the politically accountable Administrator can issue a final order that carriers any effect, *id.* § 1316.67.

framework. Instead, petitioner asks this Court not to apply the governing test. Mot. 12. But petitioner fails to justify such a departure. *See Decker Coal*, 8 F.4th at 1137 (applying *Collins* analysis in challenge to ALJ removal protections); *Calcutt v. FDIC*, 37 F.4th 293, 317-20 (6th Cir. 2022) (same), *rev'd on the other grounds*, 143 S. Ct. 1317 (2023); *see also Calcutt*, 37 F.4th at 346 (Murphy, J., dissenting) (noting the lack of "historical precedent" for the proposition that invalid removal protections necessarily "render an officer's actions void" and that the "[t]he Supreme Court's recent cases have all held that unconstitutional removal provisions do not render the office to which they attach invalid or require courts to find actions taken by the officers void" (quotation marks omitted)).

Petitioner argues that a prejudice analysis is inappropriate because an ALJ's removal protections are "not severable from the officer's authority to act," reasoning that Congress "vested DEA ALJs with power *because* of their independence." Mot. 12. But petitioner's premise is mistaken. Congress directed that a proceeding to revoke a registration must comply with the APA's general procedures for adjudication, which do not require the use of an ALJ or any adjudicator with removal protections. *See* 21 U.S.C. § 824(c)(4) (requiring the use of APA procedures); 5 U.S.C. § 556(b) (APA adjudications can be conducted by "one or more members of the body

which comprises the agency" who need not have removal protections); *see also Kalaris v. Donovan*, 697 F.2d 376, 397-401 (D.C. Cir. 1983) (rejecting argument that administrative adjudicators must have protection from removal).  There is no ALJ-exception to *Collins*.

### B.    Petitioner's Appointments Clause Claim Is Forfeited And Fails On The Merits

**1.**  An Appointments Clause argument is forfeited when a party acknowledges that argument's existence but fails to develop or press it. *Jones Bros., Inc. v. Secretary of Labor*, 898 F.3d 669, 677 (6th Cir. 2018). This Court has recognized that it may properly decline to consider Appointments Clause challenges that are not preserved.  *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 (5th Cir. 2013).  Here, petitioner forfeited its Appointments Clause challenge by merely identifying it as an objection while declining to seek any corresponding action from the agency.

Petitioner asserts that it "repeatedly raised" an objection to the ALJ's appointment before the agency and in district court litigation.  Mot. 15; *see also* 88 Fed. Reg. at 34,542.  But context matters.  Petitioner told the ALJ that it was contemplating filing a motion regarding the "constitutionality of the DEA's administrative process."  Mot. Ex. D at 37 (pretrial submission). But at the hearing, petitioner explicitly disclaimed the notion that it was asking for any relief, insisting that it was merely making "a statement for

the record" and, "to be absolutely clear, we are not seeking anything, we are just stating our objection and preserving our rights for appeal." Opp. Ex. 1 at 23:11, 23:22-25.

Petitioner decided not to pursue relief even though it knew that relief was available. In an earlier prehearing conference, the ALJ informed petitioner that a motion for recusal would likely result in the case being assigned to a different ALJ. Opp. Ex. 2 at 36-37; *see id.* at 36:17-20 (ALJ: "I'm aware of a solicitor general opinion that basically suggested if anybody files a motion, the Judge is recused or needs to recuse himself."); *accord Lucia*, 138 S. Ct. at 2055 (holding that remedy for Appointments Clause challenge to ALJ is reassignment to a different, properly appointed ALJ). Such a reassignment would have eliminated any "taint" from the ALJ's pre-appointment work on the case. *Lucia*, 138 S. Ct. at 2055. Thus, by electing not "to press an argument" it had "acknowledge[d]," *Jones Bros.*, 898 F.3d at 677, petitioner forfeited its Appointment Clause claim.

**2.** The circumstances here do not warrant excusal for petitioner's forfeiture. In *Lucia*, 138 S. Ct. at 2049, the Supreme Court explained that an ALJ must be appointed in accordance with the Appointments Clause, and DEA has subsequently ensured that its ALJs are duly appointed. 88

Fed. Reg. at 34,542.  There is thus "little for [this Court] to add" to the law of that question.  *D.R. Horton*, 737 F.3d at 351.

Seeking relief from DEA would not have been futile.  Petitioner's assertion that the government's brief to the district court somehow indicated "that formally seeking reassignment would be rejected," and so rendered any such motion "futile," is inaccurate.  Mot. 16 (discussing Dkt. 24 at 14 n.5, *Morris & Dickson Co.*, No. 18-cv-1406 (E.D. La. Nov. 1, 2018)).  Although the government argued that the agency's ratification of the ALJ's appointment "cure[d]" the defect, Dkt. No. 24, at 14 n.5, it took no position with respect to any recusal motion petitioner might have filed after the district court dismissed the case.  And given the ALJ's indication that a recusal motion would likely be granted, petitioner had no reason to believe—much less to be certain—that such a motion would be futile.  *See* Opp. Ex. 2 at 37 (ALJ: "Apparently, if you file a motion, there's a good chance you'll wind up with a different Judge.").

Allowing petitioner to seek relief on this claim despite its earlier disavowal would therefore be contrary to principles of judicial efficiency and the goals of the Appointments Clause.  *See Ryder v. United States*, 515 U.S. 177, 183 (1995) (noting that remedies should incentivize *timely* Appointments Clause challenges).  It would also encourage

"sandbagging"—the practice of strategically declining to raise timely Appointments Clause challenges in the hopes of prevailing on the merits of the administrative proceeding while reserving the argument as a means of obtaining a "do-over" in the event of an unfavorable decision. *See Freytag*, 501 U.S. at 895 (Scalia, J., concurring in part and concurring in the judgment).

**3.** Should this Court choose to reach it, petitioner's Appointments Clause claim also fails on the merits. The Appointments Clause is "designed to preserve political accountability." *Edmond v. United States*, 520 U.S. 651, 662-63 (1997). Thus, to obtain the remedy prescribed by *Lucia*, a challenger must show that an officer exercised that authority by "hear[ing] and decid[ing the] case without the kind of appointment the Clause requires." *Lucia*, 138 S. Ct. at 2055. Here, the Attorney General duly ratified, and accepted responsibility for, the ALJ's appointment long before the ALJ considered any evidence or issued a decision. *See* 88 Fed. Reg. at 34,542.

Petitioner emphasizes that the ALJ was assigned to the case and made a handful of preliminary rulings before the ratification. But the circumstances here are unlike *Lucia*, where the ALJ had "already both heard Lucia's case and issued an initial decision on the merits" before his

appointment was ratified and thus could not "be expected to consider the matter as though he had not adjudicated it before." *Lucia*, 138 S. Ct. at 2055. Petitioner has received all that *Lucia* guarantees: a decision on the merits by a duly appointed ALJ, untainted by any prior decision predating his appointment.

### C. Petitioner Is Unlikely To Succeed On A Challenge To The Merits Of The Revocation Determination

**1.** Before this Court, the Administrator's findings of fact "are conclusive if supported by substantial evidence." *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 829 (11th Cir. 2018) (per curiam) (citing 21 U.S.C. § 877). Substantial evidence means "more than a mere scintilla but less than a preponderance." *Ameristar Airways, Inc. v. Administrative Review Bd.*, 771 F.3d 268, 272 (5th Cir. 2014). Further, this Court upholds an administrative agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). "[T]here is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Louisiana Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 558 (5th Cir. 2014).

Here, petitioner has failed to establish that revocation of its registrations is inconsistent with agency practice and procedure. DEA

"rationally may conclude that past performance is the best predictor of future performance," and it is not required to permit continued violations of the CSA. *Alra Labs., Inc. v. DEA*, 54 F.3d 450, 452 (7th Cir. 1995).

**2.** The Administrator determined there were "long-term, egregious failures" by petitioner in maintaining effective controls against diversion that spanned four years and involved multiple customers. 88 Fed. Reg. at 34,523. Petitioner failed to design an adequate suspicious order monitoring system and to report suspicious orders to DEA, as required under 21 C.F.R. § 1301.74(b). Petitioner also maintained very little documentation of its resolution of red flags. Despite petitioner's knowledge regarding its critical role in preventing "dangerous and potentially lethal consequences," it did not adequately resolve or document investigation into the numerous red flags indicating diversion that its own Pro Compliance Reports identified. 88 Fed. Reg. at 34,527, 34,540.

Additionally, a distributor's general duty to prevent diversion includes the duty to perform due diligence on its customers. 72 Fed. Reg. 36,487, 36,500 (July 3, 2007) (revocation decision); *see also* 80 Fed. Reg. 55,418, 55,476 (Sept. 15, 2015) (revocation decision). The reporting of suspicious orders is particularly important for DEA to be able to "conduct an investigation" and identify potential diversion. 88 Fed. Reg. at 34,529.

Yet petitioner failed to perform this responsibility.

Citing these violations of the applicable regulations, 21 C.F.R. §§ 1301.71(a), 1301.74(b), as adverse evidence under statutory factors 823(b)(1) (maintenance of effective control against diversion) and (b)(4) (past experience in the distribution of controlled substances), the Administrator concluded that the evidence "weigh[ed] strongly in favor of revoking" petitioner's registrations.  86 Fed. Reg. at 34,537.

Moreover, petitioner troublingly never grappled with the gravity of its misconduct.  Instead, petitioner's compliance officer dismissed petitioner's long-running, systemic violations as mere failures to operate "consistent with best practices."  88 Fed. Reg. at 34,523.  The Administrator reasonably determined that a distributor that would minimize widescale noncompliance with DEA regulations, and mistake affirmative legal requirements for mere best practices, has not demonstrated the necessary grasp of the significance of the requirements.  *Id.* at 34,538.

In reaching the determination that revocation was the appropriate sanction, the Administrator first addressed the Agency's principle that, when there is a *prima facie* case supporting revocation, the burden shifts to the registrant to demonstrate why it can still be entrusted with a registration in spite of its misconduct, and the Agency has emphatically

emphasized the requirement that the registrant unequivocally accept responsibility to re-establish that trust. 88 Fed. Reg. at 34,538; *see MacKay v. DEA*, 664 F.3d 808, 821 (10th Cir. 2011). Here, given petitioner's minimization of its wrongdoing, it was consistent with established agency policy to conclude that petitioner's registration should be revoked. *See* 88 Fed. Reg. at 34,538-39; *see also* 79 Fed. Reg. 62,957 (Oct. 21, 2014) (revoking registration), *petition denied* 626 F. App'x 493 (5th Cir. 2015) (per curiam) (rejecting petitioner's argument that DEA erred in determining he failed to accept responsibility for his actions where, while apologetic, petitioner equivocated and deflected blame).

**3.** This Court may not set aside the agency's choice of remedy unless it is "unwarranted in law or without justification in fact." *Butz v. Glover Livestock Comm'ns Co.*, 411 U.S. 182, 185-86, 188 (1973) (alterations omitted). Revocation of a registration is one of the legally authorized remedies available to the Administrator if the registration of the person or entity would be "inconsistent with the public interest." *See* 21 U.S.C. §§ 823(b), (e), 824(a)(4). Petitioner's arguments mischaracterize the Agency's decision as failing to meaningfully consider petitioner's revised operations, Mot. 17, however, the Administrator thoroughly considered petitioner's lack of established trust, enforceable assurances of future

compliance, and alternative sanctions before deciding that revocation is the most appropriate sanction.  88 Fed. Reg. at 34,541.  "[A] sanction less than revocation would send a message to the current and prospective registrant community that compliance with DEA regulations is not a condition precedent to maintaining a DEA registration and that a distributor can spend years insufficiently reporting suspicious orders and inadequately resolving red flags presented by its customers, so long as it finally invests in the procedures it should have had in place all along after it is caught and faces potential consequences."  *Id.* at 34,540-41 (footnote omitted).  It was not arbitrary and capricious for the Administrator to conclude that petitioner's continued registrations would be inconsistent with the public interest.

**4.**  Nor is there merit to petitioner's accusations that the scope or timing of the order here are pretextual.  With respect to the order's scope, as detailed above, the Administrator's thorough and carefully reasoned decision is consistent with a comprehensive review of the record and longstanding agency policy.  As to timing, petitioner asserts that the Administrator "justified" the timing of the order based on an (allegedly inaccurate) breakdown in settlement negotiations (Mot. 22), but that argument fundamentally misunderstands footnote 92 of the

22

Administrator's decision.  88 Fed. Reg. at 34,540 n.92.  In fact, footnote 92 says nothing about the order's timing.  Rather, it notes that revocation was appropriate in part because "the parties ha[d] not reached a settlement" in this case and therefore there was no "way [for Petitioner] to provide enforceable assurances of . . . future compliance" with the CSA and its underlying regulations.  *Id.*  Moreover, Petitioner has failed to identify a legal basis, nor is there any, for disturbing a substantively and procedurally proper final order in a long-pending matter based on its timing.

## II.     PETITIONER HAS NOT DEMONSTRATED THAT A STAY WILL PREVENT ITS ALLEGED ECONOMIC HARM

To secure a stay pending appeal, petitioner must demonstrate "irreparable injury absent a stay." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021).  Here, petitioner's sole claim of injury is that its customers will choose to purchase controlled substances elsewhere, Mot. 24-25, and that "manufacturers have already stopped supplying" petitioner with controlled substances, Petitioner's June 7 Letter (emphasis omitted).  But petitioner fails to demonstrate that a stay will cause any of those customers and manufacturers to change course.

As petitioner's declarants explain, "customers will not stay in a relationship that poses risk to their supply," and they "cannot easily change distributors on a moment's notice."  Hatcher Decl. 4.  Well before DEA

issued its final order, several of petitioner's customers had "permanently terminated their relationships," and many others temporarily ceased purchasing from petitioner. *Id.* at 5. That is because "sourcing pharmaceuticals from thousands of manufacturers" is "complex" and customers prefer certainty and stability. Hunter Decl. 3.

The same stability concerns guide the choices of drug manufacturers. Even after petitioner sought judicial review, moved for a stay, and presented its various arguments for challenging DEA's revocation decision, "key manufacturers ha[d] terminated their supply of controlled substances to" petitioner. Hatcher Suppl. Decl. 2. That suggests that these entities preferred certainty—not to have their decisions depend on the outcome of a stay motion or litigation. Petitioner points to nothing in its declarations to support the proposition that a stay would cause those customers and manufacturers to re-engage in substantial business with petitioner during the pendency of this litigation. And there is a perfectly sound reason why customers and manufacturers would wish to disassociate from petitioner— petitioner does not contest DEA's conclusions that it violated its statutory obligations by failing to maintain effective controls against the diversion of oxycodone and hydrocodone. Third parties are free to contract with those

they wish; and to not deal with individuals and companies who have violated their legal obligations.

## III. PETITIONER HAS NOT SHOWN THAT THE EQUITIES WEIGH IN ITS FAVOR

As the Administrator explained, the "record demonstrates that [petitioner's] violations of the law were not isolated occurrences, but took place over the course of four years and involved multiple customers." 88 Fed. Reg. at 34,540. Against those demonstrated violations, it is petitioner's burden to "demonstrate why it can still be entrusted with a registration in spite of its misconduct." *Id.* at 34,538. The Administrator recognized that petitioner had made some remedial efforts, but those efforts were overshadowed by petitioner's minimization of its misconduct, which cast substantial doubt on whether "[petitioner] can be entrusted with a registration." *Id.* at 34,539. And there can be no doubt that "the public interest is served" by "making a heavily-abused opioid less susceptible to abuse." *Endo Pharms. Inc. v. Amneal Pharms., LLC*, 2016 WL 1732751, at *7 (S.D.N.Y. Apr. 29, 2016).

Petitioner also emphasizes the length of time the matter was pending before the agency. But the delays in the adjudication were attributable in significant part to the agency's accommodation of requests by petitioner. 88 Fed. Reg. at 34,541 n.97. The agency's determination that

countervailing considerations, including the COVID-19 crisis, merited postponing final action in this case, does not mean that petitioner poses no ongoing harm to the public—particularly now that it is no longer subject to the scrutiny of an ongoing administrative enforcement proceeding.

## CONCLUSION

The motion for a stay pending appeal should be denied.

Respectfully submitted,

 */s/ Anita J. Gay*
ANITA J. GAY
*(202) 353-7629*
*Trial Attorney*
*Criminal Division, Narcotic*
*and Dangerous Drug Section*
*U.S. Department of Justice*
*145 N Street NE, 2nd Floor*
*Washington, DC  20530*

Anita.Gay2@usdoj.gov

 */s/ Daniel Aguilar*
JOSHUA M. SALZMAN
DANIEL AGUILAR
ANNA M. STAPLETON
*(202) 514-5432*
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave. NW*
*Washington, DC  20530*

Daniel.J.Aguilar@usdoj.gov

June 2023

**CERTIFICATE OF SERVICE**

I certify that on June 14, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel Aguilar*
DANIEL AGUILAR

**CERTIFICATE OF COMPLIANCE**

I certify that this response to petitioner's motion complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it contains 5,188 words.

*/s/ Daniel Aguilar*
Daniel Aguilar

# ADDENDUM

# EXHIBIT 1

## Excerpt of May 13, 2019, Hearing Transcript

UNITED STATES DEPARTMENT OF JUSTICE

DRUG ENFORCEMENT ADMINISTRATION

HEARING

_____
                                        :
IN THE MATTER OF:                       :
                                        :
MORRIS & DICKSON CO., LLC    : Docket No. 18-31
                                        :
_____:

          Monday,
          May 13, 2019

          Courtroom A

          Drug Enforcement Administration

          Office of Administrative Law Judges

          1550 Crystal Drive

          Suite 901

          Arlington, Virginia 22202


          The above-entitled matter came on for
hearing, pursuant to notice, at 9:30 a.m.



   BEFORE:     THE HONORABLE CHARLES WM. DORMAN,
               U.S. Administrative Law Judge

**APPEARANCES:**

      On Behalf of the Government,
      Drug Enforcement Administration:

           PAUL A. DEAN, ESQ.
           JOHN E. BEERBOWER, ESQ.
      of:   Drug Enforcement Administration
           Diversion and Regulatory
             Litigation Section
           Office of Chief Counsel
           8701 Morrissette Drive
           Springfield, VA 22152
           202-307-8038 (Dean)
           202-307-4736 (Beerbower)
           paul.a.dean@usdoj.gov
           john.e.beerbower@usdoj.gov

      On Behalf of the Respondent,
      Morris & Dickson Co., LLC:

           JODI AVERGUN, ESQ.
           KEITH GERVER, ESQ.
      of:   Cadwalader, Wickersham & Taft, LLP
           700 6th Street, NW
           Washington, D.C. 20001
           202-862-2456
           jodi.avergun@cwt.com
           keith.gerver@cwt.com
           cheryl.risell@cwt.com

           JOSHUA ARNOLD, ESQ.
      of:   Cadwalader, Wickersham & Taft, LLP
           200 Liberty Street
           New York, NY 10281
           212-504-5601
           joshua.arnold@cwt.com

**ALSO PRESENT:**
CHERYL RISELL, Law Clerk, Cadwalader, Wickersham
      & Taft, LLP

20

1  protective order is best raised to the
2  Administrator, as they were in CVS.
3        Mr. Dean, in my second prehearing
4  ruling, which was dated January 10, 2019, and I
5  asked the Government to clarify why pages 1 and 2
6  in the proposed Government Exhibits 7, 8, and 15
7  appear to be the same.  Perhaps you complied with
8  my ruling and I simply missed it, but in getting
9  ready for the hearing today, I'm still puzzled.
10  Is there some difference in pages 1 and 2 of each
11  one of those exhibits?
12        MR. DEAN:  No, Your Honor, but that's
13  the way the record is, it's a double copy.  So we
14  didn't want to split the record, because it is
15  stored that way, two versions together.
16        JUDGE DORMAN:  Okay, so I can ignore
17  page 2 in each one of those and I won't miss
18  anything at all?
19        MR. DEAN:  Yes, Your Honor.
20        JUDGE DORMAN:  Okay.  Is there
21  anything further that either party would like to
22  address before we move into opening statements?
23        MS. AVERGUN:  Yes, Your Honor.  Your
24  Honor, with due respect, we do have a preliminary
25  matter.

21

1        We continue to renew our objection and
2  continue to object to the hearing on the grounds
3  that this administrative proceeding is
4  unconstitutional.  Specifically, Your Honor, and
5  again with respect, the statutes, regulations,
6  and administrative policies, as applied by DEA
7  and the United States Department of Justice,
8  providing for the appointment and removal of DEA
9  administrative law judges are unlawful, violate
10  the appointment clause in constitutional
11  separation of powers principles of the
12  Constitution.  Respondent, and indeed the public
13  interest, will suffer irreparable injury is
14  Morris & Dickson is subjected to this
15  unconstitutional administrative proceeding.
16        As Your Honor is aware, we have raised
17  this objection before.  On May 30, less than two
18  weeks after receiving the order to show cause, I
19  provided a notice to DEA Chief Counsel of the
20  constitutional objection.
21        And then we objected to the proceeding
22  on the grounds of the unconstitutional
23  appointment and removal of DEA administrative law
24  judges in a July 13, 2018 submission to this
25  Tribunal.  And in our August 3, 2018 prehearing

22

1  statement and then in an August 8, 2018
2  prehearing conference.
3        On October 26, 2018, as you alluded to
4  this morning, Your Honor, we filed a complaint in
5  the U.S. District Court for the Western District
6  of Louisiana seeking declaratory and injunctive
7  relief to enjoin this proceeding, which complaint
8  was dismissed by the U.S. District Court for lack
9  of subject-matter jurisdiction after a delay of
10  time.
11        Your Honor, Respondent is aware and
12  mindful of your ruling of November 1, 2018, in
13  which the Tribunal stated that it did not have
14  the authority to rule on the constitutionality of
15  its appointment as an ALJ.  However, we
16  respectfully renew for the record our objection
17  to the hearing and proceeding.
18        JUDGE DORMAN:  That was very nice of
19  you to submit that in writing ahead of time.  Do
20  you have a response?
21        MR. DEAN:  Your Honor, our response is
22  short and simple.  This is the first time they've
23  actually ever objected to this proceeding.  And
24  in January of this year, Respondent had an
25  agreement with this party, with this Court, and

23

1  with the Government not to object to this
2  proceeding on these grounds.
3        MS. AVERGUN:  We're not -- we did not
4  violate any agreement, we said we would not seek
5  any further delays or file any additional
6  motions.  We are here doing the proceeding.  I am
7  noting the continued objection for the record,
8  simply.
9        JUDGE DORMAN:  Oh, it's not a motion?
10        MS. AVERGUN:  It is not a motion, no.
11  It is just a statement for the record.
12        JUDGE DORMAN:  We stand in recess.
13        (Whereupon, the above-entitled matter
14  went off the record at 9:51 a.m. and resumed at
15  10:00 a.m.)
16        JUDGE DORMAN:  Ms. Avergun, are you
17  asking me to do anything with what you've just
18  laid out on the record?
19        MS. AVERGUN:  No, sir, I'm not, and I
20  sincerely apologize for taking the Court aback.
21  I did not do -- mean to do anything but preserve
22  our objection on the record.  But to be
23  absolutely clear, we are not seeking anything, we
24  are just stating our objection and preserving our
25  rights for appeal.  We had no --

24

1    JUDGE DORMAN:  Again -- okay, so
2  you're ready to go to hearing today?
3    MS. AVERGUN:  Yes, sir.
4    JUDGE DORMAN:  Okay.  Government, do
5  you believe that I need to do anything with what
6  Respondent's Counsel just pledged on the record?
7    MR. DEAN:  No, Your Honor.  I would
8  perhaps suggest you note that the objection was
9  untimely and therefore is waived.
10    JUDGE DORMAN:  Well, I think the
11  Administrator has already told me that I don't
12  have the -- really, the ability to rule on
13  whether something has been waived or not on other
14  cases that I've dealt with.  So I don't see any -
15  - that would be kind of fun to do, but I don't
16  think it would amount to a whole lot.
17    (Laughter.)
18    All right.  Is there anything else
19  that's surprising before we move into opening
20  statements?
21    MS. AVERGUN:  Not from me, Your Honor.
22    JUDGE DORMAN:  Okay.
23    MR. DEAN:  No, Your Honor.
24    JUDGE DORMAN:  All right, Mr. Dean, do
25  you wish to make an opening statement?

25

1    MR. DEAN:  Yes, Your Honor.
2    JUDGE DORMAN:  Okay.
3    MR. DEAN:  Good morning, Your Honor,
4  Ms. Avergun, Mr. Arnold, Mr. Gerver, Ms. Risell,
5  I believe.  I apologize to anyone I may have
6  missed.  May it please the Court.
7    The issue before the Court, as you
8  stated previously, is whether Morris & Dickson's,
9  the Respondent's, continued registrations are in
10  the public interest.  The Government's
11  unequivocal position is that no, they are not.
12    It is well settled that DEA bears the
13  initial burden in these cases to establish by a
14  preponderance of the evidence that the
15  Respondent's registrations are inconsistent with
16  the public interest.
17    Having met that burden, the burden
18  shifts to Morris & Dickson, and they must
19  explicitly accept responsibility for their
20  actions.  And then they may attempt to show
21  remedial measures to correct their previous
22  behavior.
23    It is a fundamental fact of DEA case
24  law, however, that any offered remedial measures
25  by the Respondent are irrelevant without a clear

26

1  acceptance of responsibility for the charges
2  proven by the Government.
3    This case involves the interplay of
4  revenue, responsibility, and the regulatory
5  framework.  The evidence will illustrate the
6  problems that occur when revenue is prioritized
7  over responsibility to the public within a
8  regulated industry.
9    Government evidence consists of files
10  and data provided by Morris & Dickson in response
11  to various Government subpoenas, Government
12  witness testimony, and Government data, including
13  ARCOS data.
14    The Government witness -- ARCOS,
15  including ARCOS data.
16    JUDGE DORMAN:  Thank you.
17    MR. DEAN:  The Government witnesses
18  will testify that the opioid epidemic in the
19  United States continues unabated.  Yet all the
20  evidence will show that one of the largest
21  distributors in the country cavalierly ignored
22  warnings from the DEA, from its own third-party
23  compliance vendor, and indeed from its own
24  employees, and continued to ship hundreds of
25  millions of oxycodone and hydrocodone pills

27

1  across the South for years, at least through
2  early 2018.
3    The evidence will show that controlled
4  substance distributors operate in a highly
5  regulated framework monitored by DEA to protect
6  the public.  Compliance with the requirements of
7  this framework is not unduly onerous, but it is
8  not optional.  Government witnesses will explain
9  that the requirements of this framework spin from
10  the Controlled Substances Act, the implementing
11  regulations, and legal precedent, and that all
12  distributors are charged with knowledge of these
13  requirements.
14    The evidence will show that these
15  requirements mean, and the Government witnesses
16  will testify, that distributors have two related
17  obligations.  An obligation to maintain effective
18  controls against, diversion, and an obligation to
19  design and operate a system to disclose to the
20  Respondent suspicious orders of controlled
21  substances.
22    Government witnesses will further
23  explain that, therefore, distributors have a
24  preliminary due diligence requirement, an
25  obligation, before shipping to a customer to

# EXHIBIT 2

## Excerpt of August 10, 2018, Conference Transcript

UNITED STATES DEPARTMENT OF JUSTICE

DRUG ENFORCEMENT ADMINISTRATION

PRE-HEARING CONFERENCE

_____
                                    :
IN THE MATTER OF:                   :
                                    :
MORRIS & DICKSON CO., LLC.   : Docket No. 18-31
                                    :
                                    :
_____:

                    Friday,
                    August 10, 2018

                    Courtroom A
                    Drug Enforcement Administration

                    Office of Administration Law Judges

                    1550 Crystal Drive

                    Suite 901

                    Arlington, Virginia


                    The above-entitled matter came on
for hearing, pursuant to notice, at 2:00 p.m.


    BEFORE:      THE HONORABLE CHARLES WM. DORMAN,

                 U.S. Administrative Law Judge

APPEARANCES:


  On Behalf of the Drug Enforcement
Administration:

    PAUL A. DEAN, ESQ.
    JOHN E. BEERBOWER, ESQ.
  of:  Drug Enforcement Administration
    Diversion and Regulatory Litigation
    Section
    Office of Chief Counsel
    8701 Morrissette Drive
    Springfield, VA 22152
    202-307-8038 (Dean)
    202-307-4736 (Beerbower)
    paul.a.dean@usdoj.com
    john.e.beerbower@usdoj.gov



  On Behalf of the Respondent, Morris &
Dickson Co., LLC:

    JODI AVERGUN, ESQ.
    KEITH GERVER, ESQ.
  of:  Cadwalader, Wickersham & Taft, LLP
    700 6th Street, NW
    Washington, D.C. 20001
    202-862-2456
    202-862-2400 fax

    jodi.avergun@cwt.com

    keith.gerver@cwt.com

1          MS. AVERGUN:  Shall we talk about the

2     other matters Section of the pre-Hearing

3     statements, Your Honor or is that part of

4     scheduling?

5          JUDGE DORMAN:  I think your other

6     matters -- what would you like to talk about?

7          MS. AVERGUN:  Well, first of all, Your

8     Honor, with regards to the Lucia case, this is

9     obviously no disrespect intended to the Court but

10    we do think that it's a significant issue that

11    should we proceed to hearing, we do want to

12    address and I would like to file a motion about

13    it.  So, I need --

14         JUDGE DORMAN:  Well, if you're going

15    to file a motion about it, I obviously would need

16    to take a look at it.

17         I'm aware of a solicitor general

18    opinion that basically suggested if anybody files

19    a motion, the Judge is recused or needs to recuse

20    himself.

21         Because of Lucia, the absolutely silly

22    portion of that decision that says the Judge that

23    heard the case can't hear it a second time,

24    although that happens in Federal Court all the

25    time and in State Court all the time, but as an

1  Administrative Law Judge, we don't have the
2  capability to hear something twice.
3          Apparently, if you file a motion,
4  there's a good chance you'll wind up with a
5  different Judge.
6          MS. AVERGUN:  Fair enough.
7          JUDGE DORMAN:  That's not a threat,
8  I'm just telling you, again, just putting you on
9  notice that that's what's likely to happen.
10          MS. AVERGUN:  I understand, Your
11  Honor.
12          JUDGE DORMAN:  Anything else that you
13  want to talk about, preliminary matters or other
14  matters?
15          MS. AVERGUN:  No, just the motion
16  schedule when we talk through the schedule.
17          JUDGE DORMAN:  Mr. Dean how soon can
18  you have your Exhibits to the Respondent?
19          MR. DEAN:  Within a week, Your Honor.
20          MS. AVERGUN:  So would that be before
21  the supplemental statement?
22          JUDGE DORMAN:  That's my plan, yes.
23  Obviously, you're expert witness would probably
24  like to look at it because your supplemental
25  pre-Hearing statement elaborating, he needs to